## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| JESSIE HOFFMAN,<br><br>                  Plaintiff,<br><br>     v.<br><br>GARY WESTCOTT, Secretary, Louisiana Department of Public Safety and Corrections; DARREL VANNOY, Warden, Louisiana State Penitentiary; and JOHN DOES, unknown executioners,<br><br>                  Defendants. | Civil Action No. 25-169 |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

### EXECUTION SET FOR MARCH 18, 2025

### NATURE OF THE CASE

1.      This action is brought by Plaintiff Jessie Hoffman pursuant to 42 U.S.C. § 1983 seeking declaratory and injunctive relief for violations and threatened violations of Mr. Hoffman's rights under the First, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

2.      Three decades ago, Louisiana made lethal injection the sole means of executing condemned inmates in the State. Lawmakers at the time explained that the prior method—electrocution—was a "gruesome," "ghastly," and "horrible" way to die. Last year, Louisiana amended La. Rev. Stat. § 15:569 and § 15:570, shrouding the execution process in secrecy and expanding the methods of execution to include nitrogen "hypoxia" and the electric chair. The Secretary of the Department of Public Safety and Corrections ("DPSC") now has the unfettered authority to choose between nitrogen gas, lethal injection, or electrocution in carrying out a sentence of death.

3.      Less than twenty-six days before Mr. Hoffman's scheduled execution date on March 18, 2025, the DPSC notified Mr. Hoffman that he would be executed by nitrogen hypoxia, that is, by forced nitrogen gassing.  Nitrogen gas has been used to kill condemned individuals in only one state, Alabama, and each of the four times it has been used it has resulted in an excruciating, prolonged death that was horrifying for both the person being executed and those who bore witness.

4.      Mr. Hoffman has been deprived of notice regarding the protocol that will be used to kill him.  On Monday, February 10, 2025, Governor Jeffrey Landry announced that the State had "finalized and implemented an updated [execution] protocol" and would promptly resume executions.[1]  The Governor did not release the protocol.  Rather, his office released a half-page "summary" of a new nitrogen gas "protocol."[2]  Defendants have rejected Mr. Hoffman's requests for the actual protocol.

5.      Defendants are moving forward at warp speed to use Mr. Hoffman as a test case for an unusual method of execution, never used by this State, which is known to cause a terrifying and excruciating death.  It took Alabama five years of preparations to begin to employ gas as a method of execution.  Each time it has been used, witnesses report that the inmate "gasped, shook and struggled against his restraints,"[3] "rocked his head, shook and pulled against the gurney

---

[1] Press Release, Louisiana Governor Jeff Landry, *Promises Made, Promises Kept: Justice Coming for Crime Victims* (Feb. 10, 2025), https://gov.louisiana.gov/news/4762.
[2] *Id*.
[3] Marty Roney, *Alabama Executes Alan Eugene Miller with Nitrogen Gas*, Montgomery Advertiser (Sept. 26, 2024 7:45 PM), https://www.montgomeryadvertiser.com/story/news/crime/2024/09/26/alabama-executes-alan-eugene-miller-with-nitrogen-gas/75360739007/.

restraints,"[4] "struggle[d] to breathe,"[5] "heav[ed] and retch[ed] inside the mask,"[6] and "gasp[ed] for air."[7]

6.      Based on Defendants' prior execution protocols and previous actions, the current undisclosed execution protocol does not adequately protect Mr. Hoffman from cruel and unusual punishment in violation of the Eighth Amendment of the United States Constitution.  Specifically, the execution protocol creates a substantial risk of suffering a lingering or unnecessarily painful death due to: the manner of execution; the insufficient training, expertise, and supervision of those involved in the administration of this new method of executions; and the precipitate, arbitrary and haphazard implementation of the protocol and procedures to be utilized in the implementation of the execution.  Mr. Hoffman additionally raises an as-applied Eighth Amendment challenge to execution by nitrogen hypoxia, that is, forced nitrogen gassing method.

7.      Defendants have also violated other protections under the United States Constitution and applicable law:

8.      First, execution of Mr. Hoffman by nitrogen gassing violates the *ex post facto* clause of Article I, Section 10, clause 1 of the United States Constitution because the method of execution has been changed by Defendants to a manner that is more painful or protracted than the method in effect at the time that Mr. Hoffman was originally sentenced.

---

[4] Kim Chandler, *Alabama Carries out Nation's Third Nitrogen Gas Execution on a Man for Hitchhiker's Killing*, Associated Press (Nov. 22, 2024 7:15 AM), https://apnews.com/article/death-penalty-nitrogen-execution-alabama-09450359e223a9d38a5fb24e87fcfb45.
[5] Sarah Clifton, *Alabama Executes Demetrius Frazier by Nitrogen Gas for 1991 Murder*, Montgomery Advertiser    (Feb.    6,    2025    8:46    PM), https://www.montgomeryadvertiser.com/story/news/local/alabama/2025/02/06/alabama-executes-demetrius-frazier-by-nitrogen-gas-for-1991-murder/78282236007/.
[6] Lee Hedgepeth, '*Never Alone': The Suffocation of Kenneth Eugene Smith*, available at https://www.treadbylee.com/p/never-alone-the-suffocation-of-kenneth
[7] *Id.*

9. Second, Defendants' refusal to provide adequate notice of the manner of execution and/or to provide access to the protocols and procedures to be utilized in the implementation of execution denies Mr. Hoffman the procedural due process right to notice and opportunity to be heard regarding the method by which Defendants seek to execute him, as well as equal protection of the law.

10. Third, the execution protocol's secrecy provisions violate Mr. Hoffman's rights to counsel and of access to the courts under the Fourteenth, Sixth, and First Amendments.

11. Fourth, the method of forced nitrogen gassing will substantially burden and prevent Mr. Hoffman from practicing his Buddhist faith, and specifically Buddhist meditative breathing techniques, in the execution chamber and during the process in which he is killed by forced nitrogen gassing. This violates both the Religious Land Use and Institutionalized Persons Act ("RLUIPA") and the free exercise clause of the First Amendment of the United States Constitution.

12. Mr. Hoffman seeks declaratory and injunctive relief to prevent Defendants from executing him through unconstitutional means.

**PARTIES**

13. Plaintiff Jessie Hoffman is a citizen of the United States of America, currently incarcerated under a sentence of death at the Louisiana State Penitentiary, in Angola, Louisiana ("Angola"), and is under the control and supervision of the DPSC. Mr. Hoffman has completed the administrative remedy process for this complaint when his ARPs were rejected on June 6, 2024, and July 3, 2024. On February 12, 2025, the Twenty-Second Judicial District for the Parish of St. Tammany executed a warrant for Mr. Hoffman's execution. In an abundance of caution, after his attorneys received notice that the State was seeking an execution warrant, Mr. Hoffman

filed an emergency ARP on February 11, 2025.  On February 13, 2025, Mr. Hoffman was notified that a response from the Warden's office would be issued within 40 days of the date of his filing.

14.     Defendant Gary Westcott is Secretary of the DPSC ("DPSC Secretary") and, thus, the chief executive officer of the DPSC.  He was appointed to this position by the Governor of Louisiana.  In this capacity, Defendant Westcott has control of the DPSC, and is responsible for protecting the constitutional rights of all persons held in the DPSC's custody.  At all relevant times, Defendant Westcott was acting under color of law and as the agent, and, as a matter of law, the official representative of the DPSC.  Defendant Westcott is sued in his individual and official capacities.

15.     Defendant Darrel Vannoy is the Warden of Angola ("Warden").  In this role, Defendant Vannoy is responsible for carrying out executions at Angola, including but not limited to making staffing, budget, and administrative decisions related to executions.  Defendant Vannoy is responsible for the "custody, control, care, and treatment of adjudicated people" at Angola.[8]  At all relevant times, Defendant Vannoy was acting under color of law and as the agent, and, as a matter of law, the official representative of Angola.  Defendant Vannoy is sued in his individual and official capacities.

16.     Defendants John Does ("Doe Defendants") are involved in the implementation of the DPSC's execution protocols including transport, administration of drugs, security, preparation for the execution, and a variety of other tasks.  Mr. Hoffman has not been able, through due diligence, to discover their identities.  Defendants Westcott and Vannoy possess information identifying these individuals as they are responsible for selecting the individuals to carry out these tasks.  Mr. Hoffman anticipates that the identities of these unknown executioners will be revealed

---

[8]     La. Dep't of Public Safety & Corrections, Louisiana State Penitentiary, https://doc.louisiana.gov/location/louisiana-state-penitentiary/.

in discovery. The Doe Defendants are made defendants in their individual and official capacities. Upon information and belief, the Doe Defendants are citizens of the United States of America and residents of Louisiana.

## JURISDICTION AND VENUE

17.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343 because this action arises and seeks relief under the laws and Constitution of the United States, specifically, the First, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, 18. U.SC. § 3599, RLUIPA, and 28 U.S.C. § 2201 (declaratory relief), and 28 U.S.C. § 2202 (injunctive relief).

18.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b), as the events complained of have occurred/will occur in this district.

## RELEVANT PROCEDURAL BACKGROUND

19.     During the course of a separate lawsuit in state court, the DPSC publicly disclosed a copy of its execution protocol dated January 7, 2010, the date of Gerald Bordelon's execution. However, the DPSC later disclosed that it was no longer able to obtain one of the drugs listed in this protocol.

20.     Beginning in 2012, counsel for Mr. Hoffman attempted to obtain a copy of the DPSC's then-current execution protocol. After the DPSC denied the public records requests, Mr. Hoffman submitted ARPs asserting that he had no notice of how Defendants would seek to execute him and requesting a copy of the current protocol. The DPSC rejected these requests.

21.     In December 2012, Mr. Hoffman brought an action in the United States District Court for the Middle District of Louisiana pursuant to 42 U.S.C. § 1983 for violations and threatened violations of his rights under the First, Sixth, Eighth and Fourteenth Amendments to

the United States Constitution.  *See Hoffman v. Jindal, et al.*, No. 3:12-cv-00796-SDD-EWD
(M.D. La.) ("Related Case").  Other parties later intervened in that action as plaintiffs.  *Id.*, Rec.
Docs. 10 (Sepulvado), 120 (Code), 201 (Wessinger, Irish), 210 (Blank), 222 (Tyler), 252 (Reeves,
Bell, Tart, Broadway).[9]

22.     At the time of filing of the Related Case, Louisiana law provided that "[e]very
sentence of death executed on or after September 15, 1991, shall be by lethal injection; that is, by
the intravenous injection of a substance or substances in a lethal quantity into the body of a person
convicted until such person is dead." La. Rev. Stat. § 15:569(B) (1991).  Based on the execution
protocol ultimately disclosed by the State, Mr. Hoffman argued, among other things, that (a) he
was at a substantial risk of suffering a lingering or unnecessarily painful death due to the nature of
the lethal injection drugs to be used in the execution, and (b) the execution protocol did not
adequately protect him from cruel and unusual punishment due to the insufficient training,
expertise, and supervision of those involved in the administration of the lethal drug.

