# IN THE UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| JESSIE HOFFMAN<br><br>          Plaintiff,<br><br>   v.<br><br>GARY WESTCOTT, Secretary, Louisiana Department of Public Safety and Corrections; DARREL VANNOY, Warden, Louisiana State Penitentiary; and JOHN DOES, unknown executioners<br><br><br>          Defendants. | Civil Action No. 25-169-SDD-SDJ<br><br>(Related to Civil Action 12-796-SDD-EWD) |

## EXECUTION SCHEDULED FOR MARCH 18, 2025

## MEMORANDUM IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION AND EXPEDITED DISCOVERY

## I.    INTRODUCTION

The State waited until a mere twenty-six days before his execution date to advise Jessie Hoffman that he would be executed by "nitrogen hypoxia," that is, by forced nitrogen gassing suffocation, or nitrogen asphyxiation.   And as of today, a mere twenty days before that scheduled execution, no execution protocol has been provided to him or his counsel despite requests and despite public confirmation by Governor Landry that an updated protocol for execution by nitrogen gassing has been finalized and implemented. 12-796 Rec. Doc. 335-2.[1] The State has refused to provide this basic information about the method it intends to utilize to gas Mr. Hoffman to death based on the erroneous and irrelevant contention that the protocol is not a public record. Critically, Louisiana has never before attempted a gas execution and intends to use Jessie Hoffman as a test

---

[1] Citations to "12-796 Rec. Doc." refer to the record documents in the related action No. 12-796-SDD-EWD (the "Related Case").

case for a method that has proven to cause prolonged torture and suffering in the few times it has been used in history.

A preliminary injunction staying Mr. Hoffman's March 18, 2025 execution must be issued to prevent the State from killing him before it is compelled, at a minimum, to disclose the detailed protocol it plans to use, explain what steps it has taken to minimize the substantial risk that this unusual execution method will result in a botched and unnecessarily tortuous execution, and provide Mr. Hoffman with an opportunity to be heard regarding any challenge to the protocol.

Louisiana has not conducted an execution for well over a decade. Yet it has scheduled an execution now to take place in less than three weeks while it continued to oppose re-opening the Related Case and, shockingly, failed to provide its new, updated protocol. There is no experience or precedent in Louisiana for an execution or execution protocol involving forced nitrogen gassing and so under these circumstances it is essential that Mr. Hoffman have access to the protocol and the details regarding exactly how the State intends to conduct this execution in a constitutionally appropriate manner.

Instead, the State has issued a press release generically describing death by forced nitrogen gassing in a short paragraph purporting to be a summary of a protocol for one of the three statutorily available execution methods. But the summary does not provide critical information, including information about (1) whether the individuals tasked with executing Mr. Hoffman have been sufficiently trained to do the job properly and to anticipate and be able to detail any difficulties or contingencies that may or are likely to arise; (2) how the mask will remain sealed and in the correct position throughout the execution; (3) how carbon dioxide will be removed from the mask; (4) procedures for a condemned person who vomits inside the mask; (5) the concentration of the gas to be used; (6) the purity of the gas to be used and whether the gas is industrial or medical-grade; (7) the identification and limits of impurities present; (8) the

ventilation capacity of the chamber and safety protocols in connection with releasing nitrogen into the chamber; or (9) monitoring blood oxygen levels as nitrogen is being administered. Having a full understanding of these details is particularly critical in light of the shocking experience and evidence of severe pain and suffering experienced by death row inmates in four prolonged and tortuous nitrogen asphyxiation execution deaths in Alabama in the last year.

Importantly, Mr. Hoffman raises as-applied challenges here specific to executing him by forced gassing with nitrogen. First, Mr. Hoffman has long-standing psychiatric diagnoses whereby any method of death by forced gassing with nitrogen poses a substantial additional risk of a Post Traumatic Stress Disorder ("PTSD")-induced panic attack and the risk of a botched execution that would not exist with any of the two pleaded alternative methods. Second, Mr. Hoffman is a practicing Buddhist and the method of death by forced nitrogen gassing will prevent him from practicing a principal Buddhist meditative breathing practice in the execution chamber and at the time of his death. In Mr. Hoffman's case, killing him by forcing him to breathe pure nitrogen will place a substantial and unnecessary burden on his free exercise of Buddhism and the practice of his faith in the execution chamber while he is put to death. The pleaded alternative methods would not interfere with or burden the practice of his faith.

This case raises substantial legal challenges. This Court should require the State to answer basic questions and provide basic and critical facts on the method it intends to use and how it will be implemented, and the execution should be stayed by preliminary injunction to allow for a reasonable period of expedited discovery, briefing and a hearing with experts so that this case may be decided on a developed record. The State is attempting to push through an extremely accelerated and imminent execution while at the same time withholding basic and critical method information and opposing the re-opening of the Related Case. Unreasonably, the State opposed a Rule 60(b)(6) motion to re-open Mr. Hoffman's 2012 method challenge lawsuit, even filing a

mandamus petition and stay application after re-opening to delay getting Mr. Hoffman's forced nitrogen gassing challenge before this Court. This then necessitated the filing of this second lawsuit to mitigate the State's dilatory practices and expedite bringing Mr. Hoffman's application for expedited discovery and a preliminary injunction before this Court. The State's tactics can fairly be described by the label it so freely uses (falsely) against plaintiffs: dilatory. It appears that the State's plan is to run out the clock and execute Mr. Hoffman before any court can fairly review the constitutionality of his execution in this manner.

As explained herein, the standard for a preliminary injunction is met and injunctive relief is needed to prevent the State from executing Mr. Hoffman without first addressing and resolving through proper litigation his legitimate constitutional and statutory claims. There is no legitimate reason why Mr. Hoffman's execution should take place before his claims can feasibly be heard by this Court. Mr. Hoffman will, of course, agree to proceed with expedited discovery, expedited briefing and a preliminary injunction hearing. The State should not be rewarded for its dilatory tactics and brazen attempt to summarily execute Mr. Hoffman while seeking to deny him the basic access and information necessary to challenge the State's forced nitrogen gassing method.

## II.     BACKGROUND

In 2012, Mr. Hoffman initiated the Related Case pursuant to 42 U.S.C. § 1983 for violations and threatened violations of his rights under the First, Sixth, Eighth and Fourteenth Amendments, and ex post facto clause, to the United States Constitution. *See* 12-796 Rec. Doc. 118 (Second Am. Compl. dated February 3, 2014). The other Plaintiffs intervened in the action commenced by Mr. Hoffman. *See* 12-796 Rec. Docs. 120 (Code), 201 (Wessinger, Irish), 210 (Blank), 222 (Tyler), and 252 (Reeves, Bell, Tart, Broadway).

At the time of filing, Louisiana law provided that "[e]very sentence of death executed on or after September 15, 1991, shall be by lethal injection; that is, by the intravenous injection of a substance or substances in a lethal quantity into the body of a person convicted until such person is dead." La. R.S. § 15:569(B) (West 2024 (effect. 8/15/2015)). Mr. Hoffman's original Complaint was filed after the Department of Public Safety and Corrections ("DOC") repeatedly denied access to its execution protocol. It contained allegations that, *inter alia*, lack of notice as to how he would be executed violated due process. 12-796 Rec. Doc. 1, at 10.  The current protocol denial is much more prejudicial to Mr. Hoffman because death by nitrogen gassing is a new execution method with which Louisiana has no experience.  Mr. Hoffman's due process and related Sixth Amendment claims arise from the totality of circumstances faced by Mr. Hoffman, including the withholding of the protocol and the State's prejudicial dilatory tactics.

On August 12, 2021, Defendants filed a Motion to Dismiss, contending that the DOC "ha[d] no ability to obtain the lethal injection drugs authorized by [the DOC's] current protocol nor any other potential lethal injection drugs in the foreseeable future." 12-796 Rec. Doc. 263-1, at 4.  In response to the Defendants' Motion, the Court determined that "Defendants are no longer engaging in the behavior the Plaintiffs have deemed unconstitutional in their lawsuit allegations," and, "[t]here being no live controversy," the Court determined that it "lacks subject-matter jurisdiction" and granted Defendants' motion, dismissing Plaintiffs' claims "without prejudice." 12-796 Rec. Doc. 312, at 22-23. The Court further noted, however, that "[i]ndeed, if a live controversy re-emerges [through legislation or revisions to the execution protocol], Plaintiffs may employ the same procedural mechanisms they have previously used to seek the relief they desire." *Id.* at 21. Plaintiffs filed a Motion for Reconsideration, 12-796 Rec. Doc. 315, which the Court denied. 12-796 Rec. Doc. 317. In that Ruling, the Court noted that "[i]f Attorney General Landry

is somehow successful in the future at accomplishing that which has yet to be accomplished by the legislature – an alternative means of execution in Louisiana, Plaintiffs and Defendants will have an entirely different execution protocol over which to litigate." *Id.*

On March 5, 2024, at the urging of now Governor Landry, the Louisiana Legislature passed Act 5 of the Second Extraordinary Session of 2024, amending La. R.S. § 15:569-70 to add two new methods of execution in addition to lethal injection – nitrogen gas and electrocution – effective July 1, 2024:

> At the discretion of the secretary of the Department of Public Safety and Corrections and with no preference to the method of execution, every sentence of death shall be by one of the following methods:
>
> **(1)** Intravenous injection of a substance or substances in a lethal quantity into the body.
>
> **(2)** Nitrogen hypoxia.
>
> **(3)** Electrocution, causing to pass through the body of the person convicted a current of electricity of sufficient intensity to cause death, and the application and continuance of such current through the body of the person convicted until such person is dead.

