## DECLARATION OF PHILIP E. BICKLER, M.D., PhD

I declare, under penalty of perjury, that the following is true and correct:

1. My name is Philip E. Bickler. I reside in Larkspur, California. I am over the age of eighteen, fully capable and competent of making this declaration and have personal knowledge of the facts set forth herein.

2. I have been retained to serve as an expert witness on the plaintiff's behalf. This declaration is not an exhaustive recitation of my qualifications or my opinions in this case. Rather, given the compressed deadline for Mr. Hoffman's motion for preliminary injunction, this declaration is intended to alert the Court and Defendants to my role in this litigation, the general tenor of my opinions, and my availability to testify to the same.[1]

3. I am a Medical Doctor and hold a PhD in biology. I have worked as a practicing physician since 1986. I am a Board-certified anesthesiologist.

4. Since 2006, I have been the Chief of Neuroanesthesia at the University of California, San Francisco ("UCSF"). I am also an attending anesthesiologist at UCSF, where my primary responsibility is care of neurosurgical patients.

5. I am the Director of the Hypoxia Research Laboratory at UCSF. Founded in 1958, the Hypoxia Research Laboratory is a leading center for the study of the effects of hypoxia (oxygen deprivation) on humans.

6. I have expertise in the effects of oxygen deprivation (hypoxia) on humans and study this area of science in controlled blood oxygen desaturation studies at the Hypoxia Research Laboratory. Over the years I have published many studies in peer-reviewed scientific and medical journals concerning the physiological effects of hypoxia on humans and other animals.

7. I am a reviewer for numerous medical and scientific journals, including Anesthesiology, Anesthesia and Analgesia, Neuroscience, Brain Research, The Journal of the American Medical Association, Science, and Nature.

8. I often give speaking presentations and publish articles about the effects of hypoxia on humans and animals. My CV, which lists these speaking engagements and articles, is attached as Exhibit 1 to this declaration.

9. In 2024 I authored an article in the Journal of the American Medical Association ("JAMA") titled *Evidence Against Use of Nitrogen for the Death Penalty*. In that article, I explain the science behind nitrogen hypoxia and analyze the significance of the many eye-witness accounts of Alabama's first nitrogen asphyxiation (Mr. Smith).  That article is attached as Exhibit 2 to this declaration The analysis of the effects of forced nitrogen inhalation are applicable to every execution using nitrogen to date.  My opinions remain consistent with those published in that article.

10. I have also submitted testimony that is similar in substance to my recent JAMA article to the Kansas State Legislature. That testimony is attached as Exhibit 3 to this Affidavit.

11. I am familiar with the eye-witness accounts of the State of Alabama's executions of four prisoners with nitrogen hypoxia over the past year. It is my understanding that many eyewitnesses reported that in each case death was not "instantaneous," but rather lasted for several minutes. Reports included descriptions that condemned individuals gasped for air, violently jerked and convulsed among other obvious indications of physical distress.  These effects of forced nitrogen asphyxiation are those predicted in my JAMA article. The accounts of the executions that I have reviewed is enclosed in Exhibit 4.

12. It is my understanding that some of the four executed prisoners in Alabama may have received sedative medications before execution. Sedative medications would likely blunt the panic and distress caused by forced nitrogen asphyxiation, but this would depend of course on the drug used and the dosage.

13. Eyewitness reports corroborate that, as I would predict, forcing a person to inhale nitrogen to execute them causes severe pain and suffering. All the accounts to date describe a prolonged death process with struggling, evident distress, irregular breathing and continued movements many minutes into the execution. In no case has the

execution unfolded quickly or without distress as its proponents have claimed. This includes Smith, Miller, Grayson, and Frazier.

14. In my professional opinion, what happened during the Smith, Miller, Grayson and Frazier executions in the State of Alabama is a demonstration of the suffering that other condemned prisoners will face during forced nitrogen asphyxiation applied by the State of Louisiana. Louisiana Prisoner Jessie Hoffman is scheduled for execution in the coming weeks.

15. I have not seen any description of the specific methods proposed by the state of Louisiana to accomplish nitrogen executions. I do not know what the qualifications of the individuals who are going to deliver the nitrogen, nor do I know the details about the type of equipment planned for use. Assessing the necessary provisions for any prisoner requires medical training.

16. The cruel effects of nitrogen breathing led the American Veterinary Medical Association (AVMA) to condemn it's use for euthanasia in dogs and other animals *(AVMA Guidelines for the Euthanasia of Animals: 2020* Edition). Nitrogen for euthanasia is prohibited at my institution, the University of California at San Francisco, and other major academic centers.

17. There can be significant differences in purity between medical- and industrial- grade nitrogen gas. Industrial-grade gas may contain toxins (such as carbon monoxide) and other impurities (such as oxygen or carbon dioxide). For this reason, medical professionals only use medical-grade nitrogen gas on humans.

18. I am available and willing to testify in an evidentiary hearing on this matter. Because of my obligations to ongoing patient care, I would prefer to testify remotely, but if that is not possible, I am willing to travel to Louisiana.

Dated: February 23, 2025

Respectfully submitted,

Philip E. Bickler, MD

**EXHIBIT 1**

**University of California, San Francisco**

# CURRICULUM VITAE

**Name:**        Philip E. Bickler, MD, PhD

**Position:**    Professor, Step 9
Anesthesia & Perioperative Care
School of Medicine

**Address:**    Box 0542
513 Parnassus Ave, Med Sciences, Rm. 256
University of California, San Francisco
San Francisco, CA 94143
Voice: 476-1411
Fax: 476-8841
Email: philip.bickler@ucsf.edu
Web: www.hypoxialab.com

## EDUCATION

| Years | Institution | Degree | Field |
|---|---|---|---|
| 1973 - 1977 | University of California at Riverside | B.S. | Biology |
| 1977 - 1981 | University of California at Los Angeles (supervisor Malcolm S. Gordon, PhD) | Ph.D. | Biology |
| 1981 - 1983 | University of California at San Diego, Scripps Institution of Oceanography, (supervisor Fred White, PhD) | Postdoctoral Fellowship | Physiology |
| 1983 - 1986 | University of California at San Diego | M.D. | Medicine |
| 1985 - 1985 | University of California at San Diego Dept. Physiology (supervisor Frank Powell, PhD) | Post-doctoral Fellowship | Physiology |
| 1986 - 1987 | UCSF Cardiovascular Research Institute (CVRI) and Anesthesiology Research (supervisor John Severinghaus, MD) | Postdoctoral Fellowship | Physiology |
| 1987 - 1988 | Saint Mary's Medical Center, San Francisco, California | Internship | Internal Medicine |
| 1988 - 1990 | University of California at San Francisco | Residency | Anesthesiology |
| 2003 - 2003 | Cambridge University, Dept. Zoology (Robert Boutilier, PhD) | Sabbattical | Physiology Research |

## LICENSES, CERTIFICATION

| | |
|---|---|
| 1988 | Medical License, California #G64031 |

| 1992 | American Board of Anesthesiology | | |

**PRINCIPAL POSITIONS HELD**

| 1991 - 1995 | University of California at San Francisco | Assistant Professor in Residence | Anesthesia |
| 1995 - 2000 | University of California at San Francisco | Associate Professor in Residence | Anesthesia |
| 2000 - 2003 | University of California at San Francisco | Professor in Residence | Anesthesia |
| 2002 - 2002 | Cambridge University (sabbatical) | Visiting Research Professor | Zoology |
| 2003 - present | University of California at San Francisco | Professor | Anesthesia |

**OTHER POSITIONS HELD CONCURRENTLY**

| 2015 - present | University of California at San Francisco | Chief, Division of Neuroanesthesia | Anesthesia and Preoperative Care |
| 2006 - 2007 | University of California at San Francisco | Chief, Division of Neuroanesthesia (acting) | Anesthesia and Preoperative Care |
| 2007 - 2010 | University of California at San Francisco | Chief of Regional and Orthopedic Anesthesia | Anesthesia and Preoperative Care |
| 1991 - 2015 | University of California at San Francisco | Acute Pain Service Attending Physician | Anesthesia and Preoperative Care |
| 2005 - present | University of California at San Francisco | Director, Dept. Anesthesia Human Studies Laboratory | Anesthesia and Preoperative Care |

**HONORS AND AWARDS**

| 1977 | Governor's Scholar Award of California |
| 1975 | National Science Foundation Undergraduate Research Fellow |
| 1977 | Hazel Lagerson Scholar, UC Riverside |
| 1977 | Presidents Undergraduate Fellow, University of California |
| 1977 | Phi Beta Kappa |

| 1981 | Chancellor's Intern Fellow, UCLA | |
|------|------|------|
| 1981 | Lasiewski Award for Physiology Research, UCLA | |
| 1985 | A. Baird Hastings Medical Honor Society | |
| 1988 | Outstanding Medical Intern, Saint Mary's Medical Center | |
| 1991 | Awarded competitive Postdoctoral Research Fellowships from both the NIH and the National Science Foundation | |
| 1991 | Anesthesiology Young Investigator Award, American Society of Anesthesiologists | |
| 1994 | Elected to the Association of University Anesthesiologists | |
| 2000 | William Hamilton Endowment (UCSF) Research Award | |
| 2001 | Citation for Distinguished Service, American Physiological Society | |
| 2005 | Foundation for Anesthesia Education and Research, Research Mentor to Greg Stratmann, MD, PhD | |
| 2006 | Foundation for Anesthesia Education and Research, Research Mentor to Jeffrey Sall, MD, PhD | |
| 2013 | Article on cerebral oximeter performance chosen as article of the month in Anesthesia and Analgesia and featured as interview on OpenAnesthesia.org | |
| 2014 | Nominated for outstanding medical student mentor | UCSF Clinical and Translational Science Institute |
| 2015 | Elected Fellow | California Academy of Sciences |

## KEYWORDS/AREAS OF INTEREST

Human adaptation to hypoxia and high altitude environments, effects of skin pigmentation on pulse oximeter performance, clinical trials of pulse oximeter performance across race and skin pigmentation, mechanisms of neuromuscular paralysis caused by snake venoms

## CLINICAL ACTIVITIES

**CLINICAL ACTIVITIES SUMMARY**
I am an attending anesthesiologist at UCSF and my current clinical duties are approximately 2 to 3 days per week.  As chief of the division of neuroanesthesia, my primary responsibility is care of neurosurgical patients.  Preoperative care is provided for all types of neurologic surgery including intracranial aneurysms, tumors, and awake craniotomies for speech mapping on adults and children older than 5 years. I have been a member of this subspecialty team  for over 20 years, and I have been interim director twice, and am now Chief.
My other clinical duties involve providing care for almost all types of surgery at Moffitt-Long Hospital, Mt. Hospital and Mission Bay Hospitals.  I am a member of the group of elite clinicians who take overnight call at these hospitals and must be able to provide sophisticated care under emergency conditions for complex and gravely ill patients.

## PROFESSIONAL ACTIVITIES

**MEMBERSHIPS**

| | |
|---|---|
| 1980 - present | American Society of Zoologists |
| 1981 - present | American Physiological Society |
| 1988 - present | American Society of Anesthesiologists |
| 1988 - present | California Society of Anesthesiologists |
| 1994 - present | Society for Neuroscience |
| 1994 - present | Society of Academic Anesthesiologists |

**SERVICE TO PROFESSIONAL ORGANIZATIONS**

| | | |
|---|---|---|
| 2013 - 2014 | International Anesthesia Research Society | Grant Reviewer for New Investigator Awards |
| 2021 - 2022 | International Standards Organization (ISO) Pulse Oximetry Performance Standards document revisions working group (establishes standards for pulse oximetry globally, used by US FDA for regulatory framework in USA) | Committee Chair |

**SERVICE TO PROFESSIONAL PUBLICATIONS**

| | |
|---|---|
| 1990 - present | Reviewer, Anesthesiology, consistently top 10% of reviewers |
| 1993 - 2001 | Editorial board, American Journal of Physiology |
| 1998 - present | Editorial board, Journal of Experimental Biology |
| 2006 - 2007 | ISIAMOV symposium, Guest Section Editor, Anesthesia and Analgesia |
| 2007 - 2008 | ISIAMOV symposium, Organizing committee: International symposium at Duke University |

| 2010 - 2012 | International symposium on metabolic regulation in dormancy, hibernation and cell stasis (Journal of Experimental Biology sponsored symposium) |
| 2010 - 2012 | Organizing committee, International Society for Monitoring of Oxygenation and Ventilation, Symposium at Yale University, 2011, and editing/organizing publication of symposium manuscripts in Anesthesia and Analgesia. |
| 2013 - 2015 | Editor and organizing committee, International Society for Monitoring of Oxygenation and Ventilation, Symposium at St. Lukes Medical Center, Tokyo Japan and editor of papers for publication in Anesthesia and Analgesia |
| 2013 - 2017 | Committee on Experimental Neurosciences, American Society of Anesthesiologists |
| 2019 - 2021 | Organizing committee, International Society for Monitoring of Oxygenation and Ventilation, Symposium at Univ College London, and editing/organizing publication of symposium manuscripts in Anesthesia and Analgesia. |

## INVITED PRESENTATIONS - INTERNATIONAL

| 2003 | Brain hypoxia symposium, sponsored by the Company of Biologists/Journal of Experimental biology, Tuscany, Italy. | Invited lecturer |
| 2006 | Hypoxia tolerance mechanisms, The Society for Experimental Biology, Canterbury, England. | Invited lecturer |
| 2007 | Symposium Speaker: neuroprotective roles of intracellular calcium signaling, Society for Neuroscience Symposium, Atlanta. | Invited lecturer |
| 2009 | Symposium Speaker: Anesthetic Neurotoxicity Workshop, University of Pennsylvania. | Invited lecturer |
| 2009 | Invited Lecture: Role of intracellular calcium in neuroprotective signaling processes. 11th International Congress on Amino Acids, Peptides, and Proteins, Vienna, Ausria. | Invited lecturer |
| 2010 | Symposium Participant, Invited speaker: Anesthetic Neurotoxicity Workshop, University of Toronto. | Invited lecturer |
| 2010 | Invited Lecture: Regional Anesthesia and Perioperative Outcomes, Departement d'Anesthesie et de Reanimation. Centre Hospitalier et Universitaire de Toulouse, France. | Invited lecturer |
| 2011 | Invited Lecture: New roles for intracellular calcium in cell signaling. Symposium at the 8th World Congress of Neuroscience, Florence, Italy. | Invited lecturer |
| 2011 | Invited Lecture: Hypoxia tolerance in developing mammals. Symposium at the 8th World Congress of Neuroscience, Florence Italy. | Invited lecturer |

| | | |
|---|---|---|
| 2012 | Symposium co-organizer: Preconditioning and neuroprotection with anesthetics, International Stroke Conference. | Symposium organizer |
| 2012 | Symposium organizer and speaker: Accuracy of Cerebral Oximeters, Presented at the International Conference Innovations in Monitoring Perfusion, Oxygenaiton and Ventilation, Yale University | Symposium Organizer |
| 2013 | Invited Lecture: Therapeutic uses of hypothermia. Chinese Society of Anesthesiology meeting. | Invited lecturer |
| 2013 | Visiting Professor, Capital Medical School, Beijing, China. Lectures on therapeutic hypothermia and cerebral protection during surgery. | Invited lecturer |
| 2013 | Invited Lecture: Therapeutic uses of hypothermia. Korean Society of Anesthesiologists meeting. | Invited lecturer |
| 2013 | Invited Lecture: Non-invasive assessment of oxygenation. Shenzhen University School of Medicine, China | Invited lecturer |
| 2013 | Benefits and Limitations of Therapeutic Hypothermia. Shenzhen University College of Engineering and Medicine, China | Invited lecturer |
| 2014 | Invited lecture: New technology to assess oxygenation, dyshemoglobins, and ventilation. Shenzhen University School of Medicine, China | Invited lecturer |
| 2015 | Invited speaker at symposium: Advances in monitoring oxygenation and ventilation. Sponsored buy the Society of Technology in Anesthesia. Delivered 2 lectures: Tissue Oximetry and Clinical Outcomes, Development of Methodology for Testing Accuracy of Oximetry Instruments | Symposium Organizer, Invited lecturer |
| 2015 | Invited expert: International Standards Organization (ISO) committee on pulse oximetry. Delivered statement on current standards for pulse oximetry and safety of pulse oximetry validation in humans | Invited expert |
| 2016 | Invited expert: ISO committee on developing standards for tissue oximetry | Invited expert |
| 2016 | Chinese FDA and Peoples Hospital, China: Methodology for developing the next generation of blood and tissue oximeters | Invited Lecturer |
| 2018 | Indo-Anesthesia Conference, Jakarta Indonesia. Lectures on neuroprotection, hypoxia, and anesthesia for stroke care. | Invited speaker |

| | | |
|---|---|---|
| 2018 | International Standards Committee Meeting, Tokyo Japan, Presentation "Cerebral Oximeter Validation in Humans" | Invited speaker |
| 2019 | Lectures on Tissue Oxygen and Clinical Outcomes and Anesthesia for Awake Craniotomies, IndoAnesthesia Conference, Jakarta, Indonesia February 2019 | Invited Speaker |
| 2020 | Invited Lecture: Human adaptation to Hypoxia. Indoanesthesia conference, Jakarta | Invited Speaker |
| 2021 | Invited Lecture: Silent presentation of hypoxemia and COVID-19. IndoAnesthesia Conference, Jakarta | Invited Speaker |
| 2022 | IndoAnesthesia Conference, Jakarta, Indonesia. Pulse oximeter performance. | Invited Speaker |
| 2023 | IndoAnesthesia Conference. Pulse oximeter performance and human skin pigmentation. | Invited Speaker |

## INVITED PRESENTATIONS - NATIONAL

| | | |
|---|---|---|
| 2002 | Visiting Professor Lecture: Mechanisms of brain adaptation to hypoxia in aging. The Buck Institute, Novato, CA. | Visiting Professor |
| 2003 | Visiting Professor Lecture: Protecting the brain: Calcium-dependent mechanisms in neuroprotective signaling. Department of Biological Sciences, California State University, Hayward. | |
| 2004 | Visiting Professor: Ion channel regulation and neuroprotection in vertebrate neurons, signaling pathways and processes. University of Alaska. | |
| 2004 | Invited Lecture: Clinical uses of hypothermia, Life in the Cold (international Hibernation Symposium). | |
| 2005 | Invited Lecture: Role of calcium in neuroprotection and preconditioning neonatal brain disorders center. Department of Neurology, University of California, San Francisco. | |
| 2005 | Invited Lecture: Calcium signaling in preconditioning and neuroprotection. Center for Cerebrovascular Disease, San Francisco General Hospital. | |
| 2005 | Session moderator and speaker: Long-term effects of anesthesia. UCSF Changing Practice of Anesthesia Conference, San Francisco. | |
| 2006 | Invited Lecture: Role of calcium in neuroprotection and preconditioning. Department of Pharmacology and Physiology, Saint Louis University. | |

| | | |
|---|---|---|
| 2006 | Symposium Lecture: Role of calcium in neuroprotection and preconditioning. Society for Neuroscience Meeting. | |
| 2006 | Grand Rounds: neuroprotection during surgery-Clinical reality or laboratory curiosity? Department of Anesthesiology University of Iowa. | |
| 2006 | Grand Rounds: Neuroprotection during Anesthesia. Grand Rounds, St. Louis University. | |
| 2006 | Grand Rounds: Is neuroprotection during surgery possible? Department of Anesthesiology, Saint Louis University. | |
| 2008 | Visiting Professor: Neuroprotective and neuro-injurious effects of anesthesia. University of Pennsylvania. | Visiting Professor |
| 2008 | Symposium Participant, Invited speaker: Long-term neurotoxic effects of anesthesia. University of Pennsylvania. | Symposium speaker |
| 2009 | Workshop co-organizer: Problems in regional anesthesia. Changing Practice of Anesthesia Meeting, San Francisco | Workshop Organizer |
| 2011 | Workshop co-organizer: Challenges in pain management and regional anesthesia. UCSF Changing Practice Meeting, San Francisco | Workshop Organizer |
| 2012 | Grand Rounds, UCSD Department of Pediatrics: Responses of the developing mammalian brain to hypoxia and hypothermia | Invited Speaker |
| 2014 | Invited speaker: Anesthesia care for medical missions in the developing world: Latin America. UCSF Changing Practice of Anesthesia meeting, San Francisco | Invited Speaker |
| 2014 | Invited speaker: American Physiological Society conference: Comparative approaches to grand challenges in physiology; speaking on Novel animal models in health and disease | Invited Speaker |
| 2015 | Workshop organizer: Care of patients with acute stroke. Changing Practice of Anesthesia Conference, organized by the UCSF Department of Anesthesia and Preoperative Care. | Organizer |
| 2017 | Human adaptation to Hypoxia. UCSD Department of Medicine, Physiology Lecture Series | Invited Speaker |
| 2017 | Effects of hypoxia on humans. UCSD Pulmonary and Critical Care Grand Rounds | Invited Speaker |

| 2017 | Human adaptation and dysadaptation to hypoxia. Grand Rounds, Oregon Health and Sciences University, Grand Rounds | Visiting Professor lecture |
|------|------|------|
| 2017 | The unfolded protein response in brain ischemia and neuroprotection | Visiting Professor Lecture |
| 2018 | Clinical uses and limitations of profound hypothermia | Visiting Professor Lecture |
| 2022 | Pulse Oximeter performance in real-world clinical settings. US FDA Advisory Panel Meeting on Pulse Oximeter Performance. | Invited speaker |

## INVITED PRESENTATIONS - REGIONAL AND OTHER INVITED PRESENTATIONS

| 1983 | Invited Speaker: Acid-base balance and metabolic regulation. Department of Biology, University of California, Irvine |
|------|------|
| 1984 | Invited Speaker: Effects of temperature on acid-base regulation. Department of Medicine, University of California, San Diego |
| 1985 | Invited Speaker: Management of acid-base balance during hypothermic surgical procedures. A.B. Hastings Research Society Lecture, University of California, San Diego |
| 1991 | Invited Speaker: Effects of sedatives and anesthetics on control of breathing. Department of Pediatrics, University of California, San Francisco |
| 1992 | Invited Speaker: Cerebral protection with hypothermia. World Congress of Anesthesiologists, The Hague, Netherlands |
| 1993 | Invited Speaker: Pulmonary function and ventilator management. Yale University Surgical Basic Science Course, San Francisco |
| 1995 | Panel Member: Changing Practice of Anesthesia Conference, San Francisco |
| 1996 | Panel Member: Update: Protection of the brain and spinal cord. Changing Practice of Anesthesia Conference, San Francisco |
| 1996 | Invited Speaker: Effects of anesthetics on intracellular calcium regulation--implications for anesthetic mechanisms. University of Basel, Switzerland |
| 1996 | Invited Speaker: Hypoxia-tolerant neurons: Mechanisms of Ion Channel Arrest. Neurosurgery Grand Rounds, University of California, San Francisco |

| | | |
|---|---|---|
| 1996 | Panel Member/Discussant: American Society of Anesthesiologists Stroke Panel, American Society of Anesthesiologists Meeting, New Orleans | |
| 1997 | Consultant/Panelist: Conference on neuroprotection in hemorrhagic shock. Department of the Navy, Pittsburgh, PA | |
| 1998 | Moderator and Invited Speaker: Clinical controversies in neuroprotection: Pharmacologic alternatives to barbiturates. Changing Practice of Anesthesia Conference, San Francisco | |
| 1999 | Invited Speaker: Symposium on surviving brain anoxia. Experimental Biology Meeting, Washington, DC | |
| 1999 | Moderator and Invited Speaker: Does preemptive analgesia alter long-term surgical outcome? Changing Practice of Anesthesia Conference, San Francisco, CA | |
| 2000 | Invited Speaker: Society for Experimental Biology, "Off Switches: Mechanisms of metabolic arrest" Cambridge, England | |
| 2000 | Visiting Professor Lecture: Role of calcium in neurotoxicity and aging. Buck Institute for Age Research, Novato, CA | |
| 2000 | Invited Particiipant: DARPA conference on biomedical applicaitons of extremophile biology and applicaitons in medicine. Colorado | |
| 2001 | Visiting Professor Lecture: Neuroprotection during anesthesia. Department of Anesthesiology, University of Louisville | |
| 2017 | Department of Neurological Surgery, UCSF. Lecture: Human response and adaptation to hypoxia | Invited speaker, Grand Rounds |
| 2023 | International Standards Committee on Pulse Oximetry. Pulse oximeter errors caused by dark skin pigmentation and low perfusion. | Invited speaker |

## CONTINUING EDUCATION AND PROFESSIONAL DEVELOPMENT ACTIVITIES

| | |
|---|---|
| 2003 | Anesthesia Grand Rounds |
| 2003 | American Society of Anesthesiologists Annual Meeting |
| 2003 | Changing Practice of Anesthesia |
| 2003 | Society for Neuroscience Annual Meeting |
| 2004 | Anesthesia Grand Rounds |
| 2004 | American Society of Anesthesiologists Annual Meeting |

| | |
|---|---|
| 2004 | Changing Practice of Anesthesia |
| 2004 | Society for Neuroscience Annual Meeting |
| 2005 | Anesthesia Grand Rounds |
| 2005 | American Society of Anesthesiologists Annual Meeting |
| 2005 | Changing Practice of Anesthesia |
| 2005 | Society for Neuroscience Annual Meeting |
| 2006 | Anesthesia Grand Rounds |
| 2006 | American Society of Anesthesiologists Annual Meeting |
| 2006 | Changing Practice of Anesthesia |
| 2006 | Society for Neuroscience Annual Meeting |
| 2007 | Anesthesia Grand Rounds |
| 2007 | American Society of Anesthesiologists Annual Meeting |
| 2007 | Changing Practice of Anesthesia |
| 2007 | Society for Neuroscience Annual Meeting |
| 2008 | Anesthesia Grand Rounds |
| 2008 | American Society of Anesthesiologists Annual Meeting |
| 2008 | Changing Practice of Anesthesia |
| 2008 | Society for Neuroscience Annual Meeting |
| 2009 | Anesthesia Grand Rounds |
| 2009 | American Society of Anesthesiologists Annual Meeting |
| 2009 | Changing Practice of Anesthesia |
| 2009 | Society for Neuroscience Annual Meeting |
| 2010 | Anesthesia Grand Rounds |
| 2010 | American Society of Anesthesiologists Annual Meeting |
| 2010 | Changing Practice of Anesthesia |
| 2010 | Society for Neuroscience Annual Meeting |
| 2011 | Changing Practice of Anesthesia Meeting, San Francisco |
| 2011 | American Society of Anesthesiologists Annual Meeting, Chicago |
| 2011 | Improving Surgical Systems Conference, UC San Diego |
| 2011 | UCSF Dept Anesthesia and Perioperative Care Grand Rounds Presentations |
| 2012 | UCSF Department of Anesthesia and Perioperative Care Grand Rounds- bi weekly conferences |

| 2012 | International Conference: Innovations in Monitoring Perfusion, Oxygenation and Ventilation, Yale University |
|------|---|
| 2012 | American Society of Anesthesiologists Annual Meeting |
| 2013 | American Society of Anesthesiologists Annual Meeting |
| 2013 | Society for Neuroscience Annual Meeting |
| 2013 | Society for Neuroscience in Anesthesia and Critical Care annual meeting |
| 2014 | Society for Neuroscience in Anesthesia and Critical Care annual meeting |
| 2015 | Society for Neuroscience in Anesthesia and Critical Care annual meeting |
| 2015 | American Society of Anesthesiologists Annual Meeting |
| 2015 | Neuroanesthesia Grand Rounds Organizer, UCSF |
| 2017 | Grand Rounds Organizer, Neuroanesthesia theme, Department of Anesthesia UCSF |
| 2021 | Grand Rounds Organizer, Neuroanesthesia UCSF |

## GOVERNMENT AND OTHER PROFESSIONAL SERVICE

| 2000 - 2002 | Study Section Member, American Heart Association. | Grant reviews |
|------|---|---|
| 2003 - present | Ad Hoc Reviewer, National Science Foundation, Welcome Trust, U.K. National Research Council, National Institues of Health (USA), NRC (Canada). | Approx. 50 grants reviewed in last 10 years |
| 2004 - 2009 | Advisor, NIH Neuroscience SNRP Program, University of Alaska. | Advisor to Alaska Neuroscience Program |
| 2005 - 2008 | Committee on Respiration, American Society of Anesthesiologists. | |
| 2006 - 2009 | Veterans Administration Center of Excellence in Neuroscience (NCIRE). | Grant Reviews |
| 2007 - 2007 | Organizing Committee and Editor of Anesthesia and Analgesia, International Symposium on Monitoring of Oxygenation and Ventilation (ISIAMOV) Duke University. | Symposium Organizing Committeee |
| 2012 - 2013 | Organizing Committee, International Symposium: Innovations and Applications of Monitoring Perfusion Oxygenation, and Ventilation | Symposium Organizing Committee, Editor |
| 2014 - 2014 | Member of International committee working to improve the design of the life box pulse oximeter (inexpensive pulse oximeter to improve surgery safety in developing countries) | committee member |

| | | |
|---|---|---|
| 2015 - 2017 | Korean Food and Drug Administration. | Member, expert panel on testing medical devices |
| 2015 - present | International Standards Committee on Standards for Tissue Oximetry Performance and Validation | member |
| 2022 - present | International Standards Committee on Standards for pulse oximetry | advisor |

# UNIVERSITY AND PUBLIC SERVICE

## SERVICE ACTIVITIES SUMMARY

Currently, directing the growing activities of the Department of Anesthesia and Perioperative Care's Human Phjysiological Studies Laboratory represents the main area of my administrative service to the University.

My position on the board of Operation Rainbow is instrumental in involving numerous Department of Anesthesia faculty and residents in overseas medical missions.

I am also involved as a consultant to the LifeBox pulse oximeter project which provides low cost pulse oximeters to operating rooms in developing countries.

## UNIVERSITY SERVICE
## UC SYSTEM AND MULTI-CAMPUS SERVICE

| | | |
|---|---|---|
| 1992 - 1999 | President's Advisory Committee, University of California White Mountain Research Station. | |
| 1999 - 2003 | Chair, President's Advisory Committee, University of California White Mountain Research Station. | |

## UCSF CAMPUSWIDE

| | | |
|---|---|---|
| 2022 - 2023 | New UCSF medical center neurosurgery/neuroradiology operating room design group | committee member |

## SCHOOL OF MEDICINE

| | | |
|---|---|---|
| 2018 - 2020 | Research Allocation Program Training Grant (RAPtr) for medical student support for a year of research | grant reviewer |

## DEPARTMENTAL SERVICE

| | | |
|---|---|---|
| 1987 - 1987 | Anesthesia and Perioperative Care | Western Anesthesia Residents Conference Organizer |

| | | |
|---|---|---|
| 1992 - 1997 | Anesthesia and Perioperative Care | Chair, Visiting Professor Committee |
| 1992 - 1993 | Anesthesia and Perioperative Care | Merits and Promotions Committee |
| 1992 - 1994 | Anesthesia and Perioperative Care | Co-Chair, J. W. Severinghaus Fellowship Committee |
| 1995 - 1998 | Anesthesia and Perioperative Care | Resident Selection Committee |
| 2003 - 2004 | Department of Anesthesia, Division of Neuroanesthesia | Service Chief (acting) |
| 2006 - 2010 | Dept. of Anesthesia, Regional Anesthesia Group | Service Chief |
| 2007 - 2007 | Anesthesia and Perioperative Care | Anesthesia Call Working Group |
| 2009 - 2009 | Anesthesia and Perioperative Care | Orthopedic Institute Planning Group |
| 2008 - present | Anesthesia and Perioperative Care | Research Committee |
| 2010 - present | Anesthesia and Perioperative Care | Director, Human Studies Laboratory |
| 2007 - present | Anesthesia and Perioperative Care/Foundation for Anesthesia Education and Research | Coordinator for summer research projects for medical students |
| 2015 - present | Division of Neuroanesthesia | Chief |
| 2015 - present | Clinical Chiefs Committee, Department of Anesthesia and Perioperative Care | Committee Member |
| 2015 - present | NIH T32 training grant program "Comprehensive Anesthesia Research Training" | Executive Committee Member |
| 2016 - 2016 | Committee to evaluate and allocate funding for clinical research projects | Chair |
| 2017 - 2017 | Committee to evaluate and allocate funding for clinical research projects | chair |

| | | |
|---|---|---|
| 1995 - 2023 | I direct the Human Studies Laboratory in the Department of Anesthesia and Perioperative Care. This facility is a venue for all sorts of human volunteer studies, including those requiring invasive monitoring and general anesthesia. Studies include evaluation of clinical monitors such as pulse oximeters and cerebral oximeters during profound, and hemodilution studies. These services and research activities have made a huge impact on improving pulse oximeter accuracy over the last 20 years. The HSL currently supports research of about 7 faculty in the UCSF Dept. Anesthesia and Perioperative Care. | Director |

## COMMUNITY AND PUBLIC SERVICE

| | | |
|---|---|---|
| 1994 - 2000 | NIH Minority Access to research Careers San Francisco State University | Preceptor |
| 1995 - 2000 | Trinity Business College | Advisor |
| 1998 - 2010 | Advisory Board Member, Operation Rainbow (Pediatic Orthopedic Surgery in Latin America) | Advisory Board |
| 1999 - 1999 | Filmed BBC documentary on "suspended animation" concerning physiology of dormancy and hibernation | advisor |
| 2010 - present | Executive Board, Operation Rainbow, a non-profit pediatric orthopedic surgery organization sponsoring medical missions to Haiti and Latin America) | Executive Board |
| 2013 - present | Scientific advisor to the Lifebox Project, an international NGO to improve the safety of surgery worldwide by developing high quality low-cost pulse oximeters | technical advisor |
| 2016 - 2016 | Marin County CA, Sherifs Search and Rescue Unit. Presented information on mountain sickness causes and treatments | presentation |
| 2015 - present | Lifebox Foundation Clinical Advisory Group- developing pulse oximetry for low resource settings | technical advisor |

# TEACHING AND MENTORING

## TEACHING SUMMARY

My teaching involves 2 major areas: **1) Clinical supervision** of post-graduate medical trainees and  **2) Laboratory research** training for post-doctoral fellows, faculty and medical students. My laboratory typically has 2-3 post-doctoral fellows and 1 or 2 medical students actively involved in research projects that I supervise.

**FORMAL TEACHING**

| | Academic Yr | Course No. & Title | Teaching Contribution | School | Class Size |
|---|---|---|---|---|---|
| | 2013 - 2018 | Research ethics course for postdoctoral trainees and clinical fellows | Developing course curriculum,preparing lectures and discussion material | | |
| | 2000 - present | 110. Anesthesia Core Clerkship | Operating Room Patient evaluation and care | | |
| | 1995 - 2007 | 110 Anesthesia Core Clerkshil | Pain management lecture | | |
| | 1995 - 2005 | 111. Advanced Cardiovascular Life Support | Life support skills | | |
| | 1995 - present | 140.01. Advanced Clinical Clerkship | Cardiopulmonary resuscitation, pain service | | |
| | 1991 - present | 400. Anesthesia Staff Conference. | Resident lecture series | | |
| | 1991 - present | 450. Anesthesia Clinical Work | Operating room teaching | | |

**MENTORING SUMMARY**

My primary mentoring activities have always involved research training of undergraduate students, graduate students, medical students, post-doctoral fellows and junior faculty.  These individuals have carried out mentored or independent research projects within my basic science laboratory or in connection with my human studies research program.

**PREDOCTORAL STUDENTS SUPERVISED OR MENTORED**

| Dates | Name | Program or School | Mentor Type | Role | Current Position |
|---|---|---|---|---|---|
| 1997 - 1998 | Richard Liniger | UC Berkeley | | Student research project | Private Practice |
| 1998 - 1998 | Dirk Liu | Medical Student | | Research Supervisor | Private Practice |
| 1998 - 1999 | Breandan Sullivan | UC Davis | | Research Project | Professor, Univ Colorado |
| 1991 - 1993 | Brendan O'Donnell | Grad Student, SF State | | Graduate research | Professor, U. Wash |

| Dates | Name | Program or School | Mentor Type | Role | Current Position |
|-------|------|-------------------|-------------|------|------------------|
| 2001 - 2001 | Sergio Estrada | Medical Student, UCSF | | Research Supervisor | Private Practice |
| 1999 - 2003 | Terry O'Connor | Medical Student, UCSF | | Research Supervisor | Prof. U. Colorado |
| 2003 - 2003 | R.J. Andres | Medical Student, UCSF | | Research Supervisor | Private Practice |
| 2004 - 2004 | Erica Strauss | Medical Student, UCSF | | Research Supervisor | Private Practice |
| 2004 - 2004 | Emily Ginsberg | Medical Student, UCSF | | Research Supervisor | Private Practice |
| 2003 - 2005 | Jonathan Gray | SF State Student | | Research mentor | Faculty Anesthesiologist |
| 2005 - 2005 | Ian Tate (w/Gerald Dubowitz) | Medical Student, UVA | | Research Supervisor | Medical Resident |
| 2006 - 2007 | Michael Lipnick | Medical Student, UCSF | | Research Supervisor | Assoc Professor, UCSF |
| 2007 - 2007 | Ann Vo | SF State Student | | Student research project | Staff Physician |
| 2007 - 2008 | Zachariah Martinez | Medical Student, UCSF | | Research Supervisor | Anesthesiologist |
| 2008 - 2008 | Abdul Kanu | Medical Student, UCSF | | Research Supervisor | Resident, UCLA |
| 2009 - 2010 | David Polhemus | Undergrad, Emory University | | Summer research project | Physician in private Practice |
| 2010 - 2013 | Heather Brosnan | Portland State Univ | | Post-baccalaureate research | Anesthesia Resident |

| Dates | Name | Program or School | Mentor Type | Role | Current Position |
|---|---|---|---|---|---|
| 2010 - 2010 | Alex Lee | Med Student, U. Michigan | | Doris Duke Fellowship Applicant | Resident Physician |
| 2010 - 2010 | Michael Smith | Med Student, Johns Hopkins | | Howard Hughes Fellowship Applicant | Medical Student |
| 2010 - 2012 | Alex Birch | UC Irvine | | Post-baccalaureate research | Medical Student, George Washington |
| 2011 - 2011 | Lauren Dunn | Medical Student, UT Southwestern | | Doris Duke Fellowship applicant | Lost contact |
| 2012 - 2012 | Erin Crawford | UCSF Medical Student | | Research Supervisor | Faculty, Stanford Anesthesiology |
| 2012 - 2012 | James Rothschild | NYU Medical Student | | Research Supervisor, FAER | Anesthesiology Resident UCSF |
| 2013 - 2016 | Christopher Sanchez | UCSF Medical Student | Research/Scholarly Mentor,Project Mentor,Career Mentor | Research Mentor, CTSI program | Attending Anesthesiologist |
| 2014 - 2014 | Jenny Lundeberg | Medical Student, The Karolinska Institute | Research/Scholarly Mentor,Project Mentor,Career Mentor | Research mentor | Medical Resident, Sweden |
| 2014 - 2015 | Sin Yeong An | UCSF Medical Student | Research/Scholarly Mentor,Project Mentor | Research Mentor | Medical Student |
| 2014 - present | Heather Brosnan | Oregon Health Sciences medical Student | Research/Scholarly Mentor,Project Mentor,Career Mentor | Research Mentor, FAER summer program | Medical Resident |

| Dates | Name | Program or School | Mentor Type | Role | Current Position |
|-------|------|-------------------|-------------|------|------------------|
| 2014 - 2014 | McLean House | Univ. Kentucky medical student | Research/Scholarly Mentor,Project Mentor | Research Mentor, FAER summer program | Medical Resident |
| 2016 - 2016 | Benjamin Baron | Connecticut College Undergraduate | Research/Scholarly Mentor,Project Mentor,Career Mentor | summer intern | College Student |
| 2016 - 2016 | Alexander King | Reed College Undergraduate | Research/Scholarly Mentor,Project Mentor,Career Mentor | Summer Intern | College Student |
| 2016 - 2016 | Koki Nishimura | UCSF Medical Student | Research/Scholarly Mentor,Project Mentor,Career Mentor | Summer Research | Medical Student |
| 2016 - 2016 | Aaron Louie | UCSF Medical Student | Research/Scholarly Mentor,Project Mentor,Career Mentor | Research Mentor, FAER Summer program | Medical Student |
| 2017 - 2017 | Lucas Mani | Wesleyan College undergraduate | Research/Scholarly Mentor,Project Mentor | Summer Intern | College Student |
| 2017 - 2017 | Benjamin Baron | Connecticut College Undergraduate | Research/Scholarly Mentor,Project Mentor,Career Mentor | Summer Intern | College Student |
| 2017 - 2017 | Leah Campbell | Connecticut College Student | Research/Scholarly Mentor,Project Mentor | Summer Intern | College Student |

| Dates | Name | Program or School | Mentor Type | Role | Current Position |
|-------|------|-------------------|-------------|------|------------------|
| 2018 - 2018 | Frances Zorensky | Bowdoin College Student | Research/Scholarly Mentor,Project Mentor | Summer Intern | College Student |

## POSTDOCTORAL FELLOWS AND RESIDENTS MENTORED

| Dates | Name | Fellow | Mentor Role | Faculty Role | Current Position |
|-------|------|--------|-------------|--------------|------------------|
| 1991 - 1993 | Marlow Eldridge MD | | | Supervision | Professor, U. Wisconsin |
| 1992 - 1993 | John Feiner MD | | | Supervision | Professor, UCSF |
| 1993 - 1993 | R. Christopher Cardone MD | | | Supervision | Anesthesiologist |
| 1993 - 1996 | Les Buck PhD | | | Supervision | Prof, Univ. Toronto |
| 1994 - 1997 | Andrew Gray MD PhD | | | Supervision | Professor, UCSF |
| 1995 - 1997 | Helge Eilers MD | | | Supervision | Professor Clinical Anesthesia, Vice Chair UCSF |
| 1996 - 1998 | Christoph Kindler MD | | | Supervision | Chair, Univ. Basel Anesthesia |
| 1996 - 1998 | Robert Popovic, MD | | | Supervision | Anesthesiologist in Australia |
| 1997 - 1997 | Roxanne Ryan PhD | | | Supervision | High School Teacher |
| 1997 - 1999 | Paul Donohoe PhD | | | Supervision | Professor, Univ. Otago, New Zealand |
| 1997 - 2000 | Donald Taylor MD PhD | | | Supervision | Assoc Prof, UCSF |

| Dates | Name | Fellow | Mentor Role | Faculty Role | Current Position |
|---|---|---|---|---|---|
| 1999 - 2004 | Christian Fahlman PhD | | | Supervision | Senior Staff Research Assoc, UCSF |
| 2001 - 2002 | John Haddad PhD | | | Supervision | Professor, Univ. Beiruit |
| 2003 - 2005 | Gerald Dubowitz MD | | | Supervision | Assoc. Professor Professor, UCSF |
| 2003 - 2004 | Mena Narasaiah PhD | | | Supervision | Biotech Industry |
| 2003 - 2005 | Xinhua Zhan MD PhD | | | Supervision | Scientist, UC Davis |
| 2008 - 2008 | Jingli Zhang PhD | | | Supervision | Visiting Postdoc Scholar, UCSF |
| 2008 - 2008 | Liel Rubinsky PhD | | | Supervision | Biotech Industry |
| 2009 - 2010 | Daniel Warren, PhD | | | Supervisor | Professor, St. Louis University |
| 2009 - 2010 | Damjan Osredkar, MD | | | Co-sulpervisor with Donna Ferriero | Professor in Croatia |
| 2008 - present | John Paul Clark, PhD | | | Supervisor | Faculty, UCSF |
| 2009 - 2009 | Deokhee Lee, MD | | | Supervisor | Professor in Korea |
| 2010 - 2011 | William Michels, PhD | | | Supervisor | Biotech Industry Entrepreneur |
| 2012 - 2013 | Ran Zhou, MD, PhD | Postdoctoral Fellow | | Supervisor | Faculty,Beijing Univertsity |
| 2013 - present | Xuena Zhang, MD, PhD | Postdoctoral Fellow | | Supervisor | Senior Researcher,Capital Medical University, China |

| Dates | Name | Fellow | Mentor Role | Faculty Role | Current Position |
|---|---|---|---|---|---|
| 2014 - 2014 | Ning Yang, MD, PhD | Postdoctoral Fellow | | Supervisor | Anesthesiology Resident, Capitol Medical University, Beijing |
| 2015 - 2016 | Leila Emami, MD | Postdoctoral Fellow | | Supervisor | University of Tehran, Iran |
| 2017 - 2019 | Odmara Baretto-Chang, MD, PhD | Clinical Fellow/Postdoctoral Fellow | Research/Scholarly Mentor,Project Mentor,Career Mentor,Co-Mentor/Clinical Mentor | Supervisor | Clinical Instructor, UCSF |
| 2017 - 2018 | Katrine Bernholm | CTSI Fellow from Copenhagen, DK | Research/Scholarly Mentor,Project Mentor | Supervisor | Resident Physician, Copenhagen Denmark |
| 2018 - 2020 | Laura Alonso-Aguilar | Postdoctoral Fellow | Research/Scholarly Mentor,Project Mentor,Career Mentor | Supervisor | Visiting Scholar UCSF |
| 2022 - 2023 | Heather Brosnan | Clinical Fellow | Career Mentor,Co-Mentor/Clinical Mentor | Supervisor | Neuroanesthesia Fellow,UCSF |

## FACULTY MENTORING

| Dates | Name | Position while Mentored | Mentor Type | Mentoring Role | Current Position |
|---|---|---|---|---|---|
| 2003 - 2008 | Greg Stratmann, MD, PhD | Junior faculty | | Research mentor | Associate Professor Clinical Anesthesia, UCSF |
| 2003 - 2008 | Gerald Dubowitz, MD | Junior faculty | | Research mentor | Associate Professor, UCSF |

| Dates | Name | Position while Mentored | Mentor Type | Mentoring Role | Current Position |
|-------|------|------------------------|-------------|----------------|------------------|
| 2003 - present | Matthew R. Lewin, MD, PhD | Junior faculty | | Research mentor | Asst. Professor of Medicine |
| 2006 - 2006 | Pekka Talke, MD | Junior faculty | | Research mentor | Professor and director of Neuroanesthesia, UCSF |
| 2006 - present | Jeffrey Sall, MD, PhD | Post-doc & Junior faculty | | Research mentor | Assistant Professor in residence UCSF |
| 2008 - present | Mark Rollins, MD, PhD | Junior faculty | | Research mentor | Associate Professor, UCSF |
| 2009 - present | John P. Clark, PhD | Post-doc & Junior faculty | Research/Scholarly Mentor,Career Mentor | Research mentor | Adjunct Asst. Prof, UCSF |
| 2010 - 2011 | William Michels, PhD | Post-doc & Junior faculty | Research/Scholarly Mentor | Research mentor | Biotech Industry |
| 2014 - present | Philip Kurien, MD, PhD | Junior Faculty | Research/Scholarly Mentor,Career Mentor | Academic Mentor | Assistant Professor UCSF |
| 2015 - present | Michael Lipnick, MD | Junior faculty | Research/Scholarly Mentor,Career Mentor | Academic mentor | Assistant Professor UCSF |
| 2014 - present | Wei Zhou, MD, PhD | Junior Faculty | Research/Scholarly Mentor | Academic mentor | Assistant Professor UCSF |
| 2014 - present | Andrew Schober, MD | Junior faculty | Research/Scholarly Mentor,Career Mentor | Academic mentor | Assistant Professor UCSF |
| 2017 - present | Michael Bokoch, MD, PhD | Junior faculty | Career Mentor | | |

**VISITING FACULTY MENTORED**

| 2006 - 2006 | Michael Hedrick, PhD | Cal State Hayward (sabbatical) |
| 2006 - 2006 | William Mautz, PhD | University of Hawaii (sabbatical) |
| 2009 - 2011 | Robert Popovic, MD | U. Western Australia (extended research, intermittent every year) |
| 2013 - 2014 | Deokee Lee | Daejeon University, Korea |
| 2018 - 2019 | Hyun Young Lee | Gwangju University, Korea |
| 2018 - 2019 | Laura Alonso Alvarez | University of Madrid, Spain |

# RESEARCH AND CREATIVE ACTIVITIES

## RESEARCH AND CREATIVE ACTIVITIES SUMMARY

My current research program is based on my role as director of the UCSF Hypoxia Research Laboratory.  Our main projects center on advancing the performance, global access, and equity in pulse oximetry. A major focus is addressing the problem of skin pigmentation in contributing to missed diagnosis of hypoxia in humans with dark skin. There are three main projects that are devoted to solving this important problem. The **EquiOx project** is a clinical trial in critically ill patients examining pulse oximeter errors across skin pigmentation. I was asked to lead this project by the US Food and Drug Administration.

The second major project is the **OpenOximetry Project** (lead by Dr. Michael Lipnick, in collaboration with the Center for Health Equity in Surgery and Anesthesia), which is an open-source for information on pulse oximeter performance to improve performance and access of pulse oximeters in low and middle income countries.  The third major project is defining the source of errors in pulse oximeter performance in the **Hypoxia Lab**, and has collaborations with industry, data scientists, statisticians, and engineers.

In my role as a Fellow of the California Academy of Sciences, I am involved in promoting the recognition and treatment of one of the world's most neglected of tropical diseases: snakebite. My collaborators at the Academy and I have worked to advance understanding and clinical assessment of on eof the most letal problems of snake bite: respiratory muscle paralysis, which is a natural concern for someone like me who is trained as an anesthesiologist. My background in Comparative Physiology and interest in global heal equity is also highly appropriate for that role. I have authored several review on this topic and have advised the Welcome Trust and other NGOs on better ways of dealing with neuromuscular weakness in resource limited settings.

## RESEARCH AWARDS - CURRENT

| 1. NIH T32 | Program Faculty | 5 % effort | Hellman (PI) |
| National Institutes of Health | | 01/01/2000 | 12/30/2023 |

Training grant for anesthesiology researchers

Basic science training grant for academic anesthesiologist development

Program faculty, mentor for trainees

| 2. | Principal Investigator | 20% % effort | Bickler (PI) |
|---|---|---|---|
| | US Food and Drug Administration | 6/1/2022 | 04/14/2024 |
| | Prospective Clinical Study of Pulse Oximeter Errors in Hospitalized Patients | $ 655000 direct/yr 1 | $ 655,000 total |

This is a study to quantify pulse oximeter errors related to differences in skin pigmentation. We were invited to do this work by the FDA based on our many decades of experience with pulse oximeter performance issues.

Principal Investigator

3.

## RESEARCH AWARDS - PAST

| 1. | N/A | PI | | |
|---|---|---|---|---|
| | UCSF REAC Grant | | 1991 | 1992 |
| | Mechanisms of hypoxia tolerance | | | $ 10,000 total |

| 2. | N/A | PI | | |
|---|---|---|---|---|
| | Academic Senate Grant | | 1991 | 1992 |
| | Neuron adaptation to hypoxia | | | $ 10,000 total |

| 3. | Anesthesia Young Investigator Award | | | |
|---|---|---|---|
| | Foundation for Anesthesia Education and Research | 1991 | 1993 |
| | Cerebral Physiology in Hypoxia Tolerant Animals | | $ 70,000 total |

| 4. | | | |
|---|---|---|---|
| | Academic Senate Shared Equipment Grant | 1993 | 1993 |
| | | | $ 18,000 total |

| 5. | | | |
|---|---|---|---|
| | Medical Research Council Canada | 1993 | 1995 |
| | Ion channel regulation in Hypoxia tolerant Cells | | $ 90,000 total |

| 6. | 1st Award (R29) | Principal Investigator | | |
| | NIH | | 07/01/1994 | 06/30/2000 |
| | Regulation of brain ion channels during anoxia and anesthesia | | | $ 495,000 total |

| 7. | | Principal Investigator | | 103,000 (PI) |
| | Navy Research and Development Command | | 1997 | 2001 |
| | Suspended animation strategies to protect the brain | | | |

| 8. | PO 1 | Co-investigator with George Gregory, MD, Principal Investigator | | |
| | NIH | | 1998 | 2002 |
| | Neonatal Brain Injury Program Project Grant | | $ 50,000 direct/yr 1 | |

| 9. | | | | |
| | W.K. Hamilton Endowment | | 2001 | 2001 |
| | a DNA Microarray Reader for Anesthesiology | | | $ 45,000 total |

| 10. | RO1GM 52212-11 | PI | | |
| | NIH | | 2001-07-01 | 2006-06-30 |
| | Calcium in anesthetic and hypoxic preconditioning of neurons&quot; (competing continuation application submitted 7/1/06-funding anticipated April 2007) | | $ 285,000 direct/yr 1 | $ 2007 total |

| 11. | | | | |
| | UCSF REAC Grant | | 2005 | 2006 |
| | | | | $ 25,000 total |

| 12. | | Mentor for Jeff Sall | | |
| | Foundation for Anesthesia Education and Research | | 07/01/2005 | 06/01/2007 |

Volatile Anesthetic Toxicity in Hippocampal Derived | $ 40,000 total
Progenitor Cells

---

13. | Mentor for Greg Stratmann

Foundation for Anesthesia Education and Research, | 07/01/2005 | 06/01/2007
Research Mentor

The role of neurogenesis in the young and old brain in | $ 40,000 total
mediating cognitive outcome following anesthesia (Mentor for
Greg Stratmann)

---

14. | Co-investigator with Mark
Rollins, MD, PhD

Anesthesia Patient Safety Foundation | 2008 | 2010

Supplemental Oxygen: A reduction in Pulse Oximetry | $ 150,000
Sensitivity, or an Increased Margin of Safety? | total

---

15. 2U54 NS041069 | Research Mentor to | Duffy (PI)
Barbara Taylor, PhD

NIH NINDS Special Neuroscience Research Program | 01/01/2006 | 12/31/2011

5-HT neuromodulation and sudden infant death syndrome: A | $ 85,000 | $ 500,000
developmental Investigation | direct/yr 1 | total

This project identified respiratory pacemaker neurons in the tadpole hindbrain using
fluorescent dye indicators of neuronal function

---

16. MASI75 | PI

Masimo Corporation | 06/06/2012 | 07/07/2012

Accuracy of detection of methemoglobin with pulse oximetry | $ 15,873.00 | $ 15,873.00
direct/yr 1 | total

Research and development for improving non-invasive monitoring of blood and tissue
oxygenation in humans. Phase I laboratory testing in humans.

---

17. MASI77 | PI

Masimo Corporation | 06/20/2012 | 07/192012

Accuracy of detection of methemoglobin with pulse oximetry | $ 15,873.00 | $ 15,873.00
direct/yr 1 | total

Research and development for improving non-invasive monitoring of blood and tissue
oxygenation in humans. Phase I laboratory testing in humans.

18. MESP02                          PI

Mespere Lifesciences Inc                                    07/12/2012        08/11/2012

MESP02: Accuracy of cerebral oximeters with hypoxia and        $ 30,596.00     $ 30,596.00
transvenous detection systems                                   direct/yr 1     total

Research and development for improving non-invasive monitoring of blood and tissue
oxygenation in humans. Phase I laboratory testing in humans.

---

19. MASI78                          PI

Masimo Corporation                                          07/11/2012        08/10/2012

MASI78: Accuracy of detection of carboxyhemoglobin with        $ 31,729.00     $ 31,729.00
pulse oximetry                                                  direct/yr 1     total

Research and development for improving non-invasive monitoring of blood and tissue
oxygenation in humans. Phase I laboratory testing in humans.

---

20. MASI76                          PI

Masimo Corporation                                          06/13/2012        07/12/2012

MASI76: Accuracy of detection of methemoglobin with pulse      $ 15,873.00     $ 15,873.00
oximetry                                                        direct/yr 1     total

Research and development for improving non-invasive monitoring of blood and tissue
oxygenation in humans. Phase I laboratory testing in humans.

---

21. MASI73                          PI

Masimo Corporation                                          05/10/2012        05/10/2012

MASI73: Accuracy of detection of methemoglobin with pulse      $ 15,873.00     $ 15,873.00
oximetry                                                        direct/yr 1     total

Research and development for improving non-invasive monitoring of blood and tissue
oxygenation in humans. Phase I laboratory testing in humans.

---

22. 12GRNT11550017                  PI

American Heart Assn. (Western States)                       07/01/2012        06/30/2012

The unfolded protein response and neuron ischemic              $ 63,636.00     $ 127,272.00
tolerance                                                       direct/yr 1     total

Research and development for improving non-invasive monitoring of blood and tissue
oxygenation in humans. Phase I laboratory testing in humans.

---

23. MASI79                          PI

Masimo Corporation                                          08/08/2012        09/08/2012

MASI79: Accuracy of detection of carboxyhemoglobin with        $ 20,400.00     $ 20,400.00
pulse oximetry                                                  direct/yr 1     total

Research and development for improving non-invasive monitoring of blood and tissue
oxygenation in humans. Phase I laboratory testing in humans.

| | | | |
|---|---|---|---|
| 24. MASI80 | PI | | |
| Masimo Corporation | | 08/15/2012 | 09/15/2012 |
| MASI80: Accuracy of detection of methemoglobin with pulse oximetry | | $ 31,729.00 direct/yr 1 | $ 31,729.00 total |
| Research and development for improving non-invasive monitoring of blood and tissue oxygenation in humans. Phase I laboratory testing in humans. | | | |

| | | | |
|---|---|---|---|
| 25. MESP03 | PI | | |
| Mespere Lifesciences Inc | | 09/19/2012 | 11/18/2012 |
| MESP03: Accuracy of pulse oximeters with cerebral sensor and transvenous detection | | $ 49,604.00 direct/yr 1 | $ 49,604.00 total |

| | | | |
|---|---|---|---|
| 26. UNIM02 | PI | | |
| Unimed Medical Supplies Inc, | | 10/17/2012 | 11/16/2012 |
| UNIM02: Accuracy of pulse oximeters with profound hypoxia | | $ 18,823.00 direct/yr 1 | $ 18,823.00 total |
| Research and development for improving non-invasive monitoring of blood and tissue oxygenation in humans. Phase I laboratory testing in humans. | | | |

| | | | |
|---|---|---|---|
| 27. MASI81 | PI | | |
| Masimo Corporation | | 09/05/2012 | 10/04/2012 |
| MASI81: Accuracy of pulse oximeters with profound hypoxia | | $ 15,879.00 direct/yr 1 | $ 15,879.00 total |
| Research and development for improving non-invasive monitoring of blood and tissue oxygenation in humans. Phase I laboratory testing in humans. | | | |

| | | | |
|---|---|---|---|
| 28. MASI83 | PI | | |
| Masimo Corporation | | 09/26/2012 | 10/25/2012 |
| MASI83: Accuracy of pulse oximeters with profound hypoxia | | $ 15,879.00 direct/yr 1 | $ 15,879.00 total |
| Research and development for improving non-invasive monitoring of blood and tissue oxygenation in humans. Phase I laboratory testing in humans. | | | |

| | | | |
|---|---|---|---|
| 29. MASI84 | PI | | |
| Masimo Corporation | | 10/10/2012 | 11/09/2012 |
| MASI84: Accuracy of detection of carboxyhemoglobin with pulse oximetry | | $ 15,879.00 direct/yr 1 | $ 15,879.00 total |

Research and development for improving non-invasive monitoring of blood and tissue oxygenation in humans. Phase I laboratory testing in humans.

---

30. MASI82                          PI

Masimo Corporation                                          09/12/2012      10/11/2012
MASI82: Accuracy of detection of carboxyhemoglobin and      $ 23,684.00     $ 23,684.00
methemoglobin with non-invasive technology                  direct/yr 1     total

Research and development for improving non-invasive monitoring of blood and tissue oxygenation in humans. Phase I laboratory testing in humans.

---

31. SENS01                          PI

Bluepoint Medical GmbH & Co KG                              10/16/2012      11/25/2012
SENS01: Accuracy of pulse oximeters with profound hypoxia   $ 18,829.00     $ 18,829.00
                                                            direct/yr 1     total

Research and development for improving non-invasive monitoring of blood and tissue oxygenation in humans. Phase I laboratory testing in humans.

---

32. ASSU03                          PI

Xhale, Inc.                                                 08/22/2012      09/21/2012
ASSU03: Accuracy of pulse oximeters with profound hypoxi    $ 1,587.00      $ 1,587.00
                                                            direct/yr 1     total

Research and development for improving non-invasive monitoring of blood and tissue oxygenation in humans. Phase I laboratory testing in humans.

---

33. MASI85                          PI

Masimo Corporation                                          10/24/2012      11/25/2012
MASI85: Accuracy of detection of carboxyhemoglobin with     $ 15,879.00     $ 15,879.00
pulse oximetry                                              direct/yr 1     total

---

34. MASI88                          PI

Masimo Corporation                                          1/28/2012       12/27/2012
MASI88: Accuracy of detection of carboxyhemoglobin with     $ 15,879.00     $ 15,879.00
pulse oximetry                                              direct/yr 1     total

Research and development for improving non-invasive monitoring of blood and tissue oxygenation in humans. Phase I laboratory testing in humans.

---

35. MASI87                          PI

Masimo Corporation                                          11/14/2012      12/13/2012

MASI87: Accuracy of detection of methemoglobin with pulse oximetry   $ 15,879.00 direct/yr 1   $ 15,879.00 total

Research and development for improving non-invasive monitoring of blood and tissue oxygenation in humans. Phase I laboratory testing in humans.

---

36. MASI86                          PI

Masimo Corporation                                    11/07/2012   12/06/2012

MASI86: Accuracy of detection of methemoglobin with pulse oximetry   $ 15,879.00 direct/yr 1   $ 15,879.00 total

Research and development for improving non-invasive monitoring of blood and tissue oxygenation in humans. Phase I laboratory testing in humans.

---

37. CASM06                          PI

CAS Medical Systems, Inc.                             01/09/2013   02/08/2013

CASM06: Accuracy of non-invasive measurement of hemoglobin in humans   $ 20,496.00 direct/yr 1   $ 20,496.00 total

Research and development for improving non-invasive monitoring of blood and tissue oxygenation in humans. Phase I laboratory testing in humans.

---

38. MASI89                          PI

Masimo Corporation                                    12/05/2012   01/04/2013

MASI89: Accuracy of detection of methemoglobin with pulse oximetry   $ 15,879.00 direct/yr 1   $ 15,879.00 total

Research and development for improving non-invasive monitoring of blood and tissue oxygenation in humans. Phase I laboratory testing in humans.

---

39. MASI90                          PI

Masimo Corporation                                    12/19/2012   01/18/2013

MASI90: Accuracy of detection of methemoglobin with pulse oximetry   $ 15,879.00 direct/yr 1   $ 15,879.00 total

Research and development for improving non-invasive monitoring of blood and tissue oxygenation in humans. Phase I laboratory testing in humans.

---

40. MASI91                          PI

Masimo Corporation                                    01/16/2013   02/15/2013

MASI91: Accuracy of detection of methemoglobin with pulse oximetry   $ 15,879.00 direct/yr 1   $ 15,879.00 total

Research and development for improving non-invasive monitoring of blood and tissue oxygenation in humans. Phase I laboratory testing in humans.

---

41. MASI92                          PI

Masimo Corporation

MASI92: Accuracy of detection of methemoglobin with pulse oximetry

01/23/2013   02/22/2013

$ 15,879.00 direct/yr 1   $ 15,879.00 total

Research and development for improving non-invasive monitoring of blood and tissue oxygenation in humans. Phase I laboratory testing in humans.

---

42. ASSU04     PI

Assurance Biosense, Inc

ASSU04 - Accuracy of pulse oximeters with profound hypoxia

02/06/2013   03/06/2013

$ 16,177.00 direct/yr 1   $ 16,177.00 total

Research and development for improving non-invasive monitoring of blood and tissue oxygenation in humans. Phase I laboratory testing in humans.

---

43. LIFE01     PI

LifeWatch Technologies, Ltd

LIFE01: Accuracy of pulse oximeters with profound hypoxia

03/20/2013   04/19/2013

$ 16,177.00 direct/yr 1   $ 16,177.00 total

---

44. MASI94     PI

Masimo Corporation

MASI94: Accuracy of pulse oximeters with profound hypoxia

02/27/2013   03/26/2013

$ 16,177.00 direct/yr 1   $ 16,177.00 total

---

45. MASI93     PI

Masimo Corporation

MASI93: Accuracy of pulse oximeters with profound hypoxia

02/13/2013   03/12/2013

$ 16,177.00 direct/yr 1   $ 16,177.00 total

Research and development for improving non-invasive monitoring of blood and tissue oxygenation in humans. Phase I laboratory testing in humans.

---

46. MASI96     PI

Masimo Corporation

MASI96: Accuracy of non-invasive measurement of hemoglobin in humans

04/10/2013   05/09/2013

$ 90,247.00 direct/yr 1   $ 90,247.00 total

Research and development for improving non-invasive monitoring of blood and tissue oxygenation in humans. Phase I laboratory testing in humans.

---

47. MASI97     PI

Masimo Corporation      05/08/2013    06/07/2013

MASI97: Accuracy of non-invasive measurement of hemoglobin in humans    $ 116,823.00 direct/yr 1    $ 116,823.00 total

Research and development for improving non-invasive monitoring of blood and tissue oxygenation in humans. Phase I laboratory testing in humans.

---

48. MASI95      PI

Masimo Corporation      3/13/2013    04/12/2013

MASI95: Accuracy of non-invasive measurement of hemoglobin    $ 36,113.00 direct/yr 1    $ 36,113.00 total

Research and development for improving non-invasive monitoring of blood and tissue oxygenation in humans. Phase I laboratory testing in humans.

---

49. HEM01 PI 3/20/13 3/20/14      PI
HemoCue AB $39,184.00 Trend performance of non-invasive total hemoglobin measu $39,184.00

HemoCue AB      03/20/2013    03/20/2014

Trend performance of non-invasive total hemoglobin measurements in humans    $ 39,184.00 direct/yr 1    $ 39,184.00 total

Research and development for improving non-invasive monitoring of blood and tissue oxygenation in humans. Phase I laboratory testing in humans.

---

50. MASI99      PI

Masimo Corporation      07/10/2013    08/06/2013

MASI99: Accuracy of pulse oximeters with cerebral sensors    $ 60,202.00 direct/yr 1    $ 60,202.00 total

Research and development for improving non-invasive monitoring of blood and tissue oxygenation in humans. Phase I laboratory testing in humans.

---

51. MASI98      PI

Masimo Corporation      06/12/2013    07/112013

MASI98: Accuracy of non-invasive measurement of hemoglobin in humans    $ 112,927.00 direct/yr 1    $ 112,927.00 total

Research and development for improving non-invasive monitoring of blood and tissue oxygenation in humans. Phase I laboratory testing in humans.

---

52. ZENS01      PI

Nitto Denko Asia Technical Centre PteLtd      09/11/2013    10/10/2013

ZENS01: Accuracy of pulse oximeters with profound hypoxia $ 16,177.00 direct/yr 1   $ 16,177.00 total

Research and development for improving non-invasive monitoring of blood and tissue oxygenation in humans. Phase I laboratory testing in humans.

---

53. MASI100                              PI

Masimo Corporation                                    08/07/2013    09/06/2013

MASI100: Accuracy of Detection of Methemoglobin with Pulse Oximetry        $ 19,753.00 direct/yr 1   $ 19,753.00 total

Research and development for improving non-invasive monitoring of blood and tissue oxygenation in humans. Phase I laboratory testing in humans.

---

54. MASI101                              PI

Masimo Corporation                                    08/14/2013    09/13/2013

MASI101: Accuracy of non-invasive measurement of hemoglobin        $ 76,468.00 direct/yr 1   $ 76,468.00 total

Research and development for improving non-invasive monitoring of blood and tissue oxygenation in humans. Phase I laboratory testing in humans.

---

55. MASI102                              PI

Masimo Corporation                                    08/27/2013    09/26/2013

MASI102: Accuracy of detection of methemoglobin with pulse oximeters        $ 37,672.00 direct/yr 1   $ 37,672.00 total

Research and development for improving non-invasive monitoring of blood and tissue oxygenation in humans. Phase I laboratory testing in humans.

---

56. MASI103                              PI

Masimo Corporation                                    09/18/2013    10/17/2013

MASI103: Accuracy of detection of methemoglobin with pulse oximeters        $ 16,133.00 direct/yr 1   $ 16,133.00 total

Research and development for improving non-invasive monitoring of blood and tissue oxygenation in humans. Phase I laboratory testing in humans.

---

57. MASI104                              PI

Masimo Corporation                                    09/19/2013    10/18/2013

MASI104: Accuracy of detection of carboxyhemoglobin with pulse oximetry        $ 32,328.00 direct/yr 1   $ 32,328.00 total

Research and development for improving non-invasive monitoring of blood and tissue oxygenation in humans. Phase I laboratory testing in humans.

---

58. MESP04                               PI

Mespere Lifesciences Inc                                    11/13/2013     12/12/2013

MESP04: Accuracy of pulse oximeters with cerebral sensors     $ 15,185.00     $ 15,185.00
and transvenous detection                                     direct/yr 1     total

Research and development for improving non-invasive monitoring of blood and tissue
oxygenation in humans. Phase I laboratory testing in humans.

---

59. MASI105                              PI

Masimo Corporation                                          10/09/2013     11/08/2013

MASI105: Accuracy of detection of methemoglobin with pulse     $ 27,078.00     $ 27,078.00
oximetry                                                       direct/yr 1     total

Research and development for improving non-invasive monitoring of blood and tissue
oxygenation in humans. Phase I laboratory testing in humans.

---

60. MASI106                              PI

Masimo Corporation                                          11/09/2013     12/05/2013

MASI106: Accuracy of detection of methemoglobin with pulse     $ 18,909.00     $ 18,909.00
oximeters                                                      direct/yr 1     total

Research and development for improving non-invasive monitoring of blood and tissue
oxygenation in humans. Phase I laboratory testing in humans.

---

61. SENT02                               PI

SenTec AG                                                   10/16/2013     11/15/2013

SENT02: Accuracy of Pulse Oximeters with Profound             $ 18,425.00     $ 18,425.00
Hypoxia                                                        direct/yr 1     total

Research and development for improving non-invasive monitoring of blood and tissue
oxygenation in humans. Phase I laboratory testing in humans.

---

62. MASI107                              PI

Masimo Corporation                                          11/20/2013     12/19/2013

MASI107: Accuracy of detection of methemoglobin with pulse     $ 16,133.00     $ 16,133.00
oximetry                                                       direct/yr 1     total

Research and development for improving non-invasive monitoring of blood and tissue
oxygenation in humans. Phase I laboratory testing in humans.

---

63. MASI108                              PI

Masimo Corporation                                          11/21/2013     12/20/2013

MASI108: Accuracy of detection of carboxyhemoglobin with       $ 16,177.00     $ 16,177.00
pulse oximetry                                                 direct/yr 1     total

Research and development for improving non-invasive monitoring of blood and tissue
oxygenation in humans. Phase I laboratory testing in humans.

64. MASI109                          PI

Masimo Corporation                                    12/03/2013      12/03/2013

MASI109: Accuracy of detection of methemoglobin and      $ 26,456.00     $ 26,456.00
carboxyhemoglobin with pulse oximetry                    direct/yr 1     total

Research and development for improving non-invasive monitoring of blood and tissue
oxygenation in humans. Phase I laboratory testing in humans.

---

65. MASI110                          PI

Masimo Corporation                                    01/08/2014      01/08/2014

MASI110: Accuracy of detection of carboxyhemoglobin with   $ 20,496.00     $ 20,496.00
pulse oximetry                                           direct/yr 1     total

Research and development for improving non-invasive monitoring of blood and tissue
oxygenation in humans. Phase I laboratory testing in humans.

---

66. COVI01                           PI

Covidien                                              01/21/2014      04/04/2015

COVMOPR0411: Controlled Desaturation for Cerebral        $ 123,356.41    $ 123,356.41
Oximetry                                                 direct/yr 1     total

Research and development for improving non-invasive monitoring of blood and tissue
oxygenation in humans. Phase I laboratory testing in humans.

---

67. MASI111                          PI

Masimo Corporation                                    02/06/2014      02/06/2014

MASI111: Accuracy of detection of methemoglobin with pulse  $ 18,953.00     $ 18,953.00
oximetry                                                 direct/yr 1     total

Research and development for improving non-invasive monitoring of blood and tissue
oxygenation in humans. Phase I laboratory testing in humans.

---

68. NONI41                           PI

Nonin Medical, Inc.                                   02/26/2014      03/25/2014

NONI41: Accuracy of detection of carboxyhemoglobin with   $ 33,106.00     $ 33,106.00
pulse oximetry                                           direct/yr 1     total

Research and development for improving non-invasive monitoring of blood and tissue
oxygenation in humans. Phase I laboratory testing in humans.

---

69. NIHO04                           PI

Nihon Kohden                                          01/15/2014      04/302014

NIHO04: Accuracy of detection of methemoglobin and       $ 18,875.00     $ 18,875.00
carboxyhemoglobin with pulse oximetry                    direct/yr 1     total

Research and development for improving non-invasive monitoring of blood and tissue
oxygenation in humans. Phase I laboratory testing in humans.

70. BLUE04                         PI

Bluepoint Medical GmbH & Co KG                03/05/2014    06/09/2014

BLUE04: Accuracy of Pulse Oximeters with profound hypoxia  $ 34,586.47   $ 34,586.47
                                              direct/yr 1   total

Research and development for improving non-invasive monitoring of blood and tissue
oxygenation in humans. Phase I laboratory testing in humans.

---

71. MASI112                        PI

Masimo Corporation                            03/26/2014    04/25/2014

Accuracy of detection of methemoglobin with pulse oximetry  $ 15,857.00   $ 15,857.00
                                              direct/yr 1   total

Research and development for improving non-invasive monitoring of blood and tissue
oxygenation in humans. Phase I laboratory testing in humans.

---

72. MAXI01                         PI

Maxim Integrated Products, Inc                01/22/2014    03/20/2014

MAXI01: Accuracy of pulse oximeters with profound hypoxia  $ 4,868.00    $ 4,868.00
                                              direct/yr 1   total

Research and development for improving non-invasive monitoring of blood and tissue
oxygenation in humans. Phase I laboratory testing in humans.

---

73. SLEE01                         PI

SleepMed, Inc                                 06/25/2014    12/24/2014

SLEE01: Accuracy of Pulse Oximeters with Profound Hypoxia  $ 15,256.00   $ 15,256.00
                                              direct/yr 1   total

Research and development for improving non-invasive monitoring of blood and tissue
oxygenation in humans. Phase I laboratory testing in humans.

---

74. SCAN01                         PI

Scanadu Incorporated                          06/13/2014    12/12/2014

SCAN01: Accuracy of Pulse Oximeters with Profound          $ 26,597.00   $ 26,597.00
Hypoxia                                       direct/yr 1   total

Research and development for improving non-invasive monitoring of blood and tissue
oxygenation in humans. Phase I laboratory testing in humans.

---

75. IVY01                          PI

Ivy Biomedical Systems, Inc                   06/12/2014    12/11/2014

IVY01: Accuracy of Pulse Oximeters with Profound Hypoxia   $ 5,680.00    $ 5,680.00
                                              direct/yr 1   total

Research and development for improving non-invasive monitoring of blood and tissue oxygenation in humans. Phase I laboratory testing in humans.

---

76. SENT03                          PI

SenTec AG                                        08/13/2014      02/12/2015
SENT03: Accuracy of pulse oximeters with profound hypoxia   $ 53,347.00     $ 53,347.00
                                                 direct/yr 1     total

Research and development for improving non-invasive monitoring of blood and tissue oxygenation in humans. Phase I laboratory testing in humans.

---

77. SPRING01                        PI

Springer Design, Inc                             10/08/2014      04/08/2015
SPRIN01: Accuracy of pulse oximeters with profound hypoxia   $ 10,816.00     $ 10,816.00
                                                 direct/yr 1     total

Research and development for improving non-invasive monitoring of blood and tissue oxygenation in humans. Phase I laboratory testing in humans.

---

78. NIHO05                          PI

Nihon Kohden                                     01/06/2015      06/06/2015
NIHO05: Accuracy of Detection of Methemoglobin with Pulse   $ 50,202.00     $ 50,202.00
Oximetry                                         direct/yr 1     total

Research and development for improving non-invasive monitoring of blood and tissue oxygenation in humans. Phase I laboratory testing in humans.

---

79. NIGMS KO8 award                 Research Mentor                  Sall (PI)

NIH                                              02/01/2010      01/31/2014

Volatile Anesthetic Toxicity in Hippocampal Derived
Progenitor Cells

The long-term goal of this research is to relate anesthetic toxicity in neural stem cells to post-operative cognitive dysfunction.

---

80. 12GRNT11550017                  Principal Investigator           Bickler (PI)

American Heart Association- Grant-in-Aid         07/01/2012      6/30/2014
The unfolded protein response and neuron ischemic   $ 70,000        $ 140,000
tolerance                                        direct/yr 1     total

This research identifies how unfolded proteins signal the development of tolerance to cerebral ischemia in hippocampal neurons.

---

81. MESP05                          PI

Mespere Lifesciences Inc                         09/23/2014      09/23/2020

MESP05: Accuracy of pulse oximeters with cerebral sensors    $ 45,964.66    $ 45,964.66
and hypoxia                                                   direct/yr 1    total

Research and development for improving non-invasive monitoring of blood and tissue oxygenation in humans. Phase I laboratory testing in humans.

## PEER REVIEWED PUBLICATIONS

1. 1975    **Bickler PE**, Shoemaker VH: Alfalfa damage by jackrabbits in the Southern California deserts. California Agriculture 1975; 29: 10-13.

2. 1979    Shoemaker VH, **Bickler PE**: Kidney and bladder function in a uricotelic treefrog (Phyllomedusa sauvagei). Journal of Comparative Physiology 1979; 133: 211-218.

3. 1980    **Bickler PE**, Nagy KA: Effects of parietalectomy on energy expenditure in free-ranging lizards. Copeia 1980: 923-925.

4. 1981    **Bickler PE**: Effects of temperature on acid-base balance and ventilation in desert iguanas. J Appl Physiol 1981; 51: 452-60.

5. 1982    **Bickler PE**: Intracellular pH in lizard Dipsosaurus dorsalis in relation to changing body temperatures. J Appl Physiol 1982; 53: 1466-72.

6. 1984    **Bickler PE**: Blood acid-base status of an awake heterothermic rodent, Spermophilus tereticaudus. Respir Physiol 1984; 57: 307-16.

7. 1984    **Bickler PE**: $CO_2$ balance of a heterothermic rodent: comparison of sleep, torpor, and awake states. Am J Physiol 1984; 246: R49-55.

8. 1984    **Bickler PE**: Effects of temperature on acid and base excretion in a lizard, Dipsosaurus dorsalis. Journal of Comparative Physiology 1984; 154: 97-104.

9. 1985    **Bickler PE**, Spragg RG, Hartman MT, White FN: Distribution of ventilation in American alligators Alligator mississippiensis. Am J Physiol 1985; 249: R477-81.

10. 1985   Weinstein Y, Bernstein MH, **Bickler PE**, Gonzales DV, Samaniego FC, Escobedo MA: Blood respiratory properties in pigeons at high altitudes: effects of acclimation. Am J Physiol 1985; 249: R765-75.

11. 1986   **Bickler PE**: Day-night variations in blood and intracellular pH in a lizard, Dipsosaurus dorsalis. J Comp Physiol [B] 1986; 156: 853-7.

12. 1986     **Bickler PE**, Anderson RA: Ventilation and aerobic metabolism in a small monitor lizard (Varanus gilleni). Physiological Zoology 1986; 59: 76-83.

13. 1986     **Bickler PE,** Maginniss LA, Powell FL: Intrapulmonary and extrapulmonary shunt in ducks. Respir Physiol 1986; 63: 151-60.

14. 1987     **Bickler PE**, Dueck R, Prutow RJ: Effects of barbiturate anesthesia on functional residual capacity and ribcage/diaphragm contributions to ventilation. Anesthesiology 1987; 66: 147-52.

15. 1987     White FN, **Bickler PE**: Cardiopulmonary gas exchange in the turtle: A model analysis. American Zoologist 1987; 27: 31-40.

16. 1988     **Bickler PE**, Litt L, Banville DL, Severinghaus JW: Effects of acetazolamide on cerebral acid-base balance. J Appl Physiol 1988; 65: 422-7.

17. 1988     **Bickler PE**, Litt L, Severinghaus JW: Effects of acetazolamide on cerebrocortical NADH and blood volume. J Appl Physiol 1988; 65: 428-33.

18. 1989     **Bickler PE**, Koh SO, Severinghaus JW: Effects of hypoxia and hypocapnia on brain redox balance in ducks. Am J Physiol 1989; 257: R132-5.

19. 1990     **Bickler PE**, Schapera A, Bainton CR: Acute radial nerve injury from use of an automatic blood pressure monitor. Anesthesiology 1990; 73: 186-8.

20. 1990     **Bickler PE**, Sessler DI: Efficiency of airway heat and moisture exchangers in anesthetized humans. Anesth Analg 1990; 71: 415-8.

21. 1991     Bissonnette B, **Bickler PE**, Gregory GA, Severinghaus JW: Intracranial pressure and brain redox balance in rabbits. Can J Anaesth 1991; 38: 654-9.

22. 1991     Miller AC, **Bickler P**: The laryngeal mask airway. An unusual complication. Anaesthesia 1991; 46: 659-60.

23. 1992     **Bickler PE**: Cerebral anoxia tolerance in turtles: regulation of intracellular calcium and pH. Am J Physiol 1992; 263: R1298-302.

24. 1992        **Bickler PE**: Effects of temperature and anoxia on regional cerebral blood flow in turtles. Am J Physiol 1992; 262: R538-41.

25. 1992        **Bickler PE**, Julian D: Regional cerebral blood flow and tissue oxygenation during hypocarbia in geese. Am J Physiol 1992; 263: R221-5.

26. 1992        **Bickler PE**, Kelleher JA: Fructose-1,6-bisphosphate stabilizes brain intracellular calcium during hypoxia in rats. Stroke 1992; 23: 1617-22.

27. 1993        **Bickler PE**, Gallego SM: Inhibition of brain calcium channels by plasma proteins from anoxic turtles. Am J Physiol 1993; 265: R277-81.

28. 1993        **Bickler PE**, Gallego SM, Hansen BM: Developmental changes in intracellular calcium regulation in rat cerebral cortex during hypoxia. J Cereb Blood Flow Metab 1993; 13: 811-9.

29. 1993        Szenohradszky J, Trevor AJ, **Bickler P,** Caldwell JE, Sharma ML, Rampil IJ, Miller RD: Central nervous system effects of intrathecal muscle relaxants in rats. Anesth Analg 1993; 76: 1304-9.

30. 1994        **Bickler PE**, Buck LT, Hansen BM: Effects of isoflurane and hypothermia on glutamate receptor-mediated calcium influx in brain slices. Anesthesiology 1994; 81: 1461-9.

31. 1994        **Bickler PE**, Hansen BM: Causes of calcium accumulation in rat cortical brain slices during hypoxia and ischemia: role of ion channels and membrane damage. Brain Res 1994; 665: 269-76.

32. 1994        Cardone C, Szenohradszky J, Yost S, **Bickler PE**: Activation of brain acetylcholine receptors by neuromuscular blocking drugs. A possible mechanism of neurotoxicity. Anesthesiology 1994; 80: 1155-61; discussion 29A.

33. 1994        O'Donnell BR, **Bickler PE**: Influence of pH on calcium influx during hypoxia in rat cortical brain slices. Stroke 1994; 25: 171-7.

34. 1994        Sato M, Severinghaus JW, **Bickler P**: Time course of augmentation and depression of hypoxic ventilatory responses at altitude. J Appl Physiol 1994; 77: 313-6.

35. 1995        Bickler PE, Buck LT, Feiner JR: Volatile and intravenous anesthetics decrease glutamate release from cortical brain slices during anoxia. Anesthesiology 1995; 83: 1233-40.

36. 1995    Buck LT, **Bickler PE**: Role of adenosine in NMDA receptor modulation in the cerebral cortex of an anoxia-tolerant turtle (Chrysemys picta belli). J Exp Biol 1995; 198: 1621-8.

37. 1995    Feiner JR, **Bickler PE**, Severinghaus JW: Hypoxic ventilatory response predicts the extent of maximal breath-holds in man. Respir Physiol 1995; 100: 213-22.

38. 1996    **Bickler PE**, Buck LT: Effects of fructose-1,6-bisphosphate on glutamate release and ATP loss from rat brain slices during hypoxia. J Neurochem 1996; 67: 1463-8.

39. 1996    **Bickler PE**, Hansen BM: Alpha 2-adrenergic agonists reduce glutamate release and glutamate receptor-mediated calcium changes in hippocampal slices during hypoxia. Neuropharmacology 1996; 35: 679-87.

40. 1996    Eilers H, **Bickler PE**: Hypothermia and isoflurane similarly inhibit glutamate release evoked by chemical anoxia in rat cortical brain slices. Anesthesiology 1996; 85: 600-7.

41. 1996    Eldridge MW, Podolsky A, Richardson RS, Johnson DH, Knight DR, Johnson EC, Hopkins SR, Michimata H, Grassi B, Feiner J, Kurdak SS, **Bickler PE**, Wagner PD, Severinghaus JW: Pulmonary hemodynamic response to exercise in subjects with prior high-altitude pulmonary edema. J Appl Physiol 1996; 81: 911-21.

42. 1996    Podolsky A, Eldridge MW, Richardson RS, Knight DR, Johnson EC, Hopkins SR, Johnson DH, Michimata H, Grassi B, Feiner J, Kurdak SS, **Bickler PE**, Severinghaus JW, Wagner PD: Exercise-induced VA/Q inequality in subjects with prior high-altitude pulmonary edema. J Appl Physiol 1996; 81: 922-32.

43. 1996    Talke P, **Bickler PE**: Effects of dexmedetomidine on hypoxia-evoked glutamate release and glutamate receptor activity in hippocampal slices. Anesthesiology 1996; 85: 551-7.

44. 1997    Eilers H, Schaeffer E, **Bickler PE**, Forsayeth JR: Functional deactivation of the major neuronal nicotinic receptor caused by nicotine and a protein kinase C-dependent mechanism. Mol Pharmacol 1997; 52: 1105-12.

45. 1997     Gray AT, Buck LT, Feiner JR, **Bickler PE**: Interactive effects of pH and temperature on N-methyl-D-aspartate receptor activity in rat cortical brain slices. J Neurosurg Anesthesiol 1997; 9: 180-7.

46. 1998     **Bickler PE**: Reduction of NMDA receptor activity in cerebrocortex of turtles (Chrysemys picta) during 6 wk of anoxia. Am J Physiol 1998; 275: R86-91.

47. 1998     **Bickler PE**, Hansen BM: Hypoxia-tolerant neonatal CA1 neurons: relationship of survival to evoked glutamate release and glutamate receptor-mediated calcium changes in hippocampal slices. Brain Res Dev Brain Res 1998; 106: 57-69.

48. 1998     Buck L, Espanol M, Litt L, **Bickler P**: Reversible decreases in ATP and PCr concentrations in anoxic turtle brain. Comp Biochem Physiol A Mol Integr Physiol 1998; 120: 633-9.

49. 1998     Buck LT, **Bickler PE**: Adenosine and anoxia reduce N-methyl-D-aspartate receptor open probability in turtle cerebrocortex. J Exp Biol 1998; 201: 289-97.

50. 1998     Hampson AJ, Bornheim LM, Scanziani M, Yost CS, Gray AT, Hansen BM, Leonoudakis DJ, **Bickler PE**: Dual effects of anandamide on NMDA receptor-mediated responses and neurotransmission. J Neurochem 1998; 70: 671-6.

51. 1999     Eilers H, Kindler CH, **Bickler PE**: Different effects of volatile anesthetics and polyhalogenated alkanes on depolarization-evoked glutamate release in rat cortical brain slices. Anesth Analg 1999; 88: 1168-74.

52. 1999     Kindler CH, Eilers H, Donohoe P, Ozer S, **Bickler PE**: Volatile anesthetics increase intracellular calcium in cerebrocortical and hippocampal neurons. Anesthesiology 1999; 90: 1137-45.

53. 1999     Taylor DM, Eger EI, 2nd, **Bickler PE**: Halothane, but not the nonimmobilizers perfluoropentane and 1,2-dichlorohexafluorocyclobutane, depresses synaptic transmission in hippocampal CA1 neurons in rats. Anesth Analg 1999; 89: 1040-5.

54. 2000     **Bickler PE**, Donohoe PH, Buck LT: Hypoxia-induced silencing of NMDA receptors in turtle neurons. J Neurosci 2000; 20: 3522-8.

55. 2000     Popovic R, Liniger R, **Bickler PE**: Anesthetics and mild hypothermia similarly prevent hippocampal neuron death in an in vitro model of cerebral ischemia. Anesthesiology 2000; 92: 1343-9.

56. 2001     Donohoe PH, Fahlman CS, **Bickler PE**, Vexler ZS, Gregory GA: Neuroprotection and intracellular Ca2+ modulation with fructose-1,6-bisphosphate during in vitro hypoxia-ischemia involves phospholipase C-dependent signaling. Brain Res 2001; 917: 158-66.

57. 2001     Eilers H, Philip LA, **Bickler PE**, McKay WR, Schumacher MA: The reversal of fentanyl-induced tolerance by administration of "small-dose" ketamine. Anesth Analg 2001; 93: 213-4.

58. 2001     Liniger R, Popovic R, Sullivan B, Gregory G, **Bickler PE**: Effects of neuroprotective cocktails on hippocampal neuron death in an in vitro model of cerebral ischemia. J Neurosurg Anesthesiol 2001; 13: 19-25.

59. 2002     Fahlman CS, **Bickler PE**, Sullivan B, Gregory GA: Activation of the neuroprotective ERK signaling pathway by fructose-1,6-bisphosphate during hypoxia involves intracellular Ca2+ and phospholipase C. Brain Res 2002; 958: 43-51.

60. 2002     Serkova N, Donohoe P, Gottschalk S, Hainz C, Niemann CU, **Bickler PE**, Litt L, Benet LZ, Leibfritz D, Christians U: Comparison of the effects of cyclosporin a on the metabolism of perfused rat brain slices during normoxia and hypoxia. J Cereb Blood Flow Metab 2002; 22: 342-52.

61. 2002     Sullivan BL, Leu D, Taylor DM, Fahlman CS, **Bickler PE**: Isoflurane prevents delayed cell death in an organotypic slice culture model of cerebral ischemia. Anesthesiology 2002; 96: 189-95.

62. 2003     **Bickler PE**, Fahlman CS, Taylor DM: Oxygen sensitivity of NMDA receptors: relationship to NR2 subunit composition and hypoxia tolerance of neonatal neurons. Neuroscience 2003; 118: 25-35.

63. 2003     **Bickler PE**, Warner DS, Stratmann G, Schuyler JA: gamma-Aminobutyric acid-A receptors contribute to isoflurane neuroprotection in organotypic hippocampal cultures. Anesth Analg 2003; 97: 564-71, table of contents.

64. 2004     **Bickler PE**, Fahlman CS: Moderate increases in intracellular calcium activate neuroprotective signals in hippocampal neurons. Neuroscience 2004; 127: 673-83.

65. 2004    **Bickler PE**, Fahlman CS, Ferriero DM: Hypoxia increases calcium flux through cortical neuron glutamate receptors via protein kinase C. J Neurochem 2004; 88: 878-84.

66. 2004    O'Connor T, Dubowitz G, **Bickler PE**: Pulse oximetry in the diagnosis of acute mountain sickness. High Alt Med Biol 2004; 5: 341-8.

67. 2005    **Bickler PE**, Feiner JR, Severinghaus JW: Effects of skin pigmentation on pulse oximeter accuracy at low saturation. Anesthesiology 2005; 102: 715-9.

68. 2005    **Bickler PE**, Zhan X, Fahlman CS: Isoflurane preconditions hippocampal neurons against oxygen-glucose deprivation: role of intracellular Ca2+ and mitogen-activated protein kinase signaling. Anesthesiology 2005; 103: 532-9.

69. 2005    Feiner JR, **Bickler PE**, Estrada S, Donohoe PH, Fahlman CS, Schuyler JA: Mild hypothermia, but not propofol, is neuroprotective in organotypic hippocampal cultures. Anesth Analg 2005; 100: 215-25.

70. 2005    Gray JJ, **Bickler PE**, Fahlman CS, Zhan X, Schuyler JA: Isoflurane neuroprotection in hypoxic hippocampal slice cultures involves increases in intracellular Ca2+ and mitogen-activated protein kinases. Anesthesiology 2005; 102: 606-15.

71. 2005    Hedrick MS, Fahlman CS, **Bickler PE:** Intracellular calcium and survival of tadpole forebrain cells in anoxia. J Exp Biol 2005; 208: 681-6.

72. 2005    Liu C, Cotten JF, Schuyler JA, Fahlman CS, Au JD, **Bickler PE**, Yost CS: Protective effects of TASK-3 (KCNK9) and related 2P K channels during cellular stress. Brain Res 2005; 1031: 164-73.

73. 2006    **Bickler P**, Brandes J, Lee M, Bozic K, Chesbro B, Claassen J: Bleeding complications from femoral and sciatic nerve catheters in patients receiving low molecular weight heparin. Anesth Analg 2006; 103: 1036-7.

74. 2006    **Bickler PE**, Fahlman CS: The inhaled anesthetic, isoflurane, enhances Ca2+ -dependent survival signaling in cortical neurons and modulates MAP kinases, apoptosis proteins and transcription factors during hypoxia. Anesth Analg 2006; 103: 419-29, table of contents.

75. 2006    Platts-Mills TF, Lewin MR, Wells J, **Bickler P**: Improvised cricothyrotomy provides reliable airway access in an unembalmed human cadaver model. Wilderness Environ Med 2006; 17: 81-6.

76. 2006    Zhan X, Fahlman CS, **Bickler PE**: Isoflurane neuroprotection in rat hippocampal slices decreases with aging: changes in intracellular Ca2+ regulation and N-methyl-D-aspartate receptor-mediated Ca2+ influx. Anesthesiology 2006; 104: 995-1003.

77. 2007    Feiner JR, Severinghaus JW, **Bickler PE**: Dark skin decreases the accuracy of pulse oximeters at low oxygen saturation: the effects of oximeter probe type and gender. Anesth Analg 2007; 105: S18-23.

78. 2008    Christian SL, Ross AP, Zhao HW, Kristenson HJ, Zhan X, Rasley BT, **Bickler PE**, Drew KL: Arctic ground squirrel (Spermophilus parryii) hippocampal neurons tolerate prolonged oxygen-glucose deprivation and maintain baseline ERK1/2 and JNK activation despite drastic ATP loss. J Cereb Blood Flow Metab 2008; 28: 1307-19.

79. 2009    Pasternak JJ, McGregor DG, Lanier WL, Schroeder DR, Rusy DA, Hindman B, Clarke W, Torner J, Todd MM; IHAST Investigators.  Effect of nitrous oxide use on long-term neurologic and neuropsychological outcome in patients who received temporary proximal artery occlusion during cerebral aneurysm clipping surgery.  Anesthesiology. 2009; Mar 110(3):563-73.

80. 2009    **Bickler PE**, Fahlman CS, Gray J, McKleroy W.  Inositol 1,4,5-triphosphate receptors and NAD(P)H mediate Ca2+ signaling required for hypoxic preconditioning of hippocampal neurons. Neuroscience. 2009; Apr 21 160(1):51-60. Epub 2009 Feb 13.

81. 2009    Sall JW, Stratmann G, Leong J, McKleroy W, Mason D, Shenoy S, Pleasure SJ, **Bickler PE** Isoflurane inhibits growth but does not cause cell death in hippocampal neural precursor cells grown in culture. Anesthesiology. 2009; Apr 110(4):826-33.

82. 2009    Baranov D, **Bickler PE**, Crosby GJ, Culley DJ, Eckenhoff MF, Eckenhoff RG, Hogan KJ, Jevtovic-Todorovic V, Palot?s A, Perouansky M, Planel E, Silverstein JH, Wei H, Whittington RA, Xie Z, Zuo Z; Consensus statement: First International Workshop on Anesthetics and Alzheimer's disease. First International Workshop on Anesthetics and Alzheimer's Disease. Anesth Analg. 2009; May 108(5):1627-30.

83. 2009      Todd MM, Hindman BJ, Clarke WR, Torner JC, Weeks JB, Bayman EO, Shi Q, Spofford CM; IHAST Investigators.  Perioperative fever and outcome in surgical patients with aneurysmal subarachnoid hemorrhage. Neurosurgery. 2009; May 64(5):897-908; discussion 908.

84. 2009      **Bickler PE**, Fahlman CS  Expression of Signal Transduction Genes Differs after Hypoxic or Isoflurane Preconditioning of Rat Hippocampal Slice Cultures.. Anesthesiology. 2009; 111:258-66.

85. 2010      Hindman BJ, Bayman EO, Pfisterer WK, Torner JC, Todd MM; IHAST Investigators. No association between intraoperative hypothermia or supplemental protective drug and neurologic outcomes in patients undergoing temporary clipping during cerebral aneurysm surgery: findings from the Intraoperative Hypothermia for Aneurysm Surgery Trial. Anesthesiology. 2010; Jan 112(1):86-101.

86. 2010      **Bickler PE**, Fahlman C. Enhanced hypoxic preconditioning by isoflurane: requirement of intracellular Ca2+ and inositol triphosphate receptors.  Brain Research 2010; 1340: 86-95.

87. 2010      Stratmann G, Sall JW, Bell JS, Alvi RS, May LV, Ku B, Dowlatshahi M, Dai R, **Bickler PE**, Russell I, Lee MT, Hrubos MW, Chiu C.Isoflurane does not affect brain cell death, hippocampal neurogenesis, or long-term neurocognitive outcome in aged rats. Anesthesiology. 2010; Feb 112(2):305-15.

88. 2010      Osredkar, D, Sall, JW, **Bickler, P**, Ferriero, DM. Erythropoeitin promotes hippocampal neurogenesis in in vitro models of neonatal stroke. Neurobiol Dis. 2010; 38(2):259-65.

89. 2010      Rubinsky L, Raichman N, Lavee J, Frenk H, Ben-Jacob E, **Bickler PE**. Antifreeze protein suppresses spontaneous neural activity and protects neurons from hypothermia/re-warming injury. Neurosci Res. 2010; Jul 67(3):256-9. Epub 2010 Apr 14.

90. 2010      Feiner, JR, **Bickler PE**, Mannheimer, PD Accuracy of Methemoglobin detection by pulse CO-oximetry during hypoxia.  Anesthesia and Analgesia, 2010; 111(5): 1160-7.

91. 2010      Nguyen HP, Zaroff JG, Bayman EO, Gelb AW, Todd MM, Hindman BJ; IHAST-MIDS and IHAST Investigators. Perioperative hypothermia (33 degrees C) does not increase the occurrence of cardiovascular events in patients undergoing cerebral aneurysm surgery: findings from the Intraoperative Hypothermia for Aneurysm Surgery Trial. Anesthesiology. 2010; Aug 113(2):327-42.

92. 2010    **Bickler P**, Fahlman C, Gray, J: Hypoxic preconditioning failure in aging hippocampal neurons: impaired gene expression and rescue with intracellular calcium chelation. J. Neuroscience Research 2010; 88(16): 3520-9.

93. 2010    Feiner, J.R. and **Bickler. P.E.** Improved accuracy of methemoglobin detection by pulse CO-oximetry during hypoxia. Anesthesia and Analgesia, 2010; 111(5):1160-7.

94. 2011    Pianezza A, Salces y Nedeo A, Minville V, **Bickler P**, Cheynes P. Emergence level of the musculocutaneous nerve from the brachial plexus: Implications for infraclavicular nerve blocks. Anesth Analg. 2012 May;114(5):1131-3. Epub 2012 Feb 6.

95. 2011    **Bickler PE**, Warren DE, Gregerson M, Gabatto P. Anesthetic protection of neurons injured by hypothermia and rewarming: role of intracellular Ca2+ and excitotoxicity. Anesthesiology. 2012 Aug;117(2):280-92.

96. 2012    Warren DE, **Bickler PE**, Clark JP, Gregersen M, Brosnan H, McKleroy W, Gabatto P. Hypothermia and rewarming injury in hippocampal neurons involves intracellular Ca2+ and glutamate excitotoxicity Neuroscience, 2012 Apr 5;207:316-25. Epub 2012 Jan 12.

97. 2012    Shih J, May L, Gonzalez H, Lee W, Alvi R, Sall J, Rau V, **Bickler PE**, Lalchandani GR, Ysupova M, Woodward E, Kang H, Wilk AJ, Carlson CM, Mendoza MV, ,Guggenheim JM, Schaeffer M, Rowe, AM, Stratmann, G. Delayed Environmental Enrichment Reverses Sevoflurane-induced Memory Impairment in Rats. Anesthesiology. 2012 Mar;116(3):586-602.

98. 2012    Sall JW, Stratmann G, Leong J, Woodward E, **Bickler PE**. Propofol at clinically relevant concentrations increases neuronal differentiation but is not toxic to hippocampal neuroal precursor cells in vitro. 2012. Anesthesiology 117(5): 1080-90.

99. 2013    Feiner, JR, Rollins M, Sall J, Eilers H,Au, P, **Bickler, PE.** Accuracy of carboxyhemoglobin detection by pulse co-oximetry during hypoxemia. Anesth Analg. 2013 Oct; 117(4):847-58.

100. 2013    Bayman EO, Chaloner KM, Hindman BJ, Todd MM; IHAST Investigators. Bayesian methods to determine performance differences and to quantify variability among centers in multi-center trials: the IHAST trial. BMC Med Res Methodol. 2013 Jan 16;13:5. doi: 10.1186/1471-2288-13-5.

101. 2013     Brosnan H, **Bickler PE**. Xenon neurotoxicity in rat hippocampal slice cultures is similar to isoflurane and sevoflurane. Anesthesiology. 2013 Aug;119(2):335-44.

102. 2013     **Bickler P**, Feiner JR, Rollins M. Factors affecting the performance of 5 cerebral oximeters during hypoxia in healthy volunteers. Anesthesia and Analgesia 2013, 117: 813-823.

103. 2013     Dubowitz G, Breyer, K, Lipnick M, Sall J, Feiner JR, Ikeda K, MacLeod DB, **Bickler PE**. Accuracy of the Lifebox pulse oximeter during hypoxia in healthy volunteers. Anaesthesia. 2013 Dec 68(12):1220-3.

104. 2013     Gregerson, M, Lee, D.H., Gabatto, P., **Bickler PE**. Limitations of mild, moderate and profound hypothermia in protecting developing hippocampal neurons following simulated ischemia. Ther Hypothermia Temp Manag. 2013 Dec 3(4):178-88.

105. 2014     Lewin M, Samuel S, Wexler D, **Bickler P.E.** and Mensh B. Early treatment with intranasal neostigmine reduces mortality in a mouse model of Naja naja (Indian cobra) envenomation. J Trop Med. 2014; 2014:131835 Epub 14 May 2014.

106. 2014     Lewin MR, **Bickler PE**, Heier T, Feiner J, Montau, M, Mens, B. Reversal of experimental paralysis in human by intranasal neostigmine aerosol suggests a novel approach to early treatment of neurotoxic envenomation. Clinical Case Reports, 2013 Oct;1(1):7-15. doi: 10.1002/ccr3.3. Epub 2013 Jul 24.

107. 2015     **Bickler, PE,** Clark, JP, Gabatto, P, Brosnan, H. Hypoxic preconditioning and ischemic cell death in hippcampal neurons co-opts a subset of the unfolded protein response. Neuroscience. 2015 Dec 3;310:306-21

108. 2016     Lipnick MS, Feiner JR, Au P, Bernstein M, **Bickler PE**. The Accuracy of 6 Inexpensive Pulse Oximeters Not Cleared by the Food and Drug Administration: The Possible Global Public Health Implications. Anesth Analg. 2016 Aug;123(2):338-45

109. 2016     Kulcke A, Feiner JR, Menn I, Holmer A, **Bickler PE**. Accuracy of pulse spectroscopy to detect hypoxemia and co-existing methemoglobin or carboxyhemoglobin. Anesth Analg. 2016 Jun;122(6):1856-65

110. 2016    **Bickler P**, Feiner J, Rollins M, Meng L. Tissue oximetry and clinical outcomes. Anesth Analg. 2017 Jan;124(1):72-82.

111. 2016    **Bickler PE**, Feiner JR, Lipnick MS, Batchelder P, MacLeod DB, Severinghaus JW.Effects of acute, profound hypoxia on healthy humans: Implications for safety of tests evaluating pulse oximetry or tissue oximetry performance. Anesth Analg. 2017 Jan;124(1):146-153.

112. 2016    Lewin M, Samuel S, Merkel J, **Bickler** P. Varespladib (LY315920) Appears to Be a Potent, Broad-Spectrum, Inhibitor of Snake Venom Phospholipase A2 and a Possible Pre-Referral Treatment for Envenomation. Toxins (Basel). 2016 Aug 25;8(9).

113. 2017    Zhou R, **Bickler P.** Interaction of isoflurane, tumor necrosis factor-α and β-Amyloid on long-term potentiation in rat hippocampal slices. Anesth Analg. 2017 Feb;124(2):582-587.

114. 2017    Lundeberg J, Feiner JR, Schober A, Sall JW, Eilers H, Bickler PE. Increased Cytokines at High Altitude: Lack of Effect of Ibuprofen on Acute Mountain Sickness, Physiological Variables, or Cytokine Levels. High Alt Med Biol. 2018 Sep;19(3):249-258. doi: 10.1089/ham.2017.0144. Epub 2018 Jun 20.

115. 2017    Yang N, Gabatto P, **Bickler P.**  Reduction in N-methyl-D-aspartate receptor-mediated cell death in hippocampal neurons by glucose deprivation preconditioning.  J Neurosurg Anesthesiol. 2017 Mar; 29(4), 448-457

116. 2017    Srejic U, Larson P, **Bickler PE**. Little Black Boxes: Noncardiac Implantable Electronic Medical Devices and Their Anesthetic and Surgical Implications. Anesth Analg. 2017 Jul;125(1):124-138.

117. 2018    Lucero, J, Louie A, Feiner JR, , Rhodes L, Bernstein M, **Bickler PE**. Four types of pulse oximeters accurately detect hypoxia during low perfusion and motion.  Anesthesiology, 2018 Mar;128(3):520-530.

118. 2018    Schober A, Feiner J, **Bickler P,** Rollins D. Effects of Changes in Arterial Carbon Dioxide and Oxygen Partial Pressures on Cerebral Oximeter Performance. Anesthesiology. 2018 Jan;128(1):97-108

119. 2018     Lipnick M, Cahill L, Feiner JR, **Bickler PE**.  Comparison of transcranial Doppler and ultrasound-tagged near infrared spectroscopy for measuring relative changes in cerebral blood flow in human subjects. Anesthesia and Analgesia, 2018 Feb;126(2):579-587

120. 2018     Bulfone TC, Samuel SP, **Bickler PE**, Lewin MR. Developing Small Molecule Therapeutics for the Initial and Adjunctive Treatment of Snakebite./> J Trop Med. 2018 Jul 30;2018:4320175

121. 2018     Lewin MR, Gutiérrez JM, Samuel SP, Herrera M, Bryan-Quirós W, Lomonte B, **Bickler PE**, Bulfone TC, Williams DJ.Delayed Oral LY333013 Rescues Mice from Highly Neurotoxic, Lethal Doses of Papuan Taipan (Oxyuranus scutellatus) Venom./> Toxins (Basel). 2018 Sep 20;10(10)

122. 2018     Lewin MR, Gilliam LL, Gilliam J, Samuel SP, Bulfone TC, **Bickler PE**, Gutiérrez JM.Delayed LY333013 (Oral) and LY315920 (Intravenous) Reverse Severe Neurotoxicity and Rescue Juvenile Pigs from Lethal Doses of Micrurus fulvius (Eastern Coral Snake) Venom./> Toxins (Basel). 2018 Nov 17;10(11)

123. 2018     Zhou W, Cheung K, Kyu S, Wang L, Guan Z, Kurien PA, **Bickler PE**, Jan LY. Activation of orexin system facilitates anesthesia emergence and pain control./> Proc Natl Acad Sci U S A. 2018 Nov 6;115(45)

124. 2019     Li G, Lin L, Xiao J, Rosenbaum S, **Bickler P**, Meng L. Intraoperative physiological ranges associated with improved outcomes after major spine surgery: an observational study. BMJ Open. 2019 May 28;9(5):e025337. doi: 10.1136/bmjopen-2018-025337.

125. 2020     **Bickler PE**, Feiner JR, Lipnick MS, McKleroy, W.   Silent presentation of hypoxemia and cardiorespiratory compensation in COVID-19.   Anesthesiology 2021 Feb 1;134(2):262-269.

126. 2020     Bickler SW, Cauvi DM, Prieto JM, Gaidry A**,** Thangarajah H, Lazar D, Ignacio, R, Gerstmann DR, Ryan AF, Fisch KM, **Bickler P**, De Maio A. Extremes of age are associated with differences in the expression of selected pattern recognition receptor genes and ACE2, the receptor for SARS-CoV-2: implications for the epidemiology of COVID-19 disease.BMC Med Genomics. 2021 May 24;14(1):138. doi: 10.1186/s12920-021-00970-7.PMID: 3403067

127. 2020     Pardo, A, Feiner JR, **Bickler PE**.  Effects of age on oxygenation and heart rate in visitors to 3800 m altitude. Submitted for publication 2020.

128. 2021     Bernholm KF, Mayhoff CS,  **Bickler PE**. Association between tissue oxygenation and myocardial injury in patients undergoing major spine surgery: a prospective cohort study. BMJ Open. 2021 Sep 17;11(9):e044342. doi: 10.1136/bmjopen-2020-044342.PMID: 34535471

129. 2021     Browne, SH, Bernstein, M, **Bicker P.** Accuracy of Samsung Smartphone Integrated Pulse Oximetry Meets Full FDA Clearance Standards for Clinical Use.  MedRxiv preprint server doi: https://doi.org/10.1101/2021.02.17.21249755

130. 2021     **Bickler PE**, Hornbein T, Saidman LJ. John W. Severinghaus, M.D., 1922 to 2021.Anesthesiology. 2021 Oct 1;135(4):555-557.

131. 2021     Okunlola O, Lipnick MS, Batchelder P, Bernstein M, Feiner J, **Bickler P.** Pulse Oximeter Performance, Racial Inequity, and the Work Ahead. Respir Care.  2022 Feb;67(2):252-257. doi: 10.4187/respcare.09795. Epub 2021 Nov 12

132. 2022     **Bickler P,** Tremper KK.The Pulse Oximeter Is Amazing, but Not Perfect./> Anesthesiology. 2022 May 1;136(5):670-671. doi: 10.1097/ALN.0000000000004171./> PMID: 35303063

133. 2022     Xiang X, Chen Y, Li KX, Fang J, **Bickler PE**, Guan Z, Zhou W. Neuroanatomical Basis for the Orexinergic Modulation of Anesthesia Arousal and Pain Control. Front Cell Neurosci. 2022 Apr 26;16:891631. doi: 10.3389/fncel.2022.891631. eCollection 2022.

134. 2022     Liam J. Campbell, Praveen V. Mummaneni, Vijay Letchuman, Nitin Agarwal, Erica Langnas,Lucy S. Guan, Enrique Vargas, Rhiannon Croci, Lori Reisner, **Philip E. Bickler,** Dean Chou, Edward Chang, and Zhonghui Guan. Difference between in-patient opioid requirements and discharge opiate prescriptions in neurosurgical patients. Submitted for publication

135. 2022     A novel approach for the detection of cognitive impairment and delirium risk in older patients undergoing spine surgery. Baretto-Chang, O, Miller, B, **Bickler P**, et al. Journal of the American Geriatrics Society. In Press.

136. 2022     Lewin, MR, Carter RW, Matteo IA, Samuel SP, Rao, S, Fry BG, **Bickler, PE**.  Varespladib in the Treatment of Snakebite Envenoming: Development History and Preclinical Evidence Supporting Advancement to Clinical Trials in Patients Bitten by Venomous Snakes. /> Toxins 14(11), 783; https://doi.org/10.3390/toxins14110783

137. 2022     Gudelunas KM, Lipnick M, Hendrickson, C, Vandenburg, S.,Okunlola, B, Auchus, A, Feiner, JR, **Bickler PE**. Low perfusion and missed diagnosis of hypoxemia by pulse oximetry in darkly pigmented skin: A prospective study./> medRxiv 2022.10.19.22281282; doi: https://doi.org/10.1101/2022.10.19.22281282

138. 2023
                Raymond Gylys, M.D.1 , John Feiner, M.D.1, Jonas Pologe, B.S.2, Ted Delianides, Ph.D.2  Stephanie Sutter, M.D.1, **Philip Bickler**, M.D.,Ph.D.1, Michael S. Lipnick. Quantifying Pulse Oximeter Accuracy During Hypoxemia And Severe Anemia Using An In Vitro Circulation System. Journal of Clinical Monitoring. In Press April 2023

139. 2023     Srejic U, Litonius E, Gandhi S, Talke P, Maties O, Siegmueller C, Magsaysay A, Hasen D, Kunwar S, Seth R, Gibson L, **Bickler P**. Bilateral Superficial Trigeminal Nerve Blocks are not more Effective than a Placebo in Abolishing Post-operative Headache in Pituitary Transsphenoidal Neurosurgery: A Prospective, Randomized, Double-blinded Clinical Trial./> /> Rev Recent Clin Trials. 2023 Feb 27. doi: 10.2174/1574887118666230227113217. Online ahead of print.

140. 2023     **Philip E. Bickler**, Michael Abouyannis ,Ashish Bhalla and Matthew R. Lewin.  Neuromuscular Weakness and Paralysis Produced by Snakebite Envenoming: Mechanisms and Proposed Standards for Clinical Assessment.
                Toxins (Basel). 2023 Jan 6;15(1):49. doi: 10.3390/toxins15010049

141. 2023     Shen, S, Wu L, Li L , **Bickler PE**, Altschuler S. Searching for molecular hypoxia sensors among oxygen-dependent enzymes. eLife. In Press

142. 2023     Gudelunas KM, Lipnick M, Hendrickson, C, Vandenburg, S.,Okunlola, B, Auchus, A, Feiner, JR, **Bickler PE**. Low perfusion and missed diagnosis of hypoxemia by pulse oximetry in darkly pigmented skin: A prospective study.Anesthesia and Analgesia, In Press

## REVIEW ARTICLES

1. 1998      Bickler PE, Buck LT: Adaptions of vertebrate neurons to hypoxia and anoxia: maintaining critical c Ca2+ concentrations. J Exp Biol. 1998; 201: 1141-52.

2. 2002      Bickler PE, Donohoe PH: Adaptive responses of vertebrate neurons to hypoxia. J Exp Biol 2002; 205: 3579-86.

3. 2002      Bickler PE, Donohoe PH, Buck LT: Molecular adaptations for survival during anoxia: lessons from lower vertebrates. Neuroscientist 2002; 8: 234-42.

4. 2004      Bickler PE: Clinical perspectives: neuroprotection lessons from hypoxia-tolerant organisms. J Exp Biol 2004; 207: 3243-9.

5. 2007      Bickler PE, Buck LT: Hypoxia tolerance in reptiles, amphibians, and fishes: life with variable oxygen availability. Annu Rev Physiol 2007; 69: 145-70.

6. 2016      Bickler PE, Feiner JR, Lipnick M, Batchelder P, MacLeod D, Severinghaus J.  Effects of acute, profound hypoxia on healthy humans: Implications for safety of tests evaluating pulse oximetry accuracy. Anesthesia and Analgesia, In Press 2016

7. 2015      Bickler PE, Feiner JR, Rollins MD, Meng LZ.  Tissue oximetry and clinical outcomes.  Anesthesia and Analgesia, In Press, 2016

8. 2020      **Bickler PE.** Amplification of snake venom toxicity by endogenous signaling pathways./>  Toxins (Basel). 2020 Jan 22;12(2). pii: E68. doi: 10.3390/toxins12020068.

## BOOKS AND CHAPTERS

1. 1986      White FN, Bickler PE and Yacoe ME: Gas exchange in intermittently breathing turtles. In: R. Gilles (Ed.); Circulation, Respiration and Metabolism, pages 139-148. Springer Verlag, Heidelberg, 1986.

2. 1992      Bickler, PE: Energetics of cerebral metabolism and ion transport.  In: B. Bissonnette (Ed.); Cerebral protection, resuscitation, and monitoring: A look into the future of neuroanesthesia. Anesthesia Clinics of North America, pages 563-574, W.B. Saunders, New York, 1992.

3. 2001        Bickler PE, Donohoe PH, and Buck LT: The hypoxic brain: suppressing energy-expensive membrane functions by regulation of receptors and ion channels. In: K. Storey (Ed.) Life in Limbo: Molecular mechanisms of metabolic arrest. BIOS scientific publishers, Inc., pp. 77-102, 2001.

4. 2002        Bickler PE, Shaughnessy T: Pulse Oximetry and Capnography. In: Weiner-Kronish, J. (Ed.) Critical Care Secrets, 3rd Ed., Hanley, and Belfus, Philadelphia, 2002.

5. 2003        Bickler PE: Craniotomy in the seated position. In: M. Pardo et al (Eds.): UCSF manual of clinical anesthesia for the Palm Pilot, 3-Com Inc., 2003.

6. 2003        Bickler PE: Obturator nerve block. In: M. Pardo et al (Eds.): UCSF manual of clinical anesthesia for the Palm Pilot, 3-Com Inc., 2003.

7. 2005        Powell FL, and Bickler PE: High Altitude. In: D. Ward, A. Dahan and L. Teppema (Eds.): Pharmacology and Pathophysiology of the Control of Breathing, Marcel Decker, 2005.

8. 2004        Bickler PE: Clinical applications and limitations of hypothermia. In: B. Barnes and H. Carey (Eds). Life in the Cold, Evolution, Mechanisms, Adaptation, and Application, University of Alaska Press, pp 489-496, 2004.

9. 2007        Bickler PE: Pulse Oximetry and Capnography. In: Weiner-Kronish, J. (Ed.) Critical Care Secrets, 4th Ed., Hanley and Belfus, Philadelphia, 2007.

10. 2013      Bickler PE: Pulse Pulse oximetry, capnography and blood gas analysis. In: Parsons, P. and Weiner-Kronish, J. (Eds.) Critical Care Secrets, 5th Ed., Mosby-Elsevier, St. Louis. 2012

11. 2016      Bickler, PE. Acute stroke. In: Manual of Neuroanesthesia. Eds. Adrian Gelb and G. Gupta.
In preparation

## OTHER PUBLICATIONS

1. 1981        Bickler PE: The effects of temperature on pulmonary and renal regulation of acid-base homeostasis in the lizard, Dipsosaurus dorsalis. Doctoral Dissertation, University of California, Los Angeles, 1981.

2. 1989        Bickler PE, Gold B, Johnson BH: Diffusion of felt-tip marker pen ink into IV bags. Letter to the Editor. Anesthesia and Analgesia 69: 412, 1989.

3. 1990          Bickler PE, Spears R, McKay W: Intralipid solution mistakenly infused into the epidural space. Letter to the Editor. Anesthesia and Analgesia 71: 712-713, 1990.

4. 1992          Bickler PE, Sohn Y: Mass spectrometers and infrared gas analyzers interpret bronchodilator propellants as anesthetic gases. Letter to editor. Anesthesia and Analgesia 75:141-42 1992.

5. 2004          Paige M, Bickler PE: Falsely low pulse oximetry values receiving docetaxel (Taxotere). Letter to Editor. Anesthesia and Analgesia 99: 622-3, 2004.

6. 2004          Bickler  PE:  The Brain Without Oxygen. Book Review J. Experimental Biology, 207: 12-13, 2004

7. 2007          Bickler, P.E, Patel PM. Editorial: Anesthetics Neuroprotection: Some things Do Last.   Anesthesiology. 106(1):8-10, January 2007.

8. 2017          Bickler PE. Enough Information to Evaluate Clinical Monitors? Letter to the editor./> Anesth Analg. 2016 Jul;123(1):254-5

9. 2017          **Bickler PE,** Cannesson M, Shelley KH. Editorial: Trends and Challenges in Clinical Monitoring: Papers From the 2015 IAMPOV Symposium./> Anesth Analg. 2017 Jan;124(1):2-3.

10. 2021         Bickler P, Feiner J, Kopotic R, MacLeod D, Mannheimer, P, Milkes M, Park, L, Pfefer J, Weininger S. Understanding and compensating for aggravating or interfering factors in pulse oximeter performance. International Standards Organization White paper for subcommittee group on pulse oximeter performance

11. 2022         **Bickler P,** Tremper KK.The Pulse Oximeter Is Amazing, but Not Perfect./> Anesthesiology. 2022 May 1;136(5):670-671. doi: 10.1097/ALN.0000000000004171.

12. 2024         Fong, N., Lipnick, M., **Bickler, P.**, Feiner, J., & Law, T. (2024)./> OpenOximetryRepository (version 1.0.0). PhysioNet. https://urldefense.com/v3/__https://doi.org/10.13026/cc78-ad74__;!!LQC6Cpwp!s37H9zJ69jTahCalll4IHm_4UrsmvrU_gmxpuwltvmN9-Xbq9cC4EgmH7PyBf-aGGNU6FsfObMYqVc9TPGrulqO7$ .

13. 2024         **Bickler PE,** Lipnick MS. Evidence against use of nitrogen for the death penalty. Viewpoint article. Journal of the American Medical Association. In Press.

**SIGNIFICANT PUBLICATIONS**

1. 2023        Gudelunas KM, Lipnick M, Hendrickson, C, Vandenburg, S.,Okunlola, B, Auchus, A, Feiner, JR, **Bickler PE**. Low perfusion and missed diagnosis of hypoxemia by pulse oximetry in darkly pigmented skin: A prospective study./> medRxiv 2022.10.19.22281282; doi: https://doi.org/10.1101/2022.10.19.22281282, SUbmitted for peer review publication 2023

Principal Investigator, wrote paper and handed revisions. This research paper is also in final stages of peer review. I believe that it is one of the highest impact papers relating to pulse oximeter performance as it describes the conditions in which dark skin contributes to the missed diagnosis of hypoxemia in Black, Asian, and Latin-X patients.

2. 2022        Okunlola O, Lipnick MS, Batchelder P, Bernstein M, Feiner J, **Bickler P**. Pulse Oximeter Performance, Racial Inequity, and the Work Ahead. Respir Care.  2022 Feb;67(2):252-257. doi: 10.4187/respcare.09795. Epub 2021 Nov 12

Senior author. In this review we describe current state of the art concerning the impact of skin pigment on pulse oximeter performance and define work that needs to be done to improve access and equity in this important medical monitor

3.        **Bickler PE**, Feiner JR, Lipnick MS, McKleroy, W.   Silent   presentation of hypoxemia and cardiorespiratory compensation in COVID-19. Anesthesiology 2021 Feb 1;134(2):262-269.

Lead author. This invited review in the leading journal in the field describes essential effects of hypoxemia in humans during infection with the COVID-19 virus.

4.        **Bickler PE**, Abouyannis M, Bhalla A,  Lewin MR.  Neuromuscular Weakness and Paralysis Produced by Snakebite Envenoming: Mechanisms and Proposed Standards for Clinical Assessment. Toxins (Basel). 2023 Jan 6;15(1):49. doi: 10.3390/toxins15010049

Lead author. This paper is a collaboration between UCSF and the California Academy of Sciences to advance undersanding and clinical care of snakebite, a neglected tropical disease that has an enormous impact in low and middle income countries.

5.        Zhou W, Cheung K, Kyu S, Wang L, Guan Z, Kurien PA, **Bickler PE**, Jan LY. Activation of orexin system facilitates anesthesia emergence and pain control. Proc Natl Acad Sci U S A. 2018 Nov 6;115(45)

Mentor and scientific advisor to lead author

**PATENTS ISSUED OR PENDING**

1. 2022        2022.  Patent Pending (via UC technology office): Improving pulse oximeter accuracy by accounting for skin pigment and low perfusion

## CONFERENCE ABSTRACTS

1975            Shoemaker VH, Bickler PE: Renal function in a uricotelic tree frog. The
                Physiologist 18: 178, 1975.

1980            Bickler PE: Effects of temperature on acid-base regulation in the lizard
                Dipsosaurus dorsalis. American Zoologist 20: 731, 1980.

1981            Bickler PE: Effects of temperature on intracellular acid-base regulation in
                desert iguanas. American Zoologist 21:1031, 1981.

1982            Bickler PE: Acid-base balance in a heterothermic mammal: comparison of
                various thermal states. Max Planck Symposium on Gas Exchange,
                Göttingen, 1982.

1982            Bickler PE: Day/night variations in blood acid-base balance in desert
                iguanas. Physiologist 25: 214, 1982.

1982            Weinstein Y, Bickler PE, Bernstein MH: Intracellular pH and blood acid-base
                status at high altitude in pigeons. Physiologist 25: 214, 1982.

1982            Swain JA, White FN, Bickler PE, Boyle M, Utley JR: Effects of pH on
                hypothermic ventricular fibrillation. Abstracts of the Samson Thoracic
                Surgical Society Meeting, 1982.

1983            Bickler PE, White FN: A model of gas exchange and gas transport in turtles:
                a model analysis. roceedings of the International Union of Physiological
                Sciences 15: 253, 1983.

1985            Bickler PE, Powell FL: Comparison of 02 and inert gas measurements of
                pulmonary shunt in ducks. Federation Proceedings 44: 853, 1985.

1985            Dueck R, Bickler PE, Prutow R: Effects of barbiturate anesthesia on FRC
                and ribcage/diaphragm contributions to ventilation. Federation Proceedings
                44: 853, 1985.

1985            Dueck R, Bickler PE, Prutow R: Effects of methohexital on FRC and ribcage
                contributions to ventilation in surgical patients. Anesthesiology 63: 3A: A554,
                1985.

1987            Bickler PE, Severinghaus JW: Effects of acetazolamide on cerebral acid-
                base balance. Fifth International Hypoxia Symposium, Alberta, Canada,
                1987.

1987        Bickler PE, Severinghaus JW, Litt L: Acetazolamide-induced carbonic
            acidosis improves brain cortex oxygenation. Abstracts of the Western
            Anesthesia Residents Conference, San Francisco, 1987.

1987        Bickler PE, Litt L, Banville DL, Severinghaus JW: In vivo 31P/1H NMR
            measurements of effects of acetazolamide on brain acid-base balance in
            rabbits. Abstracts of the Society of Magnetic Resonance in Medicine, 1987.

1987        Bickler PE, Severinghaus JW, Litt L: Acetazolamide-induced carbonic
            acidosis improves brain cortex oxygenation during hypoxia. bstracts of the
            Association of University Anesthesiologists, 1987.

1987        Bickler PE, Litt L, Severinghaus JW: Effects of acetazolamide on
            cerebrocortical NADH and blood volume during hypoxia. The Physiologist 30:
            165, 1987.

1988        Bickler PE, Severinghaus JW: Transcellular distributions of protons and
            deuterons suggest a neutral flux model for acid-base balance. FASEB
            Journal 2: A948, 1988.

1988        Bissonnette B, Bickler PE, Gregory GA, Severinghaus JW: Effects of
            intracranial pressure on brain redox balance in rabbits.Abstracts of the
            American Society of Anesthesiologists meeting, 1988.

1988        Bissonnette B, Bickler PE, Gregory GA, Severinghaus JW: Effects of
            intracranial pressure on brain redox balance in rabbits. Abstracts of the
            International Anesthesia Research Society Meeting, 1988.

1989        Bickler PE, Koh SO, Severinghaus JW: Effects of hypoxia on brain redox
            balance in ducks. Abstracts of the 6th International Hypoxia Symposium,
            Alberta Canada, 1989.

1989        Bickler PE, Severinghaus JW: A neutral flux model for acid-base balance in
            ectotherms. American Zoologist 29:1 04A, 1989.

1990        Bickler PE, Severinghaus JW: A proton-neutral flux model for acid-base
            balance in animals. Abstracts of the Association of University Anesthetists
            Meeting, 1990.

1992        Bickler PE, Kelleher J, Gregory GA: Fructose-1, 6-phosphate decreases
            Ca++i in rat neurons and astrocytes during anoxia. Abstracts of the
            International Anesthesia Research Society, 1992.

1992            Severinghaus JW, Sato M, Bickler PE, Spellman MJ: Differential hypoxic
                response during hypoxic ventilator depression. Clinical Research 40:66A,
                1992.

1992            Sato M, Severinghaus JW, Bickler PE, Spellman MJ: Hypoxic ventilatory
                response in man steadily rises over two weeks at 3810M altitude. Clinical
                Research 40: 66A, 1992.

1992            Severinghaus JW, Sato M, Bickler PE, Spellman MJ: Ambient hypoxic
                ventilatory depression at altitude. FASEB Journal, 1992.

1992            Bickler PE: Brain [Ca++]i and pHi regulation in hypoxia tolerant and hypoxia
                sensitive animals. FASEB Journal, 1992.

1992            Bickler PE: Neuroprotection with fructose-1, 6-bisphosphate: Intracellular
                calcium, pH and ATP in cortical brain slices and astrocytes during anoxia.
                Abstracts of the Association of University Anesthesiologists, 1992.

1992            Bickler PE: Lessons in cerebral protection: Regulation of intracellular calcium
                and pH in hypoxia tolerant animals. Anesthesiology 77 (3A), A767, 1992.

1992            Severinghaus JW, Bickler PE, Eldridge MW: Pressure-dependent pulmonary
                shunting during high altitude pulmonary edema: Theory and study in
                progress. The Physiologist 35:231, 1992.

1992            Eldridge MW, Severinghaus JW, Bickler PE, Wood SC: Pulmonary gas
                exchange impairment in ultramarathoners following a 100 mile race at
                altitude. The Physiologist 35: 231, 1992.

1993            Podolsky A, Eldridge M, Knight D, Poole D, Richardson R, Johnson D,
                Johnson C, Bickler PE, Wagner P, Severinghaus J: Pulmonary gas
                exchange after two days at high altitude. FASEB Journal 7: A21, 1993.

1993            Bickler PE: Cerebral hypoxia tolerance in turtles: Role of glutamate receptor
                blockade. Eighth International Hypoxia Symposium, 1993.

1993            Eldridge MW, Severinghaus JW, Bickler PE, Wood SC: Effect of maximal
                exercise at moderate altitude on post exercise gas exchange in sojourners
                and altitude natives. Eighth International Hypoxia Symposium, 1993.

1993            Feiner JR, Bickler PE, Severinghaus JW: A poor hypoxic ventilatory
                response predicts greater oxyhemoglobin desaturation during breath holding.
                Eighth International Hypoxia Symposium, 1993.

1993        Buck LT, Bickler PE: The effect of adenosine on the NMDA receptor mediated calcium influx in turtle cerebral cortical sheets. The Physiologist 36: A4, 1993.

1994        Bickler PE, Hansen BM: Hypoxia reduces glutamate receptor activity in neonatal rat cerebral cortex. FASEB Journal 8: A655, 1994.

1994        Podolsky A, Eldridge M, Richardson RS, Knight DR, Johnson EC, Hopkins SR, Michimata H, Grassi B, Feiner J, Kurdak SS, Uribe JM, Poole DC, Bickler PE, Severinghaus JW, Wagner PD: Relationship between susceptibility to high altitude pulmonary edema and to exercise induced ventilation-perfusion mismatch. Am Rev Resp Dis 148: A818, 1994.

1994        Eldridge MW, Johnson DH, Podolsky A, Richardson RS, Bickler PE, Wagner PD, Severinghaus JW, Hill HR: Evidence of immunological mediator activation with exposure to high altitude. Am Rev Resp Dis 148: A298, 1994.

1994        Gray AT, Buck LT, Feiner JR, Hansen B, Bickler PE: Effect of hypothermia and extracellular pH on cortical NMDA receptor activity. Society for Neuroscience Abstracts, 1994.

1994        Bicker PE, Buck LT, Hansen BM: Isoflurane inhibition of cortical glutamate receptors: Role in neuroprotection. Anesthesiology 81: A859, 1994.

1994        Feiner JR, Bickler PE, Severinghaus JW, Sessler DI: Hypothermia and hypoxic ventilatory responses in humans. Anesthesiology 81: A1412, 1994.

1994        Bickler PE, Buck LT: Anoxia reduces N-methyl-D-aspartate receptor activity in freshwater turtle cerebral cortex. The Physiologist 37: A71, 1994.

            Buck LT, Bickler PE: Role of adenosine in N-methyl-D-Aspartate receptor modulation
            in an anoxia tolerant turtle (Chrysemys picta belli) The Physiologist 37: A72, 1994.

1995        Gray A, Bickler P, Yost C: Differential sensitivity of recombinant glutamate receptors to protons. Association of University Anesthesiologists, San Diego, 1995.

1995        Talke P, Bickler P: Effect of dexmedetomidine on glutamate exocytosis and glutamate receptor activity in rat hippocampus. Anesthesiology, In Press, 1995.

1995        Buck LT, Bickler PE: Adenosine and anoxia decrease NMDA receptor activity in cortical brain slices of the western painted turtle. Soc. for Neuroscience Abstracts 21: 95,1995.

1996        Buck L, Bickler PE, Rampil I: Nitrous oxide depolarizes pyramidal neurons in turtle cerebral cortex. Assoc. University Anesthesiologists meeting, 1996.

1996        Buck L, Rampil I, Bickler PE: Differential effects of nitrous oxide or halothane on turtle cortical pyramidal neurons. Anesthesiology, 1996.

1997        Bickler PE: Anoxia-tolerant CA1 neurons from rat hippocampus: anoxia-evoked calcium changes and NMDA receptor inactivation. Soc. for Neuroscience Abstracts, 1997.

1997        Kong D, Buck LT, and Bickler PE: Expression of heat shock protein-70 but not C-fos in an anoxia tolerant turtle during prolonged anoxia. Int. Anesth. Res. Soc. Abstracts, 1997.

1997        Eilers H, Buck LT, and Bickler PE: Halothane reduces NMDA channel receptor open probability in turtle cortical neurons. Eur. Anesthesia Society Abstracts, 1997.

1997        Bickler PE: Hypoxia-induced inactivation of NMDA receptors in immature rat CA1 neurons: role of actin-NMDAR depolymerization. Soc. Neuroscience Abstracts 23:1997.

1997        Eilers H, Schaeffer E. Bickler PE, and JR Forsayeth: Nicotine causes functional deactivation of the major neuronal nicotinic receptor by a protein kinase C dependent mechanism. Soc. Neurosci. Abstracts. 23: 917, 1997.

1997        Wagner PD, Eldridge MW, Podolsky A, Richardson RS, Johnson DH, Knight DR, Johnson EC, Michimata H, Grassi B, J Kurdak SS, Bickler PE, Severinghaus JW: Elevated wedge pressure in HAPE-susceptible subjects during exercise. In: Houston C, Sutton C, Proceedings of the 10th International Hypoxia Symposium, 1997.

1998        Bickler, PE: Brain Cortex NMDA receptor inactivation during prolonged anoxia in western painted turtles. The FASEB Journal. 12: A754, 1998.

1998        Kindler C, Eilers H, Donohoe P, Ozur S, Bickler PE: Volatile anesthetics increase intracellular calcium in cortical and hippocampal neurons. Abstracts of the Association of University Anesthesiologists meeting, San Francisco, 1998.

1998              Taylor D, Bickler PE: Effects of non-anesthetics on synaptic transmission in ippocampus. Abstracts of the Association of University Anesthesiologists meeting, San Francisco, 1998.

1998              Donohoe PH, Vexler Z, Gregory G, Bickler PE: Fructose-1, 6-bisphosphate prevents increases in intracellular free calcium in cultured cortical neurons following six hours of anoxia. Soc. Neurosci. Abstracts, 1998.

1998              Taylor, DM, Eger, EI, Bickler, PE: The volatile anesthetic halothane, but not the non-immobilizers perfluoropentane and 2N, suppress synaptic transmission in rat hippocampal CA1. Soc. Neurosci, 1998.

1999              Bickler PE, Buck LT, Donohoe PH: Ion channel inactivation in hypoxia-tolerant neurons-- A key to surviving anoxia? Eleventh International Hypopxia Symposium, Jasper, Canada, 1999.

1999              Bickler PE, Donohoe PH: Surviving long-term-anoxia: Silencing of NMDA receptors in turtle neurons. Soc. Neuroscience, 1999.

1999              Taylor DM, Bickler PE: Nitrous oxide increases intracellular calcium in acutely dissociated rat hippocampal neurons. Soc. Neuroscience, 1999.

1999              Behringer W, Prueckner S, Kentner R, Tisherman S, Rodovsky A, Bickler PE, et al: Dizocilpine (MK-801) by aortic flush (AAF) for cerebral preservation during 20 min cardiac arrest. American Heart Association, 1999.

1999              Serkova N, Donohue P, Leibfritz D, Benet LZ, Bickler PE, Litt LL, and Christians U: Metabolic Neurotoxicity and Hypoxic Neuroprotection of Cyclosporine in Brain Slices: Evidence That Both Occur From Mitochondrial Interactions. Soc. Neuroscience, 1999.

2000              Bickler PE and Fahlman C: Hypoxia inactivates NMDA receptors in neonatal neurons. Society for Neuroscience, 2000.

2000              Taylor DM, Gray AT, Fahlman CS and Bickler PE: Nitrous oxide antagonizes recombinant NMDA receptors in Xenopus oocytes and NMDA stimulated intracellular calcium increases in murine cortical neurons. Society for Neuroscience, 2000.

2001              Taylor DM, Fahlman CS and Bickler PE: Oxygen sensitivity of NMDA receptor subtypes: role in hypoxia-tolerance of neonatal mammalian neurons. Society for Neuroscience, 2001.

2001        Hedrick MS, Fahlman CS, Bickler PE. Hypoxia-tolerant neurons from rana
            tadpole forebrain: relationship of survival to intracellular calcium regulation.
            Society for Neuroscience, 2001.

2001        Fahlman CS, Vexler ZS, Gregory GA, Bickler PE: Fructose-1, 6-
            bisphosphate neuroprotection may involve phospholipase-C dependent
            pathways, modulating calcium homeostasis. Society for Neuroscience, 2001.

2002        O'Connor T, Dubowitz G, Bickler PE: Arterial saturation does not predict
            acute mountain sickness in climbers at 3030 m. High Altitude and
            Physiology, 2002.

2003        Bickler PE, Fahlman CS, Schuyler: Ischemic preconditioning with isoflurane:
            Role of MEK1/2 (p42/44). J. Neurosurgical Anesthesiology 15:366, 2003.

2003        Bickler PE, Fahlman CS, Schuyler J, Gray J, Zhan X: Preconditioning with
            the anesthetic isoflurane: possible role of MAPK MEK1/2(p42/44). Society for
            Neuroscience, Wash. DC, 2003.

2003        Fahlman CS, Schuyler JA, Bickler PE: Neuroprotection with the anesthetic
            isoflurane depends on the MAPK ERK 1/2 (p42/44). Soc. For Neuroscience,
            wash. DC, 2003.

2003        Bickler PE: Oxygen-sensitive MAPK pathway signaling in neurons:
            interaction with intracellular calcium in neuroprotection mechanisms. Exp.
            Biology, 2003.

2004        Bickler PE, Fahlman CS, Zhan X: Isoflurane neuroprotection in hipocampal
            slice cultures involves increases in intracellular Ca2+ and MAP kinases. J.
            Neurosurg. Anesthesiology, 2004.

2004        Bickler PE and Fahlman CS: Preconditioning and concurrent neuroprotection
            with isoflurane involve increases in intracellular calcium and MAP kinase
            signaling. Mm Soc. For Neuroscience, Wash, DC 2004.

2004        Narasaiah M and Bickler PE: Effects of hypoxia on glutamate or NMDA
            responses in cultures turtle cortical neurons. Soc. Neuroscience, Wash. DC,
            2004.

2004        Zhan X and Bickler PE: Age-related differences inhippocampal neurons
            death in an in vitro model of cerebral ischemia. Soc. Neuroscience, Wash.
            DC, 2004.

2005        Lewin MR, Platts-Mills TA, Wells J, Bickler PE: An improvised cricothyrotomy device provides reliable airway access in un-embalmed, partially re-warmed human cadavers. Annals of Emergency Medicine Supplement 2005, 46, (3), s86.

2005        Lewin MR, Strauss E, Bickler PE, Feiner J: Oxygen supplemented with C02 reduces the incidence of apnea during procedural sedation in healthy volunteers. JAAM Abs v.35 abs#298 2005./>

2006        Stratmann G, Bell J, Alvi RS, Ku K, Si L, Encarnacion A, Magnusson K, Bickler PE and Liu J: Neonatal isoflurane anesthesia causes a permanent neurocognitive deficit in rats. Soc. For Neuroscience, 2006.

2006        Fahlman CS, McKleroy WO, Bickler PE: Reversal of age-dependent failure of hypoxic preconditioning in hippocampal slice cultures with intracellular calcium buffering. Soc. For Neuroscience, 2006.

2008        Osredkar D, Sall J, Mckleroy W, Bickler PE, Lee C, Ferriero DM: The role of erythropoietin and erythropoietin receptors in posthypoxic neurogenesis. Soc. For Neuroscience, 2008.

2009        Rubinsky, L, Bickler P. Neuroprotective effects of antifreeze protein against hypothermia induced cell death in rat hippocampal slices. Experimental Biology 2009.

2010        Rubinsky, L., Bickler P, Brundage, C, Taylor B. Identification of respiratory neurons in frog hinbrain. IUPS, Kyoto 2010./>

2011        Bickler, P, Warren, D.  Endoplasmic reticulum signaling in neuron adaptation to hypoxia; Role of the unfolded protein response.  Experimental Biology, Washington, DC 2011

2011        Bickler, P., Michels, W, Gabatto, P, Birch, A.  Anesthetic neurotoxicity involves unfolded protein stress.  American Society of Anesthesiologists Annual Meeting, Chicago 2011

2011        Birch A, Gabatto P, Brosnan H, Gregersen, M, Clark, JP, Bickler P. Anesthetic neurotoxicity in hippocampal neurons may be caused by misfolded proteins.  Society of Neuroanesthesia and Critical Care annual meeting abstracts. 2011

2011        Bickler, P, Feiner J.  Performance of cerebral oximeters during profound hypoxia.  American Society of Anesthesiologists Annual Meeting, Chicago 2011

2011          Dubowitz, G, Bickler, P, Feiner, J. Performance of Life Box pulse oximeters.
              ASAP Global Surgery Conference, San Diego. 2011

2013          Bickler, P, Brosnan H, Gabatto P.  Involvement of the PERK/UPR pathway in
              hypoxic preconditioning of hippocampal neurons.  Society for
              Neuroanesthesia and Critical Care 2013

2013          Bickler, P., Zhou, R., Clark, J.P., Yue, Y.  Interaction of isoflurane, TNF-alpha
              and beta-amyloid on long-term potentiation in rat hippocampal synapses.
              American Society of Anesthesiologists Annual Meeting, San Francisco 2013

2013          Feiner, J.R., Gruss, C., Bickler, P.E. Effects of acute hypoxia on hemoglobin
              concentration in healthy humans.  American Society of Anesthesiologists
              Annual Meeting, San Francisco 2013

2013          Bickler, P.E., Brosnan, H. Xenon neurotoxicity in rat hippocampal slice
              cultures is similar to isoflurane and sevoflurane. American Society of
              Anesthesiologists Annual Meeting, San Francisco 2013

2014          Hypoxia tolerance in the vertebrate brain: insights from comparative
              physiology.  The Physiologist, In Press, Oct. 2014

2014          Sanchez, C., Bickler P.  Hypoxic Preconditioning and the Unfolded Protein
              Response - A New Target for Neuroprotection Against Hypoxic Brain Injury.
              American Society of Anesthesiologists Annual Meeting. 2014

2014          Brosnan H, Bickler P.  Role of mTOR, PERK pathway and JNK in progenitor
              cell toxicity from isoflurane in the developing rat hippocampus.  American
              Society of Anesthesiologists meeting, New Orleans.  2014

2014          House, M, Bickler P.  Injury from profound hypothermia in hippocampal
              neurons involves the unfolded protein response.  American Society of
              Anesthesiologists Meeting, New Orleans. 2014

2014          An, SY, Bickler P, Feiner J, rollins, M. Unexpected effect of pH and CO2 on
              oxyhemoglobin P50 as measured by blood gas machine algorithm compared
              to accepted equations. American Society of Anesthesiologists Meeting, 2014

2018          Bernholm KF, Meyhoff CS, Bickler PE.  Decrease in tissue oxygenation as a
              predictor for myocardial injury in patients undergoing major spine surgery.
              Danish Anesthesiology Society, Copenhagen, November 2018

2018            Bernholm KF, Meyhoff CS, Bickler PE. Decrease In Tissue Oxygenation As
                Predictor For Myocardial Injury In Patients Undergoing Major Spine Surgery.
                Anesthesiology October2018

**ADDITIONAL RELEVANT INFORMATION**
Public Service

 I direct the Human Studies Laboratory in the Department of Anesthesia and Perioperative
Care.  This facility is a venue for all sorts of human volunteer studies, including those requiring
invasive monitoring and general anesthesia. Studies include evaluation of clinical monitors
such as pulse oximeters and cerebral oximeters during profound, and hemodilution studies.
These services and research activities have made a huge impact on improving pulse oximeter
accuracy over the last 20 years.  The HSL currently supports research of about 7 faculty in the
UCSF Dept. Anesthesia and Perioperative Care.

| Depositions | | | Court/venue |
|---|---|---|---|
| March 2021 | De la Rosa v Nichols | deposition for defense | Eureka CA |
| May 2021 | Dailey v Clev Clinic | deposition for defense | Cleveland OH |
| July 2021 | Pletzer v Engle | deposition for plaintiff | Reno, NV |
| December 2021 | Bean v Castle Hosp | deposition for plaintiff | Honolulu, HI |
| December 2021 | Danley v Kincer et al | deposiiton for plaintiff | Des Moines, IA |
| January 2022 | Fath vs Ingalls Hosp | deposition for plaintiff (Boujie) | Chicago IL |
| March 2022 | Blazevic v James | deposition for plaintiff | Des Moines, IA |
| August 2022 | Rogers v Aldrich | deposition for plaintiff | Des Moines, IA |
| April 2022 | Floyd v Palomar | deposiiton for plaintiff | San Diego Co, CA |
| June 2023 | Salazar v Valley Anesthesia | deposition for plaintiff | Phoenix, AZ |
| July 2024 | Miller v Alabama | deposiiton for plaintiff | Montgomery  Alabama Federal court |
| August 2024 | Hernandez vPatients | deposition for plaintiff | Redding CA |
| September 2021 | Price v Kaiser | deposition for plaintiff | Santa Rosa CA |
| November 2024 | Khuu v Umich | depo for plaintiff | Detroit MI |
| January 2025 | Santo v NWM | depo for plaintiff | Chicago IL |
| January 2025 | Sullivan v DelPero | depo for plaintiff | Sacramento, CA |
| **Trial Testimony** | | | |
| Mar 23 | Fath v Engles | witnedss for plaintiff | Superior Court Chicgago |
| April 2023 | Rogers v Aldrich | witness for Plaintiff | Superior Court, Des Moines, IA |
| March 2023 | Danley v Greene Co | witness for plaintiff | Superior court, Boone, Iowa |
| September 2021 | Dailey v Cleveland Clinic | witness for defense | Superior Court, Cleveland OH |

Opinion

**VIEWPOINT**

**Philip E. Bickler, MD, PhD**
Hypoxia Research Laboratory, Department of Anesthesia and Perioperative Care, University of California, San Francisco.

**Michael S. Lipnick, MD**
Hypoxia Research Laboratory, Center for Health Equity in Surgery and Anesthesia, Department of Anesthesia and Perioperative Care, Division of Critical Care Medicine, University of California, San Francisco, and Zuckerberg San Francisco General Hospital, San Francisco.



Multimedia

# Evidence Against Use of Nitrogen for the Death Penalty

**Forced nitrogen inhalation (nitrogen hypoxia)** was used by the state of Alabama to execute Kenneth Smith on January 25, 2024. Nitrogen is considered too inhumane for euthanizing mice or dogs, but some misinformed politicians, attorneys general, and inexperienced health care practitioners are supporting use of this cruel method for capital punishment in the US.

Our team of anesthesiologists, critical care physicians, and dive medicine and high-altitude physiologists at the Hypoxia Research Laboratory at UCSF urgently seeks to share why using nitrogen is inhumane. Our opinions are based on studies on the effects of profound hypoxemia in more than 7000 human research subjects over the past 50 years[1] as well as a wealth of other scientific evidence about hypoxia.

The execution of Kenneth Smith is proof of the inhumanity of the nitrogen hypoxia method. For Smith, nitrogen administration began at 7:56 PM. About a minute later, eyewitnesses in the execution room[2] described violent retching, heaving, and gasping, with convulsions and twitching movements lasting several minutes, then agonal breathing until approximately 8:07 PM and an official time of death from the Alabama Department of Corrections at 8:23 PM, a period of 27 minutes.

---

**The existing body of knowledge on the effects of hypoxia on humans argues against its use for capital punishment due to its inconsistent and frequently distressing effects.**

---

One cannot know how long and to what extent Smith consciously experienced extreme distress, but available evidence and eyewitness accounts strongly suggests that he did. Smith's spiritual adviser described the execution as "the most horrible thing I've ever seen." He described Smith as popping up in the gurney repeatedly, gasping and convulsing, while the nitrogen was being administered. An Alabama reporter who was also present published a similar account.[3] From a different vantage point, Alabama attorney general Marshall hailed the new method as a success and said that "as of last night, nitrogen hypoxia as a means of execution is no longer an untested method. It is a proven one."[4] As physicians and scientists, we believe it was proven only to be inhumane.

The horrible lingering death described by witnesses aligns with existing medical knowledge and our experience with the clinical and experimental effects of profound hypoxia. The US Constitution and Supreme Court rulings[5] hold that no execution can involve a cruel or lin-

gering death. The American Veterinary Medical Association has banned the use of nitrogen as a method of euthanasia in dogs and most other animals because of the variable and distressing responses to nitrogen breathing.[6] This same response to nitrogen has also been described in humans and provides ample evidence of the unconstitutionality of the practice (if one needs a constitutional justification).

Was the state of Alabama not aware of, or did it ignore, the body of knowledge concerning the effects of hypoxia on humans? There are 3 primary sources of data on the effects of acute hypoxemia on humans: (1) controlled laboratory desaturation studies in healthy volunteers (eg, to test accuracy of pulse oximeters); (2) rapid hypobaric hypoxemia (eg, rapid ascent to altitude to simulate effects of aircraft decompression for pilots); and (3) critically ill patients (eg, acute hypoxemic respiratory failure due to COVID-19 or airway obstruction). Herein we focus on the first 2 of these scenarios as the most relevant sources of data, although all of these data seem to have been largely ignored or unknown to many policymakers.

The existing body of knowledge on the effects of hypoxia on humans argues against its use for capital punishment due to its inconsistent and frequently distressing effects. As our group and others have published in peer-reviewed scientific journals,[1,7-9] the human response to hypoxia is quite variable. In the blood oxygen saturation range of 60% to 100%, symptoms range from minimal or mild shortness of breath and visual changes to a full-blown feeling of suffocation. Scientific studies report that approximately 25% of people have few symptoms when oxygen levels drop modestly to approximately 80% saturation (Adams et al[7] and personal observations by both authors). The response to extremely low oxygen levels (below 60% saturation) becomes more consistent. At saturations less than 60%, the majority of people, not yet unconscious, report significant distress and shortness of breath. These feelings of extreme stress are an important reason why it is unethical to even study the effects of very low oxygen levels (<60%) on humans. For example, this experience informed our research studies done for the purpose of pulse oximeter development and validation. We have stopped using desaturations below 60% due to concerns for study participant safety and comfort. Also relevant is the extensive experience of aerospace medicine researchers who have studied human responses to sudden loss of oxygen (eg, from decompression at high-altitude flight) and demonstrated significant variability in hypoxia's effects.[10]

Supporters of nitrogen asphyxia for capital punishment claim that the method is fast, predictable, and pain-

**Corresponding Author:** Philip E. Bickler, MD, PhD, Hypoxia Research Laboratory, Department of Anesthesia and Perioperative Care, University of California, San Francisco, 513 Parnassus Ave, Sciences Bldg, Room S-256, Box 0542, San Francisco, CA 94143-0542 (philip. bickler@ucsf.edu).

© 2024 American Medical Association. All rights reserved.

Downloaded from jamanetwork.com by UCSF LIBRARY user on 02/18/2025

Opinion  Viewpoint

less, yet it is clear from eyewitness accounts of Smith's execution that the method is none of these things. Any attempt to justify these claims using scientific literature is a gross misinterpretation of the evidence. As discussed above, human response to hypoxia is variable, and many people are likely to experience prolonged distress with asphyxia. While some studies and anecdotal reports do describe rapid loss of consciousness in a subset of people, these are all voluntary exposures to hypoxia. For example, military simulations, controlled desaturation studies in a laboratory, or the rare anecdotal use of nitrogen where medical aid in dying is not illegal, are likely to be a very different experience than forced nitrogen inhalation during an execution. When faced with an impending, forced withdrawal of oxygen, humans are likely to breathe irregularly or breath hold, 2 of many factors that will likely cause prolonged, significant shortness of breath, anxiety, increased heart rate, sweating, visual loss, muscle twitching, seizures, and a feeling of impending doom as consciousness fluctuates.

Intentionally making humans profoundly hypoxic is something very few physiologists, physicians, or politicians have any experience with doing, so it is no surprise that most of the commentary on the topic of nitrogen capital punishment has come in the popular press with little reference to or awareness of scientific evidence. Furthermore, most compassionate and competent clinicians avoid the politics of how to intentionally end a life for capital punishment. There is ample science on how to manage pain, consciousness, and comfort at the end of life and a growing evidence base on the appropriate use of medical aid in dying.

As of March 2024, several states are working to approve nitrogen as a method for capital punishment. In Alabama, in the wake of Smith's execution and its touted success by politicians, 43 death row inmates have reportedly requested the method, likely without medical evidence and without access to eyewitness reporting that death by nitrogen inhalation can be cruel and prolonged.

ARTICLE INFORMATION

Published Online: May 29, 2024.
doi:10.1001/jama.2024.6577

Conflict of Interest Disclosures: None reported.

REFERENCES

1. Bickler PE, Feiner JR, Lipnick MS, Batchelder P, MacLeod DB, Severinghaus JW. Effects of acute, profound hypoxia on healthy humans: implications for safety of tests evaluating pulse oximetry or tissue oximetry performance. *Anesth Analg*. 2017; 124(1):146-153. doi:10.1213/ANE.0000000000001421

2. Bogel-Burroughs N, Dewan S, Betts A. "Textbook" execution or botched one? Alabama case leaves sides divided. *New York Times*. Published January 26, 2024. Accessed April 25, 2024. https://www.nytimes.com/2024/01/26/us/alabama-execution-kenneth-smith-nitrogen.html

3. Hedgepeth L. "Never Alone": the suffocation of Kenneth Eugene Smith. *The Tread*. Published January 24, 2024. Accessed April 25, 2024. https://www.treadbylee.com/p/never-alone-the-suffocation-of-kenneth

4. Chandler K. Alabama man shook violently on gurney during first-ever nitrogen gas execution. *Associated Press*. Published January 26, 2024. Accessed April 25, 2024. https://apnews.com/article/nitrogen-execution-death-penalty-alabama-6d66344d3199f8c58f2408baa3df0738

5. US Supreme Court. In re Kemmler, 136 US 436.

6. American Veterinary Medical Association. *AVMA Guidelines for the Euthanasia of Animals: 2020 Edition*. Accessed April 25, 2024. https://www.avma.org/sites/default/files/2020-02/Guidelines-on-Euthanasia-2020.pdf

7. Adams L, Chronos N, Lane R, Guz A. The measurement of breathlessness induced in normal subjects: individual differences. *Clin Sci (Lond)*. 1986;70(2):131-140. doi:10.1042/cs0700131

8. Bickler PE, Feiner JR, Lipnick MS, McKleroy W. "Silent" presentation of hypoxemia and cardiorespiratory compensation in COVID-19. *Anesthesiology*. 2021;134(2):262-269. doi:10.1097/ALN.0000000000003578

9. Kronenberg R, Hamilton FN, Gabel R, Hickey R, Read DJ, Severinghaus J. Comparison of three methods for quantitating respiratory response to hypoxia in man. *Respir Physiol*. 1972;16(1):109-125. doi:10.1016/0034-5687(72)90092-8

10. Shaw DM, Cabre G, Gant N. Hypoxic hypoxia and brain function in military aviation: basic physiology and applied perspectives. *Front Physiol*. 2021;12:665821. doi:10.3389/fphys.2021.665821

© 2024 American Medical Association. All rights reserved.

Downloaded from jamanetwork.com by UCSF LIBRARY user on 02/18/2025

**House Committee on Judiciary**
**February 15, 2024**
**House Bill 2782**
**Testimony of Philip E. Bickler, MD, PhD & Michael Lipnick, MD**
**In Opposition**

To the Chair and Members of House Committee on Judiciary:

The use of nitrogen is considered too inhumane for euthanizing mice or dogs, yet some misinformed politicians, attorneys general, and inexperienced healthcare practitioners are supporting use of this cruel method for capital punishment in the United States.

Setting aside whether the death penalty is effective justice or ethical, our team of anesthesiologists, critical care physicians, dive medicine and high altitude physiologists at the Hypoxia Research Laboratory at UCSF urgently seeks to clarify important facts related to nitrogen hypoxia. Our opinions are based on scientific evidence and our laboratories unparalleled experience from studies on the effects of profound hypoxemia in more than 7000 human research subjects over the past 50 years. Dr. Bickler is a Professor of Anesthesia and Director of Neuroanesthesia at the University of California at San Francisco (UCSF), with more than 30 years' experience studying the effects of hypoxia on humans. Dr. Lipnick is an Associate Professor of Anesthesia at UCSF, and is boarded in Internal Medicine and Critical Care Medicine and has 20 years of experience studying hypoxia.

On January 25, 2024, Alabama executed Kenneth Smith by nitrogen inhalation, becoming the first state to use this method, and Kansas now may follow suit. For Kenneth Smith, eyewitnesses in the execution room described a violent, prolonged, then agonal and lingering death process, with convulsions and twitching movements (New York Times January 26, 2024). The process required many minutes. We may not know how long he consciously experienced extreme distress, but available evidence strongly supports that he did. Smith's spiritual adviser described the execution as "the most horrible thing I've ever seen." He described Smith as popping up in the gurney repeatedly, gasping and convulsing when the gas was turned on. From a different vantage point of the same event, Alabama attorney general Marshall hailed the new method as a success and said, "as of last night, nitrogen hypoxia as a means of execution is no longer an untested method. It is a proven one." As physicians and scientists we hope it will be the last one.

The horrible death experienced by Kenneth Smith aligns with existing medical knowledge and our experience with the clinical and experimental effects of profound hypoxia. This knowledge base includes caring for critically ill humans dying of hypoxemia (e.g acute airway obstruction, lung disease, COVID pneumonia) and healthy humans briefly experiencing severe hypoxia during experimental studies. It is

shocking that the state of Alabama was not aware of, or ignored, this body of knowledge.

As our group and others have previously published in peer-reviewed scientific journals (Bickler et al., 2017, Bickler et al., 2021, Adams et al.,1986), the human response to hypoxia is variable in the 60-100% saturation range, with symptoms ranging from minimal or mild shortness of breath and visual changes, to full-blown feeling of suffocation. But below 50%, the cruel nature of administering nitrogen to humans becomes universally apparent. We base this observation on personally experiencing these low levels of oxygen, as well as observations and evidence prior to 1995 when research studies stopped using desaturations below 60% (due to concerns for study participant safety and comfort). It also draws on the extensive experience of aerospace medicine researchers who study human responses to sudden loss of oxygen from decompression at high altitude flight. Based on personal knowledge of these often unpublished/unpublicised and even classified experiments, the effects of sudden oxygen deprivation can be shocking. With sudden loss of an oxygen supply, humans feel significant and distressing shortness of breath. This is usually accompanied by anxiety, increased heart rate, sweating, sleepiness, visual loss, and a feeling of impending doom as they go in and out of consciousness. Muscle twitching and seizures can occur. We also know this from personally being study participants involving saturations of 50% for less than one minute. If these study participants had not been rescued with oxygen, then continuing to raise nitrogen levels to 100% and oxygen levels to 0% would eventually lead to cardiac arrest and death after a variable period of time.

In case you are wondering why any laboratory would study profound hypoxia in humans, the studies are conducted to understand human physiology, including how breathing is controlled and how our bodies adapt to the hypoxia of high altitude or lung disease. Such experiments are safely done by slowly increasing the nitrogen fraction of inhaled gasses while lowering the oxygen concentration (e.g. Kronenberg et al., 1972 ). The healthy volunteers for these studies are in a monitored, hospital setting with constant feedback and assurance of comfort from study participants. Contemporary studies using this protocol are used to validate performance of many common medical devices such as pulse oximeters.

There are three common mechanisms underlying the sensation of shortness of breath. These are low oxygen levels, high carbon dioxide levels, and diseased lungs (e.g. pulmonary edema). Inability to excrete carbon dioxide produces a very strong response. Most people will begin to feel short of breath after only a minute or less of holding their breath. During this time, carbon dioxide levels rise enough to trigger shortness of breath, but oxygen levels have not started to decrease. The body's response to carbon dioxide is extremely strong in most people. However, the body's response to low oxygen levels is more varied across different people. Our experience is consistent with published scientific literature that finds approximately 25% percent of

2

people are relatively asymptomatic with oxygen levels dropping to a stable level of 80% percent (Adams et al., 1986, Lipnick and Bickler personal observations). The human response to extremely low oxygen levels (below 70% saturation) becomes much more consistent. When oxygen saturations are 40-55%, the majority of people will not yet have lost consciousness and will report significant shortness of breath, and distress. These feelings of extreme stress are an important reason why it is unethical to even study the effects of very low oxygen levels on humans. Colleagues from Europe have told us that it is difficult to even study very low oxygen levels because of the history of the horrific experimentation on oxygen deprivation by the Nazis (Spitz, 2005). Our experience as clinicians caring for hospitalized patients experiencing the horror of sudden loss of their airway and/or decreasing oxygen level is one that has become indelibly etched in our memories and is refreshed each time such a tragedy occurs. This was not an infrequent event during the COVID pandemic. The look of abject terror in a patient's eyes under these conditions is unforgettable.

Increasing the nitrogen fraction of what humans breathe is something very few physiologists, physicians, or politicians have any experience with doing, so it is no surprise that most of the commentary on the topic of nitrogen capital punishment has come in the popular press with little reference to or awareness of scientific evidence. Furthermore, most compassionate and competent clinicians avoid getting involved in the politics of 'how to euthanize' people, outside of palliative care practice. There is ample science on how to manage pain, consciousness, and comfort in the transition to death, and no available evidence or practice supports the use of nitrogen.

According to the US Constitution and Supreme Court rulings (Supreme Court ruling in Kemmler, 1890), no execution can involve a cruel or lingering death. The American Veterinary Medical Association has banned the use of nitrogen as a method of euthanasia in dogs and most other animals because of the variable and distressing responses to nitrogen breathing (American Veterinary Medical Association, 2020). This same response to nitrogen has also been well described in humans and should provide ample evidence of the unconstitutionality of the practice, if you need a constitutional justification.

As of February 2024, Kansas is among several states working to approve nitrogen as a method for capital punishment. This must be stopped before others experience the same horrible death as Kenneth Smith. At a time when the world has been scrambling to save lives and prevent human suffering by increasing access to medical oxygen, to intentionally deprive anyone of oxygen is all the more tragic.

Philip Bicker, MD, PhD
Michael Lipnick, MD
University of California at San Francisco

# References

'Textbook' Execution or Botched One? Alabama Case Leaves Sides Divided. Bogel-Burroughs, N, Dewan, S, Betts, A.https://www.nytimes.com/2024/01/26/us/alabama-execution-kenneth-smith nitrogen.html?unlocked_article_code=1.U00.8rvp.1kTJecJ2ds6d&smid=em-share.

Bickler PE, Feiner JR, Lipnick MS, Batchelder P, MacLeod DB, Severinghaus JW. Effects of Acute, Profound Hypoxia on Healthy Humans: Implications for Safety of Tests Evaluating Pulse Oximetry or Tissue Oximetry Performance. Anesth. Analg. 2017 Jan;124(1):146-153.

Bickler PE, Feiner JR, Lipnick MS, McKleroy W. "Silent" Presentation of Hypoxemia and Cardiorespiratory Compensation in COVID-19. Anesthesiology. 2021 Feb 1;134(2):262-269.

Adams L, Chronis N, Lane R, Guz A. The measurement of breathlessness induced in normal subjects: individual differences. Clin Sci (Lond) 1 February 1986; 70 (2): 131–140. doi: https://doi.org/10.1042/cs0700131.

Spitz, V. Doctors from hell: The horrific account of Nazi experiments on humans. 2005.Sentient Publications: Boulder, Colorado, USA.

Guidelines of the Euthanasia of Animals. American Veterinary Medical Association, Guidelines 2020.

Kronenberg R, Hamilton FN, Gabel R, Hickey R, Read DJ, Severinghaus J. Comparison of three methods for quantitating respiratory response to hypoxia in man. Respir Physiol. 1972 Sep;16(1):109-25. doi: 10.1016/0034-5687(72)90092-8. PMID: 5073532.

```
 1              IN THE UNITED STATES DISTRICT COURT

 2             FOR THE MIDDLE DISTRICT OF ALABAMA

 3                      NORTHERN DIVISION

 4   DEMETRIUS FRAZIER,

 5        Plaintiff,

 6   Vs.                    CASE NO.: 2:24cv732-ECM

 7   JOHN Q. HAMM, et al.,

 8        Defendants.

 9              *  *  *  *  *  *  *  *  *  *  *  *  *

10                      MOTION HEARING

11              *  *  *  *  *  *  *  *  *  *  *  *  *

12       BEFORE THE HONORABLE EMILY C. MARKS, UNITED STATES DISTRICT

13   JUDGE, at Montgomery, Alabama, on Tuesday, January 28, 2025,

14   commencing at 9:22 a.m.

15                        APPEARANCES

16   FOR THE PLAINTIFF:     Mr. Spencer Jay Hahn
                            Mr. Eric C. Brown
17                          Mr. Matt David Shulz
                            Attorneys at Law
18                          OFFICE OF FEDERAL DEFENDERS
                            817 South Court Street
19                          Montgomery, Alabama

20   FOR THE DEFENDANTS:    Ms. Polly Spencer Kenny
                            Ms. Lauren Ashley Simpson
21                          Mr. Dylan L. Mauldin
                            Mr. Cameron G. Ball
22                          Mr. Charles A. McKay
                            Mr. Robert M. Overing
23                          Office of the Attorney General
                            501 Washington Avenue
24                          Montgomery, Alabama

25
```

```
 1              Proceedings reported stenographically;
 2              transcript produced by computer
 3              * * * * * * * * * * * * *
 4      (The following proceedings were heard before the Honorable
 5       Emily C. Marks, United States District Judge, at Montgomery,
 6       Alabama, on Tuesday, January 28, 2025, commencing at
 7       9:22 a.m.:)
 8      (Proceedings commenced in the robing room.)
 9              THE COURT:  Good morning.
10              We've got somebody from --
11              MR. HAHN:  Federal Defenders.  Eric Brown, Spencer
12      Hahn.
13              MS. KENNY:  Polly Kenny, Dylan Mauldin.  We've got a
14      few more in there.
15              THE COURT:  Sure.  Sure.  I don't need everybody for
16      this.
17              I just wanted to update you on the issue of the
18      documents having been filed for a period of time, confidential
19      documents, not under seal.
20              We have investigated.  Our IT investigation has
21      determined that we don't have any evidence that anyone other
22      than attorneys or Court staff accessed those documents at any
23      time before they were placed under seal.
24              MS. KENNY:  That's very good news.  I will go share
25      that with the ADOC folks.
```

1          THE COURT:  Very good.

2          MS. KENNY:  They're very anxious about it.

3          THE COURT:  Of course.  Yes.  We went to the highest

4   level, and we had everybody working on it, and we're very

5   satisfied that there's no evidence that anybody accessed it

6   other than attorneys and Court staff.

7          MS. KENNY:  Thank you.  We appreciate that.

8          MR. HAHN:  And just briefly, John Palombi can't be here

9   today.  I've taken over as lead counsel over the weekend.  He's

10  got a serious medical issue, and he's -- he's been suffering

11  with medical issues for a while.  He's on extended medical

12  leave.  So I will let him know, and I think he will be thrilled

13  to hear that.  I just wanted to let the Court know the reason

14  Mr. Palombi is not here is no fault of his own.  It's just

15  medical.

16          And as far as housekeeping, just a couple of matters.

17  Mr. Brown is a junior attorney in our office -- not that he

18  isn't as good as me, he's just not as experienced -- and given

19  the short turnaround, I would intend to do any argument on any

20  substantive issues, and he's going to do direct on Dr. McAlary.

21  But there may be an argument about whether Dr. McAlary can come

22  in as an expert or whatnot.  I would intend to handle that.  I

23  know ordinarily one attorney, one witness, but I would ask the

24  Court's indulgence on that.

25          THE COURT:  Any objection?

```
 1            MS. KENNY:  No objection.

 2            THE COURT:  That's fine.

 3            MR. HAHN:  Then I did want to let the Court know -- and

 4   I talked to Ms. Kenny about that.

 5            There are two alternatives.  And I talked to Ms. Kenny,

 6   and I -- in reviewing the preliminary injunction motion and our

 7   reply, it was not clear to me that we were only going to pursue

 8   alternative number one for purposes of this hearing, so the

 9   midazolam alternative.  We're not going to be talking about

10   alternative number two, which could help channel things a little

11   more.  Because we're going to rise or fall on an alternative,

12   and that's the one that we have the strongest likelihood on.

13            THE COURT:  All right.  Are you abandoning the second

14   alternative altogether?

15            MR. HAHN:  Not altogether, but for purposes for

16   preliminary injunction, we are.  If this were to get to a full

17   trial, we anticipate we would have the ability to present that.

18   But given that we only have to establish one alternative and

19   given the compressed time line and given the willingness of the

20   Court to even hear us on this, given the time, we think it's

21   cleaner and easier if we just go that way.  So I wanted to let

22   them know and let the Court know because that could shorten some

23   of the testimony as well.

24            THE COURT:  All right.  Any issue with that?

25            MS. KENNY:  No, Your Honor.
```

```
1                 THE COURT:  All right.  Very good.
2                 MS. KENNY:  I do have a couple of things as well.  We
3        have the mask in the trunk of my car.  Judge Huffaker had wanted
4        to see it at the very beginning of the first litigation in the
5        Kenny Smith litigation.  There was a lot of issues about mask
6        fit at that point.  I don't believe that it's going to be
7        relevant necessarily for you to see it, but I just wanted to let
8        you know that I have it in the event that you feel like you
9        would like to see it.  We cannot do it in open court, so you
10       would have to look at it in chambers, but, again, we don't
11       really think it's necessary.  That's why we didn't go through
12       the rigmarole to bring it in, because we can't just bring it
13       through open security because we don't want it to be seen by the
14       public.
15                 THE COURT:  Sure.
16                 MS. KENNY:  So we didn't want to go through that
17       without knowing for sure that you might want to see it.  So it
18       is securely in the trunk of my car right now.
19                 And it's not the mask.  We have multiples.
20                 MR. HAHN:  Your Honor, I think I'm anticipating what
21       you're going to ask, which is, we do not intend to argue about
22       mask fit or infiltration of oxygen as something that it would
23       matter to see that.  I think that can be covered by any
24       testimony about how they fit the mask if they testify to that.
25       We're not arguing about there's going to be infiltration.
```

```
 1           THE COURT:  All right.
 2           MS. KENNY:  And then my last thing is, Mr. Overing is
 3  on this case as an attorney on the case, and he will be sort of
 4  in and out.  He's just going to be sitting on the back row.
 5  He's got some personal reasons that he can't be sitting up at
 6  the table.  Just didn't want you to think that that was odd if
 7  you saw him coming and going.
 8           THE COURT:  All right.  I hear we have a full house, so
 9  it's a public forum, so anybody can come and go as they need to.
10           MS. KENNY:  Thank you.
11           THE COURT:  All right.  Very good.  Anything else?
12           MR. HAHN:  No, I don't think so.
13           THE COURT:  I'll see you in the courtroom.
14      (Proceedings continued in the courtroom.)
15      (Call to Order of the Court.)
16           THE COURT:  Good morning.  This is a hearing on the
17  plaintiff's motion for preliminary injunction in the case of
18  Frazier versus Hamm, et al., case number 24cv732.
19           Who do we have here as counsel for Mr. Frazier?
20           MR. HAHN:  Your Honor, Spencer Hahn.
21           MR. BROWN:  Your Honor, Eric Brown.
22           MR. SHULZ:  Good morning, Your Honor.  Matt Shulz.
23           THE COURT:  Good morning.  And this is Mr. Frazier with
24  you here at counsel table?
25           MR. SHULZ:  Yes, Your Honor.
```

```
 1              THE COURT:  Good morning, Mr. Frazier.

 2              And who do we have here for the defendants?

 3              MS. KENNY: Polly Kenny from the Attorney General's

 4   office.

 5              MS. SIMPSON:  Lauren Simpson from the Attorney

 6   General's office.

 7              MR. MAULDIN:  Dylan Mauldin from the Attorney General's

 8   office.

 9              MR. MCKAY:  Charles McKay from the Attorney General's

10   office.

11              MR. BALL:  Cameron Ball for the Attorney General's

12   office.

13              THE COURT:  Good morning.

14              MR. HAHN:  Your Honor, I had one preliminary matter

15   with regard to Mr. Frazier.  He has cuffs on.  Is there -- I

16   know -- I believe he has leg chains on.  Is there a way that we

17   could have one of the cuffs removed so that he can write on his

18   note pad?

19              THE COURT:  It is the policy of the Court that that not

20   occur, so I'm going to ask that he remain in handcuffs.

21              MR. HAHN:  All right.  Thank you, Your Honor.

22              THE COURT:  This is an evidentiary hearing.

23              Is there another attorney for the Attorney General's

24   office?

25              MR. OVERING:  Robert Overing.
```

 1            THE COURT:  All right.  Thank you.

 2            This is an evidentiary hearing.  Is anyone going to

 3    invoke the rule?

 4            MS. KENNY:  Yes, Your Honor.

 5            THE COURT:  All right.  The rule has been invoked.  Is

 6    that going to apply to the experts?  Is there any objection to

 7    the experts -- two experts witnesses remaining in the hearing?

 8            MS. KENNY:  Your Honor, yes.  We would object to

 9    Dr. McAlary being allowed to be treated as an expert in this

10    proceeding.

11            He was an expert in the Grayson litigation.  He

12    provided a report in accordance with Rule 26(a)(2)(B) in that

13    litigation.  He has not provided a report, supplemental report

14    in this litigation.

15            My understanding from the status conference that we had

16    and the averment of -- I believe it was Mr. Palombi -- was that

17    Dr. McAlary was going to testify as to his observations of the

18    Grayson execution.  That is akin to lay witness testimony.  That

19    execution was in November of last year, so two months.  In that

20    two months' time, Dr. McAlary could have and should have written

21    or supplemented his Rule 26 report if he intended to provide

22    expert testimony about his observations of the Grayson

23    execution.  He has not done so.  Therefore, we, the defendants,

24    have no knowledge, have no notice of the opinions he would

25    provide under sub A -- sub 1 and the facts and data considered

1  by him under sub 2 of Rule 26(a)(2)(B).  And to allow him to

2  provide expert testimony in regard to his lay -- lay

3  observations would be a great detriment to the defendants in

4  this case.  Again, they've had plenty of time to amend his

5  report.

6          Also, just as an aside, in the 1983 complaint in this

7  case, they don't talk about -- Frazier doesn't discuss

8  Mr. Grayson's execution.  Grayson's name does not appear in the

9  1983 complaint except where it appears that there was a

10 typographical error in the prayer for relief.  So we are going

11 to object to him as an expert overall in regard to anything

12 postdating his prior testimony in the Grayson litigation, and

13 thereby we would also object to him being allowed to listen to

14 the testimony of other lay witnesses.

15         MR. HAHN:  Your Honor, just as far as listening to

16 testimony, at this point, given that Dr. McAlary is going to be

17 testifying -- I think everybody agrees that he can testify about

18 his observations, whether he's classified as a lay witness or an

19 expert.  I guess I shouldn't say everyone agrees.  Your Honor

20 has to decide on that.  I think the parties are in agreement

21 that he can testify to his observations from the Grayson

22 execution.

23         I will let the Court and counsel know that we do not

24 intend to call Matt Shulz as a witness, so our only witness will

25 be Dr. McAlary, given that we don't want to duplicate.  So

```
 1  Dr. McAlary would be our first and only witness.  At that point,
 2  once he's done testifying, he's also consulting with us in terms
 3  of their expert, and so we would ask that he be allowed to
 4  listen to Dr. Antognini's testimony and any testimony that
 5  Dr. Antognini would be relying on.  But we certainly -- I don't
 6  know that excluding him serves much of a function, given that
 7  we're going to rest after we present his testimony and wait for
 8  their expert.
 9           THE COURT:  In light of the fact that he will testify
10  first, is there any reason to exclude him after his testimony is
11  complete?
12           MS. KENNY:  Your Honor, as long as he is providing
13  consultation only and is not going to be called as a rebuttal
14  witness once Dr. Antognini testifies.
15           THE COURT:  Can you make that --
16           MS. KENNY:  That would be a big problem from our
17  perspective.
18           THE COURT:  Mr. Hahn, can you make that representation
19  that he won't be called as a rebuttal witness?
20           MR. HAHN:  I can, Your Honor.
21           THE COURT:  All right.
22           MS. KENNY:  Then we do not have an objection to
23  Dr. McAlary listening to the entirety of the proceedings.
24           THE COURT:  All right.  Very good.
25           Would anybody like to make an opening statement?
```

```
 1          MS. KENNY:  Your Honor, as we did invoke the rule, we
 2  would request that our witnesses depart at this time, with the
 3  exception of the two named defendants.
 4          THE COURT:  All right.
 5          MS. KENNY:  And any other -- any witnesses -- well,
 6  you're only calling one, so, I guess, never mind.
 7          THE COURT:  All right.  Any witnesses need to leave the
 8  courtroom, please.
 9          Mr. Hahn, would you like to make an opening statement,
10  or should we get right into evidence?
11          MR. HAHN:  Your Honor, let's just jump into this,
12  please, if we can.
13          THE COURT:  All right.  Ms. Kenny, does anyone from the
14  defense table wish to make some sort of an opening?
15          MS. KENNY:  No, Your Honor, but we would request just
16  clarification that Dr. Antognini will also be allowed to be on
17  the zoom the entirety of the hearing.
18          THE COURT:  Any objection?
19          MR. HAHN:  None at all, Your Honor.
20          THE COURT:  All right.  That's fine.
21          MS. KENNY:  Thank you.
22          THE COURT:  All right.  Mr. Hahn, plaintiff will call
23  its first witness.
24          MR. HAHN:  Yes, Your Honor.  We will call Dr. Brian
25  McAlary.  And Mr. Brown will be handling the direct.
```

1          THE COURT:  All right.  The courtroom deputy will swear

2    in the witness, please.

3          THE WITNESS:  Can you hear me now?

4          THE COURTROOM DEPUTY:  Yes.  Can you hear me?

5          THE WITNESS:  Okay.  Yes, ma'am.

6          THE COURTROOM DEPUTY:  I'm the courtroom deputy.  I'm

7    going to swear you in at this time.  If you'll raise your right

8    hand.

9                         BRIAN MCALARY

10        The witness, having first been duly sworn to speak the

11   truth, the whole truth and nothing but the truth, testified as

12   follows:

13                      DIRECT EXAMINATION

14   BY MR. BROWN:

15   Q.  Dr. McAlary, good morning.

16   A.  Good morning to you.

17   Q.  Did you witness the execution of Carey Grayson on November

18   21st, 2024?

19   A.  I did.

20   Q.  And did you have a clear view of Mr. Grayson during the

21   execution?

22   A.  I did.

23   Q.  Were you able to take notes while you observed the

24   execution?

25   A.  No.  That task was assigned to one of your attorney

1  colleagues in the Federal Defender group, with the understanding

2  that the note taking would potentially be distracting from my

3  observation of events.

4  Q.  Did you observe Mr. Grayson give his last words?

5  A.  I did.

6  Q.  And what happened after he gave his last words?

7  A.  The microphone that was placed in reasonable proximation to

8  his face mask, which had been previously affixed, was taken

9  back, coiled, and hung on a hook on the wall.  After that he was

10  approached by his spiritual advisor, who prayed with him, and

11  then backed away to a predesignated corner of the execution

12  chamber.

13  Q.  And what happened after his spiritual advisor backed away?

14  A.  Almost immediately afterwards, it was apparent that evidence

15  of distress was occurring with the individual as manifest by

16  struggling motions with his upper extremities, which were -- had

17  been previously restrained out to the side of his body.  He was

18  moving his head back and forth, and it was quite apparent that

19  he was hyperventilating both in the sense of increased --

20         MS. KENNY:  Your Honor, we're going to object to

21  this --

22         THE COURT:  Hold on, Dr. McAlary.

23         Go ahead.

24         MS. KENNY:  Opinions are not allowed by lay witnesses,

25  and I believe that he's getting into a medical opinion.

1          THE COURT:  What's your response?

2          MR. BROWN:  Can I confer with my cocounsel momentarily?

3          THE COURT:  You may.

4     (Brief pause in the proceedings)

5          MR. HAHN:  Your Honor, may I respond to this?

6          THE COURT:  You may.

7          MR. HAHN:  I appreciate it.  Thank you.

8          Your Honor, I don't know that we can take the expert

9  hat off of Dr. McAlary in terms of his -- just as if you have an

10 officer come in and testify as to what they observed to be a

11 speed, I don't think that he can take off his experience.  And

12 so I suppose we could go through what sort of experience he has

13 that would allow him to classify something a certain way, but, I

14 mean, this is just him testifying straight up in the narrative.

15 I don't fully understand how his classification of something a

16 certain way -- like we had testimony at prior hearings, and

17 we've seen it in the pleadings from the government, which is

18 agonal breathing and various medical terms or things that lay

19 witnesses are using.  Obviously, it's up to the Court on this,

20 but Dr. McAlary is not here to offer a medical opinion in terms

21 of Mr. Grayson, but he is offering observations that he can't

22 really detach from his --

23         THE COURT:  Well, he can testify as to what he

24 observed.  He cannot speculate and go behind his observations

25 about what it meant.

```
 1            MR. HAHN:  Okay.

 2            THE COURT:  Do you understand the Court's ruling?

 3            MR. BROWN:  Yes, Your Honor.

 4            THE COURT:  Do you understand it?  All right.  Go

 5    ahead.

 6    Q.  (Mr. Brown, continuing:)  Dr. McAlary, what caused you to

 7    believe that Mr. Grayson appeared to be agitated?

 8    A.  There were multiple elements that permitted that conclusion

 9    to be reached.

10        There was increased movement of his head in a back and forth

11    manner, there was increased rapid eye movement, there was

12    struggling against the restraints with his upper extremities,

13    and there was an increased rate and depth of breathing.

14    Q.  Did you observe Mr. Grayson making what you considered to be

15    voluntary movements after he appeared agitated?

16    A.  Yes, to the extent he could, given the restraints that were

17    in place.

18    Q.  What was the final movement Mr. Grayson made that appeared

19    voluntary?

20    A.  The final movement was a raising of both legs, which were

21    parallel to each other, lying with the heels against the

22    stretcher through the early part of his execution.  And both

23    legs were raised, pivoted at the hip to a point where his feet

24    were approximately at an angle of 45 degrees to his body and the

25    horizon.  Pausing in that position for a few seconds, and then
```

1  at the same measured cadence, slowly lowered back down to the

2  supine position.

3  Q.  Could you estimate how much time elapsed between when you

4  first observed Mr. Grayson appearing agitated and the point in

5  time when he raised and then lowered his legs?

6  A.  Yes.  If I may, I'm going to support my memory by the notes

7  obtained by one of the attorneys, who was kind enough to note

8  the clock times associated with these --

9          MS. KENNY:  Objection, Your Honor.  These are notes

10  that were made by a different person, and they are notes that

11  have not been previously provided to the defendants.

12          THE COURT:  What's your response?

13          MR. BROWN:  I would ask Dr. McAlary to just testify to

14  his recollection and not refer to the notes.

15          THE COURT:  All right.

16          MS. KENNY:  We would request also that he put those

17  notes away so that he cannot read them.

18          THE COURT:  All right.  Dr. McAlary, you will need to

19  limit your testimony to what you remember without reviewing any

20  of the notes that you just referenced.

21          THE WITNESS:  I understand, Your Honor.

22          THE COURT:  All right.  Go ahead.

23  Q.  (Mr. Brown, continuing:)  I'll repeat the question,

24  Dr. McAlary.  Could you estimate, based on your recollection,

25  approximately how much time elapsed between when you first

1   observed Mr. Grayson appearing agitated and the point in time

2   when he raised and lowered his legs?

3   A.   Approximately three minutes.

4   Q.   And what did you observe after Mr. Grayson lowered his legs?

5   A.   At that point, his breathing continued at an increased depth

6   and rate for approximately another two minutes, and then his

7   breathing became less frequent and with less depth for another

8   ten minutes or so.

9   Q.   And after that ten minutes, what happened next?

10  A.   It would appear that all voluntary movement ended.  And then

11  at some point shortly after that, approximately 15 or so minutes

12  after the initial agitated movements, his voluntary efforts at

13  respiration ceased.

14       MR. BROWN:  Your Honor, if I may confer with my

15  cocounsel momentarily.

16       THE COURT:  You may.

17    (Brief pause in the proceedings)

18       MR. BROWN:  Your Honor, I have no further questions.

19       THE COURT:  All right.  Cross-examination.

20       MS. KENNY:  Yes, Your Honor, but could I please have

21  about ten minutes with the team to discuss?  We weren't sure how

22  Your Honor would rule in regard to the expert versus lay

23  witness, so I need to discuss what areas that we need to cover.

24       THE COURT:  All right.  It's 9:55.  Let's take a recess

25  to 10 after 10.

1          MS. KENNY:  Thank you, Your Honor.

2      (Recess was taken from 9:55 a.m. until 10:21 a.m., after

3        which proceedings continued, as follows:)

4          THE COURT:  All right.  Ms. Kenny, are you ready for

5  cross-examination?

6          MS. KENNY:  Yes, Your Honor.  And I apologize for the

7  delay.  I was trying to get a copy of the notes.

8          THE COURT:  All right.  Go ahead.

9          MS. KENNY:  And I believe that they're going to be

10  emailed to me, but I have not seen them yet, so --

11          THE COURT:  All right.

12                          CROSS-EXAMINATION

13  BY MS. KENNY:

14  Q.  Okay, Dr. McAlary.  How are you doing today?

15  A.  Fine, thank you.

16  Q.  I am Polly Kenny from the Attorney General's office.  I

17  believe we've met before?

18  A.  Yes.

19  Q.  So the Grayson execution was the only execution you've ever

20  seen; correct?

21  A.  Correct.

22  Q.  As a matter of fact, prior to being involved in the Grayson

23  case, you had not dealt with executions at all?

24  A.  Correct.

25  Q.  So in seeing his execution, you have nothing to compare it

1   to; correct?

2   A.   No, that's not correct.

3   Q.   So you've seen other executions?

4   A.   No, but that's not the only comparator I was making

5   reference to.

6   Q.   So have you seen someone die of inert gas asphyxiation

7   before?

8   A.   I don't believe so.

9   Q.   How was it that you came to witness Mr. Grayson's execution?

10  A.   I received a phone call from a representative of the Federal

11  Defenders, asking me if I would agree to do so.

12  Q.   So did you agree to that?

13  A.   I did.

14  Q.   And were you compensated for attending the Grayson

15  execution?

16  A.   I was.

17  Q.   How much were you paid for that?

18  A.   My fee was $400 an hour for the time that I was asked to be

19  involved.

20  Q.   And how many hours were you involved?

21  A.   I think about three, if memory serves me correctly.

22  Q.   You weren't paid for your travel?

23  A.   No, I was compensated for the cost that I incurred for that

24  travel.

25  Q.   So at the evidentiary hearing that you were here for in

 1  Montgomery in October of last year, you met Mr. Grayson for the
 2  first time; is that correct?
 3  A.  Yes.  Actually, I didn't meet him.  I was told who he was,
 4  and he was fairly obvious by the fact that he was escorted by
 5  police and was in a prison uniform with shackles.  So it was
 6  quite apparent to me that he was, indeed, who they indicated he
 7  was, but we did not meet or speak.
 8  Q.  Okay.  After that time, did you meet or speak with
 9  Mr. Grayson?
10  A.  I did not.
11  Q.  Would you consider yourself Mr. Grayson's friend?
12  A.  No.
13  Q.  I'm going to ask you to turn to Exhibit 79 of the exhibits
14  that I think Mr. Hahn sent you from the defendant's exhibits.
15  If you could turn to Exhibit 79, please.
16  A.  I'm looking through the pile that's in front of me, and I do
17  not see that one.  Is there some way you could identify it that
18  would perhaps allow me to find it?  Because I don't see numbers
19  that are of any use to me.
20  Q.  It is one of a couple of exhibits that are on Federal
21  Defenders letterhead, looks like a letter with Federal
22  Defenders, Middle District of Alabama, at the top of the first
23  page.
24  A.  Okay.  The one I'm looking at, and correct me if this is not
25  what you want me to be looking at, is plaintiff's amended

1  exhibit list.

2  Q.  No, that is not the one I'm asking you to look at.

3      I tell you what.  How about we do this, Dr. McAlary?  Let me

4  read you a line out of Exhibit 79 and ask you a question about

5  that line, since it might take us some time for you to find that

6  exhibit.

7      On page 2 of Exhibit 9, you were listed as an execution

8  witness for the execution on November 21st, 2024, and you are

9  listed as a friend.  Is that true or not true?

10 A.  I have no idea.

11 Q.  Well, are you a friend to Mr. Grayson?

12 A.  I believe we've answered that question already, and as you

13 recall, the answer was no.

14 Q.  Let's talk a little bit about the notes that you were

15 relying on at the beginning of your testimony.  I could observe

16 you looking down.  It appeared you were reading from them.  Is

17 that true?

18 A.  Yes.  That is correct.

19 Q.  So the beginning part of your testimony, you were reading

20 from those notes.  I did not notice it, but it is true that you

21 were reading from the notes?

22 A.  It is true that I started to prior to your objection and my

23 instruction by the Court not to.

24 Q.  And I saw you put them away at that point, and I appreciate

25 that.

1     But you did rely upon those notes at the beginning of your

2   testimony and used them; correct?

3   A.  I used them to confirm my recollection, and they were

4   confirmatory.

5   Q.  Now, you were aware from listening to the Grayson

6   evidentiary hearing here in Montgomery -- you were aware that

7   Mr. Grayson was not going to cooperate with his execution; is

8   that correct?

9   A.  I did hear that issue come up.  I don't recall if there was

10  a conclusion to that or any input from Mr. Grayson.

11  Q.  Well, are you aware that we read portions of his deposition

12  wherein he said he was not going to cooperate out of his own

13  mouth?

14  A.  I remember that that was said.  Whether it came from his

15  deposition or not, I would defer to you.

16  Q.  So who was in the observation room that you were in with you

17  for the Grayson execution?

18  A.  There were more than one observation rooms.  The particular

19  one that I was escorted to by the prison guards contained

20  myself, two of the attorneys from Federal Defenders, and

21  approximately I would say nine other individuals, all adults,

22  male and female, and I have no idea who they were or who they

23  were representing.  My assumption is that they were, at least

24  some of them, members of the media.

25  Q.  And you assumed that they were members of the media?

1   A.   Yes.  I did not ask and I wasn't told.

2   Q.   Who took the notes that you relied upon?

3   A.   One of the Federal Defender attorneys.

4   Q.   Which one?

5   A.   The gentleman would be Mr. Shulz.

6   Q.   Okay.  Thank you.  And I would ask you to put away those

7   notes now, please, Dr. McAlary.

8   A.   Yes.  I just had to go to the notes to find his name.

9   Q.   So you heard -- we're talking about the Grayson execution

10  now.  You heard his last words that he said into the microphone;

11  correct?

12  A.   No, ma'am.  I heard words.  I did not hear them in the sense

13  of being able to make any sense.  There was only noise which was

14  coming commensurate with the movement of his mouth.

15  Q.   So you did not hear the words when he said to F y'all?

16  A.   I did not.

17  Q.   So you also after that point did not hear anything from the

18  execution chamber; correct?

19  A.   Let me think.  In the sense of words, you mean?

20  Q.   Anything.  Any words, any sounds.  Did you hear anything?

21  A.   There might have been some adventitial sounds, but I don't

22  recall that well enough to know.  I'm virtually certain that I

23  did not hear any speech.

24  Q.   And could you please repeat the word you said?  What kind of

25  sounds?

```
1  A.  Adventitial.

2  Q.  Can you spell that, please.

3  A.  I don't know if I can.  A-D-V-E-N-T-I-T-I-A-L would be very

4  close.

5  Q.  And what is that?

6  A.  That is sounds that are in the process of the environment or

7  something that's going on but not of direct relevance to the

8  process.  For example, if someone coughed or sneezed.

9  Q.  Okay.  So you might have heard someone cough or sneeze in

10  the chamber, but that was all?

11  A.  Yes.  There was no speech or identifiable speech, at least,

12  from anyone.

13  Q.  And how long -- how far into the process could you hear

14  those noises?

15  A.  I couldn't recall enough to do anything but guess.

16  Q.  You don't know when the nitrogen began to flow, do you?

17  A.  I do not know for a fact, but a deduction and the

18  observation --

19  Q.  Dr. McAlary, I'm only asking you for facts.  Do you know --

20  A.  Well --

21  Q.  -- when the nitrogen --

22  A.  -- I'm trying to give you facts.

23  Q.  Do you know when --

24  A.  But I'm saying those -- there is more than one way to obtain

25  evidence.  One would be if it were announced.  To my knowledge,
```

1  it was not, at least not to me or to the individuals within that

2  particular witness confine.

3      But there was evidence of behavioral processes that started

4  almost immediately after his spiritual advisor stepped back from

5  the bed that would allow me to deduce that that was consistent

6  with the start of the nitrogen.

7  Q.  So your testimony is that when -- almost immediately after

8  the spiritual advisor completed the mission of spiritual

9  advising and stepped back, that's when the agitation on the part

10  of Mr. Grayson began; right?

11  A.  Correct.

12  Q.  And by agitation, you described that as moving the head back

13  and forth; correct?

14  A.  That was one element.

15  Q.  And I think you said something about movement to the side or

16  something like that, like his body was moving to the side?  Can

17  you tell us what that is?

18  A.  No, ma'am.  Apparently, you misunderstood.  My apologies.

19  What I was referring to the side was that the head movements

20  were from side to side.

21  Q.  Okay.  Gotcha.  And then you also testified that the final

22  movement that you observed was the raising of both legs, and

23  that was at about three minutes; correct?

24  A.  Correct.

25  Q.  Did you see Mr. Grayson shooting birds with both of his

1  hands?

2  A.  Yes, I did.  If you're saying did he extend the middle

3  finger of his hand, both hands, yes, I did see that.

4  Q.  You also testified something about him being previously

5  restrained.  Did his restraints come off?  Is that what you're

6  testifying to?

7  A.  No, ma'am.  If I had thought that, I would have said that.

8  There was no evidence that the restraints in any way got loose

9  or came off.

10 Q.  And did you see his hands begin to turn blue?

11 A.  I don't recall his hands turning blue, but I did detect some

12 facial cyanosis at some point in the process prior to his

13 ceasing all movement.

14        MS. KENNY:  If I could have just a moment, Your Honor.

15        THE COURT:  All right.

16        (Brief pause)

17        MS. KENNY:  Your Honor, I was checking to see if I had

18 gotten the letter yet, and I have not, so I guess we'll wrap

19 this up without it.

20 Q.  (Ms. Kenny, continuing:)  So did you hear Mr. Grayson say

21 anything or make any noise other than the last words that you

22 had trouble understanding?

23 A.  I did not.  I did not hear any verbalization.  I cannot even

24 tell you whether the microphone that was used to approach him by

25 Warden Raybon was taken away.  Whether there was any in-room

 1  microphone that would have allowed anything that was said to be
 2  heard is a fact that I do not know the answer to.
 3  Q.  All right.  Thank you.
 4        MS. KENNY:  I have no further questions.
 5        THE COURT:  All right.  Any redirect?
 6                    REDIRECT EXAMINATION
 7  BY MR. BROWN:
 8  Q.  Dr. McAlary, what reason led you to believe that
 9  Mr. Grayson's leg movement was voluntary?
10        MS. KENNY:  I'm going to object to the extent it calls
11  for an expert opinion.  If he can answer without it being an
12  expert opinion answer, then I do not object.
13        MR. BROWN:  I believe that a fact witness could testify
14  to their perception of whether movement was voluntary or not.
15        THE COURT:  I'm going to allow him to answer.
16  Overruled.  Go ahead.
17  A.  Yes.  Involuntary movement is typically characterized by it
18  being asynchronous, meaning if more than one extremity is
19  involved --
20        MS. KENNY:  We're going to object, Your Honor.  This
21  seems to be expert testimony.
22        THE COURT:  Is this being offered as expert testimony?
23        MS. KENNY:  It's not an observation.  It is actually --
24  he is now using his medical knowledge to answer the question.
25        THE COURT:  What's your response?

1          MR. BROWN:  Could I rephrase the question?

2          THE COURT:  Go ahead.

3    Q.  (Mr. Brown, continuing:)  Dr. McAlary, without referring to

4    generalizations about how to distinguish voluntary from

5    involuntary movements, what did you specifically observe during

6    the execution that led you to believe that the leg raising was a

7    voluntary movement?

8    A.  Both legs were moved at exactly the same time.  They moved

9    in the same direction.  They moved the same distance.  There was

10   then a pause, with both of the ankles together and the feet

11   elevated, and then there was a lowering that mimicked the

12   elevation in both speed and direction.

13   Q.  Thank you.

14          MR. BROWN:  If I could have a moment to confer with my

15   cocounsel.

16          THE COURT:  You may.

17      (Brief pause in the proceedings)

18          MR. BROWN:  I have no further questions, Your Honor.

19          THE COURT:  All right.  Any recross?

20          MS. KENNY:  No, Your Honor.

21          THE COURT:  All right.  Thank you, Dr. McAlary.

22          THE WITNESS:  Thank you, Your Honor.

23          THE COURT:  And Dr. McAlary, just to reiterate, will be

24   permitted to watch the remainder of the testimony.

25          All right.  Plaintiff will call its next witness.

```
 1          MR. HAHN:  Your Honor, we have no further witnesses.
 2   And by way of some housekeeping, if I could, because I don't
 3   like to rest without making sure I have some exhibits in, the
 4   parties had presented earlier -- Ms. Kenny had filed it for the
 5   parties -- a joint exhibit list, which I believe was document
 6   39, ECF number 39.  Attached to ECF number 39 were three
 7   redacted transcripts from the Grayson evidentiary hearing that
 8   the parties have agreed to offer jointly for purposes of this
 9   hearing.  I would just make sure that those got admitted.
10          THE COURT:  All right.
11          MS. KENNY:  No objection.
12          THE COURT:  All right.  Just to make sure the record is
13   clear, you're referencing the document 39 in this case entitled
14   Defendants' Notice and Exhibit List, and therein the defendants
15   note that the parties conferred and had agreed that the exhibits
16   referenced in document 39 should be considered by this Court,
17   and they are now being offered.
18          MS. KENNY:  Yes, Your Honor.  And they're marked as
19   Joint Exhibit 1, Joint Exhibit 2, and Joint Exhibit 3, because
20   there were three separate transcripts.
21          THE COURT:  All right.  Those exhibits are admitted.
22          MR. HAHN:  And, Your Honor, the parties had also
23   agreed --
24          If I could have just one moment, Your Honor.
25      (Brief pause in the proceedings)
```

1          MR. HAHN:  Your Honor, I was just letting Ms. Kenny

2    know that Mr. Shulz's e-mail finally connected and came through.

3    I let her know I'd be happy to let her reopen with him or not

4    object to her asking him additional questions in a minute while

5    she has a chance to review that.  But I'll go back through some

6    housekeeping matters as well, Your Honor.

7          The parties have both agreed that various exhibits from

8    the Grayson hearing would be admitted as well, and I think we

9    filed filings to that effect.  There were just a few that are

10   unique to this case within the plaintiff's exhibits, and I

11   wanted to run through those very quickly.

12         THE COURT:  Are these also listed out in document 39?

13         MR. HAHN:  They are not, Your Honor.  They are listed

14   out in document -- they are listed out in document 42, Your

15   Honor, called Plaintiff's Amended Witness List.

16         As you'll recall, there were -- this is the third

17   iteration, and this is the one that does not contain any

18   confidential information.  The first -- a great number of them

19   were admitted in Grayson.  The only ones that were not and are

20   you would say new to this case are labeled on there as Exhibits

21   25, 26, 27, 28, and 32 through 34.  All the others were already

22   admitted in the Grayson litigation, and we would just move to

23   admit those.

24         THE COURT:  Any objection?

25         MS. KENNY:  The State has no objection to Exhibits 25,

1    26, 27, 28 --

2           Did you offer 29?

3           MR. HAHN:  No.  That's actually already in.

4           MS. KENNY:  28, 32, 33, or 34, which I think is all

5    they offered.

6           THE COURT:  It is.

7           MS. KENNY:  I just wanted to double check.

8           THE COURT:  Yes.  Those exhibits are admitted.  25, 26,

9    27, 28, and 32 through 34.

10          And then, again, just so the record is clear, you have

11   both jointly agreed to the admission of any exhibits that had

12   been admitted in the Grayson case, and those are listed out in

13   document 39; correct?

14          MR. HAHN:  Yes, Your Honor.  And just for clarity,

15   we -- I believe they will be offering -- they'll be providing

16   the Court with specific exhibits from Grayson that they wish to

17   draw the Court's attention to.  We have done the same with this

18   amended exhibit list.  So when we refer to them, I suspect we'll

19   be referring to them by these numbers rather than by the numbers

20   from Grayson.  It will be, I hope, easier for the Court to be

21   able to go through specific exhibits that we've provided there.

22          But that was all that we had, Your Honor, and we would

23   rest at this time.

24          THE COURT:  All right.

25          MR. HAHN:  Barring Ms. Kenny wanting to ask some more

1  questions.

2       MS. KENNY:  Your Honor, we did get the letter, so I

3  just need a second in place to look at it.

4       THE COURT:  All right.

5       MS. KENNY:  I mean, the notes.

6    (Brief pause in the proceedings)

7       MS. KENNY:  Your Honor, we do not wish to question

8  Dr. McAlary any further.

9       THE COURT:  All right.  The defense will call its first

10 witness.

11      MS. KENNY:  The defendants call Dr. Joseph Antognini,

12 who is with us via zoom.

13                  JOSEPH FRANCIS ANTOGNINI

14    The witness, having first been duly sworn to speak the

15 truth, the whole truth and nothing but the truth, testified as

16 follows:

17                  DIRECT EXAMINATION

18 BY MS. SIMPSON:

19 Q.  Good morning, Dr. Antognini.  Could you please spell your

20 name for the record.

21 A.  Joseph Francis Antognini.  J-O-S-E-P-H, F-R-A-N-C-I-S,

22 A-N-T-O-G-N-I-N-I.

23 Q.  Thank you.  And what is your occupation?

24 A.  I am a physician.

25 Q.  Do you have any medical speciality?

1  A.  I'm an anesthesiologist.

2  Q.  Where are you employed?

3  A.  I currently work in clinical research at some clinics here

4  in the Los Angeles area.  That is part time.  And then I also am

5  the chief scientific officer for a small pharmaceutical company

6  trying to develop new anesthetics.

7  Q.  Any previous medical employment?

8  A.  After my training, I was in private practice in

9  anesthesiology, and then I became -- went to the University of

10  California Davis where I trained, and I became a faculty member

11  there.  I was a professor of anesthesiology at UC Davis up

12  until -- well, I retired from UC Davis in 2016.

13  Q.  Doctor, I assume you are licensed.  Where and when were you

14  licensed?

15  A.  I have a California license that started in I believe August

16  of 1985, thereabouts, and I've had continual licensure in

17  California, so my California license is still current.  And then

18  I also have a Georgia license.

19  Q.  Could you tell the Court a little about your education.

20  A.  I went to --

21        THE COURT:  Can I just stop you for a minute?  Are you

22  going to offer him as an expert?

23        MS. SIMPSON:  Yes, Your Honor.

24        THE COURT:  Is there going to be any objection?

25        MR. HAHN:  No, Your Honor.  In fact, I would note that

 1  most of this was testified to in the earlier transcript, and I

 2  think we're incorporating those earlier transcripts.

 3          THE COURT:  And I've reviewed his qualifications.  If

 4  there's not going to be an objection, we can streamline that.

 5          MS. SIMPSON:  We would certainly tender him as an

 6  expert, Your Honor, at this time.

 7          THE COURT:  And I hear that there's no objection to him

 8  being offered and accepted as an expert?

 9          MR. HAHN:  No objection, Your Honor.

10          THE COURT:  All right.  He's accepted.

11          MS. SIMPSON:  Thank you, Your Honor.

12  Q.  (Ms. Simpson, continuing:)  Dr. Antognini, do you have in

13  front of you Defendant's Exhibit 71?

14  A.  I'll have to light up, so give me a moment to do that.

15      Defendant's Exhibit 71.  I have it.

16  Q.  Should be your declaration.

17  A.  Yes, I have it now.  I have it here.

18  Q.  This exhibit was marked highly confidential, so we're not

19  putting it on the Elmo.

20          MS. SIMPSON:  If I may approach, we just have copies

21  for the Court.

22          THE COURT:  I have it.  It's in my binder.

23          MS. SIMPSON:  All right.  Very well.

24          THE COURT:  Certainly.

25  Q.  Dr. Antognini, you testified at the October 2024 evidentiary

1  hearing in Grayson v. Hamm, et al.; correct?

2  A.  Yes.

3  Q.  Have you reviewed your testimony from that case?

4  A.  I did.

5  Q.  Do you stand by the opinions that you expressed in that

6  testimony?

7  A.  Yes.

8  Q.  Is there anything from that testimony that you want to amend

9  here today?

10  A.  Not really, except there were just some minor -- because I

11  testified by video, there were, obviously, some words that came

12  across that were incorrect.  I actually made a note of it, but

13  maybe I didn't, but clearly they were incorrect words and the

14  reporter may not have heard me.  But I don't think there was

15  anything there of substantial -- that was substantive in terms

16  of changing my opinion or misinterpreting my opinion.

17  Q.  And is it still your opinion that an inmate being executed

18  by Alabama's nitrogen hypoxia protocol will not experience

19  physical pain?

20  A.  Yes.  That is my opinion.

21  Q.  Doctor, there have been some claims you heard today from

22  Dr. McAlary and others of movement in hypoxia executions.  Does

23  this surprise you?

24  A.  No, it does not.  As I outlined to some extent in my report,

25  and as I said before, the evidence indicates that -- and by

1  evidence I mean the reports of people who have committed suicide

2  by inert gas hypoxia -- can have movements after losing

3  unconsciousness -- I'm sorry -- after losing consciousness and

4  becoming unconscious.  And then also an earlier report that I

5  cited where people who were subjected to hypoxic conditions

6  developed convulsions.  So I'm not surprised at all that there

7  are going to be movements after the introduction of nitrogen.

8  It's pretty clearcut that that would happen.

9  Q.  I'd like to direct you to Defendant's Exhibit 29, if we

10 could put that up.  That's an article by Ogden.

11 A.  Yes.  Give me a moment to pull that up.  Okay.

12 Q.  And if we can go to page 4, table 3, at the bottom of the

13 page.

14 A.  Okay.  I'm on page 4, table 3.

15 Q.  Thank you, doctor.  Is this an article that you relied on in

16 formulating your expert report?

17 A.  Yes.

18 Q.  Can you tell us what table 3 shows.

19 A.  So these are the summary of findings -- not all the findings

20 but a summary of the findings -- of the four individuals who

21 committed suicide by inert gas hypoxia.  And they are listed

22 there as case one, two, three, and four.  That states the

23 estimated time to loss of consciousness and then the

24 intermittent gross extremity movements, basically when they

25 started and when they finished, the time to cessation of

1  breathing, when they stopped breathing or had sort of stopped

2  regular breathing, and then the time when the last terminal gasp

3  or breath occurred in that individual.

4      So, for example, case one, you see that the estimated time

5  to loss of consciousness was 36 seconds.  There was intermittent

6  gross extremity movements starting at about one minute and then

7  concluding at about two minutes.  Breathing stopped at three

8  minutes, but there were agonal breaths occurring intermittently

9  between three minutes and five seconds to six minutes and 30

10  seconds, and then it looks at eight minutes as well.

11      I'm sorry.  I apologize.  That was the number of terminal

12  gasps.  You can see that listed there for the rest of the

13  individuals.

14      So focusing on the extremity movements, for example, the

15  extremity movements occurred as late as three minutes and 17

16  seconds for case number three.

17      Case number four was a little bit unusual because that was

18  one where they didn't have a very proper fitting mask on, and I

19  think that was why that was more prolonged.

20      But nonetheless, that table very nicely summarizes the

21  movements that can occur after the loss of consciousness, and it

22  can go on for several minutes.  The breathing can go on as well.

23  Q.  And, doctor, you have a couple of terms here, for those of

24  us without MDs, what do they mean or what is your understanding

25  of the term intermittent gross extremity movements?

1   A.   That means that they're not necessarily -- they're not

2   continuous necessarily, they're intermittent.  So they might

3   have some movements of the arms and the legs, and then it stops

4   for 10, 15, 20 seconds, and then it starts up again, and then

5   eventually it stops.

6        So the intermittent gross extremity movements, start to

7   finish, in that table indicates -- again, going back to case

8   number one, those movements started at one minute and then

9   finished at two minutes.  So between that one- and two-minute

10  mark, there were these intermittent gross extremity movements.

11  So that individual would move and then stop and then move again

12  and so forth.  And the actual movement is in the -- basically in

13  the results section of the description of the paper.

14  Q.   And by gross extremity movement, that means movement of the

15  hands and feet or the arms and legs?

16  A.   Yes.  Arms, legs, extension of the arm or -- so, for

17  example, if we just go to, if I may, case number two, which is

18  just in that paragraph to the left of the table and up, you can

19  see that they write, at 1:05 -- I'm in the middle of the

20  paragraph there.  It says, at 1:05 there were tremors in the

21  arm, arching of the back, and the head tilted back.  Then at

22  1:37, the left arm contracted at the elbow.  And then at other

23  times there were light movements in the left arm at 6:33 and

24  6:46.

25       So I just want to point out that the gross extremity

1   movements that are shown here in the table do not reflect the

2   slight movements.  So, for example, going to case two, this

3   woman at the end of that first paragraph, where they write,

4   there were two more slight movements in the left arm at 6:33 and

5   6:46.  So they didn't consider this to be the gross extremity

6   movements.  But nonetheless, that individual moved at 6:33 and

7   6:46.  So there can be movement well after the gross extremity

8   movement that's just not -- gross is a term that we use in

9   medical jargon that basically means it's very demonstrable.  You

10  can see it.  If I just have a fine little quivering of my hand,

11  that's not gross movement.  If I'm shaking my hand, that would

12  be considered a gross movement.

13  Q.  So I guess in the execution context, if you were to see an

14  inmate straining against his arm restraints during a nitrogen

15  hypoxia execution, would that surprise you?

16  A.  No, it does not.

17  Q.  Doctor, have you ever observed an execution?

18  A.  I have.

19  Q.  By what method?

20  A.  Lethal injection.

21  Q.  Did you see a lot of gross movement during a lethal

22  injection?

23  A.  No.  No.  There was no -- as I recall, there wasn't any

24  gross movement.  Obviously, it depends on the type of -- to some

25  extent the protocol, what you're going to observe, but I did not

 1  observe any gross, purposeful movement.

 2  Q.  The lethal injection that you observed, did it include a

 3  paralytic drug?

 4  A.  Yes, it did.

 5          THE COURT:  Can we take the document off the Elmo and

 6  get back to the witness?  Are we done with that?

 7          MS. SIMPSON:  I had one more question about this

 8  document.

 9          THE COURT:  I would prefer to see him testifying than

10  the document if we're going to get past the document.

11          MS. SIMPSON:  I apologize, Your Honor.

12          Would you scroll up to case one.

13  Q.  All right.  Doctor, could I direct your attention to case

14  one in that left-hand column there.

15  A.  Yes.  I see it.

16  Q.  At approximately 60 seconds.  That's the second full

17  paragraph there.

18  A.  Yes.

19  Q.  Could you describe what happened in that case with the gross

20  movements.

21  A.  So at 60 seconds, they describe what's called purposeless

22  movements in the arms.  So the left arm extended upward and

23  reached about involuntary.  The right hand was being held by the

24  attendant, supported.  The attendant was surprised at the

25  movement.  I guess they thought they were surprised that

 1  somebody would be moving.  And then gross arm movements and fine

 2  tremors occurred for about a minute after that.  Then

 3  eventually, the arms relaxed.

 4  Q.  Thank you.  That's all we need on this exhibit.

 5      Doctor, should we correlate movement with pain during an

 6  execution?

 7  A.  No.  No.  Movement can happen in the absence of pain.

 8      And I don't know whether I've said this in my report, I

 9  can't remember exactly, but I think I did talk of brain dead

10  individuals can have movements, can have involuntary movements.

11  So movements can be generated within the spinal cord, basically,

12  and not have any input from the brain.  So you don't have to

13  have pain to have that kind of involuntary movement.

14  Q.  Do you have to have consciousness to have that kind of

15  involuntary movement?

16  A.  Well, if you're conscious -- you can have involuntary

17  movement when you're conscious.  For example, when you put your

18  hand on a very hot kettle on the stove, you will withdraw your

19  hand.  That movement is involuntary.  That is wired in,

20  basically, into our nervous system, but you are conscious.  So

21  you can have involuntary movements when you're conscious.  But

22  in general, when you are unconscious -- not in general.  When

23  you are unconscious, you can't have voluntary movements.

24  Q.  Did you hear Dr. McAlary's testimony about observing

25  synchronous movement from Mr. Grayson's legs during the

1  execution?

2  A.  I did hear that, yes.

3  Q.  Have you ever observed synchronous involuntary movement?

4  A.  Yes.  That can occur during seizures, for example.  So

5  that's something that -- whether they're asynchronous or

6  synchronous says nothing about whether it's voluntary or not.

7  You can have seizures where there's synchronous movement of the

8  arms and legs.  In the setting of an execution where you have a

9  really low oxygen level and the neurons are not firing -- the

10 central nervous system is not working properly and you start to

11 get seizure like movements, you can definitely -- you would be

12 able to see synchronous movements.  So I'm not surprised that

13 Dr. McAlary observed synchronous movements during the execution.

14 Q.  Doctor, did you review the complaint that Mr. Frazier filed

15 in this litigation, which is Document 1?

16 A.  Yes, I did.

17 Q.  Have you reviewed Mr. Frazier's medical records from Holman

18 Correctional Facility?

19 A.  Yes, I did.

20 Q.  Did you see any evidence that Mr. Frazier has asthma in

21 those records?

22 A.  He has a history of asthma that's been documented for many,

23 many years.  He takes medication for it.  But the extent of

24 this -- his asthma seems very mild, based on my review of the

25 medical records.

1  Q.  Doctor, what is asthma?

2  A.  Asthma, in a very sort of high-level description, is a lung

3  disease essentially affecting the small airways of the lung.  So

4  we all have our lungs, and the airways are very large from the

5  windpipe going through what are called the bronchi and then down

6  into the very small airways that are called bronchioles.  The

7  asthma that people get generally affects those very small

8  airways where they can get a constriction or the airways get

9  smaller, and the air movement is more difficult basically when

10  they have an asthma attack.

11  Q.  Is asthma a disorder of the upper airway or the lower

12  airway?

13  A.  Lower airway.  It's not an upper airway type of disease.

14  Q.  Did you do any research about asthma in preparing your

15  expert report?

16  A.  I did look at a few papers that I put into my report just

17  related to evaluation of asthmatics, but for the most part

18  asthma is such a common disease -- especially in our speciality,

19  anesthesiology, we get a lot of patients that have asthma, so

20  it's almost second nature.  It's very commonplace for us as

21  anesthesiologist to have to deal with people with asthma.  It's

22  just very common.

23  Q.  I would like to pull up Defendant's Exhibit 68, please.

24  That's an article by George, et al.

25  A.  I have it up here on my screen.

1   Q.   Thank you, sir.  Did you review this article in connection

2   with your expert report?

3   A.   Yes, I did.

4   Q.   Did this article inform your opinion?

5   A.   To some extent, it did.  I didn't specifically mention it in

6   my report.  I looked at it, and I included it in the reference

7   section, but I did so as a way of explaining that people who

8   have asthma, they actually can kind of go -- it's called the

9   hypoxic challenge test for fitness to fly.  Basically, if

10  somebody has asthma and they're concerned, can I fly in an

11  airplane, they can be tested for that by simulating essentially

12  what the oxygen level would be in an airplane.  So they actually

13  are subjected to a hypoxic environment to see whether that

14  triggers their asthma or not or makes their asthma worse.

15       And the point of that is being that if being subjected to a

16  hypoxic mixture was so dangerous and would cause problems in

17  terms of air obstruction and so forth, asthmatics would never be

18  put through this test, but it's pretty common for them to be put

19  through this test if they're interested in flying.  So it's just

20  evidence that subjecting somebody to a hypoxic mixture, at least

21  at these levels, doesn't seem to be a problem in terms of

22  triggering severe asthma attacks.

23  Q.   Okay.  And I want to draw your attention to one more

24  exhibit, please.  That's Defendant's 69, an article by Eckert,

25  et al.

1  A.  Yes.  I have it here.

2  Q.  Thank you.  Again, did this article inform your opinion?

3  A.  Yes.  I cited this paper as well.  And this is where these

4  individuals -- or these investigators looked at asthmatics that

5  had been subjected to -- among other types of testing, they

6  subjected them to hypoxic mixtures.  And they found that

7  asthmatics actually had a reduced or impaired sensation of

8  respiratory symptoms, what's called respiratory load, and that

9  compared to normals, actually, asthmatics seem to have less

10  sensations of problems with hypoxic mixtures.  So evidence in my

11  mind that if anything, subjecting an asthmatic to a hypoxic

12  mixture, that asthmatic would have fewer symptoms as compared to

13  somebody who does not have asthma.

14  Q.  Doctor, I'd like to direct your attention to Mr. Frazier's

15  complaint, which is Document 1, page 19, paragraph 142.  And I

16  would just read it rather than put the whole exhibit up.

17      Mr. Frazier claims, quote, "Individuals with upper airway

18  obstruction issues, including asthma, will not breathe as

19  effectively as individuals without these issues.  This will

20  cause the process to be delayed in a way that violates the

21  Eighth Amendment."

22      Do you agree or disagree with Mr. Frazier's claim?

23  A.  Well, I disagree with it.

24      Number one, asthma, as I said, is not an upper airway

25  problem.  It doesn't involve the upper airway to any significant

1   extent, in fact, to any really extent at all.  And I don't think

2   that -- even if somebody could be subjected to the hypoxic

3   mixtures that, number one, as I said earlier, just a moment ago,

4   they would have reduced symptoms compared to a normal person.

5   And I don't think that it would trigger an asthma attack.  But

6   even if it did, someone who's asthmatic is actually going to

7   be -- if they have an asthma attack, in my mind, they would

8   probably -- my opinion, they would have a faster onset or I

9   should say the decrease in oxygen in their blood stream would

10  occur faster as compared to someone without asthma.  They

11  already have breathing problems.  So if they did have an

12  asthmatic -- if they did have an attack, in my opinion, they

13  would actually have a faster decrease in the oxygen in their

14  blood.  Because that's what happens with asthma, essentially, or

15  can happen with asthma, is that you have problems breathing and

16  that you would have a reduced -- or faster reduction of the

17  oxygen.

18  Q.  Mr. Frazier uses the term conscious suffocation in his

19  complaint.  What is your understanding of that term?

20  A.  So suffocation has a few definitions.  The ones that we are

21  familiar with are, for example, putting a pillow over someone's

22  head or putting a rope around their neck.  That is one way in

23  which you can suffocate somebody.  Also there is a definition

24  that a reduced amount of oxygen that they breathe in can cause

25  suffocation.  So it sort of includes both of those kinds of

 1  scenarios.  Obviously, the conscious part means that it occurred

 2  while the person is conscious.

 3      The type of suffocation that occurs with, for example, the

 4  pillow over the head is completely different in the sensation as

 5  opposed to what happens with somebody who would be breathing an

 6  inert gas.  With an inert gas, they're still able to breathe,

 7  they're still able to take breaths in and out, so they don't

 8  have that sensation of that type of suffocation.  They also are

 9  able to -- because they're able to breathe, they're able to get

10  rid of the carbon dioxide, and that carbon dioxide that we

11  breathe out, that carbon dioxide, if it starts to build up in

12  the blood, will give the sensation of breathlessness.  That's

13  one of the triggers for us to start breathing faster is the

14  carbon dioxide.  So you don't really see that at all in a

15  situation where someone is still able to breathe, but they're

16  just breathing low oxygen gas.

17      So conscious suffocation, again, that's -- I think that's a

18  bit pejorative, in my opinion, to use that term.

19  Q.  Doctor, did you review Mr. Frazier's proposed alternative

20  methods of execution?

21  A.  Yes.

22  Q.  I just want to direct your attention to the first one, which

23  is 500 milligrams of midazolam, introduced intravenously,

24  followed by use of the mask.  Based upon your medical knowledge

25  and your knowledge of Mr. Frazier's medical conditions, does

1  this protocol present any risks to Mr. Frazier in particular?

2  A.  Well, the introduction of 500 milligrams of midazolam, that

3  dose is going to cause unconsciousness.  In fact, in my opinion,

4  a dose much smaller than that would induce unconsciousness, but

5  in any case, it would induce unconsciousness.

6      With unconsciousness comes the risk of airway obstruction.

7  So it's possible that a person that was provided or given 500

8  milligrams of midazolam intravenously would have airway

9  obstruction.  And so then during this process of placing the

10  mask and so forth after the introduction of the midazolam, there

11  is this risk of airway obstruction.

12      And I know that the complaint also talks about the issue

13  around airway obstruction and pulmonary edema and so forth.  In

14  my opinion, doing the -- giving the 500 milligrams of midazolam

15  would increase that risk because it increases the risk of airway

16  obstruction.  So that's -- that, to me, basically goes against

17  what they're trying to prevent essentially.

18  Q.  Doctor, have you ever had cause to administer midazolam in

19  your practice?

20  A.  Yes.  I've done that many times.

21  Q.  What's the typical therapeutic dose of midazolam?

22  A.  For somebody who's coming in for surgery and they're going

23  to be sedated with midazolam, typically we would give around 1

24  to 2 milligrams total.  We might go up to 3 or 4, depending on

25  the response.  Rarely we would go above 5.  Obviously, it

1  depends on the person's weight, but it would be unusual to go

2  above 5 for the purposes of sedation.

3  Q.  You've never had cause to give a half a gram of midazolam at

4  once; right?

5  A.  I've never done that.  No.

6  Q.  Could 500 milligrams of midazolam be a lethal dose in and of

7  itself?

8  A.  Yes.

9  Q.  Doctor, I'd like to direct your attention to Plaintiff's

10  Exhibit 32, an article by Philip Bickler.

11  A.  Yes.  I have it up.

12  Q.  That's fine.  Doctor, have you reviewed Plaintiff's Exhibit

13  32?

14  A.  Yes, I did.

15  Q.  Okay.  What is, first of all, this article?

16  A.  Well, this is an opinion piece or a viewpoint piece,

17  basically.  It is, essentially, an opinion.  Obviously, it's

18  referenced, so there are some -- some of the statements are

19  going to be -- reference to other articles to support that

20  opinion.  But basically, it's an opinion about the overall

21  nitrogen hypoxia protocol and typically what happened with Kenny

22  Smith, the Kenny Smith execution.  This is just this author's

23  opinion about what they think happened and what their opinion is

24  on that execution.

25  Q.  You keep saying opinion.  Is this a peer-reviewed article

1  from what you can tell?

2  A.  Well, virtually -- I would say, based on my experience,

3  papers like this or opinion pieces like this, there is going to

4  be some peer review.  There's going to be somebody who is going

5  to look at that from the journal side.  Typically that peer

6  review is very, very minimal.

7       So, for example, just based on my own experience, I've been

8  asked in the past numerous times to write an editorial about a

9  paper that was going to be published.  So I would write the

10  editorial about -- an opinion piece about that specific paper,

11  about the limitations and so forth.  Now, that opinion, that

12  editorial that I write, is peer reviewed in the sense that the

13  editor in chief will look at it; but in my experience, I don't

14  recall ever an editor saying, oh, you need to change something

15  here.

16       So I suspect that this opinion piece, although it probably

17  does -- you know, it was peer reviewed, I doubt that it was

18  looked at very closely and an opposing opinion was offered.  So

19  technically, yes, probably it was peer reviewed, but I don't

20  think -- I doubt that much input went into it.

21  Q.  Okay.  Does Dr. Bickler's piece here give you any concern

22  about Alabama's hypoxia protocol?

23  A.  No.

24  Q.  Why is that?

25  A.  Well, I just disagree with some of the things that he's said

1    there.  And I think his -- he's coming from the perspective --

2       So Dr. Bickler -- just to make sure that everybody's aware,

3    Dr. Bickler does work with subjects that are given low

4    concentrations of oxygen -- not the ones that are, obviously,

5    seen here in the protocol -- and then they look at what happens

6    with the subjects.  And specifically what they're primarily

7    doing is that they're -- in his lab they're testing pulse

8    oximeters to see how accurate they are.  So essentially what

9    he's talking about is that if you subject somebody to a low

10   amount of oxygen, they can have symptoms of breathlessness and

11   so forth.

12       And, yes, that is true, but that isn't across the board,

13   number one.  Number two is that in his studies, he keeps people

14   at these relatively low concentrations for five, ten minutes, if

15   not more.  So that's different than what happens in the Alabama

16   protocol, which is that the inmate is subjected to basically 100

17   percent nitrogen, and they go -- the inmate will become hypoxic

18   very, very quickly and become unconscious.  And in Dr. Bickler's

19   studies, the individuals, the subjects, don't become

20   unconscious, for obvious ethical reasons.  So it's almost an

21   apples to oranges comparison in my opinion.

22   Q.  Speaking of Dr. Bickler's study, it wouldn't be ethical to

23   take human subjects down to, say, 10 percent oxygen in one of

24   these studies, would it?

25   A.  No, I don't think 10 percent -- possibly ethical, but

 1  certainly you have to be very, very careful.  Certainly if you

 2  got even lower concentrations, it would be unethical.  So it

 3  kind of depends on the individual subject, but 10 percent would

 4  probably be lower than an ethics committee would allow.

 5  Q.  Doctor, I would like to draw your attention to Plaintiff's

 6  Exhibits 33 and 34, which are OSHA documents.

 7  A.  Yes.  I'm sorry.  These are 33 and 34, plaintiff's exhibits;

 8  correct?

 9  Q.  Yes, sir.

10  A.  Yes.  Yes, I have them here.

11  Q.  Okay.  Did you review these documents?

12  A.  Yes, I did.

13  Q.  Okay.  Again, do these documents give you any concern about

14  Alabama's hypoxia protocol?

15  A.  So, first, we'll take these in turn.  Exhibit 33

16  describes -- this was on May 12th, 2007, an employee who went

17  into a tanker trailer.  That tanker had been filled with

18  nitrogen.  Then it says at 11:45, the employee lost air flow to

19  a supplied air hood.  He yelled to the attendant at the top of

20  the tanker that he had no air, but there was only a manual

21  retriever system available, and the attendant could not extract

22  the employee from the confined space, and then he died.

23      So that's different than what occurs in a nitrogen hypoxia

24  execution, according to the protocol.  In this individual, they

25  lost air flow.  So the actual mask that they use, it's rigid,

1  and you have to have that air flow to it to be able to take in

2  air.  And when you lose the air flow, it's almost like akin to

3  smothering.  It's almost like a pillow over the head because

4  there's no air flow going into the mask at all.  And that's what

5  happened here, and that's why he couldn't get his breath.

6      So that's different than what happens in the nitrogen

7  hypoxia protocol where air is switched to nitrogen and the

8  nitrogen is flowing at a high rate, so they're still able to

9  take big breaths.  For example, that's what Dr. McAlary

10 testified to earlier, that Grayson was still able to take big

11 breaths and deep breaths, but they -- in this case it was a loss

12 of the air flow.  So that's not the same thing as occurs in the

13 nitrogen hypoxia.

14     Now, for the next, number 34, which I now have up, it says

15 here that the employee was attempting to exit the confined

16 space, and he reported to the hole watch that he could not

17 breathe.  The hole watch, which was, I guess, the person that's

18 watching from the hole, told the employee to turn on the

19 emergency bottle.  The employee then reported that he was on the

20 bottle.  The hole watch told the employee to connect to the

21 emergency escape line.  He refused and attempted to climb out of

22 the confined space, and then he climbed about 30 feet and so

23 forth.  So I think what happened here, based on what I'm

24 reading, is that he was on his emergency bottle, and it's quite

25 possible that the emergency bottle was empty, so, again, a

1   situation where the individual was not able to take big breaths

2   in because the bottle was empty.  So I'm not -- I don't think

3   these two cases indicate that -- the same situation,

4   essentially, what occurs in the nitrogen hypoxia protocol.

5   Q.  And, doctor, you mentioned what Dr. McAlary had testified to

6   earlier about the Grayson execution when he said there was an

7   increased rate and depth of breathing for Mr. Grayson.  Do you

8   recall that?

9   A.  Yes.

10  Q.  What does an increased rate and depth of breathing suggest

11  to you?

12  A.  Well, it indicates that Grayson was able to take in big

13  breaths and do it at a more rapid rate, and that is not

14  consistent with an airway obstruction.  If you have an airway

15  obstruction, you're not able to take in big breaths.  You may

16  try to breathe faster, but you're not able to take in big

17  breaths.  That's, obviously, the definition of an airway

18  obstruction.  You're not able to take in big breaths.

19      But Dr. McAlary stated twice, basically, at different times

20  in his testimony that he observed that, so that to me indicates

21  that there was no airway obstruction.  And, again, their claim

22  is that airway obstruction would lead to a problem for this

23  inmate, for Frazier, but the evidence in the Grayson case is

24  that there was clearly not any airway obstruction because

25  Dr. McAlary was able to observe deep breaths and increased

1  breathing.

2  Q.  Is that something that you would expect to see in a

3  condition that would set up negative pressure pulmonary edema?

4  A.  You need to have airway obstruction, basically, in order to

5  develop the negative pressure pulmonary edema.

6      Just to go over the physiology a little bit, if you have an

7  obstructed airway and you're trying to take that big breath and

8  you develop, essentially, a lot of negative pressure in your

9  chest, then that draws fluid from the blood in your lungs into

10  the actual air sacs of your lungs, and that causes the negative

11  pressure pulmonary edema.  So you need to have an airway

12  obstruction to be able to do that.  And clearly in the Grayson

13  case, based on his testimony, there was no airway obstruction

14  because of the ability or the -- his observation that he,

15  Grayson, was taking big breaths.

16          MS. SIMPSON:  Your Honor, if I may have just one

17  moment.

18      (Brief pause in the proceedings)

19  Q.  (Ms. Simpson, continuing:)  Doctor, you've reviewed

20  Alabama's hypoxia protocol; correct?

21  A.  Yes.

22  Q.  How does the protocol deal with carbon dioxide?

23  A.  So the supplied air -- I apologize if I'm saying something

24  that may be confidential.  So the mask, the mask that is used,

25  is made in a way that allows for the exhaled carbon dioxide to

1   leave the mask, basically.  So there's a one-way valve on it.

2   And so there's a lot of gas flowing into the mask at a high

3   flow, and the carbon dioxide that is exhaled by the individual

4   is going to go out the one-way valve into the environment.  So

5   all that carbon dioxide that would be in the mask is just

6   basically blown away, essentially.  And these types of --

7       I'll just leave it at that.  I think that's sufficient.

8   Q.  Would you expect someone breathing under those conditions to

9   experience the sensation of suffocation?

10  A.  No.

11  Q.  Why is that?

12  A.  Well, they're not going to feel the sensation of this sort

13  of smothering effect as I mentioned earlier.  They're still able

14  to take the big breaths in, so not going to have it from that

15  perspective.  And they go through the -- the nitrogen that comes

16  in comes in so fast and the nitrogen builds up so quickly that

17  they very rapidly go from 21 percent oxygen to less than 5

18  percent, on the order of probably 20 to 30 seconds basically.

19  So it's a very rapid decrease in the oxygen.  So there's really

20  very little time for them to develop any type of symptoms

21  related to the hypoxia because they become unconscious so

22  quickly.

23          MS. SIMPSON:  Nothing further at this time, Your Honor.

24          THE COURT:  Cross-examination.

25          MR. HAHN:  Your Honor, could we take a 15-minute break?

```
 1              THE COURT:  Yes.  It is 11:30.  We will break until
 2    11:45.
 3              MR. HAHN:  Thank you.
 4         (Recess was taken from 11:30 a.m. until 11:45 a.m., after
 5           which proceedings continued, as follows:)
 6              THE COURT:  Mr. Hahn, cross-examination.
 7              MR. HAHN:  Thank you, Your Honor.
 8                           CROSS-EXAMINATION
 9    BY MR. HAHN:
10    Q.   I guess it's good morning, Dr. Antognini.
11    A.   Good morning.  Are you able to hear and see me?
12    Q.   You're coming through loud and clear, doc.
13         So I'm not going to spend a whole lot of time talking to you
14    today, because I know we spent a while back during the Grayson
15    evidentiary hearing.  And my understanding from listening to
16    your direct testimony here is that you -- apart from some typos
17    in any transcripts, you stand by all the testimony that you
18    provided in that hearing?
19    A.   Yes.
20    Q.   Okay.  And that would include your responses to my
21    cross-examination?
22    A.   Yes.
23    Q.   All right.  So the first question is, since the Grayson
24    hearing, have you testified in any execution-related litigation?
25    A.   Since the Grayson execution?
```

1   Q.  I guess since -- since you testified in the Grayson hearing.

2   I apologize.

3   A.  Oh, okay.  I'm sorry.  I would have to refer to my report.

4   I believe the Georgia case that I have listed there, I believe I

5   testified in Georgia.  That would have -- I guess May, I think.

6   Q.  And, doctor, just to -- and I think that if we were to look

7   at paragraph seven of your affidavit, the last one that you list

8   was Grayson v. Hamm.  And I'm not trying to trick you.  I don't

9   think there was anything beyond that, but I just wanted to

10  clarify.  If that's in your affidavit, would that be -- would

11  that sound accurate?

12  A.  Well, I seem to recall that I -- I think maybe what

13  happened, perhaps why my thinking is a little bit -- or my

14  chronology might be a little bit different than listed there, I

15  think I submitted my report in that Georgia case maybe before

16  the Grayson hearing, but I testified in the Georgia case I think

17  after the hearing.  So the chronology may be a little bit not

18  quite right there in that regard.

19  Q.  But it was the same case that you listed in your report?

20  A.  Yes.

21  Q.  Okay.

22  A.  Yes.

23  Q.  That's all I was curious about.  No new clients or no new

24  defendants that you've taken on in the execution context since

25  the Grayson evidentiary hearing?

1  A.  Well, I have, but it's not gotten to the point of a

2  deposition or testifying.

3  Q.  Perfect.  All right.  I appreciate that, Dr. Antognini.

4      Have you ever witnessed a suicide by nitrogen hypoxia?

5  A.  No.

6  Q.  Have you ever looked at a video of a suicide by nitrogen

7  hypoxia?

8  A.  I don't think so.  And the reason why I'm sort of not -- I'm

9  not trying to -- there was a paper that was done -- that was

10 written a number of years ago that was related to hanging that

11 I -- they looked at videos, but I don't think they had the

12 videos.  So I'll say yes, I have not seen a video of a nitrogen

13 hypoxia suicide or an inert gas suicide.

14 Q.  And have you ever witnessed an inert gas asphyxiation of any

15 kind?

16 A.  No.

17 Q.  And let's see.  You testified on direct that you have

18 witnessed one execution?

19 A.  Yes.

20 Q.  And can you tell us a little about when did that happen?

21 A.  It was almost exactly three years ago.  It was in late

22 January.  It was an Oklahoma execution.  That was in 2022.  And

23 the inmate was Grant.

24     There were two Grants that were executed.  One was John

25 Grant.  The other one was Donald Grant.  One was in October of

1  '21, I think, and the one I observed was in January of '22.  And

2  I'm sorry, because they have the same last name, I'm not sure

3  which one it was, but it was the one in January of 2022.

4  Q.  And the method of execution that Oklahoma used at that time,

5  was that a three-drug protocol?

6  A.  Yes.

7  Q.  And were the three drugs midazolam first?

8  A.  Yes.

9  Q.  Okay.  And was it a 500-milligram bolus of midazolam

10 delivered intravenously?

11 A.  Yes.

12 Q.  Okay.  And you've worked with the State of Alabama or the

13 Department of Corrections on lethal injection litigation in

14 Alabama; right?

15 A.  I'm not sure I've done lethal injection litigation in

16 Alabama.  I'd have to review my files.  I don't think lethal

17 injection was part of what I've done with Alabama.

18 Q.  Okay.  And I won't hold you to it, but you are familiar that

19 Alabama, for lethal injection, uses a three-drug protocol

20 similar to Oklahoma's?

21 A.  Yes.

22 Q.  And in your past testimony, you said you are no longer a

23 practicing anesthesiologist?

24 A.  That's correct.  I'm not doing anesthesia anymore.

25 Q.  And since you testified in Mr. Grayson's case, have you

1  induced anesthesia in a patient?

2  A.   No.

3  Q.   And I know your report in Grayson, which is in the record,

4  and your report here, which is in the record, both indicate a

5  fee schedule.  And they're fairly similar, but it looks like

6  your fee has increased slightly since Mr. Grayson's case.  Is

7  that fair?

8  A.   Yes.

9  Q.   All right.  I think -- I think it went up --

10  A.   I'm sorry.  That was on --

11  Q.   You're it.

12  A.   That was on the recommendation of the company that sort of I

13  work for or work with, I suppose, just, I guess, based on

14  overall inflationary factors.  I don't know.  That's why.

15  Q.   All right.  So the folks who sort of hook up expert

16  witnesses with litigants suggested you were undercharging?

17  A.   Yes, basically.  Not undercharging, but they just said, this

18  is the new fee schedule that we propose, and I said, okay.

19  Q.   All right.  So in your report in this matter, you talked

20  about -- and I'm going to look at paragraph nine of your

21  declaration here or your affidavit.  Declaration of Joseph

22  Antognini.

23          THE COURT:  And which exhibit is this, again?

24          MR. HAHN:  I'm trying to figure that out, Your Honor.

25  71.  Exhibit 71.

1  Q.  And it's at page 6.  It's paragraph nine, Dr. Antognini.

2  A.  I have it up here.  Hold on.  Let me get to the right

3  paragraph.  Yes, I have paragraph nine.

4  Q.  All right.  Does it remain your opinion -- in here you

5  say -- let me ask you this:  You say in here that the inmate

6  will quickly become unconscious, within 30 to 40 seconds after

7  the inspired nitrogen is greater than 90 percent and the inmate

8  is inhaling, i.e., there is no breath holding.  Is that still

9  true?

10  A.  Yes.

11  Q.  Okay.  And in reaching your conclusions here, you relied on

12  certain witness observations of prior executions.  And I'm going

13  to ask you to look at paragraph 30 of Exhibit 71, which is page

14  18 of your declaration.  When you get there, please let me know.

15  A.  Yes, I have page -- I'm sorry.  Which paragraph?

16  Q.  Paragraph 30 on page 18.

17  A.  Yes.  Thank you.  Yes, I have paragraph 30 here.

18  Q.  All right.  And did you -- this appears to be very similar

19  to a paragraph in your Grayson affidavit in that you had an

20  affidavit from Brandon McKenzie, captain on the execution team,

21  and used that in some fashion in formulating your opinion.

22  A.  Yes.

23  Q.  Okay.  Between the time that you wrote the Grayson report

24  and testified in Mr. Grayson's hearing and writing this report,

25  did you have an opportunity to review Captain McKenzie's

1   testimony from the Grayson hearing?

2   A.   I did review the testimony yesterday or the day before -- I

3   guess it was yesterday, I'm not sure -- from the Grayson

4   hearing.  I primarily focused on my testimony.  I don't know

5   whether I saw the testimony of McKenzie.  I don't recall.

6   Q.   But you did not -- can you say with confidence here that you

7   did not review that testimony before drafting this declaration?

8   A.   That's correct.  I did not review the testimony before

9   drafting this.

10  Q.   Okay.  So you relied solely on his affidavit, written

11  statement, regarding that Smith execution?

12  A.   Yes.

13  Q.   So I know we talked probably ad nauseam about midazolam at

14  the last hearing, and I'm going to try to limit myself here to

15  maybe a couple of questions just to hit some highlights.

16       You have testified in the past that 500 milligrams of

17  midazolam, delivered as a bolus -- that is, one large injection

18  at once, not a drip intravenously -- is sufficient to induce

19  unconsciousness in a person; is that right?

20  A.   Yes, that's correct.

21  Q.   And that it is -- in that case, it is such a high dose that

22  it will prevent you from -- prevent a person who receives it

23  from appreciating or experiencing a noxious stimulus; is that

24  right?

25  A.   That is correct.

1  Q.  And that noxious stimulus could include something like the

2  second drug in the three-drug protocol, which is a paralytic;

3  right?

4  A.  Yes, although I would disagree, I think, with considering

5  that to be a noxious stimulus, the second drug.  But it would

6  prevent the person from feeling the effects of the second drug.

7  Q.  And so they would not be aware -- and just so we're clear,

8  the second drug is a paralytic which paralyzes all of the muscle

9  groups in the body?

10 A.  Yes.

11 Q.  Including the diaphragm?

12 A.  Yes.

13 Q.  Okay.  And so it will stop your breathing if given in a

14 large enough dose?

15 A.  Yes.

16 Q.  And it would prevent -- would you consider an injection of

17 potassium chloride to be a noxious stimuli?

18 A.  Yes.

19 Q.  And that is the third drug in these three-drug protocols?

20 A.  Yes, it is.

21 Q.  And even though a person who -- let's subtract out the

22 paralytic.  Let's say the paralytic is not on board.  Would the

23 500 milligrams of midazolam be sufficient to prevent any sort of

24 sensation of the potassium chloride alone?

25 A.  It would prevent what I would consider to be the conscious

1    sensation.  Because the person's unconscious, they're not going

2    to have the normal sort of perception of that stimulus that a

3    conscious person would have.  The --

4    Q.  And -- sorry.

5    A.  If I may just finish that.

6        The person with a reflex from the potassium chloride -- or

7    you might see an increase in heart rate and so forth from the

8    potassium chloride because of that noxious stimulus, which can

9    happen, for example, during surgery with a stimulation, but I

10   don't believe that they have a conscious perception of that.

11   They're not having pain if they receive 500 milligrams of

12   midazolam followed by the potassium chloride.

13   Q.  And, doctor, that is consistent with you -- you recall --

14   you testified concerning an execution involving a gentleman by

15   the name of Donnie Johnson who was up in Tennessee.  And I know

16   we talked about it a little bit in your last testimony last time

17   around.  I just want to ask you a couple of questions about

18   that.  I'll represent to you that we discussed the fact that

19   Mr. Johnson received a 500-milligram intravenous dose of

20   midazolam, and that witnesses -- you recounted witnesses

21   described him as making gurgling, snoring, gasping, and

22   high-pitched ah sounds.  And you explained those sounds were

23   "totally consistent with someone who is breathing through a

24   partially obstructed airway."  Do you recall that?

25   A.  Yes.

1  Q.  Okay.  And you provided that in a declaration in an Ohio

2  case concerning a Tennessee execution.  But you noted in that

3  declaration that because of the midazolam, any such obstructed

4  breathing would not be painful; is that correct?

5  A.  Yes.

6  Q.  Okay.  And so would -- I know you testified that midazolam

7  can cause an obstructed airway.  Can you give us your opinion as

8  to whether you think that's what happened with Mr. Johnson?

9  A.  Well, it sounds like it, based on the description of the

10 gurgling and the snoring.  Again, I'm not sure exactly what

11 words were used, but the words that were used to describe that,

12 someone used to describe that, is consistent with somebody who

13 has a partially obstructed airway.  So, yeah, that -- that's

14 consistent.

15 Q.  Okay.  And ultimately if you have a partially obstructed

16 airway, you are still breathing; right?

17 A.  That is correct.

18 Q.  Okay.  So if, for example, Mr. Frazier were to be given a

19 500-milligram bolus of midazolam and it caused a partially

20 obstructed airway, he could still inhale nitrogen while

21 unconscious?

22 A.  He could, yes.

23 Q.  And do you have any reason to believe that the partially

24 obstructed airway would slow down his death?

25 A.  In general, I would say probably not.  I could give a

1  scenario where I suppose it might slow down his death a little

2  bit, but not by much.  I mean, with an obstructed airway, you're

3  going to become hypoxic anyway, even in the absence of nitrogen.

4  Q.  And the only difference between a person who is given the

5  500 milligrams of midazolam before an execution and a person who

6  is not is that the person who is not is going to be conscious at

7  the start.

8  A.  That's correct.  If someone's getting 500 milligrams of

9  midazolam, they're going to be, in my opinion, unconscious.

10 Q.  It could even be fatal; right, doctor?  It could even be

11 fatal --

12 A.  Yes.

13 Q.  -- that dose?

14 A.  Yes.  500 milligrams could be fatal.

15 Q.  And how long would that 500 milligrams of midazolam or

16 whatever was actually taken in by the body at that level, how

17 long would it remain in effect, causing unconsciousness in a

18 person?

19 A.  I would say -- I would probably say between maybe 20, 30, 40

20 minutes.  It's kind of hard to off top of my head give you a

21 figure more accurate than that.  And there's a lot of reasons

22 why, because of the kinetics of the drug, and it's a large dose

23 and so forth.  It could even be longer than that 40 minutes.

24 Sorry.  I can't really do more than that.

25 Q.  That's fine.  It's more than 15 minutes that the nitrogen

1  would be flowing?

2  A.   That's correct.  I think so.  I think that's accurate.

3  Q.   Have you ever, while providing anesthesia to a patient, seen

4  one of them lift both of their legs up the way Dr. McAlary

5  described?

6  A.   Yes.

7  Q.   And what was that all about?  What happened?

8  A.   Well, movement can occur during surgery in all extremities.

9  I've seen people lift their head up.  I've seen people try to

10  lift their torso up.  I've seen people bring their arms across.

11  I've seen the leg movement as I described earlier.  Pretty much

12  everything.

13  Q.   So, doctor, if I could just ask you, let's get specific with

14  the legs.  You've seen somebody lift both of their legs

15  together, with the ankles together, up to a 45-degree angle,

16  hold that position, and then slowly lower them down?

17  A.   Well, I'm not sure I've seen that.

18  Q.   Okay.

19  A.   No.

20  Q.   So not exactly like Dr. McAlary observed.

21  A.   No, I don't think I've ever observed someone do that.

22  Q.   All right.  And just briefly, Exhibit 29, I believe, was the

23  assessment of -- or the analysis of various suicides that were

24  videotaped, I believe; is that right?

25  A.   Yes.  I'm not sure they were videotaped, but they were

1  observed.

2  Q.  Okay.  I know that in table 3, there was a footnote that

3  talked about how the videotape had to be changed during the

4  process.

5  A.  I suppose you're right.  There was a videotape then.

6  Q.  I inferred from that that they had used videotape throughout

7  all of them, since they were making reference to one of the

8  videotapes being interrupted.  Would that be fair?

9  A.  Yes.  I think you're right, then.  I apologize.  I mis -- I

10 didn't remember correctly on that.

11 Q.  No problem, doctor.  I've got the exhibits folder or the

12 binder, and it's as long as my arm.

13     But those -- so then those were all videotaped, and then

14 medical professionals who were writing this journal article

15 assessed what occurred while reviewing those videotapes; is that

16 right?

17 A.  You know, it's a good question.  I'm guessing that's what

18 they did.  Let's see if I --

19     May I refer to that paper?

20 Q.  Please.  Absolutely.

21 A.  I guess that's probably what they did.  I'm not sure it's

22 explicit that they say they reviewed the videotape, but it would

23 make sense that they probably did, especially since they have

24 these times that are very accurate.  So I'm going to -- I would

25 imagine that they did review videotapes and so forth.  Yes.  I

1  think that's probably right.

2  Q.  All right.  And to your knowledge, has a nitrogen hypoxia

3  execution ever been videotaped?

4  A.  To my knowledge, no.

5  Q.  And you have never witnessed a nitrogen hypoxia execution?

6  A.  No.

7  Q.  Okay.  Have you interviewed witnesses following a nitrogen

8  hypoxia execution to get their observations?

9  A.  No.

10  Q.  All right.

11         MR. HAHN:  If I could have just one moment, Your Honor.

12     (Brief pause in the proceedings)

13         MR. HAHN:  That's all.  Thank you, Your Honor.

14         THE COURT:  Any redirect?

15         MS. SIMPSON:  One moment, Your Honor.

16     (Brief pause in the proceedings.)

17         MS. SIMPSON:  Very briefly, Your Honor.

18                      REDIRECT EXAMINATION

19  BY MS. SIMPSON:

20  Q.  Doctor, you testified as an expert witness in the Grayson

21  litigation; correct?

22  A.  Yes.

23  Q.  Did you observe or listen to all of the testimony during

24  that hearing?

25  A.  I think so.  I'm not sure if I listened to anything after I

 1  had testified.  I can't remember exactly everything, but a lot

 2  of it.

 3  Q.  Do you remember that Brandon McKenzie testified in Grayson?

 4  A.  Yes.  Yes.  Actually, now I'm -- I do.  Yes, I do.

 5  Q.  Okay.  And, doctor, are you familiar with lethal injection

 6  protocols in general from your work as an expert witness?

 7  A.  Yes.

 8  Q.  To your knowledge, when an inmate in a lethal injection is

 9  given midazolam, is he conscious or unconscious?

10  A.  When he is given midazolam, he's conscious.

11  Q.  So he's conscious at the start of the execution?

12  A.  That is correct.  When the midazolam is first injected, as

13  it's just starting to go in, right before it goes in, yes, the

14  inmate is conscious and then becomes unconscious after the

15  midazolam goes in.

16          MS. SIMPSON:  Nothing further, Your Honor.  Thank you.

17          THE COURT:  All right.  Any recross?

18          MR. HAHN:  No, Your Honor.  Thank you.

19          THE COURT:  All right.  Thank you, Dr. Antognini.

20          THE WITNESS:  Thank you.

21          THE COURT:  Let's talk about logistics for a moment.

22  It's now 12:09.  How many more witnesses does the State

23  anticipate calling?

24          MS. KENNY:  Your Honor, we have about six here;

25  however, we need to assess the -- which ones we feel like we

1    need to call.  We do anticipate calling at least one more.

2         THE COURT:  All right.  Am I hearing you say we need to

3    take a recess for you to make that determination?  I guess my

4    options are we can just continue to go or take a lunch break or

5    take a brief recess for you to make that determination.

6         MS. KENNY:  If it's okay with Your Honor, if we could

7    have about ten minutes, brief break, we will let you know when

8    we come back if we anticipate that we're going to call multiple

9    witnesses or just one.

10        THE COURT:  All right.  And if you all can confer

11   about --

12        MS. KENNY:  Yes, Your Honor.

13        THE COURT:  -- if we need a break, how lengthy.  I'm

14   not a lunch person.  I'm happy to plow forward.  I'm not asking

15   for a lunch break.  I'd like to keep going.

16        MS. KENNY:  Yes, Your Honor.

17        THE COURT:  But if there's a reason why somebody needs

18   a lunch break, I'm happy to consider that.

19        MR. HAHN:  I told Mr. Brown that yesterday, Your Honor.

20   I said, prepare for this.  Judge Marks is not a lunch person.

21        THE COURT:  I'm not a breaker.  I'll continue until

22   somebody tells me somebody's at the point of exhaustion.  I

23   don't want to do that to anybody, but let's make good efficient

24   use of our time.

25        MR. HAHN:  We're not there yet, Judge.

```
 1              THE COURT:  It's ten after.  Let's reconvene at 12:20.
 2       (Recess was taken from 12:10 p.m. until 12:21 p.m., after
 3         which proceedings continued, as follows:)
 4              THE COURT:  I see a witness is taking the stand, which
 5    tells me you do not want to break for lunch.
 6              MS. SIMPSON:  No, Your Honor.  We have one witness, and
 7    he probably won't be that long on the stand.
 8              THE COURT:  The defense will call its next witness.
 9              MS. SIMPSON:  Defense calls Commissioner John Hamm.
10                          JOHN Q. HAMM
11         The witness, having first been duly sworn to speak the
12    truth, the whole truth and nothing but the truth, testified as
13    follows:
14                        DIRECT EXAMINATION
15    BY MS. SIMPSON:
16    Q.  Sir, would you please state your full name.
17    A.  John Hamm.
18    Q.  What is your occupation or title?
19    A.  Commissioner of the Alabama Department of Corrections.
20    Q.  Commissioner Hamm, Mr. Frazier has alleged in his complaint
21    that the protocol has been changed at least twice since its
22    adoption in August of 2023.  Do you agree or disagree with that
23    statement?
24    A.  I disagree.
25    Q.  Why do you disagree?
```

1   A.  Because I have not authorized a change to the protocol.

2   Q.  Who is authorized to change the protocol?

3   A.  I am.

4   Q.  Only you?

5   A.  Yes, ma'am.

6   Q.  Okay.  Commissioner, were you a witness at Mr. Grayson's

7   execution?

8   A.  Yes, ma'am.

9   Q.  And you have witnessed other executions in your role as

10  commissioner; correct?

11  A.  Correct.

12  Q.  Where do you sit for an execution?

13  A.  In the commissioner's viewing room or ADOC viewing room,

14  which is the middle viewing room.

15  Q.  So what is your view of the inmate?

16  A.  I'm looking at his feet up to his head.

17  Q.  Okay.  Now, when you entered the viewing room, were you able

18  to see what was going on in the execution chamber itself?

19  A.  Yes, ma'am.

20  Q.  What did you observe?

21  A.  Inmate strapped to the gurney with his mask on.

22  Q.  Was this before or after the actual execution began?

23  A.  This was before.

24  Q.  Was the inmate saying anything, moving at that time?

25  A.  He was moving around, and he was saying some words, but I

```
 1  cannot hear what he's saying.
 2  Q.  Okay.  At some point, did the warden read the death warrant?
 3  A.  Yes, ma'am.
 4  Q.  Can you describe how that went.
 5  A.  Yes, ma'am.  The warden read the death warrant.
 6  Q.  Okay.  Did he give the inmate the chance to make any last
 7  words following that?
 8  A.  Yes, ma'am.  After he reads the death warrant, then he asks
 9  for any last words from the inmate.
10  Q.  Did the inmate make any last words?
11  A.  Yes, ma'am.
12  Q.  And what did he say?
13  A.  You want me to quote?  From what I --
14  Q.  You can paraphrase if you like.
15  A.  It was a lot of profanity directed at the warden and the
16  staff.
17  Q.  Did he make any movements at this time?
18  A.  Yes, ma'am.  He was moving his body around under the
19  restraints, and he was shooting birds or the middle finger
20  extended up on both hands.
21  Q.  Did he continue to shoot the birds for the duration of the
22  execution, or did he stop that at some point?
23  A.  No, ma'am.  He stopped, and then he did it one more time, to
24  my knowledge.  And then after the execution was going, he did
25  not anymore.
```

1  Q.  Okay.  After the warden read the warrant and Mr. Grayson

2  said his last words, what happens next?

3  A.  After the warden reads the warrant, says -- the inmate given

4  a chance to say last words, the warden exits the chamber.

5  Q.  Okay.  Does the nitrogen begin flowing immediately at that

6  point?

7  A.  No, ma'am.

8  Q.  So there is a gap in time.

9  A.  Absolutely.

10  Q.  Did you observe Mr. Grayson in this period after the warden

11  left the chamber?

12  A.  Yes, ma'am.

13  Q.  Was he saying anything or moving?

14  A.  He was saying some words, but, again, without the microphone

15  to him, I could not understand what he was saying.  And, yeah,

16  he was moving his hands and trying to move his arms.

17  Q.  Did he try to move his head?

18  A.  Yes, ma'am.  He moved his head from side to side pretty

19  vigorously.  In my opinion, he was trying to dislodge the mask.

20  Q.  Did his spiritual advisor minister to him at some point?

21  A.  Yes, ma'am.

22  Q.  Did he move during that period as well?

23  A.  I mean, he -- yes, ma'am.

24  Q.  Okay.  At some point, did you authorize the execution to

25  proceed?

1   A.  Yes, ma'am.  After the warden reads the death warrant, exits

2   the chamber, after some period of time the warden comes over the

3   intercom and asks me if he may proceed.

4           MS. SIMPSON:  Nothing further, Your Honor.  Thank you.

5           THE COURT:  All right.  Cross-examination?

6           MR. HAHN:  No, Your Honor.

7           THE COURT:  All right.  You can step down.  Thank you.

8           All right.  There are no further witnesses by the

9   defendant?

10          MS. POLLY:  That is correct, Your Honor.  We do have

11  some exhibits we would like to offer at this time.

12          THE COURT:  Yes.

13          MS. KENNY:  We would like to offer Exhibits 68 through

14  78.

15          MR. HAHN:  If I could just have a moment.

16          No objection to 68 through 78 on document 39, their

17  list of additional defendant's exhibits.

18          THE COURT:  All right.  Those exhibits are admitted.

19          You have a lot of exhibits that have been provided.

20  Are you offering all of those exhibits, or just for the purposes

21  of the motion for preliminary injunction should the Court

22  consider only the exhibits that have been offered and admitted

23  today?

24          MS. KENNY:  In addition to the Grayson exhibits that we

25  provided and were admitted in the Grayson hearing.  So I know

1  that our exhibit list was a little bit confusing.  We tried to

2  put the PACER numbers to the right to make it clear which --

3  because we had a lot of exhibits marked in Grayson as well that

4  we did not offer and use.  And so the ones with the PACER number

5  are, obviously, the ones that were offered and admitted.  So we

6  would ask Your Honor to consider those as well as the ones that

7  we have offered here today.

8            THE COURT:  And those are all of the ones in document

9  39, that are listed out in document 39?

10           MS. KENNY:  Yes, Your Honor.

11           THE COURT:  All right.

12           MR. HAHN:  Just for clarification on that last bit,

13  Your Honor, because we're working from two records, I believe

14  the first 64 are from the Grayson hearing, and I believe they've

15  only moved to admit 68 through 78 from page 7 of doc 39, if I'm

16  right.

17           And then, Your Honor, we would just note that our

18  document 42, which lists -- I believe you have already admitted

19  the ones that were not admitted at Grayson.  We're relying on

20  all of those exhibits, and we have the confidential and highly

21  confidential on all of them in PDF, separate PDF format, on a

22  thumb drive here that we will provide to the Court.

23           THE COURT:  So all of the exhibits in document 42 are

24  offered.  Have I admitted those yet?

25           MR. HAHN:  Some of them, Your Honor, but maybe --

```
 1            THE COURT:  You're offering them all?

 2            MR. HAHN:  I am offering them all, Your Honor, please.

 3            THE COURT:  Any objection?

 4            MS. KENNY:  Your Honor, I'm a little bit confused, so I

 5   have to figure out which ones --

 6            THE COURT:  I am as well.

 7            MS. KENNY:  I need to know what they are.

 8       (Brief pause in the proceedings)

 9            MS. KENNY:  So to the extent they are exhibits that

10   were admitted in Grayson, we have absolutely no objection per

11   our agreement.

12            THE COURT:  All right.  And that would include all of

13   the exhibits that have been offered in document 42?

14            MR. HAHN:  That is correct, Your Honor.

15            THE COURT:  All right.  Those exhibits are admitted.

16            MR. HAHN:  Thank you.

17            THE COURT:  In looking at document 39, I've admitted

18   Exhibits 68 through 78.  Are those the only exhibits the Court

19   should consider?  Specifically, I'm asking about 65 through 67,

20   79 through 82.

21            MS. KENNY:  Your Honor, because I did ask Dr. McAlary

22   questions about Exhibit 79, I think it would be appropriate for

23   us to offer that one as well.  However, we are not offering --

24   just to be clear, I'll list what we're not offering.  We're not

25   offering Exhibits 65, 66, and 67, nor are we offering Exhibit 81
```

1    or 82 or 80.  I'm sorry.  80, 81, 82.

2            MR. HAHN:  Your Honor, my only concern with regard to

3    Exhibit 79 is that it contains social security numbers and dates

4    of birth of folks, and I would hope that we could redact those.

5    Subject to redaction, we would have no objection to that.

6            THE COURT:  All right.  Subject to redaction, I will

7    admit document 79 referenced in the exhibit list in document 39,

8    page 7.

9            Any other exhibits to be offered?

10           MR. HAHN:  No, Your Honor.  Thank you.

11           THE COURT:  Any further from the defendants?

12           MS. KENNY:  No, Your Honor.

13           THE COURT:  All right.  Mr. Hahn, you have the burden

14   on the motion, so let me hear from you.

15           MR. HAHN:  Yes, Your Honor.  Thank you.  I'll be brief.

16   There was a lot of argument and testimony in Mr. Grayson's case

17   that I won't repeat.  I understand Your Honor read the

18   transcripts there.

19           I'll simply get up and say that today we heard

20   testimony from a witness to the execution of Carey Grayson that

21   there were what appeared to be conscious and purposeful

22   movements for several minutes after nitrogen began to flow, and

23   that seems to butt up against Dr. Antognini's research-based

24   opinion that a person will lose consciousness within 40 seconds.

25           THE COURT:  Isn't it undisputed, though, in the

1   testimony that we're not talking about physical pain?  This is

2   only psychological pain?

3          MR. HAHN:  I believe that it is.  I think it was

4   undisputed in Grayson, and it's undisputed here.  And then when

5   we went to the Eleventh Circuit and we pointed out that that

6   language was a little loose in the District Court -- or the

7   Court's opinion, which it had to be because it was quick, they

8   clarified that psychological pain is covered under the Eighth

9   Amendment.

10          THE COURT:  Right.  I'm just asking you factually and

11  asking you for clarification of what your claim is.  Do you

12  acknowledge that the only pain that we are talking about here is

13  psychological?  It is not physical pain?

14          MR. HAHN:  Based on the evidence that we have right

15  now, yes, Your Honor.

16          THE COURT:  Okay.  And then based on that, for

17  clarification, your motion for preliminary injunction is really

18  cabined to what your claim is in Count 1 in the complaint.

19          MR. HAHN:  Yes, Your Honor.

20          THE COURT:  We're not talking about Count 2.

21          MR. HAHN:  Correct.

22          THE COURT:  Why didn't you file this lawsuit earlier?

23          And let me clarify my question.  Your claim about this

24  nitrogen hypoxia protocol violating the Eighth Amendment is

25  based on the protocol that was released in August of 2023.  Why

1  didn't you file the lawsuit around or right after August of

2  2023?  It was ripe then; correct?

3          MR. HAHN:  Yes, Your Honor.

4          And I'll start with, we are within the two-year statute

5  of limitations.  I just want to note that.

6          THE COURT:  Right.  We're talking about the equities

7  here.

8          MR. HAHN:  Absolutely.  Yes, Your Honor.  But I just

9  wanted it to be clear that we were -- yes.

10          I would suggest that the -- and I can't say that I'm

11  speaking for everyone here, but I would suggest that the more

12  noise a person makes who is on death row and out of court, the

13  more trouble they cause, whether it be legal or otherwise, the

14  more likely they are to have a date requested for them.  So

15  there are people who will say, I don't want you to do anything

16  on my case to make anybody over there at the Attorney General's

17  office aware that I am here waiting for an execution.  And so

18  there are some concerns about the squeaky wheel gets the grease,

19  or if you lift your head up, you lose it.  And so there are

20  reasons for not filing immediately.

21          There were also reasons to wait and see what happens

22  with the protocol if somebody else is ahead of you to see how it

23  actually works in practice.

24          THE COURT:  Right, but let me go back to the complaint.

25  In the complaint, Mr. Frazier is requesting extraordinary relief

1  in this motion, injunctive relief, to maintain the status quo

2  until this case can be fully litigated.  How are you coming to

3  Court asking for equitable relief to give you time to do

4  something that you don't have the time to do because you

5  purposefully waited until the last minute to file the lawsuit?

6  In other words, you've created this time crunch.  And because

7  there's a time crunch, you're asking for extraordinary relief.

8          MR. HAHN:  Right.  So, first, I do want to say -- you

9  said purposefully.  I would not necessarily say that we

10  purposefully did it.  I won't concede that we purposefully did

11  it.  But there are strategic --

12          THE COURT:  Well, there has to be a purpose.

13          MR. HAHN:  Yes, Your Honor.  There are strategic

14  reasons for why people file things at certain times and why a

15  lawsuit might get filed here or there in any litigation and when

16  you talk to a client and you figure things out and you work your

17  way through stuff.

18          I will say this.  The relief we're seeking in the

19  preliminary injunction motion is essentially twofold.  There are

20  two.  And the lesser relief that we seek is that this Court

21  order that the Department of Corrections provide a 500-milligram

22  bolus of midazolam to Mr. Frazier before they execute him by

23  hypoxia.  And that's it.  We're not asking the Court to forbid

24  them from executing them.  We're simply saying, if the case

25  can't get to trial -- which, again, that would weigh against us,

1    the fact that the case cannot get to trial in time because we

2    did not file in August of 2023.  But the fact is we are asking

3    that this Court say, fine.  There's enough here, enough concern

4    here with regard to testimony about consciousness and the like,

5    that it appears it will do no harm to the State to order that

6    Mr. Frazier receive an injection that he would have gotten under

7    lethal injection before he is -- and they have the expertise to

8    do it.  They can deliver that dose.

9         And we heard from Dr. Antognini today that a person who

10   had a partially obstructed airway or any sort of noxious

11   stimulus would not -- or what he described as a non-noxious

12   stimulus, the paralyzing of the diaphragm, lack of ability to

13   breathe -- would not perceive or be aware of that.

14        So we have a simple, straightforward option here that

15   when you look at it in that regard, I think that the equities

16   are a little bit less against us in terms of the delay.  We are

17   not seeking broad relief, a declaration today or tomorrow that

18   the protocol itself is unconstitutional in all aspects or

19   whatnot.  That's for another day if we get there.  But what we

20   are asking for is that Mr. Frazier be given the opportunity to

21   be unconscious when he is subject to nitrogen.

22        THE COURT:  Doesn't the evidence establish that he

23   could go to a treating physician and seek medication that would

24   help reduce any anxiety or psychological distress aside from the

25   protocol?

1          MR. HAHN:  I'll say this.  That to the extent that

2    medical professionals would allow for that to occur, it does not

3    seem to me that relieving anxiety alone -- and Dr. Antognini

4    talks about this a little bit in his affidavit, and Dr. McAlary

5    got into this a little bit in Grayson, that there is inherently

6    going to be anxiety in any execution, no matter what it is.  And

7    so whether or not a person gets an anxiolytic to deal with

8    ordinary anxiety is different from whether a person is conscious

9    while they're experiencing the deprivation of oxygen.  So to the

10   extent that the 500 milligrams we know will work -- according to

11   their expert, we know it will work -- that is something that

12   cannot be prescribed.

13          You heard Dr. Antognini talk about -- and I think in

14   his report he also talks about that it is substantially larger

15   than a medical dose.  It is 100 to 150 times the size of a

16   normal medical dose.  And so what we're talking about here is

17   not medical at all.  It is execution.  And there is a different

18   protocol for execution by midazolam than there would be for

19   inducing anesthesia or reducing anxiety in a patient who is

20   going in for a procedure.

21          So it is qualitatively different than a medical

22   professional making a judgment.  This is us saying, let's use

23   part of the lethal injection protocol and import it into the

24   nitrogen protocol.

25          THE COURT:  Isn't that inconsistent with his previous

1   lethal injection litigation?

2          MR. HAHN:  Well, Your Honor, his previous lethal

3   injection litigation concerned the three-drug protocol, and what

4   he said was, midazolam does not work as advertised.  It will not

5   prevent him from being conscious for purposes of the second and

6   the third drugs.  And we said, the better option is either

7   nitrogen hypoxia or midazolam alone, because midazolam alone

8   will kill you.

9          What we're presenting here -- and while that lawsuit

10  was pending, the legislature passed a law that said, we're going

11  to allow nitrogen hypoxia, and that case settled.  And part of

12  the settlement was he can challenge this protocol.

13         And he's not saying, lethally inject me.  If he were

14  saying that -- and I think that there could be an equities

15  argument if he came in and said, I want to switch back.

16         THE COURT:  But isn't he?  You just said a

17  500-milligram bolus of midazolam could be lethal.  If it is, he

18  will have been executed by lethal injection; correct?

19         MR. HAHN:  Yes, Your Honor, just as -- but that is the

20  same as if they put the mask on and they caused the nitrogen to

21  flow, and within the first 30 seconds, before it's even taken

22  effect, he has a heart attack.  You wouldn't say that it wasn't

23  an effective nitrogen hypoxia.  He was being executed by

24  nitrogen hypoxia.

25         He could die as a result of that 500 milligrams.  We

1    don't know how long it would take.  We do know that it will

2    prevent the noxious stimuli from being appreciated or the

3    psychological torment from being appreciated, and that it would

4    not extend the time for the execution beyond -- appreciably

5    extend the time, according to Dr. Antognini.

6            THE COURT:  How do you -- or how would you suggest that

7    the Court quantify what psychological distress is inherent in an

8    execution versus psychological distress because of this

9    particular method of execution?  What about the nitrogen hypoxia

10   protocol creates a level of psychological distress that rises to

11   the level of an Eighth Amendment violation?

12           MR. HAHN:  Well, Your Honor, it's not necessary for a

13   person to be conscious when the nitrogen is provided, and it is

14   necessary for a person to be conscious for the first drug in the

15   three-drug protocol.  For the prick of the -- of setting the IV

16   line, that is necessary.  That's not superadded in any way.

17           But the fact is, having seen the reactions that these

18   prisoners are having, which is, they're remaining conscious

19   longer than Dr. Antognini thought they would and still thinks

20   they would -- he thinks 40 seconds is the outer limit for

21   consciousness after nitrogen begins being breathed, and the

22   facts on the ground just don't support that.

23           And so our take is that if you are aware that you are

24   not receiving oxygen for an appreciable time -- and I would say

25   probably longer than the 40 seconds that he says is the max if

1   this is done correctly -- that is psychological torment.

2   Knowing that you cannot breathe, that you're not receiving

3   life-sustaining oxygen, is a torment.

4          And that's different from injecting someone or hooking

5   up electrodes for an electrocution.  Those are all part and

6   parcel.  And they don't -- they are ordinary, attendant

7   circumstances, and they are just -- they're no different than

8   being afraid of going to the doctor and having an injection.

9          This is, however, the equivalent of going to the doctor

10  and having them say, we're going to cut this thing off your arm.

11  I don't feel like numbing it today or doing any of that.  I

12  mean, you would say that's cruel.  That's wrong.  We should do

13  the thing that we can do to ensure that that doesn't happen.  So

14  some people may have white coat syndrome.  They go to the

15  doctor, they have high blood pressure --

16         THE COURT:  But in that scenario, there is the

17  sensation of the cut.  Here I have testimony that there is no

18  sensation of suffocation because breathing continues.  There's

19  just the oxygen levels are reduced to the point that the inmate

20  becomes unconscious.

21         MR. HAHN:  I think what we have is not necessarily

22  testimony that there is not suffocation, Your Honor.  I think

23  what Dr. Antognini took issue with was the broad use of the term

24  conscious suffocation.  And what he said was that there are

25  different types of suffocation.  And I could be wrong, but I

1   believe he talked about manual strangulation.  He talked about

2   basically being -- having a pillow over your face.  But he said

3   reduction of oxygen levels can also cause and result in

4   suffocation.

5          THE COURT:  Right.  He talked about scenarios where an

6   individual is being suffocated, and they're unable to breathe.

7   They have the sensation of not being able to breathe.  But that

8   with nitrogen hypoxia, there is no sensation of being unable to

9   breathe because the individual is, in fact, breathing.  They're

10  just not breathing enough oxygen.  So you don't have -- that's

11  why we're talking about only psychological pain, not physical

12  pain; correct?

13         MR. HAHN:  That is correct.

14         THE COURT:  Okay.  So at what point -- at the point in

15  time, under your alternative, an inmate is conscious when they

16  would receive the 500-milligram bolus of midazolam, which would

17  be the start, correct --

18         MR. HAHN:  Yes, Your Honor.

19         THE COURT:  -- of the execution.  And that could be a

20  lethal dose of midazolam in someone.  How does that -- how does

21  the fact that the State is not giving the injection when an

22  inmate is conscious, how does that superadd pain to the nitrogen

23  hypoxia protocol itself such that it rises to the level of an

24  Eighth Amendment violation?

25         MR. HAHN:  I think -- so as far as if you give -- if

1  somebody's not conscious when they are deprived of oxygen -- the

2  protocol itself calls for depriving a person of oxygen by

3  replacing breathing air with nitrogen.  And according to the

4  speculation and opinion of Dr. Antognini, a person will lose

5  consciousness within three to five breaths, deep breaths, or 40

6  seconds at the outer limit.

7        That's not what's happening with the protocol.  So

8  either the protocol was designed in a manner that permitted

9  there to be some problem with it that we can't identify -- it's

10  essentially res ipsa loquitur.  Something's going wrong, and we

11  can't really say what is going wrong or why it's going wrong,

12  but for some reason, every inmate, every prisoner who has so far

13  been executed by nitrogen hypoxia has exhibited signs of

14  consciousness to some witnesses beyond the 40 seconds.

15        And that indicates a problem.  Because their doctor,

16  Antognini, consulted with them before they developed the

17  protocol and released it.  And they developed it and released it

18  with the idea, I would submit, that 40 seconds was the outer

19  limit, and it's not working that way.  And at some point you

20  have to say, well, the protocol itself must -- and not amending

21  it.  And Commissioner Hamm says he has not amended it or changed

22  it in response to anything.

23        THE COURT:  Well, what's the evidence of consciousness?

24  Are you talking about movement?

25        MR. HAHN:  Yes, Your Honor.

1          THE COURT:  Because the State has offered evidence that

2  the movements are explained as a side effect, I guess, so to

3  speak, of unconsciousness.

4          MR. HAHN:  Right.  I will say this.  Captain McKenzie

5  testified at the Grayson hearing that it was more than -- it was

6  at least a couple of minutes.  I forget what he said.  His exact

7  words were, I would say it was a couple of minutes.  He couldn't

8  say for sure because he didn't take notes or write anything

9  down.  But he was asked, and he said it was minutes.  And he

10  said that --

11          THE COURT:  But he also said, I can't be sure about

12  that because what seems like a long time to me then could be a

13  short time in reality --

14          MR. HAHN:  He did, Your Honor.

15          THE COURT:  -- to consider all of his testimony as a

16  whole.

17          MR. HAHN:  Right.

18          But I'm going to move to Miller as well.  He said that

19  Miller was similar to Mr. Smith.  But he also said -- the only

20  testimony we had about a consciousness check and a timing of a

21  consciousness check was the six-minute mark that he gave in

22  Miller.  Which, again, the lethal injection protocol calls for a

23  consciousness check after midazolam is given to make sure that

24  the person is not sensate.  This one appears to have just sort

25  of a freewheeling, whatever the captain decides is a

1  consciousness check is a consciousness check.

2         So no one's actually sitting down and doing the work to

3  say, we're going to check and see if this person is conscious.

4  Why wouldn't you say, we're going to check at 40 seconds?  And

5  if it appears the person is conscious, something is going wrong

6  here?  But instead what we have here, so we're left to cobble

7  together testimony and speculation from a witness who doesn't

8  write down what's happening.  And there's apparently no scribe

9  saying what's happening.

10         And I'll say this.  That we have seen duty logs that

11  we've been produced in prior discovery in cases, and they've

12  been filed in court, that document -- and they'll do this.

13  They'll document everything a person ate and every time the

14  person went to the restroom for the 72 hours before their

15  execution.  Yet somehow when they get into the execution

16  chamber, it's impossible to determine when things are happening.

17  And that is problematic when you are seeing the evidence here of

18  exceeding 40 seconds.

19         And he probably -- I would submit to you that Captain

20  McKenzie had no reason to exaggerate.  And, yes, he did temper

21  his words with, I couldn't tell you for sure, but he's the

22  execution team captain who has presided over both lethal

23  injection and nitrogen executions.  And he knows how to tell

24  time.  And the lethal injection executions, the execution team

25  captain is doing a consciousness check within just a few minutes

1  of the midazolam going on board.  So he knows how long a period

2  of time is within that chamber.  He's not the first into that

3  chamber.

4          THE COURT:  This exact protocol has been challenged

5  twice in court.

6          MR. HAHN:  Yes.  At least.

7          THE COURT:  At least.  And decisions have come out from

8  the District Court, the Eleventh Circuit, and the United States

9  Supreme Court about this very protocol, and the decisions so far

10  have all been, this protocol does not violate the Eighth

11  Amendment; correct?

12          MR. HAHN:  Technically they say that there's not a

13  substantial likelihood of success --

14          THE COURT:  Success on the merits.

15          MR. HAHN:  Yes.  Yes, Your Honor.

16          THE COURT:  What is different in this case?

17          MR. HAHN:  What's different in this case, Your Honor,

18  is we have the observation now from Mr. Grayson's execution.  We

19  have Dr. McAlary's observations that there was conscious,

20  purposeful movement for several minutes after nitrogen began to

21  flow.  And this is not a captain who can't, you know,

22  necessarily tell time terribly well.  This is a person whose

23  entire job, outside of being this witness here, is an

24  anesthesiologist.  And anesthesiologists are trained to --

25          MS. KENNY:  Objection to arguing that -- he's arguing

1  he's an expert.

2          THE COURT:  Dr. McAlary is not being offered here as an

3  expert.  He's being offered as a lay witness to give his

4  observations.

5          But let's just take his observations.  Didn't

6  Dr. Antognini give a contrasting explanation for those movements

7  that would be very consistent with unconscious movement?

8          MR. HAHN:  Well, I would like to just quickly -- when

9  I'm explaining the observations that Dr. McAlary had, you

10  can't -- it basically bolsters his testimony, his

11  qualifications, just as if you brought a police officer in and

12  they weren't testifying as a witness, you might say -- as the

13  Court you might say, this person has received specialized

14  training in observing things and taking notes, et cetera.

15          I'm not -- when I'm arguing about the Grayson

16  observations, I'm simply putting -- shining a light on that,

17  that that was --

18          THE COURT:  I understand that.  But even in the Grayson

19  case, the District Court there said, what we have here is a

20  battle of the experts.  We don't really have that here because

21  you don't have an expert, other than what testimony I might take

22  judicial notice of from the Grayson case.  But of course, the

23  Grayson case was a decision by the District Court that

24  Mr. Grayson had not established a substantial likelihood of

25  success on the merits, which was affirmed by the Eleventh

1  Circuit and by the United States Supreme Court.  So what do we

2  have here that should result in a different decision?

3  Q.  So what we have here, two answers.  First answer is

4  Dr. Antognini was not able to fully explain away Dr. McAlary's

5  observations.  I asked him whether or not he's ever seen a

6  patient lift both legs up who was under anesthesia in that

7  manner.  He initially said yes.  And then as we got into it, it

8  turned out that, no, I've never seen that happen before in a

9  procedure.  And what we have here, then, is observations that

10  their expert has looked at and cannot explain away.

11        And I will say this.  We have agreed to admit the

12  testimony of an expert for Mr. Frazier from the prior

13  proceeding.  And the thing that we have here is yet another data

14  point, only this time we have a data point from a witness who

15  has testified to his perceptions of what occurred during the

16  most recent execution that Mr. Grayson predicted would happen

17  and did happen.

18        And I will say this.  As far as the second reason that

19  we can differentiate this case from Grayson is if you look at

20  the Grayson decision, you will see -- and if you look at the

21  Grayson record, you will see that Mr. Grayson was not an ideal

22  plaintiff, Your Honor.  Mr. Grayson testified during deposition

23  that he was going to fight and do whatever it took to slow or

24  prevent things from happening.  Mr. Grayson testified that he

25  had no intention of cooperating.  Mr. Grayson testified that he

1   didn't want midazolam.  There were a lot of factors.  And if you

2   look at what Judge Huffaker said in there, he went through about

3   20 points that weighed against Mr. Grayson, and many of those

4   points don't weigh against Mr. Frazier.

5          So we can't look at Mr. Grayson's case as establishing

6   a hard and fast rule that this protocol, when challenged at

7   preliminary injunction stage, is going to generally be found to

8   not meet the standard to grant one.  What we're asking for is

9   substantially more limited relief here.  And we have a plaintiff

10  who has not expressed an interest in resisting or denying the

11  drug.  He would like -- well, he would like it, through his

12  counsel representing him, within his religious freedom.  We have

13  expressed that with his authorization.  We have provided the

14  alternative through our pleading.

15     But that would be the difference, is they're two different

16  people, and the facts are substantially different with regard to

17  the merits of who they are and what they were pursuing.

18          THE COURT:  But what we're really examining, though, is

19  the constitutionality of the protocol.

20          MR. HAHN:  We are, Your Honor.  And I acknowledge that

21  so far, I believe that plaintiffs are 0 for 2 -- it might be 0

22  for 3 at this point, but 0 for 2 with regard to challenges of

23  this protocol.  But every execution that happens under it after

24  the plaintiff loses in the preliminary injunction stage provides

25  yet another data point as to why the earlier person now, with

 1  this evidence, may have been able to persuade that earlier court

 2  that there's a substantial likelihood of success on the merits.

 3          THE COURT:  Give me your best argument on how this is

 4  an actual Eighth Amendment claim.  And I'm not talking about,

 5  here's something that the State could do that might make the

 6  execution less distressful versus superadding pain, in light of

 7  the fact that the law is very clear that there's no guarantee

 8  that a person will have a painless execution.  Some level of

 9  pain, even psychological pain, may be expected.  How does this

10  protocol, in the absence of a 500-milligram bolus of

11  midazolam -- how does it rise to the level of violating the

12  Eighth Amendment?

13          MR. HAHN:  The protocol itself does not cause

14  unconsciousness in the time frame that it anticipated.  And

15  therefore, it would be --

16          It would be the equivalent of if there was an

17  electrocution protocol, and it called for a certain voltage to

18  be administered.  And after a couple of executions, somebody

19  came along and said, I think that's an insufficient voltage.

20  And a court said, well, their expert says it's sufficient

21  voltage, and you'll be fine.  Or at least not enough to raise it

22  to a substantial level.  And then you go through one execution,

23  and a person is still alive.  In fact, that happened during the

24  first execution in Alabama after reinstatement of the death

25  penalty.  A person was electrocuted multiple times in a row.

1  There was a commissioner on the phone with the governor talking

2  about, hey, should we stop this?

3           So we have a history.  So you've seen it in action now.

4  And we know now that whatever intent they may have had with

5  regard to good intentions has now -- I believe we can infer from

6  that, and this Court should infer from that, that now we have

7  superadded pain or disgrace.  I mean, the language is a little

8  loose in terms of the Eighth Amendment.  It's not limited to

9  just physical pain or pain.

10          But I would note that we also have the study that we

11  put in today -- not a study, I'm sorry -- the American Medical

12  Association journal article that discusses human response to

13  lowered blood oxygenation and discusses that in the context of

14  nitrogen hypoxia.

15          And so we do have information now that did not exist

16  before the Kenny Smith execution, that did not exist when they

17  were developing the protocol, that this superadds distress,

18  pain, distress, disgrace.

19          And I guess that that would be my best shot.  If it's

20  okay or if it -- if a department of corrections knows or has

21  reason to believe that a person will take longer to die while

22  being deprived of oxygen than their plan calls for, that would

23  be an Eighth Amendment violation.  Because they have a duty to

24  improve that if it shows that it's not doing what they're

25  saying.

1      Because they don't have an interest.  There's no public
2 interest in torturing someone.  There's no public interest in an
3 Eighth Amendment violation.  So here what we're saying is as
4 each execution proceeds forward, we get more and more data
5 points that things are not going as expected.  And that, when
6 you add those up, makes the Eighth Amendment violation palpable.
7      THE COURT:  Can you explain the delay in filing your
8 motion for preliminary injunction?
9      MR. HAHN:  I cannot, Your Honor.  I simply can't.  I
10 know we talked back there a little bit, it was on the record,
11 but there's been a change in counsel in the case now, and the
12 person who filed that is not available here to provide that
13 explanation.  I can simply say we don't have an explanation for
14 that, Your Honor.
15      THE COURT:  In the filings, there's a suggestion that
16 it's the defendant's lack of transparency that caused a delay in
17 bringing this lawsuit.  Based on what you've told me, it doesn't
18 sound like you're persisting in that argument.
19      MR. HAHN:  I will say this, Your Honor, with regard to
20 the lack of transparency issue.  There have been three
21 executions by nitrogen hypoxia so far.  Prior to Mr. Grayson's
22 evidentiary hearing, we received an autopsy report for Mr. Smith
23 but not for Mr. Miller.  And there still have not -- because of
24 the way autopsies are conducted following an execution in
25 Alabama, the chief prosecutor -- the prosecuting attorney in the

1   county where the death occurred has to take it to grand jury, or

2   he has a policy in Escambia County, Alabama, of taking all

3   judicial homicides to grand jury.  And until that grand jury has

4   met and decided that it was appropriate, I suppose -- I don't

5   understand why they do it that way, they have an order from the

6   Alabama Supreme Court authorizing it, but they -- that has been

7   his position.  And so when we contact the Department of Forensic

8   Sciences to attempt to request a public record, we are often

9   told and have been told in this instance that those are not

10   available yet because there's still an open investigation.

11         And so we attribute to the State that because the State

12   is a unitary entity for purposes of this.  And the fact that we

13   can't get access to those autopsy reports does contribute to the

14   strength of our case; our ability to make certain allegations

15   and pleadings.  So, yes, we have said that it's not an excuse

16   for everything, but it is -- that's an explanation for why we

17   discussed lack of transparency.  There are issues there.

18         THE COURT:  But that doesn't explain the lack of filing

19   of the lawsuit.

20         MR. HAHN:  I could not say that it does, Your Honor.  I

21   could not say that that would be a cause and effect.

22         THE COURT:  And you understand and, I'm confident, know

23   that this Court has expressed frustration in previous cases,

24   that it appears as though these cases can be strategically filed

25   at the last minute in an effort to delay an execution for the

1  sake of delay, as opposed to involving a sincere litigant who is

2  coming to court in order to make a claim that his constitutional

3  rights have been violated.

4        MR. HAHN:  Yes, Your Honor.  And I would like to

5  address that.

6        THE COURT:  Please.

7        MR. HAHN:  I would like to say that I have never filed

8  a lawsuit or a pleading without a good-faith belief in that

9  lawsuit or that pleading.  And I am acting in some ways at

10  directions of clients, and in some ways within the context of

11  discussion with colleagues, and there is always strategy in

12  litigation.  We do not delay lawsuits for strategic bases.

13  Well, I don't delay lawsuits for strategic bases.  I'm not going

14  to speak for anybody else.

15        I will say this:  That when issues emerge, when

16  something happens like Mr. Grayson's execution happens, a person

17  who might not have been inclined to challenge or file a lawsuit

18  in some regard sees that and says, it keeps going wrong.  Or

19  sees that and says, that's another data point for me.  As you

20  point out, everyone who's brought this claim before has lost.

21  And you file these lawsuits.

22        We are not civil practitioners.  I was at the office

23  the other day, and I was saying, there's a reason I didn't go

24  into civil law, and that is because it is way beyond my

25  expertise.  There are discovery issues and all sorts of aspects

 1   of this that I do not -- that I cannot adequately --

 2          THE COURT:  Let me stop you.  You know that this

 3   lawsuit was filed before Mr. Grayson was executed?

 4          MR. HAHN:  When was it filed?

 5          THE COURT:  This lawsuit was filed on November 15th,

 6   2024.  Mr. Grayson was executed November 21st.

 7          MR. HAHN:  Yes.  Okay.

 8          THE COURT:  So that can't possibly be.

 9          MR. HAHN:  It can't possibly be a reason, Your Honor.

10   No, it can't.

11          So I don't have an explanation, Your Honor, other than

12   sometimes an execution warrant or request for an execution

13   warrant causes a person to change their mind about what they do

14   or causes a person to change their mind about -- they start to

15   realize how real something is.  They start to see that there is

16   a desire to do something.

17          And, look.  Nobody who files these lawsuits thinks that

18   there's a high likelihood that they're going to prevail, because

19   it's hard to prevail on an Eighth Amendment claim.  I can't

20   think of an instance in which a person has prevailed on an

21   Eighth Amendment claim -- I don't know -- ever?  I mean, there

22   have been some remands.  Like Glossip, there was a remand for a

23   evidentiary hearing.  But the idea is people generally don't

24   prevail on these, but it doesn't mean you don't keep trying to

25   advance this legal argument that is in good faith and intended

1    to express that.  So, yes --

2         THE COURT:  Well, do you see -- let me ask you this.

3    If the lawsuit is filed very late, which this one just was --

4         MR. HAHN:  Yes.

5         THE COURT:  -- and it results in 800 plus pages of

6    documents being filed with the Court with very little

7    opportunity for the parties to do analysis of those documents,

8    point out to the Court the importance of the documents, how the

9    Court should analyze them, it feels like, for lack of a better

10   term, that those documents have been dumped into the record.

11   The Court is left with very little benefit of advocacy by the

12   parties to figure out how those documents are to be interpreted

13   and analyzed.  You've got also the limited time frame, which

14   means the Court has to get the work done, but you have

15   artificially and without reason limited the amount of time

16   available to the Court to do that.  And then you have a

17   plaintiff, your client, who, up until the moment of execution,

18   probably, doesn't know whether or not the Court is going to

19   issue a stay or not issue a stay.

20         Doesn't this strategic late filing of these lawsuits

21   increase the likelihood of psychological distress, the very

22   psychological distress that you are saying violates the Eighth

23   Amendment because of the protocol?

24         MR. HAHN:  I will not dispute the fact that stays and

25   whether they're granted or not up till the last minute increases

1   the level of stress.  And I will say that we have had situations

2   where persons have received a stay, and it's been upheld, like,

3   for example, Willie Smith in the Religious Land Use case.  I was

4   talking with him the night that the Supreme Court denied the

5   State's motion to vacate the injunction.  And I can tell you

6   that although it was psychologically stressful for Mr. Smith,

7   ultimately, nine months later, as a result of that litigation,

8   he was able to have his spiritual advisor present in the

9   chamber.

10          So, yes, every lawsuit involves a weighing with the

11  client of --

12          THE COURT:  Right.  And in some cases, you get the

13  relief sought.

14          MR. HAHN:  Right.

15          THE COURT:  That doesn't explain the last-minute

16  filing.

17          MR. HAHN:  Right.

18          THE COURT:  If that lawsuit had been filed earlier,

19  that outcome could have happened earlier.

20          And I'm struck by Dr. McAlary's testimony in the

21  Grayson case that for some inmates, they have better outcomes if

22  they have had time to come to terms with the fact that the

23  execution is moving forward because there's less likelihood of

24  an upper airway restriction in those cases.  So that tells me we

25  have testimony in the record that there is a better outcome for

1  inmates who have had time to come to terms with what is about to

2  happen.  And isn't it true that these last-minute filings really

3  prevents that type of acceptance that may actually mean that the

4  outcome of the execution is not as good?

5          MR. HAHN:  I don't know the answer to that, Your Honor.

6          And I'll say this:  Every client that we have is an

7  individual, and they all react differently to everything.  And I

8  will say that some clients don't want any lawsuits filed at any

9  point.  Some clients are volunteers.  They don't even want to

10  challenge their conviction.  And so if you take that and you

11  work it back, you can get to a point where -- because I have to

12  tell a client in capital habeas, under AEDPA, the standard is

13  incredibly high.  And for us to prevail in an AEDPA claim is

14  nearly impossible.

15          So if I tell a client, we can file your capital habeas

16  suit, and they say, Well, what are my odds?  And I'll say,

17  They're not good.  They're not good.  It will take a while for

18  the Court to decide your case, but I'm not thinking that it's

19  going to prevail.  But that doesn't mean we don't raise it.  So

20  we could even make it easier by stopping there and trying to

21  counsel a client not to file a capital habeas petition.

22          And I understand there's a qualitative difference

23  between months or weeks before an execution and years before an

24  execution.  But if you stop there and you don't file the habeas,

25  the person is out of court, and they're subject to execution at

 1  that point.

 2          There are clients who don't want anything filed, there

 3  are clients who want everything filed, and there's everything in

 4  between.

 5          THE COURT:  Well, let's talk about this case.  This

 6  case was filed late.  It's a case where we're not talking about

 7  an execution that will involve physical pain; we're talking

 8  about psychological pain.  So we have a late-filed lawsuit only

 9  about psychological pain, and it was filed in such a way that

10  likely enhances the likelihood of psychological pain.  So

11  doesn't the Court have to parse out or quantify what

12  psychological pain is there that is attributable to the protocol

13  as opposed to the fact of execution or the uncertainty of

14  whether a stay may or may not be entered on this particular

15  individual?

16          MR. HAHN:  If this were the first case that was

17  brought, I would say probably.  But I will say this:  That

18  Mr. Smith brought his lawsuit, and he went in -- so he went in

19  under the same pressure and, in fact, possibly more because he

20  had -- he had not seen a District Court issue a decision, making

21  findings and making a determination.  So at that point, it was

22  sort of a coin flip probably in his mind -- we didn't represent

23  him -- but a closer call than it would be for the next person in

24  line who then went up.  And Alan Miller was litigating his case

25  up until -- toward the end when they reached an agreement, which

1  Mr. Miller decided to take.  But each of these people were

2  litigating at the last minute.  So I don't know that you can

3  separate out any of these people, not the least of which is

4  Mr. Frazier.  I don't know.

5          But I do know that these people are remaining conscious

6  longer than 40 seconds, and that is distressing.  A person who

7  is consciously aware that they are not able to breathe oxygen

8  and knowing why, unlike, say, a suicide person is actively

9  seeking to die.  A person in an industrial accident is not aware

10 of what's happening to them.  A person who is being executed has

11 not come to terms with the fact, generally speaking, that the

12 state is killing them for a crime.  And so it really depends on

13 the person.  It depends on where they are psychologically.  It

14 depends on where they are spiritually.  Everybody is so

15 different that I couldn't even begin to parse out what

16 psychological torment would be different based on when something

17 was filed or not.  But I understand the concern, and it's a fair

18 point to consider talking to clients about as well.  But that's

19 my best answer, Your Honor.

20          THE COURT:  All right.  Anything else?

21          MR. HAHN:  That's it.  Thank you.

22          THE COURT:  Thank you.

23          MR. MAULDIN:  Thank you, Judge Marks.  Dylan Mauldin

24 for defendants.

25          The motion should be denied on the merits and on the

1   equities, but I'll start with the merits.  So Frazier had an

2   exceedingly high burden coming into this today.  He needed to

3   show that he was assured very likely to experience severe pain

4   over and above death itself.  That standard is so high that no

5   one has ever met it before the Supreme Court of the United

6   States.  And I think it's especially unlikely here because

7   Frazier, coming into this hearing today, had the exact same

8   claim, exact same evidence, that Carey Grayson had in his

9   litigation in November.

10          And, Judge Marks, I think you asked the perfect

11  question:  What's different today?  Well, in November Grayson's

12  claim amounted to a highly speculative chain of unlikely events

13  that Judge Huffaker found fell well short of establishing an

14  Eighth Amendment violation.  And that was because in the Grayson

15  case, Grayson relied on essentially Dr. McAlary to say that

16  someone who is being deprived of oxygen while they're conscious

17  will panic.  The panic will lead to an upper airway closure,

18  essentially, and that will prolong the death.

19          But Dr. McAlary had no supporting evidence at all.  He

20  had no articles.  He had done no research before coming to his

21  opinion.  It was just something he came up with.

22          And, you know, he also relied a lot on these what Judge

23  Huffaker called highly questionable hearsay accounts from

24  reporters of the Smith execution, but those accounts were also

25  unreliable because those reporters did not know -- they did not

1  hear the testimony that we heard in the Smith litigation -- or

2  in the Grayson litigation about Smith, the reports of him

3  holding his breath, about him, you know, acting out and

4  resisting, which Judge Huffaker also found -- and, for example,

5  Kenneth Smith was yelling that he smelled nitrogen, which you

6  can't smell, and it was before the nitrogen had even started to

7  flow.

8      THE COURT:  Doesn't that support the idea that the

9  psychological state of these inmates breathing in nitrogen is

10 such that there should be something in the protocol that

11 addresses the unique nature of the inhalation of an inert gas?

12     MR. MAULDIN:  I don't really think so.  One, it needs

13 to be severe pain over and above death itself.  And there is

14 going to be some amount of pain that is inherent in any type of

15 execution because, you know, going into the execution chamber,

16 the inmate knows he's about to die.  And so if the only pain is

17 the inmate knowing he's about to die, there's really nothing we

18 can do about that, and we don't know anything about the baseline

19 to know whether it's superadded or severe within the terms of

20 the Eighth Amendment.

21     THE COURT:  Well, they're saying that could all be

22 addressed if the State will just give the midazolam bolus.  Is

23 the State saying there's no penological reason why it should

24 alter the protocol to allow for that?

25     MR. MAULDIN:  I think the baseline before you even get

1   to the alternatives is you have to show some type of severe

2   pain, and they haven't done that.  So the evidence so far has

3   established that there is no physical phenomenon established

4   with inhaling pure nitrogen gas.  So they would have to show

5   that the fear here, at minimum, is so above and beyond the

6   typical execution to cause an Eighth Amendment problem, but I

7   think that would be incredibly surprising with a method that no

8   one has identified a plausible risk of physical pain.

9           Those risks are present with other methods of

10  execution.  If you look at cases like Glossip, Bucklew, Baze,

11  there was some risk of physical pain.  Like in Baze, the risk of

12  the inmate feeling like they were burning alive, for example.

13  That risk seems like it would cause a lot more psychological

14  pain than a painless death.

15          And there's -- and still the expert testimony that

16  they've had that, you know, gives rise to this superadded pain,

17  it's not just that oxygen deprivation itself is so scary to be

18  an Eighth Amendment violation.  It's that it causes panic, the

19  panic caused an upper airway closure, which causes the pain.

20  And, again, there was no support for that at all.  That was

21  Dr. McAlary's opinion.  I never really understood him to say

22  that just nitrogen inhalation on its own provided some

23  superadded level of psychological pain.  And, you know, he's not

24  a psychologist, so it would be kind of surprising to hear him

25  say that.

1     THE COURT:  Would you agree with me that the longer an

2  inmate remains conscious as nitrogen is being introduced to the

3  mask could at some point get to the point where it's violative

4  of the Eighth Amendment?

5     MR. MAULDIN:  Well, if there's no physical pain, I'm

6  not really sure how that would be superadded, and I'm also not

7  sure how we could reduce that with any alternative.  Because, I

8  mean, why would it be -- why would it start with the nitrogen

9  flow?  They don't really know when the nitrogen starts to flow

10  to begin with.  Why wouldn't that start when the midazolam is

11  about to flow?  Because in both situations, you know, like,

12  ideally, with midazolam as well, the inmate is going to think,

13  okay.  I'm about to experience my last few minutes of

14  consciousness, and then I'm going to die with no physical pain.

15  There's really no way to get around that.  And they could even

16  experience that when they're moved to the execution chamber.

17     And so this type of, you know, just fear of a painless

18  death theory really has no bounds.  It kind of gets to

19  challenging almost any method of execution whatsoever.  But the

20  Supreme Court has been clear, capital punishment is

21  constitutional, and, you know, the Supreme Court has never found

22  a method to violate the Constitution.

23     I think what's also the Supreme Court has said is

24  instructive is the type of methods of execution that the

25  amendment was designed to prohibit and the type of methods that

 1   were understood to be constitutional at the founding.  And all

 2   of those methods are much more painful and you would think would

 3   cause a lot more psychological distress than nitrogen hypoxia,

 4   which doesn't really pose a risk of physical pain.

 5          And then the new evidence I don't think really fills in

 6   the gaps whatsoever of Dr. McAlary's prior shortcomings.  He

 7   still has no articles that make it plausible that someone will

 8   have this upper airway constriction.  And the only expert

 9   testimony we had today that talked about upper airway

10   constrictions -- which, you know, for that reason is

11   undisputed -- is Dr. Antognini, who says that the eyewitness

12   accounts that Dr. McAlary has are inconsistent with an upper

13   airway constriction whatsoever because of the speed that his

14   chest was moving up and down.  And also the movements that

15   Dr. McAlary described, they are consistent, as Dr. Antognini

16   described, with unconscious movements.

17          And I think what's really telling about this is in the

18   Grayson case, Dr. McAlary, before he came to his conclusions,

19   did not review reports of inert gas asphyxia that described

20   involuntary movements, so he wasn't really sufficiently familiar

21   with the likelihood that those movements would occur in a

22   nitrogen execution.

23          THE COURT:  In Carey Grayson's case, you represented

24   that he could independently request some sort of a sedative from

25   his medical provider separate and apart from the protocol.

1          MR. MAULDIN:  Yes.

2          THE COURT:  If Mr. Frazier is also concerned about the

3    psychological distress, could he also do the same?

4          MR. MAULDIN:  So if he has a medical need, he can go

5    see the doctors at YesCare, and they will make a determination

6    of whether that is sufficient.  But we had some testimony about

7    this from Dr. Crook, I believe, and she kind of describes the

8    relationship between ADOC and YesCare and how --

9          THE COURT:  Right.  They would be independent of one

10   another.

11         MR. MAULDIN:  Yes.  Yes.  Yes, Your Honor.

12         THE COURT:  But is there anything that would prevent

13   Mr. Frazier from going to the medical providers at YesCare and

14   say, I'm really anxious about this execution, could you provide

15   me with some sort of a sedative?

16         MR. MAULDIN:  I think the only thing is, is there a

17   medical need, essentially, for that to be provided.

18         THE COURT:  Right.

19         MR. MAULDIN:  Yes.

20         THE COURT:  Is there anything in the protocol that

21   prevents an inmate from going to seek medical care --

22         MR. MAULDIN:  No, there's not.

23         THE COURT:  -- for an issue regarding anxiety that may

24   be inherent in a pending execution?

25         MR. MAULDIN:  No, there's not.

1          THE COURT:  Is it the State's position that it's not

2    feasible to sedate an inmate before a nitrogen hypoxia execution

3    begins?

4          MR. MAULDIN:  I wouldn't necessarily say it's not

5    feasible, but I don't think it falls within the alternatives

6    framework the Supreme Court has established.  So, essentially,

7    the alternative, it needs to have documented advantages to the

8    method that we have used, and the difference between the pain

9    must be clear and considerable.  That's from Bucklew.  And

10   that's just not really the case here because we have -- like the

11   pure psychological pain that we were kind of discussing earlier,

12   you know, just knowing they're going to die, there's no reason

13   whatsoever to think that knocking him out sooner is going to

14   reduce that psychological pain significantly.

15          And then there's also that this -- it hasn't been used

16   in this way before, midazolam and nitrogen hypoxia, and

17   midazolam can cause the type of upper airway obstructions that

18   Frazier is concerned with.  So for that reason also, it's not a

19   substantial difference in the threat that's posed, especially

20   when there's no reason, really, on this record to think that the

21   upper airway obstruction would occur to begin with.

22          THE COURT:  So can you give the Court some guidance?

23   As I said to Mr. Hahn, the Court has received hundreds and

24   hundreds of pages of documents --

25          MR. MAULDIN:  Yes.

```
 1          THE COURT:  -- for its consideration.  And the Court
 2    will review those documents, but unfortunately, because of the
 3    condensed time frame, I'm reviewing those documents without what
 4    I would ordinarily have, and that is analysis of those documents
 5    by the parties.  So I'm left to review documents --
 6          MR. MAULDIN:  Right.
 7          THE COURT:  -- and know what I'm supposed to do with
 8    them and how it might support Mr. Frazier's case or how it might
 9    support the State's case.  Can you provide to me what documents
10    go to the heart of your case or the State's position about
11    whether this violates the Eighth Amendment's prohibition of
12    cruel and unusual punishment?
13          MR. MAULDIN:  Yes.  I think the key documents are those
14    that are attached to our preliminary injunction opposition.  So
15    those go into a few buckets, and I'll go through those.
16          First we have the OSHA reports.  There's one that's --
17    I believe it's called Deaths Involving Inert Gas Asphyxiation,
18    something along those lines.  And it talks about multiple
19    instances of employees in workplace who accidentally inhaled
20    pure nitrogen gas, and they quickly became unconscious and died.
21    And so as that report establishes, if those employees knew that
22    something was going on, that they were not inhaling oxygen, they
23    could have easily just taken off their mask or taken other
24    measures to self-rescue.  So those establish that when someone
25    inhales pure nitrogen gas quickly, they're unlikely to
```

1 experience any type of physical pain.

2      And then --

3      THE COURT:  But here it's undisputed we're not talking

4 about physical pain.  In those cases, because those individuals

5 did not know they were breathing nitrogen, there wasn't the

6 psychological --

7      MR. MAULDIN:  Yes.  So no physical pain, but also just

8 didn't really have any type of signs that something was going

9 wrong.  No type of significant physical response.  So it could

10 be, you know, aside from physical pain, but really any other

11 type of sign something was happening.

12      And then also there's the suicide reports.  So you have

13 people who have, like, studies of suicides wherein people have

14 put on the nitrogen, the inert gas, and they quickly die, and

15 they'll inhale it for 30, 40 seconds.  If it were incredibly

16 discomforting, again, you would think they would remove the

17 mask, but they didn't.  And then there's also -- those studies

18 talk about the involuntary movements after unconsciousness.

19      And then the other key piece of evidence is

20 Dr. Antognini's report.  He cites numerous articles in that as

21 well.

22      And then on the flip side, of course, is, you know,

23 Frazier has the burden.  He has to show some type of superadded

24 physical pain.  And just the complete lack of supporting

25 articles, I think that is almost dispositive on its own.  They

1  can't really point to anything, any articles in their favor,

2  that establish there is superadded pain, and we've just

3  discussed several on our end that really rebut it.

4         The one article they do have now is the Philip Bickler

5  article.  And Dr. Antognini explained, it's quite different from

6  the Alabama protocol, which rapidly -- which the inmate rapidly

7  inhales pure nitrogen gas.  Not the case in Bickler.  So

8  Bickler's a little off point.

9         I would also point out, the Bickler article also really

10  focuses in on, likewise, the hearsay accounts of the Kenny Smith

11  execution.  And there's no reason to think whatsoever that

12  Philip Bickler understood that Kenny Smith did hold his breath

13  and, you know, was acting out there in his execution, which is

14  another reason why that's unreliable.

15         And then I would like to go to the equities, if you

16  have no further questions on the merits.

17         THE COURT:  Please.

18         MR. MAULDIN:  So I absolutely agree with you that delay

19  here, there really is no explanation for it.  So Frazier has

20  been subject to the protocol for since about 2018, and he could

21  have brought the lawsuit at least after the Kenny Smith

22  execution, which that's one of the big pieces of his evidence is

23  the hearsay reports in that execution.  And then he also could

24  have brought it right after -- you know, he brought it shortly

25  before the Grayson execution but didn't move for the PI until

1    this Court prompted him to.  But it's the exact same case.  The
2    difficulties of obtaining evidence cannot be the explanation,
3    because Judge Huffaker received almost the exact same evidence
4    back in October, I believe.

5           And the notion that, you know, some inmates don't want
6    to bring lawsuits to gather attention, I just don't think that
7    can apply here either.  Frazier has been suing the State for
8    decades -- for at least a decade.

9           And as we point out in our PI opposition, you know, it
10   looks like what happened is that instead of moving forward with
11   this lawsuit, filing a PI motion, moving for discovery, which
12   never happened -- and, you know, if they really needed more
13   evidence, you would think that would have happened -- Frazier
14   was trying to convince Gretchen Whitmer to try to fight Alabama
15   to take him back.  And then around a week ago, he filed the
16   habeas petition, which he later dismissed within a few days,
17   recognizing that it was meritless.  So either way you look at
18   it, there's really no explanation for this delay.

19          The State has a strong interest with moving forward
20   with this execution timely.  We originally moved on Grayson
21   about a decade ago -- or Frazier about a decade ago.  And the
22   Court in Bucklew has explained just how much a state is harmed
23   and how victims of these crimes can't achieve real finality
24   until the sentence is completed.

25          And instead, this has been drug out for litigation for

1  many years.  We initially had Frazier suing, saying, you know,

2  execute me with nitrogen hypoxia, not lethal injection.  And we

3  did that, and we spent years developing a protocol.  We do.  We

4  used it.  It worked.  And then he waits even longer, files a

5  last-minute lawsuit, last-minute PI motion, and then files

6  another last-minute lawsuit, all in what appears to be just

7  attempts to delay his execution.

8           THE COURT:  Thank you.

9           Mr. Hahn, anything further?

10          MR. HAHN:  Not unless Your Honor has any questions.

11          THE COURT:  All right.  We're going to take a

12  five-minute recess.

13          MR. HAHN:  Is it all right if we check in with the

14  clerk and ask a question about the USB drive?

15          THE COURT:  Of course.

16      (Recess was taken from 1:32 p.m. until 1:40 p.m., after

17       which proceedings continued, as follows:)

18          THE COURT:  I do not have any further questions of

19  either side, but I do want to make sure that our case contains

20  independently all of the documents.  Specifically, the documents

21  that you have offered and I am admitting from the Grayson case,

22  those need to be filed in our case to make it easier, to the

23  extent that an appellate court is going to review this, they're

24  not going to have to go look at the Grayson case; that we have

25  everything contained in our case.  Are those exhibits on that

1  zip drive that you are providing the Court?

2        MR. HAHN:  The ones that are on our list, Your Honor,

3  Doc 42, are all on there and labeled accordingly.

4        THE COURT:  What about the joint notice of the

5  documents that you want the Court to take judicial notice of

6  from the Grayson case?

7        MS. KENNY:  We have not turned in our thumb drive yet.

8  We will ensure that the transcripts, those three joint exhibits,

9  are on ours as well, as all the Grayson exhibits and the

10 additional Frazier exhibits.

11        THE COURT:  Just make sure we do that so at whatever

12 point anybody may or may not take an appeal, we're making it as

13 easy for the appellate court to access the documents that were

14 considered by the Court as possible.

15        MS. KENNY:  Yes, Your Honor.  We appreciate that.

16        MR. HAHN:  Thank you, Your Honor.

17        THE COURT:  All right.  I have your arguments.  I'll

18 get an order out as soon as possible.  We're adjourned.

19     (Proceedings concluded at 1:43 p.m.)

20               * * * * * * * * * * * *

21

22

23

24

25               COURT REPORTER'S CERTIFICATE

PATRICIA G. STARKIE, RDR, CRR, OFFICIAL COURT REPORTER
U.S. District Court, Middle District of Alabama
One Church Street, Montgomery, AL  36104   334.322.8053

1          I certify that the foregoing is a correct transcript

2    from the record of the proceedings in the above-entitled matter.

3          This 30th day of January, 2025.

4

5                              /s/ Patricia G. Starkie
                               Registered Diplomate Reporter
6                              Certified Realtime Reporter
                               Official Court Reporter
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Case 2:25-cv-00160-SRB-SDJ    Document 14-5    02/26/25    Page 201 of 286



# ATTORNEY GENERAL
# STEVE MARSHALL

(https://www.alabamaag.gov)

Search …

Home > (/)News > (/news/)
( https://www.alabamaag.gov/alabama-attorney-
general-marshall-successfully-defends-
constitutionality-of-nitrogen-hypoxia-method-of-
execution/)

Alabama Attorney General Marshall
Successfully Defends Constitutionality of
Nitrogen Hypoxia Method of Execution

# Alabama Attorney General Marshall Successfully Defends Constitutionality of Nitrogen Hypoxia Method of Execution (https://www.alabamaag.gov/alabama-attorney-general-marshall-successfully-defends-constitutionality-of-nitrogen-hypoxia-method-of-execution/)

*Miller settles lawsuit against the State, dropping his legal claim*

Case 2:25-cv-00169-RDP-SGC Document 4-5 02/26/25 Page 202 of 286

## View PDF (https://www.alabamaag.gov/wp-content/uploads/2024/08/2024.07.05-Press-Release.pdf)

For Immediate Release:
August 5, 2024

For press inquiries only, contact:
Amanda Priest (334) 322-5694
William Califf (334) 604-3230

(**Montgomery, Ala.**) – Alabama Attorney General Steve Marshall announced the State of Alabama has settled a lawsuit that will allow the execution of convicted murderer, Alan Miller, to proceed as scheduled in September. Miller had challenged the method of execution, which Alabama used for the first time in January of this year. The two sides had spent months in discovery, anticipating a major hearing on August 6, but after reviewing key documents and deposing the State's witnesses, Miller agreed to settle with the State. The terms of the settlement remain confidential, but the result will be the dismissal of Miller's lawsuit with prejudice.

"The resolution of this case confirms that Alabama's nitrogen hypoxia system is reliable and humane," said Attorney General Marshall. "Miller's complaint was based on media speculation that Kenneth Smith suffered cruel and unusual punishment in the January 2024 execution, but what the State demonstrated to Miller's legal team undermined that false narrative. Miller's execution will go forward as planned in September."

In January, Alabama was the first state in the nation to use nitrogen gas as a method of execution when it successfully executed Kenneth Smith for the 1988 murder-for-hire slaying of Elizabeth Sennett. Although Miller sued in 2022 to ensure that his method of execution would be nitrogen hypoxia, he later asked a federal court to force the State to change its protocol once again. Miller's speculative complaint relied on news reports, an unsworn statement by Kenneth Smith's lawyer, and hyperbolic claims by Smith's spiritual advisor that Smith appeared to be in discomfort during his execution. In its briefing, the State responded that Smith held his breath; much of the reporting wrongly attributed Smith's early movements to nitrogen gas. As Smith's own expert, Dr. Phillip Nitschke, explained: If Smith had "taken deep breaths …, he would, almost certainly, have lost consciousness and died much sooner" than he did. Other eyewitnesses, including Mrs. Sennett's son, Mike Sennett, agreed that Smith seemed to be holding his breath. After dismissing most of his claims, the federal court allowed Miller to obtain discovery based a single claim that was "just barely" sufficient to proceed. Now, after the conclusion of that discovery, Miller has agreed to settle his case and to dismiss, with prejudice, all of his claims without so much as a hearing. Alabama will move forward to bring justice to Miller's victims.

Miller has spent over two decades on death row for the "execution style" murders of Lee Holdbrooks, Scott Yancey, and Terry Lee Jarvis on August 5, 1999. Miller had worked with each of the victims before, and he claimed to believe that they had spread rumors about him. Miller shot Yancey once, paralyzing him, before shooting him twice more and causing his death. Miller shot Holdbrooks several times, and then as his victim crawled away, Miller approached and shot him in the head at point-blank range. Miller then drove to his former place of employment and shot Jarvis four times in the chest and

Case 2:25-cv-00169-SRB-SGC   Document 4-5   02/06/25   Page 203 of 286

once through the heart. The sentencing court called the murders "calculated, premeditated and callous, with utter disregard of human life" and noted that "the taking of these lives was among the worst in the memory of this Court and was well beyond the level" required for capital punishment.

-30-

2/13/25, 4:50 PM    Alabama Attorney General Marshall Successfully Defends Constitutionality of Nitrogen Hypoxia Method of Execution - Alabama Att…

Case 3:25-cv-00169-SDD-SDJ    Document 45    02/26/25    Page 204 of 286

# Recent News

**Attorney General Marshall Announces the Conviction of Former Birmingham Nurse for Theft of Opioid Tablets (https://www.alabamaag.gov/attorney-general-marshall-announces-the-conviction-of-former-birmingham-nurse-for-theft-of-opioid-tablets/)**
February 11, 2025

---

**Attorney General Marshall Joins Multi-State Effort to Hold Dr. Fauci Accountable for COVID-19 Response (https://www.alabamaag.gov/attorney-general-marshall-joins-multi-state-effort-to-hold-dr-fauci-accountable-for-covid-19-response/)**
February 11, 2025

---

**Attorney General Marshall Joins 22-State Coalition in Defending President Trump's Authority to Reform Federal Workforce (https://www.alabamaag.gov/attorney-general-marshall-joins-22-state-coalition-in-defending-president-trumps-authority-to-reform-federal-workforce/)**
February 10, 2025

---

**Attorney General Marshall joins coalition probing asset managers' activity regarding Chinese investments (https://www.alabamaag.gov/attorney-general-marshall-joins-coalition-probing-asset-managers-activity-regarding-chinese-investments/)**
February 10, 2025

---

**Attorney General Marshall Announces Murder Conviction and Consecutive Life Sentences for Coosa County Woman (https://www.alabamaag.gov/attorney-general-marshall-announces-murder-conviction-and-consecutive-life-sentences-for-coosa-county-woman/)**
February 7, 2025

---

**VIEW ALL NEWS (/NEWS)**



AGO Website footer logo

## 501 Washington Avenue
## Montgomery, AL 36104

MEET THE ATTORNEY GENERAL(/ABOUT/)

CAREERS(/EMPLOYMENT/)

CONTACT(/GENERAL-CONTACT/)

DIVISIONS(/DIVISIONS/)

OPINIONS(HTTPS://WWW.ALABAMAAG.GOV/OPINIONS/)

CONSUMER COMPLAINT(/CONSUMER-COMPLAINT/)

VICTIM ASSISTANCE(/VICTIM-ASSISTANCE/)

Office of the Attorney General 2025
**Statements and Policies (http://isd.alabama.gov/isd/statements.aspx)**

2/13/25, 4:46 PM
Alabama carries out nation's third nitrogen gas execution on a man for a hitchhiker's killing | AP News
Case 3:25-cv-00169-SDD-SDJ     Document 4-5     03/26/25     Page 206 of 286



Live updates: Trump tariffs      'Saturday Night Live'      California storm      Joann closures      USS Harry S. Truman

AP SETS THE STANDARD FOR POLITICAL REPORTING.
SUPPORT INDEPENDENT, FACT-BASED JOURNALISM.

DONATE

U.S. NEWS

# Alabama carries out nation's third nitrogen gas execution on a man for a hitchhiker's killing

BY KIM CHANDLER

Updated 7:15 AM EST, November 22, 2024

ATMORE, Ala. (AP) — An Alabama man convicted in the 1994 killing of a hitchhiker cursed at the prison warden and made obscene gestures with his hands shortly before he was put to death Thursday evening in the nation's third execution using nitrogen gas.

Carey Dale Grayson, 50, was executed at the William C. Holman Correctional Facility in southern Alabama. He was one of four teenagers convicted of killing Vickie DeBlieux, 37, as she hitchhiked through the state on the way to her mother's home in Louisiana. The woman was attacked, beaten and thrown off a cliff.

Alabama began using nitrogen gas earlier this year to carry out some executions. The method involves placing a respirator gas mask over the face to replace breathable air with pure nitrogen gas, causing death by lack of oxygen.

Alabama Corrections Commissioner John Q. Hamm said the nitrogen flowed for 15 minutes and an electrocardiogram showed Grayson no longer had a heartbeat about 10 minutes after the gas began flowing.

Like two others previously executed by nitrogen, Grayson shook at times before taking a periodic series of gasping breaths.

RELATED COVERAGE



**A rare bipartisan coalition in Alabama pushes ban on machine gun conversion devices**



**Alabama governor vows to sign bill that writes definitions of male and female into state law**

Case 3:25-cv-00169-SDD-SDJ     Document 4-5     03/26/25     Page 208 of 286



**Stevenson and No. 2 Alabama blow past Texas 103-80 to set up SEC showdown with rival No. 1 Auburn**

The victim's daughter told reporters afterward that her mother had her future stolen from her. But she also spoke out against the decision to execute Grayson and "murdering inmates under the guise of justice."

The curtains to the execution room were opened shortly after 6 p.m. Strapped to a gurney with a blue-rimmed gas mask on his face, Grayson responded with an obscenity when the warden asked if he had any final words. Prison officials turned off the microphone. Grayson appeared to speak toward the witness room where state officials were present, but his words could not be heard. He raised both middle fingers at the start of the execution.

It was unclear when the gas began flowing. Grayson rocked his head, shook and pulled against the gurney restraints. He clenched his fist and appeared to struggle to try to gesture again. His sheet-wrapped legs lifted off the gurney into the air at 6:14 p.m. He took a periodic series of more than a dozen gasping breaths for several minutes. He appeared to stop breathing at 6:21 p.m., and then the curtains to the viewing room were closed at 6:27 p.m.

Grayson was pronounced dead at 6:33 p.m.

DeBlieux's mutilated body was found at the bottom of a bluff near Odenville, Alabama, on Feb. 26, 1994. She was hitchhiking from Chattanooga, Tennessee, to her mother's home in West Monroe, Louisiana, when the four teens offered her a ride. Prosecutors said the teens took her to a wooded area and attacked and beat her. They returned to mutilate her body.

A medical examiner testified that her face was so fractured that she was identified by an earlier X-ray of her spine. Investigators said the teens were identified as suspects after one of them showed a friend one of DeBlieux's severed fingers and boasted about the killing.

DeBlieux's daughter Jodi Haley spoke with reporters at the media center on prison property after the execution. Haley was 12 when her mother was killed, She said her mother had her life and future stolen from her.

"She was unique. She was spontaneous. She was wild. She was funny. She was gorgeous to boot," Haley said of her mother.

She said Grayson was abused in every possible way in his youth but "society failed this man as a child, and my family suffered because of it."

2/13/25, 4:46 PM
Alabama carries out nation's third nitrogen gas execution for a hitchhiker's killing | AP News
Case 3:25-cv-00169-SDD-SDJ    Document 4-5    03/26/25    Page 209 of 286

"Murdering inmates under the guise of justice needs to stop," she said, adding that "no one should have the right to take a person's possibilities, days, and life."

Gov. Kay Ivey said afterward she was praying for the victim's loved ones to find closure and healing.

"Some thirty years ago, Vicki DeBlieux's journey to her mother's house and ultimately, her life, were horrifically cut short because of Carey Grayson and three other men," Ivey said in a statement. "She sensed something was wrong, attempted to escape, but instead, was brutally tortured and murdered."

Grayson's crimes "were heinous, unimaginable, without an ounce of regard for human life and just unexplainably mean. An execution by nitrogen hypoxia (bears) no comparison to the death and dismemberment Ms. DeBlieux experienced," she added.

Grayson was the only one of the four teenagers who faced a death sentence since the other teens were under 18 at the time of the killing. Grayson was 19.

The execution was carried out hours after the U.S. Supreme Court turned down Grayson's request for a stay. His final appeals had focused on a call for more scrutiny of the nitrogen gas method. His lawyers argued the execution method causes "conscious suffocation" and that the first two nitrogen executions did not result in swift unconsciousness and death as the state had promised.

Hamm said he thought some of Grayson's initial movements were "all show" but maintained other movements exhibited by Grayson and the two others executed by nitrogen gas were expected involuntary movements, including the breathing at the end.

No state other than Alabama has used nitrogen hypoxia to carry out a death sentence. In 2018, Alabama became the third state — along with Oklahoma and Mississippi — to authorize the use of nitrogen gas to execute prisoners.

---

**MOST READ**



| | |
|---|---|
| 1 | As DOGE hammers away at the US government, Republicans stir with quiet objections |
| 2 | Her parents were injured in a Tesla crash. She ended up having to pay Tesla damages |
| 3 | White House says it has the right to punish AP reporters over Gulf naming dispute |
| 4 | Trump upends US policy on Ukraine and says he and Putin have agreed to begin talks on ending the war |
| 5 | White House says it's the judges — not Trump — causing a 'constitutional crisis' |

# **Montgomery** Advertiser

CRIME

# Alabama executes Carey Dale Grayson by nitrogen gas for brutal 1999 murder

 **Marty Roney**
Montgomery Advertiser

Published 7:48 p.m. CT Nov. 21, 2024 | **Updated 9:28 p.m. CT Nov. 21, 2024**

ATMORE – The State of Alabama executed Carey Dale Grayson by nitrogen gas hypoxia Thursday evening for the brutal 1994 Jefferson County murder of a hitchhiker.

It was Alabama's sixth execution for the year and the third in two months. Three of those executions have been by the controversial method of nitrogen gas hypoxia.

Grayson, now 50, was convicted of capital murder along with three other teens in the torture, bludgeoning death and mutilation of Vickie Lynn DeBlieux on Feb. 21, 1994. The 37-year-old Deblieux was hitchhiking from Chattanooga, Tennessee, to visit her mother in Louisiana when the teens picked her up along Interstate 59 near Trussville in Jefferson County, court records show.

He was pronounced dead at 6:33 p.m.

"Some thirty years ago, Vicki DeBlieux's journey to her mother's house and ultimately, her life, were horrifically cut short because of Carey Grayson and three other men," Gov. Kay Ivey said in a statement. "She sensed something was wrong, attempted to escape, but instead, was brutally tortured and murdered. Even after her death, Mr. Grayson's crimes against Ms. DeBlieux were heinous, unimaginable, without an ounce of regard for human life and just unexplainably mean.

"An execution by nitrogen hypoxia bares no comparison to the death and dismemberment Ms. DeBlieux experienced. I pray for her loved ones that they may continue finding closure and healing."

Grayson was executed in the death house at William C. Holman Correctional Facility in Atmore, a small town about 110 miles south of Montgomery.

# Execution timeline

There is a digital clock in the death chamber, but the seconds are not visible. The following times are approximate. The execution proceeded as follows:

**6:06 p.m.:** The drapes to the death chamber opened. Grayson was strapped cruciform on a gurney, with his arms strapped down. He was wearing khaki prison garb and was covered by a tightly tucked in white sheet. Restraints crisscrossed his chest.

A clear plastic mask covered his face. A clear plastic line ran from the death chamber through a small rectangular hole in the wall of the death chamber.

**6:08 p.m.:** Warden Terry Raybon entered the death chamber to read the death and governor's warrant. Grayson put up his middle finger on his left hand. When given the opportunity to make a final statement he put Grayson said "Yeah, for you, you need to (expletive) off! For.." his words trailed off, officers may have cut off the microphone. Raybon walked out of the death chamber to go into the control room. As corrections officers closed the valve to the mask and checked its seal, Grayson seemed combative. He shook his head vigorously. He held his head up and seemed to be making comments to the witness room where state officials were located.

> 6:11 p.m.: Grayson put his middle fingers of both hands up. A woman approached the gurney, and he appeared to calm down. She spoke a few words to him. She was later identified as his spiritual advisor.
>
> 6:12 p.m.: The nitrogen appeared to begin flowing. Grayson's hands were tightly clenched. He took several deep gasps, shaking his head vigorously. He pulled his arms against the restraints. He took more deep gasps.
>
> 6:13 p.m.: He took several deep gasps, raising his head off the gurney.
>
> 6:14 p.m.: He raised his legs from the gurney. He took several deep breaths. His legs lowered about 30 seconds later.
>
> 6:15 to 6:17 p.m.: Grayson took several deep breaths. His hands remained tightly clenched.
>
> 6:17 p.m.: A corrections officer performed a consciousness check.
>
> 6:18 p.m.: Grayson appeared to lose consciousness; His hands relaxed.
>
> 6:18 to 6:22 p.m.: He took eight to nine large gasps with several seconds in between each gasp.
>
> 6:22 p.m.: He appeared to stop breathing.

6:27 p.m.: The curtain to the death chamber was closed.

# Reactions

After the execution Alabama Department of Corrections Commissioner John Q. Hamm confirmed that his Grayson's microphone was turned off in the middle of his final statement. Hamm said that Grayson has "cussed out" staff throughout the execution process and that the prison system did not want to allow his to "spew" obscenities. Hamm said the nitrogen gas flowed for about 15 minutes, and that Grayson flatlined about 10 minutes after the gas began flowing.

Hamm said Grayson's movements at the beginning of the execution appeared to be "for show." He said his gasping after he appeared to lose consciousness was involuntary and expected.

In a news conference after the execution Jodi DiBlieux Haley, Vickie DiBlieux's daughter, spoke. She was 12 when her mother was murdered.

"She was unique. She was spontaneous. She was wild. She was funny," Jodi Haley said. "She was gorgeous to boot. I don't know what it is like to have a mother while going through life. Graduation, marriage, children, hurts and joys. I've had to experience life without her presence because all those opportunities were stolen from her."

Amnesty International condemned the execution while noting that Alabama has carried out the most of any state this year.

"Alabama must devote resources to alternatives to the death penalty that would better address crime at its roots and protect human rights," said TJ Riggs, Amnesty International USA's Death Penalty Abolition Coordinator for the State of Alabama.

"The prosecutor in Carey Grayson's case was inconsistent with his claims against Grayson and the other co-defendants and misled the jury. This use of inconsistent claims flouted the UN Guidelines on the Role of Prosecutors. This execution – like all executions, no matter the circumstances – was a violation of human rights. Governor Kay Ivey should have taken the opportunity to grant Carey Grayson clemency and commute his death sentence and take steps towards abolition, instead of overseeing yet another execution in her state."

During his last day Grayson's visitors included attorneys Matt Schulz, Kacey Keeton and Robin Konrad. He refused a breakfast and lunch tray but was seen drinking coffee and

2/13/25, 4:46 PM
Alabama executes Carey Dale Grayson by gas for brutal 1999 murder
Case 3:25-cv-00169-SDD-SDJ    Document 45    02/26/25    Page 213 of 286

Mountain Dew. His final meal included soft tacos, beef burritos, tostada, chips and guacamole with Mountain Dew Blast. The last meal is provided by local restaurants, and the state pays for the bill, said Kelly Betts, spokeswoman for the prison system.

Witnesses to his execution were set to be friend Brian McAlary and attorneys Robin Konrad, Kacey Keeton and Matt Schulz.

## The crime

Court records and media coverage paint a grim picture of DeBlieux's last hours. Grayson was convicted on capital murder along with Kenny Loggins, Trace Duncan and Louis Mangione.

After picking her up on the interstate, the group went to a wooded area on Bald Mountain using the ruse that the teens were going to get another vehicle. DeBlieux was beaten, stomped and kicked to death. Testimony showed that one teen stood on her throat in an effort to kill her.

**More:** Alabama executions through the years: Facts, figures and failures

Her body was thrown off a cliff. The teens returned later and mutilated her corpse, cutting the body at least 180 times and removing a portion of one of her lungs and cutting off her fingers. The teens became suspects in the murder when Mangione showed one of DeBlieux's fingers to a friend.

Duncan, Loggins and Mangione had their death sentences reversed and were each given life in prison without the possibility of parole after the United States Supreme Court in 2005 banned the execution of offenders who are younger than 18 when they commit crimes. Grayson was 19 at the time of the murder.

## The execution method

Nitrogen hypoxia is a controversial method of execution, having only been tried for the first time in the nation when Alabama executed Kenneth Eugene Smith in January. Smith's execution by the method drew national and international scorn and media attention, including a protest from the Vatican.

Smith appeared to writhe and convulse on the gurney for at least four minutes during the execution. State and prison systems' officials had said before the execution that Smith should

lose consciousness "within seconds," and be dead within minutes once the gas started flowing into the full-face mask Smith wore.

**More:** Nitrogen gas execution: Kenneth Smith convulses for four minutes in Alabama death chamber

Alabama Department of Corrections Commissioner John Q. Hamm called Smith's execution "textbook," in a news conference about half an hour after the execution, and said the prisons system was ready to move forward with other nitrogen hypoxia executions.

In Alabama, there are about 160 inmates on death row, and they are given the option of what method of execution will be used: lethal injection, nitrogen hypoxia and electrocution. Grayson is among about 30 inmates who chose the nitrogen hypoxia method before its first use in Alabama.

With the nitrogen hypoxia method, the condemned breathes pure nitrogen through a mask that displaces oxygen in their system. Proponents claim it is an almost instant and painless method. Opponents claim it is untried and amounts to torture.

On Sept. 26, Alan Eugene Miller became the second Alabama inmate executed with nitrogen hypoxia as the method.

Alabama is the only state in the nation to have used nitrogen gas hypoxia as an execution method.

*Contact Montgomery Advertiser reporter Marty Roney at mroney@gannett.com.*



**Subscribe**

<u>**More local news for Birmingham, Huntsville and Mobile – Start Today for $1**</u>

<u>NEWS</u>

# Alabama executes Carey Dale Grayson by nitrogen gas for 1994 murder

Updated: Nov. 21, 2024, 11:43 p.m. | Published: Nov. 21, 2024, 10:49 a.m.

![Carey Grayson photo]

Carey Grayson, now 50, will be put to death in November 2024. It will be 30 years after Vicki Deblieux's death. (Photo by ADOC) Alabama Department of Corrections

  

**By Kent Faulk | kfaulk@al.com**

Alabama executed Carey Dale Grayson for the 1994 brutal slaying and mutilation of a hitchhiker in Jefferson County on Thursday evening, making it the state's sixth execution in 2024.

Earlier Thursday, the U.S. Supreme Court cleared the way for 50-year-old Grayson to be killed using the relatively new method of pumping nitrogen gas into a mask fitted over an inmate's face and suffocating him to death.

It was the third nitrogen gas execution carried out in the United States – all by Alabama.

The execution took place at the William C. Holman Correctional Facility in Atmore at 6 p.m. Thursday. It marks the most executions in a single year in more than a decade.

Grayson used his last words to curse the warden in charge of the prison.

Grayson was convicted with three other men-- all teenagers at the time-- for the murder and mutilation of 37-year-old Vicki Lynn Deblieux. The woman had been hitchhiking when she was picked up by the group of teenagers. Her body was found days later at the base of a cliff.

Her daughter, Jodi Haley, was present at Holman prison on Thursday night. She described her mother at a press conference following the execution. "She was unique. She was spontaneous, she was wild. She was funny and she was gorgeous to boot," Haley said.

She said she didn't know what it was like to have a mother while going through life events like graduation, marriage, and children - opportunities that were stolen from her. But Haley also focused on Grayson and her stance against the death penalty.

Grayson was abused "in every possible way," including having cigarettes put out on his skin, facing physical and sexual abuse and being thrown out on the street as an adolescent, Haley said.

"I have to wonder how all of this slips through the cracks of the justice system. Because society failed this man as a child and my family suffered because of it," she said.

Haley wondered what kind of positive impact Grayson could have had on lives. The 'eye for an eye' justification for the death penalty "it's not right," Haley said. "Murdering inmates under the guise of justice needs to stop," Haley said. "State sanctioned homicide needs never be listed as cause of death," she said.

"I don't know who we think we are. To be in such a modern time, we regress when we implement this punishment. I hope and pray my mother's death will invoke these changes and give her senseless death some purpose," Haley said.

**The execution**

The curtains to the execution chamber opened at 6:06 p.m.

The prison warden read the death warrant and pointed the microphone to Grayson's face to utter his last words, but then immediately backed off after Grayson said, "For you, you need to f*** off."

Grayson, at one point, also pointed up the middle finger on at least his left hand, which was visible to media witnesses.

"He's cussed out most of our employees tonight so we were not going to give him the opportunity to spew that profanity," said Commissioner John Hamm on why the warden took away the microphone.

But following Grayson's death, his attorney and spiritual advisor Kacey Keeton said that Grayson had more to say when the microphone was taken away. Keeton, who was sitting in the execution chamber with Grayson, said that he was cursing at Raybon specifically with his expletives and not at the broader audience.

After the microphone was taken and those in the witness rooms could not clearly hear him, Keeton said Grayson talked about how he committed a horrible crime and how sorry he was for it, adding that he had been sorry for over 30 years. According to Keeton, Grayson said he repented and that he was saved and knows God, and hopes for forgiveness.

He talked about the prison and disappointment in the system, mentioning that people there are committing murder and are "serial killers."

Grayson said, according to Keeton, that he hopes everyone knows the state is committing murder in the name of Alabama and the people that live there. He said he was praying for everyone, that God was with them.

Grayson continued leaning his head forward following his remarks and said something in a loud manner towards what appeared the middle execution viewing room, where state officials usually sit, as a guard hung the microphone up and the warden went into a separate room to begin the execution.

The gas apparently started flowing at 6:12 p.m., followed by Grayson gasping and raising, shaking his head left to right. About 6:14 p.m., both of his legs on the gurney raised up. His movements slowed, but he had what appeared to be periodic gasps over the following six minutes when he stopped moving.

At a press conference following the execution, Hamm said the first movements Grayson was doing were "all show" and the later movements were consistent with nitrogen gas executions.

Alabama Gov. Kay Ivey issued a press release following the execution, listing his time of death as 6:33 p.m.

She said in a press release, "Some thirty years ago, Vicki DeBlieux's journey to her mother's house and ultimately, her life, were horrifically cut short because of Carey Grayson and three other men. She sensed something was wrong, attempted to escape, but instead, was brutally tortured and murdered. Even after her death, Mr. Grayson's crimes against Ms. DeBlieux were heinous, unimaginable, without an ounce of regard for human life and just unexplainably mean. An execution by nitrogen hypoxia bares no comparison to the death and dismemberment Ms. DeBlieux experienced. I pray for her loved ones that they may continue finding closure and healing."

Earlier in the evening, an Alabama Department of Corrections spokesperson released details of Grayson's final meals and visitors. He refused his breakfast and lunch tray, but had coffee and Mountain Dew. For his final meal, Grayson had from local restaurants soft tacos, beef burritos, a tostada, chips and guacamole, and a Mountain Dew Blast.

His visitors included his attorneys Matt Schulz, Kacey Keeton, and Robin Konrad. Grayson also had calls with Konrad and Keeton.

Amnesty International had urged people today to contact Ivey to seek clemency for Grayson. Earlier this week, Death Penalty Action held a protest outside the Capitol in Montgomery on his behalf.

## The crime

Deblieux was kidnapped while hitchhiking from Chattanooga to see her mother in Louisiana. She accepted a ride from Grayson, Kenny Loggins, Trace Duncan, and Louis Mangione on the Trussville exit of Interstate 59 on Feb. 22, 1994.

Deblieux's nude and dismembered body was found four days later at the bottom of a cliff on Bald Rock Mountain in St. Clair County.

Court records show after picking up the woman, the teens took her to an abandoned area near Medical Center East in Birmingham, where they all drank. At some point, the teens attacked and killed Deblieux, drove her body to St. Clair County, then tossed her body and luggage off the cliff.

According to testimony in the teens' 1996 trials, Mangione went home while the other three returned to the scene and mutilated her body. They stabbed Deblieux's body more than 180 times, cut open her chest cavity, severed her fingers, and more. The teens later gave a finger to Mangione, who showed it to other friends who then contacted police.

All of the bones in Deblieux's face and head were broken, and all but one tooth was missing. She was identified by an old X-ray of her spine.

Grayson was 19 at the time of the slaying.

Mangione was 16, while Loggins and Duncan were both 17.

## Conviction and sentence

Although different versions of who was the "ringleader" of the attack at their trials, Grayson, Loggins and Duncan were all convicted and Jefferson County Circuit Judge Mike McCormick sentenced those three to death.

Grayson's sentence came after a unanimous recommendation from the jury.

The judge sentenced Mangione to life in prison without parole. But years later, Loggins and Duncan had their sentences changed to life in prison after the 2003 U.S. Supreme Court ruling that says juveniles (17 or younger) can't be sentenced to death. Justice Antonin Scalia cited the Deblieux case in his dissent in that ruling of teens that commit murder "that involve truly monstrous acts."

After a separate ruling from the U.S. Supreme Court, Duncan and Loggins had yet more hearings to allow a judge the opportunity to grant them a possibility of parole in the future.

Loggins was not given the chance of parole; Duncan will be eligible for parole in 2029.

Mangione was also made eligible for parole in 2029 after an appeal.

# Deblieux

Vicki Deblieux's half-brother, Mike Deblieux, told AL.com on Wednesday he hopes Grayson asks for forgiveness and that "God has mercy on his soul."

But Mike Deblieux said he's for the death penalty. "An eye for an eye… What they did to her, I think they all should have been put to death," he said.

"It was horrific what they did," Mike Deblieux added. He said he knows from reading about the trial that the boys were "on drugs and they're taking pills and drinking and probably not in their right mind at the time, but you know, there's no excuse for that and you got to account for your actions."

Though, the younger Deblieux said he understands the legal reasons why the others are not on death row.

He does not know any family members who plan to attend Grayson's execution. Mike Deblieux said he and Vicki's mother is still alive, but is not attending. The half-siblings have different fathers.

Mike Deblieux doesn't remember much about Vicki, who moved with her mother to the Monroe area of Louisiana after their parents divorced when he was about 7 and Vicki was about 14. He stayed behind with his other siblings. "So, you know, I have just a few memories of her growing up," he said.

"My mother still thinks about it today. I mean, it's affected her whole life, …I just remember when it happened, it was devastating to all of us, really. Just hard to believe it happened."

Vicki had two daughters who would probably have been in their late teens at the time she was killed, Mike Deblieux said.

Mike Deblieux said he recalled his half-sister was living up in Chattanooga around the time of her death.

"What she was doing there (Chattanooga), I have no clue. I know she was trying to get back home to see my mother - her mother. But, you know, I guess she didn't have the means, so she was trying to hitchhike back (to Louisiana)," Deblieux said.



Abe Bonowitz of Death Penalty Action leads a protest outside the Capitol in Montgomery, Ala., on Monday, Nov. 18, 2024, against a scheduled execution in Alabama using nitrogen gas. (Kim Chandler/Associated Press) AP

## Appeals

The U.S. Supreme Court denied Grayson's request to review his case and to halt his execution on Thursday morning.

The last appeals in Grayson's case had centered on Alabama's new method of using nitrogen gas to suffocate him. He and other death row inmates had previously sued in 2012 to prevent his execution by lethal injection and later when nitrogen gas was announced, he was among the inmates who signed up for that method.

However, critics — citing how the first two people executed shook for several minutes — say the nitrogen gas method needs more scrutiny, particularly if other states follow Alabama's path and adopt the new execution method.

In its appeal to the U.S. Supreme Court and request to halt the execution, attorneys with the Middle District of Alabama Federal Public Defenders Office representing Grayson said the case has national significance.

"Grayson's petition for writ of *certiorari (review)* raises issues of national importance among the 27 states that permit capital punishment and the federal government: whether the Eighth Amendment prohibits suffocating a conscious prisoner and whether a state's refusal to prevent conscious suffocation via a novel method of execution superadds terror and pain in violation of the Eighth Amendment."

The Alabama Attorney General's Office maintained that execution by nitrogen hypoxia is constitutional and the prior executions have gone according to plan. "What is generally uncontested from the evidence is that the ADOC's (prison system's) nitrogen hypoxia protocol has been successfully used twice, and both times it resulted in a death within a matter of minutes."

When media witnesses described the first inmate - Kenneth Smith - executed by nitrogen hypoxia as having writhed on the gurney, "what the journalists who described Smith writhing did not know was that when Smith was first moving on the gurney, he had not breathed in any nitrogen gas. That suggests his movements were voluntary or associated with holding his breath."

Grayson's lawyers had also been seeking a strong sedative if the execution proceeds, but the lawyers on Thursday morning withdrew that request and an emergency hearing set for 11:30 a.m. was canceled.

*AL.com reporter Ivana Hrynkiw contributed to this report.*

## MORE ON ALABAMA EXECUTIONS

**Alabama inmate Demetrius Frazier executed by nitrogen gas for 1991 Birmingham slaying: 'Let's go'**

**Mother of convicted murderer asks Michigan governor to rescue son from Alabama execution**

**Alabama death row inmate's lawyers drop effort to move him to Michigan**

**Alabama Death Row inmate set for execution is in wrong state, lawsuit argues**

# Federal court hears arguments on blocking Alabama's third nitrogen gas execution

If you purchase a product or register for an account through a link on our site, we may receive compensation. By using this site, you consent to our User Agreement and agree that your clicks, interactions, and personal information may be collected, recorded, and/or stored by us and social media and other third-party partners in accordance with our Privacy Policy.



▼ **About Us**

About Alabama Media Group

Jobs at Alabama Media Group

Advertise with us

About AL.com

Frequently Asked Questions

Accessibility Statement

Contact Us

Online Store

▼ **Subscriptions**

AL.com

The Birmingham News

The Huntsville Times

Press-Register

Newsletter

▼ **Already a Subscriber**

Manage your Subscription

Place a Vacation Hold

Make a Payment

Delivery Feedback

---

▼ **AL.com Sections**

News

Business

Sports

High School Sports

Alabama Life & Culture

Opinion

Archives

Obituaries

Jobs

Autos

---

▼ **Your Regional News Pages**

Anniston/Gadsden

Birmingham

Huntsville

Mobile

Montgomery

Tuscaloosa

Gulf Coast Beaches

---

▼ **On the Go**

Mobile Apps

Tablet Apps

▼ **Follow Us**

Pinterest

Twitter

Facebook

Instagram

RSS

---

▼ **Customer Service**

Send us an email

Submit a news tip

Buy newspaper front pages, posters and more

---

▼ **More on AL.com**

Videos

Weather News

Site Map & search

Sponsor Content

Post a job

---

Privacy Policy    |    User Agreement    |    Ad Choices

ADVANCELOCAL

Use of and/or registration on any portion of this site constitutes acceptance of our User Agreement, (updated 8/1/2024) and acknowledgement of our Privacy Policy, and Your Privacy Choices and Rights (updated 1/1/2025).

© 2025 Advance Local Media LLC. All rights reserved (About Us).
The material on this site may not be reproduced, distributed, transmitted, cached or otherwise used, except with the prior written permission of Advance Local.

Community Rules apply to all content you upload or otherwise submit to this site.

**YouTube's privacy policy** is available here and **YouTube's terms of service** is available here.

Ad Choices

Case 3:25-cv-00169-SDD-SDJ    Document 1-5    02/26/25    Page 227 of 286

# **Montgomery** Advertiser

---

**ALABAMA**

# Alabama executes Demetrius Frazier by nitrogen gas for 1991 murder

 **Sarah Clifton**
Montgomery Advertiser

Published 8:46 p.m. CT Feb. 6, 2025

---

**Key Points**   AI-assisted summary ⓘ

> Demetrius Terrence Frazier was executed by nitrogen gas hypoxia in Alabama for the 1991 murder of Pauline Brown.

> Frazier was the fourth inmate to be executed by nitrogen hypoxia, a method that has drawn controversy and legal challenges.

> Alabama prison officials maintain that nitrogen hypoxia is a painless and effective method of execution, despite concerns raised by witnesses and anti-death penalty advocates.

---

ATMORE, Ala. — The State of Alabama carried out its first execution of 2025 Thursday evening, putting Demetrius Terrence Frazier to death by nitrogen gas hypoxia for the 1991 rape, robbery and murder of a Birmingham woman named Pauline Brown.

This execution is the fourth ever of its kind. The previous three have been contentious points of conversation nationwide because of the controversial method that the State of Alabama first used in January 2024.

Frazier remained in the legal custody of the Michigan Department of Corrections, a state where the death penalty was outlawed in 1847. But he was executed in Alabama, where he was transferred under an arrangement made in 2011.

"In Alabama, we enforce the law," Gov. Kay Ivey said in a statement released after Frazier was declared dead. "You don't come to our state and mess with our citizens and get away with it. Rapists and murderers are not welcome on our streets, and tonight, justice was carried out for Pauline Brown and her loved ones. I pray for her family that all these years later, they can continue healing and have assurance that Demetrius Frazier cannot harm anyone else."

Frazier, who was 52 at the time of death, was convicted of capital murder for breaking into Brown's apartment, stealing as much cash as he could get from her, and raping her at gunpoint before killing her. Frazier has also been convicted of first-degree murder in Michigan for the murder of a 14-year-old girl.

He was officially pronounced dead at 6:36 p.m.

## Execution timeline

In the execution chamber, there is a digital clock, but the seconds are not visible. The following times are an approximate timeline:

**6:05**: The drapes in the viewing chamber were drawn back. Frazier was strapped cruciform by his arms and chest to the gurney, his body covered tightly in a white sheet from his chest down, and his hands in fists.

**6:06**: Alabama's authorization of Frazier's execution was read aloud by Warden Terry Raybon. As it was read, Frazier appeared to move his fists slightly against the restraints and seemed to inaudibly speak as he shook his head slightly.

**6:08**: Frazier spoke his last words. "First of all, I want to apologize to the family and friends of Pauline Brown," Frazier said. "What happened to her should have never happened." Frazier also said he wanted to apologize to the Black community and urged the media to contact Monica Childs, who was with the Detroit Police Department, about a false confession. Frazier directly addressed Michigan Gov. Gretchen Whitmer, and said, "If you cannot stand up for the constitution of Michigan, how are you going to stand up for the U.S. Constitution when you run for president?" Frazier ended his statement with "Detroit strong. I love everyone on death row. Let's go."

**6:10**: Raybon closed Frazier's mask. Seconds later, he appeared to say something inaudible. He appeared to move his fists in a slow, inward pumping motion, then appeared to open his fists with palms outstretched, followed by moving his hands in what seemed to be circular motions, as if imitating air flow. About thirty second later, his hands continued this apparent motion, but appeared to move more rigidly, occasionally off sync.

**6:11**: Frazier's breathing appeared to get heavier. He seemed to quiver and twitch.

**6:12**: Frazier appeared to struggle to breathe and seemed to clench the muscles in his face.

**6:13**: Frazier appeared to breathe sporadically, with seemingly inconsistent amounts of time between breaths, and apparently slightly shuddering. Frazier's legs appeared to tense and raise a few inches off the gurney, with his head seemingly lolling to the side. His arms seemed to tighten and fists clenched.

**6:14**: Frazier's breath appeared to slow down, though still slightly shuddering.

**Between 6:13 and 6:17**: His time between breaths appeared to be inconsistent, but his breaths appeared to come in shuddering gasps.

**6:18**: Frazier seemed to twitch slightly and shudder, with another shuddering breath apparently coming about 15 seconds later.

**From 6:18 to 6:20**: There appeared to be very little, if any, physical movement. If Frazier was breathing, it was imperceptible.

**6:20**: Frazier appeared to take his last, shuddering breath.

**Between 6:21 and 6:23**: Frazier appeared to have no perceptible movement.

**6:24**: Frazier's fists seemed to loosen slightly.

**Between 6:24 and 6:29**: No perceptible movement was apparent.

**6:29**: The drapes were drawn, closing off the view to the execution chamber.

## The aftermath

Alabama Department of Corrections Commissioner John Q. Hamm confirmed that the gas began flowing at 6:13 p.m. but noted that he was using a different clock than the one witnesses viewed in the execution chamber. The gas flowed for 18 minutes, with five of those minutes being past Frazier's flatline.

Hamm said that Frazier appearing to move less than the previous three inmates executed by nitrogen gas was on account of the fact that "all people are different and the body is reactive, it's all individual." He also said that Frazier's apparent leg raising movement was involuntary.

"We did see movement, and his movement was a lot less than we've had," Hamm said. "As y'all could see, he was kind of twirling his wrists, which didn't last very long, which we saw as a communication that he lost consciousness."

Hamm said that every movement after Frazier lost consciousness was involuntary. Upon being asked if the execution was "textbook," Hamm said the execution went "according to plan."

No witness statements were provided.

Before his execution, Frazier had seven visitors and one phone call. He refused breakfast, lunch, and dinner trays, but requested a final meal from Taco Bell which consisted of burritos, a chicken chalupa, tacos, chips and dip and a Mountain Dew. Matt Schulz, Frazier's attorney, was his only witness during the execution.

Frazier's remains are set to be transported to the Escambia County Coroner and the to the Alabama Department of Forensic Sciences for a postmortem inspection.

## The crime

On Nov. 27, 1991, Frazier broke into Brown's ground-floor apartment in Birmingham, court records show. Frazier, who was 19 at the time, saw a light on in the apartment and removed a screen to break in through the window.

He searched through her apartment and found $10. Brown, who was asleep at the time of the break-in, was awoken by Frazier demanding more money at gunpoint. After giving him $80 out of her purse, he raped her at gunpoint, all while she begged for her life, court records show. He killed her with a gunshot to the back of the head.

**More:** Who was Pauline Brown? Alabama woman killed by man set for execution on Thursday

Court records show that he checked outside the apartment to see if anyone heard any noise, and satisfied that he was undetected, he went back in, checked to ensure Brown was dead, ate some bananas in her kitchen, then left.

Frazier was arrested in March 1992 in Detroit for a different crime — the murder of 14-year-old Crystal Kendrick, which he was convicted of in 1993 and sentenced to life in prison. Frazier tried to rape Kendrick, and when she tried to escape, he murdered her, according to media reports. While under arrest for Kendrick's murder, he admitted his involvement in Brown's murder to the Detroit Police Department.

When convicted for the murder of Brown in 1996, a jury recommended the death penalty by a 10-2 vote, records show.

After serving 18 years of his life sentence in Michigan for convictions of felony murder, armed robbery, criminal sexual misconduct and felon in possession of a firearm charges, Rick Snyder and Robert Bentley, then-governors of Michigan and Alabama respectively, made an agreement to extradite Frazier to Alabama death row in November 2011.

# Controversial execution method

Nitrogen hypoxia is an execution method in which the inmate breathes in pure nitrogen gas through a mask, which displaces all the oxygen in their body and eventually suffocates the inmate. Proponents of the method claim it's an almost instantaneous, painless way to go. Opponents claim that it's untested, unconstitutional, painful torture.

**More:** Alabama tied an execution record in 2024, half by nitrogen gas

Alabama was the first state to use nitrogen hypoxia to execute an inmate. The method's first use ever only dates back to a little over a year ago, when Alabama executed Kenneth Eugene Smith in January of 2024. Frazier is now the fourth inmate to die by inhalation of nitrogen gas.

When Alabama was preparing to execute Smith, the state said once the gas started, he would lose consciousness "within seconds" and dead in minutes. During Smith's execution, he appeared to writhe and convulse on the gurney for at least four minutes, as the Montgomery Advertiser previously reported. The other two inmates before Frazier to be executed by this method exhibited similar behavior.

In late January, Frazier and his lawyers attempted to get a federal judge to block his execution, claiming the method violated the Eighth Amendment as it was "cruel and unusual punishment."

"Something is going wrong. Every inmate who has been executed by nitrogen gas has exhibited signs of consciousness beyond the 40 seconds [that was predicted by the state]," said Spencer Hahn, Frazier's attorney, in the court proceedings, the Associated Press reported.

This attempt to block his execution was denied, however, with U.S. District Court Judge Emily Marks writing that "the Eighth Amendment does not guarantee Frazier a painless death," and that he had failed to meet the "exceedingly high bar" that his claim faced.

*Sarah Clifton covers business for the Montgomery Advertiser. You can reach her at sclifton@montgome.gannett.com or follow her on X @sarahgclifton.*



**Subscribe**

<u>**More local news for Birmingham, Huntsville and Mobile – Start Today for $1**</u>

<u>NEWS</u>

# Alabama inmate Alan Miller executed with nitrogen gas Thursday for 1999 shootings

Updated: Sep. 26, 2024, 8:59 p.m. | Published: Sep. 26, 2024, 12:00 p.m.

Alan Miller is set to die on September 26 by suffocating on nitrogen gas. (Mugshot by ADOC) Alabama Department of Corrections

**By Ivana Hrynkiw | ihrynkiw@al.com**

An Alabama Death Row inmate, convicted of killing three men in a workplace shooting, was executed Thursday evening. He is the second inmate in the country to be executed using nitrogen gas.

Alan Eugene Miller, 59, was executed at 6 p.m. at William C. Holman Correctional Facility in Atmore. The prison, located just north of the Florida border, is the only facility in the state equipped with an execution chamber and where most of the state's death row inmates are housed.

His nitrogen hypoxia execution happened after Miller reached a confidential settlement with the state in August and his federal lawsuit was dismissed.

The curtains opened to the viewing room at 6:12 p.m., and the prison warden read aloud his death warrant. When asked if he had last words, Miller said: "I didn't do anything to be in here." He asked his family and friends witnessing the execution to take care of someone, which was inaudible to media witnesses.

"I didn't do anything to be on death row," he said again, before adding "thank you."

Following his final words, a correctional officer inside the execution chamber checked the seal of the gas mask fitted to Miller's face and shut the mask valve, which had been opened for him to speak. A beep was heard through the prison walls.

The gas appeared to start flowing into the mask at 6:16 p.m. His fingers moved slightly on the gurney as his spiritual advisor approached him and touched his leg, praying over Miller.

Miller then took deep breaths and lifted his head off the gurney several times at 6:18 p.m. He struggled against the restraints on the gurney, shaking and trembling for about two minutes.

Miller then gasped off and on for about six minutes.

At 6:23 p.m. a correctional officer leaned down and listened to Miller's breath.

The curtains closed at 6:32 p.m.

Prison officials said Miller's official time of death was 6:38 p.m.

The shaking was similar to what was seen at Kenneth Smith's execution - the first ever nitrogen gas execution ever conducted - earlier this year, but was not as long or violent.

## Officials comment on the execution

Alabama Department of Corrections Commissioner John Hamm spoke to reporters at the prison's media center following the execution.

"There's going to be involuntary body movements as the body is depleted of oxygen, so that was nothing we did not expect," Hamm said when asked about Miller's shaking.

No changes to the protocol were made as a result of Miller's federal court settlement last month, Hamm added.

"Everything went according to plan and according to our protocol."

The nitrogen gas flowed for 15 minutes, Hamm confirmed.

Alabama Attorney General Steve Marshall sent a statement following the execution, saying "justice has been served."

"Tonight was the second time Alabama used nitrogen hypoxia as the method of execution... The Department of Corrections first used this humane and effective method to execute murderer Kenneth Smith in January. Backed by a major law firm, Smith had challenged the method in federal courts, ultimately appealing to the U.S. Supreme Court. But the courts found little evidence to support his claims."

He continued, "Likewise, Alan Miller sued to stop his execution by nitrogen hypoxia—the method he chose under state law. But after conducting extensive discovery and receiving unprecedented access to prison personnel and documents, Miller agreed to drop his suit and settle with the State."

"Tonight, despite misinformation campaigns by political activists, out-of-state lawyers, and biased media, the State proved once again that nitrogen hypoxia is both humane and effective. Miller's execution went as expected and without incident."

Marshall did not witness the execution.

Alabama Gov. Kay Ivey also issued a statement via email: "Just as Alan Miller cowardly fled after he maliciously committed three calculated murders in 1999, he has attempted to escape justice for two decades. Tonight, justice was finally served for these three victims through the execution method elected by the inmate. His acts were not that of insanity, but pure evil. Three families were forever changed by his heinous crimes, and I pray that they can find comfort all these years later."

A prison spokesperson, Kelly Betts, provided information about Miller's last 24 hours. On Wednesday, Miller was visited by his two sisters, brother, and brother-in-law, along with his spiritual advisor, and two attorneys.

He refused Wednesday's formal meals, but ate a Philly cheesesteak sandwich, pizza, a chicken sub sandwich, a chicken burrito, several sodas and a bottle of water.

On Thursday, Miller was visited by three attorneys, a friend, his brother-in-law, two sisters, brother and spiritual advisor. He didn't make any phone calls.

He refused his breakfast on Thursday but did accept a final meal of hamburger steak, a baked potato, and French fries.

He had six witnesses to his execution: a friend, two sisters, brother and two attorneys.

**First attempted execution**

Thursday night was the second time Miller entered Alabama's execution chamber.

<u>Miller was first set to die</u> by Alabama's three-drug lethal injection cocktail on on Sept. 22, 2022, but prison officials called off that execution about 30 minutes before the state's death warrant expired. Miller's veins couldn't be accessed within execution protocol time limits.

Miller was convicted in the Aug. 5, 1999 Shelby County shootings in which he killed Terry Jarvis, 39, Lee Holdbrooks, 32, and Scott Yancy, 28. The shootings happened at two businesses where Miller worked and had previously worked.

Holdbrooks and Yancy were employees of Ferguson Enterprises, while Jarvis worked for Post Airgas in Pelham.

The execution was called off at approximately 11:30 p.m. that night in 2022 because of issues accessing Miller's veins, Alabama Department of Corrections Commissioner John Hamm told reporters gathered at the prison system media center. At the time, the state's death warrant expired at midnight — meaning the execution couldn't happen after 12 a.m. — and there wouldn't have been enough time left to finish setting up the IVs and preform the lethal injection.

Miller's legal battles prior to that execution attempt centered around his claims that in June 2018, he completed a form distributed to death row inmates at Holman electing to die by the state's newly approved method of execution, nitrogen hypoxia, instead of the default method of lethal injection.

The AG's Office argued there was no record of that form being submitted, and that he should be executed using lethal injection instead.

The U.S. Supreme Court had issued a ruling that sided with the state just after 9 p.m. the night of the first execution attempt, giving the prison nearly three hours to conduct the execution before the death warrant expired.

At the time, Hamm said the execution team tried to access Miller's veins to insert the IV lines for the three-drug lethal injection cocktail. When pressed what was being done during that nearly three-hour period, Hamm would not elaborate. "Like I said, there are several things that we have to do before we even start accessing the veins. And that was taking a little bit longer than we anticipated."

Miller claimed later in a lawsuit that prison workers poked him for 90 minutes trying to start an IV. And later, the state agreed with Miller's lawyers in a federal lawsuit that it would not seek to execute Miller by lethal injection again, and that any attempt to execute him in the future would be done with nitrogen gas.

In 2022, when the lethal injection attempt happened, the state hadn't yet begun using nitrogen.

## MORE ON ALABAMA EXECUTIONS

**Alabama inmate Demetrius Frazier executed by nitrogen gas for 1991 Birmingham slaying: 'Let's go'**

**Mother of convicted murderer asks Michigan governor to rescue son from Alabama execution**

**Alabama death row inmate's lawyers drop effort to move him to Michigan**

**Alabama Death Row inmate set for execution is in wrong state, lawsuit argues**

**Alabama executes Carey Dale Grayson by nitrogen gas for 1994 murder**

**Nitrogen hypoxia**

Miller's execution Thursday night was the second one carried out in America using the method of nitrogen hypoxia — having an inmate breathe in pure nitrogen, lose consciousness and die of asphyxiation.

Kenneth Smith's execution in January drew international attention, as groups around the world expressed outrage over the method and after Smith thrashed against the gurney for several minutes before losing consciousness.

The U.S. Supreme Court had allowed Smith's execution to proceed, but Justice Sonia Sotomayor filed a dissent, with which two other justices joined.

In that document, Sotomayor noted Alabama failed in its first attempt to execute Smith by lethal injection—an execution attempt that happened just after the attempted execution of Miller in 2022. She also wrote Smith predicted "Alabama's protocol will cause him to suffocate and choke to death on his own vomit. I sincerely hope that he is not proven correct a second time. With deep sadness, but commitment to the Eighth Amendment's protection against cruel and unusual punishment, I respectfully dissent."

The Alabama Attorney General's Office, led by Attorney General Steve Marshall, said in a filing to the high court in that case that nitrogen hypoxia was "perhaps the most humane method of execution ever devised."

The method works by strapping a gas mask onto the condemned inmate and pumping pure nitrogen into the mask. Some Alabama Death Row inmates' lawsuits have centered around calls for not using a mask for the procedure.

After Miller's case settled last month, Marshall issued a statement saying that the nitrogen protocol was "reliable and humane." He said the lawsuit "was based on media speculation that Kenneth Smith suffered cruel and unusual punishment in the January 2024 execution, but what the State demonstrated to Miller's legal team undermined that false narrative."

State officials have argued that Smith held his breath at the beginning of his execution, delaying the nitrogen entering his body and causing his seizure-like movements.

But Miller's lawyers argued that the state doesn't offer any proof for their claims that Smith held his breath, and the state "hang(s) their hat exclusively on the self-serving testimony of a witness who claims to have remembered Mr. Smith's oxygen levels nearly seven months after the execution."

The witness— an execution team captain — didn't write down those oxygen levels, according to Miller's lawyers, nor tell anyone about them on the night of the execution.

"In fact, evidence in the record suggest that the witness could not even see the levels from his position in the execution chamber, and the execution log from Mr. Smith's execution… undercuts (the state's) entire argument," said a court filing.

In a deposition earlier this summer, Miller said he has no intention of holding his breath or resisting his execution, but he's worried the state will fail at securing his gas mask because they're "incompetent."

"I don't think y'all know what you're doing," Miller told a state attorney during the deposition. "And these guys can't even open a cell door sometimes. They're keystone cops is basically what they are."

Death penalty opponents on Wednesday delivered petitions asking Gov. Kay Ivey to halt the execution, according to the Associated Press. Miller is one of five death row inmates scheduled to be put to death in the span of one week, an unusually high number of executions that defies a yearslong trend of decline in the use of the death penalty in the U.S.

**The crime**

The three men killed by Miller were gunned down at their workplaces on that August day in 1999, in the Shelby County city of Pelham. Shortly after the slayings, a friend of one victim summed up the situation: "There will probably never be any sense made of this … There never is."

The men died after Miller opened fire in two Highway 31 businesses while alleging his current and former co-workers were "spreading rumors" about him, according to court records.

Yancy and Holdbrooks were killed at Ferguson Enterprises; Jarvis was slain at Post Airgas, located just down the street.

Shelby County District Attorney Robby Owens, in his opening statement in Miller's trial nearly a year after the shootings, described the killings as methodical and cold. "These men are not just murdered. They are executed," he said.

Efforts by AL.com to reach relatives of the three men killed by Miller were unsuccessful prior to his first execution attempt.

But immediately after the slayings, some friends did talk to The Birmingham News about the men and how they would be missed.

Yancy was 28 when he was gunned down, leaving behind a wife and two children. An article published in the days after the shooting by The Birmingham News quoted Yancy's pastor, calling Yancy a dedicated family man and friend who didn't seek attention for his many good deeds.

Yancy and Holdbrooks were close friends, and both graduated from Thompson High School; Holdbrooks in 1985 and Yancy in 1989, according to the former principal. Friends and family told the newspaper in 1999 that Yancy liked to talk about his job at Ferguson and loved spending time at his church, where he chaired the church maintenance committee. Reports say he was gentle, despite his large frame of 6 feet and 6 inches.

Ferguson's Atlanta branch sent two Japanese maple trees that were planted in front of the Pelham office in memory of Yancy, a 10-year employee, and Holdbrooks. Officials from the company declined to comment in 1999 after the shootings, saying they were focusing on letting their employees grieve.

Holdbrooks was 32 when he was killed. He suffered six gunshot wounds, with the sixth being the fatal shot fired at close range.

According to reports at the time of the slayings, he had recently celebrated his fourth anniversary with his wife. The couple had no children, but The Birmingham News reported Holdbrooks doted on his dog, Oreo. He had just taught the pet to catch a Frisbee from a long distance.

Jarvis was 39, working at Post Airgas when he was shot five times, also at close range. Witnesses said that before he was shot, Miller confronted Jarvis about spreading rumors. Jarvis denied the accusation but was shot just seconds later.

Jarvis wasn't married and had no children.

He was described as "jolly" and his sister said later in August 1999 that, if Jarvis was alive, he would likely be deep-sea fishing in Florida.

At a joint memorial service for the three men held that summer, Jarvis' pastor said the community must hold out hope.

Rev. Donald Vanderslice of Macedonia Baptist Church said, "In the midst of this tragic time, we must have courage; courage for today, courage for tomorrow."

## Alan Miller's past

Court records filed by an appeal team for Miller in 2006 talked about his "unstable" upbringing and the "extreme physical and psychological abuse" he suffered from his father. Those records also note a "well-documented history of family mental illness."

Records show Miller's father "did not like his son at all," according to Miller's mother. "After (Miller) was born, his father frequently called him 'the devil' or 'a demon,'" the appeal stated. "He 'deliberately tried to instill terror in the Miller children.'"

Appeal records state Miller's father belittled him, called him names, and wouldn't let him participate in sports or activities. He also physically beat Miller, resulting in multiple concussions and other injuries, and stabbed him with a knife. Miller's father also, according to the records, would often wave a pistol and threaten to kill his family. This abuse happened to all the Miller children and Miller's mother but was often worse with Miller himself.

The Millers lived with rats and cockroaches roaming their beds "in constant poverty," the record stated, and were never accepted by any community they moved into because of the father's behavior.

Miller did not testify at his trial.

If you purchase a product or register for an account through a link on our site, we may receive compensation. By using this site, you consent to our User Agreement and agree that your clicks, interactions, and personal information may be collected, recorded, and/or stored by us and social media and other third-party partners in accordance with our Privacy Policy.



**▼ About Us**

About Alabama Media Group

Jobs at Alabama Media Group

Advertise with us

About AL.com

Frequently Asked Questions

Accessibility Statement

Contact Us

Online Store

▼ **Subscriptions**

AL.com

The Birmingham News

The Huntsville Times

Press-Register

Newsletter

---

▼ **Already a Subscriber**

Manage your Subscription

Place a Vacation Hold

Make a Payment

Delivery Feedback

---

▼ **AL.com Sections**

News

Business

Sports

High School Sports

Alabama Life & Culture

Opinion

Archives

Obituaries

Jobs

Autos

---

▼ **Your Regional News Pages**

Anniston/Gadsden

Birmingham

Huntsville

Mobile

Montgomery

Tuscaloosa

Gulf Coast Beaches

▼ **On the Go**

Mobile Apps

Tablet Apps

---

▼ **Follow Us**

Pinterest

Twitter

Facebook

Instagram

RSS

---

▼ **Customer Service**

Send us an email

Submit a news tip

Buy newspaper front pages, posters and more

---

▼ **More on AL.com**

Videos

Weather News

Site Map & search

Sponsor Content

Post a job

---

Privacy Policy    |    User Agreement    |    Ad Choices

---

ADVANCELOCAL

Use of and/or registration on any portion of this site constitutes acceptance of our User Agreement, (updated 8/1/2024) and acknowledgement of our Privacy Policy, and Your Privacy Choices and Rights (updated 1/1/2025).

© 2025 Advance Local Media LLC. All rights reserved (About Us).
The material on this site may not be reproduced, distributed, transmitted, cached or otherwise used, except with the prior written permission of Advance Local.

Community Rules apply to all content you upload or otherwise submit to this site.

**YouTube's privacy policy** is available here and **YouTube's terms of service** is available here.

Ad Choices



**Subscribe**

<u>**More local news for Birmingham, Huntsville and Mobile – Start Today for $1**</u>

<u>NEWS</u>

# Alabama inmate Demetrius Frazier executed by nitrogen gas for 1991 Birmingham slaying: 'Let's go'

Updated: Feb. 06, 2025, 8:27 p.m. | Published: Feb. 06, 2025, 11:00 a.m.

Demetrius Frazier shown here in an updated photo from the Alabama Department of Corrections. (ADOC) Alabama Department of Corrections

  

**By Ivana Hrynkiw | ihrynkiw@al.com**

An Alabama Death Row inmate was executed tonight for the 1991 slaying of a woman in her Birmingham apartment, who he admitted killing after he got tired of hearing her beg for her life.

Demetrius Terrence Frazier was executed at the William C. Holman Correctional Facility in Atmore. The 52-year-old was put to death by inhaling pure nitrogen gas through a gas mask. He is the fourth inmate in Alabama—and the country—to be executed using that method. It is Alabama's first execution for 2025 after having led the nation in 2024 with six executions- by either lethal injection or nitrogen gas.

Alabama Gov. Kay Ivey issued a statement saying Frazier's official time of death was 6:36 p.m.

"In Alabama, we enforce the law," Ivey said in a press release.

"You don't come to our state and mess with our citizens and get away with it. Rapists and murderers are not welcome on our streets, and tonight, justice was carried out for Pauline Brown and her loved ones. I pray for her family that all these years later, they can continue healing and have assurance that Demetrius Frazier cannot harm anyone else."

## Execution

The curtain over the viewing window into the execution chamber opened at 6:05 p.m. and after the prison warden read Frazier's death warrant, Frazier gave a last statement:

"First of all, I want to apologize," to the friends and family of Pauline Brown and the Black community, he said. "What happened to Pauline Brown should have never happened."

Frazier also said members of the media should contact a former detective at the Detroit Police Department to ask about a false confession he made regarding the killing of a 14-year-old there in 1992.

"Detroit strong. I love everybody on Death Row," he said.

Frazier's final words were, "Let's go."

After his last words, a guard in the execution chamber checked the seal on the gas mask.

About 6:11 p.m., Frazier started waving his hands in circles towards his body. About a minute later, his hands stopped moving.

At approximately 6:12 p.m. Frazier clenched his face, and his nostrils flared, while his hands quivered. He appeared to say something, which was inaudible to the three witness rooms. His legs slightly lifted up off the gurney and he gasped.

Then, his head rolled to the right side. Frazier exhibited sporadic gasping and shallow breathing until about 6:20 p.m.

The curtains closed at 6:29 p.m., and his time of death declared seven minutes later at 6:36 p.m.

Though Frazier's execution was punishment for the 1991 slaying of Pauline Brown, he was also serving a life sentence in Michigan for the 1992 killing of a teenager. He was brought to Alabama to await execution in 2011.

Frazier's lawyers were hoping that before Frazier was escorted into the execution chamber, Michigan Gov. Gretchen Whitmer would ask Alabama to halt the execution and send the inmate back north. That didn't happen.

Frazier said while strapped to the gurney in the execution chamber about Michigan Gov. Whitmer: "If you can't stand up for the Michigan Constitution, how can you stand up for the U.S. Constitution?" He made the statement assuming she will one day run for president.

Following the execution, Alabama Department of Corrections Commissioner John Hamm spoke to members of the media gathered at a building down the street from Holman prison. He said that the nitrogen flowed for 18 minutes, starting around 6:13 p.m. It flowed five minutes past Frazier's flatline.

When asked about the eight minutes of movement after the gas started to flow, Hamm said he believed Frazier lost consciousness when his hands and wrists stopped moving and those breaths were involuntary movements.

"All people are different," Hamm said, and each of the four inmates so far executed in Alabama using nitrogen have behaved differently under the gas. Frazier showed less movement than the others, he said.

Prior to being transferred to the Yellowhammer State in 2011, Frazier was serving multiple life sentences in Michigan for sex crimes and the murder of a 14-year-old girl. Frazier's lawyers argued that his transfer to Alabama Death Row was illegal, and he should have

been serving his life sentences up north. While that battle is no longer being waged in court, Frazier was hoping the Michigan governor would step in.

But the Detroit News reported that Whitmer said this afternoon that it was out of her hands.



Frazier's lawsuit over the Michigan transfer was dismissed, and his other legal move that sought to have a judge either call off the execution or order the Alabama Department of Corrections to administer a sedative before turning on the nitrogen gas was denied last week.

His lawyers didn't appeal that decision.

It was during the investigation of the 14-year-old girl's murder in Detroit that Frazier admitted to Brown's shooting in Birmingham. In 1996, when Frazier stood trial in a Jefferson County courtroom, his then-lawyers said the Alabama slaying might never have been solved without Frazier's confession.

## Last days

On Wednesday, Frazier was visited by his mother and sister, according to an Alabama Department of Corrections spokesperson.

He refused his breakfast tray, which consisted of scrambled eggs, grits, two biscuits, strawberry jelly and orange Kool-Aid. He took a phone call from his wife.

On Thursday, he was visited by a friend, his mother, his sister, a lawyer, his wife, the prison chaplain, and an investigator. He refused his breakfast, lunch and dinner tray.

His final meal was a beefy five-layer burrito, a chicken chalupa supreme, beef crunchy tacos, chips and dip, and a Mountain Dew.

## Pauline Starks Brown's killing

Brown was a daughter, sister, mother, and had recently become a grandmother. She had worked for 20 years as a cook at Bama Foods.

Her life ended in the early morning hours of November 27, 1991, when she was raped and shot in the back of the head. She had been discussing with her mom the plans for Thanksgiving, which was only two days away.

"Pauline was 40 years old, in the prime of her life, had raised her two daughters. Six weeks ago, Phyllis had her baby; she would have been a grandmother for the first time," said prosecutor Roger Brown during Frazier's trial nearly 30 years ago.

"And that grandbaby will never see grandmother because Demetrius Frazier got tired of listening to Pauline beg."

According to court records, Frazier saw a light on in Brown's Fountain Heights apartment early that morning. He took a screen off a window in the ground floor apartment and climbed in. He searched the apartment for money, but didn't find much.

At some point, and while armed with a gun, he woke up a sleeping Brown. He demanded money, and she gave him about $80 from her purse. Frazier then forcibly raped Brown and, after she begged him not to kill her, shot her at close range.

According to Frazier's police statements, which were used at his 1996 trial, he was tired of hearing Brown plead for her life. According to reporting from The Birmingham News at the time, Frazier said in his taped confession: "She kept on making some sorry excuses why I should (not) hurt her. She kept saying she was a po' Black woman… and I got mad."

Records show Frazier, who was 19 at the time, then left the apartment to see if anyone heard the blast. When he didn't see anyone outside, he went back inside the apartment. He made sure Brown was dead, looked for more cash, and ate bananas in her kitchen.

Brown's mother, who was a longtime employee of the Birmingham Housing Authority, learned of her slaying the next day.

According to a Detroit homicide investigator-- the same one called into question by Frazier's last words--Frazier "said he hated women who whined and begged for their lives," a report from The Birmingham News said during the trial.

# Detroit man convicted of 1991 rape-murder; could face execution

By **Vickli Howell**
News staff writer

In statements to police, murderer Demetrius Terrence Frazier said he got tired of Pauline Starks Brown pleading with him not to hurt her after he robbed and raped her, so he fired a .22-caliber bullet into the back of her head.

Because of that, a Jefferson County jury Wednesday found the Detroit man guilty in two of the three capital murder counts against him in the 41-year-old Birmingham woman's death 4½ years ago.

The jury still had questions about one of the counts against him — capital murder committed during the course of burglary — and withheld a decision on that count until further deliberations today.

However, after more than 2½-hours of deliberations Wednes-

day, it found Frazier, 23, guilty of capital murder committed during a robbery and of capital murder committed during a rape.

The verdicts puzzled family members of the victim, but they said they were largely satisfied with what they understand.

"It doesn't make any difference what they come back with (today) because he was found guilty of capital murder and that takes precedence over all of the others," said Curtis Starks, Mrs. Brown's brother. "That means the death penalty."

Conviction of capital murder carries the sentence of either life without parole or death in the electric chair. The jury will make a recommendation on the sentence, which the judge can accept or change.

Frazier sat calmly in the courtroom through the third day of his trial and through the reading of the verdicts Wednesday afternoon, a dif-



**Pauline Starks Brown**
Killed in 1991 attack

ferent man from the one whose courtroom antics the day before included angrily throwing a pen into the jury box.

Upset that the 10 white jurors outnumbered the black jurors, Frazier accused them of being racist, then he threw the pen at the jury box and cursed them, all after opening statements began Tuesday.

Before that, he threatened his own attorneys and accused them of colluding with the prosecution to make him look like a liar by saying he's

See **Convicted**, Page **4B**

A June 6, 1996 article in The Birmingham News showing a photo of Pauline Starks Brown. (Archive) File

Brown's nephew, Curtis Starks Jr., told AL.com he planned to witness the execution on Thursday. His father, grandmother, and one of Brown's daughters have since died.

Several family members witnessed the execution, but prison officials did not name those relatives.

Starks Jr. recalled the day of Brown's killing, which happened when he was in high school. He was at football practice, getting ready for the upcoming playoff game, when something didn't feel right.

The younger Starks said he went home, and his mother told him what happened to his aunt. He had just seen her the weekend before—Starks Jr. said he and his dad visited Brown and ate cornbread as they talked.

"I never knew that would be the last time I saw her," he said.

And now, his family is still dealing with the aftermath of Brown's murder.

"It was a terrible, terrible day. I'm 50 now, and that was in '91, and what happened still hurts the same," Starks Jr. said. "Someone was taken from me, from my family. I think the thing that hurts most is this guy, Demetrius Frazier, broke into her house, raped my aunt and killed her because she was pleading for her life. That's the most devastating thing for us."

Brown was an integral part of their close-knit family, her nephew said. She was a cook—like everyone in their family, he said laughing. But of everyone, she made the best red velvet cake. It took Starks Jr. years before he could even eat the confection again.

"Our whole family remembers our aunt."

 Stories by **Ivana Hrynkiw**

**Alabama lawmakers look into paroles and 'oversight of a board that currently just ignores all'**

**Michigan must stop Alabama from executing Demetrius Frazier, lawyers say**

**Alabama Death Row inmate asks for sedative ahead of nitrogen execution**

**Alabama death row inmate's lawyers drop effort to move him to Michigan**

**'A sexual predator': Michigan prisons don't want Alabama death row inmate back**

## Behavior

Frazier's erratic behavior during his 1996 trial in Birmingham consisted of throwing things, cursing his jury, spewing claims of racism and accusing his own attorneys of being undercover prosecutors before threatening them, too.

In court records, Frazier's former lawyers said before his 1996 trial that he "had several incidents… (of) uncontrollable violent behavior… which may indicate the onset of some mental disease or disorder," and that Frazier had "become very difficult to communicate with."

The judge denied the lawyers' ask to have a mental evaluation before trial.

On the second day of his trial during the summer of 1996, according to court records, Frazier refused to wear a leg brace—which was concealed under his pants and designed to limit any quick movements in case he became violent. When the judge asked him why he was refusing the leg brace, Frazier was silent.

"Well, I'm going to give you a choice, you can either wear the leg brace or you can wear the shackles and the handcuffs. Obviously sitting there with shackles and handcuffs is not going to impress the jury very much; in fact, it would prejudice your case," said former Jefferson County Circuit Judge Mike McCormick, according to trial transcripts.

"I don't want to do that. In fact, I have never done that in the 15 years I've been on the bench. And most people understand that it hurts their case to do that, [and it is] an unreasonable position to take. Do you have anything to say?"

Frazier didn't respond to the judge, nor his attorneys, for a while. Eventually, he said:

"Don't make me no difference, go on with y'all, do what you got to do… I don't care, don't make me no difference. I don't even want to be in the courtroom for my hearing."

When his lawyer attempted to intervene, Frazier said, "I don't want to talk to you. I don't want to be in the courtroom, either."

He asked to be put in the "hole" at the county jail, and said he didn't trust his legal team.

"Plus I got a all mother-f****** white jury. I don't — I got 10 white jurors and 4 black jurors. I don't even want to sit in trial with them. I don't trust that jury. I don't trust the lawyers, either. I think them with the other prosecutors… And I don't see I'm going to get a fair trial with them white jurors up there with you. We in Birmingham right now. This city majority, this city right here majority black, and I got 10 mother-f****** white jurors, a white jury."

He continued asking to be put in the jail. "Because right now I'm mad, I'm real mad right now, I'm real mad. There ain't no telling what I might do when I get back… I'm giving you a warning, I'm just letting you know. Like I say, I'm really mad right now. I might slap the shit out of my lawyer right there."

He admitted guilt multiple times to Brown's slaying during that talk with the judge, transcripts show.

When the jury was finally brought into the courtroom, Frazier threw a pen at the jury and narrowly missed a juror. "Shut the f*** up. That jury right there is racist, man. That jury is racist, man, look at them. That guy looking at me, man. That jury is racist, man."

He was escorted out of the room.



Demetrius Frazier is heavily guarded by Wayne County sheriff's deputies during his sentencing in Detroit on murder, rape and other charges.

An AP photo from The Birmingham News shows Demetrius Frazier surrounded by police during his trial in Detroit. (File) AP Photo

After Frazier's outburst, the judge moved the trial to another courtroom, where Frazier could watch the proceedings from an enclosed soundproof box typically reserved for members of the media.

But the Alabama Supreme Court wrote that Frazier's attitude wasn't a sign of mental illness. His "violent outburst and his belligerent, disrespectful, and suspicious behavior toward the court, the jury, and his counsel all appear to be the result of a bad temper and poor judgment — not a lack of competency to stand trial."

During the trial, Frazier's audio confession was played. Records show that two of Brown's family members—her daughter and her mother—became emotional. "Why you did that, why you did that, why you did you hurt mama like that? Why you do her like that?" said one of Brown's

daughters.

And her mother uttered, "That's my baby. Oh, mercy, I can't take that. I can't take no more."

Both family members were escorted out of the courtroom.

But one of Frazier's lawyers argued in his closing arguments that no one might have ever known who killed Brown if Frazier hadn't confessed.

After the jury convicted Frazier, they recommended he be sent to death row on a 10-2 vote.

At the time, Brown's brother Curtis Starks told The Birmingham News, "It was a great relief to the family to get him convicted… He's a serial rapist who just kills somebody when they make him mad."

## Michigan crimes and sentences

Frazier's lawyers had previously asked a federal judge to order he be brought back to Michigan to finish serving his life sentences there. But after the Michigan prison system said they didn't want Frazier back; the lawyers dropped the case.

Frazier was arrested in Michigan in 1992, months after Brown's killing. After Brown's death, Frazier returned to his home city of Detroit and, according to court records, took 14-year-old Crystal Kendrick into a vacant house, preparing to rape her at gunpoint. But as he undid his pants, the teen fled. Frazier went after her and shot her in the head.

He was arrested days later in Detroit. According to the Alabama Attorney General's Office, at the time of his arrest Frazier had a slew of pending charges including 15 counts of first-degree criminal sexual conduct.

During his talks with police in Michigan in 1992, Frazier admitted to Brown's slaying in Alabama.

Frazier was convicted in Michigan the next year for criminal sexual conduct, robbery, and the teenager's slaying. There, he was given three life sentences. During court proceedings there, reporting from The Birmingham News in 1996 showed, Frazier attempted an escape, hit a prosecutor in the jaw, and lunged at jurors.

In 1995, Michigan authorities brought Frazier to Alabama, where he was tried for Brown's killing, found guilty and sentenced to death. The Michigan authorities then brought him back north, where he was imprisoned.

But in 2011, then-Govs. Robert Bentley of Alabama and Rick Snyder of Michigan created an executive agreement to transfer Frazier to Alabama, according to documents signed by the governors.

In a lawsuit, Frazier's lawyers from the Federal Defenders Office argued his "Michigan life sentences have not been commuted and he has not been pardoned." And the northern state's law says, according to the lawyers, that an inmate like Frazier "shall not be eligible for custodial incarceration outside a state correctional facility or a county jail."

Michigan does not have the death penalty.



Carol Frazier, mother of Demetrius Frazier, pleads publicly on Tuesday, Jan. 28, 2025 to Gov. Gretchen Whitmer to bring home her son Demetrius Frazier, a Detroit man convicted of rape and a separate murder of a 14-year-old in the early 1990s who was serving a life sentence when he was charged with another murder in Alabama. Carol Frazier delivered a letter to the Gov. Whitmer's office in the George W. Romney Building in Lansing requesting she give an executive order requesting her son's return to Michigan before he is executed as early as Feb. 6 in Alabama through the death penalty.  Jake May | MLive.com

"While Michigan takes no position on the imposition of the death penalty in this case, Michigan does not seek to return Frazier to a Michigan correctional facility," a court filing from a Michigan Department of Corrections lawyer read.

Frazier cannot make the state take him back into custody, Michigan's filing said. The inmate's question about state custody, said Michigan lawyers, is one for state court and not federal court. And, they added, the executive agreement between Bentley and Snyder "boils down to a priority-of-custody matter between sovereigns."

It called Frazier's claim a "farfetched argument" and "decades too late."

The Alabama Attorney General's Office agreed, writing that the lawsuit was "a "blatant misuse of this Court to stop his execution" and called the inmate "a sexual predator."

"The only conclusion (the state) can draw is that this is yet another attempt to sandbag the State of Alabama with meritless litigation in an effort to stop an execution."

While the Michigan argument is no longer being fought in a courtroom, Frazier's lawyers still hoped Whitmer would intervene.

"You have the absolute authority to demand Mr. Frazier's return," the Federal Defenders Office lawyers wrote in a letter to Whitmer.

It's the second request they made of the northern governor; the first was met with a response from Whitmer's staff, indicating the governor wouldn't act at that time.

Death Penalty Action, an advocacy group opposed to capital punishment, prompted its members to reach out to Whitmer and ask for her to act on Wednesday.

"Last week I spent hours in the lobby of the Romney building with Carol Frazier, Demetrius Frazier's mother, and Governor Whitmer's staff did not have the decency to come down the elevator to look her in the eye and take her hand written letter," Abraham Bonowitz, Executive Director of Death Penalty Action, said in a press release.

"If Governor Whitmer is going to ignore a mother from Detroit begging for the life of her child while also ignoring more than 180 years of Michigan history, she owes the people an explanation. But it's not too late to act, and that is why we are taking one more shot at waking her up to this matter."

## Nitrogen lawsuit

Frazier's lawyers have been challenging the state's nitrogen gas protocol and asking a judge to either call off the execution for now or instruct the state to give Frazier a sedative prior to the gas being pumped through the gas mask.

Specifically, the lawyers asked for 500 milligrams of midazolam—the first drug in the state's lethal injection, three-drug cocktail.

"What we're talking about here isn't medical, it's execution," said attorney Spencer Hahn during a federal court hearing in Montgomery last month. "Let's use part of the lethal injection protocol and import it" to the nitrogen protocol.

"They're remaining conscious longer than (the state's medical expert) said they would," said Hahn about the three inmates who have been executed in Alabama using nitrogen gas.

The Alabama Attorney General's Office's expert anesthesiologist, who works in Los Angeles, said a person who undergoes a nitrogen execution like Alabama's would lose consciousness in under a minute.

"The facts on the ground don't support that," Hahn said. "Something is going wrong… It's not working that way."

But U.S. Chief District Judge Emily Marks declined to stop the execution and sided with the state.

Frazier's lawyers did not appeal the denial to the U.S. Eleventh Circuit Court of Appeals.

In a move to spare Frazier's life, his lawyers asked Gov. Kay Ivey for clemency last week. The petition, signed by attorney Matt Schulz, sought the governor to halt the execution and either commute Frazier's sentence to life without parole or send him back to Michigan.

On Thursday, a spokesperson for Ivey said she hadn't been in contact with the Michigan Governor's Office.



Carol Frazier, mother of Demetrius Frazier, pleads publicly on Tuesday, Jan. 28, 2025 to Gov. Gretchen Whitmer to bring home her son Demetrius Frazier, a Detroit man convicted of rape and a separate murder of a 14-year-old in the early 1990s who was serving a life sentence when he was charged with another murder in Alabama. Carol Frazier delivered a letter to the Gov. Whitmer's office in the George W. Romney Building in Lansing requesting she give an executive order requesting her son's return to Michigan before he is executed as early as Feb. 6 in Alabama through the death penalty.  Jake May | MLive.com

In the letter, Schulz wrote that Frazier was born to a teenage mother who wasn't prepared to raise a child, and that Frazier's mental development was behind other children his age. The family moved often and frequently lived in dangerous and impoverished neighborhoods, and Frazier witnessed violence and criminal activity from a young age.

Attached to the clemency petition were letters from several of Frazier's family members. His mother, Carol Frazier, wrote that she loves her son and is devastated for Brown's family. "I know that the crime he committed was terrible," she wrote, "and I know another mother lost her daughter."

"I know we can't bring that poor woman back."

Her letter, and Frazier's sisters' letters, say that he has expressed remorse for the slaying. They each asked Ivey to send Frazier back to Michigan to serve his life sentence.

Frazier was the fourth Alabama inmate to be executed by nitrogen gas.

Three Alabama inmates were put to death in 2024 using nitrogen gas: Kenneth Smith, Alan Miller, and Grayson. So far, Alabama is the only state in the country to roll out nitrogen executions.

If you purchase a product or register for an account through a link on our site, we may receive compensation. By using this site, you consent to our User Agreement and agree that your clicks, interactions, and personal information may be collected, recorded, and/or stored by us and social media and other third-party partners in accordance with our Privacy Policy.



▼ About Us

About Alabama Media Group

Jobs at Alabama Media Group

Advertise with us

About AL.com

Frequently Asked Questions

Accessibility Statement

Contact Us

Online Store

▼ Subscriptions

AL.com

The Birmingham News

The Huntsville Times

Press-Register

Newsletter

▼ **Already a Subscriber**

Manage your Subscription

Place a Vacation Hold

Make a Payment

Delivery Feedback

---

▼ **AL.com Sections**

News

Business

Sports

High School Sports

Alabama Life & Culture

Opinion

Archives

Obituaries

Jobs

Autos

---

▼ **Your Regional News Pages**

Anniston/Gadsden

Birmingham

Huntsville

Mobile

Montgomery

Tuscaloosa

Gulf Coast Beaches

---

▼ **On the Go**

Mobile Apps

Tablet Apps

▼ **Follow Us**

Pinterest

Twitter

Facebook

Instagram

RSS

---

▼ **Customer Service**

Send us an email

Submit a news tip

Buy newspaper front pages, posters and more

---

▼ **More on AL.com**

Videos

Weather News

Site Map & search

Sponsor Content

Post a job

---

Privacy Policy     |     User Agreement     |     Ad Choices

---

ADVANCE LOCAL

Use of and/or registration on any portion of this site constitutes acceptance of our User Agreement, (updated 8/1/2024) and acknowledgement of our Privacy Policy, and Your Privacy Choices and Rights (updated 1/1/2025).

© 2025 Advance Local Media LLC. All rights reserved (About Us).
The material on this site may not be reproduced, distributed, transmitted, cached or otherwise used, except with the prior written permission of Advance Local.

Community Rules apply to all content you upload or otherwise submit to this site.

**YouTube's privacy policy** is available here and **YouTube's terms of service** is available here.

Ad Choices

Case 3:25-cv-00169-SDD-SDJ    Document 4-5    02/26/25    Page 262 of 286



Live updates: Trump tariffs    'Saturday Night Live'    California storm    Joann closures    USS Harry S. Truman

AP SETS THE STANDARD FOR POLITICAL REPORTING.
SUPPORT INDEPENDENT, FACT-BASED JOURNALISM.

DONATE

U.S. NEWS

# Alabama puts man to death for a 1991 murder in the nation's fourth execution using nitrogen gas



BY KIM CHANDLER
Updated 10:17 PM EST, February 6, 2025

ATMORE, Ala. (AP) — An man convicted of murdering a woman after breaking into her apartment as she slept was put to death Thursday evening in Alabama in the nation's fourth execution using nitrogen gas.

Demetrius Frazier, 52, was pronounced dead at 6:36 p.m. at a south Alabama prison for his murder conviction in the 1991 rape and killing of Pauline Brown, 41. It was the first execution in Alabama this year and the third in the U.S. in 2025, following a lethal injection Wednesday in Texas and another last Friday in South Carolina.

2/13/25, 4:48 PM
Case 3:25-cv-00169-SDD-SDJ    Document 4-5    02/26/25    Page 263 of 286
Alabama puts man to death for a 1991 murder in the nation's fourth execution using nitrogen gas | AP News

## US executions since 1977

Since capital punishment was reinstated in the 1970s, more than 1,600 prisoners have been executed in the United States, the vast majority by state authorities.

__States__    U.S. government

'77    '80    '85    '90    '95    '00    '05    '10    '15    '20    '25

Figures for 2025 are as of Feb. 6.

Source: Death Penalty Information Center                                          **AP**

"First of all, I want to apologize to the family and friends of Pauline Brown. What happened to Pauline Brown should have never happened," Frazier said in his final words. He finished by saying, "I love everybody on death row. Detroit Strong."

Frazier in his final words also criticized Michigan Gov. Gretchen Whitmer for what he called her failure to step in following appeals for him to be returned to serve out a previous life sentence in her state.

Recently, Frazier's mother and death penalty opponents had pleaded to Whitmer to take Frazier back to his home state of Michigan to complete his life sentence for the murder of a teenage girl before he was turned over years ago to Alabama authorities. Michigan does not have the death penalty. Police had said Frazier confessed to killing Brown in 1992 while in custody in Michigan.

### RELATED COVERAGE



**A rare bipartisan coalition in Alabama pushes ban on machine gun conversion devices**



**Alabama governor vows to sign bill that writes definitions of male and female into state law**



**Stevenson and No. 2 Alabama blow past Texas 103-80 to set up SEC showdown with rival No. 1 Auburn**

Whitmer told The Detroit News before the execution that her predecessor, Rick Snyder, "unfortunately" agreed to send Frazier to Alabama and it was in the hands of officials there.

"It's a really tough situation," she told the media outlet. "I understand the pleas and concerns. Michigan is not a death penalty state."

Prosecutors said that on Nov. 27, 1991, Frazier, then 19, broke into Brown's apartment in Birmingham while she was asleep. Prosecutors said he demanded money and raped Brown at gunpoint after she gave him $80 from her purse. He then shot her in the head and returned later to have a snack and look for money, they said.

Alabama Gov. Kay Ivey said in a post-execution statement that justice was done.

"In Alabama, we enforce the law. You don't come to our state and mess with our citizens and get away with it," Ivey said. "Rapists and murderers are not welcome on our streets, and tonight, justice was carried out for Pauline Brown and her loved ones."

Frazier was sentenced to life in prison in Michigan for the 1992 murder of Crystal Kendrick, 14. Then in 1996, an Alabama jury convicted him of murdering Brown and recommended by a vote of 10-2 that he receive a death sentence. Frazier remained in Michigan custody until 2011 when the then-governors of the two states agreed to move him to Alabama's death row. Frazier suggested in his final statement that his confession to the killing of the Michigan girl was false.

Alabama became the first state to conduct [nitrogen gas executions](#), putting three people to death last year with the method. It involves placing a respirator gas mask over the person's face to replace breathable air with pure nitrogen gas, causing death by lack of oxygen. Frazier, like the first three people to be executed by the method, shook or quivered on the gurney, although to a lesser degree than the others.

## Most executed by lethal injection

For decades, lethal injection was the preferred way to execute death row prisoners in the U.S. But recent problems procuring and administering the drugs have led some states to consider alternative methods.



Data as of Feb. 5, 2025.
Source: Death Penalty Information Center

Frazier was strapped to a gurney with a blue-rimmed gas mask covering his entire face. The execution began at about 6:10 p.m. after a corrections officer did a final check of the mask.

Frazier moved his outstretched palms in a swirling circular movement for the first minute or two. At 6:12 p.m., he stopped circling his hands. He appeared to grimace, quiver on the gurney and take a gasping breath. A minute later, he raised both legs several inches off the gurney and then lowered them.

His breathing slowed at 6:14 p.m. to a series of sporadic breaths. He had no visible movement by about 6:21 p.m. The curtains to the execution chamber closed at 6:29 p.m.

Alabama Corrections Commissioner John Hamm said afterward that the gas flowed for about 18 minutes and that instruments indicated Frazier no longer had a heartbeat 13 minutes after the gas began.

Hamm said he believed that Frazier lost consciousness quickly. He said he believed other movements, including the raising of the legs and periodic breaths, were involuntary.

A federal judge last week refused to block the execution. Defense attorneys had argued the new method does not work as quickly as the state promised. [Media witnesses](#), including The Associated Press, previously [described](#) how those put to death with the method shook on the gurney at the start of their executions.

The judge, however, ruled that the descriptions of the executions did not support a finding that any of the men "experienced severe psychological pain or distress over and above what is inherent in any execution."

Case 3:25-cv-00169-SDD-SDJ    Document 4-5    02/26/25    Page 266 of 286

Abraham Bonowitz of Death Penalty Action said the method of execution is "experimental gas suffocation."
He said it needs more scrutiny in the federal courts before Alabama uses it to carry out another execution.

Some of Brown's family members witnessed the execution but declined to make a statement to the media.

Hours ahead of his execution, Frazier visited with his mother, sister and legal team. He had a final meal from
Taco Bell that included burritos and a Mountain Dew soft drink.

## MOST READ



1    As DOGE hammers away at the US government, Republicans stir with quiet objections

2    Her parents were injured in a Tesla crash. She ended up having to pay Tesla damages

3    White House says it's the judges — not Trump — causing a 'constitutional crisis'

4    White House says it has the right to punish AP reporters over Gulf naming dispute

5    Trump upends US policy on Ukraine and says he and Putin have agreed to begin talks on ending the war



Live updates: Trump tariffs    'Saturday Night Live'    California storm    Joann closures    USS Harry    ●

AP SETS THE STANDARD FOR POLITICAL REPORTING.    **DONATE**
SUPPORT INDEPENDENT, FACT-BASED JOURNALISM.

U.S. NEWS

# Court filings provide additional details of the US' first nitrogen gas execution

![Alabama lethal injection chamber]

FILE- Alabama's lethal injection chamber is shown Oct. 7, 2002, at Holman Correctional Facility in Atmore, Ala. Court filings are providing new details of what happened in the nation's first execution using nitrogen gas on Jan. 25, 2024. (AP Photo/Dave Martin, File)

Read More

BY **KIM CHANDLER**
Updated 6:48 PM EST, August 1, 2024

MONTGOMERY, Ala. (AP) — A corrections officer who helped carry out the nation's first nitrogen gas execution said in a court document that the inmate had normal blood oxygen levels for longer than he

expected before the numbers suddenly plummeted.

Another court document indicated that the nitrogen gas was flowing for at least 10 minutes during the execution. The documents filed last month in ongoing litigation provided additional details of the execution of Kenneth Smith, who was the first person put to death using nitrogen gas.

Alabama Attorney General Steve Marshall's office maintains the high oxygen readings indicate that Smith held his breath as the nitrogen gas flowed, causing the execution to take longer than expected. But attorneys for another inmate said the state has no proof to back up that claim and is trying to "explain away" an execution that went horribly awry.

As the state of Alabama plans additional nitrogen gas executions, questions and disagreements continue over what happened at the first one. A federal judge on Tuesday will hear arguments in a request to block the state from executing Alan Miller by nitrogen gas in September in what would be the nation's second nitrogen execution.

---

**RELATED COVERAGE**



**Russian crypto expert Alexander Vinnik returns to Moscow in Russia-US prisoner swap, reports say**

2/13/25, 4:50 PM
Court filings provide additional details of the US' first nitrogen gas execution | AP News
Case 3:25-cv-00169-SDD-SDJ    Document 4-5    02/26/25    Page 269 of 286



**Virginia Attorney General's office struck by cyberattack targeting attorneys' computer systems**

Case 3:25-cv-00169-SDD-SDJ    Document 5    02/26/25    Page 270 of 286



**Prominent Miami defense lawyer charged in DEA bribery scheme**

[Media witnesses to Smith's execution](#), including The Associated Press, said that Smith shook on the gurney for several minutes before taking a series of gasping breaths. Alabama had assured a federal judge before the execution that the new execution method would quickly cause unconsciousness and death.

A pulse oximeter showed that Smith had oxygen levels of 97% to 98% for a "period of time that was longer than I had expected," the corrections captain said in a sworn statement. The corrections captain said he did not observe Smith make any violent or convulsive movements, but he did tense up and raise his body off the gurney. After "he released a deep breath," the oxygen levels began dropping, the corrections captain said.

"The best explanation of the testimony is that Smith held his breath and lost consciousness when he breathed nitrogen gas — not that the mask did not fit or that the nitrogen was impure," the Alabama attorney general's office wrote in a court filing.

Attorneys for Miller responded that the state has no evidence to back up that claim and said it would be impossible for someone to hold their breath for as long as the execution took. Instead, they suggested other problems with the mask accounted for the delay.

"It should therefore not be surprising that Mr. Smith did not lose consciousness after a few breaths — as the State repeatedly promised this Court. Instead, Mr. Smith's entire body — including his head — convulsed and jerked violently, heaving against the straps with enough force to move the gurney," attorneys for Miller wrote.

Dr. Philip E. Bickler, an expert hired by Miller's defense, wrote in a court document that most people can hold their breath only a minute or less.

The court filing, which was later placed under seal, indicated that the nitrogen gas was flowing for at least 10 minutes. Bickler wrote that he that he understands that Alabama's "execution log states that 10 minutes passed in between the initiation of the flow of nitrogen gas to Mr. Smith" and when the corrections' officer performed a consciousness check on Smith.

Unless stopped by the court, Alabama plans to execute Miller with nitrogen gas on Sept. 26. Miller, a delivery truck driver, was convicted of killing three men — Terry Jarvis, Lee Holdbrooks and Scott Yancy — during back-to-back workplace shootings in 1999.

Alabama had previously attempted to execute Miller by lethal injection. But the state called off the execution after being unable to connect an IV line to the 351-pound inmate. The state and Miller agreed that any other execution attempt would be done with nitrogen gas.

Miller said in a deposition, however, that he did not trust the state to properly fit the gas mask. "And these guys can't even open a cell door sometimes. They're keystone cops is basically what they are," he said.

The attorney general's office is also seeking an nitrogen gas execution date for Carey Dale Grayson, who was convicted in the 1994 killing of Vickie Deblieux in Jefferson County.

An attorney for Grayson said the descriptions of Smith's execution show there needs to be more scrutiny of the new execution method.

"Even after the first execution, we have more questions than answers. We need to slow down, not speed up," John Palombi, an attorney with the Federal Defenders Program, said.

---

## MOST READ

2/13/25, 4:50 PM
Court filings provide additional details of the US' first nitrogen gas execution | AP News
Case 3:25-cv-00169-SDD-SDJ    Document 4-5    02/26/25    Page 272 of 286



1    White House says it has the right to punish AP reporters over Gulf naming dispute

2    Trump upends US policy on Ukraine and says he and Putin have agreed to begin talks on ending the war

3    Elon Musk calls for the US to 'delete entire agencies' from the federal government

4    A humpback whale briefly swallows kayaker in Chilean Patagonia — and it's all captured on camera

5    Top prosecutors quit after Justice Department orders end to corruption case against NYC Mayor Adams

Case 3:25-cv-00169-SDD-SDJ       Document 4-5       03/26/25       Page 273 of 286

NOWCAST                                                          Watch on Demand ▶

Birmingham, AL 35201                                          ‹  1 / 1  ›  ⏸

45°   ☼ Partly Cloudy  ◢ 1%   📍   ◥



# 'Detroit strong': Alabama carries out execution of inmate in Michigan's custody

Updated: 3:32 PM CST Feb 10, 2025

Infinite Scroll Enabled  ◯

**Riley Conlon** ✉

Digital Producer

### Taylor Lang ✉

Digital Content Manager

**ATMORE, Ala. —** Alabama death row inmate Demetrius Frazier became the first person executed while in the custody of the state of Michigan Thursday night.

WVTM 13's Gladys Bautista witnessed the execution firsthand. She said Frazier spoke for about a minute when asked if he had any last words, first apologizing to the friends and family of Pauline brown.

"What happened to Pauline brown should have never happened," he said.

"Detroit strong. I love everybody on death row. Let's go," he continued.

The gas started to flow shortly after.

At about 6:11 p.m., Frazier started waving his hands in circles toward his body. About a minute later, his hands stopped moving.

At approximately 6:12 p.m., Frazier clenched his face and his nostrils flared, while his hands quivered. His legs slightly lifted up off the gurney and he gasped.

He had sporadic gasping and shallow breathing until about 6:20 p.m. The curtains closed at 6:29 p.m.

Alabama Department of Corrections Commissioner John Hamm said the gas flowed for about 18 minutes. Instruments indicated that Frazier no longer had a heartbeat 13 minutes after the gas started.

Frazier's time of death was 6:36 p.m.

***Video below: ADOC officials provide an update following the execution***

Case 3:25-cv-00169-SDD-SDJ     Document 4-5     03/26/25     Page 275 of 286



"In Alabama, we enforce the law," said Gov. Kay Ivey. "You don't come to our state and mess with our citizens and get away with it. Rapists and murderers are not welcome on our streets, and tonight, justice was carried out for Pauline Brown and her loved ones. I pray for her family that all these years later, they can continue healing and have assurance that Demetrius Frazier cannot harm anyone else."

In his final hours, Frazier had seven visitors and one phone call. He refused his breakfast, lunch, and dinner trays but requested a final meal of burritos, chicken chalupa, tacos, chips and dip and Mountain Dew.

"For more than three decades, the family of Pauline Brown has waited for justice," said Alabama Attorney General Steve Marshall. "Tonight, that wait is over. Demetrius Frazier was a monster who brutally took the lives of two innocent women and left behind a trail of unspeakable violence. For the crimes he committed in Alabama, he was fairly and appropriately punished. While nothing can erase the agony he inflicted, I pray that this brings closure to those who loved Pauline and have endured the painfully slow wheels of justice for so many years."

Prior to his death, Frazier's lawyers argued he actually belonged in Michigan, but the state's Governor, Gretchen Whitmer, took no action despite numerous pleas from family members and activists alike.

**Read the full response** here**.**

The United States District Court said the case was similar to a previous instance when then-United States Attorney General Jeff Sessions allowed the execution of Walter Leroy Moody, who was in the legal custody of the United States. At the time, he said that he did "not object to Alabama retaining custody of Mr. Moody for the purpose of carrying out the death sentence," according to court documents.

Michigan's Department of Corrections stated similar notions in the court documents.

"By disclaiming any interest in Mr. Frazier's physical custody (while retaining legal custody) and relying on Moody, Director Washington and General Nessel have condoned Mr. Frazier's death by nitrogen gas suffocation," the documents state.

Frazier was the state's first execution of the year and its fourth execution by means of nitrogen hypoxia.

Alabama was the first in the nation to utilize the controversial execution method, described as a "human experiment" by some detractors, having done so a total of three times since January of 2024.

Attorneys for Frazier previously sued to block the state from carrying out his execution unless the state made changes to the protocol. His lawyers argued that nitrogen gas causes "conscious suffocation" and that earlier **nitrogen executions** did not result in swift unconsciousness and death.

**Video below: Legal experts argue inmates' human rights after first historic nitrogen hypoxia death**



## Frazier's case



**Who is Demetrius Frazier? Behind Alabama's first inmate set to be executed in 2025**

Case 3:25-cv-00169-SDD-SDJ        Document 4-5        03/26/25        Page 278 of 286



In early 1992, a then 19-year-old Frazier was arrested in Detroit, Michigan, where he was ultimately convicted of murder, first-degree criminal sexual conduct and armed robbery. Each charge came with a life sentence, according to court documents.

While in custody, he made statements referring to his role in the death of an Alabama woman and eventually confessed to the **murder of Pauline Brown** in Birmingham months prior.

Frazier was indicted by a Jefferson County grand jury for Brown's murder in November of 1993. Roughly two years later, Alabama was granted temporary custody of Frazier by the Michigan Department of Corrections so he could stand trial.

On June 5, 1996, Frazier was convicted of one count of Capital murder and one count of murder. Two days later, the jury recommended the death sentence by a vote of 10-2.

## Who had custody?

Frazier was soon returned to Michigan where he spent the next 15 years, but an executive agreement signed by then-governors Robert Bentley of Alabama and Rick Snyder of Michigan

Case 3:25-cv-00169-SDD-SDJ    Document 4-5    03/26/25    Page 279 of 286

in 2011 would see him taken back to Alabama.

Frazier's attorneys argued that Bentley and Snyder's agreement caused him to be "held unlawfully in the physical custody of the wrong sovereign" and is "void, entered without lawful authority, and violates the IAD and the Due Process Clause."

According to the state's constitution, the governor of Michigan's ability to enter into agreements with other governments is limited and subject to "provisions of general law" unless "otherwise provided in this constitution.

As Michigan declared the death penalty unconstitutional in 1963, specifically declaring that "no law shall be enacted providing for the penalty of death, Frazier's attorneys claim that Gov. Snyder acted without lawful authority when signing him over to Alabama.

The lawsuit further argued that Frazier is still technically in legal custody of MDOC as state law requires him to serve out his sentences in-state.

Frazier's attorneys reached out to current Michigan governor Gretchen Whitmer last November, imploring her to have him extradited back to the state, claiming that Alabama Gov. Kay Ivey would have "no choice" but to turn him over as compliance with the U.S. constitution's extradition clause is not discretionary.

According to the suit, a staff member for Governor Whitmer notified Mr. Frazier's counsel that she would not act on his request at that time.

An Alabama Department of Corrections Inmate Summary lists Frazier as "borrowed" from MDOC; MDOC's website still has him listed as a current prisoner.

## A Mother's Plea

Frazier's mother also desperately pleaded for the Michigan governor to bring her son back to the state to finish serving his life sentence there. Carol Frazier wrote a letter to ask for the governor's support and waited in the lobby of her office to hand-deliver it.

"I feel like Gov. Whitmer does have the power to bring my son back," Carol Frazier said, "and I would like for her to read my letter that I have for her. I would like for her to listen to me as a mother."

The letter was ultimately given to Whitmer's receptionist.

Frazier reiterated her plea to WVTM 13's Gladys Bautista the night before his death, saying that while she knows he did "terrible things" she still loves him dearly. She said his multiple life sentences in Michigan should have been "enough torture."

*The Associated Press contributed to this report.*

## TOP PICKS

**True love's kiss? More like true love's kidney.**

**Making cents of it all: Here's how much a penny costs you**

**Feeling bitter? These anti-Valentine's Day fundraisers turn heartbreak into charity for animals**

**WATCH: Oklahoma man has fun way to test ice after winter storm hits**

## WVTM BIRMINGHAM, ALABAMA

 

News Team

Apps & Social

Email Alerts

Careers

Internships

Advertise

Digital Advertising Terms & Conditions

Broadcast Terms & Conditions

RSS

EEO Reports

Captioning Contacts

Public Inspection File

Public File Assistance

FCC Applications

News Policy Statements

Hearst Television participates in various affiliate marketing programs, which means we may get paid commissions on editorially chosen products purchased through our links to retailer sites.

©2025, Hearst Television Inc. on behalf of WVTM-TV.

Privacy Notice    Your California Privacy Rights    Interest-Based Ads    Terms of Use    Site Map



Live updates: Trump tariffs    'Saturday Night Live'    California storm    Joann closures    USS Harry S. Truman

AP SETS THE STANDARD FOR POLITICAL REPORTING.    **DONATE**
SUPPORT INDEPENDENT, FACT-BASED JOURNALISM.

U.S. NEWS

# Federal judge hears request to block an upcoming nitrogen gas execution in Alabama



BY KIM CHANDLER AND SAFIYAH RIDDLE

Updated 6:32 PM EST, January 28, 2025

MONTGOMERY, Ala. (AP) — The state of Alabama urged a federal judge Tuesday to allow the nation's fourth execution with nitrogen gas to proceed next week, but a doctor who witnessed an earlier execution by the new method told the judge the inmate appeared to be in distress and awake minutes longer than officials predicted.

Alabama has carried out all three of the nation's executions using the gas and has set a Feb. 6 execution date for Demetrius Terrence Frazier, 52. But attorneys for Frazier, who was convicted of the 1991 rape and murder of a woman in Birmingham, sought the hearing asking the court to intervene.

Frazier's attorneys urged the judge to block the execution unless the state makes changes to its protocol, such as giving the inmate the same sedative used at the start of lethal injections before the gas begins flowing. Separately Tuesday, Frazier's mother and death penalty opponents asked Michigan's governor to bring Frazier back there to finish a life sentence in the state for a separate murder conviction in the killing of a 14-year-old girl. Michigan has no death penalty.

Alabama's method involves placing a respirator gas mask over the face to replace breathable air with pure nitrogen gas, causing death by lack of oxygen. The state maintained Tuesday that the method brings swift death.

RELATED COVERAGE



**Pritzker delays $1.2B invasive carp project over concerns Trump won't cover federal share**



**Wolf scores 15 and No. 20 holds off No. 7 Purdue 75-73**

Case 3:25-cv-00169-SDD-SDJ    Document 4-5    02/26/25    Page 285 of 286



**Izzo stays on brink of breaking Knight's Big Ten wins record as Indiana beats No. 11 Michigan State**

Dylan L. Mauldin, assistant solicitor general for Alabama, called Frazier's legal maneuver a tactic to delay his execution and said the court should deny his request for a preliminary injunction. Mauldin noted the U.S. Supreme Court has never ruled the method unconstitutional.

Meanwhile, a lawyer for Frazier, argued that inmates executed with the gas appeared to be conscious for some minutes, instead of the 30 to 40 seconds he said the state predicted.

U.S. District Judge Emily Marks questioned Frazier's attorney about why she should intervene when the courts have previously let nitrogen executions go forward.

"Something is going wrong. Every inmate who has been executed by nitrogen gas has exhibited signs of consciousness beyond the 40 seconds," Spencer Hahn, an attorney for Frazier, responded.

Dr. Brian McAlary, an anesthesiologist who witnessed the November execution of Carey Dale Grayson, testified that he observed clear "evidence of distress" in the prisoner. He noted Grayson moved his head back and forth, had rapid eye movements and struggled against his restraints.

McAlary said he believed Grayson's last voluntary movement occurred after about three minutes when he simultaneously raised both legs and held them in the air before letting them fall down. McAlary said he believed the movement was voluntary because "both legs were moved at exactly the same time, direction and distance."

The testimony was the first time a medical doctor had testified about observations during a nitrogen execution. The court was previously given news accounts from journalists and the observations of prison staff.

Dr. Joseph Antognini, an anesthesiologist hired by the state as an expert witness, gave competing testimony that such movements did not necessarily indicate Grayson was conscious. Antognini did not witness Grayson's execution.

"Movement can happen in the absence of pain," Antognini said. He gave examples of instances when he saw patients move involuntarily during surgery while unconscious. But he acknowledged he had never seen movements like a double leg lift during surgery.

Frazier was in the courtroom throughout, shackled and taking notes in handcuffs on a legal pad.

Case 3:25-cv-00169-SDD-SDJ     Document 4-5     03/26/25     Page 286 of 286

Alabama Corrections Commissioner John Hamm testified that Grayson was combative at the start of his execution, cursing the warden and raising his middle fingers as he was strapped to the gurney. Hamm testified that he thought Grayson's head movements were an effort to knock the mask loose.

Frazier's supporters had also argued he should be in a Michigan prison instead of Alabama's death row.

Frazier was first convicted in Michigan and sentenced to life in prison for the 1992 murder of a 14-year-old girl. Prosecutors said Frazier while in police custody in Michigan, confessed to raping and shooting Brown in Alabama after stealing about $80 from her purse. He was convicted in Alabama and given the death penalty. The then governors of Alabama and Michigan agreed in 2011 to place him on Alabama's death row.

Frazier's attorneys had filed a separate appeal to have him sent to Michigan to finish his life sentence there but dropped the request after Michigan's attorney general wrote in a court filing that Michigan doesn't seek his return.

Death penalty opponents and Frazier's mother made a last-minute plea to Michigan Gov. Gretchen Whitmer to intervene and request that Frazier be sent back to Michigan.

"Please bring my son back to Michigan. Please don't let Alabama kill my son if you can stop it," Carol Frazier wrote in the letter to Whitmer.

Whitmer's office declined to comment.

——

Associated Press reporter Joey Cappelletti contributed from Lansing, Michigan



**SAFIYAH RIDDLE**

Riddle covers the Alabama statehouse with a focus on law enforcement. She is based in Montgomery, Alabama.

✉

---

## MOST READ



| 1 | As DOGE hammers away at the US government, Republicans stir with quiet objections |
|---|---|
| 2 | Her parents were injured in a Tesla crash. She ended up having to pay Tesla damages |
| 3 | White House says it's the judges — not Trump — causing a 'constitutional crisis' |
| 4 | White House says it has the right to punish AP reporters over Gulf naming dispute |
| 5 | Trump upends US policy on Ukraine and says he and Putin have agreed to begin talks on ending the war |