## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF LOUISIANA

JESSIE HOFFMAN,

        Plaintiff,

    v.

GARY WESTCOTT, *et al.*,

        Defendants.

CIVIL ACTION No. 25-169-SDD-SDJ
CHIEF JUDGE SHELLY D. DICK

MAGISTRATE JUDGE
SCOTT D. JOHNSON

## MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION AND IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ....................................................................................ii

INTRODUCTION AND BACKGROUND...................................................................1

ARGUMENT .............................................................................................................2

  I.  PLAINTIFF IS NOT LIKELY TO SUCCEED ON THE MERITS. .......................................2

    A.  Virtually All of Plaintiff's Claims Are Unexhausted. ....................................3

    B.  In Any Event, Plaintiff's Eighth Amendment Claims (Counts I and II) Are Not Likely to Succeed on the Merits.................................................................6

      1.  Nitrogen does not cruelly superadd pain. ....................................................8

      2.  Plaintiff has not identified a suitable alternative.......................................20

    C.  Plaintiff's Religious-Exercise Claims (Counts VI and VII) Are Not Likely to Succeed. .................................................................................................23

      1.  Plaintiff's Free Exercise claim is foreclosed by *Smith*. ..............................24

      2.  Plaintiff's RLUIPA claim is foreclosed and meritless. ...............................24

    D.  Plaintiff's Access-to-Counsel, Access-to-Courts, and Access-to-Protocol Claims (Counts IV and V) Are Not Likely to Succeed. ................................26

    E.  Plaintiff's Ex Post Facto Clause Claim (Count III) Is Not Likely to Succeed ......................................................................................................27

  II.  THE EQUITIES FAVOR DEFENDANTS.....................................................................30

CONCLUSION.........................................................................................................33

# TABLE OF AUTHORITIES

Page(s)

Cases

*Ala. Pub. Serv. Comm'n v. S. Ry. Co.*,
  341 U.S. 341 (1951) ................................................................. 33

*Bargher v. White*,
  928 F.3d 439 (5th Cir. 2019) ..................................................... 3

*Big Tyme Invs., L.L.C. v. Edwards*,
  985 F.3d 456 (5th Cir. 2021) ..................................................... 2

*Bucklew v. Precythe*,
  587 U.S. 119 (2019) ......................................................... passim

*Calderon v. Thompson*,
  523 U.S. 538 (1998) ................................................................ 32

*D.T. v. Sumner Cnty. Sch.*,
  942 F.3d 324 (6th Cir. 2019) .................................................... 32

*Dennis Melancon, Inc. v. City of New Orleans*,
  703 F.3d 262 (5th Cir. 2012) ..................................................... 2

*Dunn v. Smith*,
  141 S. Ct. 725 (2021) .............................................................. 26

*Employment Division, Department of Human Resources of Oregon v. Smith*,
  494 U.S. 872 (1990) ................................................................ 24

*Frazier v. Hamm*,
  2025 WL 361172 (M.D. Ala. Jan. 31, 2025) ............................ passim

*Fulton v. City of Phila.*,
  593 U.S. 522 (2021) ................................................................ 24

*Garner v. Jones*,
  529 U.S. 244 (2000) ................................................................ 29

*Glossip v. Gross*,
  576 U.S. 863 (2015) ........................................................... 8, 22

*Grayson v. Hamm*,
  2024 WL 4701875 (M.D. Ala. Nov. 6, 2024) ........................... passim

*Grayson*,
  121 F.4th ............................................................................... 9

*Herrera v. Collins*,
  506 U.S. 390 (1993) ................................................................ 32

*Hill v. McDonough*,
  547 U.S. 573 (2006) .................................................... 26, 30, 31

*In re Blodgett*,
  502 U.S. 236 (1992) ................................................................ 32

*Johnson v. Bell*,
  457 F. Supp. 2d 839 (M.D. Tenn. 2006) .................................... 29

*Jones v. Crow,*
 No. 21-6139, 2021 WL 5277462 (10th Cir. Nov. 12, 2021)....................................28

*Lawson v. Aetna Ins. Co.,*
 41 F.2d 316 (4th Cir. 1930) ................................................................................33

*Malloy v. South Carolina,*
 237 U.S. 180 (1915) ............................................................................................28

*Matter of Fed. Bureau of Prisons' Execution Protocol Cases,*
 No. 05-CV-2337, 2021 WL 127602 (D.D.C. Jan. 13, 2021) ..................................29

*Miller v. Parker,*
 910 F.3d 259 (6th Cir. 2018) ..............................................................................29

*Mills v. Hamm,*
 102 F.4th 1245 (11th Cir.)...................................................................................27

*Mills v. Hamm,*
 734 F. Supp. 3d 1226 (M.D. Ala. 2024)..............................................................27

*Mock v. Garland,*
 75 F.4th 563 (5th Cir. 2023)..........................................................................2, 30

*Moran v. Burbine,*
 475 U.S. 412 (1986) ............................................................................................32

*Nelson v. Campbell,*
 541 U.S. 637 (2004) ......................................................................................30, 31

*Nken v. Holder,*
 556 U.S. 418 (2009) ..............................................................................................2

*Poland v. Stewart,*
 117 F.3d 1094 (9th Cir. 1997) ............................................................................28

*Ramirez v. Collier,*
 595 U.S. 411 (2022) ..................................................................................5, 25, 26

*Sepulvado v. Jindal,*
 729 F.3d 413 (5th Cir. 2013) ..............................................................................27

*Smith v. Comm'r, Ala. Dep't of Corr.,*
 2024 WL 266027 (M.D. Ala. Jan. 24, 2024)..........................................................7

*Smith v. Hamm,*
 2024 WL 1160303 (M.D. Ala. Jan. 10, 2024)........................................................7

*Smith,*
 144 S. Ct...............................................................................................................8

*State v. Hoffman,*
 768 So. 2d 542 (La. 2000) .....................................................................................1

*Stratta v. Roe,*
 961 F.3d 340 (5th Cir. 2020) ................................................................................2

*Turner v. Epps,*
 460 F. App'x 322 (5th Cir. 2012) ........................................................................32

*United States v. Abbott,*
 110 F.4th 700 (5th Cir. 2024)........................................................................2, 30

*United States v. Chandler,*
 996 F.2d 1073 (11th Cir. 1993) .....................................................................28, 29

iii

*United States v. Rose*,
   153 F.3d 208 (5th Cir. 1998) ................................................................. 28
*United States v. Tipton*,
   90 F.3d 861 (4th Cir. 1996) ................................................................... 28
*Whitaker v. Collier*,
   862 F.3d 490 (5th Cir. 2017) ................................................................. 27
*White v. Carlucci*,
   862 F.2d 1209 (5th Cir. 1989) ............................................................... 32
*White v. Johnson*,
   429 F.3d 572 (5th Cir. 2005) ............................................................... 3, 4
*Winter v. Nat. Res. Def. Council, Inc.*,
   555 U.S. 7 (2008) ..................................................................................... 2
*Zink v. Lombardi*,
   783 F.3d 1089 (8th Cir. 2015) ............................................................... 28

Statutes

42 U.S.C. § 1997e(a) .................................................................................. 3
42 U.S.C. § 2000cc-1(a) ........................................................................... 24

Other Authorities

14A Cyc. of Federal Proc. § 73:96 (3d ed.) ............................................. 33

## INTRODUCTION AND BACKGROUND

On the night before Thanksgiving Day in 1996, Plaintiff kidnapped, robbed, and raped Mary "Molly" Elliot. He then marched her—still naked—"down a dirt path which was overgrown with vegetation and in an area full of trash used as a dump." *State v. Hoffman*, 768 So. 2d 542, 550 (La. 2000). "Her death march ultimately ended at a small, makeshift dock" on Middle Pearl River, where Plaintiff "forced [her] to kneel" and "shot [her] in the head, execution style." *Id.* She "likely survived for a few minutes after being shot." *Id.* But she was not discovered until Thanksgiving Day, when a duck hunter came across her naked body on the dock. *Id.* at 549. For his part, Plaintiff "soon thereafter" took his girlfriend shopping with Molly's money. *Id.* at 550.

