**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**

JESSIE HOFFMAN,

        Plaintiff,

        v.

GARY WESTCOTT, *et al.*,

        Defendants.

CIVIL ACTION No. 25-169-SDD-SDJ
CHIEF JUDGE SHELLY D. DICK

MAGISTRATE JUDGE
SCOTT D. JOHNSON

**DEFENDANTS' [PROPOSED] FINDINGS OF FACT AND**
**CONCLUSIONS OF LAW**

# TABLE OF CONTENTS

TABLE OF CONTENTS ..................................................................................... ii

FINDINGS OF FACT ........................................................................................ 1

I.   PLAINTIFF WAS CONVICTED FOR THE FIRST-DEGREE MURDER OF MARY
     "MOLLY" ELLIOT AND SENTENCED TO DEATH. .................................... 1

II.  BECAUSE OF COMPLICATIONS WITH LETHAL-INJECTION DRUGS, LOUISIANA
     RESEARCHES AND ADOPTS NITROGEN HYPOXIA AS A METHOD OF EXECUTION. 2

     A.   Pharmaceutical Companies Block Louisiana from Carrying Out
          Executions by Lethal Injection. ................................................... 2

     B.   Louisiana Adopts Nitrogen Hypoxia as a Method of Execution and
          Develops an Execution Protocol Based on Alabama's. ............................ 4

     C.   DPSC Builds the Louisiana State Penitentiary's Nitrogen System
          Based on Alabama's. ................................................................ 5

     D.   DPSC Promulgates its Nitrogen Protocol Based on its 2014 Protocol
          and Alabama's. ...................................................................... 8

III. NITROGEN HYPOXIA AS APPLIED TO PLAINTIFF. ............................................ 9

     A.   Louisiana Will Execute Plaintiff by Nitrogen Hypoxia on March 18,
          2025 ................................................................................ 9

     B.   Plaintiff is a Practicing Buddhist Who Will Use Deep Mediated
          Breathing During His Execution. .................................................. 10

     C.   Plaintiff's Claims of PTSD and Claustrophobia Are Unsubstantiated. 11

          1.   Any "Life Threatening Event" Might Trigger Plaintiff's PTSD. ......... 11

          2.   The Claustrophobia Diagnosis is Unfounded. ............................. 13

IV.  THE EXPERT TESTIMONY SHOWS THAT PLAINTIFF'S EXECUTION BY
     NITROGEN HYPOXIA WILL NOT SUPERADD PAIN COMPARED TO
     ALTERNATIVES. ......................................................................... 13

     A.   Nitrogen Hypoxia Is Quick and Does Not Cause Pain. .......................... 13

B.    The Alternatives Are Both Unavailable and Equally, if not More, Painful. ................................................................................ 15

1. DDMAPh Method of Execution. ............................................... 15

2. Firing Squad Method of Execution. .......................................... 17

V.    THE STATE OF LOUISIANA WILL EXECUTE PLAINTIFFS BY NITROGEN HYPOXIA FOR MOLLY'S MURDER. ..................................................... 19

CONCLUSIONS OF LAW ................................................................... 20

I.    ALL OF PLAINTIFF'S LIVE CLAIMS ARE UNEXHAUSTED. .................................. 20

A.    The Eighth Amendment Claims Are Not Exhausted. ........................... 21

B.    Plaintiff's Ex Post Facto and Access Claims Are Not Exhausted. ......... 24

C.    This Court's Motion-to-Dismiss Ruling Is Mistaken. ........................... 25

II.   EVEN IF IT WERE EXHAUSTED, PLAINTIFF'S EX POST FACTO CLAUSE CLAIM (COUNT III) IS NOT LIKELY TO SUCCEED. ................................................. 29

III.  PLAINTIFF'S ACCESS CLAIMS (COUNT IV) ARE NOT LIKELY TO SUCCEED. .... 31

IV.   PLAINTIFF'S EIGHTH AMENDMENT CLAIMS ARE NOT LIKELY TO SUCCEED (COUNTS I AND II). ........................................................................ 32

A.    Plaintiff Is Unlikely to Prove that Nitrogen Hypoxia Poses a Substantial Risk of Severe Pain. ........................................................ 34

1.    Plaintiff's own elicited testimony confirms Dr. Antognini's opinion that there is no substantial risk of severe pain. .................... 35

2.    Plaintiff's halftime switch of Dr. Bickler for Dr. McAlary did not help him. ................................................................... 40

3.    Plaintiff's gestures at PTSD and tenets of Buddhism do not affect this analysis. .......................................................... 45

B.    In All Events, Plaintiff Is Unlikely to Prove a Sufficient Alternative... 48

1.    The firing squad is not a sufficient alternative. ................... 48

2.    DDMAPh is not a sufficient alternative. .............................. 51

V.    THE EQUITIES WEIGH IN DEFENDANTS' FAVOR.............................. 55

RELIEF ...................................................................................... 58

## FINDINGS OF FACT

### I.    PLAINTIFF WAS CONVICTED FOR THE FIRST-DEGREE MURDER OF MARY "MOLLY" ELLIOT AND SENTENCED TO DEATH.

1.    On the night before Thanksgiving Day in 1996, Plaintiff, Jessie Hoffman, kidnapped, robbed, and raped Mary "Molly" Elliot. *State v. Hoffman*, 768 So. 2d 542, 550 (La. 2000). Plaintiff kidnapped Molly at gunpoint and drove her to an ATM, where he forced her to withdraw $200 that he then robbed her of. *Id.*

2.    Plaintiff subsequently raped Molly in the backseat of her own car in a remote area of St. Tammany Parish. *Id.* He then marched her—still naked—"down a dirt path which was overgrown with vegetation and in an area full of trash used as a dump." *Id.* "Her death march ultimately ended at a small, makeshift dock" on Middle Pearl River, where Plaintiff "forced [her] to kneel" and "shot [her] in the head, execution style." *Id.*

3.    Molly "likely survived for a few minutes after being shot." *Id.* But she was not discovered until Thanksgiving Day, when a duck hunter came across her naked body on the dock. *Id.* at 549.

4.    For his part, Plaintiff "soon thereafter" took his girlfriend shopping with Molly's money. *Id.* at 550.

5.    A jury convicted him of first degree murder, and he was sentenced to death. *Id.* at 549; *see* ECF 1 (Complaint) ¶ 61. His direct appeal was litigated to finality. *Hoffman v. Louisiana*, 531 U.S. 946 (2000) (denying petition). And Plaintiff exhausted all of his state and federal post-conviction remedies. *State v. Hoffman*, 2020-00137 (La. 10/19/21), 326 So. 3d 232, 235–36, 242 (collecting his post-conviction

1

cases) ("Hoffman has now fully litigated his application for state post-conviction relief.").

## II. BECAUSE OF COMPLICATIONS WITH LETHAL-INJECTION DRUGS, LOUISIANA RESEARCHES AND ADOPTS NITROGEN HYPOXIA AS A METHOD OF EXECUTION.

6.    It is no secret that drug companies have made it extraordinarily difficult for States to carry out executions by lethal injection. So, many States have turned to nitrogen. Nitrogen is the most abundant atmospheric gas and constitutes nearly 78% of the ambient air that we breathe. 1st Tr. 182:22–23. Inhalation of nitrogen displacing oxygen in the lungs can cause unconsciousness and then death—that is by nitrogen hypoxia. 2nd Tr. 46:23–47:7, 59:14–18. And for those reasons, Oklahoma, Mississippi, and Alabama have all adopted nitrogen hypoxia as a method of execution. *See* Okla. Stat. tit. 22, § 1014(B); Miss. Code § 99-19-51(1); Ala. Code § 15-18-82.1. This case represents Louisiana's part of that story.

### A. Pharmaceutical Companies Block Louisiana from Carrying Out Executions by Lethal Injection.

7.    Before July 2024, Louisiana's exclusive available statutory method of execution was lethal injection. *See* La. R.S. 15:569 (2010); 1990 La. Sess. Law Serv. 717 (S.B. 243) (adopting execution by lethal injection).

8.    The Louisiana Department of Public Safety and Corrections lethal injection protocol included (and still includes) the administration of—among other drugs—Midazolam and Hydromorphone. Plfs.' Ex. 9 at 15 (2014 protocol).

9.    Beginning around 2014, DPSC officials corresponded regularly "with various pharmaceutical manufacturers and [their] wholesalers" that assured DPSC

that its "using one of their drugs" for an execution would mean the companies were "no longer going to supply drugs [DPSC] need[s] to treat people." 1st Tr. 170:19–24.

10.    Some pharmaceutical companies requested that DPSC certify in writing that their products—including Midazolam and Hydromorphone—would not be used in the administration of any capital punishment. *Id.* at 176:20–177:1. If DPSC refused to certify, the companies would withhold their medications for delivery for medical care for *all* inmates in DPSC custody. *Id.* But DPSC could "run that risk" because the prison system has "full-blown hospitals" with an "aging population" that need the "life-saving" drugs. *Id.* at 177:2–7.

11.    These companies maintain that prohibition today. For example, in 2018, DPSC executed a certification to Pfizer and its wholesaler (Morris & Dickson) in order to access potential execution drugs solely for the medical care needs of its inmate population, which, if violated, could jeopardize DPSC's ability to utilize these drugs for legitimate medical needs. *Id.* at 167:13–20. And that certification has no expiration date. *Id.* at 176:20–21. Included in that certification is diazepam, one of the drugs that is required for Plaintiff's proposed DDMAPh alternative method of execution. Plfs.' Ex. 135 at 2.

12.    DPSC has also previously received correspondence from Hikma Pharmaceuticals PLC ("Hikma") stating that it objected to DPSC's use of any of its drugs for capital punishment, including any restricted drugs listed on its website. *Id.* at 168:1–4. According to Hikma's website, it specifically objects to the use of phenobarbital for capital punishment. *Id.*; *see Hikma Pharmaceuticals strongly*

3

*objects to the use of its products in capital punishment*, HIKMA (May 15, 2013), t.ly/MkaIF. Phenobarbital is one of the drugs that is required for the proposed DDMAPh method of execution. 1ˢᵗ Tr. 137:4–12, 141:18–19.

13.    Because of the pharmaceutical companies' actions, it has been and remains impossible for DPSC to implement its lethal injection execution protocol. 1ˢᵗ Tr. 159:4–6, 187:6–7.

**B. Louisiana Adopts Nitrogen Hypoxia as a Method of Execution and Develops an Execution Protocol Based on Alabama's.**

14.    In 2014, the Louisiana Legislature issued House Resolution No. 142. *Id.* at 171:24–172:4. It directed DPSC to study different methods of execution to determine the best practices for administering the death penalty in the most humane manner and to issue a written report to the House Committee on the Administration of Criminal Justice. *Id.* at 177:23–25. The written report later led to a 2015 bill introducing inhalation of nitrogen as an alternative method of administering capital punishment. *Id.* at 178:1–3. But the bill was ultimately not passed. *Id.*

15.    The first execution by nitrogen hypoxia occurred a decade later on January 25, 2024, when the State of Alabama executed Kenneth Eugene Smith at Holman Correctional Facility. *See* Ralph Chapoco, *Kenneth Eugene Smith executed by nitrogen gas for 1988 murder-for-hire scheme*, ALABAMA REFLECTOR, t.ly/UaAPK (Jan. 26, 2024).

16.    Back in Louisiana, in February 2024, during a special legislative session focusing on criminal justice issues, a bipartisan majority of the Legislature considered and passed a bill to add nitrogen hypoxia as a method of execution. *See*

2024 La. Sess. Law Serv. 2nd Ex. Sess. Act 5 (H.B. 6) (codified at La. R.S. 15:569–570). On March 5, 2024, Governor Landry signed Act 5 into law to take effect on July 1, 2024. *Id.* Once effective, it amended La. R.S. 15:569 to adopt nitrogen hypoxia as a method of execution. *Id.*

17.    Now, the only currently available means of carrying out an execution in Louisiana is by nitrogen hypoxia. 2nd Tr. 21:24–22:5.

### C. DPSC Builds the Louisiana State Penitentiary's Nitrogen System Based on Alabama's.

18.    DPSC subsequently began to study how to build a nitrogen hypoxia system for use in Louisiana State Penitentiary's Death Chamber. 1st Tr. 178:16–18.

19.    In March 2024, Chief of Operations for DPSC, Seth Smith, and LSP's Warden traveled to Atmore, Alabama, to see the nitrogen hypoxia system used by the Alabama Department of Corrections (ADOC). *Id.* at 178:18–22, 179:20–23. After the Alabama visit, DPSC directed LSP to begin discussing the construction of a nitrogen hypoxia system for use in the execution chamber at LSP's Camp F, E (entrance) building. *Id.* at 181:13–18.