23.     In January 2013, Christopher Sepulvado, who was under warrant for execution,
intervened in the Related Case.  At the hearing on Mr. Sepulvado's motion for preliminary
injunction, the Court ordered the DPSC to disclose its execution protocol, but the attorneys for the
DPSC had only a Wikipedia printout of its entry for the drug pentobarbital.  Noting the
"intransigence of the State Defendants," the Court found that "[i]t is axiomatic that . . . an inmate
who is to be executed cannot challenge a protocol as violative of the 8th Amendment until he
knows what that protocol contains." Rec. Doc. 28.

24.     Pursuant to orders issued by the Court in the Related Case, the DPSC ultimately
disclosed several versions of its execution protocol, revealing that the protocol was in a state of

---

[9] "Rec. Doc." refers to docket entries in the Related Case.

constant flux during the time when Mr. Sepulvado was set to be executed in 2013 and 2014. *See*, *e.g.*, Rec. Doc. 137, at 4-5; 169-1, at 4-5.

25.     On August 12, 2021, Defendants moved to dismiss the Related Case contending that the DPSC "ha[d] no ability to obtain the lethal injection drugs authorized by [the DPSC's] current protocol nor any other potential lethal injection drugs in the foreseeable future." Rec. Doc. 263-1, at 4.

26.     On March 31, 2022, the Court granted Defendants' motion to dismiss without prejudice.  Rec. Doc. 312, at 22-23.  In so ruling, the Court found that "[g]iven the Defendants' virtual inability to obtain lethal injection drugs . . . . Plaintiffs cannot demonstrate a reasonable expectation that Defendants will resume executing prisoners without significant and substantial changes to the execution protocol or the law." *Id*. at 21.

27.     Because of the unavailability of lethal injection drugs, the Court determined that "Defendants are no longer engaging in the behavior the Plaintiffs have deemed unconstitutional in their lawsuit allegations," and, "[t]here being no live controversy," the Court "lacks subject-matter jurisdiction."   Of particular relevance here, the Court also stated that, "[i]ndeed, if a live controversy re-emerges [through legislation or revisions to the execution protocol], Plaintiffs may employ the same procedural mechanisms they have previously used to seek the relief they desire." *Id*. at 21.

28.     On March 5, 2024, at the urging of now Governor Landry, the Louisiana Legislature passed Act 5 of the Second Extraordinary Session of 2024, amending La. Rev. Stat. § 15:569-70 to include two methods of execution in addition to lethal injection—nitrogen gas and electrocution—effective July 1, 2024.  La. Rev. Stat. § 15:569 (2024).

29.     By e-mail dated May 1, 2024, Mr. Hoffman's counsel requested certain information from the DPSC, including: (a) whether the DPSC has obtained or attempted to obtain or compound

any lethal injection drugs; (b) whether the DPSC remains unable to procure any drugs that could be used for lethal injection; (c) whether the DPSC has the necessary materials and equipment for an execution by electrocution or nitrogen hypoxia; and (d) whether Department Regulation No. C-03-001 (the State's execution protocol) has been modified with respect to lethal injection, nitrogen hypoxia or electrocution. The DPSC, however, declined to answer most of those queries, responding only that it has not procured any drugs intended to be used for lethal injection and has not made any changes to its lethal injection protocol.

30.    On November 27, 2024, the DPSC responded to a public records request submitted by a reporter, representing that the DPSC had not changed its protocol, and that the DPSC did not possess drugs or any supplies for use in executions.

31.    On February 10, 2025, Governor Landry announced that the DPSC had "finalized and implemented an updated protocol that allows for the sentences of those on Death Row to be carried out." His press release included a link to a "brief summary" of a nitrogen gas protocol that "builds upon" Alabama's method.

32.    That same day, the St. Tammany Parish District Attorney filed a request for a warrant of execution in Mr. Hoffman's case. Mr. Hoffman filed an Emergency Request for Administrative Remedy on February 11, 2025, requesting, *inter alia*, a copy of the DPSC's execution protocol. The prison informed Mr. Hoffman that he would receive a response within 40 days. The state court signed the warrant on February 12, 2025, setting Mr. Hoffman's execution for March 18, 2025.

33.    On February 20, 2025, eight days after the issuance of Mr. Hoffman's warrant, the DPSC served Mr. Hoffman with notice of his execution warrant and that the method of execution would be nitrogen hypoxia. Mr. Hoffman's counsel reached out to Defendants' counsel to request a copy of the protocol on February 14, 2025. On February 18, 2025, Defendants' counsel

responded that the request: "is being treated as a public records request pursuant to La. R.S. 44:1, et seq. Please be advised that the execution protocol is exempt from disclosure pursuant to La. R.S. 44:3 and La. R.S. 15:570, which is incorporated by reference in La. R.S. 44:4.1(B)(8)." No protocol has been disclosed to either Mr. Hoffman or his counsel.

FACTUAL BACKGROUND

**A.    Changes to Louisiana's Execution Methods and Procedures**

34.    For the last three decades, since 1991, lethal injection was the only authorized method of execution in Louisiana. In March 2024, the Louisiana state legislature amended La. Rev. Stat. § 15:569 and § 15:570 and expanded the manner in which the State can execute condemned inmates by adding nitrogen hypoxia and electrocution. *See* Act 5/2024. The DPSC Secretary now has the unfettered authority to choose between nitrogen hypoxia, lethal injection, or electrocution in carrying out a sentence of death.

35.    Specifically, La. Rev. Stat. § 15:569 now provides:

(A)    Every sentence of death imposed in this state shall be executed at the Louisiana State Penitentiary at Angola. Every execution shall be made in a room entirely cut off from view of all except those permitted by law to be in the room. At the discretion of the secretary of the Department of Public Safety and Corrections and with no preference to the method of execution, every sentence of death shall be by one of the following methods:

(1)    Intravenous injection of a substance or substances in a lethal quantity into the body.

(2)    Nitrogen hypoxia.

(3)    Electrocution, causing to pass through the body of the person convicted a current of electricity of sufficient intensity to cause death, and the application and continuance of such current through the body of the person convicted until such person is dead.

> (B)    Upon receipt of the warrant commanding the secretary to cause the execution of the person condemned as provided by law, the secretary shall, within seven days, provide a written notice to the condemned person of the manner of execution.

La. Rev. Stat. § 15:569(A)-(B) (2024).

36.    La. Rev. Stat. § 15:570 also provides for "the absolute confidentiality" of persons or entities involved in the execution:

> (F)    It is the intent of the legislature that the provisions of this Subsection shall be construed to ensure the absolute confidentiality of the identifying information of any person, business, organization, or other entity directly or indirectly involved in the execution of a death sentence within this state.  This confidentiality provision shall prevail over any conflicting provision in state law related to public disclosure.
>
> > (1)    Except as provided in Subsection F of this Section, the identity of any person who participates in or performs ancillary functions in the execution process, including a person or business that delivers, dispenses, distributes, supplies, manufactures, or compounds the drugs, equivalent drug products, pharmacy generated drugs, device drugs, medical supplies, medical equipment, or other supplies or materials intended for use by the Department of Public Safety and Corrections in the administration of an execution shall be confidential and shall not be disclosed.

La. Rev. Stat. § 15:570(G) (2024).

37.    The amendments to La. Rev. Stat. § 15:569 and § 15:570 went into effect on July 1, 2024, applying to all executions regardless of the date of offense or imposition of sentence.

### 1.    Former Protocols

38.    The DPSC's lethal injection protocol has been altered many times since it was first instituted in 1991.  On multiple occasions, those alterations were announced mere days or hours before an execution.

39.    For example, on January 7, 2010, the DPSC promulgated a new protocol.  The same day, Gerald Bordelon was executed using the new protocol.

11

40.     Beginning in April 2012, counsel for Mr. Hoffman made repeated requests for a copy of the then-current protocol, through public records requests and administrative remedy procedures.  The DPSC denied those requests.  Mr. Hoffman therefore filed the Related Case on December 20, 2012, asserting multiple constitutional violations including a violation of his due process rights to notice and an opportunity to be heard regarding the method by which he was to be executed.

41.     Mr. Sepulvado was given an execution date of February 13, 2013.  Mr. Sepulvado filed a motion for a stay of execution and in a hearing on that motion, the DPSC announced for the first time that it planned to use the drug pentobarbital in Mr. Sepulvado's execution.  The Court granted Mr. Sepulvado's motion for a stay of execution on February 7, 2013.

42.     In June 2013, in the Related Case, the DPSC disclosed in discovery a new lethal injection protocol which substituted a single dose of pentobarbital for the three-drug formula consisting of an ultra-short-acting barbiturate, a paralytic, and concentrated potassium to stop the heart.

43.     On September 1, 2013, the DPSC's supply of pentobarbital expired.

44.     In December 2013, an execution warrant was signed for Mr. Sepulvado, ordering the DPSC to execute him on February 5, 2014.

45.     On December 19, 2013, the Louisiana Board of Pharmacy disclosed that the DPSC did not have any unexpired stock of pentobarbital.

46.     Instead of the drugs in the 2013 protocol, Defendants purchased midazolam from Morris & Dickson on July 25, 2013.

47.     At 4:51 p.m. on January 27, 2014, 9 days before the scheduled execution of Mr. Sepulvado, the Ohio Department of Corrections sent a fax to the DPSC, attaching a copy of Ohio's lethal injection protocol.  At that time, the Ohio protocol called for lethal injection options to be

chosen at the discretion of the warden, including a single dose of 5g pentobarbital, in manufactured or compounded form, "under whatever name it may be available," or a combination of 10 mg midazolam and 40mg hydromorphone—under whatever names these drugs may be sold, compounded or manufactured, with additional back-up doses of 60mg hydromorphone. This protocol also allowed for the drugs to be injected either intravenously or intramuscularly.

48.     Less than two hours after receiving Ohio's protocol, at 6:32 p.m. on January 27, 2014, the DPSC issued a new drug protocol that was nearly identical to Ohio's protocol. The DPSC's protocol included an array of lethal drug options to be chosen at the discretion of the warden and/or pharmacist, including a single dose of 5g pentobarbital in manufactured or compounded form, or a combination of 10mg midazolam and 40mg hydromorphone in manufactured or compounded form. This protocol also allowed for the drugs to be injected either intravenously or intramuscularly.

49.     The next day, on January 28, 2014, the DPSC purchased 20 vials of 50mg/5ml (10mg/ml) hydromorphone, from the Lake Charles Memorial Hospital.

50.     On February 1, 2014, four days before the scheduled execution of Mr. Sepulvado, Defendants disclosed that the DPSC had been unable to procure any pentobarbital and would be using "Hydromorphone HC 150mg/5ml vial" and "Midazolam 2mg/2ml."