La. R.S. § 15:569(A) (West 2024 (effect. 7/1/24)).

Further, La. R.S. § 15:570 now provides for "the absolute confidentiality" of persons or entities involved in the execution:

> (G)    It is the intent of the legislature that the provisions of this Subsection shall be construed to ensure the absolute confidentiality of the identifying information of any person, business, organization, or other entity directly or indirectly involved in the execution of a death sentence within this state.  This confidentiality provision shall prevail over any conflicting provision in state law related to public disclosure.
>
> (1)    Except as provided in Subsection F of this Section, the identity of any person who participates in or performs ancillary functions in the execution process, including a person or business that delivers, dispenses, distributes,

6

> supplies, manufactures, or compounds the drugs, equivalent drug products, pharmacy generated drugs, device drugs, medical supplies, medical equipment, or other supplies or materials intended for use by the Department of Public Safety and Corrections in the administration of an execution shall be confidential and shall not be disclosed.

La. Rev. Stat. § 15:570(G) (2024).

As a result of the amendments of § 15:569-70, on June 14, 2024, Plaintiffs filed a Motion pursuant to Fed. R. Civ. P. 60(b)(6) to return the Related Case to the active docket (the "60(b)(6) Motion"). The State opposed the 60(b)(6) Motion. 12-796 Rec. Doc. 327.

On February 10, 2025, Governor Landry announced that the DOC has finalized and implemented an updated protocol for nitrogen hypoxia. 12-796 Rec. Doc. 335-2. The updated protocol announced by Governor Landry has not been publicly released and has not been provided to Mr. Hoffman or his counsel despite a specific request that it do so. "Department Regulation No. C-03-001," dated March 12, 2014, is the most recent execution protocol disclosed to Plaintiffs ("2014 Execution Protocol"),[2] but it does not address execution by nitrogen hypoxia.

On the same day, Plaintiffs filed a motion for leave to file an Emergency Supplemental Memorandum in support of the 60(b)(6) Motion in order to bring to the Court's attention the recent developments. 12-796 Rec. Doc. 331.

On February 12, 2025, the State obtained a Warrant for Mr. Hoffman's execution signed by Judge Alan Zaunbrecher of the 22nd Judicial District Court for the Parish of St. Tammany. Ex. A. The Warrant provides for Mr. Hoffman to be "put to death on March 18, 2025, between the hours of 6:00 p.m. and 11:59 p.m." *Id.* at 2. The Warrant does not indicate a particular method of execution, but instead, merely states: "in the manner provided by law." *Id.*

---

[2] The 2014 Protocol is available at https://dpic-cdn.org/production/documents/2014.03.14.LA.protocol.pdf?dm=1683576299.

On February 13, 2025, Mr. Hoffman filed a motion to recall the warrant in state court based on the now present case in controversy and then pending motion to re-open the Related Case. The state court denied the recall motion by February 18, 2025, order without opinion.

On February 14, 2025, Plaintiffs filed a Motion for Expedited Consideration of the 60(b)(6) Motion. 12-796 Rec. Doc. 336. Defendants took no position on the request for expedited consideration but continued to oppose reopening this case. *Id*.

By letter dated February 20, 2025, the DOC's Secretary, Gary E. Wescott, sent a copy of the Warrant to Mr. Hoffman and notified Mr. Hoffman that "[p]ursuant to La. R.S. § 15:569, the method of execution will be by nitrogen hypoxia." Ex. B. at 1.

On February 21, 2025, the Court granted the Rule 60(b)(6) Motion, vacated the prior order of dismissal and returned the Related Case to the active docket. 12-796 Rec. Doc. 337. The State thereafter filed a petition for writ of mandamus to the United States Court of Appeals for the Fifth Circuit, which entered an administrative stay of the order granting the Rule 60(b)(6) Motion. *In re Gary Westcott, et al.*, No. 25-30088, Doc. 16-1 (5th Cir.).

Mr. Hoffman filed his Complaint in this case on February 25, 2025. This Motion follows. Mr. Hoffman is now scheduled to be executed in just twenty days. The State has by its own admission finalized and implemented an updated nitrogen asphyxiation execution protocol, but has refused to disclose it. The State's strategy appears to be to rush to execute Mr. Hoffman and deny him his day in Court. It is axiomatic that Mr. Hoffman cannot possibly challenge the method of his execution appropriately without receiving a copy of the protocol and having an opportunity for expedited and limited discovery to understand and develop the full details regarding the manner in which the State plans to kill him, as well as the sufficiency of the steps undertaken to implement the execution in a constitutional manner. Developing these facts is particularly important now

given the fact that Louisiana has never before utilized forced nitrogen gassing to execute someone, combined with the evidence from Alabama that recent executions by nitrogen gassing have caused horrific and torturous pain and suffering.

After over a decade with no executions, the State is now trying to rush to execute Mr. Hoffman, in the dark, and block Mr. Hoffman's opportunity to raise life-and-death federal constitutional and statutory claims. It appears that the State is trying to run out the proverbial clock, not only on Mr. Hoffman, but on this Court, denying the parties and the Court the time to handle these novel issues in a manner that would allow a ruling on a well-developed record.

## III.    Death By Nitrogen Gassing

Louisiana has never executed or attempted to execute a condemned inmate by nitrogen gassing. Nor has the federal government. The fact is, despite its scientific-sounding name, "nitrogen hypoxia" as a method of execution was not conceived by scientists or doctors. Instead, it was the idea of a few criminal law professors. In 2014, Professors Michael Copeland, Christine Pappas, and Thomas Parr at Oklahoma's East Central University co-authored a 14-page white paper in which they advocated for the use of forced nitrogen gas asphyxiation (which they called "nitrogen hypoxia")[3] over lethal injection. *See* Michael Copeland, Thom Parr, and Christine Papas, *Nitrogen Induced Hypoxia as a Form of Capital Punishment* (2014). At the time, Oklahoma was under fire for multiple botched executions using lethal injection. In September 2014, Mike Christian of Oklahoma's House of Representatives invited Copeland to present his research to the

---

[3] The term "nitrogen hypoxia" itself reflects the method's non-medical origin. The word "hypoxia" means "low oxygen." It does not describe a process, but rather a state of being. A medical professional would instead describe this execution method as "asphyxiation"—i.e., the *process* of being deprived of oxygen.

Oklahoma House Judiciary Committee.[4] Soon thereafter, in February 2015, Rep. Christian introduced House Bill 1879 to authorize "nitrogen hypoxia" as a legal alternative to lethal injection. The bill sailed through the Oklahoma state legislature (without expert review), and Governor Mary Fallin signed HB 1879 into law just over two months from its introduction. Oklahoma thereby became the first state to sanction execution by forced nitrogen gas asphyxiation, though it has yet to utilize this method.

Alabama is the only state to execute people by forced nitrogen gassing.[5] According to eyewitness accounts, all four nitrogen gas executions conducted by the state of Alabama have included observations of extreme suffering. Ex. C Declaration of Philip E. Bickler, M.D., PhD ("Bickler Decl.") at 2.  In January 2024, the Alabama Department of Corrections ("ADOC") executed Kenneth Smith by nitrogen gassing.  This involved strapping Mr. Smith to a gurney, fitting him with a respirator mask connected to nitrogen gas, and then forcing him to breath nitrogen gas.[6]

After ADOC started the flow of nitrogen gas, Mr. Smith started "to convulse and shake vigorously for about four minutes. . . .  It was another two to three minutes before he appeared to lose consciousness, all while gasping for air to the extent that the gurney shook several times."[7]

---

[4]  Jack Shuler, "Can Executions Be More Humane?," *Atlantic* (March 20, 2015), https://www.theatlantic.com/politics/archive/2015/03/can-executions-be-more-humane/388249/.

[5] Nicholas Bogel-Burroughs & Abbie VanSickle, *Alabama Carries Out First U.S. Execution by Nitrogen*, N.Y. Times (Jan. 25, 2024),  www.nytimes.com/2024/01/25/us/alabama-nitrogen-execution-kenneth-smith.html.