On March 18, 2025, the State of Louisiana will execute Plaintiff by nitrogen hypoxia for Molly's murder. Nearly a year after the Louisiana Legislature adopted nitrogen hypoxia as a method of execution—and eight months after Plaintiff filed a motion to reopen *Hoffman v. Jindal*, No. 12-cv-796 (M.D. La.), to press the claims he now presses here—Plaintiff opted to file this lawsuit, 20 days before his execution. Virtually all of his claims are unexhausted and non-cognizable. And the eleventh-hour nature of this lawsuit (notwithstanding his representation that the controversy in this case has been live *for eight months*) confirms that any injunction against, or stay of, Plaintiff's execution would be improper. *See* Mem. in Support of Mot. for Relief from J. at 1, No. 12-cv-796 (M.D. La. June 14, 2024), ECF 318-1 ("[T]here has since been a material and extraordinary change of circumstances that gives rise to a live

1

controversy between the parties."). The Court should deny Plaintiff's Motion for Preliminary Injunction, if not dismiss his Complaint outright.

## ARGUMENT

"A preliminary injunction is an 'extraordinary remedy,' and the 'burden of persuasion on all ... requirements' is on the movant party." *Mock v. Garland*, 75 F.4th 563, 587 (5th Cir. 2023) (ellipsis in original) (quoting *Big Tyme Invs., L.L.C. v. Edwards*, 985 F.3d 456, 464 (5th Cir. 2021)). "The district court should deny relief 'unless the party seeking it has clearly carried the burden of persuasion' by" satisfying four factors: "(1) it is likely to succeed on the merits, (2) it is likely to suffer irreparable harm without an injunction, (3) the balance of equities tips in its favor, and (4) an injunction is in the public interest." *United States v. Abbott*, 110 F.4th 700, 706 (5th Cir. 2024) (footnote omitted) (first quoting *Dennis Melancon, Inc. v. City of New Orleans*, 703 F.3d 262, 268 (5th Cir. 2012), then citing *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). And where, as here, "the Government is the opposing party," the equities and public-interest factors "merge." *Nken v. Holder*, 556 U.S. 418, 435 (2009). Plaintiff has failed to carry his burden. The Court thus should at least deny his Motion, if not dismiss his Complaint outright. *See, e.g.*, *Stratta v. Roe*, 961 F.3d 340, 349 (5th Cir. 2020) (To survive a motion to dismiss, "[a] plaintiff's complaint 'must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'").

## I.  PLAINTIFF IS NOT LIKELY TO SUCCEED ON THE MERITS.

"The first factor—likelihood of success on the merits—is 'the most important.'" *Abbott*, 110 F.4th at 706 (quoting *Mock*, 75 F.4th at 587 n.60). Here, that most

important factor is also the last. For Plaintiff is not likely to succeed on any of his claims. Nearly all of them are unexhausted. And even if they were exhausted, they are unlikely to succeed on the merits.

### A.    Virtually All of Plaintiff's Claims Are Unexhausted.

The Prison Litigation Reform Act provides that "[n]o action shall be brought with respect to prison conditions ... by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). The prisoner "must have 'pursue[d] the grievance remedy to conclusion'—substantial compliance with administrative procedures is not enough." *Bargher v. White*, 928 F.3d 439, 447 (5th Cir. 2019). Relevant here, the essential first step of "Louisiana's Administrative Remedy Procedure" is to "submit[] a request to the warden briefly setting out the basis for the claim and the relief sought." *Id.* This obligation applies full bore in method-of-execution lawsuits, including where a plaintiff challenges potential procedures for administering a longstanding method of execution. *See, e.g.*, *White v. Johnson*, 429 F.3d 572, 574 n.1 (5th Cir. 2005) (rejecting as unexhausted claim that "the State might use a cut-down procedure to gain venous access" in administering lethal injection).

As of today, Plaintiff has only two pending grievances—one filed on February 11 and one filed on February 14—and neither of them exhausts the claims he now presses (save perhaps one[1]). Ex. A, Oliveaux Decl., Exs. 1 and 2. That ends this case.

---

[1] Consistent with his grievances, Count V asserts that Plaintiff has a due process right to the nitrogen protocol. Compl. ¶¶ 228–32. As discussed below, that claim is moot and foreclosed by Fifth Circuit precedent, which renders exhaustion beside the point.

3

**Eighth Amendment Claims (Counts I and II).** Beginning with the Eighth Amendment claims, as discussed more fully below, Plaintiff bears the burden of claiming, and then showing, that there is "a feasible and readily implemented alternative method of execution that would significantly reduce a substantial risk of severe pain and that the State has refused to adopt without a legitimate penological reason." *Bucklew v. Precythe*, 587 U.S. 119, 134 (2019). Plaintiff's grievances, however, never so much as mention an alternative method of execution, let alone suggest that it would significantly reduce a substantial risk of severe pain from nitrogen hypoxia. Indeed, insofar as Plaintiff's grievances raise Eighth Amendment claims at all, they vaguely assert that Louisiana's three methods of execution—lethal injection, nitrogen hypoxia, and electrocution—are all unconstitutional and will be unconstitutionally administered. Oliveaux Decl., Exs. 1 and 2.

It was not until Plaintiff filed his Complaint last week that he identified, for the first time, what his Eighth Amendment claim is: that the firing squad and a drug cocktail known as DDMAPh are feasible and readily implemented alternatives that render nitrogen hypoxia unconstitutional. To reiterate, this claim and these alternatives appear nowhere in Plaintiff's grievances. This is a textbook example of failure to exhaust—and thus, Plaintiff's Eighth Amendment claims (Counts I and II) are barred under binding Fifth Circuit precedent. *See White*, 429 F.3d at 574.

**Ex Post Facto Clause Claim (Count III).** Count III asserts an Ex Post Facto Clause violation, citing Louisiana's addition of nitrogen hypoxia as a method of execution. Compl. ¶¶ 206–14. Plaintiff's grievances nowhere mention the Ex Post

4

Facto Clause or articulate this claim. Oliveaux Decl., Exs. 1 and 2. Count III is thus unexhausted.

**Access to Counsel/Courts Claim (Count IV).** Count IV asserts that Plaintiff has a First, Sixth, and Fourteenth Amendment right to counsel in the execution chamber. Compl. ¶¶ 215–27. Plaintiff's grievances nowhere articulate this claim (or even mention the Sixth Amendment). Oliveaux Decl., Exs. 1 and 2. Count IV is thus unexhausted.

**Religious Land Use and Institutionalized Persons Act (RLUIPA) Claim (Count VI).** Count VI asserts that executing Plaintiff with nitrogen would violate RLUIPA because he allegedly will be unable to conduct Buddhist breathing exercises as he passes away. Compl. ¶¶ 233–38. Because RLUIPA establishes an accommodation framework, however, the Supreme Court has made clear in the execution context that, where "relief is appropriate under RLUIPA, the proper remedy is an injunction ordering the accommodation, not a stay of execution." *Ramirez v. Collier*, 595 U.S. 411, 436 (2022). Here, Plaintiff's February 14 grievance references his Buddhist breathing practice, but he has never requested an accommodation for it. Instead, the grievance simply requests (as relevant here) a declaration that all Louisiana methods of execution are unconstitutional and "[a]n injunction preventing the State of Louisiana from carrying out my sentence."