20.    After July 1, 2024, LSP began to procure equipment and supplies for use in constructing the nitrogen hypoxia system. *Id.* at 181:22–24. LSP personnel began construction of the nitrogen hypoxia system that same month. *Id.* at 182:9–11.

21.    Mr. Smith wanted to improve the components so that Louisiana's system more closely resembled Alabama's, so he instructed LSP personnel to get a deeper understanding of the details of Alabama's system by the people directly involved in piping and maintenance. *Id.* at 181:24–182:5.

22.     On August 7–8, 2024, LSP personnel—those "more directly involved with piping, maintenance type work"—traveled to Atmore, Alabama, to see ADOC's nitrogen hypoxia system. *Id.* at 182:20–182:24. During that visit, LSP personnel were allowed to inspect every feature of ADOC's nitrogen hypoxia system to obtain a complete understanding of its setup and function. *Id.* at 183:2–5.

23.     About two weeks after returning from Alabama, LSP personnel ordered automatic manifolds, copper piping, two exhaust fans, three permanent wall-mounted $O_2$ sensors, and various fittings in order for LSP's system to more closely mirror those of ADOC's nitrogen hypoxia system. *Id.* at 183:6–9.

24.     In August 2024, LSP resumed trainings for staff involved in executions under both ADOC's redacted nitrogen hypoxia protocol and DPSC's March 2014 lethal injection protocol. *Id.* at 165:11–14, 176:2–11. Mr. Smith attended at least three such trainings and was "very satisfied" with the results. *Id.* at 189:18–23.

25.     By September 2024, LSP completed construction of its nitrogen hypoxia system. *Id.* at 165:15–18.

26.     LSP's completed nitrogen hypoxia facility has three rooms—the valve and storage room, the observation room, and the execution chamber. *Id.* at 188:23–189:2, 191:11–13; *see, e.g.*, Plfs.' Exs. 101, 108, 114, 117, 121.

27.     The valve and storage room contains multiple tanks of breathing air and of nitrogen that are not in use—but are full and ready to be used. 1st Tr. 191:11–13. The tanks are "clearly labeled." *Id.* at 191:15–16.

28.     That room also contains two electronic manifolds mounted on the wall—

6

one for nitrogen, one for breathing air. *Id.* at 183:25–184:19. The nitrogen in the tanks is labeled with "UHP 300" because they contain ultra-high grade nitrogen (99.999%, 0.001% impurities)—not medical grade nitrogen (99.0%, 1% impurities), which is comparatively inferior. *Id.* at 175:5–22.

29.     Each manifold contains two tanks connected into the system—one bottle "ready/in use," and one on "standby." *Id.* Each tank has a gauge measuring the pressure within it. *Id.*; *see id.* at 191:15–21. If a tank were to lose pressure, the electronic system "automatically flips" to the full tank "without a break in service." *Id.* at 183:25–184:19. Alabama uses the same system. *Id.* at 184:20–23.

30.     From each manifold come two pipes. *Id.* at 191:22–23. One goes to an exhaust vent in case of overpressures. *Id.* at 191:23–192:3. The other pipe travels through a manual pressure gauge and into opposite ends of the same T joint that feeds into a flow meter. *Id.* at 192:4–11. For redundancy, LSP personnel monitor the manual gauges to verify they stay at 50 pounds per square inch (psi). *Id.* at 192:11–13. The flow meter itself regulates the flow rate out of the T joint—no matter the psi fed into the T joint. *Id.* at 192:15–20. From the flow meter comes a single industrial tube leading to the mask. 2nd Tr. 125:12–126:7. Louisiana improved on Alabama's system by procuring higher grade industrial tubing. 1st Tr. 193:1–8.

31.     The mask used is a full-face silicon mask with a plexi-glass screen known as a "source respirator"—industrial grade and superior in quality to medical grade masks. *Id.* at 180:22–24. The thick, cushion material that straps against the face creates a "virtually air tight seal." 2nd Tr. 126:13–127:6. The mask has a one-way

7

inlet valve allowing for airflow into the mask from the industrial tube. *Id.* The mask allows for exhaling through another one-way exhaust valve. *Id.* The protection factor of the mask is 1000. *Id.* at 127:7–129:12. As a result, breathing in the mask is "very comfortabl[e]." *Id.* 131:4–5. The mask is very similar, if not identical, to the one used in Alabama's system. 1st Tr. 180:20–23.

32.    When nitrogen and carbon dioxide exit the mask, they dissipate into the air in the execution chamber. *Id.* at 188:1–6. Out of an abundance of caution, DPSC installed two exhaust fans for any excess nitrogen to be taken out of the room entirely. *Id.* at 188:7–15.

33.    More, DPSC has placed permanent and portable oxygen monitors in the visiting room, the valve room, and the execution chamber with alarms set for oxygen levels below 18.5%. *Id.* at 189:2–16. The monitors alert personnel and witnesses if oxygen levels happen to drop in the room. *Id.*

### D. DPSC Promulgates its Nitrogen Protocol Based on its 2014 Protocol and Alabama's.

34.    On February 3, 2025, DPSC executed a new nitrogen protocol to include the procedures implementing LSP's nitrogen hypoxia system. *See* Plfs. Ex. 11; 2nd Tr. 14:2–4.

35.    On February 11, 2025, Warden Vannoy signed an updated protocol that addressed some inconsistencies and minor grammatical errors. 2nd Tr. 11:4–9; *see* Plfs.' Exs. 1 & 3.

36.    The protocol is a blend of DPSC's 2014 lethal injection protocol and ADOC's redacted nitrogen hypoxia protocol. 1st Tr. 176:2–11. In fact, the protocol

maintains every procedure from the 2014 protocol for what happens before the condemned inmate arrives at the table. *Id.*

37.    While constructing its nitrogen hypoxia system and protocol, DPSC did not consider electrocution, lethal injection, firing squad, or medical aid in dying as alternatives because all are impossible, unauthorized by law, or both. *Id.* at 159:1–22.

38.    Louisiana law determines who can witness an execution. 2nd Tr. 22:13–16. Secretary Westcott has the discretion to choose three of those witnesses, and he has chosen a member of law enforcement, a representative from the Attorney General's Office, and a representative from the Governor's Office. *Id.* at 23:17–22.

39.    On the day of the execution, the execution will occur between 6 P.M. and 9 P.M. *Id.* at 17:18–23. The Warden can terminate the condemned inmate's contact with his attorney and spiritual advisor at 3:00 P.M. *Id.* at 17:10–14. But Warden Vannoy will allow contact with Plaintiff's attorneys until about 4:30. *Id.* at 17:15–17. At that point, the attorneys will be able to join Plaintiff's family at a designated location. *Id.* at 17:24–18:3.

## III.    NITROGEN HYPOXIA AS APPLIED TO PLAINTIFF.

### A. Louisiana Will Execute Plaintiff by Nitrogen Hypoxia on March 18, 2025.

40.    On February 20, 2025, Plaintiff was served a death warrant. 1st Tr. 25:23–26:1.

41.    Secretary Westcott chose the nitrogen hypoxia method of execution because it was the only one immediately available. 2nd Tr. 21:24–22:5.

## B. Plaintiff is a Practicing Buddhist Who Will Use Deep Mediated Breathing During His Execution.

42.    Plaintiff has been a practicing Buddhist since 2002 when his grandmother passed away. 1st Tr. 23:12–17. In his regular practice, Plaintiff does mediated breathing twice a day—at morning and at night. *Id.* at 24:12–17. That mediated breathing requires concentrated "deep breaths" by inhaling and exhaling. *Id.* at 33:15–22.

43.    When exercising his mediated breathing, Plaintiff is *not* concerned with the composition of the air he is breathing. *Id.* at 34:4–9. Only when prompted by his lawyer did Plaintiff indicate that oxygen is itself essential to his religious practice. *Id.* at 40:6–8; *see id.* at 52:3–11.

44.    Plaintiff plans to use mediated breathing during his execution by nitrogen hypoxia. *Id.* at 39:15–17. And on Wednesday, March 5, 2025, Plaintiff met his spiritual advisor Rev. Reimoku Gregory Smith who plans to aid in the mediated breathing and ensure a peaceful death. *Id.* at 101:3–4, 101:22–102:25.

45.    Reverend Michaela O'Connor Bono explained that Plaintiff's mediated breathing is the Buddhist practice of Anapanasati, which involves detailed breathing instructions with a focus on the breathing itself and especially the sensation of the breath traveling from the nose and mouth to the diaphragm. *Id.* at 48:17–49:3, 52:12–17, 101:10–14. While Reverend Bono maintained that air is important to the practice, she was unable to identify any doctrine within the Tibetan Buddhist tradition that required oxygen in particular. *Id.* at 52:3–9.

**C. Plaintiff's Claims of PTSD and Claustrophobia Are Unsubstantiated.**

**1. Any "Life Threatening Event" Might Trigger Plaintiff's PTSD.**

46.    In 2003, Dr. Frederic Sautter observed Plaintiff and diagnosed him with Post-Traumatic Stress Disorder (PTSD) and Psychotic Disorder NOS (not otherwise specified). *Id.* at 59:11–16. He did not diagnose Plaintiff with claustrophobia. *Id.* at 61:23–62:1.

47.    Plaintiff has not "sought any treatment for PTSD in over five years." *Id.* at 32:18–21.

48.    Just weeks ago, Dr. Sautter again assessed Plaintiff. *Id.* at 62:23–63:1. While he testified that Plaintiff's 2003 diagnosis remained unchanged, Dr. Sautter altogether ignored Plaintiff's 22 years of intervening medical and psychiatric records. *Id.* at 63:4–6. Although he has recognized Plaintiff has improved, Dr. Sautter now describes this as "complex PTSD" from Plaintiff's "early environment"—*i.e.*, "symptom environment"—before his "personality develop[ed]." *Id.* at 83:24–84:7.

49.    Dr. Sautter relied on "frequent reports of symptoms and problems that people are experiencing." *Id.* at 63:8–11. Dr. Sautter, however, has not communicated with any medical professional at LSP. For when asked to identify who reported Plaintiff's psychological problems to him, Dr. Sautter identified Plaintiff's lawyer. *Id.* at 75:7–17.

50.    In general, PTSD increases the chances that one might have a panic attack if triggered. *Id.* at 60:4–9. In Plaintiff's case, a triggering event includes any "life threatening" event. *Id.* at 62:5–12. In other words, if "he thinks he is going to die,

11

he is going to be susceptible to having some PTSD symptoms." *Id.* at 69:3:–7. That is because he is conditioned to have a "fear of death." 1st Tr. 71:14–21.

51.    (To skip ahead in the narrative, Dr. Bickler echoed that for Plaintiff— no matter how—the "inevitability of the coming death would be a terror." 2nd Tr. 39:4– 8. Indeed, execution by any means will cause psychological pain and anxiety. *Id.* at 97:7–10.

52.    And stressful experiences can be hard on PTSD patients—so much so that Dr. Bickler has to hold their hand through awake brain surgery. *Id.* at 34:7–10. The environment of the execution chamber alone would be enough to make someone with PTSD "extremely uncomfortable," says Dr. Bickler. *Id.* at 55:21–25.)

53.    Turning back to Dr. Sautter, Plaintiff being held at gunpoint, too, is an example from the "100 stimuli [Plaintiff] probably experienced that are associated with traumatic events" and "could" trigger his PTSD symptoms. *Id.* at 83:1–10. According to Dr. Sautter's 2003 report, part of Plaintiff's PTSD stems from twice being robbed and held at gun point. *Id.* at 78:25–79:3; *see* Defs.' Ex. 20 at 6. So, if faced with a firing squad, Plaintiff may have a panic attack "depend[ing] on his emotion response." 1st Tr. 80:1–4; *see id.* at 124:6–10 (Dr. Williams with no opinion on psychological pain).

54.    Even so, when Plaintiff is faced with a PTSD triggering event, his meditated breathing practices help prevent any symptoms. *Id.* at 72:12–16.  (Dr. Bickler says that only if that coping mechanism is interfered with will there be additional stress on Plaintiff. 2nd Tr. 59:7–9.) Moreover, Dr. Sautter testified that

Plaintiff will be able to practice his breathing techniques while he is executed, thus "decreas[ing]" any distress. 1st Tr. 72:8–16.