51.     This disclosure did not comport with the invoices for the DPSC's purchase of hydromorphone, which instead showed a purchase of 20 vials of 50mg/5ml (10mg/ml) of hydromorphone.

52.     On February 3, 2014, Defendants contacted counsel for plaintiffs in the Related Case and requested a 90-day temporary restraining order and stay of execution. The Court granted this request, which was extended and remained in effect until the Court lifted the stay on June 30, 2021.

13

53.     In the Related Case, the Court further ordered Defendants to provide a final execution protocol by March 14, 2014.

54.     On March 13, 2014, Defendants provided a copy of the "revised lethal injection protocol," including a seven-page document entitled "Department Regulation No. C-03-001" ("2014 Execution Protocol") to plaintiffs in the Related Case.  This is the last-disclosed execution protocol.

55.     Pursuant to an informal agreement between counsel for Defendants and counsel for Mr. Hoffman and other plaintiffs in the Related Case, counsel for Defendants would provide quarterly updates as to (i) whether the DPSC had changed its execution protocol, and if so provide a copy of any new protocol, and (ii) whether the DPSC had in its possession drugs intended for use in executions.  Until July 1, 2024, the DPSC represented that no changes had been made and no drugs had been obtained.  However, after July 1, 2024, the DPSC began to take the position with counsel for Mr. Hoffman that this information was exempted from the Public Records Act. Under the 2014 Execution Protocol, attorneys are allowed to remain with the condemned inmate only "until the visit is terminated at the discretion of the Warden."  The condemned inmate is given no right to an attorney present throughout his execution.

56.     The 2014 Execution Protocol is the most recent DPSC execution protocol disclosed to Mr. Hoffman.[10]  The 2014 Execution Protocol describes only the DPSC's procedure for executions by lethal injection.  Upon information and belief, the 2014 Execution Protocol has never been revoked.

57.     The 2014 Execution Protocol provides the DPSC with the option to use either (a) a one-drug protocol comprising of an intravenous dose of pentobarbital ("Pentobarbital Protocol"),

---

[10]     The 2014 Execution Protocol is available at https://dpic-cdn.org/production/documents/2014.03.14.LA.protocol.pdf?dm=1683576299.

or (b) a two-drug protocol using an intravenous dose of a mixture of midazolam and hydromorphone ("Midazolam-Hydromorphone Protocol").

58.    ***Pentobarbital Protocol***: Under the 2014 Pentobarbital Protocol, the condemned inmate is administered a total of 5 grams of pentobarbital "divided into the two syringes," three syringes containing "25mL of saline flush," and "[f]our additional syringes" containing an "additional 10 grams of Pentobarbital . . . to be used if the primary dose of five grams proves to be insufficient for the procedure."[11]

59.    ***Midazolam-Hydromorphone Protocol.***    Under the 2014 Midazolam-Hydromorphone Protocol, the condemned inmate is administered 10 mg of midazolam and 40 mg of hydromorphone "drawn into or mixed in a single syringe."[12]  The protocol further provides for two back-up syringes, one filled with a mix of 10 mg of midazolam and 40 mg of hydromorphone, and the third containing 60 mg of hydromorphone.[13]

### 2.    Methods Authorized by Law at the Time of Mr. Hoffman's Sentencing

60.    At the time the offenses occurred that subjected Mr. Hoffman to a death sentence, and at the time that Mr. Hoffman was sentenced to death, La. Rev. Stat. § 15:569 provided that "[e]very sentence of death executed on or after September 15, 1991, shall be by lethal injection; that is, by the intravenous injection of a substance or substances in a lethal quantity into the body of a person convicted until such person is dead."  La. Rev. Stat. § 15:569 (1991).

61.    Mr. Hoffman was sentenced by a jury to death by lethal injection.

62.    Lethal injection was the only statutorily authorized method of execution for over thirty years, from 1991 to 2024.

---

[11] 2014 Execution Protocol, Attachment E, at 1.
[12] *Id.*
[13] *Id.* at 1–2.

63.     The amendments to La. Rev. Stat. § 15:569 and § 15:570 went into effect on July 1, 2024, applying to all executions regardless of the date of offense or imposition of sentence.

**B.      Louisiana Refuses to Disclose Crucial Information**

        **1.      Louisiana Refuses to Disclose the Method of Execution Until the Last Possible Moment**

64.     As set forth above, in 2024, the Louisiana legislature amended La. Rev. Stat. § 15:569 and expanded the manner in which the State can execute condemned inmates by adding electrocution and nitrogen gas.

65.     The 2024 amendments give the DPSC Secretary the discretion and unfettered authority to choose between lethal injection, nitrogen gas, or electrocution in carrying out a sentence of death.  The statute does not set any guidelines, nor does it require any stated reason for the DPSC Secretary's choice for a given individual.

66.     Nor does the statute require the DPSC Secretary to make known which of the three methods are currently available to the State.  That is, the DPSC Secretary is not required to inform the public of which methods it has the capacity to carry out.  And the DPSC Secretary has indeed refused to disclose which methods are currently practicable.

67.     On February 10, 2025, Governor Landry announced that the DPSC had finalized a protocol to carry out executions by nitrogen hypoxia and would resume executions.  Rec. Doc. 335-2.  The Governor did not, however, announce that the nitrogen hypoxia protocol replaced the 2014 lethal injection protocol.  Nor did the Governor indicate whether the DPSC has developed or plans to develop a protocol for electrocution.

68.     On February 20, 2025—eight days after the issuance of the warrant and just 26 days before Mr. Hoffman's execution date—the DPSC served Mr. Hoffman with notice that the method of execution would be nitrogen gas.

16

**2.    Louisiana Refuses to Disclose the Current Execution Protocol**

69.    Mr. Hoffman has been denied notice of any actual protocol by which Defendants will use to kill him.

70.    As set forth above, Governor Landry announced on February 10, 2025, that the DPSC issued an updated protocol for nitrogen hypoxia.  Governor Landry's announcement was accompanied by a three-paragraph document titled "Brief Summary of Nitrogen Hypoxia Execution Protocol," which states:

> Execution by nitrogen hypoxia is accomplished by placing a mask on the inmate's face and replacing oxygen with nitrogen gas.
>
> The inmate will be allowed access to a spiritual advisor.  Designated victim relationship witnesses and designated media representatives will be authorized to witness the execution in accordance with the protocol and Louisiana law.
>
> The Louisiana State Penitentiary personnel will conduct checks on all aspects of the nitrogen system and other apparatus utilized in the protocol prior to the commencement of the execution.   Once escorted to the death chamber, medical monitors will be attached to the inmate to evaluate the relevant vital signs.  The inmate will be offered the opportunity to make a final statement, and then, the specialized mask for administration of the nitrogen will be fitted onto the inmate.  At the designated time, pure nitrogen gas will be administered to the inmate through the mask for a sufficient time period necessary to cause the death of the inmate. In accordance with the protocol, the coroner will then be asked to confirm the death.  The Warden of Louisiana State Penitentiary will then make a statement confirming that the execution has been completed in accordance with the laws of the State of Louisiana.[14]

71.    The "updated" protocol itself has not been publicly released and has not been provided to Mr. Hoffman or his counsel despite requests for it.  Thus, the 2014 Execution Protocol is the most recent execution protocol disclosed to Mr. Hoffman.

---

[14] Press Release, Office of Governor Jeff Landry, Brief Summary of Nitrogen Hypoxia Execution Protocol (Feb. 10, 2025), https://gov.louisiana.gov/assets/2025-Extras/Summaries/Summary-of-Protocol-Info.pdf.

72.     Under La. Rev. Stat. § 15:568, the DPSC Secretary is responsible for executing offenders in conformity with the death warrant issued in each case.  Given that the DPSC has not made a revised execution protocol available to Mr. Hoffman or the public, Mr. Hoffman reserves the right to amend this complaint if the DPSC produces a revised execution protocol.

73.     Without sufficient notice of and/or access to the protocols and procedures to be utilized in the implementation of the execution, Mr. Hoffman cannot adequately evaluate and challenge the protocols and procedures by which Defendants seek to execute him.

### C.     Death by Nitrogen Gas

74.     Nitrogen hypoxia is a method of execution that forces nitrogen gas inhalation, depriving the condemned inmate of oxygen and causing asphyxiation.

75.     The DPSC has never executed or attempted to execute a condemned inmate by nitrogen gas.  Nor has the federal government.  The only state that has carried out an execution by nitrogen gas is Alabama.

76.     In March 2018, Alabama enacted legislation authorizing the use of nitrogen gas for executions.  The statute became effective on June 1, 2018.

77.     The Alabama Department of Corrections ("ADOC") released a protocol for gas executions until August 25, 2023.  Before it released that protocol, the ADOC performed testing of the nitrogen delivery system and training on its use.

78.     In January 2024, the ADOC executed Kenneth Smith by nitrogen gas.  This involved strapping Mr. Smith to a gurney, fitting him with a respirator mask connected to nitrogen gas, and then administering the nitrogen gas.[15]

---

[15] *See* Ala. Dep't of Corrections Execution Procedures (Aug. 2023), at 15-17, https://dpic-cdn.org/production/documents/Al_Lethal_Gas_Execution_Protocol_2023_08.pdf?dm=1693938490.

79.     After the ADOC started the flow of nitrogen gas, Mr. Smith started "to convulse and shake vigorously for about four minutes. . . .  It was another two to three minutes before he appeared to lose consciousness, all while gasping for air to the extent that the gurney shook several times."[16]

80.     Media witness Lee Hedgepeth recounted that Mr. Smith's head moved back and forth violently in the minutes after the execution began.  Having witnessed four other executions, Mr. Hedgepeth stated that he had "never seen such a violent reaction to an execution."[17]

81.     Mr. Smith's spiritual advisor, Reverend Jeff Hood, was also present in the execution chamber and described the scene: "[w]e didn't see someone go unconscious into two or three seconds.  We didn't see somebody go unconscious in 30 seconds.  What we saw was minutes of someone struggling for his life.  We saw minutes of someone heaving back and forth.  We saw spit.  We saw all sorts of stuff develop from his mask."[18]

82.     The victim's son, Mike Sennett, stated that he was told by prison personnel that Mr. Smith would "take two or three breaths and he'd be out and gone."[19]  However, he described: "That ain't what happened.  After about two or three breaths, that's when the struggling started.

---

[16] Marty Roney, *Nitrogen Gas Execution: Kenneth Smith Convulses for Four Minutes in Alabama Death Chamber*, Montgomery Advertiser (Jan. 25, 2024), www.montgomeryadvertiser.com/ story/news/local/alabama/2024/01/25/four-minutes-of-convulsions-kenneth-smith-executed-with-nitrogen-gas/72358038007/.

[17] Nicholas Bogel-Burroughs and Abbie VanSickle, *Alabama Carries Out First U.S. Execution by Nitrogen*, N.Y. Times (Jan. 25, 2024), www.nytimes.com/2024/01/25/us/alabama-nitrogen-execution-kenneth-smith.html.