[6]  *See* Ala. Dep't of Corrections Execution Procedures (Aug. 2023), at 15–17, https://dpic-cdn.org/production/documents/Al_Lethal_Gas_Execution_Protocol_2023_08.pdf?dm=16939384 90.

[7] Marty Roney, *Nitrogen Gas Execution:  Kenneth Smith Convulses for Four Minutes in Alabama Death Chamber*, Montgomery Advertiser (Jan. 25, 2024),  www.montgomeryadvertiser.com/story/news/local/alabama/2024/01/25/four-minutes-of-convulsions-kenneth-smith-executed-with-nitrogen-gas/72358038007/.

Media witness Lee Hedgepeth recounted that Mr. Smith's head moved back and forth violently in the minutes after the execution began. Having witnessed four other executions, Mr. Hedgepeth stated that he had "never seen such a violent reaction to an execution."[8]

Mr. Smith's spiritual advisor was also present in the execution chamber and described the scene: "[W]e didn't see someone go unconscious into two or three seconds. We didn't see somebody go unconscious in 30 seconds. What we saw was minutes of someone struggling for his life. We saw minutes of someone heaving back and forth. We saw spit. We saw all sorts of stuff develop from his mask."[9]

The victim's son, Mike Sennett, stated that he was told by prison personnel that Mr. Smith would "take two or three breaths and he'd be out and gone."[10] However, he described: "That ain't what happened. After about two or three breaths, that's when the struggling started. Other people kept saying he was trying to raise himself up. . . . With all that struggling and jerking and trying to get off that table, more or less, it's just something I don't ever want to see again."[11] Twenty-seven minutes after ADOC started the flow of gas, Mr. Smith was declared dead.[12]

The three other nitrogen gas executions carried out by ADOC were similar. On September 26, 2024, ADOC executed Alan Eugene Miller by nitrogen gas. According to reports, Mr. Miller

---

[8] Nicholas Bogel-Burroughs & Abbie VanSickle, *Alabama Carries Out First U.S. Execution by Nitrogen*, N.Y. Times (Jan. 25, 2024), www.nytimes.com/2024/01/25/us/alabama-nitrogen-execution-kenneth-smith.html.

[9] Ralph Chapoco, *Kenneth Eugene Smith Executed by Nitrogen Gas for 1988 Murder-for-Hire Scheme*, Alabama Reflector (Jan. 25, 2024), https://alabamareflector.com/2024/01/25/kenneth-eugene-smith-executed-by-nitrogen-gas-for-1988-murder-for-hire-scheme/.

[10] Nicholas Bogel-Burroughs, *A Select Few Witnessed Alabama's Nitrogen Execution. This Is What They Saw*, N.Y. Times (Feb. 1, 2024), www.nytimes.com/2024/02/01/us/alabama-nitrogen-execution-kenneth-smith-witnesses.html.

[11] *Id.*

[12] Roney, *supra* note 14.

"shook and trembled on a gurney for about two minutes, with his body at time pulling against restraints. . . . The shaking and trembling was followed by about six minutes of periodic gulping breaths before he became still."[13]  According to media witness Marty Roney, "Miller gasped, shook and struggled against his restraints for two minutes after the gas apparently began to flow."[14] Media witness Ivana Hrynkiw noted that Mr. Miller took deep breaths after the gas began to flow and lifted his head off the gurney several times, then gasped on and off for six minutes.[15]

Mr. Miller's spiritual adviser John Muench, who is also a physician, said of the execution: "We don't see people jerking around like that while they're dying normally.  His face was twisted and he looked like he was suffering."[16]  Muench also noted that he had no question that Mr. Miller suffered: "I'm sure he was suffering certainly at the beginning of it, when he was gasping for oxygen.  When he lifted his head up and I could see him, he was definitely gasping."[17]  Muench observed Mr. Miller shaking on the gurney: "I didn't feel like there would be anything possible that I could do, but I very much felt, when he started jerking, that we need – we should stop this at

---

[13] Michelle Watson & Jason Hanna, *Alabama Has Executed Alan Eugene Miller, the Second Inmate Known to Die by Nitrogen Gas*, CNN (Sept. 26, 2024), www.cnn.com/2024/09/26/us/alan-eugene-miller-alabama-execution/index.html.

[14] Marty Roney, *Alabama executes Alan Eugene Miller with nitrogen gas*, Montgomery Advertiser (Sept.            26,            2024            7:45            PM), https://www.montgomeryadvertiser.com/story/news/crime/2024/09/26/alabama-executes-alan-eugene-miller-with-nitrogen-gas/75360739007/.

[15] Ivana Hrynkiw, *Alabama inmate Alan Miller executed with nitrogen gas Thursday for 1999 shootings*, AL.com (Sept. 26, 2024 8:59 PM), https://www.al.com/news/2024/09/alabama-inmate-alan-miller-set-to-be-executed-with-nitrogen-gas-thursday-for-1999-shootings.html.

[16] Lauren Gill, *"Agony" and "Suffering" as Alabama Experiments with Nitrogen Executions*, Bolts (Oct. 8, 2024), https://boltsmag.org/alabama-nitrogen-executions/.

[17] *Id*.

some point."[18]  Twenty-two minutes after the gas apparently began to flow, Mr. Miller was declared dead.[19]

On November 21, 2024, ADOC executed Carey Dale Grayson by nitrogen gas.  During the approximately six minutes it took for Mr. Grayson to lose consciousness, he "tightly clenched his hands, took deep gasps, shook his head vigorously and pulled against his restraints."[20]  Media witness Kim Chandler observed that "Grayson rocked his head, shook and pulled against the gurney restraints."[21]  His hands were "tightly clenched [and he] took several deep gasps, shaking his head vigorously."[22]  Mr. Grayson's "sheet-wrapped legs lifted off the gurney into the air. . . . He took a periodic series of more than a dozen gasping breaths for several minutes."[23]

Dr. Brian McAlary witnessed Mr. Grayson's execution and testified in Demetrius Frazier's federal court challenge to the method.[24]  He is the first medical doctor to testify about observations

---

[18] *Id.*

[19] Ivana Hrynkiw, *Alabama inmate Alan Miller executed with nitrogen gas Thursday for 1999 shootings*, AL.com (Sept. 26, 2024 8:59 PM), https://www.al.com/news/2024/09/alabama-inmate-alan-miller-set-to-be-executed-with-nitrogen-gas-thursday-for-1999-shootings.html.

[20] Marty Roney et al., *Carey Dale Grayson Executed in Alabama in Hiker's Murder; 3rd Nitrogen Gas Execution in US*, USA Today (Nov. 21, 2024), www.usatoday.com/story/news/nation/2024/11/21/carey-dale-grayson-execution-alabama-nitrogen-gas/76489211007/.

[21] Kim Chandler, *Alabama carries out nation's third nitrogen gas execution on a man for hitchhiker's killing*, Associated Press (Nov. 22, 2024 7:15 AM), https://apnews.com/article/death-penalty-nitrogen-execution-alabama-09450359e223a9d38a5fb24e87fcfb45.

[22] Marty Roney, *Alabama executes Carey Dale Grayson by nitrogen gas for brutal 1999 murder*, Montgomery Advertiser (Nov. 21, 2024 7:48 PM), https://www.montgomeryadvertiser.com/story/news/crime/2024/11/21/alabama-executes-carey-dale-grayson-by-gas-for-brutal-1999-murder/76465482007/.

[23] Kim Chandler, *Alabama carries out nation's third nitrogen gas execution on a man for hitchhiker's killing*, Associated Press (Nov. 22, 2024 7:15 AM), https://apnews.com/article/death-penalty-nitrogen-execution-alabama-09450359e223a9d38a5fb24e87fcfb45.

[24] Kim Chandler & Safiyah Riddle, *Federal judge hears request to block an upcoming nitrogen gas execution in Alabama*, Associated Press (Jan. 28, 2025 6:32 PM),

during a nitrogen execution.[25]  McAlary testified that there was clear "evidence of distress," that Mr. Grayson moved his head back and forth, had rapid eye movements, and struggled against his restraints.[26]  McAlary believed that Mr. Grayson's last voluntary movement occurred about three minutes after gas began flowing, when Mr. Grayson simultaneously raised both legs and held them in the air before letting them fall down.[27]  McAlary believed this was voluntary because "both legs were moved at exactly the same time, direction, and distance."[28]  Twenty-one minutes after ADOC appeared to begin the flow of gas, Mr. Grayson was declared dead.[29]

And on February 6, 2025, ADOC used nitrogen gas to execute Demetrius Frazier.  As the nitrogen gas flowed, Mr. Frazier "appeared to struggle to breathe and seemed to clench the muscles in his face. . . . [Mr.] Frazier's legs appeared to tense and raise a few inches off of the gurney, with his head seemingly lolling to the side.  His arms seemed to tighten and fists clenched."[30]  Media witnesses observed Mr. Frazier waving his hand in circles.[31]  Mr. Frazier "clenched his face, and

---

https://apnews.com/article/nitrogen-gas-execution-alabama-hearing-demetrius-frazier-7a222a9654da01125192d1c4b893fdca.