Oliveaux Decl., Ex. 2. That relief is unavailable under *Ramirez.* By failing to request an accommodation, therefore, Plaintiff has failed to exhaust his RLUIPA claim.[2]

**Free Exercise Clause Claim (Count VII).** Count VII repurposes the RLUIPA claim as a Free Exercise Clause violation. Compl. ¶¶ 239–44. But Plaintiff's grievances never mention the Free Exercise Clause, let alone claim a Free Exercise Clause violation. *Cf.* Oliveaux Decl., Ex. 2. (mentioning RLUIPA, the Free Speech Clause, and the Free Press Clause). This claim, too, is thus unexhausted.

\*     \*     \*

Perhaps sensing his exhaustion problem, Plaintiff claims in a footnote (Mot. 27 n.39) that Louisiana's grievance system is unavailable to him because the prison will not answer his grievances until after his execution date. That is misdirection. Plaintiff failed to raise the claims above in his grievances—so, it does not matter whether those grievances are resolved before his execution or not. Either way, they do not reflect or preserve the claims above. This case thus does not get off the ground.

**B.     In Any Event, Plaintiff's Eighth Amendment Claims (Counts I and II) Are Not Likely to Succeed on the Merits.**

If the Court reaches the merits, however, it should start with the Eighth Amendment claims in holding that Plaintiff is not likely to succeed on the merits. Every level of the federal courts—from Alabama district courts, to the Eleventh Circuit, to the Supreme Court—has repeatedly rejected Eighth Amendment challenges based on virtually the same method of execution and virtually the same

---

[2] This exhaustion defect likewise may be characterized as a merits defect, since, even if Plaintiff's RLUIPA claim were considered exhausted, it would not be viable under *Ramirez* absent a request for an accommodation. Either way, the claim fails.

expert testimony. *See Frazier v. Hamm*, 2025 WL 361172 (M.D. Ala. Jan. 31, 2025) (no appeal); *Grayson v. Hamm*, 2024 WL 4701875 (M.D. Ala. Nov. 6, 2024), *aff'd*, *Grayson v. Comm'r, Ala. Dep't of Corr.*, 121 F.4th 894 (11th Cir. 2024), *stay of execution denied*, *Grayson v. Hamm*, 145 S. Ct. 586 (2024) (no noted dissents); *Smith v. Hamm*, 2024 WL 1160303 (M.D. Ala. Jan. 10, 2024), *aff'd*, *Smith v. Comm'r, Ala. Dep't of Corr.*, 2024 WL 266027 (M.D. Ala. Jan. 24, 2024), *stay of execution denied*, *Smith v. Hamm*, 144 S. Ct. 414 (2024) (Sotomayor, Kagan, Jackson, JJ., dissenting). The Court should do the same here.

"The Constitution allows capital punishment." *Bucklew*, 587 U.S. at 129. Indeed, "the Eighth Amendment does not guarantee a prisoner a painless death." *Id.* at 132. Instead, it bars only those "forms of punishment that intensif[y] the sentence of death with a (cruel) superaddition of terror, pain, or disgrace." *Id.* at 133 (cleaned up). And "perhaps" for that reason the Supreme Court "has yet to hold that a State's method of execution qualifies as cruel and unusual." *Id.*

To that end, "where (as here) the question in dispute is whether the State's chosen method of execution cruelly superadds pain to the death sentence, a prisoner must show a feasible and readily implemented alternative method of execution that would significantly reduce a substantial risk of severe pain and that the State has refused to adopt without a legitimate penological reason." *Id.* at 134; *see id.* at 136–37 ("[W]hen it comes to determining whether a punishment is unconstitutionally cruel because of the pain involved, the law has always asked whether the punishment 'superadds' pain well beyond what's needed to effectuate a death sentence.").

Requiring a plaintiff to show that the challenged method "is sure or very likely to result in needless suffering," *Glossip v. Gross*, 576 U.S. 863, 881 (2015), is, as Justice Kagan has put it, an "extremely demanding standard," *Smith*, 144 S. Ct. at 416 (Kagan, J., dissenting from the denial of application for stay and denial of certiorari).

Here, Plaintiff has failed to (1) show that Louisiana's nitrogen method of execution cruelly superadds pain, or (2) identify a feasible and readily implemented alternative that would significantly reduce a substantial risk of severe pain and show the State refused to adopt the alternative without a legitimate penological reason. For either reason, therefore, his Eighth Amendment claims are not likely to succeed.

### 1. Nitrogen does not cruelly superadd pain.

**a.** Execution by nitrogen hypoxia may well be the most humane and reliable method of execution in existence today. For that fact, look no further than Dr. Antognini, whom numerous courts have credited for his considered opinions on the nature of execution through nitrogen hypoxia. His core opinion—supported by a wealth of research and studies, as well as his own testing of Louisiana's system—is that the system "will cause unconsciousness within 35-40 sec[onds] (and perhaps sooner) once the inmate inhales 90-100% nitrogen gas." Ex. B, Antognini Decl. ¶¶ 9, 54. In addition, the system "will result in death rapidly, within 10-15 minutes," and it "will not cause significant suffering or pain." *Id.*

As recently as a month ago, courts have credited Dr. Antognini's opinion over that of Plaintiff's expert, Dr. McAlary. *See Frazier*, 2025 WL 361172, at *11 ("[T]he Court assigns greater weight to Dr. Antognini's expert opinion that an inmate loses

consciousness closer to thirty to forty seconds after nitrogen gas is introduced."); *id.* at \*13 ("According to Dr. Antognini, whose opinion the Court credits, the period between the nitrogen's activation and loss of consciousness is likely less than a minute."); *Grayson*, 121 F.4th at 900 (affirming district court's finding that "Dr. Antognini's opinions [including that the nitrogen flow 'will lead to unconsciousness within 10 to 40 seconds'] ... were 'more credible and persuasive than those of Dr. McAlary'"). This Court should do the same, recognizing two overarching indicia of the reliability and superiority of Dr. Antognini's opinions.

*First*, Dr. Antognini is the only expert before this Court who has tested Louisiana's nitrogen system. Specifically, he wore the mask "while air was delivered at 70, 50, and 30 LPM, and [he] was able to breathe easily." Antognini Decl. ¶ 19. He ensured that "[t]he mask did not loosen or become dislodged while [he] was talking or after vigorous head movements." *Id.* And he confirmed that "the 70 LPM gas flow"—the rate at which both oxygen and nitrogen are delivered—"is adequate to provide for normal breathing patterns." *Id.* On that last point, the "high gas flow rate" is important because it "quickly and efficiently removes exhaled carbon dioxide and minimizes rebreathing of carbon dioxide." *Id.* ¶ 17. And that, in turn, is important because, without a carbon dioxide buildup, the condemned inmate will not experience "a sense of breathlessness" that would signal to the inmate that he is not breathing oxygen. *Id.* ¶ 29. As Dr. Antognini explains (quoting the Occupational Safety and Health Administration), this means that a condemned inmate will have "little

9

warning before losing consciousness": He "is fooled because there is no clear indication that anything is amiss. Blackout occurs quickly, without warning." *Id.*

Dr. Antognini also cycled the nitrogen system with a mannequin to confirm his opinion—and that test "documented how quickly the oxygen decreased in the mask after the introduction of nitrogen," even without a human actively inhaling the remaining oxygen in the mask. *Id.* ¶ 21. In particular, "from the initiation of the nitrogen at time 0, it took 40 seconds to reach <2%" oxygen and 30 seconds to reach 4.4% oxygen. *Id.* Cited scientific evidence establishes that "[t]he time to unconsciousness at 5% oxygen is about 10-12 seconds." *Id.* So, Dr. Antognini "expect[s] unconsciousness to occur within 35-40 seconds after the inhalation of 95-100% nitrogen." *Id.* Again, Dr. Antognini is the only expert in this case that has conducted these in-depth tests of Louisiana's system to form his opinion.