### 2. The Claustrophobia Diagnosis is Unfounded.

55.    Plaintiff claims to suffer from claustrophobia stemming from being locked in a closet by his brother as a child. *Id.* at 30:18–31:1. But no one—not even Dr. Sautter—has diagnosed Plaintiff with claustrophobia. *Id.* 73:23–25. Yet Plaintiff still believes a mask over his face, the "idea of that … you know" may "trigger" his "small space issue." *Id.* at Tr. 31:10–14.

## IV.    THE EXPERT TESTIMONY SHOWS THAT PLAINTIFF'S EXECUTION BY NITROGEN HYPOXIA WILL NOT SUPERADD PAIN COMPARED TO ALTERNATIVES.

### A.  Nitrogen Hypoxia Is Quick and Does Not Cause Pain.

56.    Louisiana's method of nitrogen hypoxia does not itself cause any physical pain. 2nd Tr. 92:17–93:4, 160:24–1611.

57.    Louisiana's nitrogen hypoxia system will cause unconsciousness and then death. *Id.* at 46:23–47:7, 59:14–18.

58.    Because the flow rate stays constant in Louisiana's system, Plaintiff will not be able to detect when breathing air has stopped flowing into the mask and nitrogen has started flowing into the mask. *Id.* at 86:2–8. At least in "some instances," "the victim is fooled because there is no clear indication that anything is amiss. Blackout occurs quickly without warning." *Id.* at 76:13–16.

59.    Once nitrogen is introduced, Plaintiff can continue to breathe. *Id.* at 92:2–4. Indeed, Plaintiff can calm down by doing his meditated breathing exercises. *Id.* at 96:7–10. And such deep breathing may well lead to him losing consciousness

13

even more quickly. *Id.* at 78:23–25.

60.    Muscular    movement    and    convulsions—both    conscious    and
unconsciousness—are not surprising, given potential struggling before nitrogen begins to
flow and convulsions after unconsciousness from hypoxia. *Id.* at 86:21–87:1.

61.    From the initiation of the pure nitrogen, it will take just 30 seconds to
reach less than 4.4% oxygen in the mask and just 60 seconds to reach 0.08% oxygen
in the mask. *Id.* at 88:21–89:1.

62.    The only material dispute is the total time to unconsciousness.
According to Dr. Antognini, Louisiana's nitrogen hypoxia system will cause Plaintiff
to lose consciousness 10 to 40 seconds after he starts inhaling 90–100% nitrogen gas.
*Id.* at 143:14–19.  Dr. Antognini predicts that even a perfectly timed breath hold (the
moment of nitrogen replacing breathing air) would render Plaintiff unconscious
within 10 seconds after he takes his first breath because of the incredibly low
concentration of oxygen in the mask once breathing resumes. *Id.* at 175:21–176:18.

63.    While Dr. Bickler agrees that a full breath of nitrogen might make
someone go unconscious in 30 to 40 seconds, *id.* at 53:9–13, 78:18–22, he believes that
the system will cause Plaintiff to lose consciousness 3 to 5 minutes into the execution.
*Id.* at 54:10–19. Critically, that is "because" he assumes Plaintiff will "hold his breath"
and only "breath shallowly and then only slowly get hypoxic." *Id.* And most people
can hold their breath for 45 seconds to one minute. *Id.* at 87:7–11.

64.    To support his conclusion, Dr. Bickler relied on a single article: An
opinion piece he and others wrote for the Journal of the American Medical Association

14

(JAMA). *Id.* at 203:16–21. Even that opinion pieces acknowledges that "some studies and anecdotal reports do describe rapid loss of consciousness…." *Id.* at 85:7–17.

65.    At least in the assisted-suicide context, Dr. Bickler's view is that "allowing the free flow of a gas into the lungs but with no oxygen causes a gentle hypoxic death." *Id.* at 98:11–12.

**B. The Alternatives Are Both Unavailable and Equally, if not More, Painful.**

66.    Plaintiff proposed two alternatives to nitrogen hypoxia as a method of execution: DDMAPh and firing squad. *See* Compl. ¶¶ 118–43. But Plaintiff could not testify as to how he arrived as his alternative methods. 1st Tr. 35:15–19.

**1. DDMAPh Method of Execution.**

67.    DDMAPh stands for Diazepam, Digoxin, Morphine, Amitriptyline, and Phenobarbital (DDMA). *Id.* at 135:6–9. It is a mixture of drugs used for physician-assisted suicide in the two states that recognize the practice as medical aid in dying ("MAID") and excluded it from their suicide laws. *Id.* at 137:2–8.

68.    In Louisiana, doctors are prohibited from assisting suicides. *Id.* at 143:10–13.

69.    Dr. Charles Blanke has overseen the medically aided death of 500 people for $725 each on a credit card in the northwest. *Id.* at 137:4–12, 141:18–19. The mixture identified by Dr. Charles Blanke calls for 100 milligrams of digoxin, 2,000 milligrams of valium, 8,000 milligrams of amitriptyline, 15,000 milligrams morphine, and 10,000 milligrams of phenobarbital. *Id.* at 136:17–23.

70.    DDMAPh requires ingesting that mixture orally or rectally by catheter,

akin to anesthesia. *Id.* at 145:23–25. In Dr. Blanke's patients, voluntary ingestion of the drug mixture leads to light headedness and sometimes nausea. *Id.* 146:1–3. The average time to coma is 5.8 minutes and to death is 96 minutes. *Id.* at 139:5–7. But death can take as long 67 hours. *Id.* at 145:12–15. Dr. Blanke uses and recommends a higher dose than the DDMAPh standard. *Id.* at 150:18–22. Neither timeline was made available to Plaintiff as he does not know how drawn out his death would be by DDMAPh. *Id.* at 38:14–16.

71.    DDMAPh has never been used as a method of execution in the United States. *Id.* at 149:1–4.

72.    Though Dr. Blanke has never applied his method to an involuntary patient (for good reason). *Id.* at 146:1–3, he acknowledges that the involuntary nature of executions would make the DDMAPh procedure more challenging. For example, oral ingestion would be unworkable because the condemned inmate would likely refuse to swallow the mixture. *Id.* at 146:4–14.

73.    Rectal administration, however, requires "a rubber tube" placed "through the patient's anus a few inches into the rectum" followed by "blow[ing] up a small balloon to secure" the catheter. *Id.* at 137:14–22. On Dr. Blanke's telling, involuntary placement of such tubing through the anus and into the rectum involves only "brief discomfort" and is not "invasive." *Id.* at 146:23–147:2, 147:12–14. But he "certainly could see how it would be embarrassing." *Id.* at 147:18–23.

74.    Dr. Blanke's takeaway, as he explained it, is that he cannot predict how such an involuntary DDMAPh experience could go because the involuntary

administration "[o]f course … never happens in medical-aid-in-dying." *Id.* at 148:13–18. And Dr. Bickler readily agreed that medical-aid-in-dying is "not comparable … at all" because it has "ready and willing participant[s]." 2nd Tr. 59:14–60:3.

75.    For his part, Dr. Antognini testified that "the literature is very clear about if you are old and debilitated"—like the typical subjects of DDMAPh—"you're very sensitive to drugs." *Id.* at 163:8–10. By contrast, a young individual like Plaintiff, "just based on the age factor, [] would be relatively resistant, based on my experience with giving drugs to people, including barbiturates." *Id.* at 163:18–21.

### 2. Firing Squad Method of Execution.

76.    The firing squad method of execution has been used in the United States just four times since 1977. 1st Tr. 124:11–17.

77.    In terms of mechanics, the firing squad method of execution requires five to eight individuals to volunteer to shoot the condemned inmate. *Id.* at 125:1–5. According to Dr. James Williams, relying on firing squad execution protocols from Utah and the United States military, *id.* at 117:24–118:9, the condemned inmate is strapped to a chair, *id.* at 126:19–23. A paper target with a bullseye is placed over his chest at which the shooters aim. *Id.* at 127:16–19.

78.    Once they shoot—the first volley—the heart will "literally tear … to pieces" if the bullet hits the target. *Id.* at 108:17–22. The bullet continues to traverse through the chest and destroys all of the "structures behind" including the spine, *id.*, which itself "would be painful," *id.* at 122:14–17. When cardiac output stops, unconsciousness should set in within 3 to 5 seconds. *Id.* at 112:9–13. But the first

17

volley might not work, as contemplated by both the Utah and United States protocols. *Id.* at 127:23–128:8.

79.    In that case, the pain is substantial—so much so that the Army's protocol requires a mercy shot to the head to complete an execution that misses the cardiac bundle on the first volley. *Id.* at 128:1–4.

80.    Plaintiff believes the firing squad method is not virtually painless, contrary to his allegations in his Complaint. *Id.* at 36:24–37:1. His expert, Dr. Williams, testified that gunshot wounds cause a "sensation of numbness or tingling" based on his experience treating gunshot wounds in the emergency room. *Id.* at 114:20–115:20. The ambient damage to the spinal column, however, would indisputably be painful, *id.* at 122:14–17, which is in part why medical professionals offer pain medication to gunshot wound victims in the hospital, *id.* at 123:16–18.

81.    Dr. Antognini confirmed that the firing squad, indeed, can be very painful. *Id.* at 168:18–169:1. That is principally because the breaking of bones wrapped in nerves is painful. So as the sternum, ribs, spine, and spinal cord all shatter on impact of a bullet, it could be very painful—and certainly more so than nitrogen hypoxia. *Id.*

82.    For the shooters' parts, Dr. Williams disclaimed offering any opinion on the psychological effects on the shooters in firing squad executions. *Id.* at 126:11–18. But he did explain that the theory of giving one or more of the shooters a blank for plausible deniability is a myth, for anyone who has handled a firearm knows the difference between a blank round and a live round. *Id.* at 126:3–10.

18

## V.     THE STATE OF LOUISIANA WILL EXECUTE PLAINTIFFS BY NITROGEN HYPOXIA FOR MOLLY'S MURDER.

83.     On March 18, 2025, the State of Louisiana will execute Plaintiff by nitrogen hypoxia for Molly's murder.

84.     Instead of filing a new lawsuit when the Legislature amended La. R.S. 15:569 in May 2024, Plaintiff filed a motion to reopen *Hoffman v. Jindal*, No. 12-cv-796 (M.D. La.) to press the claims he now presses here. The Fifth Circuit has entered an administrative stay of the Court's order granting that motion to reopen.

85.     Plaintiff also has two pending grievances—one filed on February 11 and one filed on February 14.

86.     On February 25, 2025—just 20 days before his execution—Plaintiff filed this suit along with a motion for a preliminary injunction. ECF 1, 4.

87.     The Court expedited discovery and consideration of Plaintiff's motion for a preliminary injunction at a March 7 hearing. ECF 29.

88.     On March 5, Defendants moved to dismiss Plaintiff's claims. ECF 55. Upon consideration of that motion, the Court granted in part and denied in part. *See* ECF 79. The Court granted the motion with respect to the access-to-protocol, Free Exercise Clause, and RLIUPA claims (Counts V, VI and VII). The Court denied the motion with respect to the Eighth Amendment, the right-to-counsel and right-to-access-the-courts, and the Ex Post Facto clause claim (Counts I, II, III, and IV).

89.     The Court conducted a preliminary-injunction hearing with live testimony on March 7.

19

## CONCLUSIONS OF LAW

90.    A preliminary injunction is an "extraordinary remedy," and the "burden of persuasion on all ... requirements" is on the movant party. *Big Tyme Invs., L.L.C. v. Edwards*, 985 F.3d 456, 464 (5th Cir. 2021) (quoting *Dennis Melancon, Inc. v. City of New Orleans*, 703 F.3d 262, 268 (5th Cir. 2012)). Indeed, a preliminary injunction "should not be granted unless the party seeking it has clearly carried the burden of persuasion on all four requirements." *Dennis Melancon, Inc.*, 703 F.3d at 268 (internal quotation marks and citation omitted).

91.    "A preliminary injunction is warranted only 'if the movant establishes: (1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable injury if the injunction is not issued, (3) that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted, and (4) that the grant of an injunction will not disserve the public interest." *Big Tyme Invs., L.L.C.*, 985 F.3d at 463–64 (quoting *Speaks v. Kruse*, 445 F.3d 396, 399–400 (5th Cir. 2006)).

92.    As discussed below, Plaintiff is not likely to succeed on any of his claims that remain live in this case: They are not likely to succeed because they are not exhausted (Section I); they are not likely to succeed on their merits (Section II: Ex Post Facto Clause Claim; Section III: Access Claims; and Section IV: Eighth Amendment Claims); and the equities factors weigh in Defendants' favor (Section V).