[18] Ralph Chapoco, *Kenneth Eugene Smith Executed by Nitrogen Gas for 1988 Murder-for-Hire Scheme*, Alabama Reflector (Jan. 25, 2024), https://alabamareflector.com/2024/01/25/kenneth-eugene-smith-executed-by-nitrogen-gas-for-1988-murder-for-hire-scheme/.

[19] Nicholas Bogel-Burroughs, *A Select Few Witnessed Alabama's Nitrogen Execution. This Is What They Saw*, N.Y. Times (Feb. 1, 2024), www.nytimes.com/2024/02/01/us/alabama-nitrogen-execution-kenneth-smith-witnesses.html.

Other people kept saying he was trying to raise himself up. . . . With all that struggling and jerking and trying to get off that table, more or less, it's just something I don't ever want to see again."[20]

83.    Twenty-seven minutes after the ADOC started the flow of gas, Mr. Smith was declared dead.[21]

84.    The three other nitrogen gas executions carried out by the ADOC were similar.  On September 26, 2024, ADOC executed Alan Eugene Miller by nitrogen gas.  According to reports, Mr. Miller "shook and trembled on a gurney for about two minutes, with his body at time pulling against restraints. . . . The shaking and trembling was followed by about six minutes of periodic gulping breaths before he became still."[22]

85.    On November 21, 2024, the ADOC executed Carey Dale Grayson by nitrogen gas. During the approximately six minutes it took for Mr. Grayson to lose consciousness, he "tightly clenched his hands, took deep gasps, shook his head vigorously and pulled against his restraints."[23]

86.    And, on February 6, 2025, the ADOC executed Demetrius Frazier. The execution took approximately 20 minutes.  During that time, Mr. Frazier "started waving his hands in circles toward his body."[24] Then, he "clenched his face and his nostrils flared, while his hands quivered. His legs slightly lifted up off the gurney and he gasped." After that, Mr. Frazier "had sporadic gasping and shallow breathing."[25]

---

[20] *Id.*
[21] Roney, supra note 16.
[22] Michelle Watson & Jason Hanna, *Alabama Has Executed Alan Eugene Miller, the Second Inmate Known to Die by Nitrogen Gas*,  CNN (Sept. 26, 2024), www.cnn.com/2024/09/26/us/alan-eugene-miller-alabama-execution/index.html.
[23] Marty Roney et al., *Carey Dale Grayson Executed in Alabama in Hiker's Murder; 3rd Nitrogen Gas Execution in US*, USA Today (Nov. 21, 2024), www.usatoday.com/story/news/nation/2024/11/21/carey-dale-grayson-execution-alabama-nitrogen-gas/76489211007/.
[24] WTVM13, *'Detroit Strong': Alabama Carries Out Execution of Inmate in Michigan's Custody*, https://www.wvtm13.com/article/alabama-inmate-execution-michigan-lawsuit-1738878056/63692646.
[25] *Id.*

87.    The DPSC has not disclosed or made public any execution protocol for nitrogen gas.  Upon information and belief, the DPSC intends to employ a procedure similar to the ADOC's in carrying out this form of execution.

88.    As confirmed by the Smith, Miller, Grayson, and Frazier executions, nitrogen gas creates terror and extreme pain and suffering.

89.    Execution by nitrogen gas deprives the condemned inmate of oxygen, which can cause the feeling of suffocation, panic, significant pain and suffering.  For example, to test the accuracy of pulse oximeters, researchers have conducted controlled laboratory desaturation studies using healthy volunteers.[26]  In these studies, at blood oxygen saturation levels of 60% to 100%, "symptoms range from minimal or mild shortness of breath and visual changes to a full-blown feeling of suffocation"; at blood oxygen saturations of less than 60%, the "majority of people, not yet unconscious, report significant distress and shortness of breath."[27]  Because of this response, "it is [now] unethical to even study the effects of very low oxygen levels (<60%) on humans. . . . [Put differently, researchers] have stopped using desaturations below 60% due to concerns for study participant safety and comfort."[28]

90.    The deprivation of oxygen can also cause nausea.  Because the condemned inmate is strapped to a gurney in the supine position, vomiting can cause the condemned inmate to choke to death.

---

[26] Philip E. Bickler and Michael S. Lipnick, *Evidence Against Use of Nitrogen for the Death Penalty*, J. Am. Med. Ass'n (May 29, 2024), https://jamanetwork.com/journals/jama/fullarticle/2819295.
[27] *Id.*
[28] *Id*.

91.    Moreover, if the respirator mask is not properly sealed, some oxygen can enter the mask and therefore prolong the time to reach unconsciousness and lead the condemned inmate to enter a persistent vegetative state, have a stroke, or endure the painful sensation of suffocation.[29]

92.    To avoid suffering to animals, for example, the American Veterinary Medical Association ("AVMA") has advised the use of nitrogen gas is "unacceptable" as euthanasia for most mammals, because it "create[s] an anoxic environment that is distressing for some species and aversive to [others]."[30]  Louisiana has explicitly codified in law that "[e]uthanasia methods and procedures must conform with recommendations outlined in the report of the American Veterinary Medical Association on Euthanasia," and has specifically outlawed gassing as a method of euthanasia for cats and dogs.  La. Rev. Stat. § 3:2465(C)(1)-(2).

93.    The United Nations Human Rights Office, too, has admonished the use of nitrogen gas and the "grave suffering"[31] it may cause as likely "amount[ing] to torture under international law."[32]

94.    Louisiana's Twenty-Fourth Judicial District Court considered Jerman Neveaux's challenge to nitrogen gas and electrocution as less humane methods of execution than lethal injection.  In support, Mr. Neveaux presented expert affidavits opining that nitrogen gas can cause

---

[29] *See* Russel D. Ogden et al., *Assisted Suicide by Oxygen Deprivation with Helium at a Swiss Right-To-Die Organization*, 36 J. Med. Ethics 174, 174 (2010) ("Oxygen deprivation with a face mask is not acceptable because leaks are difficult to control and it may not eliminate rebreathing.  These factors will extend time to unconsciousness and time to death.").

[30] AVMA Guidelines for the Euthanasia of Animals, at 28 (2020 ed.), www.avma.org/sites/default/files/2020-02/Guidelines-on-Euthanasia-2020.pdf. These guidelines are followed by major research universities, including Louisiana State University and Louisiana State University Health Sciences Center. *See, e.g.*, LSU Health, New Orleans, Institutional Animal Care and Use Committee, www.lsuhsc.edu/administration/academic/ors/iacuc/default.aspx.

[31] U.N. Human Rights, Office of the High Commissioner, *United States: UN Experts Alarmed at Prospect of First-Ever Untested Execution by Nitrogen Hypoxia in Alabama* (Jan. 3, 2024), www.ohchr.org/en/press-releases/2024/01/united-states-un-experts-alarmed-prospect-first-ever-untested-execution.

[32] *First U.S. Nitrogen-Gas May Constitute Torture—UN Rights Office*, reuters.com (Jan. 16, 2024), www.reuters.com/world/us/first-us-nitrogen-gas-execution-may-constitute-torture-un-rights-office-2024-01-16/.

the condemned inmate to "enter[] a persistent vegetative state, experienc[e] [a] stroke, or experienc[e] painful suffocation instead of dying," as well as "distress, panic, pain, and suffocation by vomit."[33]

95.     Judge Darensburg agreed and granted Mr. Neveaux's motion to declare La. Rev. Stat. § 15:569 unconstitutional.[34]

### D.     Maladministration

#### 1.     Louisiana's Execution Procedure Lacks Oversight and Safeguards

96.     Upon information and belief, Defendants' undisclosed execution protocol has not been examined by a licensed medical professional to ensure that there are adequate safeguards to protect the condemned inmates' constitutional rights against torture, pain, and suffering.

97.     Upon information and belief, the undisclosed execution protocol was promulgated without any medical research or review to determine that a prisoner would not suffer cruelly superadded pain or a lingering death.

98.     Upon information and belief, Defendants have made core deviations from the written execution protocols in the past.

99.     For example, in the days following up to Mr. Sepulvado's scheduled February 5, 2014 execution date, Defendants materially deviated from their written protocol. *See supra* ¶¶ 41, 46-51.

100.    Upon information and belief, at 30 days prior to Mr. Sepulvado's scheduled execution, Defendants did not perform the first five "actions" listed on the checklist dated "1-10-13," which were to (1) receive the warrant of execution from the secretary; (2) serve the offender

---

[33] *State v. Jerman Neveaux*, No. 16-4029 (24th J.D.C.) (Apr. 19, 2024 ruling on Defense Motion to Declare La. R.S. 15:569(A)(2) & (3) Unconstitutional).
[34] *Id.* ("Motion to Declare La RS 15:569(A)(2) & (3) Unconstitutional – GRANTED by the Court, State objection for the record.").

with the execution order; (3) return the signed warrant to the secretary; (4) notify execution team and executive staff; (5) establish staffing for execution day; and (6) establish staff crisis support team for debriefing of officers post execution.

101.    Upon information and belief, prior to Mr. Sepulvado's scheduled execution, Defendants did not perform the first two items listed on its (undated) "LSP Pharmacist Checklist," an integral part of the protocol, specifically, to maintain at "all times . . . . the following stock ensuring chemicals have not exceeded expiration date: 15 grams pentobarbital 50mg/ml solution;" and "30 days prior to execution . . . [v]erify execution drugs are in stock as above and expiration dates will not be exceeded prior to execution date."

102.    Based on Defendants' past practices, Defendants will likely deviate from their written protocol. The undisclosed execution protocol does not contain any mechanism to prevent Defendants from making such deviations.

103.    Even if Defendants fully adhere to the undisclosed execution protocol, the execution will proceed without adequate safeguards.

104.    The lack of safeguards is further shielded from public scrutiny by the secrecy provisions of La. Rev. Stat. § 15:570(G), which provide for "the absolute confidentiality of the identifying information of any person, business, organization, or other entity directly or indirectly involved in the execution of a death sentence within this state."

105.    Upon information and belief, the undisclosed execution protocol does not consider the condemned inmate's physical size or medical conditions in determining the appropriate mask and other implements, as well as the method itself.

**2.    The Individuals Tasked with Carrying Out the Execution Have Not Received Adequate Training**

106.    Defendants have not been properly trained to carry out an execution.

24

107.    Upon information and belief, the members of the current execution team (the Doe Defendants) have not received adequate training, which increases the likelihood that errors will be made in carrying out the execution.

108.    Upon information and belief, none of the Doe Defendants are medical professionals or have any medical training.  Nor will there be any medical supervision of the Doe Defendants during the execution.

109.    Upon information and belief, the Doe Defendants are not qualified to administer lethal gas, and are deliberately indifferent to the risks that their failure to train and supervise the Doe Defendants will have on Mr. Hoffman's constitutional rights.