[25] *Id*.

[26] *Id*.

[27] *Id*.

[28] *Id*.

[29] Kent Faulk, *Alabama executes Carey Dale Grayson by nitrogen gas for 1994 murder*, AL.com (Nov. 21, 2024 11:43 PM), https://www.al.com/news/2024/11/live-updates-alabama-set-to-execute-carey-dale-grayson-by-nitrogen-gas-for-1994-murder.html.

[30] Sarah Clifton, *Alabama Executes Demetrius Frazier by Nitrogen Gas for 1991 Murder*, USA Today (Feb. 6, 2025), www.usatoday.com/story/news/local/alabama/2025/02/06/alabama-executes-demetrius-frazier-by-nitrogen-gas-for-1991-murder/78282236007/.

[31] *See* Kim Chandler, *Alabama puts man to death for a 1991 murder in the nation's fourth execution using nitrogen gas*, Associated Press (Feb. 6, 2025 10:17 PM), https://apnews.com/article/alabama-execution-demetrius-frazier-nitrogen-gas-e1b391e1e157f2815be1baa248737778; Riley Conlon & Taylor Lang, *"Detroit Strong": Alabama carries out execution of inmate in Michigan's custody*, WVTM13 (Feb. 10, 2025 3:32 PM),

his nostrils flared, while his hands quivered.  He appeared to say something . . . .  His legs slightly lifted up off the gurney and he gasped.  Then, his head rolled to the right side.  Frazier exhibited sporadic gasping and shallow breathing . . ."[32]  He appeared to "quiver and twitch," "struggle to breathe", and "breathe sporadically, with seemingly inconsistent amounts of time between breaths, and apparently slightly shuddering."[33]  Approximately twenty-five minutes after the gas began flowing, Mr. Frazier was declared dead.[34]

## IV.    ARGUMENT

### A.    Legal Standard

The purpose of a preliminary injunction "is merely to preserve the relative positions of the parties until a trial on the merits can be held." *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981). The primary reason to grant a preliminary injunction is "to preserve the court's power to render a meaningful decision after a trial on the merits." 11A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 2947, at 112, 114 (3d ed. 2013). "[P]reliminary injunctions are 'customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits." *Attorney General of Oklahoma v.*

---

https://www.wvtm13.com/article/alabama-inmate-execution-michigan-lawsuit-1738878056/63692646.

[32] Ivana Hrynkiw, *Alabama inmate Demetrius Frazier executed by nitrogen gas for 1991 Birmingham slaying: "Let's go"*, AL.com (Feb. 6, 2025 8:27 PM), https://www.al.com/news/2025/02/alabama-inmate-demetrius-frazier-set-to-die-by-nitrogen-michigan-governor-hasnt-acted.html.

[33] Sarah Clifton, *Alabama executes Demetrius Frazier by nitrogen gas for 1991 murder*, Montgomery Advertiser (Feb. 6, 2025 8:46 PM), https://www.montgomeryadvertiser.com/story/news/local/alabama/2025/02/06/alabama-executes-demetrius-frazier-by-nitrogen-gas-for-1991-murder/78282236007/.

[34] Ivana Hrynkiw, *Alabama inmate Demetrius Frazier executed by nitrogen gas for 1991 Birmingham slaying: "Let's go"*, AL.com (Feb. 6, 2025 8:27 PM), https://www.al.com/news/2025/02/alabama-inmate-demetrius-frazier-set-to-die-by-nitrogen-michigan-governor-hasnt-acted.html.

*Tyson Foods, Inc.*, 565 F.3d 769 (10th Cir. 2009) (quoting *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981)). For that reason, the moving party is not required to "prove his case in full at a preliminary injunction hearing." *Id.* (quoting *Camenisch*, 451 U.S. at 395).

To be entitled to a preliminary injunction, generally, a party should demonstrate that (1) they will likely succeed on the merits of their claim(s); (2) without preliminary relief, they will likely suffer irreparable harm; (3) "the balance of the equities tips in [their] favor"; and (4) "an injunction is in the public interest." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Any of the four factors may provide a reason for this Court to enter or deny an injunction. The same factors apply for a stay of execution. *Hill v. McDonough*, 547 U.S. 573, 584 (2006) (explaining that "like other stay applicants, inmates seeking time to challenge the manner in which the State plans to execute them must satisfy all of the requirements for a stay, including a showing of a significant possibility of success on the merits"). Where the other factors are strong, "it is not even necessary that a substantial likelihood of success be shown…a showing of some likelihood of success on the merits will justify temporary injunctive relief." *Productos Carnic, S.A. v. Central Amer. Beef and Seafood Trading Co.*, 621 F.2d 683, 686 (5th Cir. 1980). In particular, "the likelihood-of-success element varies with the relative harm occasioned to the parties from the issuance *vel non* of the injunction." *Bluebonnet Savings Bank v. Office of Thrift Supervision*, 62 F.3d 397, 397 (5th Cir. 1995).

The Fifth Circuit has not explicitly adopted a standard to determine whether a party is entitled to conduct expedited discovery, but "many district courts within the Fifth Circuit have chosen to apply the 'good cause' standard." *Yogaratnam v. Doe*, No. 24-393, U.S. Dist. LEXIS 210774, at *11 (E.D. La. Nov. 19, 2024); *see also Planned Parenthood Gulf Coast, Inc. v. Gee*, 2018 U.S. Dist. LEXIS 248849, at *50 (M.D. La. May 23, 2018). Pursuant to that standard, "good

cause" exists where "the need for expedited discovery, in consideration of the administration of justice, outweighs the prejudice to the responding party." *Id.* Courts in this circuit have found the requisite good cause exists where "the normal course of discovery would not provide enough time to conduct the discovery prior to the Court's consideration of [a] motion for preliminary injunction." *Doe v. Marine-Lombard*, No. 16-14876, 2016 U.S. Dist. LEXIS 156156, at *9 (E.D. La. Nov. 10, 2016). Mr. Hoffman meets this standard for the entry of a preliminary injunction to prevent Mr. Hoffman's execution before his substantial legal challenges may be heard on a proper record.

**B.     Mr. Hoffman Has a Substantial Likelihood of Success on His Claims.**

   **1.   Mr. Hoffman Has a Substantial Likelihood of Success on His Eighth Amendment Claim**

The Eighth Amendment forbids the State, in carrying out a death sentence, from inflicting pain beyond that necessary to end the condemned prisoner's life. *In re Kemmler*, 136 U.S. 436, 447 (1890). "Punishments are cruel when they involve torture or a lingering death . . . something more than the mere extinguishment of life." *Id.*; *see also Baze v. Rees*, 553 U.S. 35, 50 (2008) (execution violates the Eighth Amendment if it presents a "substantial risk of serious harm").

A condemned prisoner challenging a method of execution must show the method creates a "demonstrated risk of severe pain" that is "substantial when compared to the known and available alternatives." *Baze*, 555 U.S. at 61. A "substantial risk of conscious suffocation can create an Eighth Amendment problem regardless of the method of execution being used." *Grayson v. Comm'r, Ala. Dep't of Corr.*, 121 F.4th 894, 898 (11th Cir. 2024). A prisoner's proposed alternative need not be authorized by state law. *Bucklew v. Precythe*, 578 U.S. 119, 153 (2019) (Kavanaugh, J., concurring).

To prevail on his Eighth Amendment claim, Mr. Hoffman must show that there is a "substantial risk of serious harm" or an "objectively intolerable risk of harm" when compared to an alternative method of execution to the state's protocol that is "feasible, readily implemented, and in fact significantly reduce[s] a substantial risk of severe pain." *Glossip*, 576 U.S. at 876 (quoting *Baze*, 553 U.S. at 50, 52). A "substantial risk of serious harm" may occur when the method of execution involves "torture or a lingering death," *Baze*, 553 U.S. at 49, or the "'superaddition' of 'terror, pain, or disgrace.'" *Bucklew*, 587 U.S. at 133 (quoting *Baze*, 553 U.S. at 48).

Mr. Hoffman is likely to succeed on his claim that death by forced nitrogen gassing will violate his rights under the Eighth Amendment. While Defendants have not yet disclosed the execution protocol and much of the information that will be needed to adjudicate Mr. Hoffman's claims, as part of a run-out-the-clock strategy, Mr. Hoffman can demonstrate a likelihood of success even on what little has been disclosed up to now.