*Second*, Dr. Antognini's declaration is the only expert declaration regarding nitrogen before this Court that is based on scientific studies and evidence. *See Grayson*, 2024 WL 4701875, at *12 ("In support of his opinions, Dr. Antognini relies upon multiple scientific studies and articles. The Court credits Dr. Antognini's opinions and affords them great weight."). Most significantly, Dr. Antognini thoroughly catalogues how "[t]he lethality of nitrogen (and other inert gases) is well documented by suicides and industrial accidents." Antognini Decl. ¶ 11; Ex. G, Tomeny Decl., Exs. 1–20 (scientific literature regarding the lethality of nitrogen and other inert gases).

10

For example, he explains how one study addressing suicide by helium (another inert gas) led to unconsciousness "within 36-55 sec[onds]" and death "in 5-10 minutes" at a flow rate "much lower than those anticipated in the Louisiana protocol." *Id.* He explains that one subject in the study died much later "most likely due to inadequate placement of the breathing mask, which permitted the patient to breathe room air." *Id.* And he emphasizes that here "the prison staff can adjust the mask to minimize leaks, if needed," *id.*, and in fact, Louisiana's mask has a "strapping mechanism that ensures a virtual airtight fit which minimizes air entrainment and which makes it nearly impossible to dislodge the mask," *id.* ¶ 18.

Dr. Antognini also assesses other reports regarding suicide by helium (in "large plastic bags") and by nitrogen (in a "breathing tent"). *Id.* ¶ 12. In both reports, "there was no evidence of pain." *Id.* And in the helium report, he notes that the subjects lost consciousness "at 10-12 seconds." *Id.*

Similarly, Dr. Antognini emphasizes that "[n]umerous industrial accidents have resulted in worker deaths due to inhalation of inert gases, such as nitrogen and argon." *Id.* ¶ 13. In looking at OSHA's reports, Dr. Antognini finds it "noteworthy that these reports do not describe any evidence that the workers attempted to self-rescue to escape the dangerous environment, as would be expected if they felt pain or distress." *Id.* Again, this is not surprising as to "[v]ictims wearing respirators connected to inert gas lines" because, as OSHA says, they "are in a zero percent oxygen atmosphere and unconsciousness can occur in about 12 seconds and death in a matter of minutes." *Id.* ¶ 29 (footnote omitted).

11

Finally, Dr. Antognini emphasizes the consistency between the facts above and a study regarding "the effects of nitrogen inhalation as a method of euthanasia in dogs." *Id.* ¶ 14. In that study, "[l]oss of consciousness occurred at about 40 seconds on average," with blood pressure reaching zero "at "about 204 seconds" (nearly four minutes). *Id.* As Dr. Antognini recognizes, that time to unconsciousness and death "comport[s] with what has been observed in human suicides as described above." *Id.*

In short, Dr. Antognini's opinion—that Plaintiff will be unconscious within 30 to 40 seconds of his inhaling pure nitrogen (without breath-holding), that Plaintiff will have virtually no warning alerting him to the lack of oxygen, that Plaintiff will die in a matter of minutes, and that he will not suffer significant pain or suffering— is directly based on scientific studies and evidence.

**b.** In response, Plaintiff's Motion appears to assert three distinct theories suggesting that nitrogen nonetheless "'superadds' pain well beyond what's needed to effectuate a death sentence," *Bucklew*, 587 U.S. at 137: (i) eyewitness accounts of the four Alabama executions suggest as much; (ii) Plaintiff is particularly at risk of experiencing such pain because he allegedly has PTSD; and (iii) veterinary guidelines prohibit euthanasia by inert gas for animals. None of these theories works.

**i. Alabama Executions.** Begin with "what [has been] generally uncontested" by litigants in Alabama: Alabama's nitrogen protocol—which essentially mirrors Louisiana's, *see* Ex. C, Smith Decl. ¶¶ 23–28—"has been successfully used" four times, and each time "it resulted in a death within a matter of minutes." *Grayson*, 2024 WL 4701875, at *22. Plaintiff's tack here is to cite a litany of news articles that,

by Plaintiff's telling, reflect eyewitness "observations of extreme suffering" in these four executions and statements that the condemned prisoners moved their bodies for minutes after the nitrogen began flowing. Mot.10. Dr. McAlary likewise emphasizes that he watched Mr. Grayson "shaking, convulsing, writhing, and gasping for air for more than four minutes," "indicat[ing] ... considerable pain and agony." Ex. D, McAlary Decl. ¶ 5. Like the plaintiffs in the Alabama cases, Plaintiff here paints these accounts as "evidence that the inmates remained conscious after the nitrogen began flowing and were distressed and in pain." *Frazier*, 2025 WL 361172, at *11.

Plaintiff omits that these assertions have been repeatedly discredited and rejected by the courts. Specifically, the courts have rejected those accounts (including specifically Dr. McAlary's) as "insufficiently reliable because [the eyewitnesses] d[id] not know"—and could not know—"when the nitrogen began to flow." *Id.* at *11 (footnote omitted). Because they did not know time zero, therefore, the witnesses could not "'reliably pinpoint'" how soon after the introduction of nitrogen "'an inmate los[t] consciousness.'" *Id.* On top of that, the courts have recognized that—as Dr. Antognini explains here, Antognini Decl. ¶ 22— "unconscious individuals experience involuntary movements," such as "'muscle tremors and convulsion-like activity,'" *Frazier*, 2025 WL 361172, at *12. It is thus "not supris[ing]" that the condemned inmates exhibited "breaths and even convulsions[] after the introduction of an inert gas—when a person is unconscious and unable to feel pain." *Id.* For that reason, "the evidence of Smith's, Miller's, and Grayson's movements during their respective executions does not support a finding that any of them experienced severe

13

psychological pain or distress over and above what is inherent in any execution." *Id.* Plaintiff's attempt to relitigate that issue here gets him nowhere.

Because of Plaintiff's and Dr. McAlary's focus on the Smith execution in particular, that focus merits a direct response. *First*, "for as much as Smith's execution was painted in the violent manner that it was, Miller's execution was not"— so, the Court should not lose sight of the fact that Miller's execution "was quick, unconsciousness reached in less than 2 minutes, was void of struggles against the restraints, and with minimal body movement as compared to the Smith execution." *Grayson*, 2024 WL 4701875, at *21.

*Second*, as Dr. Antognini explains (and as Smith's own expert witness agreed), the Smith execution was principally complicated by Smith's "non-cooperation with the execution process," specifically his "breath-holding," which "would have increased the level of carbon dioxide in his body, acidifying his blood and increasing discomfort and distress." Antognini Decl. ¶ 31. As the Alabama courts recognized, the evidence from the Smith execution showed that Smith refused to inhale the nitrogen, which caused the reaction Plaintiff now highlights. *Frazier*, 2025 WL 361172, at *5 & nn.9– 10, *11 n.20; *Grayson*, 2024 WL 4701875, at *21 ("Smith held his breath and struggled against the restraints while Miller did not."). On top of that, Smith's autopsy showed that he had "a synthetic cannabinoid" in his blood that "can cause hallucinations, vomiting, paranoia, and convulsions (seizures)"—which, in turn, may have made Smith's "convulsions more likely and pronounced." Antognini Decl. ¶ 32; *Grayson*, 2024 WL 4701875, at *17 n.18. None of this has anything to do with

14

nitrogen's constitutionality or efficacy as a method of execution—it has everything to do with Smith's own actions.

*Third*, Dr. McAlary emphasizes that Smith's autopsy report indicates pulmonary edema (too much fluid in the lungs). In particular, he claims that Smith "almost certainly suffered from" *negative pressure* pulmonary edema, which he finds significant because that occurs when "the individual has an upper airway obstruction." McAlary Decl. ¶¶ 13–14. That upper airway obstruction then "lead[s] to fluid being drawn from blood vessels into the alveoli as seen in cases of strangulation or smothering with a plastic bag." *Id.* ¶ 14. But Dr. McAlary has changed nothing about his erroneous opinion since the last time it was rejected.