## I.    ALL OF PLAINTIFF'S LIVE CLAIMS ARE UNEXHAUSTED.

93.    The Prison Litigation Reform Act provides that "[n]o action shall be

brought with respect to prison conditions ... by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). The prisoner "must have 'pursue[d] the grievance remedy to conclusion'—substantial compliance with administrative procedures is not enough." *Bargher v. White*, 928 F.3d 439, 447 (5th Cir. 2019). Relevant here, the essential first step of "Louisiana's Administrative Remedy Procedure" is to "submit[] a request to the warden briefly setting out the basis for the claim and the relief sought." *Id.* This obligation applies full bore in method-of-execution lawsuits, including where a plaintiff challenges potential procedures for administering a longstanding method of execution. *See, e.g.*, *White v. Johnson*, 429 F.3d 572, 574 n.1 (5th Cir. 2005) (rejecting as unexhausted claim that "the State might use a cut-down procedure to gain venous access" in administering lethal injection). But Plaintiff failed to fulfill that obligation as to his remaining live claims—and there are no viable counterarguments.

### A. The Eighth Amendment Claims Are Not Exhausted.

94.    Regarding the Eighth Amendment claims (Counts I and II), Plaintiff bears the burden of claiming, and then showing, that there is "a feasible and readily implemented alternative method of execution that would significantly reduce a substantial risk of severe pain and that the State has refused to adopt without a legitimate penological reason." *Bucklew v. Precythe*, 587 U.S. 119, 134 (2019).

95.    Plaintiff's grievances, however, never so much as mention an alternative method of execution, let alone suggest that it would significantly reduce a substantial

risk of severe pain from nitrogen hypoxia. Indeed, insofar as Plaintiff's grievances raise Eighth Amendment claims at all, they vaguely assert that Louisiana's three methods of execution—lethal injection, nitrogen hypoxia, and electrocution—are all unconstitutional and will be unconstitutionally administered. Oliveaux Decl., Exs. 1 and 2.[1] Plaintiff does not dispute that this is not an Eighth Amendment claim under *Bucklew*.

96.    It was not until Plaintiff filed his Complaint last week that he identified, for the first time, what his Eighth Amendment claim is: that the firing squad and a drug cocktail known as DDMAPh are feasible and readily implemented alternatives that render nitrogen hypoxia unconstitutional. To reiterate, this claim and these alternatives appear nowhere in Plaintiff's grievances. This is a textbook example of failure to exhaust—and thus, Plaintiff's Eighth Amendment claims (Counts I and II) are barred under binding Fifth Circuit precedent. *See White*, 429 F.3d at 574.

97.    In his PI Reply, Plaintiff protested that Defendants' argument would be "a radical expansion of the exhaustion requirement, whereby incarcerated people would be required to detail the legal theories underlying their claims." ECF 75 at 6. In the same breath, however, he admitted that he was required, at the least, "to allege facts sufficient to alert prison officials to the problem, providing officials with fair notice and an opportunity to address the grievance." *Id.*

98.    And there's the rub: Based on Plaintiff's grievances submitted last

---

[1] This document cites the two preliminary-injunction transcripts as well as the preliminary-injunction papers, including, as illustrated here, those exhibits attached to Defendants' preliminary-injunction opposition memorandum (ECF 56).

month, Defendants quite literally could not have addressed Plaintiff's alleged Eighth Amendment claims regarding nitrogen hypoxia—for the simple reason that Defendants had no clue that he would subsequently identify methods of execution that are not legal under Louisiana law (the firing squad and the DDMAPh cocktail). In fact, it appears that even Plaintiff himself did not know what he would claim until his attorneys later told him. 1st Tr. 35:15–19 ("Q. Mr. Hoffman, how did you decide on these two alternative methods of execution? The Court: Mr. Hoffman, are you able to answer that question without relating or referring to your lawyers? The Defendant: I cannot."). By his own telling, therefore, Plaintiff did not adequately exhaust his new Eighth Amendment claims.

99.     Moreover, Plaintiff has no way around *White*. He complains (ECF 75 at 6) that *White* "was a case dismissed on timeliness grounds." But he omits that one of *White*'s *alternative holdings* was that the plaintiff's challenge to a cut-down procedure was "barred from federal review by [his] failure to exhaust it pursuant to the PLRA." 429 F.3d at 574 n.1; *see Mejia-Alvarenga*, 95 F.4th 319, 326 n.2 (5th Cir. 2024) ("Alternative holdings are not dicta and are binding in this circuit."). That is damning for Plaintiff because it was undisputed that the plaintiff in *White* at least had squarely exhausted a challenge to lethal injunction as a method of execution. *White*, 429 F.3d at 574. Yet even that was insufficient to exhaust a challenge to a cut-down procedure for obtaining venous access to administer lethal injection. Just so here.

100.     Plaintiff also observes that *White* "was decided a decade before the Supreme Court ruled that condemned individuals must allege an alternative method

in method of execution challenges." ECF 75 at 6. But that *hurts* Plaintiff. If, even before cases like *Bucklew*, the Fifth Circuit demanded precise exhaustion of claims regarding *one* method of execution, *a fortiori* the same precedents compel precise exhaustion of claims that depend on introducing *additional and different* methods of execution into the analytical framework. *White* ends Plaintiff's Eighth Amendment claims.

### B. Plaintiff's Ex Post Facto and Access Claims Are Not Exhausted.

101.   The same is true of Plaintiff's Ex Post Facto Clause claim (Count III), Compl. ¶¶ 206–14, and Plaintiff's access to counsel/courts claim (Count IV), *id.* ¶¶ 215–27. Plaintiff's grievances nowhere mention the Ex Post Facto Clause or articulate these claims. Oliveaux Decl., Exs. 1 and 2. And Plaintiff's PI Reply effectively admits that he has not exhausted the claims. *See* ECF 75 at 6 ("Mr. Hoffman did not need to grieve his Ex Post Facto or access to the courts claims." (capitalization altered)).

102.   Rather than dispute his failure to exhaust, Plaintiff claims that he did not need to do so because these claims do not present "a challenge to 'prison conditions' or 'prison life'" that is governed by the PLRA's exhaustion requirement. ECF 75 at 6. Plaintiff is profoundly wrong.

103.   His demand that Defendants allow his attorney to be with him in the execution chamber and/or witness his execution is a quintessential claim about prison conditions. Indeed, it is no different than the claim in *Ramirez v. Collier*, 595 U.S. 411 (2022)—that the condemned's pastor be permitted to touch him and pray with

24

him during his execution—as to which the Supreme Court specifically required and identified exhaustion under the PLRA. *See id.* at 422 ("We are persuaded—at least in the current posture of the case—that Ramirez properly exhausted these administrative remedies."); *see also Porter v. Nussle*, 534 U.S. 516, 532 (2002) ("[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong."). This claim is not exhausted.

104.     Similarly, Plaintiff's claim that execution by nitrogen hypoxia would violate the Ex Post Facto Clause is subject to PLRA exhaustion *by Plaintiff's own concession*. He concedes, as he must, that his Eighth Amendment claim must have been exhausted. ECF 75 at 5–6. But he identifies no reason why his Ex Post Facto Clause would be treated any differently—and indeed, courts do not treat Ex Post Facto Clause claims any differently. *See, e.g.*, *Jones v. Douglas*, 108 F. App'x 254, 255–56 (6th Cir. 2004); *Owens v. Robinson*, 2008 WL 11429426, at *7–10 (S.D. Iowa Sept. 29, 2008); *Rosales v. Hunt*, 2006 WL 3469528, at *2–3 (N.D. Ga. Nov. 30, 2006) (all rejecting unexhausted Ex Post Facto Clause claims). This claim, too, is not exhausted.

### C. This Court's Motion-to-Dismiss Ruling Is Mistaken.

105.     Finally**,** with great respect for this Court, its exhaustion ruling from the bench at the motion-to-dismiss stage is incorrect. The Court gave two reasons for excusing Plaintiff's failure to exhaust.

106.     *First*, the Court stated that "there is no administrative process

available" to Plaintiff because the Department of Public Safety and Corrections told Plaintiff that a response to his pending grievances would be issued within a 40-day period that extends just past Plaintiff's scheduled execution date. 1st Tr. 12:3–8. Respectfully, that holding rests on a mistaken assumption—that Plaintiff's grievances preserve the claims above in the first place. As just explained, they do not. Accordingly, because Plaintiff has not even attempted to exhaust the claims he now brings, he cannot claim that the grievance process is unavailable to him.

107.   On that point, cases like *Sapp v. Kimbrell*, 623 F.3d 813 (9th Cir. 2010), are particularly instructive. In *Sapp*, the prisoner challenged the grievance process itself, claiming that one official (Kimbrell) was improperly screening out his grievances and another official (Van Cor) failed "to give him an *Olson* review of his medical records." *Id.* at 824. But the prisoner never exhausted a grievance challenging Kimbrell's improper screening or Van Cor's alleged failure to give the prisoner an *Olson* review. *Id.* And that was fatal on the Ninth Circuit's view. In other words, even though the prisoner believed the grievance process was rigged (because of the allegedly improper screening), he was required nonetheless to exhaust that complaint. So, too, here: Just because Plaintiff believes he might not receive a response to his grievances until after he is executed does not excuse Plaintiff's failure to even attempt to exhaust a grievance that presses the claims he now raises here.

108.   *Ross v. Blake*, 578 U.S. 632 (2016), underscores this point. It reiterates that a grievance process commonly is unavailable if, for example, "it operates as a simple dead end." *Id.* at 643. The only way to identify whether a road ends in a dead

end, however, is to actually get on that road. And to this day, Plaintiff has refused to try out in the grievance process the claims he now raises in this Court.

109.    *Second*, the Court stated it would be "futile" for Plaintiff to ask the prison for relief on the claims above." 1st Tr. 12:9–17. That is not correct. That is most clear as to Plaintiff's access to counsel/courts claim: Plaintiff demands accommodations for his counsel to witness the execution—and those demands are not controlled by any statute that Defendants simply carry out. As Plaintiff elicited from Warden Vannoy and Secretary Westcott, that issue is solely with Warden Vannoy's and Secretary Westcott's discretion. 2nd Tr. 17:10–14 ("Q. Is it fair to say that if you deem it appropriate, you can terminate Mr. Hoffman's contact with his attorney on the date of his execution? A. If I deemed it appropriate, but I wouldn't do it that early.") (Warden Vannoy); *id.* at 22:13–23:3 ("Q. Secretary Westcott, who decides who the witnesses to an execution will be? A. It's set by statute and also I have some discretion... three are I guess my discretion."). Because both Warden Vannoy and Secretary Westcott unquestionably could have acquiesced in Plaintiff's demands (though such demands are not legally required, *see infra*), there is no question that Plaintiff's access claims would not have been futile if they had been properly exhausted in the grievance process.

110.    The same is true of Plaintiff's Eighth Amendment and Ex Post Facto Clause claims. In his words, for example, his claims depend on such things as "having a mask on over me," 1st Tr. 31:8, "being in a small space," *id.* at 30:16, and his "Buddhist practice" that "allows me every day to be a better version of myself," *id.* at

27

26:16–19. These central features of his legal theories quite possibly could have been accommodated, and Defendants—had they known about his proposed alternatives— could have evaluated whether his planned execution would violate the Eighth Amendment and whether the current Department protocol and regulations should be amended to account for Plaintiff's concerns. *Cf.* 1st Tr. 165:22–166:16 (Chief of Operations Seth Smith's testimony that the current protocol is applied uniformly).

111.   For example, by proposing death by drug cocktail, Plaintiff appears to concede that he would have no constitutional objection if he were first rendered unconscious by a drug. *See, e.g.*, 1st Tr. 139:5–7 (Dr. Blanke: "So for DDMAPh across the board, the average time to sleep is 5.8 minutes, and the average time to death is about 96 minutes."). But (again, for example) he never proposed—and thus, Defendants never considered—amending Louisiana's nitrogen hypoxia protocol generally or his planned execution specifically to permit the front-end use of a non-lethal sedative that entirely moots his current Eighth Amendment concerns. *See* 2nd Tr. 63:18–20 (Plaintiff's counsel suggesting that "the Louisiana protocol [could] include a[] drug or anesthetic that would relieve pain or anxiety"). Nor could Defendants consider whether this ancillary use of a medication would be permitted notwithstanding drug companies' general refusal to allow their drugs to be used to actually execute a prisoner. *Cf.* ECF 75 at 19 (Plaintiff's PI Reply insisting that nothing "foreclose[s] the DPSC's ability to obtain the DDMAPh drugs").