110.    Indeed, the previous execution protocol—relating to executions by lethal injection—did not include any requirement that the Doe Defendants become familiar with the drugs they are administering in order to understand their properties, the dangers associated with those drugs, and/or any other relevant medical information.  It did not standardize the timing for the administration of the drugs, increasing the likelihood of errors in their delivery.  Upon information and belief, the Doe Defendants will not engage in adequate practice sessions prior to Mr. Hoffman's execution.

111.    In past executions, Defendants did not adhere to the terms of the execution protocols with regard to practice.

112.    For example, under the 2013 execution protocol, once an execution date was set, the members of the execution team were required to train at least weekly.  Mr. Sepulvado's execution date was scheduled for February 5, 2014.  According to the execution log, the execution team only practiced twice prior to Mr. Sepulvado's execution date.  Defendants also materially changed the protocol nine days before the February 5, 2014 execution date, leaving insufficient time to practice the new protocol.

113.    On February 10, 2025, Governor Landry released a half-page "summary" of an unreleased nitrogen gas protocol.  Within 36 hours, a state court judge had signed an execution warrant for Mr. Hoffman.  This gives Defendants just over one month to ensure that the gas protocol can be administered effectively and safely by the Doe Defendants, and that sufficient practice sessions can take place.

114.    Upon information and belief, staff members at the DPSC, including the Warden, did not know about the new nitrogen gas "protocol" until Governor Landry's public announcement on February 10, 2025.

115.    Upon information and belief, Defendants have not conducted sufficient training and practice for the execution of Mr. Hoffman that is scheduled to take place on March 18, 2025.

116.    Upon information and belief, any "execution practice" sessions held by Defendants are insufficient to adequately train Defendants to be able to undertake an execution in a constitutional manner.

117.    The risk of maladministration due to lack of training is substantial.

**E.    Alternative Means of Execution are Feasible, Readily Available, and Would Significantly Reduce Mr. Hoffman's Risk of Harm**

**1.    Execution by Firing Squad**

118.    Execution by use of a firing squad is a known, available, and feasible alternative method that would reduce pain and suffering.

119.    Other states and the United States military have carried out numerous executions by firing squad.

120.    Oklahoma, Utah and Mississippi also currently authorize the use of a firing squad among their statutory methods of execution.[35] Utah has executed three inmates by firing squad since 1976—most recently on July 18, 2010.[36]

121.    Protocols for execution by firing squad are known and available.  Utah's technical manual, which specifies the state's execution protocol in great detail, is publicly accessible.[37]  For example, in Utah's most recent execution by firing squad, the inmate was seated in a chair set up between stacked sandbags to prevent the bullets from ricocheting.  A target was pinned over the inmate's heart.  Five shooters set up at a distance of 21 feet from the inmate, armed with .30-caliber Winchester rifles.  One rifle was loaded with blanks so that no one knew which officers killed the inmate.  The inmate was pronounced dead two minutes after he was shot.[38]

122.    Upon information and belief, Defendants could easily identify qualified personnel to carry out an execution by firing squad.  Furthermore, the State already has a sufficient stockpile of both the weapons and ammunition necessary to carry out an execution.  The State has all the personnel and implements necessary to carry out executions by firing squad.

123.    Execution by firing squad is both swift and virtually painless.  If performed properly—a simple matter for trained marksmen—the use of a firing squad will eliminate the substantial risk of severe pain that Defendants' current execution protocol presents to Mr. Hoffman.

---

[35] *See* Okla. Stat. Ann. tit. 22 § 1014; Utah Code Ann. § 77-18-5.5; Miss. Code Ann. § 99-19-51; *see also* 2019 S.C. S.B. 176, 123rd Session General Assembly – 2nd Regular Session (2020) (South Carolina Senate Bill to revive firing squad as method of execution).

[36] *See* Kirk Johnson, *Double Murderer Executed by Firing Squad in Utah*, N.Y. Times, June 19, 2010, https://www.nytimes.com/2010/06/19/us/19death.html.

[37]    *See* Technical Manual of Utah Department of Corrections, https://cdn.muckrock.com/foia_files/2017/03/22/3-13-17_MR34278_RES.pdf; *see also* United States Army Firing Squad Protocol (1959).

[38] Brady McCombs, Utah Brings Back the Firing Squad, So How Does It Work?, Associated Press (Mar. 24, 2015), https://apnews.com/general-news-58559881d0f743009cfeb52196702382.

124.    Furthermore, evidence and recent experience strongly suggest that "the firing squad is significantly more reliable" than lethal injection. *Glossip v. Gross*, 576 U.S. 863, 976-77 (2015) (Sotomayor, J., dissenting).  Historically, the firing squad has resulted in significantly fewer "botched" executions. "Botched executions are those involving unanticipated problems or delays that caused, at least arguably, unnecessary agony for the prisoner or that reflect gross incompetence of the executioner."[39] A recent study, which analyzed the contemporaneous news reports of all executions in the United States from 1900 to 2010 found that 7.12% of the 1,054 executions by lethal injection were "botched" and none of the 34 executions by firing squad had been botched.[40]

125.    Accordingly, execution by firing squad is a known and available alternative method of execution that presents a substantially lower risk of severe pain and suffering than nitrogen gas. Defendants have no legitimate penological reason for not implementing such a protocol.

### 2.    Execution by Administration of Medical-Aid-In-Dying ("DDMAPh")

126.    Medical-aid-in-dying is a known, available, and feasible alternative method that would reduce pain and suffering.  DDMAPh is the most commonly used regimen for medical-aid-in-dying in the United States.

127.    The study and regular use of the regimen means that Mr. Hoffman is able to present evidence on "essential questions" like what drugs should be administered and in what quantities. This is not merely "a proposal for more research," but a readily implemented alternative. *Bucklew v. Precythe*, 587 U.S. 119, 142 (2019).

128.    DDMAPh is the administration of digonxin, diazepan, morphine, amtirtipyline and phenobarbital.

---

[39] Austin Sarat, Gruesome Spectacles: Botched Executions and America's Death Penalty, p. 5 (2014) (quotations omitted).
[40] *Id.*

129.     Specifically, for a quick death in the execution setting, the DDMAph protocol consists of 100 mg of digoxin, 2,000 mg of diazepam, 15,000 mg of morphine, 8,000 mg of amitriptyline, and 10,000 mg of phenobarbital.  The medications are simply mixed with apple juice/apple syrup and administered to the prisoner.

130.     Defendants should be able to carry out an execution by administration of DDMAPh using supplies, equipment, and the services of personnel already within their control.

131.     Administration of DDMAPh does not require any specialized equipment or training.

132.     DDMAPh effectively causes death without any risk of prolonged pain or suffering.

133.     This manner of causing death is neither untried nor untested.  DDMAPh would not be an experiment.  There is a proven track record of success in causing death using the DDMAPh regimen.  Defendants have no legitimate penological reason for not implementing such a protocol.

**F.     Plaintiff Jessie Hoffman is a Practicing Buddhist and Suffers from PTSD**

134.     Mr. Hoffman has been a devout follower of the Buddhist faith for over two decades. He has attended Buddhist services on Death Row since the prison began offering them in 2018. He follows Buddhist teachings and practices mindfulness and meditation.  A core component of his Buddhist practice is breathing meditation.

135.     According to the Buddha, one must maintain contact with the breath in order to be mindful.  Mr. Hoffman sincerely believes that he must practice breathing meditation at the most critical time of his transition between life and death.

136.     Executing Mr. Hoffman by forcing him to breathe pure nitrogen, poisonous to humans and animals, would interfere with his ability to engage in essential Buddhist beliefs and practices at the time of his death.

137.    Mr. Hoffman also suffered a childhood of abuse so severe that it was tantamount to torture and has been diagnosed with complex post-traumatic stress disorder as a result.

138.    Mr. Hoffman was two months past his eighteenth birthday at the time of his offense. His childhood was characterized by sexual, physical, and verbal abuse, and other torture and violence.  Throughout his childhood, beginning at an early age until about the age of 10, his mother used physically abusive "discipline" to maintain control.  In addition to the family member reports of the horrific abuse he suffered growing up, police calls for service reflect regular reports of cruelty to juveniles in the places he lived.

139.    Mr. Hoffman's mother would beat her children with sticks, pipes, pans, belts, on one occasion a bat, and electrical cords.  Often the beatings were after baths when the children were wet and naked.  They left welts and drew blood.  She also sexually abused her children, again from a young age.  She would make them get into bed with her while she was naked and "massage" her.

140.    Mr. Hoffman's mother would also hold his hand over the fire burner on the stove when he touched something he was not supposed to.  At 14 months of age, Mr. Hoffman's grandmother brought him to Charity Hospital for a burn to his hand, which she said he suffered ten days before.  By then the second- and third-degree burns were so raw and infected, he was hospitalized for nineteen days for treatment.

141.    The time that Mr. Hoffman spent at his father's house was no respite.  His father would hog-tie the children for punishment and lock them in the closet for long periods of time. Mr. Hoffman still has claustrophobia from that experience today.

142.    It is only due to two decades of practicing mindfulness through breathing meditation that Mr. Hoffman has been able to manage his severe and debilitating symptoms of PTSD.

143.    Without the ability to breathe air and practice Buddhist breathing meditation, Mr. Hoffman is very likely to re-experience the severely distressful symptoms of his PTSD.  These symptoms may include psychotic and dissociative symptomatology, extreme stress and anxiety, and panic attacks.

144.    Executing Mr. Hoffman by nitrogen gas will very likely cause him to experience extreme psychological distress and panic.  An individual experiencing panic while also being denied oxygen will experience a constricted airway like an upper airway obstruction.  Mr. Hoffman may vomit, convulse, experience an inability to breathe, and otherwise suffer severe psychological pain.

145.    As a direct and proximate result of Defendants' violations of the United States Constitution and other laws, Mr. Hoffman has suffered and will continue to suffer irreparable injury.

## EXHAUSTION

146.    Mr. Hoffman has completed the administrative remedy process for this complaint when his ARPs were rejected on June 6, 2024, and July 3, 2024.  On February 12, 2025, the Twenty-Second Judicial District for the Parish of St. Tammany executed a warrant for Mr. Hoffman's execution.  In an abundance of caution, after his attorneys received notice that the State was seeking an execution warrant, Mr. Hoffman filed an emergency ARP on February 11, 2025.  On February 13, 2025, Mr. Hoffman was notified that a response from the Warden's office would be issued within 40 days of the date of his filing.