The Eighth Amendment forbids "deliberate indifference" to "serious medical needs of prisoners," *Estelle v. Gamble*, 429 U.S. 97, 104 (1976), and to a substantial risk of serious harm to a prisoner. *See Farmer v. Brennan*, 511 U.S. 825, 834 (1994); *see also West v. Atkins*, 487 U.S. 42, 58 (1988) ("[A] physician who acts on behalf of the State to provide needed medical attention to a person involuntarily in state custody (in prison or elsewhere) and prevented from otherwise obtaining it, and who causes physical harm to such a person by deliberate indifference, violates the [Constitution's] protection against the deprivation of liberty without due process.") (Scalia, J., concurring). The State is required to provide Mr. Hoffman with appropriate medical care until the moment of death and, thus, the Eighth Amendment's proscription against "deliberate indifference" requires that the State administer the death penalty without the "unnecessary and wanton infliction

of pain." *Gregg v. Georgia*, 428 U.S. 153, 173 (1976). The State cannot fulfill this Constitutional obligation by gassing Mr. Hoffman to death.

Executing Mr. Hoffman by forced nitrogen gassing would violate his Eighth Amendment rights because it will subject him to a substantial risk of severe pain and suffering as compared with the two proposed and pleaded alternative methods (i.e., (i) a firing squad targeting the cardiac bundle, and (ii) a widely used (where legal) medical-aid-in-dying ("MAID") protocol using commonly available drugs), as confirmed by experts in these fields as discussed below.

All four executions conducted in Alabama by nitrogen gassing featured shaking, gasping, and shocking evidence of great pain and suffering. These four experiments with forced nitrogen gassing evidence the substantial terror, pain and suffering to be expected by a method causing death by forced gas asphyxiation. And death by this method took over twenty minutes from the time nitrogen gas began flowing until the time of death.

Dr. Philip Bickler, the Chief of Neuroanesthesia at the University of California, San Francisco is a leading expert on the effects of oxygen deprivation on humans. Ex. C., Bickler Decl. at 1. Dr. Bickler explains that forcing even a healthy person to inhale nitrogen for execution "causes severe pain and suffering." *Id*. at 2. That suffering includes a prolonged death process with struggling, distress and evident distress. *Id*. at 1.

Nitrogen asphyxiation is widely criticized for causing panic, distress, and severe pain and suffering.[35] Indeed, the American Veterinary Medical Association (AVMA) has concluded that

---

[35] In 2024, Louisiana's 24th Judicial District Court considered and credited expert testimony opining that nitrogen hypoxia can cause the condemned inmate to "enter[] a persistent vegetative state, experienc[e] [a] stroke, or experienc[e] painful suffocation instead of dying," as well as "distress, panic, pain, and suffocation by vomit" in declaring La. R.S. 15:569(A)(2) & (3) unconstitutional as violating the Ex Post Facto Clauses of the US and Louisiana constitutions. *See* Minute Order, *State v. Neveaux*, No. 16-04029 (La. Dist. Ct., 24th Jud. Dist., Apr. 19, 2024); Supp. to Mot. to Declare La. R.S. 15:569(A)(2) & (3) Unconstitutional As Applied to Mr. Neveaux, at

nitrogen asphyxiation is not even an acceptable method of euthanasia for most animals.[36]  Ex. C., Bickler Decl. at 3-4.  Louisiana has explicitly codified in law that "[e]uthanasia methods and procedures must conform with recommendations outlined in the report of the American Veterinary Medical Association on Euthanasia," and has specifically outlawed gassing as a method of euthanasia for cats and dogs.  La. Rev. Stat. § 3:2465(C)(1)-(2). The United Nations Human Rights Office, too, has admonished the use of nitrogen asphyxiation and the "grave suffering"[37] it may cause as likely "amount[ing] to torture under international law."[38]

Veterinarian Lawrence Lee Capone Jr. explains that, in the early 1980s, he observed the euthanasia of companion animals by a local Louisiana shelter using forced carbon monoxide gassing. Ex. D., Capone Decl. at ¶ 3.  He explains that carbon monoxide gassing, like nitrogen gassing, denies the animal oxygen and causes death by asphyxiation.  Ex. D., Capone Decl. at ¶ 4. He further explains that these animals were "in agony and incredibly frightened" and that even more than forty-five years later that the image of this suffering "affects me deeply." Ex. D., Capone Decl. at ¶¶ 5-8. This animal gassing method is now outlawed in Louisiana and, as Dr. Capone

---

1, *State v. Neveaux*, No. 16-04029 (La. Dist. Ct., 24th Jud. Dist., Apr. 9, 2024).  The expert testimony went to the question of whether the legislature's approval of nitrogen hypoxia made more burdensome the punishment for a capital crime so as to constitute a prohibited ex post facto law.

[36] AVMA Guidelines for the Euthanasia of Animals, at 28 (2020 ed.), www.avma.org/sites/default/files/2020-02/Guidelines-on-Euthanasia-2020.pdf.  These guidelines are followed by major research universities, including Louisiana State University and Louisiana State University Health Sciences Center.  *See, e.g.*, LSU Health, New Orleans, Institutional Animal Care and Use Committee, https://www.lsuhsc.edu/administration/academic/ors/iacuc/default.aspx.

[37] U.N. Human Rights, Office of the High Commissioner, *United States:  UN Experts Alarmed at Prospect of First-Ever Untested Execution by Nitrogen Hypoxia in Alabama* (Jan. 3, 2024), www.ohchr.org/en/press-releases/2024/01/united-states-un-experts-alarmed-prospect-first-ever-untested-execution.

[38] *First U.S. Nitrogen-Gas May Constitute Torture – UN Rights Office*, reuters.com (Jan. 16, 2024), www.reuters.com/world/us/first-us-nitrogen-gas-execution-may-constitute-torture-un-rights-office-2024-01-16/.

explains, it is accepted that it is inappropriate and cruel to euthanize companion animals using gas to cause death by asphyxiation. Capone Decl. at ¶ 10.

Execution by nitrogen gas deprives the condemned inmate of oxygen, which will likely cause even an otherwise healthy person to experience the feeling of suffocation, panic, and significant pain and suffering. Even for a healthy person, execution by nitrogen gassing is cruel, because it involves significantly more pain and suffering than necessary for the mere extinguishment of life. Death by nitrogen gassing is not instantaneous. *See supra* at Sec. III. Asphyxiation by nitrogen gas causes conscious terror for several minutes and excruciating sensations of being suffocated to death. *Id.* "[F]orcing a person to inhale nitrogen to execute them causes severe pain and suffering. All the accounts to date describe a prolonged death process with struggling, evident distress, irregular breathing and continued movements many minutes into the execution." Ex. C., Bickler Decl. at 2. None of the executions by nitrogen asphyxiation have "unfolded quickly or without distress as its proponents have claimed." *Id.* at 3. For example, during the execution of Mr. Smith in January 2024, witnesses described Mr. Smith as "very much still conscious" while he convulsed and suffocated to death on the gurney. *See supra* Sec. III. Dr. Brian McAlary, a board-certified anesthesiologist who has been practicing medicine for over 50 years, reviewed Kenneth Smith's autopsy report and related documents and concluded that Mr. Smith was suffocated while conscious. *See* Ex. E, Decl. of Dr. Brian McAlary, *Miller v. Grayson*, No. 24-cv-376-RAH (M.D. Al.). Dr. McAlary notes that Mr. Smith's lungs were far heavier than they should have been, indicating the presence of fluid and blood. According to Dr. McAlary:

> Mr. Smith's lungs were filled with fluid and blood at the time of his death. This is the result of negative pressure pulmonary edema (NPPE), which would not result from heart problems. Rather, NPPE occurs when inspiration is attempted against an upper airway obstruction, leading to fluid being drawn from blood vessels into the alveoli. NPPE can also occur after strangulation or smothering with a plastic bag.

21

*Id.*

NPPE can appear when someone panics while conscious and being deprived of oxygen, which triggers blood vessel constriction resulting in an upper respiratory obstruction.

Because it is notoriously difficult to keep oxygen out of the respirator mask, death by nitrogen gassing can be prolonged because the more oxygen infiltrates the mask, the more adulterated the nitrogen entering the person's lungs. This prolongs the hypoxia, increasing the risk that even a healthy person enters into a persistent vegetative state, suffers a stroke, or continues to experience the feeling of suffocation.

Moreover, because La. Rev. Stat. § 15:570(G) "ensure[s] the absolute confidentiality of the identifying information of any person, business, organization, or other entity directly or indirectly involved in the execution of a death sentence within this state" and because the State has thus far refused to disclose its execution protocol, Mr. Hoffman has no way of knowing whether DOC has actually obtained and will use pure nitrogen gas certified as medical grade, as opposed to some substandard substance that could increase or prolong any pain and suffering.