"Smith's autopsy report only indicates pulmonary edema, not *negative pressure* pulmonary edema." *Grayson*, 2024 WL 4701875, at *20 n.21 (emphasis added). And in fact, Smith's autopsy "found no anatomic or foreign body (e.g., vomit or food) upper airway obstruction." Antognini Decl. ¶ 36; *see Grayson*, 2024 WL 4701875, at *16 ("Dr. McAlary acknowledged that Smith's medical examiner ... did not find any obstruction of Smith's airway at autopsy and did not attribute the pulmonary edema to an upper airway obstruction or negative pressure. And Dr. McAlary offered no case studies or articles supporting his opinions."). Moreover, pulmonary edema at autopsy "is common," *id.* ¶ 37, and "Dr. McAlary provides no evidence other than his belief of the existence of negative pressure edema," *Grayson*, 2024 WL 4701875, at *20. Dr. McAlary's unfounded attempt to equate nitrogen hypoxia with "forms of suffocation,

15

such as smothering with a pillow," *Frazier*, 2025 WL 361172, at *10, should be rejected yet again.

Finally, it bears mentioning that Dr. McAlary's most recent declaration finally adds one citation to "relevant academic literature"—and then he misrepresents it. McAlary Mar. 3 Decl. ¶ 7 & n.1. "According to the relevant academic literature," he says, "an individual inhaling pure nitrogen gas may remain conscious for as long as 6 minutes." *Id.*

The cited five-page editorial by authors who "consider the death penalty barbaric and unnecessary" says no such thing. McAlary Decl., Ex. C at 1013. Rather, it says that a human body's *oxygen stores*—not *consciousness*—could last for two to six minutes. *Id.* The editorial also says that "while breathing 100% nitrogen[,] the brain will become [oxygen] deprived *far more rapidly*," leading to unconsciousness. *Id.* (emphasis added) And in this respect, the editorial *agrees with Dr. Antognini and his cited study* that dogs subjected to 100% nitrogen lost consciousness in approximately 40 seconds. *Id.* Not only that, but the editorial also goes on to emphasize that, "[a]fter they became unconscious, some dogs yelped, whereas others gasped, convulsed and/or displayed muscular tremors. *These latter behaviors occurred after sensibility had been lost, and they were thus judged to be insensitive to painful stimuli, such as pinching the foot webbing*." *Id.* (emphasis added); *accord id.* at 1012 ("the 17-20 s elapsed before Ernsting's subjects lost consciousness allows for at least four or five breaths"). In other words: All the *unconscious* movement that witnesses observed in the four Alabama executions and mistook for signs of *conscious*

16

pain and suffering was just that—unconscious "behavior after sensibility had been lost." Dr. McAlary's attempt for the first time to find a scientific basis for his opinion, therefore, provides a damning attack on Plaintiff's own theory of the case.

Here, as in the Alabama cases, Dr. McAlary "finds himself without any real foundational support other than an unsupported opinion—no supporting articles or case studies, reliance upon highly questionable hearsay witness accounts, no support in Smith's autopsy report for an upper airway obstruction that led to negative pressure pulmonary edema," and so on. *Grayson*, 2024 WL 4701875, at \*22. Given Dr. McAlary's repeated inability to substantiate his opinions, it is unsurprising that the courts have credited Dr. Antognini's opinions over his. *Frazier*, 2025 WL 361172, at \*10 ("[T]he Court credits Dr. Antognini's expert opinions over the expert opinions Dr. McAlary offered in Grayson's litigation because Dr. McAlary's opinions were not sufficiently supported by research, scientific studies, or articles."); *Grayson*, 2024 WL 4701875, at \*22 ("[T]he Court finds Dr. Antognini and his opinions on these subjects more credible and persuasive than those of Dr. McAlary."). This Court should do the same here.

**ii. PTSD.** Plaintiff tries to distance himself from the string of Alabama losses by asserting that he, unlike the Alabam plaintiffs, "also suffers from PTSD and Psychotic Disorder." Mot.22. He then complains that "[f]orcing a respirator mask upon his face that will deny him oxygen will interfere with his ability to utilize the breathing techniques that he practices to control his PTSD and cause him to suffer." *Id.* at 23.

17

As discussed above, this argument rests on a flawed premise—that Plaintiff will be unable to breathe as he wishes. Smith's execution demonstrates that Plaintiff *can and should* breathe, rather than holding his breath as Smith did. There is no record evidence suggesting that Plaintiff will be unable to breathe. To the contrary, Dr. Antognini confirmed that he "was able to breathe easily" while "air was delivered at 70, 50, and 30 LPM." Antognini Decl. ¶ 19. And as Dr. McAlary's cited editorial explains, the extremely brief period of time between nitrogen flow and unconsciousness "allows for at least four or five breaths." McAlary Decl., Ex. C at 1012. Plaintiff thus can and should breathe as he wishes, which, he acknowledges, moots this entire line of argument.

Plaintiff's and his expert's speculative claims that he may panic and experience "an upper airway obstruction" like "vomit" also were aired and dismissed in the Alabama cases. *See Grayson*, 2024 WL 4701875, at *19 n.20 ("Smith claimed that the Protocol subjected him to a substantial risk of asphyxiation on his own vomit, and his medical expert characterized that as an almost certainty. But that certainty never happened. Nor did it happen with the Miller execution." (cleaned up)). So, too, with Dr. Bickler's claim (without relying on scientific literature) that "the experience of suffocation" will trigger Plaintiff's alleged PTSD and claustrophobia "creating a loop of terror." Ex. E, Bickler Decl. ¶¶ 11–14. Once again, the "suffocation" premise is flatly inaccurate, and there is no basis for it. *See Frazier*, 2025 WL 361172, at *11 ("It is undisputed that, under the Protocol, Frazier will be deprived of oxygen while conscious after the nitrogen gas is introduced. But according to Dr. Antognini, Frazier

18

will not experience the same pain and suffering as might occur with other types of suffocation, such as smothering and choking *because the Protocol does not prevent Frazier from taking normal breaths and exhaling carbon dioxide*." (emphasis added)).

**iii. Animals.** Last, Plaintiff's gestures (Mot.19–21) at euthanasia for animals are misplaced, irrelevant, and appear to have been intended only to generate sensational headlines. The Capone declaration (cited at Mot.20) describes a situation nowhere close to the facts here. There, animal euthanasia using carbon monoxide occurred in a large "20 feet x 20 feet x 4 feet" chamber. Antognini Decl. ¶ 42. The apparent animal suffering in that chamber thus "likely" stemmed from the "improper use of carbon monoxide" and the "relatively long time [it would take] for the carbon monoxide to build up" in the huge chamber. *Id.* That, of course, is nothing like the nitrogen system here, which will be administered through a mask at a high flow rate that almost immediately achieves unconsciousness.

The Capone declaration also misstates the American Veterinary Medical Association guidelines in suggesting that they would not permit carbon monoxide (or even nitrogen) euthanasia of animals. Dr. Antognini explains that this is false: The guidelines actually *permit* such euthanasia (via both carbon monoxide and nitrogen) depending on whether the particular animal species finds the gas aversive. *Id.* ¶¶ 42–43. If yes, then the guidelines recommend another method of rendering the animal unconscious; but if no, then the guidelines permit use of the gas. *Id.* And that distinction is directly relevant here because, as demonstrated by the literature cited by Dr. Antognini, "humans do not find inert gas exposure aversive." *Id.* ¶ 43.

19

## 2.  Plaintiff has not identified a suitable alternative.

Plaintiff's failure to establish "a substantial risk of severe pain" from nitrogen hypoxia leads directly to his failure to "show a feasible and readily implemented alternative method of execution that would significantly reduce" any such risk "and that the State has refused to adopt without a legitimate penological reason." *Bucklew*, 587 U.S. at 134. He suggests two methods: (a) firing squad, and (b) DDMAPh (which Plaintiff characterizes as "the most commonly used regimen for medical-aid-in-dying in the United States," Mot.25). Neither suffices.