112.   But Plaintiff short-circuited this entire exhaustion framework by failing to bring his Eighth Amendment and Ex Post Facto Clause claims to Defendants

28

before filing this suit. These claims are not exhausted—and in total, the Court need say nothing more in denying Plaintiff's PI motion, for he has no likelihood of success on the merits.

## II. EVEN IF IT WERE EXHAUSTED, PLAINTIFF'S EX POST FACTO CLAUSE CLAIM (COUNT III) IS NOT LIKELY TO SUCCEED.

113.    On the merits, Plaintiff has no viable Ex Post Facto Clause claim. *See* PI Mot.31–33. Such a violation lies where—as relevant here—a new State law "inflicts greater punishment for an offense than was inflicted by the law in existence at the time the offense was committed." *United States v. Rose*, 153 F.3d 208, 210 (5th Cir. 1998).

114.    This Court agreed at the motion-to-dismiss stage that Plaintiff's Ex Post Facto Clause claim thus rises and falls on whether execution by nitrogen hypoxia will subject Plaintiff "to an increased punishment"—that is, is "nitrogen hypoxia ... a less humane method of execution than lethal injection, which was his original method of execution"? 1st Tr. 21:1–9. And the Court denied Defendants' motion to dismiss this claim on the ground that Plaintiff had "sufficiently alleged" as much. *Id.* at 21:10.

115.    But Plaintiff's steep preliminary-injunction burden is different—and he has failed to carry it. He must show—through law and evidence—"a substantial likelihood of success on the merits." *Big Tyme Invs., L.L.C.*, 985 F.3d at 463–64.

116.    <u>The fatal error here is that Plaintiff submitted no evidence regarding lethal injection in Louisiana in the 1990s—when he committed his crimes—that would allow this Court to answer the question whether "nitrogen hypoxia ... [is] a less humane method of execution than lethal injection." 1st Tr. 21:1–9.</u>

117.    The Court needs that baseline in order to determine whether execution by nitrogen hypoxia is more, less, or just as humane as execution by lethal injection. But Plaintiff submitted no evidence and elicited no testimony about Louisiana's lethal injection method or protocol in the 1990s. The closest his counsel came was trying to ask *Defendants'* expert, Dr. Antognini, whether he thought lethal injection was "humane" in *other States*. 2nd Tr. 194:12–14. (Dr. Antognini declined to "comment on whether it's humane or not. *Id.* at 194:15–16.)

118.    Remember, moreover, that in 2014 Plaintiff told this Court that even Louisiana's lethal-injection protocol *from 2013* "creates a substantial risk that [he] will suffer the wanton and unnecessary infliction of pain and torture, or a prolonged, lingering death," including "experiencing substantial pain and suffering, conscious paralysis, suffocation, or conscious cardiac arrest." Second Amended Complaint ¶ 101, *Hoffman v. Jindal*, No. 12-cv-796 (M.D. La. Feb. 3, 2014), ECF 118.

119.    All this and yet Plaintiff did not even try to substantiate his claim in this case that lethal injection is akin to torture. To be clear—and as discussed below— that is arguably because he knew the evidence would show that execution by nitrogen hypoxia is nothing of the sort. But, setting that aside, all that matters for present purposes is that Plaintiff failed to supply an evidentiary basis regarding the nature of lethal injection in Louisiana in the 1990s (*i.e.*, the precise method of punishment in place when he committed his crimes)—and thus, as a matter of law, this Court cannot conclude that Plaintiff is likely to succeed on his claim that "nitrogen hypoxia ... [is] a less humane method of execution than lethal injection." 1st Tr. 21:1–9. He is

30

not entitled to a preliminary injunction based on his Ex Post Facto Clause claim.

### III.    PLAINTIFF'S ACCESS CLAIMS (COUNT IV) ARE NOT LIKELY TO SUCCEED.

120.    Plaintiff's remaining "access" claims are also likely to fail. All that remains are claims for access to counsel and the courts "during the execution procedure" predicated on some combination of the Sixth Amendment, due process, and other constitutional provisions. Mot.29–30 & n.40. That, too, will fail.

121.    As the Court construed Plaintiff's claims at the motion-to-dismiss stage, they are that Louisiana's "protocol does not permit counsel to be present for any aspect of the execution procedure, which thereby deprives [Plaintiff] of the right to seek redress in the courts at precisely those points in the process when problems with the protocol's implementation are most likely to arise." 1st Tr. 18:16–20.

122.    The Court declined to dismiss these claims, however, because, "[a]s we have learned from Alabama's failed attempts to execute Mr. Smith by lethal injection, access to the courts in an execution is of paramount importance, especially in this case where the State has no experience and has never used this method of execution before." *Id.* at 18:21–25.

123.    With great respect for the Court, that holding directly contradicts binding Fifth Circuit precedent. Indeed, Defendants spent only "two sentences" (*id.* at 18:9) on that point in their PI Opposition because the outcome is so clear.

124.    In *Whitaker v. Collier*, 862 F.3d 490 (5th Cir. 2017), the Fifth Circuit confronted a claim "alleg[ing] the right to counsel 'during the events leading up to and during the execution' under the First, Sixth, and Eighth Amendments." *Id.* at

501. The Fifth Circuit minced no words: "These claims are without merit." *Id.* at 501.

As the Fifth Circuit explained, "[t]he Sixth Amendment right to counsel only 'extends

to the first appeal of right, and no further.'" *Id.* (quoting *Pennsylvania v. Finley*, 481

U.S. 551, 555 (1987)); *see Mills v. Hamm*, 102 F.4th 1245, 1250 (11th Cir.), *cert.

denied*, 144 S. Ct. 2601 (2024); *see Mills v. Hamm*, 734 F. Supp. 3d 1226, 1257 (M.D.

Ala. 2024), *appeal dismissed*, No. 24-11689, 2024 WL 3897483 (11th Cir. June 12,

2024) (rejecting the same arguments and tag-along "access to courts" claim).

125.   In the same breath, the Fifth Circuit also rejected any freestanding

"access-to-the-courts assertion." *Whitaker*, 862 F.3d at 501. For that kind of claim

cannot stand alone; it requires a viable "underlying" substantive claim. *Id.*

126.   Finally, to the extent this Court suggested that Alabama's issue with a

*lethal-injection* execution bears on this analysis, the Fifth Circuit addressed that line

of reasoning, too. For one thing, this case of course does not involve lethal injection.

But, for another thing, "the possibility of 'botched executions' that access to counsel

could address ... is just the kind of 'isolated mishap' that is not cognizable via a

method-of-execution claim." *Id.*

127.   Plaintiff is unlikely to succeed on his remaining access claims because

binding Fifth Circuit precedent forecloses them.

## IV.   PLAINTIFF'S EIGHTH AMENDMENT CLAIMS ARE NOT LIKELY TO SUCCEED (COUNTS I AND II).

128.   Last are Plaintiff's facial and as-applied Eighth Amendment claims,

which are subject to the same standard. *See Bucklew*, 587 U.S. at 135–40 (rejecting

argument that facial and as-applied challenges should be treated differently). They

are not likely to succeed.

129.    As Defendants explained in the PI Opposition, every level of the federal courts—from Alabama district courts, to the Eleventh Circuit, to the Supreme Court—has repeatedly rejected Eighth Amendment challenges based on virtually the same method of execution and virtually the same expert testimony. *See Frazier v. Hamm*, 2025 WL 361172 (M.D. Ala. Jan. 31, 2025) (no appeal); *Grayson v. Hamm*, 2024 WL 4701875 (M.D. Ala. Nov. 6, 2024), *aff'd*, *Grayson v. Comm'r, Ala. Dep't of Corr.*, 121 F.4th 894 (11th Cir. 2024), *stay of execution denied*, *Grayson v. Hamm*, 145 S. Ct. 586 (2024) (no noted dissents); *Smith v. Hamm*, 2024 WL 1160303 (M.D. Ala. Jan. 10, 2024), *aff'd*, *Smith v. Comm'r, Ala. Dep't of Corr.*, 2024 WL 266027 (M.D. Ala. Jan. 24, 2024), *stay of execution denied*, *Smith v. Hamm*, 144 S. Ct. 414 (2024) (Sotomayor, Kagan, Jackson, JJ., dissenting). This Court should do the same.

130.    "The Constitution allows capital punishment." *Bucklew*, 587 U.S. at 129. Indeed, "the Eighth Amendment does not guarantee a prisoner a painless death." *Id.* at 132. Instead, it bars only those "forms of punishment that intensif[y] the sentence of death with a (cruel) superaddition of terror, pain, or disgrace." *Id.* at 133 (cleaned up). And "perhaps" for that reason the Supreme Court "has yet to hold that a State's method of execution qualifies as cruel and unusual." *Id.*

131.    To that end, "where (as here) the question in dispute is whether the State's chosen method of execution cruelly superadds pain to the death sentence, a prisoner must show a feasible and readily implemented alternative method of execution that would significantly reduce a substantial risk of severe pain and that

the State has refused to adopt without a legitimate penological reason." *Id.* at 134; *see id.* at 136–37 ("[W]hen it comes to determining whether a punishment is unconstitutionally cruel because of the pain involved, the law has always asked whether the punishment 'superadds' pain well beyond what's needed to effectuate a death sentence."). Requiring a plaintiff to show that the challenged method "is sure or very likely to result in needless suffering," *Glossip v. Gross*, 576 U.S. 863, 881 (2015), is, as Justice Kagan has put it, an "extremely demanding standard," *Smith*, 144 S. Ct. at 416 (Kagan, J., dissenting from the denial of application for stay and denial of certiorari).

132.    Here, Plaintiff has failed at *Bucklew* Step Zero (*see infra* Section IV.A)—his burden to show that Louisiana's nitrogen hypoxia protocol poses a substantial risk of severe pain. Having failed at that threshold step, Plaintiff has no viable Eighth Amendment claim at all, and that ends his case.

133.    But, even if he had satisfied *Bucklew* Step Zero, Plaintiff independently failed to (1) identify a feasible and readily implemented alternative that would significantly reduce an alleged substantial risk of severe pain and (2) show the State refused to adopt the alternative without a legitimate penological reason. *See infra* Section IV.B(1), (2).

134.    For any of these reasons, therefore, Plaintiff's Eighth Amendment claims are not likely to succeed.

## A. Plaintiff Is Unlikely to Prove that Nitrogen Hypoxia Poses a Substantial Risk of Severe Pain.

135.    *Bucklew* Step Zero requires Plaintiff to show that execution by nitrogen

hypoxia poses "a substantial risk of severe pain." *Bucklew*, 587 U.S. at 134.

136.   On this score, Friday's preliminary-injunction hearing was extraordinarily valuable because it revealed three overarching facts that make this a simple case and end Plaintiff's claims at *Bucklew* Step Zero: (1) Plaintiff's own elicited testimony confirmed that, as Dr. Antognini explained, Plaintiff faces no substantial risk of severe pain; (2) Plaintiff's effort to memory hole Dr. McAlary and replace him with Dr. Bickler changes only the name and the face, not the flawed underlying opinions that every Alabama court to consider them has rejected; and (3) Plaintiff's gestures at PTSD and the tenets of Buddhism do not affect this analysis. Plaintiff thus does not get past *Bucklew* Step Zero.

### 1. Plaintiff's own elicited testimony confirms Dr. Antognini's opinion that there is no substantial risk of severe pain.

137.   **a.** Start with Dr. Antognini's opinion—this is the *only* expert opinion in this case regarding nitrogen hypoxia that is based on multiple pieces of scientific literature directly addressing death by hypoxia via inert gases like nitrogen, and Dr. Antognini is the *only* expert who actually inspected and tested Louisiana's nitrogen system. His opinion is that Louisiana's system will cause unconsciousness within 35 to 40 seconds (or perhaps sooner) once Plaintiff begins to inhale pure nitrogen—and he expects death to follow "rapidly," within 10 to 15 minutes. 2nd Tr. 124:19–25. Critically, there will be no carbon-dioxide buildup or air leakage, and thus "I do not believe the inmate would suffer any pain." *Id.* at 124:24–125:4. As part of his testing, he laid on the gurney, experienced airflow at the appropriate rate of 70 L/minute, and "could breathe very comfortable with the mask on." *Id.* at 131:1–5.