## CLAIMS FOR RELIEF

### <u>COUNT I</u>
**Eighth and Fourteenth Amendments Violations – Defendants' Nitrogen Gas Execution is Unconstitutional**

147.    Mr. Hoffman incorporates the allegations of the preceding paragraphs as if fully set forth herein.

148.    The Eighth Amendment forbids the Government from carrying out a death sentence in a manner that is "'sure or very likely to cause serious illness and needless suffering,' and give rise to 'sufficiently imminent dangers.'" *Glossip*, 576 U.S. 863, 876 (quoting *Baze v. Rees*, 553 U.S. 35, 50 (2008); *Helling v. McKinney*, 509 U.S. 25, 33, 34–35 (1993)). "Punishments are cruel when they involve torture or a lingering death . . . something more than the mere extinguishment of life." *In re Kemmler*, 136 U.S. 436, 447 (1890); *see also Baze*, 553 U.S. at 50 (execution violates the Eighth Amendment if it presents a "substantial risk of serious harm").

149.    To prevail on an Eighth Amendment claim, Mr. Hoffman must show that there is a "substantial risk of serious harm" or an "objectively intolerable risk of harm" when compared to an alternative method of execution to the state's protocol that is "feasible, readily implemented, and in fact significantly reduce[s] a substantial risk of severe pain." *Id.* (quoting *Baze*, 553 U.S. at 50, 52). A "substantial risk of serious harm" may occur when the method of execution involves "torture or a lingering death," *Baze*, 553 U.S. at 49, or the "'superaddition' of 'terror, pain, or disgrace.'" *Bucklew*, 587 U.S. at 133 (quoting *Baze*, 553 U.S. at 48).

150.    Defendants intend to execute Mr. Hoffman in a manner that is cruel, unreliable and that will inflict excruciating suffering on Mr. Hoffman. To the extent Mr. Hoffman knows what the execution procedure Defendants intend to use entails, Mr. Hoffman believes it creates a substantial risk of inflicting grievous suffering and harm that is foreseeable and significant, but which is unnecessary and can be avoided.

151.    The secrecy provisions of La. Rev. Stat. § 15:570(G) and the execution protocol also violate the Eighth Amendment's cruel and unusual punishment clause, as the clause derives its meaning from the evolving standards of decency that mark the progress of a maturing society. This standard requires that a court look to objective indicia that reflect the public attitude toward a given sanction; because the public is deprived of knowledge regarding Louisiana's executions, Mr. Hoffman's right to a punishment in line with contemporary values is violated.

152.    There are alternative methods of execution, as described above (*see supra* ¶¶ 118-133), that are "feasible, readily implemented, and in fact [would] significantly reduce the substantial risk of severe pain." *Baze*, 553 U.S. at 52.

153.    Because La. Rev. Stat. § 15:569, § 15:570 and the execution protocol pose a substantial risk of serious harm to Mr. Hoffman, it violates his constitutional right guaranteed by the Eighth Amendment of the United States Constitution to be free from cruel and unusual punishment.

**A.    Execution by Nitrogen Gas Will Subject Mr. Hoffman to Cruel and Unusual Punishment.**

154.    Execution by nitrogen gas is cruel and excessive, because it involves significantly more pain and suffering than necessary for the mere extinguishment of life.  Death by nitrogen gas is not instantaneous.  *See supra* ¶¶ 74-95.

155.    To be asphyxiated by nitrogen gas causes conscious terror for several minutes and excruciating sensations of being suffocated to death.  *See supra* ¶¶ 79-86, 88-89.

156.    For example, during the execution of Mr. Smith last year in Alabama, witnesses described Mr. Smith as still conscious while he convulsed and suffocated to death on the gurney *See supra* ¶¶ 79-82.

157.    Because it is difficult to keep oxygen out of the respirator mask, death by nitrogen gas can be prolonged, increasing the risk that the condemned inmate enters into a persistent vegetative state, suffers a stroke, or continues to experience the feeling of suffocation. *See supra* ¶¶ 91, 94.

158.    The United Nations has expressed concerns that death by nitrogen gas likely violates the prohibition on torture and other inhumane punishments. *See supra* ¶ 93.

159.    The AVMA refuses to recommend euthanizing most mammals by nitrogen gas because of the pain and suffering it causes. *See supra* ¶ 92.

160.    Moreover, because La. Rev. Stat. § 15:570(G) "ensure[s] the absolute confidentiality of the identifying information of any person, business, organization, or other entity directly or indirectly involved in the execution of a death sentence within this state," Mr. Hoffman has no way of knowing whether Defendants have actually obtained and will use pure nitrogen gas, as opposed to some substandard substance that could increase or prolong any pain and suffering.

161.    Execution by nitrogen gas is unusual. Virtually untested, nitrogen gas has only been used a handful of times (never by the DPSC), *see supra* ¶ 75, and is only authorized for use in a few jurisdictions (Alabama, Mississippi, Oklahoma, and Louisiana).[41]

162.    If the execution of Mr. Hoffman is allowed to proceed using nitrogen gas, he will be subjected to cruel and unusual punishment, in violation of the Eighth and Fourteenth Amendments to the United States Constitution.

**B.    The Protocol is Likely to be Maladministered**

163.    Defendants will not administer their execution protocol in a way that adequately protects Mr. Hoffman from cruel and unusual punishment. The history of Defendants' deviations

---

[41]    *See* Death Penalty Info. Ctr., *Methods of Execution: Authorized Methods by State*, https://deathpenaltyinfo.org/executions/methods-of-execution/authorized-methods-by-state.

from the written protocol, lack of oversight and safeguards in the protocol, and lack of adequate training for execution team members creates a substantial risk that Mr. Hoffman will be subjected to severe suffering.

### 1. Core Deviations from Written Execution Protocol

164. Upon information and belief, Defendants are likely to make core deviations from the written execution protocols. For example, in the days leading up to Mr. Sepulvado's scheduled February 5, 2014 execution date, Defendants made multiple material deviations from their written protocol. *See supra* ¶¶ 41, 46-51, 112.

165. Based on Defendants' past practices, Defendants will likely deviate from their written protocol, creating an unacceptable risk that Mr. Hoffman will be subjected to cruel and unusual punishment.

### 2. Lack of Oversight and Safeguards

166. Upon information and belief, Mr. Hoffman's execution will not be carried out in accordance with the written instructions, or will be administered in such a way that fails to adequately safeguard Mr. Hoffman's rights.

167. There is a reasonable likelihood that the lethal gas has been or will be ineffectively delivered, stored, and/or have expired.

168. Upon information and belief, the equipment that will be used to carry out the execution has not been tested for efficacy.

169. The overall lack of oversight and safeguards creates an unacceptable risk that Mr. Hoffman will be subjected to cruel and unusual punishment, in violation of the Eighth and Fourteenth Amendments to the United States Constitution.

### 3.    Lack of Training

170.    Upon information and belief, the members of the current execution team (the Doe Defendants) have not received adequate training, which increases the likelihood that errors will be made in carrying out the execution.  None of the Doe Defendants are medical professionals or have any medical training.  Nor will there be any medical supervision of the Doe Defendants during the execution.

171.    Upon information and belief, the named Defendants know the Doe Defendants are not qualified to administer lethal drugs, but are deliberately indifferent to the risks that their failure to train and supervise the Doe Defendants will have on Mr. Hoffman's constitutional rights.

172.    Upon information and belief, the Doe Defendants will not engage in adequate practice sessions prior to Mr. Hoffman's execution.

173.    Indeed, Defendants did not adhere to the terms of the execution protocols with regard to practice for past executions.  *See supra* ¶¶ 111-112.

174.    Nor could the Doe Defendants possibly have sufficient training and practice.  For example, under the 2013 execution protocol, once an execution date was set, the members of the execution team were required to train at least weekly.  Mr. Sepulvado's execution date was set on February 5, 2014.  The execution team practiced exactly twice prior to Mr. Sepulvado's execution date.  Significantly, Defendants materially changed the protocol nine days before the February 5, 2014 execution date, which did not allow sufficient time to practice the new protocol.

175.    On February 10, 2025, Governor Landry announced that the DPSC had finalized a new execution protocol.  Within 36 hours, an execution warrant for Mr. Hoffman was issued for March 18, 2025, leaving the DPSC just over one month to ensure that its new execution protocol can be administered effectively and safely by the Doe Defendants

176.    Upon information and belief, Defendants have not conducted sufficient training and practice for the upcoming execution on March 18, 2025.

177.    Upon information and belief, any "execution practice" sessions held by Defendants are insufficient to adequately train Defendants to be able to undertake an execution in a constitutional manner.

178.    The lack of practice and training creates a substantial risk that Mr. Hoffman will suffer the wanton and unnecessary infliction of pain and torture, or prolonged, lingering deaths, as he is put to death.  This includes experiencing cruelly superadded pain and suffering, conscious paralysis, suffocation, or conscious cardiac arrest.  On information and belief, the undisclosed execution protocol does not include adequate safeguards to protect Mr. Hoffman from cruel and unusual punishment.

179.    Upon information and belief, the execution protocol will not be administered in a way that adequately protects Mr. Hoffman from cruel and unusual punishment.  The lack of training and oversight over the implementation of Defendants' execution protocol creates a substantial risk of severe pain.

### 4.    Lack of Medical Oversight

180.    The Eighth Amendment forbids "deliberate indifference" to "serious medical needs of prisoners," *Estelle v. Gamble*, 429 U.S. 97, 104 (1976), and to a substantial risk of serious harm to a prisoner, *see Farmer v. Brennan*, 511 U.S. 825, 834 (1994).

181.    Substantive due process affords similar protections: "[A] physician who acts on behalf of the State to provide needed medical attention to a person involuntarily in state custody (in prison or elsewhere) and prevented from otherwise obtaining it, and who causes physical harm to such a person by deliberate indifference, violates the [United States Constitution's] protection

37

against the deprivation of liberty without due process." *West v. Atkins*, 487 U.S. 42, 58 (1988) (Scalia, J., concurring).

182.   The choice of a course of medical treatment may violate the Eighth Amendment where it is "so blatantly inappropriate as to evidence intentional mistreatment likely to seriously aggravate the prisoner's condition." *Thomas v. Pate*, 493 F.2d 151, 158 (7th Cir. 1974), *vacated and remanded on other grounds sub nom. Cannon v. Thomas*, 419 U.S. 813 (1974).

183.   Defendants are required to provide Mr. Hoffman with appropriate medical care until the moment of his death.  Thus, the Eighth Amendment's proscription against "deliberate indifference" requires that they administer the death penalty without the "unnecessary and wanton infliction of pain." *Gregg*, 428 U.S. at 173.

184.   Upon information and belief, the execution protocol has not been examined by a licensed medical professional to ensure that there are adequate safeguards to protect the condemned inmates' constitutional rights against torture, pain, and suffering.

185.   Upon information and belief, the execution protocol was promulgated without any medical research or review to determine that a prisoner would not suffer cruelly superadded pain or a lingering death.