Mr. Hoffman also suffers from PTSD and Psychotic Disorder, resulting from exposure to "extremely high levels of childhood abuse and domestic violence" as well as "extremely high levels of neighborhood violence and homicide" and being the victim of an armed robbery. *See* Ex. F, Declaration of Frederic James Sautter, Jr., Ph.D. ("Sautter Decl.") at ¶¶ 5, 6. Mr. Hoffman was diagnosed with PTSD and Psychotic Disorder as early as 2003 when Dr. Sautter first conducted a psychological evaluation of him. *Id.* at ¶ 5. A recent evaluation confirmed the diagnoses and found that Mr. Hoffman had learned to "manage his psychological dysregulation" and "regain control over his emotional and cognitive well-being, including his complex PTSD, in substantial part through his commitment to Buddhism" and "the ancient practice of Buddhist breathing

techniques." *Id*. at ¶¶ 9, 10. These Buddhist meditative breathing techniques "allow him to center himself in the present moment and manage his thoughts and emotions effectively." *Id*. at ¶ 10. Forcing a respirator mask upon his face that will deny him oxygen will interfere with his ability to utilize the breathing techniques that he practices to control his PTSD and cause him to suffer. *Id*. at ¶ 12 (during an execution by nitrogen asphyxiation , Mr. Hoffman would be "restrained, forced to wear a mask, and made to inhale pure nitrogen. Nitrogen without oxygen will likely increase feelings of panic and cause a panic attack. People with PTSD are highly vulnerable to panic attacks, and it is highly likely that [Mr. Hoffman] would experience traumatic memories and flashbacks as he is forced to inhale nitrogen prior to dying."); ¶ 15 ("executing Mr. Hoffman by nitrogen gas will very likely cause him to experience extreme psychological distress and panic. An individual experiencing panic while also being denied oxygen will experience a constricted airway like an upper airway obstruction. Mr. Hoffman may vomit, convulse, experience an inability to breathe, and otherwise suffer severe psychological pain.").

Accordingly, there is a substantial likelihood that Mr. Hoffman will experience superadded pain and suffering as compared to his pleaded alternative methods of execution as explained in the accompanying declarations, including that of Dr. Bickler. Dr. Bickler is a leading medical expert on the effects of hypoxia and is prepared to testify, as set forth in the attached declaration, to the severe pain and suffering very likely to be experienced from execution by forced nitrogen gassing. Ex. C., Bickler Decl. at ¶ 19.  As explained by Dr. Bickler, an anesthesiologist and leading expert on hypoxia and the ethical use of laboratory animals in research, the "cruel effects of nitrogen breathing led the American Veterinary Medical Association (AVMA) to condemn it's use for euthanasia in dogs and other animals. Nitrogen for euthanasia is prohibited at my institution, the University of California at San Francisco, and other major academic centers." *Id*. at ¶ 17. Although

the recognized suffering caused by forced nitrogen gassing is too much to inflict upon a dying pet, it is exactly how the State intends to execute Mr. Hoffman.

Further, the forced nitrogen gassing method will subject Mr. Hoffman to further superadded pain and suffering due to the PTSD that he suffers, which he controls to avoid panic attacks with Buddhist meditative breathing practices. Ex. F., Sautter Decl. at ¶ 10. Neither of his pleaded alternatives would trigger his PTSD and prevent him from utilizing the method he has developed to cope with it and thus, by comparison, present a substantially lesser risk of additional superadded pain and suffering. *Bucklew*, 587 U.S. at 141.

***Execution by firing squad****:* The firing squad is a "known and available" method of execution. *Baze*, 553 U.S. 35 at 61.

Death by firing squad is currently approved by five States: Mississippi, MS Code § 99-19-51; Oklahoma, 22 OK Stat § 1014; Utah, UT Code § 77-18-113; South Carolina, SC Code § 24-3-530; and Idaho, ID Code § 19-2716. "Point[ing] to a well-established protocol in another State as a potentially viable option" is acceptable in identifying an alternative method. *Nance v. Ward*, 597 U.S. 159, 165 (2022) (citing *Bucklew*, 587 U.S. at 140).

Defendants could easily identify qualified personnel to carry out an execution by firing squad. The weapons and ammunition necessary to carry out an execution by firing squad are easily obtainable. And Defendants could also easily borrow from other States, including Utah, or the United States Army in creating and implementing a protocol. Ex. G, Report of Dr. Williams at 11-13. All that is required is approximately 10 individuals armed with rifles. The prisoner would be fastened to chair or secured in a standing position, and the shooters would aim at his heart. *Id.* at 11-12. Some of the rifles would be loaded with blanks to ensure each rifleman a "plausible deniability." *Id.* at 14. This would ensure a fast and painless death. *Id* at 12.

Execution by firing squad is both swift and virtually painless. *Id.* 5-6 (explaining all cognitive activity would cease within seconds). Evidence and recent experience strongly suggest that "the firing squad is significantly more reliable" than lethal injection. *Glossip,* 135 S. Ct. at 2796 (Sotomayor, J., dissenting). Historically, the firing squad has resulted in significantly fewer "botched" executions. "Botched executions are those involving unanticipated problems or delays that caused, at least arguably, unnecessary agony for the prisoner or that reflect gross incompetence of the executioner." Austin Sarat, *Gruesome Spectacles: Botched Executions and America's Death Penalty,* p. 5 (2014) (quotations omitted). A study, which analyzed the contemporaneous news reports of all executions in the United States from 1900 to 2010, found that 7.12% of the 1,054 executions by lethal injection had been "botched," but none of the 34 executions by firing squad had been botched. *Id.* at App. A, p. 177. Accordingly, execution by firing squad is a known and available alternative method that presents a substantially lower risk of pain and suffering than Defendants' flawed protocol.

**Execution by administration of DDMAPh**: DDMAPh is the most commonly used regimen for medical-aid-in-dying in the United States. *See* Ex. H., Report of Dr. Blanke at 4. The study and regular use of the regimen means that Mr. Hoffman is able to present evidence on "essential questions" like what drugs should be administered and in what quantities. *Bucklew*, 587 U.S. at 141. This is not merely "a proposal for more research," but a readily implemented alternative. *Id*. at 142.

DDMAPh is the administration of digonxin, diazepan, morphine, amtirtipyline and phenobarbital. Ex. H., Report of Dr. Blanke at 2. Dr. Charles Blanke, MD, has provided his precise recommendations for administering the protocol. *See generally* Ex. H., Report of Dr. Blanke. Specifically, for a quick death in the execution setting, the DDMAph protocol consists of 100 mg

of digoxin, 2,000 mg of diazepam, 15,000 mg of morphine, 8,000 mg of amitriptyline, and 10,000 mg of phenobarbital. *Id.* at 5. The medications are simply mixed with apple juice/apple syrup and administered to the prisoner. *Id.* at 5-6. He has also explained that no specialized training is required to administer DDMAPh and that each of the drugs in DDMAPh can be obtained from a variety of compounding pharmacies. *Id.* at 2. DDMAPh effectively causes death without any risk of prolonged pain or suffering. *Id.* at 1.

Each alternative proposed by Mr. Hoffman is "sufficiently detailed to permit a finding that the State could carry it out 'relatively easily and reasonably quickly.'" *Bucklew*, 587 U.S. at 141 (citing *McGehee v. Hutchinson*, 854 F.3d 488, 493 (8th Cir. 2017)). Each produces a reliable and painless death. *See* Ex. H., Report of Dr. Blanke at ¶ 5 ("Administration of the [MAID combination of drugs] digoxin, diazepam, morphine, amitriptyline and phenobarbital (DDMAPh) . . . would cause death and would do so reliably and painlessly."); ¶ 9 ("All patients taking the lethal medication that I prescribed or recommended through consultation died, and they uniformly did so peacefully and without suffering."); ¶ 20 ("First, the morphine, diazepam, and phenobarbital induce a state of relaxation and loss of awareness, and within minutes, a deep coma. Then, the digoxin and amitriptyline cause an irregular heartbeat and lowering of the blood pressure, resulting in death. The patient is unaware and does not experience pain."); *see also* Ex. G., Report of Dr. James S. Williams, M.D. M. Sc. at 4 ("the experience of pain and suffering from a . . . lethal gunshot wound to the chest is relatively minor, if not in fact completely absent."); *id.* at 6 ("By targeting the cardiovascular bundle, the firing squad causes death with minimal pain and suffering."). The MAID drug cocktail is made up of readily available drugs, Ex. H., Report of Dr. Blanke at ¶ 6, and existing State of Utah and U.S. Military firing squad protocols that may be easily implemented in Louisiana. Ex. G., Report of Dr. Williams at 12.