**a. Firing Squad.** Beginning with the firing squad, neither Plaintiff nor his experts seriously claim that execution by firing squad would "significantly reduce" any risk of severe pain from nitrogen (if such risk even existed). As Dr. Antognini observes, Plaintiff's "Dr. Williams does not make any comparative analysis of the pain and suffering that occurs with the firing squad and any pain and suffering that might occur with the administration of nitrogen." Antognini Decl. *Id.* ¶ 51. The reality of firing squads, as Dr. Antognini explains (based on scientific evidence), is that, for somewhere between "4-13 sec[onds]," the condemned is conscious and subject to pain and suffering. *Id.* ¶ 50. And that assumes the firing squad did its job. As Dr. Antognini notes, if the condemned nonetheless remains alive after a first round of shots, he is generally then executed by a second volley of shots (in Utah) or a "coup de grace" gunshot to the head (in the Army). *Id.* ¶ 49; ECF 4-9 at 12–13.

These basic facts demonstrate Plaintiff's failure to meet the *Bucklew* standard. Given the profound pain and suffering a condemned prisoner will suffer by firing

squad, the complete absence of any scientific evidence suggesting similar pain and suffering under Louisiana's nitrogen system means Plaintiff, by definition, cannot show that use of the firing squad would "significantly reduce a substantial risk of severe pain" from nitrogen hypoxia. *Bucklew*, 587 U.S. at 134.

Even if that were not so, Louisiana plainly has "a legitimate penological reason" to adopt nitrogen hypoxia over the firing squad. For example, the Legislature reasonably could have determined that nitrogen hypoxia presents "an arguably more humane method" than the firing squad—and indeed, the Supreme Court has expressly recognized a State's "legitimate interest in selecting a method it regards as 'preserving the dignity of the procedure.'" *Id.*

By any measure of the alternative-method requirement, therefore, Plaintiff has failed to show that the firing squad meets it.[3]

**b. DDMAPh.** Plaintiff fares no better with DDMAPh, which he says is "the most commonly used regimen for medical-aid-in-dying in the United States." Mot.25. By his telling, DDMAPh is an apple juice cocktail with lethal doses of "digonxin, diazepam, morphine, amtirtipyline [sic], and phenobarbital." *Id.* at 25–26. Setting aside his failure to show that this cocktail would "significantly reduce" a non-existent "substantial risk of severe pain" from nitrogen hypoxia, *Bucklew*, 587 U.S. at 134, Plaintiff has a bigger problem.

---

[3] Although not necessary here, Dr. Antognini's response to Plaintiff's invocation (Mot.25) of the bizarre Sarat "study" warrants mentioning—including Sarat's reliance on the tragic story of Mary the Elephant in a discourse on "America's Death Penalty." *See* Antognini Decl. ¶ 52.

As Plaintiff knows, the State cannot use those drugs for execution purposes. His own recent grievance expresses "worry" that, if the State attempted lethal injection, the State will "use manufactured drugs against the manufacturer's intended use." Oliveaux Decl., Exs. 1 and 2. And as this Court and the Supreme Court have recognized, that is a serious problem. Indeed, Chief of Operations, Seth Smith, explains that the State has received numerous demands from pharmaceutical companies "prohibiting the use of their products" for execution purposes—or else the State "will be cut off from receiving their medications for the delivery of medical care to inmates." Smith Decl. ¶¶ 8, 34. Relevant here, diazepam and phenobarbital—two drugs in DDMAPh—have been the subject of such demands. *Id.* ¶¶ 39–44. Thus, "should DPSC use diazepam and phenobarbital to make the DDMAPh cocktail requested by [Plaintiff] as an alternative method of execution, it will likely result in DPSC not having those drugs available for the legitimate medical care needs of its inmate population." *Id.* ¶ 43.

Under *Bucklew*, therefore, Louisiana has at least one legitimate penological reason for not adopting DDMAPh. As the Supreme Court said, "a State can't be faulted for failing to use lethal injection drugs that it's unable to procure through good-faith efforts." *Bucklew*, 587 U.S. at 134; *see Glossip v. Gross*, 576 U.S. 863, 869–70 (2015) ("[A] practical obstacle soon emerged, as anti-death-penalty advocates pressured pharmaceutical companies to refuse to supply the drugs used to carry out death sentences."). So, too, where a State's use of such drugs would result in the State being blacklisted, which, in turn, would detrimentally impact the State's medical care

22

for its prisoners. Indeed, for the same reason, the State's choice of nitrogen precisely because "'[n]o supply concerns exist for nitrogen'" is a "valid penological reason to decline to adopt [Plaintiff's] proposed alternative method." *Frazier*, 2025 WL 361172, at *13–14.

And there is more. While a plaintiff may be able to identify a feasible alternative method by "point[ing] to a well-established protocol in another State," *Bucklew*, 587 U.S. at 140, Plaintiff appears to concede (Mot.25) that no State has ever executed someone with DDMAPh. Not only that, but there are also good reasons why a State would not do so, especially for Plaintiff. For one, as Dr. Antognini explains, death can take one, two, or even 67 hours. Antognini Decl. ¶ 45. No rational State would opt for such a protracted execution. For another, the "Academy of Aid-in-Dying Medicine website lists several red flags" regarding protracted deaths—including the relative youth of the individual (like Plaintiff who is in his 40s), for whom "the potential for a prolonged time to death is increased compared to the typical person who takes DDMAPh for assisted suicide (elderly and debilitated with a terminal disease)." *Id.* ¶ 47. And for yet another, DDMAPh is reputed to be "extremely bitter." *Id.* ¶ 46. All this goes to show that Plaintiff has not identified sufficient alternative methods of execution—and thus, his Eighth Amendment claims are extraordinarily unlikely to succeed.

### C. Plaintiff's Religious-Exercise Claims (Counts VI and VII) Are Not Likely to Succeed.

Plaintiff also is unlikely to succeed on his religious-exercise claims—both under the Free Exercise Clause and under RLUIPA.

### 1.  Plaintiff's Free Exercise claim is foreclosed by *Smith*.

In one paragraph, Plaintiff asserts that "[d]enying [him] the right to engage in Buddhist meditative breathing in the execution chamber and at the time of death would be a violation of the Free Exercise [C]lause[.]" Mot.28. His premise regarding a supposed denial of his right to engage in meditative breathing is wrong. *See infra* Section II.C(2). But more fundamentally, he rightly addresses the Free Exercise Clause only in passing because it is foreclosed by *Employment Division, Department of Human Resources of Oregon v. Smith*, 494 U.S. 872 (1990). "*Smith* held that laws incidentally burdening religion are ordinarily not subject to strict scrutiny under the Free Exercise Clause so long as they are neutral and generally applicable." *Fulton v. City of Phila.*, 593 U.S. 522, 533 (2021). Plaintiff does not even try to meet that standard—nor could he, for Louisiana's method-of-execution of law is plainly neutral and generally applicable. He has no chance of success on this claim.

### 2.  Plaintiff's RLUIPA claim is foreclosed and meritless.

So, too, with Plaintiff's RLUIPA claim. RLUIPA generally provides that the State shall not "impose a substantial burden on the religious exercise" of a prisoner, unless the burden is "in furtherance of a compelling governmental interest" and "the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000cc-1(a). Here, Plaintiff claims that "placing a respirator mask over his face to breathe pure nitrogen and deny him air violates his free exercise of religion under RLUIPA." Mot.27. Specifically, he asserts that, "[p]ursuant to Buddhist tradition, 'breathing is the essential way of practicing'" his religion. *Id.* This claim is both foreclosed and not cognizable on the merits.

24

*First*, it is foreclosed because—as explained above—the Supreme Court has held in the execution context that, where "relief is appropriate under RLUIPA, the proper remedy is an injunction ordering the accommodation, not a stay of execution." *Ramirez*, 595 U.S. at 436. Because Plaintiff has never requested a religious accommodation and instead seeks only a stay of his execution, *Ramirez* forecloses his RLUIPA claim.