138.  **b.** The most critical fact in this analysis is that Plaintiffs' expert, Dr. Bickler, agrees with Dr. Antognini on the key issues. Specifically, he agrees that:

    i.    "[A]n individual who is administered 100 percent nitrogen and is breathing normal will lose consciousness in less than a minute." *Id.* at 78:18–22.

    ii.    "It's possible, yes" that "[a] person who is taking deep breaths will lose consciousness even quicker than that." *Id.* at 78:23–25.

    iii.    At least in "some instances," "the victim is fooled because there is no clear indication that anything is amiss. Blackout occurs quickly without warning." *Id.* at 76:13–16.

    iv.    At least in the assisted-suicide context, "allowing the free flow of a gas into the lungs but with no oxygen causes a gentle hypoxic death." *Id.* at 98:11–12.

139.  Yet Dr. Bickler differs from Dr. Antognini. How? The key pivot—and the fatal problem—in Dr. Bickler's testimony is that he bases his opinion *on the assumption that Plaintiff will hold his breath when nitrogen begins to flow.* Dr. Bickler gives the game away at page 54 of the second transcript when he opines on how long it may take Plaintiff to become unconscious: "I would say potentially three to five minutes, *because I would expect that he would hold his breath and then probably attempt to breathe shallowly and then only slowly get hypoxic, all the while experiencing the effects of the progressing hypoxia and buildup of carbon dioxide in his blood*." *Id.* at 54:14–19 (emphasis added).

140.  That assumption is how Dr. Bickler gets to his outlandish claims of terror and fear: He is assuming a carbon dioxide buildup akin to what happens when you hold your breath underwater in a near-drowning incident. Of course any normal person would experience fright in that circumstance, if it were actually relevant here.

141. But that assumption is squarely contradicted by Plaintiff's own testimony and it ignores the scientific evidence. *First*, Plaintiff specifically testified he plans to *breathe*—he "plan[s] to use [his] meditative breathing techniques" if he is executed through nitrogen hypoxia. 1st Tr. 39:15–17. There is zero testimony that he intends to hold his breath. Dr. Bickler's false assumption otherwise is thus fighting Plaintiff's own testimony in this case. *See Frazier*, 2025 WL 361172, at *11 ("It is undisputed that, under the Protocol, Frazier will be deprived of oxygen while conscious after the nitrogen gas is introduced. But according to Dr. Antognini, Frazier will not experience the same pain and suffering as might occur with other types of suffocation, such as smothering and choking *because the Protocol does not prevent Frazier from taking normal breaths and exhaling carbon dioxide*." (emphasis added)) *Second*, the impropriety of Dr. Bickler's assumption (and then accusations of terror, panic, and drowning) is accentuated by Dr. Antognini's later testimony. Dr. Antognini explained that, in breathing an inert gas, a person is able to "exhale the carbon dioxide, then you don't necessarily have a build-up of carbon dioxide." 2nd Tr. 155:1–5. But, "[i]f you have a strangulation or a smothering type of event and you can't breathe or you can't move the air in and out or get rid of the carbon dioxide, then you have a build-up of carbon dioxide in that setting." *Id.* at 155:5–9. Dr. Bickler is wrongly assuming the latter to generate unfounded visions of panic and terror, when the former is the reality: that is, with normal breathing (as Plaintiff testified he intends), there is no build-up of carbon dioxide and thus no panic.

142. Moreover, even if this record said that Plaintiff intended to hold his

breath, that would not render Louisiana's nitrogen system unconstitutional any more than Kenny Smith's manifest resistance rendered his execution unconstitutional because of the complications he introduced—and that certainly would bar preliminary-injunctive relief. *See, e.g.*, *State v. Biden*, 10 F.4th 538, 558 (5th Cir. 2021) (collecting authorities providing that "a party may not satisfy the irreparable harm requirement if the harm complained of is self-inflicted" (alternation and citation omitted)).

143.    At bottom, therefore, Dr. Bickler is in lockstep with Dr. Antognini on the key issues—and he departs only based on an unfounded assumption about breath-holding. For that reason, Dr. Bickler's opinions are not credible, and once again, Dr. Antognini's opinions—as the only researched and supported opinions in this case—carry the day.

144.    **c.** Sensing that Dr. Bickler could not save him, Plaintiff's only remaining available move was to try to discredit the research and studies on which Dr. Antognini relied—to no avail.

145.    (This tactic is rich given one of the most striking aspects of this case: that Dr. Bickler cited a grand total of one paper—his own "opinion" piece—to support his opinions. Said Dr. Bickler: "I think that should be sufficient." 2nd Tr. 203:21.)

146.    For example, as to OSHA's clear guidance about immediate death without warning, Dr. Bickler complained that the OSHA reports do not say "how many situations there were where the potential victim recognized that their air supply was compromised and they were able to exit the room or tear the mask off in

38

time and self rescue." 2nd Tr. 61:3–7. When asked about OSHA's requirement "to report near misses," however, he admitted that he's "not suggesting what they're saying is wrong." *Id.* at 77:13–17.

147.    As to studies of pilots who reported virtually no apprehension or breathlessness at 93.8% nitrogen (and to the contrary, euphoria), *id.* at 72:21–73:4, Dr. Bickler speculated that military aviators might have fudged their responses because they "will not complain when asked to do exercises like this" for fear of getting grounded. 2nd Tr. 63:4–12. But on cross-examination, he admitted that the pilots' responses were anonymous; that there was a Chinese wall so that their responses could not affect their careers; and that the pilots could be told we need accurate responses to protect you and other pilots—all of which guts Dr. Bickler's baseless speculation about the pilots supposedly lying. *Id.* at 73:19–74:16.

148.    Finally, Plaintiff's counsel tried to criticize Dr. Antognini for relying on reports and studies that are *close* to the issues in this case but not exactly identical (*i.e.*, helium versus nitrogen, or dogs versus humans). *E.g.*, *id.* at 180:9. But, as even Dr. Bickler recognized, that is because no ethical studies can be conducted on identical facts. *Id.* at 66:10–12; *id.* at 181:3–7 (Dr. Antognini: "We haven't done studies where we've taken the humans and we've dropped them – you know, gave them a hundred percent nitrogen and studied them to see when they become unconscious, when does the heart stop and all that kind of stuff, for obvious reasons."). Moreover, Plaintiff's counsel's attack is ironic given that at least Dr. Antognini did what scientists and doctors are supposed to do—extrapolate from the

39

best available data. In Dr. Antognini's words, "as an expert I have to collect data from other sources, I have to look at these other sources. And animal studies help inform opinions and certainly informs my opinion here." *Id.* at 181:8–11.

149.    Dr. Bickler did not even try. And again, it bears noting that Dr. Bickler does not have a single study or paper identifying the supposed panic, terror, and drowning sensations that he repeatedly trumpeted in open court. He has nothing.

## 2. Plaintiff's halftime switch of Dr. Bickler for Dr. McAlary did not help him.

150.    Next, consider the elephant in the room: The one person that the Court did not see at Friday's hearing was Dr. Brian McAlary—Plaintiff's lead expert on whom he based his PI Motion, lauding Dr. McAlary's observation of the Grayson execution and his evaluation of the Smith autopsy report. In fact, Dr. McAlary's name did not even appear one time in Plaintiff's PI Reply. *See* ECF 75.

151.    Defendants cannot know why Plaintiff refused to bring Dr. McAlary on Friday. But perhaps it was because every court to hear Dr. McAlary's opinions has rejected them. *See* ECF 56 at 6–18. Or, perhaps it was because, when Dr. McAlary finally attempted to cite one article *in this case* in service of his opinions, he outright misrepresented it. *Id.* Or, perhaps it was because that same article actually confirms *Dr. Antognini's opinions. Id.* But whatever the reason—and notwithstanding Plaintiff's refusal to bring Dr. McAlary to Baton Rouge—the fact remains that this Court has Dr. McAlary's declaration in front of it. The opinions in that declaration are entirely baseless—and this is not a credibility determination because he didn't show up. The Court should say as much and reject Dr. McAlary outright, just as every

other court has.

152.    So, where does that leave Plaintiff? His strategy on Friday was to substitute Dr. Bickler for Dr. McAlary and start over. That did not work. That is because Dr. Bickler's opinions were based on the same media and eyewitness reports—including Dr. McAlary's—that the Alabama courts rejected in dismissing Dr. McAlary. For all practical purposes, therefore, Dr. McAlary still took the stand on Friday.

153.    Indeed, Plaintiff's counsel and Dr. Bickler were open about this point. Dr. Bickler testified that his opinions are based on "all four of the executions using nitrogen that were done by the State of Alabama." 2nd Tr. 37:11–12. "We read accounts in the popular press. We read some of the testimony ...." *Id.* at 38:13–14.

154.    Specifically, Plaintiff's counsel walked Dr. Bickler through his reliance on Dr. McAlary's own deposition testimony—including, as noted below, the very aspects of that testimony that courts have recognized is flawed. *See id.* at 42:20–24 ("He's describing what he saw when [] after the nitrogen was apparently started. And it describes the relatively prolonged process and duration of time when the victim seemed to remain conscious, moving in purposeful ways.").

155.    Plaintiff's counsel also walked Dr. Bickler through his reliance on "a few newspaper articles"—including those with accounts rejected by the courts as unreliable. *Id.* at 43:19–20; *see id.* at 64:6–16 ("Q. Doctor, just to be clear, there were four executions in Alabama using [] essentially this method. Is that right? A. Yes. Q. And you looked at data for all four? A. Yes. Q. And were they largely consistent? A.

41

Yes. Q. And what did you conclude from them? A. That the duration of suffering was much longer than I would consider humane.").

156.    As a result, all of the criticisms levied against this mode of analysis when presented by Dr. McAlary remain fully applicable here. The courts have rejected those accounts (including specifically Dr. McAlary's) as "insufficiently reliable because [the eyewitnesses] d[id] not know"—and could not know—"when the nitrogen began to flow." *Frazier*, 2025 WL 361172, at *11 (footnote omitted). Because they did not know time zero, therefore, the witnesses could not "'reliably pinpoint'" how soon after the introduction of nitrogen "'an inmate los[t] consciousness.'" *Id.* On top of that, the courts have recognized that "unconscious individuals experience involuntary movements," such as "'muscle tremors and convulsion-like activity.'" *Id.* at *12. It is thus "not supris[ing]" that the condemned inmates exhibited "breaths and even convulsions[] after the introduction of an inert gas—when a person is unconscious and unable to feel pain." *Id.* For that reason, "the evidence of Smith's, Miller's, and Grayson's movements during their respective executions does not support a finding that any of them experienced severe psychological pain or distress over and above what is inherent in any execution." *Id.* Plaintiff's attempt to relitigate that issue here gets him nowhere.

157.    Dr. Bickler also had nothing to say about the overreliance on the Smith execution and the underreliance on the Miller execution. "[F]or as much as Smith's execution was painted in the violent manner that it was, Miller's execution was not"—so, the Court should not lose sight of the fact that Miller's execution "was quick,

42

unconsciousness reached in less than 2 minutes, was void of struggles against the restraints, and with minimal body movement as compared to the Smith execution." *Grayson*, 2024 WL 4701875, at *21.

158.    Moreover, the Smith execution was principally complicated by Smith's "non-cooperation with the execution process," specifically his "breath-holding," which "would have increased the level of carbon dioxide in his body, acidifying his blood and increasing discomfort and distress." Antognini Decl. ¶ 31. As the Alabama courts recognized, the evidence from the Smith execution showed that Smith refused to inhale the nitrogen, which caused the reaction Plaintiff now highlights. *Frazier*, 2025 WL 361172, at *5 & nn.9–10, *11 n.20; *Grayson*, 2024 WL 4701875, at *21 ("Smith held his breath and struggled against the restraints while Miller did not."). On top of that, Smith's autopsy showed that he had "a synthetic cannabinoid" in his blood that "can cause hallucinations, vomiting, paranoia, and convulsions (seizures)"—which, in turn, may have made Smith's "convulsions more likely and pronounced." Antognini Decl. ¶ 32; *Grayson*, 2024 WL 4701875, at *17 n.18. None of this has anything to do with nitrogen's constitutionality or efficacy as a method of execution—it has everything to do with Smith's own actions.

159.    Finally, it bears noting that Dr. Bickler tried to cite his extensive experience slowly dropping subjects' "oxygen saturation level to about 70 percent and sometimes lower, down to 50 percent" as helpful data in this case. 2nd Tr. 65:13–18. But, again, he admitted that he has "never studied a scenario of administering nitrogen at 95 percent or higher," as Louisiana will do here—for the simple reason

that this would be unethical. *Id.* at 65:25–66:13. He further stated that his opinions on terror and panic come from his own studies where he slowly reduces the oxygen saturation levels in his subject—but then he torpedoed his own theory. *Id.* at 66:14–20. Specifically, he admitted that his own studies say that, even in those studies, "the incidence of other effects such as headache, nausea or anxiety occur at rates of less than one percent." *Id.* at 69:11–14. His excuse? "Well, that's – the methods are designed to avert that." *Id.* 69:18–19.