### C.   Alternative Execution Methods are Feasible, Readily Implemented, and Would Significantly Reduce the Substantial Risk of Mr. Hoffman's Suffering Severe Pain and Terror

#### 1.   Execution by Firing Squad

186.   Execution by use of a firing squad is a "known and available" alternative method under *Baze v. Rees*, 553 U.S. 35, 61 (2008), and *Glossip v. Gross*, 576 U.S. 863 (2015).  The Supreme Court has held that the firing squad is a constitutionally permissible form of execution. *See Wilkerson v. Utah*, 99 U.S. 130, 134-35 (1878) (upholding sentence of death by firing squad);

*Arthur v. Dunn*, 137 S. Ct. 725, 734 (2017) (Sotomayor, J., dissenting from denial of certiorari) (recognizing that condemned inmates may "find more dignity in an instantaneous death [by firing squad]").

187.    Other states and the United States military have carried out numerous executions by firing squad.

188.    Oklahoma, Utah and Mississippi currently authorize the use of a firing squad among their statutory methods of execution.[42]  Utah has executed three inmates by firing squad since 1976—most recently on July 18, 2010.[43]

189.    Protocols for execution by firing squad are known and available.  For example, as set forth above, Utah's technical manual specifies the state's execution protocol in great detail. *See supra* ¶ 121.

190.    Upon information and belief, Defendants could easily identify qualified personnel to carry out an execution by firing squad.  Furthermore, the State already has a sufficient stockpile of both the weapons and ammunition necessary to carry out an execution.

191.    Execution by firing squad is both swift and virtually painless.  If performed properly—a simple matter for trained marksmen—the use of a firing squad will eliminate the substantial risk of severe pain that Defendants' current execution protocol present to Mr. Hoffman.

192.    Furthermore, evidence and recent experience strongly suggest that "the firing squad is significantly more reliable" than lethal injection.  *Glossip*, 576 U.S. at 976-77 (Sotomayor, J., dissenting).  Historically, the firing squad has resulted in significantly fewer "botched" executions, which are those involving unanticipated problems or delays that caused, at least arguably,

---

[42] *See* Okla. Stat. Ann. tit. 22 § 1014; Utah Code Ann. § 77-18-5.5; Miss. Code Ann. § 99-19-51; *see also* 2019 S.C. S.B. 176, 123rd Session General Assembly – 2nd Regular Session (2020) (South Carolina Senate Bill to revive firing squad as method of execution).

[43] *See* Johnson, *supra* note 36.

unnecessary agony for the prisoner or that reflect gross incompetence of the executioner."[44]   A recent study, which analyzed the contemporaneous news reports of all executions in the United States from 1900 to 2010 found that 7.12% of the 1,054 executions by lethal injection were "botched" and none of the 34 executions by firing squad had been botched.[45]

193.    Accordingly, an execution by firing squad is a known and available alternative method of execution, that presents a substantially lower risk of severe pain and suffering than nitrogen gas.  Defendants have no legitimate penological reason for not implementing such a protocol.

## 2.    Execution by Administration of DDMAPh

194.    DDMAPh is the most commonly used regimen for medical-aid-in-dying in the United States.  The study and regular use of the regimen means that Mr. Hoffman is able to present evidence on "essential questions" like what drugs should be administered and in what quantities. This is not merely "a proposal for more research," but a readily implemented alternative.  *Bucklew*, 587 U.S. at 142.

195.    Specifically, for a quick death in the execution setting, the DDMAPh protocol consists of 100 mg of digoxin, 2,000 mg of diazepam, 15,000 mg of morphine, 8,000 mg of amitriptyline, and 10,000 mg of phenobarbital.  The medications are simply mixed with apple juice/apple syrup and administered to the prisoner.

196.    Administration of DDMAPh does not require any specialized equipment or training.

197.    DDMAPh effectively causes death without any risk of prolonged pain or suffering.

---

[44] Austin Sarat, Gruesome Spectacles: Botched Executions and America's Death Penalty, at 5 (2014) (quotations omitted).
[45] *Id*.

198.    This manner of causing death is neither untried nor untested.  DDMAPh would not be an experiment.  There is a proven track record of success in causing death using the DDMAPh regimen.  Defendants have no legitimate penological reason for not implementing such a protocol.

## COUNT II
### Eighth Amendment Violations – Defendants' Nitrogen Gas Execution is Unconstitutional *as Applied* to Plaintiff Jessie Hoffman

199.    Mr. Hoffman incorporates the allegations of the preceding paragraphs as if fully set forth herein.

200.    Mr. Hoffman suffered a childhood of abuse and neglect.

201.    Mr. Hoffman has been diagnosed with complex post-traumatic stress syndrome. Individuals who suffer from complex PTSD experience symptoms such as panic, severe anxiety, mood dysregulation, high blood pressure, disassociation, and a sensation of restricted breathing.

202.    Mr. Hoffman manages his symptoms by Buddhist breathing techniques.  If Mr. Hoffman were to be executed by nitrogen gas, he would be unable to manage his PTSD by Buddhist breathing techniques.

203.    Executing Mr. Hoffman by nitrogen gas will very likely cause him to experience extreme psychological distress and panic.  An individual experiencing panic while also being denied oxygen will experience a constricted airway like an upper airway obstruction.  Mr. Hoffman may vomit, convulse, experience an inability to breathe, and/or otherwise suffer severe psychological pain.

204.    The placement of a gas mask over Mr. Hoffman's face, preventing his use of these breathing techniques to manage PTSD while strapped to a gurney, moreover would trigger his PTSD and claustrophobia from being hog-tied and locked in a closet as a child.

205.    Executing Mr. Hoffman by nitrogen gas would further superadd pain and suffering and therefore violate the Eighth Amendment's prohibition on cruel and unusual punishment.

<u>COUNT III</u>

**Violation of the *Ex Post Facto* Provision of the United States Constitution – Defendants' Nitrogen Gas Execution is an Unconstitutional *Ex Post Facto* Punishment *as Applied* to Mr. Hoffman**

206.    Mr. Hoffman incorporates the allegations of the preceding paragraphs as if fully set forth herein.

207.    In accordance with Article I, Section 10, clause 1 of the United States Constitution, no State may enact a law which, by retroactive operation, creates a significant risk of increased punishment for a crime after the defendant has been sentenced.

208.    At the time the offenses occurred that subjected Mr. Hoffman to a death sentence, and at the time that Mr. Hoffman was sentenced to death, La. Rev. Stat. § 15:569 provided that "[e]very sentence of death executed on or after September 15, 1991, shall be by lethal injection; that is, by the intravenous injection of a substance or substances in a lethal quantity into the body of a person convicted until such person is dead."  La. Rev. Stat. § 15:569 (1991).

209.    As set forth above, in 2024, the Louisiana legislature amended La. Rev. Stat. § 15:569 and expanded the manner in which the State can execute condemned inmates by adding electrocution and nitrogen gas.  La. Rev. Stat. § 15:569 (2024).  The DPSC Secretary now has the discretion and unfettered authority to choose between lethal injection, nitrogen gas, or electrocution in carrying out a sentence of death.

210.    The 2024 amendments to La. Rev. Stat. § 15:569 and § 15:570 went into effect on July 1, 2024, applying to all executions regardless of the date of offense or imposition of sentence.

211.    If Defendants execute Mr. Hoffman with nitrogen gas, they will retroactively subject Mr. Hoffman to an increased punishment for a crime after Mr. Hoffman was already sentenced in violation of the *ex post facto* clause.

212.     Additionally, if Defendants elect to execute Mr. Hoffman with lethal injection, Defendants' past practices in changing Louisiana's execution protocol make it substantially likely that Mr. Hoffman will be subjected to a significantly altered execution procedure than is specified in the last-disclosed protocol. Defendants will likely make such alterations without giving any notice to Mr. Hoffman.

213.     The substitution of a compounded or different drug for an FDA-approved drug qualifies as a significant change increasing the severity of Mr. Hoffman's punishment, in violation of the *ex post facto* clause.

214.     Accordingly, La. Rev. Stat. § 15:569, § 15:570 and the execution protocol are unconstitutional as *ex post facto* laws as applied to Mr. Hoffman.

### COUNT IV
**First, Sixth, and Fourteenth Amendments and 18 U.S.C. § 3599 Violations – Defendants Intentionally Deprive Mr. Hoffman of Meaningful Access to Counsel and the Courts**

215.     Mr. Hoffman incorporates the allegations of the preceding paragraphs as if fully set forth herein.

216.     Prisoners have a right under the First, and Fourteenth Amendments of the United States Constitution to access to the courts.  *See*, *e.g.*, *Lewis v. Casey*, 518 U.S. 343, 350-51 (1996); *Wolff v. McDonnell*, 418 U.S. 539, 579 (1974).  "The right of access to the courts . . . assures that no person will be denied the opportunity to present to the judiciary allegations concerning violations of fundamental constitutional rights." *Wolff*, 418 U.S. at 579.

217.     Prisoners also have a right under the Sixth Amendment of the United States Constitution to access to counsel at all "critical" stages of criminal proceedings. *United States v. Wade*, 388 U.S. 218, 227-28 (1967).

218.     Under Section 3599(a)(2) of Title 18 of the U.S. Code, an indigent defendant's appointed attorney shall represent the defendant throughout every stage of available judicial

43

proceedings, including all available post-conviction process, together with applications for stays of execution and other appropriate motions and procedures, in addition to competency proceedings and proceedings for executive or other clemency as may be available to the defendant. *See Harbison v. Bell*, 556 U.S. 180, 194 (2009).

219.    Prisoners have the right to access to counsel throughout the execution procedure, including during an execution.  *Id.*; *In re Ohio Execution Protocol Litig.*, No. 2:11-CV-1016, 2018 WL 6529145, at *4-5 (S.D. Ohio Dec. 12, 2018).

220.    To assert an Eighth Amendment violation prior to or during execution, Mr. Hoffman must be able to communicate that violation to his counsel, and counsel must be able to access the courts on Mr. Hoffman's behalf.   Abridgement of either prisoner-counsel communication or counsel's access to the courts violates Mr. Hoffman's constitutional right to access to counsel and the courts.

221.    Under the 2014 Execution Protocol, attorneys are allowed to remain with the condemned inmate only "until the visit is terminated at the discretion of the Warden." The condemned inmate is given no right to an attorney present throughout his execution.

222.    Mr. Hoffman does not know what level of access the current execution protocol allows for, as Defendants have refused to provide Mr. Hoffman with a copy of the current execution protocol.

223.    Without attorney access to the current execution protocol, Mr. Hoffman is prevented from meaningfully challenging unconstitutional aspects of the current execution protocol in court.

224.    Without attorney access to the execution chamber, there is no way to ensure that the execution protocol is carried out as directed.

44

225.    Without attorney access to the execution chamber, there is no way to confirm that the condemned inmate does not suffer cruelly superadded pain and suffering while conscious.

226.    Without attorney access to the execution chamber, it is impossible for counsel to seek an emergency stay of execution should something go wrong.

227.    By denying Mr. Hoffman meaningful access to counsel and to the courts during the preparation for, and carrying out of, his execution, Defendants will deny him the right of access to the court system under the First, Sixth and Fourteenth Amendments and intentionally violate Mr. Hoffman's rights under 18 U.S.C. § 3599.