### 2. Mr. Hoffman Has a Substantial Likelihood of Success on His Free Exercise of Religion Claim.

Mr. Hoffman is likely to succeed on his claim that his right to the free exercise of religion will be violated if he is executed via nitrogen gassing. The Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA"), 42 U.S.C. § 2000cc *et seq.* governs religious exercise by institutionalized persons and "allows prisoners to seek religious accommodations." "In RLUIPA, in an obvious effort to effect a complete separation from the First Amendment case law, Congress deleted reference to the First Amendment and defined the 'exercise of religion' to include 'any exercise of religion, whether or not compelled by, or central to, a system of religious belief.'" *Burwell v. Hobby Lobby Stores*, 573 U.S. 682, 696 (2014) (quoting 42 U.S.C. § 2000cc-5(7)(A)). Executing Mr. Hoffman by placing a respirator mask over his face to force him to breathe pure nitrogen and deny him air violates his free exercise of religion under RLUIPA.[39]

Mr. Hoffman practices Buddhism. *See* Ex. I., Declaration of Michaela Bono ("Bono Decl."). Michaela Bono is a Buddhist priest who served as a Buddhist chaplain at LSP from 2018-2020 when she conducted Buddhist services with Mr. Hoffman. *Id.* at ¶¶ 1, 2, 3, 4. Pursuant to Buddhist tradition, "breathing is the essential way of practicing." *Id.* at ¶ 5. "Breathing is the constant connection with [Buddhists'] deepest faith and a direct expression of [Buddhists'] spirituality" and mindfulness of breathing "has always claimed a special prestige as the royal road to awakening." *Id.* There is simply no way to square forcing a nitrogen mask upon Mr. Hoffman with his ability to practice Buddhism according to his sincerely held beliefs. Rather, the forced

---

[39] Mr. Hoffman filed an emergency grievance with the DOC on February 11, 2025. In response, the DOC informed Mr. Hoffman that his grievance was accepted and that a response to the grievance would be provided within forty (40) days, *i.e.* after the date the State intends to execute Mr. Hoffman. Accordingly, the DOC has effectively made its internal grievance procedure unavailable to Mr. Hoffman.

inhalation of nitrogen will "take away [his] ability to breathe air as he dies [and] will prevent him from practicing Buddhism at the time of his transition from life to death." *Id*. at ¶ 6. The "transition from life to death is of particular importance in Buddhism, as it impacts the next life." *Id*.

Thus, executing Mr. Hoffman by the forced inhalation of nitrogen gas will interfere with his right to freely exercise his religious beliefs at that particularly important time of transition. *Id*. at ¶ 7 ("Breathing in Buddhism is taking in air and letting it go; one must focus on the human breath in order to practice meditation. Gassing [Mr. Hoffman] with pure nitrogen would prevent [him] from practicing Buddhism at the time of death due to the deprivation of air.") Mr. Hoffman's right to freely exercise Buddhism will be violated by the State's apparent plan to use some sort of mask or device to forcibly gas him with nitrogen. *See*, *e.g.*, *Ramirez v. Collier*, 595 U.S. 411, 427–30 (2022) (ban on audible prayer in execution chamber violates RLUIPA).

The Buddhist meditative breathing practices that Mr. Hoffman uses are fundamental to the practice of his faith. Denying Mr. Hoffman the right to engage in Buddhist meditative breathing in the execution chamber and at the time of death would be a violation of the Free Exercise clause of the First Amendment, applicable to the State through the Fourteenth Amendment. *Butts v. Martin*, 877 F.3d 571, 584 (5th Cir. 2017) ("Lawful incarceration inherently involves the limitation of many privileges and rights, but prisoners still benefit from some constitutional protections, including the First Amendment 'directive that no law shall prohibit the free exercise of religion.'") (quoting *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348 (1987)); *Smith v. Comm'r, Ala. Dep't of Corr.*, 844 Fed. Appx. 286, 291 (11th Cir. 2021) (finding the prohibition on allowing a pastor to be physically present with a condemned inmate at the time of execution amounted to a "required change in the way [the inmate] carries out his religious practices . . . [and] is enough for [him] to demonstrate the exercise of his religion is substantially burdened.").

28

### 3. Mr. Hoffman Has a Substantial Likelihood of Success on His Due Process and Access to Counsel Claims.

Mr. Hoffman has a real and immediate concern that the State will prevent him from being able to access his counsel and, in turn, access the courts. Mr. Hoffman has a right under the Sixth Amendment to the United States Constitution to access counsel at all "critical" stages of criminal proceedings. *United States v. Wade*, 388 U.S. 218, 227-28 (1967).[40] This includes the right to access counsel throughout the execution procedure, including during the execution. *See Harbison v. Bell*, 556 U.S. 180, 194 (2009). Mr. Hoffman further has the right under the First and Fourteenth Amendments to access the courts. *See, e.g.*, *Lewis v. Casey*, 518 U.S. 343, 350-51 (1996). In order to access the courts, he must be able to communicate with his counsel and obtain basic disclosure about how he will be executed such that counsel has the opportunity to access the courts on his behalf. To date, as described above, the State has denied Mr. Hoffman basic information about the manner in which he will be imminently executed and has moved to schedule his execution while fighting his right to even have a fair day in this Court to resolve his constitutional challenges. Mr. Hoffman needs the basic information the State is withholding, including the execution protocol and what has been done to implement it, in order to effectively seek the advice of counsel to protect his constitutional rights.

Moreover, abridgement of either prisoner-counsel communication or counsel's access to the courts violates Mr. Hoffman's right to access to counsel and the courts. In this way, Mr. Hoffman's right to access counsel up to the execution has been and will continue to be violated. Moreover, Mr. Hoffman's right to access counsel during the lead up to and at the execution also would appear to be threatened even though no protocol has been provided.

---

[40] The Sixth Amendment applies to the State through the Fourteenth Amendment.

Without attorney access during the execution procedure, there is no way to ensure that the execution will be carried out as directed or to limit the substantial risk that Mr. Hoffman will suffer cruelly superadded pain and suffering. In other words, it is essential that Mr. Hoffman have access to counsel throughout the execution procedure to allow for an application for an emergency stay to be made to the courts should something go awry during the execution process. While the State has yet to provide Mr. Hoffman or his counsel with a new execution protocol under which an execution by nitrogen asphyxiation will take place, the most recent execution protocol prepared in 2014 allowed attorneys to remain with the prisoner only "until the visit is terminated at the discretion of the Warden." Thus, the protocol provided no right to access counsel throughout the execution procedure, as required under the Sixth Amendment. *See Wade*, 388 U.S. at 227-28. Without an updated protocol that expressly provides for the required attorney access, Mr. Hoffman has an entirely plausible concern that the State will prevent his constitutional right to access counsel and the courts throughout the execution process.

Furthermore, the State's failure to provide Mr. Hoffman or his counsel with an execution protocol that will be utilized in his execution by nitrogen asphyxiation and the entirety of its dilatory, run-out-the-clock strategy violates his right to due process and further denies him his right to effective access to counsel. The "concept of due process is premised upon fairness and reasonableness in light of the totality of circumstances." *Ingraham v. Wright*, 525 F.2d 909, 917 (5th Cir. 1976). Rather than cooperating with Mr. Hoffman, the State has stonewalled, even going so far as to oppose his Rule 60(b)(6) Motion following the change in Louisiana law, impeding his ability to obtain discovery regarding the State's intended execution protocol and procedures, and then swiftly moving for a warrant to execute him on March 18, 2025 before his claims can even be litigated or his DOC grievance can be resolved. And at the same time it has strenuously opposed

reopening the Related Case to allow Mr. Hoffman's constitutional claims to be fairly litigated, it withheld from Mr. Hoffman both the method that will be utilized to kill him until mere weeks before the execution date, and to this day, the protocol that will be used for this novel-to-Louisiana execution method. This Court should put an end to the stonewalling and prevent the State from executing Mr. Hoffman before his constitutional claims can be fairly litigated.

> **4.     Mr. Hoffman Has a Substantial Likelihood of Success on His Claim That Forced Nitrogen Gassing Violates the Ex Post Facto Clause of the Constitution.**

The United States Constitution prohibits the States from passing any "ex post facto law." U.S. Const. art. I, § 10, ¶ 1. "Two critical elements must be present for a law to fall within the ex post facto prohibition: first, the law must be retrospective, that is, it must apply to events occurring before its enactment; and second, it must disadvantage the offender affected by it." *Henderson v. Scott*, 260 F.3d 1213, 1215 (10th Cir. 2001) (internal citation omitted). To sustain a claim under the ex post facto clause, the petitioner has the burden of demonstrating that a law creates "a significant risk" of increased punishment. *Garner v. Jones*, 529 U.S. 244, 255, 120 S.Ct. 1362 (2000). Where, as here, a change in method of execution increases the punishment, the change violates the Constitution's ex post facto prohibition. *See Weaver v. Graham*, 450 U.S. 24 (1981); *see also Hines v. Martel*, 2024 U.S. Dist. LEXIS 31395, at *125 (E.D. Cal. Feb. 22, 2024) (a change in the manner of execution "may reflect an ex post facto violation if the new method is less humane than that utilized at the time the defendant committed the capital crime").

At the time of the offenses for which Mr. Hoffman has been sentenced to death, and at the time Mr. Hoffman was sentenced to death, La. Rev. Stat. § 15:569 provided that "[e]very sentence of death executed on or after September 15, 1991, shall be by lethal injection; that is, by the

intravenous injection of a substance or substances in a lethal quantity into the body of a person convicted until such person is dead." La. Rev. Stat. § 15:569 (1991).