*Second*, even if the Court reached the merits, Plaintiff's RLUIPA claim does not get off the ground—not least because he has failed to identify a substantial burden on his religious exercise. He asserts that Louisiana will deny him "the right to engage in Buddhist meditative breathing." Mot.28. But the opposite is true. As Dr. McAlary's own cited editorial explains, Plaintiff will be able to breathe until he becomes unconscious. McAlary Decl., Ex. C at 1012. In fact, as the Smith execution illustrates and as emphasized above, Plaintiff *should* breathe, rather than (like Smith) hold his breath. And to that end, Louisiana has granted Plaintiff's untimely request to have his spiritual advisor present with him in the execution chamber, so that he may engage in his breathing practices as he wishes. *See* Ex. F, Vannoy Decl.

For this reason, Plaintiff appears to fundamentally misunderstand execution by nitrogen hypoxia—perhaps encouraged by his counsel's and experts' mischaracterization of the execution as akin to suffocation and smothering. As the Alabama courts have recognized and as Dr. Antognini confirms, there is no scientific basis for that mischaracterization. Accordingly, Plaintiff faces no substantial burden on his religious exercise and thus has no RLUIPA claim.

Finally, even if Plaintiff had identified a substantial burden, the State would satisfy strict scrutiny—and Plaintiff (Mot.27–28) does not even preserve a strict-scrutiny argument. There is no serious question that the State has a compelling interest in pursuing justice by carrying out executions. *Cf. Dunn v. Smith*, 141 S. Ct. 725, 726 (2021) (Kavanaugh, J., dissenting from denial of application to vacate injunction) (referencing "the State's compelling interests in ensuring the safety, security, and solemnity of the execution room"); *Ramirez*, 595 U.S. at 433 ("Both the State and the victims of crime have an important interest in the timely enforcement of a sentence." (quoting *Hill v. McDonough*, 547 U.S. 573, 584 (2006))). Moreover, Plaintiff has not identified any less restrictive means of furthering that interest. There certainly is none under Louisiana law. In addition, for the reasons explained above, DDMAPh is off the table—and Plaintiff could not seriously argue that he would be able to conduct his breathing exercises in the 4 to 13 seconds during which he would be conscious after being shot by a firing squad. Even on strict scrutiny, therefore, Plaintiff's RLUIPA claim would fail.

### D. Plaintiff's Access-to-Counsel, Access-to-Courts, and Access-to-Protocol Claims (Counts IV and V) Are Not Likely to Succeed.

Plaintiff's various "access" claims are also likely to fail. That is principally so on mootness grounds. Plaintiff complains, for example, that he has been "denied … basic information about the manner in which he will be imminently executed"—including "the execution protocol and what has been done to implement it." Mot.29–30. But, on Saturday, March 1, 2025, Plaintiff's counsel received an unredacted execution protocol and answers to 30 discovery requests related to it. *See* ECF No. 29.

And the parties stipulated to allow Plaintiff to see the unredacted protocol that same day. Nothing thus remains of any claim premised on a "failure to provide Mr. Hoffman or his counsel with an execution protocol." Mot.30. In all events, the Fifth Circuit has squarely foreclosed such a due process claim because there is no "cognizable liberty interest" in access to an execution protocol. *Sepulvado v. Jindal*, 729 F.3d 413, 419–20 (5th Cir. 2013) ("There is no violation of the Due Process Clause from the uncertainty that Louisiana has imposed on Sepulvado by withholding the details of its execution protocol.").

All that remains is a stray claim for "attorney access during the execution procedure" predicated on either the Sixth Amendment right to counsel or the Due Process Clause. Mot.29–30 & n.40. That, too, will fail. The "Sixth Amendment right to counsel only 'extends to the first appeal of right, and no further'"—Plaintiff is far beyond that first appeal. *Whitaker v. Collier*, 862 F.3d 490, 501 (5th Cir. 2017). And Plaintiff "has no constitutionally protected interest in having counsel present throughout his execution." *Mills v. Hamm*, 102 F.4th 1245, 1250 (11th Cir.), *cert. denied*, 144 S. Ct. 2601 (2024); *see Mills v. Hamm*, 734 F. Supp. 3d 1226, 1257 (M.D. Ala. 2024), *appeal dismissed*, No. 24-11689, 2024 WL 3897483 (11th Cir. June 12, 2024) (rejecting the same arguments and tag-along "access to courts" claim).

### E. Plaintiff's Ex Post Facto Clause Claim (Count III) Is Not Likely to Succeed.

Finally, Plaintiff has no viable Ex Post Facto Clause claim. *See* Mot.31–33. Such a violation lies where—as relevant here—a new State law "inflicts greater punishment for an offense than was inflicted by the law in existence at the time the

offense was committed." *United States v. Rose*, 153 F.3d 208, 210 (5th Cir. 1998). The Supreme Court has long held, however, that there is no such increase in punishment where "[t]he statute under consideration d[oes] not change the penalty—death—for murder, but only the mode of producing this." *See Malloy v. South Carolina*, 237 U.S. 180, 185 (1915); *see also id.* at 183 ("The constitutional inhibition of ex post facto laws was intended to secure substantial personal rights against arbitrary and oppressive legislative action, and not to obstruct mere alteration in conditions deemed necessary for the orderly infliction of humane punishment.").

That is the case here. From the start, "the punishment—death—has remained the same." *Zink v. Lombardi*, 783 F.3d 1089, 1108 (8th Cir. 2015); *accord Poland v. Stewart*, 117 F.3d 1094, 1105 (9th Cir. 1997) (no ex post facto violation where "sentence was death, and that sentence remains in place"). Louisiana's addition of nitrogen as a method of execution does "not increase the punishment, but would only provide for the method by which the punishment would be carried out; a change in procedure, not the sentence." *United States v. Chandler*, 996 F.2d 1073, 1096 (11th Cir. 1993), *as modified* (Sept. 30, 1993), *aff'd,* 218 F.3d 1305 (11th Cir. 2000). This "change in method" alone "does not make the sentence more burdensome and so does not violate the Ex Post Facto Clause." *Id.*; *see also United States v. Tipton*, 90 F.3d 861, 903 (4th Cir. 1996) (rejecting as foreclosed ex post facto challenge to means by which death sentence was to be carried out); *Jones v. Crow*, No. 21-6139, 2021 WL 5277462, at *7 (10th Cir. Nov. 12, 2021) ("It is well established that a procedural change in execution protocol does not violate the ex post facto clause because the

penalty—death—remains the same."); *Matter of Fed. Bureau of Prisons' Execution Protocol Cases*, No. 05-CV-2337, 2021 WL 127602, at *2 (D.D.C. Jan. 13, 2021) ("[M]ultiple Circuits have found that a change in the method of execution does not increase a condemned inmate's punishment and, thus, does not implicate the Ex Post Facto Clause."); *Johnson v. Bell*, 457 F. Supp. 2d 839, 841–42 (M.D. Tenn. 2006) (agreeing with *Poland* and denying inmate's ex post facto challenge to choice of method of execution).

Ignoring this settled law, Plaintiff argues that nitrogen "is more inhumane than lethal injunction" in violation of the Ex Post Facto Clause. Mot.32. But Plaintiff's argument presupposes a win on his Eighth Amendment claims, which, as explained above, will likely fail. Even if his proffered "more inhumane" standard were the law, therefore, he cannot show the required "significant risk of increased punishment" to support his claim. *See Garner v. Jones*, 529 U.S. 244, 252 (2000); *see also Miller v. Parker*, 910 F.3d 259, 261 (6th Cir. 2018) (requiring plaintiff to show that "the new protocol is 'sure or very likely' to be less humane" to implicate the Ex Post Facto Clause). And in all events, the law is clear: Where a capital statute specifies only a new mode of execution, the sentence itself is not altered, and so there is no ex post facto problem. *See Chandler*, 996 F.2d at 1096.