160.    At bottom, Dr. Bickler had nothing—and that is one feature of this case that is astounding: a lead expert with quite literally no scientific basis for claiming that Plaintiff will suffer sensations akin to drowning. Not only is that opinion entirely incredible, but it also does a disservice to Plaintiff himself by instilling false images of terror in his mind.

161.    Like Dr. McAlary, Dr. Bickler "finds himself without any real foundational support other than an unsupported opinion—no supporting articles or case studies, reliance upon highly questionable hearsay witness accounts," and so on. *Grayson*, 2024 WL 4701875, at *22. Just as the courts have credited Dr. Antognini's opinions over Dr. McAlary's, this Court should credit Dr. Antognini's over Dr. Bickler's. *Frazier*, 2025 WL 361172, at *10 ("[T]he Court credits Dr. Antognini's expert opinions over the expert opinions Dr. McAlary offered in Grayson's litigation because Dr. McAlary's opinions were not sufficiently supported by research, scientific studies, or articles."); *Grayson*, 2024 WL 4701875, at *22 ("[T]he Court finds Dr. Antognini and his opinions on these subjects more credible and persuasive than those

of Dr. McAlary.").

### 3. Plaintiff's gestures at PTSD and tenets of Buddhism do not affect this analysis.

162. Two final points bear mentioning: (a) although Plaintiff attempted to develop a PTSD theory, his and his witnesses' own testimony gutted that theory; and (b) although the Court permitted testimony about Buddhism out of an abundance of caution, the hearing revealed that Plaintiff's religious beliefs do not impact the Eighth Amendment analysis.

163. **a.** Beginning with PTSD, Plaintiff's briefing was blanketed with assertions that "he will have a highly traumatic and painful PTSD response to the mask and nitrogen." *E.g.*, ECF 75 at 9. But he then elicited testimony at Friday's hearing saying the exact opposite.

164. He testified, for example, that he has not "sought any treatment for PTSD in over five years." 1st Tr. 32:18–21. And he "credit[s] the Buddhist breathing techniques with [his] ability to manage [his] PTSD symptoms." *Id.* at 32:21–24. They "help [him] feel calm" and "at peace." *Id.* at 33:9–14. They involve "deep breaths" as he "inhale[s] and exhale[s]," and he is "not concerned with the composition of the air"—his "focus in on the inhaling and the exhaling." *Id.* 33:15–34:9. And in fact, he "plan[s] to use [his] meditative breathing techniques" if he is executed through nitrogen hypoxia. *Id.* at 39:15–17.

165. His own PTSD expert, Dr. Sautter, then magnified that point. "[T]he most dramatic thing," Dr. Sautter said upon seeing Plaintiff last month (for the first time in over 20 years and without reviewing his medical records), was that it "was

rather clear [] that he was managing his PTSD." *Id.* at 64:16–17. "[V]ery few" people

can do that, and Dr. Sautter "asked him, you know, how that happened." *Id.* at 64:20–

24. "And that's when he began telling me about Buddhism and the breathing," Dr.

Sautter said. *Id.* Dr. Sautter continued on to say that "[i]t's really amazing the extent

to which, you know, he has learned to adopt practices that enable him to stop re-

experiencing symptoms, which doesn't mean that they are totally gone, but they are

significantly minimized." *Id.* at 65:19–23.

166.    And that is not even when Dr. Sautter's direct examination fully went

off the rails for Plaintiff. That happened later in the following exchange (*id.* at 72:8–

16):

> Q. And then, finally, in your opinion, will Mr. Hoffman be able to practice Buddhist breathing techniques while under psychological distress?
>
> A. Yes.
>
> Q. He will be able to practice breathing techniques while under psychological distress?
>
> A. Well, if he can practice the breathing, then he will be able to decrease his distress, if he is able to do the breathing.

167.    And that is Plaintiff's PTSD theory: Dr. Sautter gave an extraordinary

endorsement of Plaintiff's strides, including his ability to overcome PTSD through

breathing exercises. Moreover, everyone agrees that Plaintiff will be able to inhale

and exhale as he is executed—and Plaintiff testified that he will use his techniques.

Accordingly, in Dr. Sautter's own words, because Plaintiff is "able to do the

breathing," "then he will be able to decrease his distress." *Id.* Plaintiff's gestures at

PTSD thus ultimately have no bearing on this case.

168.  **b.**  That Plaintiff's Buddhist beliefs inform his breathing exercises likewise is not relevant to the Eighth Amendment analysis. As repeatedly explained, everyone agrees that Plaintiff physically will be capable of doing his Buddhist breathing exercises—and in fact, Plaintiff testified that he will do those exercises—during his execution.

169.  The only additional testimony the Court heard was that Plaintiff is required to breathe *ambient air*—*i.e.*, with a standard percentage of oxygen—to carry out his religious practices. *E.g.*, *id.* at 49:4–6 (Reverend Bono). More than the standard percentage of nitrogen will not suffice. As Reverend Bono put it, "death by nitrogen hypoxia [would] prevent [Plaintiff] from practicing Buddhism" because, "if he is breathing nitrogen, he is not breathing air." *Id.* at 49:17–20; *id.* at 51:24–52:1 ("You would need to be breathing in air, and, you know, I don't know the exact composition of air. I know it has oxygen, so you would need to be breathing air.").

170.  Setting aside that Reverend Bono was unaware of "any Buddhist texts that say that meditative breathing requires oxygen to be present," *id.* 52:5–7, this line of testimony elicited by Plaintiff's counsel demonstrates that it has no bearing on the Eighth Amendment claims.

171.  The question in the Eighth Amendment claims is whether Plaintiff will suffer unconstitutional pain and suffering—not whether he will be able to engage in the religious practice that his spiritual adviser believes is compelled by Buddhism. And whether Plaintiff's breathing exercises satisfy the tenets of Buddhism or not, it is undisputed that he will be able—and in fact, he intends—to engage in those

47

exercises as he is executed. *See id.* at 39:11–17 ("Q. If you are executed with nitrogen hypoxia, are you planning to use your meditative breathing techniques? A. Yes."); *id.* at 53:24–54:1 (Reverend Bono agreeing that Plaintiff will "be breathing in and out").

172.    Accordingly, as with the failed PTSD theory, Plaintiff's efforts to add a religious valence to this Eighth Amendment analysis do not work.

### B.  In All Events, Plaintiff Is Unlikely to Prove a Sufficient Alternative.

173.    For the reasons explained above, Plaintiff is unlikely to get past *Bucklew* Step Zero because he has not identified a substantial risk of severe pain from execution by nitrogen hypoxia. Without that threshold finding, therefore, it makes little sense to reach *Bucklew* Steps One and Two: (1) a feasible and readily implemented alternative method of execution that would significantly reduce any alleged substantial risk of severe pain and (2) that the State has refused to adopt without a legitimate penological reason. *Bucklew*, 587 U.S. at 134. (That is because, if nitrogen hypoxia poses no substantial risk of severe pain in the first place, then this comparative analysis is missing one side of the equation.) In any event, Plaintiff offers the firing squad and DDMAPh—neither works.

### 1.  The firing squad is not a sufficient alternative.

174.     Plaintiff's firing squad proposal fails from the start because his own witnesses gutted any suggestion that the firing squad would "significantly reduce a substantial risk of severe pain" posed by nitrogen hypoxia. And in all events, there are legitimate penological reasons why Louisiana might not adopt the firing squad.

175.    *First*, the pain inquiry. Start with physical pain. Plaintiff's own expert,

Dr. Bickler, testified that nitrogen hypoxia "does not cause any physical pain." 2nd Tr. 92:17–93:9. Dr. Antognini agreed. *Id.* at 168:22–25 ("It's not painful to have the nitrogen hypoxia."). But the firing squad carries physical pain. Based on his own experience tending to gunshot victims, Dr. Antognini testified that, "during the period where someone is still conscious after a gunshot wound like that, then that would be, in my opinion, quite painful." *Id.* at 168:14–17. Even Plaintiff's firing-squad expert, Dr. Williams, suggested that there at least would be "a profound numbness or stunning effect." 1st Tr. 116:14–15. And this assumes the firing squad hits their mark, as Dr. Williams admitted. *Id.* at 123:23–124:2 ("Q. Well, you've got shooters who going to shoot at Mr. Hoffman, and if they miss their target, it would likely cause more pain, correct? A. If they missed the target and don't hit the heart, that would be true, yes."). In addition, Plaintiff himself testified that he "do[es]n't agree" with his Complaint's assertion that "the firing squad method would be virtually painless." *Id.* at 36:24–37:2.

176. Moreover, only Dr. Antognini offered an opinion comparing the two methods and the physical pain involved: "the pain would be more" because, while nitrogen is "not painful," "it would be painful to have the gunshot wound." 2nd Tr. 168:18–169:1. Dr. Williams refused. 1st Tr. 128:9–13 ("Q. And as you sit here today, you can't present any scientific evidence that the protocol that you suggest will result in less physical pain than the state's nitrogen hypoxia protocol, correct? A. I offer no opinion on the nitrogen hypoxia method, sir.").

177. As a matter of law, therefore, Plaintiff is unlikely to show that the firing

squad significantly reduces a substantial risk of severe physical pain from nitrogen hypoxia.

178.    The same story plays out for psychological pain. Here, too, Plaintiff's firing-squad expert, Dr. Williams, refused to address any psychological evidence regarding the firing squad or any comparison against nitrogen hypoxia. *Id.* at 128:14–18 ("Q. Okay. And as you sit here today, you can't present any scientific evidence that your suggested protocol will result in less psychological pain than the method elected by the state, right? A. Again, I offered no psychological evidence."). And of course, as detailed above, Dr. Antognini's testimony is that nitrogen hypoxia presents no substantial risk of severe psychological pain.

179.    But, in a remarkable twist, Plaintiff's Dr. Sautter provided a damning comparison between the psychological effects of nitrogen hypoxia versus the firing squad *on Plaintiff himself*. As recounted above, Dr. Sautter testified that Plaintiff will be able to "decrease" any psychological issues when Plaintiff is executed by nitrogen hypoxia because he will be able to use his breathing techniques. *Id.* at 72:8–16. But that is not true of the firing squad. After some prodding, Dr. Sautter finally admitted that one "traumatic" aspect of Plaintiff's life that Dr. Sautter had recounted in his 2003 report is that Plaintiff "had previously experienced [] being held at gunpoint on two occasions during an armed robbery." 1st Tr. 78:25–79:12, 81:3–82:10. Dr. Sautter was then asked: "[I]f [Plaintiff] was placed in front of a firing squad, isn't that the same kind of stimuli that would trigger a PTSD response?" *Id.* at 82:11–13. He then gave one of the most implausible responses on Friday's record: "Not

50

necessarily." *Id.* at 82:14. So bad was that response that he eventually caved and said "[i]t is one of the stimuli that could" trigger Plaintiff's PTSD. *Id.* at 83:13. On top of that, Plaintiff submitted no evidence that he could actually engage in his breathing exercises during the brief period of consciousness after being shot.

180.    Plaintiff is thus exceedingly unlikely to show that the firing squad would significantly reduce a substantial risk of severe psychological pain from nitrogen hypoxia.

181.    *Second* (and even if the firing squad were an otherwise suitable alternative), there are legitimate penological reasons why Louisiana might not adopt the firing squad. There are, of course, logistical difficulties both with setup and cleanup. But there are also other considerations, such as the fact that anyone who fires a round in the firing squad knows by feel whether they fired a live or blank round, despite the myth of blank rounds. And that introduces a layer of issues regarding psychological impacts and plausible deniability. 2nd Tr. 126:3–10. Louisiana was thus well within its rights to select a method of execution that is relatively quick, painless, and clinical.

### 2.    DDMAPh is not a sufficient alternative.

182.    Plaintiff fares no better with his DDMAPh proposal.

183.    *First*, the pain inquiry. As noted above, the parties' experts agree that nitrogen hypoxia causes no physical pain. But that is not true of DDMAPh. In a perfect world dealing with a voluntary subject seeking to end their life, Dr. Blanke testified that they will suffer a "mild level of bitterness" (if they elect to drink the

DDMAPh cocktail), 1ˢᵗ Tr. 138:9, or "mild pressure" (if they elect to have a "rubber tub "place[d] [] through the patient's anus a few inches into the rectum" and then secured with "a small balloon"), *id.* at 137:20–138:4. And that pain or discomfort would increase if the subject is involuntarily forced to ingest (or have injected) the cocktail. *See id.* at 147:1–2. Accordingly, as a matter of law, Plaintiff is unlikely to succeed in showing that DDMAPh significantly reduces a substantial risk of severe physical pain from nitrogen hypoxia.