### COUNT V
**Fourteenth Amendment Violations – Defendants' Refusal to Disclose the Execution Protocol**

228.    Mr. Hoffman incorporates the allegations of the preceding paragraphs as if fully set forth herein.

229.    The Due Process Clause of the United States Constitution entitles Mr. Hoffman to notice and an opportunity to be heard before he can be deprived of life, liberty, or property.

230.    Being "deprived of life" unequivocally implicates a constitutionally protected interest, U.S. Const. amend. XIV, and the U.S. Supreme Court has held that constitutionally protected "liberty interests are implicated" when the government plans to "inflict[] appreciable physical pain." *Ingraham v. Wright*, 430 U.S. 651, 674 (1977).

231.    Defendants have not disclosed sufficient information or details regarding the development and drafting of the execution protocol or the procedures that will be utilized in carrying out Mr. Hoffman's execution pursuant to the execution protocol. Mr. Hoffman, therefore, cannot determine whether aspects of the execution protocol violate provisions of federal law or constitute cruel and unusual punishment, cannot consult medical experts concerning those aspects,

and cannot determine and seek to remedy the ways in which the execution protocol presents an avoidable risk of unconstitutional pain and suffering during his execution.

232.   Executing Mr. Hoffman would violate his procedural due process rights under the Fourteenth Amendment to the United States Constitutions based on the present circumstances that have substantially interfered with any method challenge, including that (i) Defendants plan to execute Mr. Hoffman with a forced nitrogen gassing method that has never been used in this State and where forced nitrogen gassing has resulted in torturous executions when experimented with by Alabama over the last year, (ii) Defendants withheld until February 20, 2025 the information that a forced nitrogen gassing method would be used to execute Mr. Hoffman, (iii) Defendants purport to have a protocol by which they will execute Mr. Hoffman using the forced nitrogen gassing method but refused to disclose it to Mr. Hoffman or his counsel, (iv) Defendants scheduled by warrant an imminent March 18, 2025 execution date, and (v) Defendants have, through baseless oppositions to re-open the Related Case and an emergency petition for writ of mandamus and administrative stay,[46] engaged in outrageous dilatory practices to deny Mr. Hoffman access to the courts and the assistance of counsel in advance of the imminent execution date.  Defendants' conduct deprives Mr. Hoffman of his life and liberty without providing sufficient notice and opportunity to be heard on the execution procedures to be used.

## COUNT VI
**Religious Land Use and Institutionalized Persons Act ("RLUIPA") Violations –**
**Defendants' Nitrogen Gas Protocol Violates Plaintiff Jessie Hoffman's Religious Liberties**

233.   Mr. Hoffman incorporates the allegations of the preceding paragraphs as if fully set forth herein.

---

[46] Mr. Hoffman's filing of the instant suit is by no means a concession that Defendants' arguments in the Related Case are correct, but in light of the exigent circumstances of Mr. Hoffman's upcoming scheduled execution in 21 days, Mr. Hoffman has decided to initiate the instant suit to have the opportunity to assert his constitutional rights before Defendants run out the clock in the Related Case.

234.     Mr. Hoffman has practiced the Buddhist faith for over two decades. He has attended Buddhist services on Death Row beginning seven years ago. He follows Buddhist teachings and practices mindfulness and meditation. A core component of his Buddhist practice is breathing meditation.

235.     According to the Buddha, one must maintain contact with the breath in order to be mindful. Mr. Hoffman sincerely believes that he must practice breathing meditation at the most critical time of his transition between life and death.

236.     Executing Mr. Hoffman by forcing him to breathe pure nitrogen, poisonous to humans and animals, would interfere with his ability to engage in essential Buddhist beliefs and practices at the time of his death.

237.     Under the Religious Land Use and Institutionalized Persons Act, Pub. L. 106–274, codified as 42 U.S.C. § 2000cc et seq ("RLUIPA"), the State and Defendants are prohibited from imposing a substantial burden on the religious exercise of a person confined to an institution, unless that burden is in furtherance of a compelling government interest, and it is the least restrictive means to achieve that interest.

238.     Executing Mr. Hoffman by nitrogen gas is a substantial burden on his exercise of his religion. There is no compelling interest in executing him by nitrogen gas that cannot be furthered by less restrictive means.

### COUNT VII
**First Amendment Violations - Defendants' Nitrogen Gas Execution Violates Plaintiff Jessie Hoffman's Free Exercise of Religion**

239.     Mr. Hoffman incorporates the allegations of the preceding paragraphs as if fully set forth herein.

240.     The Buddhist meditative breathing practices that Mr. Hoffman uses are fundamental to the practice of his faith.

47

241.    Executing Mr. Hoffman by forcing him to breathe pure nitrogen, poisonous to humans and animals, would interfere with his ability to engage in essential Buddhist beliefs and practices in the execution chamber and at the time of his death, including Buddhist meditative breathing practices.

242.    Denying Mr. Hoffman the right to engage in essential Buddhist beliefs and practices in the execution chamber and at the time of death would be a violation of the Free Exercise clause of the First Amendment, applicable through the Fourteenth Amendment. *Butts v. Martin*, 877 F.3d 571, 584 (5th Cir. 2017); *Smith v. Comm'r, Ala. Dep't of Corr.*, 844 Fed. Appx. 286, 291 (11th Cir. 2021).

243.    Executing Mr. Hoffman by nitrogen gas will place a substantial and unnecessary burden on his free exercise of Buddhism and the practice of his faith in the execution chamber while he is put to death.

244.    Executing Mr. Hoffman by nitrogen gas violates his First Amendment rights to freely exercise his religious beliefs.

**PRAYER FOR RELIEF**

WHEREFORE, in order to prevent the violations of Mr. Hoffman's rights under the United States Constitution and other laws, Mr. Hoffman respectfully requests that the Court enter a judgment:

(a)    declaring that Defendants' actions, practices, customs, and policies with regard to their means, methods, procedures, and customs regarding executions, and specifically the execution protocol, are illegal and violate the First, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution, the *ex post facto* Clause of the United States Constitution, 18 U.S.C. § 3599, and RLUIPA;

48

(b)      declaring that it violates the Eighth Amendment for Defendants to carry out an execution using nitrogen gas;

(c)      declaring that it violates the Eighth and Fourteenth Amendments when there are alternative execution methods that would substantially reduce the risk of substantial harm to Mr. Hoffman;

(d)      declaring that it violates the *ex post facto* clause of the United States, Constitution for Defendants to execute Mr. Hoffman with nitrogen gas because it will retroactively subject Mr. Hoffman to an increased punishment for a crime after Mr. Hoffman was already sentenced;

(e)      declaring that it violates the First, Sixth and Fourteenth Amendments and 18 U.S.C. § 3599 for Defendants to prohibit Mr. Hoffman from having access to his attorneys prior to and during his execution, including having access to his attorneys in the execution chamber;

(f)      declaring that it violates the Fourteenth Amendment for Defendants to refuse to disclose the execution protocol;

(g)      declaring that it violates RLUIPA for Defendants to execute Mr. Hoffman by nitrogen gas given Mr. Hoffman's sincerely held Buddhist religious practices;

(h)      declaring that it violates the First Amendment for Defendants to execute Mr. Hoffman by nitrogen gas;

(i)      enjoining Defendants and all persons acting on their behalf from using the execution protocol, or any revised protocol that violates Mr. Hoffman's rights and the law, for the same reasons challenged above;

(j)      enjoining Defendants from executing Mr. Hoffman during the pendency of this litigation;

(k)     ordering Defendants to provide timely notice to Mr. Hoffman, through his undersigned counsel, every time the execution protocol is modified, regardless of whether an execution date has been set;

(l)     preventing Defendants from executing Mr. Hoffman through unconstitutional means;

(m)    preventing Defendants from executing Mr. Hoffman without affording notice of the protocol by which Mr. Hoffman will be executed at least six (6) months in advance of any execution date;

(n)     preventing Defendants from executing Mr. Hoffman without first promulgating a written protocol that comports with the protections guaranteed by the First, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution, the *ex post facto* Clause of the United States Constitution, 18 U.S.C. § 3599, and RLUIPA and providing Mr. Hoffman adequate time to review and challenge it;

(o)     enjoining Defendants from carrying out an execution pursuant to La. Rev. Stat. § 15:569 and § 15:570;

(p)     enjoining Defendants from carrying out an execution pursuant to the current execution protocol;

(q)     enjoining Defendants from deviating from any valid written protocol;

(r)     enjoining Defendants from carrying out an execution without giving Mr. Hoffman access to counsel before and during the execution;

(s)     ordering Defendants to make the execution and the identities of the executioners public;

(t)     awarding Mr. Hoffman attorneys' fees and costs pursuant to 42 U.S.C. § 1988, or as allowed by law; and

(u)     granting such further relief as the Court deems just and proper.


Dated: February 25, 2025

Respectfully submitted,

/s/ *Samantha Bosalavage Pourciau*
Samantha Bosalavage Pourciau, La. Bar No. 39808
Promise of Justice Initiative
1024 Elysian Fields Avenue
New Orleans, LA 70117
Tel: (504) 529-5955
Sbosalavage@defendla.org

Cecelia Trenticosta Kappel, La. Bar No. 32736
Loyola Center for Social Justice
7214 St. Charles Ave. Box 907
New Orleans, Louisiana 70118
Tel: 504-861-5735
Email: ckappel@defendla.org

Rebecca L. Hudsmith
Office of the Federal Public Defender
For the Middle and Western Districts of Louisiana
102 Versailles Blvd., Suite 816
Lafayette, LA 70501
Tel:  337-262-6336
Rebecca_Hudsmith@fd.org

James K. Stronski (*pro hac vice* forthcoming)
Ellen M. Halstead (*pro hac vice* forthcoming)
Crowell & Moring LLP
Two Manhattan West
375 Ninth Avenue
New York, NY 10001
Tel: (212) 223-4000
JStronski@crowell.com
EHalstead@crowell.com

David Lindner (*pro hac vice* forthcoming)
Crowell & Moring LLP
455 N. Cityfront Plaza Drive
Suite 3600
Chicago, IL 60611
Tel: (312) 321-4200
DLindner@crowell.com

Adam J. Singer (*pro hac vice* forthcoming)
Crowell & Moring LLP
1001 Pennsylvania Avenue, NW
Washington, DC 20004
Tel: (202) 624-2500
ASinger@crowell.com

***Counsel for Plaintiff Jessie Hoffman***

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the above and foregoing was filed electronically with the Clerk of Court using CM/ECF on this 25th day of February, 2025.  Notice of this filing as generated by the electronic filing system constitutes service of the filed document on counsel of record for Defendants.

      /s/ *Samantha Bosalavage Pourciau*
      Samantha Bosalavage Pourciau