The 2024 amendments to § 15:569, however, added the new method of execution by nitrogen gassing, and that new method purports to apply to all executions regardless of the date of offense or imposition of sentence. That violates the Ex Post Facto clause of the U.S. Constitution. The *Neveaux* decision issued by Judge June Berry Darensburg of Louisiana's 24th Judicial District is instructive on this point. In that case, the condemned prisoner challenged, among other things, nitrogen gassing as violative of Louisiana's *ex post facto* clause. In support, he presented expert affidavits opining that nitrogen gassing is more inhumane than lethal injection (the method of execution available at the time of his crime and sentencing), because gassing can cause the condemned prisoner to "enter[] a persistent vegetative state, experience[s] [a] stroke, or experienc[e] painful suffocation instead of dying," as well as "distress, panic, pain, and suffocation by vomit." Supp. to Mot. to Declare La. R.S. 15:569(A)(2) & (3) Unconstitutional As Applied to Mr. Neveaux, at 10, *State v. Neveaux*, No. 16-04029 (La. Dist. Ct., 24th Jud. Dist., Apr. 9, 2024) . Judge Darensburg agreed and declared the statute unconstitutional. *See* Minute Order, *State v. Neveaux*, No. 16-04029 (La. Dist. Ct., 24th Jud. Dist., Apr. 19, 2024) ("Def Motion to Declare La RS 15:569(A)(2) & (3) Unconstitutional – GRANTED by the Court, State objection noted for the record.").

Here too, executing Mr. Hoffman by nitrogen gassing subjects him to increased punishment for a crime after which he was already sentenced. That after the fact change violates the federal Ex Post Facto clause. As explained above, there is a substantial likelihood that execution by nitrogen gassing will cause Mr. Hoffman to experience superadded pain and suffering caused by a PTSD-induced panic attack while he is unable to utilize the breathing techniques that

allow him to control his symptoms. Subjecting Mr. Hoffman to this superadded pain and suffering is certainly less humane, particularly as applied to Mr. Hoffman, than the execution method applicable at the time of Mr. Hoffman's sentencing.

**C.    Mr. Hoffman Will Be Irreparably Harmed if He is Executed Before this Case is Resolved on the Merits.**

Mr. Hoffman will suffer irreparable injury if he is executed before the merits of his claims are resolved. "An injury is 'irreparable' only if it cannot be undone through monetary remedies." *Yorktown Sys. Grp. Inc. v. Threat Tec LLC*, 108 F.4th 1287, 1296 (11th Cir. 2024) (citation omitted). The harm here is evident and irreparable – Mr. Hoffman will be executed in violation of his constitutional rights and his suit will be moot. Nothing is more final and irreversible than death. This factor weighs heavily in favor of granting a preliminary injunction. Here, it is dispositive. *See D.T.*, 942 F.3d at 327 ("When one factor is dispositive, a district court need not consider the others.").

**D.    The Public Has an Interest in Ensuring a Merits Determination.**

"It is always in the public interest to prevent the violation of a party's constitutional rights." *Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1145 (10th Cir. 2013). Indeed, "the public interest has never been and could never be served by rushing to judgment at the expense of a condemned inmate's constitutional rights." *In re Ohio Execution Protocol Litig.*, 840 F. Supp. 2d 1044, 1059 (S.D. Ohio 2012) (citation omitted). This factor weighs heavily in favor of a preliminary injunction. The public interest also favors proceeding orderly here on the development and resolution of serious challenges to novel execution methods and not allowing the State's dilatory practices to moot these claims before they may be presented.

### E.    The Balance of Equities Favors Plaintiff.

The balance of equities indisputably favors Mr. Hoffman. The State has an interest in enforcing criminal judgments, *see Jones v. Allen*, 485 F.3d 635, 638 (11th Cir. 2007), but it does not have an interest in carrying out an unconstitutional execution. Here, any delay that would accompany a preliminary injunction is minimal, is due in no small part to the State's own dilatory and secretive practices, and Defendants would not be prejudiced.

The State told Mr. Hoffman that it would seek to execute him by nitrogen hypoxia – forced nitrogen gassing asphyxiation – only twenty-six Edays before his execution date. By contrast, Mr. Hoffman has acted promptly seeking to re-open the Related Case and when delayed by the State's dilatory tactics, filing his lawsuit, motion for preliminary injunction and expedited discovery. The short stay sought here will have little adverse effect on the State's interest and will ensure that the State does not perform an unconstitutional execution. *See Gomez v. U.S. Dist. Ct. for N. Dist. Of Cal.*, 966 F.2d 460, 462 (9th Cir. 1992) (Noonan, J. dissenting from grant of writ of mandate) ("The state will get its man in the end. In contrast, if persons are put to death in a manner that is determined to be cruel, they suffer injury that can never be undone, and the Constitution suffers an injury that can never be repaired."). Here, equity favors the issuance of a preliminary injunction that will prevent Mr. Hoffman from being executed before final judgment is entered on his claims.

## V.    LIMITED EXPEDITED DISCOVERY IS NEEDED IN AID OF THE PRELIMINARY INJUNCTION MOTION

Good cause exists to order limited expedited discovery in aid of Mr. Hoffman's motion for preliminary injunction. Mr. Hoffman submits that such expedited discovery should include a deposition pursuant to Federal Rule of Civil Procedure 30(b)(6) with no more than ten (10) topics of examination, two (2) individual depositions, a video-recorded site inspection of the execution chamber, including the supplies intended to be utilized in the execution, pursuant to

34

Federal Rule of Civil Procedure 34(a)(2), no more than ten (10) interrogatories, and no more than ten (10) requests for production of documents, with responses due five (5) days after service of the requests.

Mr. Hoffman is currently facing a March 18, 2025, execution date and, accordingly, time is of the essence for discovery to be had in aid of Mr. Hoffman's motion for preliminary injunction. *See Doe*, 2016 U.S. Dist. LEXIS 156156, at *9 (finding good cause for expedited discovery where the "normal course of discovery would not provide enough time to conduct the discovery prior to the Court's consideration of [a] motion for preliminary injunction."). Without expedited discovery, the State would not need to respond to any discovery requests at all prior to Mr. Hoffman's execution date. That looming execution date and the pending motion for preliminary injunction counsel in favor of allowing limited expedited discovery. Mr. Hoffman's need for such discovery far outweighs any potential prejudice to the State of responding to a limited number of requests on an expedited timeframe. *See Planned Parenthood Gulf Coast, Inc.*, 2018 U.S. Dist. LEXIS 248849, at *50 (good cause for expedited discovery exists where the need for it outweighs the prejudice to responding party).

## VI.    CONCLUSION

Expedited discovery and a preliminary injunction is necessary to prevent the violation of Mr. Hoffman's constitutional and statutory rights by the novel-to-Louisiana forced nitrogen gassing method of execution. The Court should enjoin Defendants from executing Mr. Hoffman during the pendency of this litigation.

Dated: February 26, 2025

Respectfully submitted,

/s/ *Samantha Bosalavage Pourciau*
Samantha Bosalavage Pourciau, La. Bar No. 39808
Promise of Justice Initiative
1024 Elysian Fields Avenue
New Orleans, LA 70117
Tel: (504) 529-5955
Sbosalavage@defendla.org

Cecelia Trenticosta Kappel, La. Bar No. 32736
Loyola Center for Social Justice
7214 St. Charles Ave. Box 907
New Orleans, Louisiana 70118
Tel: 504-861-5735
Email: ctkappel@defendla.org

Rebecca L. Hudsmith
Office of the Federal Public Defender
For the Middle and Western Districts of Louisiana
102 Versailles Blvd., Suite 816
Lafayette, LA 70501
Tel:  337-262-6336
Rebecca_Hudsmith@fd.org

James K. Stronski (*pro hac vice* forthcoming)
Ellen M. Halstead (*pro hac vice* forthcoming)
Crowell & Moring LLP
Two Manhattan West
375 Ninth Avenue
New York, NY 10001
Tel: (212) 223-4000
JStronski@crowell.com
EHalstead@crowell.com

David Lindner (*pro hac vice* forthcoming)
Crowell & Moring LLP
455 N. Cityfront Plaza Drive
Suite 3600
Chicago, IL 60611
Tel: (312) 321-4200
DLindner@crowell.com

Adam J. Singer (*pro hac vice* forthcoming)
Crowell & Moring LLP
1001 Pennsylvania Avenue, NW
Washington, DC 20004
Tel: (202) 624-2500
ASinger@crowell.com

**Counsel for Plaintiff Jessie Hoffman**

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the above and foregoing was filed electronically with the Clerk of Court using CM/ECF on this 26th day of February, 2025.  Notice of this filing as generated by the electronic filing system constitutes service of the filed document on counsel of record for Defendants.

                                            /s/ *Samantha Bosalavage Pourciau*
                                            Samantha Bosalavage Pourciau