*        *        *

All of the above arguments demonstrate why Plaintiff is not entitled to preliminary-injunction relief. But they also establish that Plaintiff has not plausibly

stated claims for relief. Accordingly, the Court's decision on the merits should both deny Plaintiff's Motion and dismiss the Complaint.[4]

## II.    THE EQUITIES FAVOR DEFENDANTS.

Plaintiff's failure to establish a likelihood of success on the merits for any of his claims ends the analysis for all practical purposes. For the remaining factors cannot make up the slack on the merits—the "most important" factor. *Abbott*, 110 F.4th at 706 (quoting *Mock*, 75 F.4th at 587 n.60). But, even if the Court reaches the remaining factors, they weigh heavily in favor of Defendants.

*First*, Plaintiff's delay in filing this suit places the equities and the public interest squarely on the State's side. The Supreme Court has emphasized that federal courts must apply "a strong equitable presumption against the grant of a stay where a claim could have been brought at such a time as to allow consideration of the merits without requiring entry of a stay." *Nelson v. Campbell*, 541 U.S. 637, 650 (2004). Indeed, "[l]ast-minute stays should be the extreme exception, not the norm, and 'the last-minute nature of an application' that 'could have been brought' earlier, or 'an applicant's attempt at manipulation,' 'may be grounds for denial of a stay.'" *Bucklew*, 587 U.S. at 150 (quoting *Hill*, 547 U.S. at 584). For that reason, federal courts "'can and should' protect settled state judgments from 'undue interference' by invoking their 'equitable powers' to dismiss or curtail suits that are pursued in a 'dilatory'

---

[4] Because of the current time constraints, Defendants have not raised a qualified-immunity defense in this memorandum. *See* Compl. ¶¶ 14, 15 (purporting to sue Defendants in both their individual and official capacities). They reserve the right to raise that defense if this case proceeds beyond the preliminary-injunction stage.

fashion or based on 'speculative' theories." *Id.* at 151 (quoting *Hill*, 547 U.S. at 584–85).

That precisely describes this case. As the Court is aware, for eight months now, Plaintiff has told this Court that he has a live controversy. *See* Mem. in Support of Mot. for Relief from J. at 1, No. 12-cv-796 (M.D. La. June 14, 2024), ECF 318-1 ("[T]here has since been a material and extraordinary change of circumstances that gives rise to a live controversy between the parties."). Yet he refused to file this lawsuit. Instead, he put all his eggs in a basket of hope that this Court would reopen his long-dismissed suit and allow him to skip the hassle of filing a new lawsuit. That strategy is inexplicable—but it is also an undisputed fact. Plaintiff now tries to turn his delay on the State by protesting (Mot.3–4) that the State should have just allowed his procedurally wrong invocation of Rule 60(b)(6) to proceed apace. But, as the Court reiterated at last Friday's conference, all parties here must play by the rules. And the rules in the Fifth Circuit's caselaw say that Plaintiff cannot use Rule 60(b)(6). That is not the State's fault. He, the State, and the Court are in this eleventh-hour time crunch solely because he refused to file *this* lawsuit eight months ago. Whether the Court deems that delay or manipulation, it is a fact that tilts the equities in the State's favor.

*Second*, the State (and therefore also the public because the factors merge) has an unquestionable compelling interest in Plaintiff's execution. *See Bucklew*, 587 U.S. at 150 ("Under our Constitution, the question of capital punishment belongs to the people and their representatives . . . ."); *Nelson*, 541 U.S. at 644 ("[A] State retains a

significant interest in meting out a sentence of death in a timely fashion."); *In re Blodgett*, 502 U.S. 236, 239 (1992) (The State's "sovereign power to enforce [its] criminal law" carries "great weight."); *Calderon v. Thompson*, 523 U.S. 538, 556 (1998) ("To unsettle these expectations [of finality] is to inflict a profound injury to the 'powerful and legitimate interest in punishing the guilty,' an interest shared by the State and the victims of crime alike." (quoting *Herrera v. Collins,* 506 U.S. 390, 421 (1993) (O'Connor, J., concurring))); *Moran v. Burbine*, 475 U.S. 412, 426 (1986) (recognizing "society's compelling interest in finding, convicting, and punishing those who violate the law"); *Turner v. Epps*, 460 F. App'x 322, 331 (5th Cir. 2012) (emphasizing that courts must "give appropriate weight to . . . the State's interests in carrying out [an] execution as scheduled . . . .").

And *third*, Plaintiff has no viable assertion of irreparable harm on the other side of the ledger. His only theory of irreparable harm is that he "will be executed in violation of his constitutional rights." Mot.33. But that theory falls apart since he has no likelihood of success on the merits. Moreover, to the extent that he suggests his showing of irreparable harm would alone be "dispositive," he is wrong. Mot.33 (citing *D.T. v. Sumner Cnty. Sch.*, 942 F.3d 324, 327 (6th Cir. 2019)). What the Sixth Circuit actually held in *D.T.* was that the *absence* of irreparable harm was dispositive. *See* 942 F.3d at 327 ("Was the district court wrong to stop the inquiry after finding no irreparable injury? No. When one factor is dispositive, a district court need not consider the others."). In addition, the Fifth Circuit has rejected limiting the preliminary-injunction inquiry to irreparable harm. *See White v. Carlucci*, 862 F.2d

1209, 1211 n.1 (5th Cir. 1989) ("Plaintiff would have us ... order the injunction to issue if we find that irreparable injury was either established or need not be. Such a result would be inappropriate."); *accord* § 73:96, 14A Cyc. of Federal Proc. § 73:96 (3d ed.) ("[E]nforcement of a constitutional state statute will not be enjoined by a federal court merely because it will cause irreparable injury." (citing *Ala. Pub. Serv. Comm'n v. S. Ry. Co.*, 341 U.S. 341 (1951); *Lawson v. Aetna Ins. Co.*, 41 F.2d 316 (4th Cir. 1930))). And for good reason: Plaintiff's theory would entitle every prisoner with a death warrant to a preliminary injunction based on nothing more than the warrant's existence. That is not the law.

In all, therefore, the remaining preliminary-injunction factors warrant the denial of Plaintiff's Motion.

## CONCLUSION

For these reasons, the Court should deny Plaintiff's Motion for a Preliminary Injunction, if not grant Defendants' Motion to Dismiss outright. If the Court were to grant a preliminary injunction against Plaintiff's execution, however, Defendants respectfully request that the Court make clear that it would deny a stay of that injunction, in order to facilitate appellate review.

Respectfully Submitted:

/s/ Jeffrey K. Cody
Jeffrey K. Cody (La. Bar Roll No. 28536)
jeffreyc@scwllp.com
Caroline M. Tomeny (La. Bar Roll No. 34120)
caroline@scwllp.com
Brooke L. R. Ydarraga (La. Bar Roll No. 41000)
brooke@scwllp.com
**SHOWS, CALI & WALSH, L.L.P.**
628 St. Louis Street (70802)
P.O. Drawer 4425
Baton Rouge, Louisiana 70821
Telephone: (225) 346-1461
Facsimile: (225) 346-1467

/s/ Connell L. Archey
Randal J. Robert (La. Bar #21840)
randy.robert@butlersnow.com
Connell L. Archey (La. Bar #20086)
connell.archey@butlersnow.com
**BUTLER SNOW, LLP**
445 North Boulevard, Suite 300
Baton Rouge, LA 70802
Telephone: (225) 325-8700
Facsimile: (225) 325-8800

**Counsel for Defendants**

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on March 4, 2025**,** a copy of the foregoing was filed electronically with the Clerk of Court using the CM/ECF system, and notice will be sent to all counsel for Plaintiff by operation of the court's electronic filing system.

   /s/ Caroline M. Tomeny
CAROLINE M. TOMENY