184.    As for psychological pain, the testimony appears to be in equipoise. Dr. Blanke maintains that DDMAPh sends subjects off to sleep without pain or anxiety. *Id.* at 138:13–21. And for the reasons explained above, nitrogen hypoxia is a "gentle" death in Dr. Bickler's words. So, as a matter of law, Plaintiff is unlikely to succeed in showing that DDMAPh would reduce *any* substantial risk of severe psychological pain presented by nitrogen hypoxia—much less *significantly* reduce any such risk.

185.    One final note on pain: On redirect, Plaintiff's counsel attempted to have Dr. Blanke compare the pain of placing a rectal tube against the pain of securing an IV line for lethal injection. *Id.* at 150:8–13. That is smoke and mirrors: Plaintiff's burden here is to show that DDMAPh significantly outperforms *nitrogen hypoxia* on pain measurements, not *lethal injection*.

186.    *Second*, the feasibility inquiry. DDMAPh also is not "a feasible and readily implemented alternative method of execution." *Bucklew*, 587 U.S. at 134. Chief of Operations Seth Smith testified that the State has had extensive "correspondence ... with various pharmaceutical manufacturers and our wholesalers.

They all told us the same thing. If we get caught using one of their drugs, they are no longer going to supply drugs we need to treat people." 1st Tr. 170:19–24; *id.* at 176:22–177:1 (drug manufacturers "have made it very clear to us that if we use any of their medication for a capital punishment case, they reserve the right to pull all of their medication off the table"). This is an untenable position for the State (*id.* at 177:2–7):

> We have an aging population in the prison system. We have large infirmaries. We have full-blown hospitals. We cannot run the risk of losing access to life-saving drugs for this reason, and that's why we did that. We quit pursuing [lethal injection]. We came out and publicly said we quit pursuing it for those reasons, and nothing has changed.

187.    Because of the incredible problem posed by drug manufacturers who refuse to allow their drugs to be used in executions, DDMAPh is not a feasible and readily implemented alternative.

188.    As the Supreme Court has said, "a State can't be faulted for failing to use lethal injection drugs that it's unable to procure through good-faith efforts." *Bucklew*, 587 U.S. at 134; *see Glossip v. Gross*, 576 U.S. 863, 869–70 (2015) ("[A] practical obstacle soon emerged, as anti-death-penalty advocates pressured pharmaceutical companies to refuse to supply the drugs used to carry out death sentences."). So, too, where a State's use of such drugs would result in the State being blacklisted, which, in turn, would detrimentally impact the State's medical care for its prisoners. Indeed, for the same reason, the State's choice of nitrogen precisely because "'[n]o supply concerns exist for nitrogen'" is a "valid penological reason to decline to adopt [Plaintiff's] proposed alternative method." *Frazier*, 2025 WL 361172, at *13–14.

53

189.   On direct examination, Plaintiff's counsel elicited testimony from Dr. Blanke that he purportedly spoke to an unspecified "pharmacy" that said it "would be willing" to sell the DDMAPh drugs "to a prison or a state." 1st Tr. 141:23–142:1. But he admitted on cross-examination that he does not "have any information that can confirm that Louisiana can in fact use these drugs for executions. *Id.* at 142:6–14. And he readily admitted that selling the drugs for "medical-aid-in-dying" is "clearly different" than selling drugs "in connection with executions." *Id.* at 143:6–9.

190.   *Third* (and even if DDMAPh were an otherwise suitable alternative), the additional legitimate penological reasons why Louisiana might not adopt DDMAPh.

191.   One, the length of time it would take to finish an execution: Dr. Blanke testified the "[t]he average time to coma is 5.8 minutes," and "[t]he average time to dying is 96 minutes." *Id.* at 139:11–12. Dr. Blanke also admitted that at least one recorded death took "up to 67 hours," although Dr. Blanke assured the Court that this was not with his proposed methods ("but it is using similar drugs, yes"). *Id.* at 145:14–15.

192.   Two, risks with the administration of the cocktail. Dr. Blanke admitted that "there are issues with the oral method if a person is not willingly taking it" and is instead trying to spit it out, not swallow, and otherwise fight the administration. *Id.* at 146:1–13. Dr. Blanke likewise admitted issues with rectal administration: "If they were actively fighting, there could be some brief discomfort." *Id.* at 147:1–2.

193.   Three, potential indignity. Another of the more remarkable witness

54

statements at Friday's hearing was Dr. Blanke's testimony that "sticking a tube up somebody's behind" is "not what I would customarily think of as an invasive procedure." *Id.* at 147:3–14. But he ultimately conceded that he "could see how some patients would be – sorry, how some convicts would be embarrassed, yes." *Id.* at 147:18–23.

194.    Four, variable risks related to the age of the subject. For his part, Dr. Blanke refused to commit, stating that this "is one of the things currently being explored." *Id.* at 145:10–11. But Dr. Antognini testified that "the literature is very clear about if you are old and debilitated"—like the typical subjects of DDMAPh— "you're very sensitive to drugs." *Id.* at 163:8–10. By contrast, a young individual like Plaintiff, "just based on the age factor, [] would be relatively resistant, based on my experience with giving drugs to people, including barbiturates." *Id.* at 163:18–21.

195.    And five, as Dr. Blanke admitted, DDMAPh has never been used in the United States as a method of execution. *Id.* at 149:1–4.

196.    For all of these reasons, Louisiana has any number of legitimate penological reasons for not adopting DDMAPh.

## V.    THE EQUITIES WEIGH IN DEFENDANTS' FAVOR.

197.    Plaintiff's failure to establish a likelihood of success on the merits for any of his claims ends the analysis for all practical purposes. For the remaining factors cannot make up the slack on the merits—the "most important" factor. *Abbott*, 110 F.4th at 706 (quoting *Mock*, 75 F.4th at 587 n.60). But, even if the Court reaches the remaining factors, they weigh heavily in favor of Defendants.

198.    *First*, Plaintiff's delay in filing this suit places the equities and the public interest squarely on the State's side. The Supreme Court has emphasized that federal courts must apply "a strong equitable presumption against the grant of a stay where a claim could have been brought at such a time as to allow consideration of the merits without requiring entry of a stay." *Nelson v. Campbell*, 541 U.S. 637, 650 (2004). Indeed, "[l]ast-minute stays should be the extreme exception, not the norm, and 'the last-minute nature of an application' that 'could have been brought' earlier, or 'an applicant's attempt at manipulation,' 'may be grounds for denial of a stay.'" *Bucklew*, 587 U.S. at 150 (quoting *Hill*, 547 U.S. at 584). For that reason, federal courts "'can and should' protect settled state judgments from 'undue interference' by invoking their 'equitable powers' to dismiss or curtail suits that are pursued in a 'dilatory' fashion or based on 'speculative' theories." *Id.* at 151 (quoting *Hill*, 547 U.S. at 584–85).

199.    That precisely describes this case. As the Court is aware, for eight months now, Plaintiff has told this Court that he has a live controversy. *See* Mem. in Support of Mot. for Relief from J. at 1, No. 12-cv-796 (M.D. La. June 14, 2024), ECF 318-1 ("[T]here has since been a material and extraordinary change of circumstances that gives rise to a live controversy between the parties."). Yet he refused to file this lawsuit. Instead, he put all his eggs in a basket of hope that this Court would reopen his long-dismissed suit and allow him to skip the hassle of filing a new lawsuit. That strategy is inexplicable—but it is also an undisputed fact. Plaintiff now tries to turn his delay on the State by protesting (Mot.3–4) that the State should have just allowed

his procedurally wrong invocation of Rule 60(b)(6) to proceed apace. But, as the Court reiterated at last Friday's conference, all parties here must play by the rules. And the rules in the Fifth Circuit's caselaw say that Plaintiff cannot use Rule 60(b)(6). That is not the State's fault. He, the State, and the Court are in this eleventh-hour time crunch solely because he refused to file *this* lawsuit eight months ago. Whether the Court deems that delay or manipulation, it is a fact that tilts the equities in the State's favor.

200.    *Second*, the State (and therefore also the public because the factors merge) has an unquestionable compelling interest in Plaintiff's execution. *See Bucklew*, 587 U.S. at 150 ("Under our Constitution, the question of capital punishment belongs to the people and their representatives . . . ."); *Nelson*, 541 U.S. at 644 ("[A] State retains a significant interest in meting out a sentence of death in a timely fashion."); *In re Blodgett*, 502 U.S. 236, 239 (1992) (The State's "sovereign power to enforce [its] criminal law" carries "great weight."); *Calderon v. Thompson*, 523 U.S. 538, 556 (1998) ("To unsettle these expectations [of finality] is to inflict a profound injury to the 'powerful and legitimate interest in punishing the guilty,' an interest shared by the State and the victims of crime alike." (quoting *Herrera v. Collins,* 506 U.S. 390, 421 (1993) (O'Connor, J., concurring))); *Moran v. Burbine*, 475 U.S. 412, 426 (1986) (recognizing "society's compelling interest in finding, convicting, and punishing those who violate the law"); *Turner v. Epps*, 460 F. App'x 322, 331 (5th Cir. 2012) (emphasizing that courts must "give appropriate weight to . . . the State's interests in carrying out [an] execution as scheduled . . . .").

201.    And *third*, Plaintiff has no viable assertion of irreparable harm on the other side of the ledger. His only theory of irreparable harm is that he "will be executed in violation of his constitutional rights." Mot.33. But that theory falls apart since he has no likelihood of success on the merits. Moreover, to the extent that he suggests his showing of irreparable harm would alone be "dispositive," he is wrong. Mot.33 (citing *D.T. v. Sumner Cnty. Sch.*, 942 F.3d 324, 327 (6th Cir. 2019)). What the Sixth Circuit actually held in *D.T.* was that the *absence* of irreparable harm was dispositive. *See* 942 F.3d at 327 ("Was the district court wrong to stop the inquiry after finding no irreparable injury? No. When one factor is dispositive, a district court need not consider the others."). In addition, the Fifth Circuit has rejected limiting the preliminary-injunction inquiry to irreparable harm. *See White v. Carlucci*, 862 F.2d 1209, 1211 n.1 (5th Cir. 1989) ("Plaintiff would have us ... order the injunction to issue if we find that irreparable injury was either established or need not be. Such a result would be inappropriate."); *accord* § 73:96, 14A Cyc. of Federal Proc. § 73:96 (3d ed.) ("[E]nforcement of a constitutional state statute will not be enjoined by a federal court merely because it will cause irreparable injury." (citing *Ala. Pub. Serv. Comm'n v. S. Ry. Co.*, 341 U.S. 341 (1951); *Lawson v. Aetna Ins. Co.*, 41 F.2d 316 (4th Cir. 1930))). And for good reason: Plaintiff's theory would entitle every prisoner with a death warrant to a preliminary injunction based on nothing more than the warrant's existence. That is not the law.

## RELIEF

202.    Accordingly, the Court denies Plaintiff's Motion.

**SO ORDERED.**

_____

Dated: March 9, 2025

Respectfully Submitted:

/s/ Jeffrey K. Cody
Jeffrey K. Cody (La. Bar Roll No. 28536)
jeffreyc@scwllp.com
Caroline M. Tomeny (La. Bar Roll No. 34120)
caroline@scwllp.com
Brooke L. R. Ydarraga (La. Bar Roll No. 41000)
brooke@scwllp.com
**SHOWS, CALI & WALSH, L.L.P.**
628 St. Louis Street (70802)
P.O. Drawer 4425
Baton Rouge, Louisiana 70821
Telephone: (225) 346-1461
Facsimile: (225) 346-1467

/s/ Connell L. Archey
Randal J. Robert (La. Bar #21840)
randy.robert@butlersnow.com
Connell L. Archey (La. Bar #20086)
connell.archey@butlersnow.com
**BUTLER SNOW, LLP**
445 North Boulevard, Suite 300
Baton Rouge, LA 70802
Telephone: (225) 325-8700
Facsimile: (225) 325-8800

**Counsel for Defendants**

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on March 9, 2025**,** a copy of the foregoing was filed electronically with the Clerk of Court using the CM/ECF system, and notice will be sent to all counsel for Plaintiff by operation of the court's electronic filing system.

      /s/ Caroline M. Tomeny   
     CAROLINE M. TOMENY