IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF LOUISIANA
(BATON ROUGE)


JESSIE HOFFMAN                                          PLAINTIFF


VS.                          CIVIL ACTION NO. 3:25CV00169-SDD-SDJ


GARY WESTCOTT, SECRETARY,                               DEFENDANTS
LOUISIANA DEPARTMENT OF PUBLIC
SAFETY AND CORRECTIONS;
DARREL VANNOY, WARDEN,
LOUISIANA STATE PENITENTIARY;
JOHN DOES, UNKNOWN
EXECUTIONERS


**TRANSCRIPT OF HEARING ON MOTION FOR PRELIMINARY INJUNCTION**

**VOLUME 1 OF 2**


BEFORE THE HONORABLE SHELLY D. DICK
UNITED STATES DISTRICT JUDGE

MARCH 7, 2025
BATON ROUGE, LOUISIANA


REPORTED BY:  TERI B. NORTON, RMR, FCRR, RDR
              Mississippi CSR #1906
_____

501 EAST COURT STREET, SUITE 2.500
JACKSON, MISSISSIPPI  39201
(601) 608-4186


First Transcript

```
 1    APPEARANCES:

 2    FOR THE PLAINTIFF:
            JAMES K. STRONSKI, ESQUIRE
 3          ELLEN HALSTEAD, ESQUIRE
            CROWELL & MORING
 4          375 NINTH AVENUE
            NEW YORK, NY  10001
 5
            APRIL BARNARD, ESQUIRE
 6          HUGHMAN CHAN, ESQUIRE
            CROWELL & MORING, LLP
 7          1001 PENNSYLVANIA AVENUE NW
            WASHINGTON, DC  20004
 8
            CECELIA TRENTICOSTA KAPPEL, ESQUIRE
 9          LOYOLA CENTER FOR SOCIAL JUSTICE
            7214 ST. CHARLES AVENUE
10          NEW ORLEANS, LA  70118

11          SAMANTHA BOSALAVAGE POURCIAU, ESQUIRE
            PROMISE OF JUSTICE INITIATIVE
12          1024 ELYSIAN FIELDS AVENUE
            NEW ORLEANS, LOUISIANA  70117
13
            REBECCA L. HUDSMITH, ESQUIRE
14          FEDERAL PUBLIC DEFENDERS OFFICE
            102 VERSAILLES BLVD., SUITE 816
15          LAFAYETTE, LOUISIANA  70501

16    FOR THE DEFENDANTS:
            JEFFREY K. CODY, ESQUIRE
17          CAROLINE M. TOMENY, ESQUIRE
            BROOKE RAGUSA YDARRAGA, ESQUIRE
18          SHOWS, CALI, BERTHELOT & WALSH, LLP
            628 ST. LOUIS STREET
19          BATON ROUGE, LOUISIANA  70802

20          CONNELL LEE ARCHEY, ESQUIRE
            RANDAL J. ROBERT, ESQUIRE
21          BUTLER SNOW
            445 NORTH BLVD., SUITE 300
22          BATON ROUGE, LOUISIANA  70802

23          J. BENJAMIN AGUINAGA, ESQUIRE
            SOLICITOR GENERAL OF THE OFFICE OF ATTORNEY GENERAL
24          1885 N. 3RD ST.
            BATON ROUGE, LA  70802

25
```

First Transcript

1  APPEARANCES:  (CONTINUED)

2  CAITLIN A. HUETTEMANN, ESQUIRE
   ZACHARY FAIRCLOTH, ESQUIRE
3  LOUISIANA DEPARTMENT OF JUSTICE
   1885 N. 3RD STREET
4  BATON ROUGE, LOUISIANA  70802

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

<pre>
1                    TABLE OF CONTENTS

2

3                        VOLUME 1

4  WITNESSES FOR THE PLAINTIFF:

5  JESSIE HOFFMAN
</pre>

<pre>
6       Direct Examination By Ms. Pourciau  ...................23

7       Cross-Examination By Ms. Tomeny  .....................31

8       Redirect Examination By Ms. Pourciau  ................39
</pre>

<pre>
9  MICHAELA BONO
</pre>

<pre>
10      Direct Examination By Ms. Pourciau  ..................41

11      Cross-Examination By Ms. Tomeny  .....................50
</pre>

<pre>
12 DR. FREDERIC SAUTTER
</pre>

<pre>
13      Direct Examination By Mr. Chan  ......................54

14      Cross-Examination By Mr. Robert  .....................73

15      Redirect Examination By Mr. Chan  ....................83
</pre>

<pre>
16 LAWRENCE LEE CAPONE
</pre>

<pre>
17      Direct Examination By Ms. Pourciau  ..................87

18      Cross-Examination By Mr. Robert  .....................94
</pre>

<pre>
19 REIMOKU GREGORY SMITH
</pre>

<pre>
20      Direct Examination By Ms. Pourciau  ..................97
</pre>

<pre>
21 DR. JAMES WILLIAMS
</pre>

<pre>
22      Direct Examination By Ms. Barnard  ..................104

23      Cross-Examination By Mr. Robert  ....................122
</pre>

<pre>
24 DR. CHARLES BLANKE
</pre>

<pre>
25      Direct Examination By Mr. Stronski  .................131
</pre>

1    Cross-Examination By Mr. Robert  .....................142

2    Redirect Examination By Mr. Stronski  ...............149

3 SETH HENRY SMITH

4    Direct Examination Ms. Halstead  ....................152

5    Cross-Examination By Mr. Cody  ......................173

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          **THE COURT:**  Call the case, please.

2          **DEPUTY CLERK:**  This is Civil Action No. 25-169,

3    Jessie Hoffman versus Gary Westcott and others.

4          **THE COURT:**  Okay.  Counsel, can you please make

5    appearances for the record?  If you are going to make

6    appearances, let's make appearances for people that are

7    actually going to appear.  If you are taking a collateral role,

8    maybe we don't need an appearance.  Go ahead, sir.

9          **MR. STRONSKI:**  Yes, Your Honor, Jim Stronski for

10   Mr. Hoffman, from the law firm of Crowell & Moring.

11         **THE COURT:**  And Mr. Stronski, will you be lead

12   counsel?

13         **MR. STRONSKI:**  I am, Your Honor.  I would ask that my

14   colleagues could introduce themselves.

15         **THE COURT:**  Yes, please.

16         **MS. KAPPEL:**  Good morning, Your Honor, Cecilia Kappel

17   on behalf of Mr. Hoffman.

18         **THE COURT:**  Good morning, Ms. Kappel.

19         **MS. POURCIAU:**  Good morning, Your Honor, Samantha

20   Pourciau on behalf of Mr. Hoffman.

21         **THE COURT:**  Good morning, ma'am.

22         **MS. BARNARD:**  Good morning, Your Honor.  I'm April

23   Barnard on behalf of Mr. Hoffman.

24         **MR. CHAN:**  Good morning, Your Honor.  Hughman Chan on

25   behalf of Mr. Hoffman.

1           **THE COURT:**  Good morning, Mr. Chan.

2           **MS. HALSTEAD:**  Good morning, Your Honor.  Ellen

3    Halstead on behalf of Mr. Hoffman.

4           **THE COURT:**  Good morning.  Okay.  Let's hear from the

5    defendants, please.

6           **MR. CODY:**  Good morning, Your Honor.  Jeff Cody on

7    behalf of the defendants.

8           **THE COURT:**  Good morning, Mr. Cody.

9           **MR. CODY:**  I don't know if there's any preference --

10          **THE COURT:**  Well, let them introduce themselves.

11          **MR. TOMENY:**  Good morning, Your Honor.  Caroline

12   Tomeny for the defendants.

13          **THE COURT:**  Good morning, Ms. Tomeny.

14          **MR. ARCHEY:**  Good morning, Your Honor.  Connell

15   Archey on behalf of the defendants.

16          **THE COURT:**  Good morning, Mr. Archey.

17          **MR. ROBERT:**  Good morning, Your Honor.  Randy Robert

18   on behalf of the defendants.

19          **THE COURT:**  Good morning, Mr. Robert.

20          **MR. AGUINAGA:**  Good morning, Your Honor.  Benjamin

21   Aguinaga, also on behalf of the defendants.

22          **THE COURT:**  Give me your name one more time.

23          **MR. AGUINAGA:**  Benjamin Aguinaga.

24          **THE COURT:**  Aguinaga.

25          **MR. AGUINAGA:**  You nailed it.  Okay.  I'm doing it

1    phonetically.  There you go.  Thank you.

2        Okay.  If that concludes all of the appearances for

3    counsel that are actually going to take a speaking role or an

4    active role in this matter, the Court will get started.

5        The Court will have a few housekeeping matters.  Let me

6    just do those now because I will forget.  When you are

7    examining a witness, please do so from the podium.  If you make

8    an objection, please stand, and please be bold in your

9    objection.

10        We will be going kind of fast, and I don't want to miss an

11    objection because I'm taking notes or whatever, so be bold in

12    your objection.  But please stand and state the grounds for

13    your objection.  Are there any other questions regarding the

14    housekeeping?

15        The reason I ask you to come to the podium is that that

16    mic is recorded in the record in this matter.  Because we are

17    going to need it quickly, I think it's going to be best

18    practice if you use the mic.  Any questions about housekeeping?

19    Okay.

20        All right.  The Court yesterday granted in part the motion

21    to dismiss filed by the defendants and denied in part the

22    motion to dismiss filed by the defendants.  The Court will

23    hereby enter or give oral reasons for that judgment.

24        Before the Court is a motion to dismiss by the defendants,

25    Gary Westcott, who is the Secretary of the Louisiana Department

1    of Public Safety & Corrections, and Darrel Vannoy, the warden

2    of Louisiana State Penitentiary, and John Does, unknown

3    executioners (hereafter collectively referred to as either the

4    Defendants or the State).  The Plaintiff is Mr. Jessie Hoffman,

5    who opposes the motion.

6         The Court has reviewed the allegations, the arguments of

7    the parties and the law and is prepared to rule.  For the

8    following reasons, the defendants' motion to dismiss is granted

9    in part and denied in part.  Specifically, the defendants'

10   motion is granted with respect to refusal to disclose the

11   execution protocol on the grounds of mootness.  And the

12   religious exercise claims, Claims VI and VII, are dismissed

13   with prejudice.  In all other respects, the defendants' motion

14   is denied.

15        The Court is providing its reasons orally this morning in

16   the interest of efficiency.  With the exception of a few

17   instances, the Court will not provide pinpoint citations to

18   case law or the record.  When citing case law, as I mentioned,

19   the Court, unless there is a noted exception, the Court will

20   not provide reporter citations.  The Court will be quoting from

21   relevant case law but without orally pronouncing the beginning

22   and end of the quoted language.

23        The Court will first address the plaintiff's claim that

24   the defendants refused to disclose the execution protocol.  As

25   the defendants note in their motion, the plaintiff now has

1    access to the execution protocol, both the full protocol under

2    seal and the redacted protocol, which is in the public record.

3    Accordingly, the plaintiff's claim for refusal to disclose the

4    execution protocol is dismissed as moot.

5        The Court will next address the jurisdictional argument.

6    The defendants styled their motion as a Rule 12(b)(6) motion to

7    dismiss for failure to exhaust administrative remedies under

8    the Prison Litigation Reform Act.  The exhaustion argument

9    presents a jurisdictional challenge under 12(b)(1).  However, a

10   motion to dismiss under 12(b)(1) is analyzed under the same

11   standard as a motion to dismiss under 12(b)(6).  The Court

12   cites *Benton versus United States*, Fifth Circuit 1992.

13       The party invoking jurisdiction bears the burden of

14   proving that the Court may adjudicate this case.  *Ramming*

15   *versus United States*, Fifth Circuit 2001.

16       When considering a 12(b)(1) motion, "The Court is

17   permitted to look at the evidence in the record beyond simply

18   those facts alleged in the complaint and its proper

19   attachments."  *Ambraco versus Bossclip*, Fifth Circuit 2009.

20       The Court may consider the complaint alone, the complaint

21   supplemented by undisputed facts evidenced in the record or the

22   complaint supplemented by undisputed facts plus the Court's

23   resolution of disputed facts.  *Williamson v. Tucker*, Fifth

24   Circuit 1981.  "Ultimately, a motion to dismiss for lack of

25   subject matter jurisdiction should be granted only if it

1   appears certain that the plaintiff cannot prove any set of

2   facts in support of his claim that would entitle the plaintiff

3   relief." *Ramming*, Fifth Circuit 2001.

4        In this case, the defendants argue that all counts cannot

5   proceed because the administrative remedies are unexhausted.

6   Mr. Hoffman counters that he has exhausted all available

7   remedies.

8        The Prison Litigation Reform Act -- the Court may refer to

9   it as PLRA -- requires a prisoner to exhaust all available

10  remedies before filing suit, even in the execution context.

11  *Ramirez v. Collier*, Supreme Court 2022.  Where there are no

12  available remedies, the petitioner may proceed.

13  *Gallegos-Hernandez versus United States*, Fifth Circuit 2012.

14       In July, 2024, Mr. Hoffman filed an ARP generally

15  challenging the three methods of execution that were then

16  authorized by Louisiana Revised Statute 15:569.  The DPSC

17  rejected his grievance as premature.

18       On February 11, 2025, the day after the Governor publicly

19  announced that the DPSC had finalized and implemented the

20  nitrogen hypoxia protocol but before the death warrant had been

21  entered and before his execution date had been scheduled, Mr.

22  Hoffman filed Step 1 of the ARP with the DPSC.  In that ARP, he

23  challenged the scheduled execution by nitrogen hypoxia.  DPSC

24  responded stating, "A response will be issued within 40 days of

25  this date."  Forty days from that response or the response date

1    would be March 23, 2025, after Mr. Hoffman's scheduled

2    execution.

3         Based on these facts, there is no administrative process

4    available to Mr. Hoffman to obtain any relief for the actions

5    complained of.  An administrative process is not available if

6    it is not capable of use to obtain some relief for the action

7    complained of.  The Court cites *Ross versus Blake*, Supreme

8    Court 2016.

9         Mr. Hoffman challenges the constitutionality and the

10   legality of the method of his scheduled execution.  His claims

11   are not that the DPSC has misapplied statutory or regulatory

12   authority.  The Court finds it is futile for him to seek relief

13   from those who are charged with enforcing the state laws

14   authorizing his execution by nitrogen hypoxia.

15   *Gallegos-Hernandez* case, Fifth Circuit 2012.  Accordingly, the

16   motion to dismiss for failure to exhaust administrative

17   remedies is denied.

18        The defendants argue that the plaintiff has failed to

19   state a claim or state a cause of action with respect to his

20   Eighth Amendment claims, Counts I and II; his religious

21   exercise claims, Counts VI and VII; and his right to counsel

22   and access to Court claim, Count IV; and his ex post facto

23   claim, Count III.  The Court will address each in turn.

24        When deciding a Rule 12(b)(6) motion to dismiss, "the

25   Court accepts all well-pleaded facts as true, viewing them in

1    the light most favorable to the plaintiff."  The quote cites

2    the *Katrina Canal Breaches* case, Fifth Circuit 2007.  The Court

3    may consider the complaint, its proper attachments, documents

4    incorporated into the complaint by reference and matters of

5    which a Court may take judiciary notice.

6        To survive a 12(b)(6) motion, the plaintiff must plead

7    enough facts to state a plausible claim for relief that is --

8    or a claim for relief that is plausible on its face.  The Court

9    cites the Supreme Court in the *Twombly* case and the *Katrina*

10   *Breaches Litigation* in the Fifth Circuit.

11       In *Twombly*, the United States Supreme Court set forth the

12   basic criteria for a complaint to survive the 12(b)(6) motion

13   to dismiss.  "While the complaint attacked by Rule 12(b)(6)

14   motion to dismiss does not need detailed factual allegations, a

15   plaintiff's obligation is to provide the grounds of his

16   entitlement to relief, and it requires more than mere labels

17   and conclusions and more than a formulaic recitation of the

18   elements of a cause of action."

19       A complaint is insufficient if it merely "tenders naked

20   assertions devoid of further factual enhancement."  That's the

21   *Ashcroft versus Iqbal* case, Supreme Court 2009.  However, "a

22   claim has facial plausibility when the plaintiff pleads factual

23   content that allows the Court to draw a reasonable inference

24   that the defendant is liable for the misconduct alleged."  Also

25   *Ashcroft*.

1    In order to satisfy the plausibility standard, the

2    plaintiff must show more than a sheer possibility that the

3    defendant has acted unlawfully.  Further, while the Court must

4    accept well-pleaded facts as true, it will not strain to find

5    inferences favorable to the plaintiff.  On a motion to dismiss,

6    the Courts are not bound to accept a legal conclusion that is

7    couched as a factual conclusion or is a factual allegation.

8        At the outset, the Court notes that the defendants'

9    memorandum in support of their motion to dismiss is identical

10   to their memorandum in opposition to their motion for

11   preliminary injunction.  The plaintiff points out that the

12   defendants failed to conduct any analysis under the 12(b)(6)

13   legal standard in their motion to dismiss.  In fact, the

14   defendants' memorandum, their 12(b)(6) memorandum, mentions

15   12(b)(6) parenthetically only one time.  The defendants failed

16   to address the *Twombly* plausibility standard, and they utterly

17   failed to argue that the allegations of the complaint failed to

18   meet the 12(b)(6) plausibility requirements.

19       In short, the defendants wholly neglect to address the

20   sufficiency of the plaintiff's allegations.  On this basis

21   alone, the Court could deny the defendants' motion.  However,

22   in the absence of the defendants' analysis, the Court conducted

23   the pertinent 12(b)(6) analysis.

24       In turning first to the Eighth Amendment claims, it is

25   well settled, as stated by the Supreme Court, that while the

First Transcript

1    Eighth Amendment does not forbid capital punishment, it does

2    speak to how states may carry out that punishment, prohibiting

3    methods that are cruel and unusual.  That's the *Bucklew* case,

4    Supreme Court 2019.

5        To that end, the question in dispute is whether the

6    State's chosen method of execution cruelly superadds pain to

7    the death sentence.  If it does, then a prisoner must show a

8    feasible and readily implemented alternative method of

9    execution that would significantly reduce a substantial risk of

10   severe pain and that the State has refused to adopt without

11   legitimate penological reason.

12       Reading the plaintiff's allegations in the light most

13   favorable to him, as the Court must do on a motion to dismiss,

14   the plaintiff satisfies *Bucklew*.  In his complaint, the

15   plaintiff pleads the process of nitrogen hypoxia and alleges

16   that this method of execution superadds pain to his death

17   sentence.  He proposes two alternative methods of execution

18   that are feasible and readily available and would significantly

19   reduce a substantial risk of severe pain.  These methods

20   include firing squad and execution by the administration of

21   medical-aid-in-dying, or MAID.  He also alleges that the State

22   has no penological reason for implementing the method of

23   execution chosen by the State.

24       Plaintiff further alleges that nitrogen hypoxia as a

25   method of execution is unconstitutional as applied to him.  He

First Transcript

1    explains that he has PTSD and manages it through Buddhist

2    meditative breathing techniques.  As plaintiff alleges, the

3    placement of a gas mask over his face, preventing his use of

4    these breathing techniques to manage PTSD, while strapped to a

5    gurney, would trigger his PTSD that he developed from

6    claustrophobia from events in his childhood.

7        Considering the foregoing and the factual allegations of

8    the plaintiff's complaint, the Court finds that the plaintiff

9    has plausibly pled claims under the Eighth Amendment.  The

10    defendants' motion to dismiss Counts I and II is denied.

11        Moving to the religious exercise claim, Counts VI and VII,

12    the plaintiff asserts two religious exercise claims based on

13    the assertion that breathing in nitrogen during his execution

14    would prevent him from practicing his Buddhist meditative

15    breathing practices at the time of his death.  These claims

16    include a Religious Land Use and Institutionalized Persons Act

17    claim, the Court will call it RLUIPA, Count VI, and a First

18    Amendment claim under the free exercise clause, Count VII.  The

19    plaintiff did not oppose dismissal of his free exercise claim,

20    Count VII, under the First Amendment.  Accordingly, the Court

21    considers the claim abandoned, and the defendants' motion to

22    dismiss the plaintiff's free exercise claim, Count VII, is

23    granted, and that claim is dismissed.

24        Plaintiff does, however, oppose dismissal of the RLUIPA

25    claim.  Under RLUIPA, no government shall impose a substantial

1    burden on the exercise of free religion of any person residing

2    or confined to an institution, even if that burden results from

3    a rule generally applicable, unless the government demonstrates

4    that the imposition of the burden on that person, number one,

5    is in furtherance of a compelling governmental interest; and,

6    number two, is the least restrictive means of furthering that

7    compelling governmental interest.

8         The defendants' move for dismissal on the grounds that Mr.

9    Hoffman's inability to engage in his Buddhist breathing

10   practices during his execution is not a substantial burden on

11   his religious exercise.  The defendants submit that the

12   plaintiff will not be in fact prevented from breathing.

13   Plaintiff responds that Mr. Hoffman's sincerely held religious

14   beliefs are substantially burdened not because he will be

15   unable to breathe but because he will be unable to breath or he

16   will be forced to breathe nitrogen in lieu of ambient air.

17        In *Adkins v. Kaspar*, the Fifth Circuit in 2004 explained

18   that a government action or regulation creates a substantial

19   burden on a religious exercise if it truly pressures the

20   adherent to significantly modify his religious behavior and

21   significantly violates his religious beliefs.

22        The Court does not find it plausible that breathing

23   nitrogen instead of air substantially burdens Mr. Hoffman's

24   religious breathing practices.  While it may impose some

25   burden, the Court does not find it substantial.  The plaintiff

1    himself acknowledges that he will have the ability to breathe

2    as the nitrogen is administered.  Mr. Hoffman, in short, will

3    not be prevented from breathing.  The evidence of meditative

4    breathing may still be relevant as related to his "as applied"

5    Eighth Amendment claim, but the Court finds that the plaintiff

6    has failed to state a claim under RLUIPA, and the defendants'

7    motion to dismiss as to this issue is granted.

8         The right to counsel and access to Courts claim, which is

9    Count IV.  The defendants, in two sentences, argue that the

10   plaintiff's right to counsel only extends to his first appeal

11   and that the plaintiff does not have a constitutionally

12   protected interest in having counsel present throughout his

13   execution.  The plaintiff notes that the defendants completely

14   misconstrue the plaintiff's claim under Count IV.  The

15   plaintiff contends that the claim stems from the fact that the

16   protocol does not permit counsel to be present for any aspect

17   of the execution procedure, which thereby deprives Mr. Hoffman

18   of the right to seek redress in the courts at precisely those

19   points in the process when problems with the protocol's

20   implementation are most likely to arise.

21        As we have learned from Alabama's failed attempts to

22   execute Mr. Smith by lethal injection, access to the courts in

23   an execution is of paramount importance, especially in this

24   case where the State has no experience and has never used this

25   method of execution before.

1    Accordingly, the defendants' motion to dismiss is denied

2    with respect to the plaintiff's right to counsel and access to

3    Courts claim, which is Count IV.

4    And finally, the ex post facto claim, the ex post facto

5    clause of the United States Constitution forbids Congress and

6    the States from enacting any law which imposes a punishment for

7    an act which was not punishable at the time it was committed or

8    imposes additional punishment to that than prescribed.  *Weaver*

9    *versus Graham*, Supreme Court 1981.

10   In their argument for dismissal, defendants cite the 1915

11   Supreme Court case of *Mallory versus South Carolina*.  They

12   argue that under *Mallory*, there is no ex post facto clause

13   violation when there is no change to the form of punishment, in

14   other words, death, but only a change to the mode of that

15   punishment or the mode of execution in this case.  The

16   defendants' view, since there has been change only to the mode

17   of execution, that the plaintiff has not pled a claim under the

18   ex post facto clause.  The Court finds that the defendants

19   misinterpret *Mallory*.

20   In *Weaver versus Graham*, in 1981, the Supreme Court

21   explained that in *Mallory* -- or explained further *Mallory*, that

22   a change in the method of execution is not ex post facto

23   because evidence showed, or was not in that case ex post facto

24   because the evidence showed the new method to be more humane.

25   In *Sepulvado v. Jindal*, the Fifth Circuit in 2013, citing the

First Transcript

1    Supreme Court cases of *Weaver* and *Mallory*, explained that "A
2    post offense change in the State's execution protocols would
3    violate the ex post facto prohibition unless the change in the
4    execution method is more humane than the prior method of
5    execution."

6         In *Nelson versus Campbell*, the Supreme Court, in 2004,
7    succinctly explained that it is not an ex post facto violation
8    to change a method of execution to a more humane method.  The
9    Court finds that the plaintiff has sufficiently alleged that
10   the nitrogen hypoxia is an inhumane method of execution.  In
11   particular, the plaintiff cites to the American Veterinary
12   Medical Association as having outlawed gassing as a method of
13   euthanasia for dogs and cats, and has cited to the United
14   Nations, which has expressed concerns that death by nitrogen
15   gas likely violates prohibitions on torture and inhumane
16   punishments.

17        The plaintiff has also set out a plethora of facts from
18   Alabama's four executions by nitrogen hypoxia to support his
19   allegation that this type of death creates terror and extreme
20   pain and suffering.  In paragraphs 94 and 95 of the complaint,
21   the plaintiff alleges that there was a challenge to the
22   nitrogen gas and electrocution protocols at -- to the nitrogen
23   gas and electrocution as less humane than lethal injection.
24   The Louisiana 24th Judicial District Court held that 15:569,
25   which was the two methods available at that time, were

1   unconstitutional on ex post facto grounds.  Though this is not

2   a specific factual allegation that nitrogen hypoxia is less

3   humane than lethal injection, the Court is bound to read the

4   plaintiff's allegations liberally in a light most favorable to

5   him.

6       When reading this allegation in connection with the

7   plaintiff's allegations in paragraph 211, that if executed with

8   nitrogen gas, the defendants will retroactively subject him to

9   an increased punishment for a crime after his sentence, the

10  Court finds that the plaintiff has sufficiently alleged

11  nitrogen hypoxia to be a less humane method of execution than

12  lethal injection, which was his original method of execution.

13      For these reasons, the Court finds that the plaintiff has

14  plausibly pled a claim under the ex post facto clause of the

15  United States Constitution, and the defendants' motion to

16  dismiss Count III is denied.

17      In summary, the motion to dismiss filed by the defendants

18  is granted in part and denied in part.  The defendants' motion

19  is granted with respect to refusal to disclose execution

20  protocol on the grounds of mootness, Count V.  The religious

21  exercise claims, Counts VI and VII, are dismissed without

22  prejudice.  The motion to dismiss is denied as to the Eighth

23  Amendment claims, Counts I and II; the ex post facto claim,

24  Count III; and the right to counsel and access to Courts claim,

25  Count IV.  Thus, the Court will now proceed with the hearing on

1    Counts I, II, III and IV.

2         Is there anything we need to take up before you call your

3    first witness?

4              **MR. STRONSKI:**  Not right now, Your Honor.

5              **THE COURT:**  Then the plaintiffs may call their first

6    witness.

7         My law clerk instructs me or pointed out that I said

8    without prejudice.  The dismissals are with prejudice, as

9    mentioned in the judgment that was filed yesterday and

10   corrected.  The dismissals where the motion to dismiss was

11   granted are with prejudice.  You may proceed, Ms. Pourciau.

12             **MS. POURCIAU:**  Good morning, Your Honor, the

13   plaintiffs call Mr. Hoffman.

14             **THE COURT:**  Mr. Hoffman, if you will make your way to

15   right here, she is going to give you an oath in just a moment.

16             **DEPUTY CLERK:**  If you would raise your right hand.

17             **(OATH ADMINISTERED.).**

18             **MS. POURCIAU:**  Your Honor, may I approach the witness

19   to hand him water?

20             **THE COURT:**  Yes.  Mr. Hoffman, it is going to be

21   important that we be able to hear you.  So if you need to

22   adjust the mic to do that, go ahead.  Go ahead, Ms. Pourciau.

23             **THE CLERK:**  Would you please state your name and

24   spell it for the record.

25             **THE DEFENDANT:**  Jessie Hoffman, J-E-S-S-I-E

1   H-O-F-F-M-A-N.

2                        **JESSIE HOFFMAN,**

3   **having first been duly sworn, testified as follows:**

4                      **DIRECT EXAMINATION**

5   **BY MS. POURCIAU:**

6   Q.  Good morning, Mr. Hoffman.  Can you please introduce

7   yourself to the Court?

8   A.  I am Jessie Hoffman.

9   Q.  I'd like to start by asking you some questions about your

10  Buddhist faith.  Do you practice Buddhism?

11  A.  Yes.

12  Q.  When did you begin practicing Buddhism?

13  A.  In 2002.

14  Q.  How is it that you came to start practicing Buddhism in

15  2002?

16  A.  After the death of my grandmother, which is a difficult

17  thing for me, I found myself in a very, very dark spot.  For

18  the first time in my life, I was without my ground, my solid

19  ground, so I was reaching out.  I tried -- you know,

20  spiritually, I was trying to reach out to different things, but

21  eventually I received a book, "*Start Where You Are.  Everything*

22  *You Need is Inside You*," based on Buddhist principles.

23  Q.  And what did you learn in that book?

24  A.  That everything I had was -- everything I needed to cope

25  and deal with what I was dealing with in that moment was inside

                                                   First Transcript

1   me.

2   Q.   What, if anything, did you do next to continue a path to

3   practicing Buddhism?

4   A.   That book was, you know, a foundation, and I was still

5   searching other things.  But one day I was in a catalog and I

6   run across a book called, *The Buddha Said*, by Osho, and I ended

7   up ordering that book.

8   Q.   And what did you learn in that book?

9   A.   Well, based on the principles, the Buddhist principles,

10  through mindful breathing and mindfulness, that I can deal with

11  the challenges of life, in particularly my life.

12  Q.   And did you begin a meditative breathing practice at that

13  time?

14  A.   Yes.  Yes.

15  Q.   And what did that look like?

16  A.   It was twice a day, when I woke every morning and once at

17  night before bed.

18  Q.   Did you ever have an opportunity to practice Buddhism with

19  a teacher?

20  A.   The first chance I had was I want to say 2018, when there

21  was a class that came to Death Row.  It was available to Death

22  Row.

23  Q.   And can you tell me a little bit about that class?

24  A.   It was introduced -- actually, I signed up, and for the

25  first time I was able to talk to somebody, engage with somebody

1    who actually knew what they was doing.  And so it was a guided

2    meditation.  We did -- we read from a book and we did, like,

3    two different meditations.

4                **THE COURT:**  One moment.  Officer, would you mind

5    taking a seat, please.  Thank you.

6    **BY MS. POURCIAU:**

7    Q.  What was the name of the teacher that led that class?

8    A.  Michaela.

9    Q.  And was that the first opportunity you had to participate

10   in a Buddhist class that the prison offered?

11   A.  Yes.

12   Q.  They didn't offer any Buddhism classes before that?

13   A.  No.

14   Q.  What does the Buddhist faith believe about afterlives, if

15   anything?

16   A.  They believe in reincarnation.

17   Q.  Do you believe you will be reincarnated?

18   A.  Yes.

19   Q.  How has your Buddhist meditation practice helped you, if

20   at all?

21   A.  Like I just said, the ability to embrace life challenges

22   has helped me be able to do that, to deal with that.

23   Q.  Was there a time recently when you were able to use the

24   breathing practice and meditation practice to help you?

25   A.  Specifically, if I needed it?  Yes.  February 20th, I was

1    served a death warrant, for which I signed, and immediately

2    afterwards, I was moved to a different location in isolation

3    away from what I was used to, and the circumstances or the

4    situation was a very small cell and just small confinements.

5    So with that, it was triggered anxiety of small spaces, and it

6    was in that moment, after everything was settled, that I needed

7    to practice.  I did my breathing exercises.

8    Q.  You mentioned that you were having anxiety of small

9    spaces?

10   A.  Um-hm.

11   Q.  Is that claustrophobia?

12   A.  As I understand it, yes.

13   Q.  In general, do you think your Buddhist practices have

14   helped you?

15   A.  Absolutely.

16   Q.  Is there anything else about your Buddhist practice that

17   you want the Court to know about?

18   A.  That it allows me every day to be a better version of

19   myself.

20   Q.  I'm pulling up what I believe has been marked as

21   Plaintiff's Exhibit 2, which bears the Bates stamp Hoffman

22   00045.

23          **THE COURT:**  Counsel, are there any stipulations as to

24   the admissibility of evidence so that we don't have to -- that

25   hasn't been admitted yet.  It needs to be off the public

1    screen, Suzie.  Thank you.

2        Can we have a stipulation as to the admissibility of

3    evidence so that we don't have to go through this every time?

4            **MR. STRONSKI:**  We stipulate.

5            **THE COURT:**  Ms. Pourciau, go ahead.

6            **MS. POURCIAU:**  We stipulate, Your Honor.

7            **THE COURT:**  You will stipulate to the admissibility

8    of all the defendants' evidence, exhibits?

9            **MS. POURCIAU:**  The plaintiffs have not seen an

10   exhibit list from the defendants, so I don't think we can say

11   that, but if we are given one and a moment to look at it --

12           **THE COURT:**  Then don't stipulate.  What I'm asking

13   you is, are you stipulating to the admissibility of your

14   opponent's documentary evidence.  That's what I'm asking.  If

15   you've not seen it, then I would think you aren't going to do

16   that.

17           **MS. POURCIAU:**  We can stipulate to it if it has all

18   been disclosed in discovery in this matter.

19           **THE COURT:**  Okay.  At the break, you can take --

20   since we are probably not going to get to the defendants'

21   exhibits, you'll have time to do that.  What about the

22   defendants, Mr. Cody?

23           **MR. CODY:**  Your Honor, yeah, and I was just talking

24   to Mr. Stronski.  I think we do need to compare our notes as

25   far as exhibit lists because that was one thing that neither

First Transcript

1    part did.  I think it wasn't in the order, so I think we just

2    went with it.  But I think we do need to do that because we

3    might be able to stipulate.

4           **THE COURT:**  Okay.  Until you stipulate, we are going

5    to go through it the hard way.  That means until it is

6    admitted, it's not going to be published to the gallery.  It is

7    going to slow things down.  So I would suggest that since y'all

8    have a plethora of people, that you take a look and see what

9    you can agree to and what you can't agree to so that we can

10   move this along.  Otherwise, we are going to be here until

11   Sunday.

12          **MR. CODY:**  Your Honor, and not to try to delay

13   things, I think it will happen quickly, because I believe a lot

14   of the exhibits are going to be things that were in discovery,

15   if not all.  So I think it probably won't be a contentious

16   matter.

17          **MR. STRONSKI:**  I said wrongly we would stipulate, not

18   having seen things, but my assumption was that, Your Honor. so

19   I think if it's things we have seen before, to move it on, we

20   would stipulate.  But we will check.

21          **THE COURT:**  Yeah.  I mean, I don't know what you have

22   seen.  Until you tell me that we will stipulate to the

23   admissibility into the record of these exhibits, you are going

24   to have to go through it the hard way, or the old fashioned

25   way.  I won't say the hard way but the old fashioned way.  Be

1    seated, but I would suggest that some of you over there be

2    doing some work on this.  Okay.  Go ahead, Ms. Pourciau,

3    Exhibit 2.

4              **MS. POURCIAU:**  Your Honor, I think defendants

5    stipulate to this exhibit.

6              **THE COURT:**  Mr. Cody, no objection to Exhibit 2?

7              **MS. TOMENY:**  Actually, Your Honor, that is correct.

8              **THE COURT:**  No objection to Exhibit 2.  It may be

9    published.

10   **BY MS. POURCIAU:**

11   Q.  Mr. Hoffman, do you recognize this document?

12   A.  Yes.

13   Q.  What is it?

14   A.  It is a refusal, medical refusal.

15   Q.  Can you describe what that is for the Court?

16   A.  Excuse me?

17   Q.  Can you describe what a medical refusal is and what

18   happened here?

19   A.  What happened, I had a medical call-out that I was made

20   aware of that morning.  And they called me, got me dressed to

21   get ready to go over to the call-out.  There was a

22   transportation van, what we call a dog cage.  It was -- how do

23   I describe it?  It was just a little small space, van with a

24   small space that you are locked in.  So I tried to get in.  I

25   actually got in, but once they closed the doors, I couldn't

1    breathe.  I was having panic attacks.  I asked the guards to

2    get me out.  They immediately got me out, and I had to sign the

3    papers of refusal.

4    Q.   And what did you write on the form that we can see here?

5    A.   That due to claustrophobia, I couldn't breathe in the

6    space, so I was refusing medical treatment.

7    Q.   And when did you sign this form?

8    A.   Because I wasn't -- I couldn't be transported in that

9    vehicle.

10           **THE COURT:**  It was when, not why.  When?

11   A.   You say when?

12   **BY MS. POURCIAU:**

13   Q.   Um-hm.

14   A.   I'm sorry.  March 7, 2024.

15   Q.   Had something like that of having a panic attack from

16   being in a small space happened to you before?

17   A.   Yes.

18   Q.   Where do you think your claustrophobia stems from?

19   A.   An incident when I was a child, 7 or 8 years old.  I had

20   told on my brother, and when my mom went to work, he locked me

21   in the kitchen pantry.  I was yelling and screaming, throwing

22   stuff off the shelf, trying to get out, but it was locked, so I

23   couldn't -- at some point, I just blacked out.  I don't know

24   how long.  I was in there for -- I woke up when they pulled me

25   out, when they took me out.  So every time since then, if I've

1   been in spaces like this, this is what I go back to.

2   Q.  Do you feel like there is something about the specific

3   method of execution of gassing that is an issue for you as an

4   individual?

5   A.  Yes.

6   Q.  And why is that?

7   A.  From what I understand, this idea of putting a mask on,

8   having a mask on over me, yeah, it's just -- I can't even think

9   of it.  The idea of having a mask over my face.

10  Q.  What do you think that will do, having a mask over your

11  face?

12  A.  Yeah, I don't know.  I think just the idea of that, you

13  know -- yeah, I believe it is going to trigger these things I

14  experienced in these small spaces, or these spaces.

15  Q.  And do you think you will be able to practice your

16  Buddhist meditative breathing at that time?

17  A.  No.

18           **MS. POURCIAU:**  No further questions, Your Honor.

19           **THE COURT:**  Cross.

20                    **CROSS-EXAMINATION**

21  BY MS. TOMENY:

22  Q.  Good morning, Mr. Hoffman.  My name is Caroline Tomeny,

23  and I represent the defendants.  You said earlier that you

24  experienced claustrophobia, but you don't have a medical

25  diagnosis of claustrophobia; is that right?

1    A.  Not that I'm aware of.  I don't know.

2    Q.  Okay.  And you mentioned -- I believe you actually can

3    still see it on your screen -- this medical call-out where you

4    were going to be transported in a van that you referred to as a

5    dog cage; is that right?

6    A.  Yes.

7    Q.  Have you had any other medical call-outs and been

8    transported in that way in the past?

9    A.  No.

10   Q.  All right.  And you've been diagnosed with post-traumatic

11   stress disorder; is that right?

12   A.  Yes.

13   Q.  And you were diagnosed in 2003, correct?

14   A.  Sounds correct.

15   Q.  Okay.  But is it fair to say that over the last 20 years,

16   you have learned to manage your PTSD symptoms?

17   A.  Yes.

18   Q.  Okay.  And you actually haven't sought any treatment for

19   PTSD symptoms in over five years; is that right?

20   A.  Yes.

21   Q.  Okay.  All right.  And you credit the Buddhist breathing

22   techniques with your ability to manage your PTSD symptoms; is

23   that right?

24   A.  Yes.

25   Q.  Is it fair to say that these breathing techniques help you

1    relax?

2    A.   Yes.

3    Q.   Do you practice meditative breathing while you are falling

4    asleep?

5    A.   No.

6    Q.   Do you practice meditative breathing when you are in a

7    stressful situation?

8    A.   Yes.

9    Q.   All right.  Is it fair to say that these breathing

10   practices help you feel calm?

11   A.   Yes.

12   Q.   And at peace?  Do these breathing practices help you feel

13   at peace?

14   A.   Yes.

15   Q.   And these Buddhist breathing practices, that involves

16   inhaling and exhaling; is that right?

17   A.   Yes.

18   Q.   It's deep breaths, right?

19   A.   Yes.

20   Q.   And as long as you can inhale and exhale, you can practice

21   your breathing techniques; is that right?

22   A.   Yes.

23   Q.   And when you practice your Buddhist breathing techniques,

24   you are not usually concerned with the composition of the air

25   itself; is that right?

1    A.  Yes, I am -- yes.

2    Q.  Okay.

3    A.  Yes, ma'am.

4    Q.  I guess to clarify my question, you're not concerned with

5    the composition of the air, right?

6    A.  No.

7    Q.  Okay.  Again, your focus is on the inhaling and the

8    exhaling, right?

9    A.  Yes.

10   Q.  All right.  Mr. Hoffman, in your complaint, you've

11   proposed two alternative methods of execution to nitrogen

12   hypoxia; is that right?

13   A.  Yes.

14   Q.  When did you decide that you would prefer these two

15   methods over nitrogen hypoxia?

16   A.  When I got a clear idea of what the method -- of what it

17   meant.

18   Q.  Okay.  And you got that clear method of what it meant, is

19   that when you viewed a copy of the protocol?

20   A.  No.

21   Q.  Okay.  When was that?

22   A.  I don't know exactly when was it.

23   Q.  All right.  How did you decide on these two methods?

24        MS. POURCIAU:  Objection.  Your Honor, defendants

25   stipulated that they wouldn't ask questions that went into

1   attorney-client privileged relationships, and this was

2   discussed in an attorney-client setting.

3          **MS. TOMENY:**  Your Honor, my question was how did you

4   decide this.  I'm not asking for what he discussed with his

5   attorneys, of course.  I'm just asking how he decided on these.

6          **THE COURT:**  I'm going to overrule this question --

7   overrule this objection.  It doesn't specifically call for the

8   release of attorney-client -- or the divulging of

9   attorney-client privileged information.  Sir, you can say

10  that -- well, don't say what you told your lawyers, and don't

11  say what your lawyers told you.  Can you rephrase or ask your

12  question again, please.

13         **MS. TOMENY:**  Yes, Your Honor.

14  **BY MS. TOMENY:**

15   Q.  Mr. Hoffman, how did you decide on these two alternative

16  methods of execution?

17         **THE COURT:**  Mr. Hoffman, are you able to answer that

18  question without relating or referring to your lawyers?

19         **THE DEFENDANT:**  I cannot.

20         **THE COURT:**  Okay.  I'm going to ask you to ask the

21  next question.  The objection is sustained.

22         **MS. TOMENY:**  Okay.

23  **BY MS. TOMENY:**

24   Q.  Mr. Hoffman, the first method you propose is a firing

25  squad; is that right?

1    A.   Yes.

2    Q.   Okay.  And you believe that this method would result in

3    less pain and suffering than nitrogen hypoxia; is that right?

4    A.   Yes.

5    Q.   All right.  And you believe that the firing squad method

6    is virtually painless; is that right?

7    A.   I believe it's better than that, the first one.

8    Q.   Okay.  Were you aware that you represented in your

9    complaint that the firing squad method is virtually painless?

10   A.   I don't recall.

11   Q.   Okay.  But you wouldn't agree that it is virtually

12   painless; is that right?

13           **MS. POURCIAU:**  Objection, Your Honor.  This goes into

14   attorney-client communications and legal decisions and

15   discussions on strategy.  I also believe that that was an

16   expert opinion.

17           **THE COURT:**  Okay.  Well, it calls for his

18   understanding of whether the firing squad -- and the question

19   was virtually painless.  It's not totally painless.  She's

20   asking you was it your understanding that it is -- you said

21   it's -- well, I'm not going to go on.  Overruled.

22           **COURT REPORTER:**  I didn't get an answer.

23   **BY MS. TOMENY:**

24   Q.   All right.  I believe my question was, you wouldn't agree

25   that -- so you don't agree that the firing squad method would

1    be virtually painless; is that right?

2    A.  No.

3    Q.  Okay.  You also claim that -- and I'm going to quote from

4    the complaint -- "If performed properly, a simple matter for

5    trained marksmen, the use of a firing squad will eliminate the

6    substantial risk of severe pain of nitrogen hypoxia."  Do you

7    recall that from your complaint?

8    A.  Yes.

9    Q.  Okay.  And in your complaint, you also claim that the

10   state has a history of deviating from its written protocol and

11   does not provide adequate training for execution team members.

12   Is that right?

13   A.  Yes.

14   Q.  Have you ever been shot?

15   A.  No.

16   Q.  Were you aware that with a firing squad, the bullets would

17   enter your chest and shatter your spine?

18          **MS. POURCIAU:**  Objection.

19          **THE COURT:**  Due to lack of foundation.  Sustained.

20   **BY MS. TOMENY:**

21   Q.  All right.  Are you familiar with the firing squad method

22   of execution?

23   A.  No.

24   Q.  Okay.  So you're not -- you're not aware that with a

25   firing squad, bullets would enter your chest and shatter your

1    spine; is that correct?

2              **MS. POURCIAU:**  Objection, asked and answered.

3              **THE COURT:**  Same result.  Sustained.

4              **MS. TOMENY:**  All right.

5    **BY MS. TOMENY:**

6    Q.  All right.  Mr. Hoffman, the second method that you

7    propose is the medical-aid-in-dying cocktail, DDMAPh; is that

8    right?

9    A.  Yes.

10   Q.  And you believe that this method would result in your

11   death, end of quote from your complaint, without any risk of

12   prolonged pain and suffering?

13   A.  Yes.

14   Q.  Okay.  Do you have any knowledge as to how long death by

15   the DDMAPh cocktail could take?

16   A.  No.

17   Q.  Do you know if it is any longer than death with nitrogen

18   hypoxia?

19   A.  No.

20   Q.  All right.

21             **MS. TOMENY:**  One moment.

22   **BY MS. TOMENY:**

23   Q.  Are you familiar -- do you know of any complications with

24   the DDMAPh cocktail, with deaths by that cocktail?

25   A.  No.

1    Q.  Okay.

2         THE COURT:  Redirect?

3         MS. TOMENY:  Oh, I'm sorry, Your Honor.  I should

4    have said something.

5         THE COURT:  You have completed your cross,

6    Ms. Tomeny?

7         MS. TOMENY:  No, Your Honor.

8         THE COURT:  Okay.  Ms. Pourciau, then take your seat.

9         MR. ROBERT:  One second, Your Honor, please.

10   BY MS. TOMENY:

11   Q.  All right, Mr. Hoffman.  If you are executed with nitrogen

12   hypoxia, do you plan to use your meditative breathing

13   techniques?

14   A.  Excuse me.  Repeat that.

15   Q.  If you are executed with nitrogen hypoxia, are you

16   planning to use your meditative breathing techniques?

17   A.  Yes.

18   Q.  Okay.  All right.  Thank you.  I have completed my cross

19   now.

20        THE COURT:  Redirect?

21        MS. POURCIAU:  Court's indulgence.

22                  REDIRECT EXAMINATION

23   BY MS. POURCIAU:

24   Q.  Mr. Hoffman, as an incarcerated person, do you have access

25   to your medical records?

First Transcript

1     A.   I do not.

2     Q.   On cross-examination, you were asked about whether you've

3     sought treatment for your PTSD.  Have you used your meditation

4     to cope with your PTSD over the past 20 years?

5     A.   Yes.

6     Q.   For your breathing meditation, is it essential that you

7     breathe in oxygen?

8     A.   Yes.

9     Q.   So if you are breathing in nitrogen without any oxygen,

10    you will not be able to conduct your breathing meditation.

11    Isn't that true?

12           **MS. TOMENY:**  Your Honor, I would object that that

13    mischaracterizes his prior testimony.

14           **THE COURT:**  Overruled.  He can clarify.

15    **BY MS. POURCIAU:**

16    Q.   You can answer the question.  Do you want me to repeat it?

17    A.   Yes.

18    Q.   If you are breathing in pure nitrogen without any oxygen,

19    would you be able to conduct your breathing meditation

20    practices?

21    A.   No.

22    Q.   So if a mask is put on you and pure nitrogen is pumped

23    into it, at that point, will you be able to meditate?

24    A.   No.

25    Q.   Do you believe the firing squad would substantially reduce

1  your pain compared to nitrogen gassing?

2  A.  Yes.

3  Q.  Do you believe that the MAID, medical-aid-in-dying, would

4  substantially reduce your pain as compared to nitrogen gassing?

5  A.  Yes.

6        **MS. POURCIAU:**  No further questions, Your Honor.

7        **THE COURT:**  Okay.  Mr. Hoffman, you may step down,

8  sir.

9        **THE DEFENDANT:**  Thank you.

10        **THE COURT:**  Plaintiffs should call their next

11  witness, please.

12        **MS. POURCIAU:**  Your Honor, plaintiffs call Michaela

13  Bono.

14        **THE COURT:**  Ms. Bono, right up here, please.

15      **(OATH ADMINISTERED.)**

16        **THE CLERK:**  If you would state your name and spell it

17  for the record.

18        **THE WITNESS:**  Michaela Bono, M-I-C-H-A-E-L-A B-O-N-O.

19                **MICHAELA BONO,**

20  **having first been duly sworn, testified as follows:**

21                **DIRECT EXAMINATION**

22  BY MS. POURCIAU:

23  Q.  Reverend Michaela, could you please introduce yourself to

24  the Court.

25  A.  My name is Reverend Michaela Bono.  I am a Zen Buddhist

1    priest.

2    Q.   Where do you currently reside?

3    A.   I currently reside in mid state New York.

4    Q.   Do you live there with a family?

5    A.   I live there with my husband and my 3-year-old daughter.

6    Q.   Is this your first time in Louisiana?

7    A.   No, it is not.

8    Q.   Did you go to college here?

9    A.   Yes, I went to Loyola University in New Orleans.

10   Q.   When did you graduate?

11   A.   I graduated in May of 2006.

12   Q.   What was your senior year of college like at Loyola?

13   A.   A few days before my senior year of college, Hurricane

14   Katrina hit and classes were cancelled, so I decided to move to

15   a Buddhist monastery at that time.

16   Q.   Why did you choose to move to a Buddhist monastery?

17   A.   I had been practicing medication a little bit and learning

18   more about Buddhism at that time, and I was really interested

19   in deepening my studies and moving to a location where that's

20   the full-time focus.

21   Q.   And briefly, I know this is a big question, but what is

22   Buddhism?

23   A.   Buddhism is one of the world's major religions, originated

24   about 2500 years ago in India.  We follow the teachings of what

25   you would call the historical Buddha, and there are three

1    branches that kind of spread out worldwide across Asia and the

2    entire world, but all of the disciples or all of the

3    practitioners follow kind of the mean ethical and spiritual

4    principles that were taught by the Buddha and the spiritual

5    disciplines and the teachings based largely on wisdom and

6    compassion.

7    Q.   Did you ever return to the Buddhist monastery in

8    California?

9            **MS. TOMENY:**   Your Honor, I'm going to object.

10           **THE COURT:**   I'm listening.

11           **MS. TOMENY:**   I'm going to object just on the basis of

12   relevance of Reverend Bono's testimony, given that the free

13   exercise claim was abandoned and the RLUIPA claim was dismissed

14   with prejudice yesterday in the motion to dismiss.  I'm not

15   seeing the relevancy.

16           **THE COURT:**   Ms. Pourciau, what's the relevance?

17           **MS. POURCIAU:**   As Your Honor stated, the Buddhism

18   element of Mr. Hoffman's claim is still relevant to his "as

19   applied" challenge, and Ms. Bono has studied -- excuse me,

20   Reverend Michaela has studied Buddhism with Mr. Hoffman and can

21   speak to his practices, and that is directly relevant to his

22   Eighth Amendment claim.

23           **THE COURT:**   I'm going to overrule the objection.  It

24   is relevant to the Eighth Amendment claim, and it would be

25   helpful to the trier of fact to have some background

1   understanding of Buddhism.  But if you would confine it to a

2   short -- give me a short, I hate to say it, thumbnail of the

3   religious practice so that I just have a baseline of

4   understanding.

5   **BY MS. POURCIAU:**

6   Q.  I believe I had asked did you ever return to the Buddhist

7   monastery?

8   A.  Yes, I returned after I graduated in May of 2006.

9   Q.  How long were you there for?

10  A.  I stayed there for about six years.

11  Q.  Did you get ordained as a priest while you were there?

12  A.  Yes, I was ordained in September of 2010.

13  Q.  Can you describe what you had to do to become ordained?

14  A.  Sure.  You commit to living at the monastery full-time for

15  five years, doing rigorous study, a lot of meditation, silence,

16  communal life, and you study one-on-one with a teacher in

17  preparation to take your vows in an ordination ceremony, and

18  the vows are -- you study them deeply, and after your

19  ordination ceremony, you kind of live as a -- at the goal of

20  higher standards, kind of, than the rest of the community.

21  Q.  Did you receive anything afterward to signify that you are

22  ordained?

23  A.  Yes, I'm wearing my priest robe called a Rakusu,

24  R-A-K-U-S-U.

25  Q.  Are there any key practices that you partake in as part of

1    your process to become ordained?

2    A.   Yes.  So the number one practice in Zen Buddhism is

3    breathing meditation.  It's the fundamental way that the

4    entire -- it's the focus of the entire monastery.  So we sit

5    meditation many hours a day.  We learn scriptures that teach

6    you how to meditate.  So breathing meditation is the essential

7    practice.

8    Q.   During your years at the Buddhist monastery in California,

9    did you ever conduct prison visits?

10   A.   I did.

11   Q.   Which prison?

12   A.   San Quentin.

13   Q.   And what did you do during those prison visits?

14   A.   I participated in the Buddhist meditation group that had

15   been already in existence there for many years where the men

16   who were incarcerated there practiced meditation and walking

17   and chanting.

18   Q.   After you completed your training at the Buddhist

19   monastery, what did you do?

20   A.   I returned to New Orleans to start a Zen temple in the

21   same lineage, and it was called Mid City Zen.

22   Q.   Briefly, what was your role and responsibility at Mid City

23   Zen?

24   A.   Pretty much everything.  As the founder and director, I

25   had to do the admin.  I grew the community, I taught classes,

1    took care of the temple, brought visiting monastics and

2    teachers and was responsible for the daily schedule.

3    Q.   Did you teach meditation at Mid City Zen?

4    A.   Yes.

5    Q.   Did you teach Buddhist scripture when you were at Mid City

6    Zen?

7    A.   Yes, we had classes pretty much quarterly on things like

8    important topics in Buddhism, like the Four Noble Truths,

9    Eightfold Path, and then a lot of writings from 13th Century

10   Japan.

11   Q.   Did you do anything in addition to running Mid City Zen?

12   A.   In late 2018, I became the Buddhist Chaplain at Louisiana

13   State Penitentiary.

14   Q.   And what were you doing as the Buddhist Chaplain at

15   Louisiana State Penitentiary?

16   A.   I held classes in main prison.  I held a class of about 20

17   to 25 folks doing Buddhist medication, breathing practice, a

18   little bit of walking meditation and scripture study and kind

19   of group discussion, and then I also had a smaller group on

20   Death Row studying together.

21   Q.   Was it easy for you to get that position as the Buddhist

22   Chaplain at Louisiana State Penitentiary?

23        **MS. TOMENY:**  Excuse me, Your Honor, we will stipulate

24   to Reverend Bono's qualifications in Buddhism.

25        **MS. POURCIAU:**  All right.  That was going to be my

First Transcript

1  next proffer.  The plaintiffs tender Reverend Michaela as an

2  expert in Buddhism at this time.

3          **THE COURT:**  The Court will accept the witness as an

4  expert in Buddhist practices and Buddhism.

5          **MS. KAPPEL:**  I do want to ask a few more questions

6  about your time at the Louisiana State Penitentiary.  Was it

7  easy for you to get that position.

8  A.  It was not.  It took over a year of phone calls and a lot

9  of red tape and administrative barriers until I sort of gently

10  pushed that the right to practice all faiths should exist in

11  prison.

12  Q.  And during the time once you were admitted and practicing

13  as the Buddhist Chaplain at Louisiana penitentiary, did you

14  meet Jessie Hoffman?

15  A.  Yes.

16  Q.  Do you see him in the courtroom today?

17  A.  Yes, I do.

18  Q.  What were your initial impressions of Jessie?

19  A.  I was struck by how Jessie was very kind and calm and

20  respectful and thoughtful.  I also was impressed by his

21  meditation practices.  He was very comfortable with his

22  posture.  He really didn't need much of instruction and usually

23  I have to give a fair amount of instruction, but he was very

24  calm and still and it really impacted our group in a positive

25  way.  And it was clear that he can apply the Buddhist teachings

1    to his challenges in life, his daily situation, his mind.   That

2    really struck me too.

3    Q.  As the Buddhist Chaplain at Louisiana State Penitentiary,

4    how often were you going there?

5    A.  I was going there once a month for about a year until

6    COVID hit, and we weren't allowed back.

7    Q.  In your interactions with Jessie, did you ever learn how

8    long he had been meditating for?

9    A.  Yes.  He shared he had been meditating for about 20 years,

10   I believe.

11   Q.  Based on your interactions with Mr. Hoffman, how was he

12   practicing Buddhism?

13   A.  He was definitely practicing daily, I'm not exactly sure

14   how long per day, but he was definitely practicing the Buddhist

15   meditation every single day, and reading books, as he stated

16   earlier.

17   Q.  Is breathing an essential way of practicing Buddhism?

18   A.  Yes.  I will try to be brief, but in every sect of

19   Buddhism, breathing meditation takes some form.   In one of the

20   most revered scriptures of the Buddha called Anapanasati, it is

21   a detailed guidance on how to practice breathing meditation.   I

22   bring this up only because that detailed instruction also goes

23   on to talk about how to be mindful of your feelings, your

24   emotions, your body, how to stay calm, how to have insight.

25   And the whole fundamental -- all of that is based on the

1    breath.  The breath is the vehicle to liberation in Buddhism.

2    It is essential.  They are kind of non -- you can't really

3    tease them apart.

4    Q.  Does that breathing meditation require the ability to

5    breathe air?

6    A.  Yes.

7    Q.  Based on your interactions with Mr. Hoffman, was he a

8    committed and devout Buddhist?

9    A.  Absolutely.

10    Q.  Reverend Michaela, why are you here today?

11    A.  I learned of a warrant for Jessie's execution and that it

12    was to be done by nitrogen hypoxia, and I believe that it would

13    interfere with his ability to practice Buddhism at the end of

14    his life, so I wanted to come testify.

15    Q.  Are you being paid for your time on the stand today?

16    A.  No.

17    Q.  And how would death by nitrogen hypoxia prevent

18    Mr. Hoffman from practicing Buddhism?

19    A.  So if he is breathing in nitrogen, he is not breathing in

20    air.  So it's not necessarily the inhale and the exhale of any

21    old gas.  It's the air that nourishes your body that keeps you

22    calm that is a function of being alive and breathing.  So if

23    that is not available, he has -- he cannot put his awareness on

24    that breathing and thus cannot follow that practice.

25    Q.  Have you ever had an experience where you were prevented

1  from being able to engage in that kind of breathing meditation?

2  A.  At Mid City --

3      MS. TOMENY:  Your Honor, I'm going to object to the

4  relevancy of her own experience.

5      THE COURT:  Overruled.

6  A.  When COVID-19 hit and we had -- Mid City Zen had gone to

7  to a virtual format, we wanted to return together in person.

8  So a few of us tried to meditate with our masks on, our N95s,

9  and after, we just decided there is no way we can do this.  So

10 we actually decided to go back to virtual because we couldn't

11 breathe smoothly through that mask.

12 BY MS. POURCIAU:

13 Q.  Is it especially important to practice the breathing

14 meditation at the time of death?

15 A.  Yes.  So in Buddhism, your final moments are very

16 important, and so they -- if you have traumatic final moments,

17 they can negatively impact what's called the Bardo, which is

18 the realm between death and then your next rebirth.  So your

19 consciousness can really struggle in that realm and it can lead

20 to negative rebirth as well.

21      MS. POURCIAU:  No further questions, Your Honor.

22              CROSS-EXAMINATION

23 BY MS. TOMENY:

24 Q.  All right.  Good morning, Reverend Bono.  My name is

25 Caroline Tomeny.  I represent the state.  You don't have any

1    medical training at all, do you?

2    A.  I do not.

3    Q.  All right.  And you do not have a degree in physiology or

4    exercise science, anatomy, anything like that?

5    A.  I do not.

6    Q.  You don't have any experience with full-face respirator

7    masks, do you --

8    A.  Having worn one?

9    Q.  Just any experience.  Have you seen one?

10    A.  Yes.

11    Q.  Have you worn one?

12    A.  I have.

13    Q.  Okay.  All right.  So you have said that Mr. Hoffman's

14    Buddhist practice is breathing meditation; is that right?

15    A.  Yes.

16    Q.  All right.  And you would agree that breathing is the act

17    of inhaling and exhaling into and out of the lungs; is that

18    right?

19    A.  Yes.

20    Q.  And as long as you can inhale and exhale, you can practice

21    meditative breathing, right?

22    A.  No.  You would -- can I explain?

23              **THE COURT:**  You may.

24    A.  You would need to be breathing in air, and, you know, I

25    don't know the exact composition of air.  I know it has oxygen,

1    so you would need to be breathing air.

2    **BY MS. TOMENY:**

3    Q.  Were you aware that air also contains nitrogen?

4    A.  Yes.

5    Q.  Okay.  Are you aware of any -- can you point to any

6    Buddhist texts that say that meditative breathing requires

7    oxygen to be present?

8    A.  The word -- using the word oxygen?

9    Q.  Yes.

10   A.  I can't think of any right now, but I can certainly search

11   and get you that.

12   Q.  All right.  Now, the focus of meditative breathing is on

13   the act of breathing; is that right?

14   A.  It is actually on the breath itself coming in through the

15   nostrils all the way down to the body and then back up.  So the

16   motion and the sensation of the air is also important in

17   noticing.

18   Q.  Okay.  So if something is getting pumped into you to

19   breathe in and breathe out, you can still meditate, right?

20   A.  No.

21   Q.  No?  All right.  You mentioned earlier that you had an

22   experience where you tried to practice meditative breathing

23   while wearing an N95 mask; is that right?

24   A.  Yes.

25   Q.  When you were wearing that mask, no air was being pumped

1    into that mask; is that right?

2    A.  That's correct.

3    Q.  You were just --

4    A.  Correct, yeah.

5    Q.  Is it possible to practice meditative breathing while

6    falling asleep?

7    A.  Yes.

8    Q.  Do you have any -- you mentioned that you have worn a

9    full-face respirator mask, but do you have any familiarity

10   with -- I guess with the mask that will be used for

11   Mr. Hoffman's execution?

12   A.  I do not.

13   Q.  And do you have any familiarity with, you know, how gas

14   will be pumped into the mask?

15   A.  I understand that it would be pure nitrogen.

16   Q.  Okay.  And do you have any knowledge as to -- any

17   awareness that Mr. Hoffman may have when the nitrogen would be

18   turned on?

19   A.  I do not.

20   Q.  And do you -- do you have any information -- do you know

21   whether Mr. Hoffman would be prevented from breathing in and

22   breathing out while he is wearing the mask?

23   A.  He would be breathing in nitrogen, to my understanding.

24   Q.  Okay.  But he will be able to -- he would be breathing in

25   and out, is that right, to your knowledge?

1    A.   That's right.

2              **MS. TOMENY:**  Thank you.  I have no further questions.

3              **THE COURT:**  Redirect?

4              **MS. POURCIAU:**  No redirect, Your Honor.

5              **THE COURT:**  Thank you.  You may step down.  Do you

6    have a quick witness?  Call your next witness.  We will take a

7    break about 10:45 for a few minutes.

8              **MR. CHAN:**  Good morning, Your Honor.  Mr. Hoffman

9    calls Dr. Frederic Sautter to the stand as the next witness.

10             **THE COURT:**  You are Mr. Chan, correct?

11             **MR. CHAN:**  Yes.

12        **(OATH ADMINISTERED.)**

13             **DEPUTY CLERK:**  State your name and spell it for the

14   record.

15             **THE WITNESS:**  I'm sorry.  I didn't hear you.

16             **DEPUTY CLERK:**  Please state your name and spell it

17   for the record.

18             **THE WITNESS:**  Frederic, F-R-E-D-E-R-I-C, James,

19   J-A-M-E-S, Sautter, S-A-U-T-T-E-R, Jr.

20                     **DR. FREDERIC SAUTTER,**

21   **having first been duly sworn, testified as follows:**

22                     **DIRECT EXAMINATION**

23   **BY MR. CHAN:**

24   Q.  Good morning, can you please introduce yourself to the

25   Court.

1    A.  I'm Dr. Frederic James Sautter, Jr.

2    Q.  Where do you currently reside, Dr. Sautter?

3    A.  I live in New Orleans, Louisiana.

4    Q.  How long have you been living there?

5    A.  I've been living there for about 30 years.

6    Q.  Dr. Sautter, where did you go to college?

7    A.  As an undergraduate, I went to Bradley University.

8    Q.  Where is that?

9    A.  That is in Peoria, Illinois.

10            **MR. ROBERT:**  Excuse me.

11            **THE COURT:**  Mr. Robert?

12            **MR. ROBERT:**  Yes, Your Honor.  If this will move this

13   along, we are willing to stipulate that Dr. Sautter has

14   expertise in clinical psychology with an emphasis on PTSD.

15            **THE COURT:**  What's your tender, Mr. Chan?  What field

16   are you tendering?

17            **MR. CHAN:**  Those exact fields that Mr. Robert just

18   mentioned, as well as trauma disorders.

19            **THE COURT:**  Trauma disorders too, Mr. Robert?

20            **MR. ROBERT:**  I don't have any objection to that, Your

21   Honor.

22            **THE COURT:**  Okay.  The defendants stipulate that Dr.

23   Sautter can give opinion testimony in the fields of clinical

24   psychology with specialization in PTSD and trauma disorders.

25   The Court will recognize him as an opinion witness in those

1   fields.

2   **BY MR. CHAN:**

3   Q.  Dr. Sautter, do you know why you are here today?

4   A.  Yes, I do.

5   Q.  Why are you here?

6   A.  I'm here to testify about the psychological problems that

7   Jessie Hoffman has, has had to deal with for his life.

8   Q.  You are also here to testify about the impacts, if any, of

9   execution by nitrogen hypoxia would have on him?

10   A.  I have some ideas.

11   Q.  Okay.  So we are going to talk about mental health related

12   opinions you have about Mr. Hoffman that you previously gave on

13   two occasions.  Do you hold those opinions, as well as any

14   opinions that you give today, to a reasonable degree of medical

15   and scientific certainty?

16   A.  Definitely, yes.

17   Q.  Before we get to those opinions, can you tell us if you

18   are being paid for your time in Court today?

19   A.  Yes, I'm being paid.

20   Q.  Has that payment affected the opinions you are about to

21   give in any way?

22   A.  No.

23   Q.  Dr. Sautter, let's discuss the first time that you met

24   Mr. Hoffman.  Do you recall meeting him in 2003?

25   A.  Yes, I do.

1   Q.  Do you see Mr. Hoffman in court today?

2   A.  Yes, I do.  I'm trying to find him, but he's there.

3   Q.  Can you please describe to the Court how you first met

4   Mr. Hoffman?

5   A.  I met Mr. Hoffman because I had been hired to conduct an

6   evaluation to determine whether he had any psychological

7   problems that might have played a role in a homicide that had

8   led to him being imprisoned.

9        MR. CHAN:  Can you pull up Exhibit 20, but don't

10  publish it, and go to page 15 of Exhibit 20.

11  BY MR. CHAN:

12  Q.  Dr. Sautter, beginning on page 15 of Exhibit 20 -- of

13  Plaintiff's Exhibit 20, do you see the first page of your

14  psychological evaluation from 2003?

15  A.  I'm trying to do this thing here.

16       THE COURT:  Can he make it bigger, Suzie?  I can't

17  remember.

18       DEPUTY CLERK:  No.  Well, is it being admitted?

19       MR. CHAN:  It's about to be.

20       DEPUTY CLERK:  Well, I can't show it to the gallery.

21       MR. ROBERT:  I have no objection to it.

22       MR. CHAN:  I move for admission, Your Honor, of

23  Plaintiff's Exhibit 20.  So that there's no confusion, it is

24  only the clinical evaluation that is part of Exhibit 20, not

25  the remainder of Exhibit 20.

1          **THE COURT:**  Okay.  Exhibit 20 is admitted without

2     objection.

3          **DEPUTY CLERK:**  If that is all you are going to admit,

4     then you need to submit the portion that you are going to --

5          **THE COURT:**  Is that all you've up loaded into JERS is

6     the part that you are admitting?

7          **MR. CHAN:**  No, it is part of a larger document, but

8     we can upload a revised version that is only the admitted

9     version.

10          **THE COURT:**  Mr. Robert?

11          **MR. ROBERT:**  Your Honor, I'm stipulating to the

12     entirety of -- I mean, I'm not objecting to the admission of

13     the entirety of the 2003 report.

14          **THE COURT:**  For the rule of completeness, the Court

15     would allow that.  So the entire Exhibit 20 is admitted.

16          **MR. CHAN:**  We will accept that stipulation.

17     **BY MR. CHAN:**

18     Q.  Dr. Sautter, as part of your evaluation, can you tell us

19     what you learned about Mr. Hoffman's background?

20     A.  I learned that he came from a family where almost everyone

21     had suffered from a diagnoseable mental illness.  I learned

22     that he had been exposed to, you know, a lot of trauma, that

23     there was a lot of trauma that occurred within the family as he

24     was growing up because all of his relatives suffered from a

25     mental illness that affected their behavior, and, you know, as

1   a result, he was exposed to things that were really at times

2   life -- could threaten his life.  He was beaten.

3        You know, as has been mentioned previously, he asked to

4   get into a cage and get into small spaces or kind of

5   claustrophobic as punishment, just a lot of parenting practices

6   that would meet PTSD Criteria A really for traumatic events.

7   Q.  Do you recall how he was treated by his mother?

8   A.  He was treated terribly by his mother.  His mother really

9   did not have good parenting practices.  She would punish him in

10  ways that were cruel and just abuse him.

11  Q.  And what were the results of your assessment of

12  Mr. Hoffman during the evaluation?

13  A.  I diagnosed Mr. Hoffman with post-traumatic stress

14  disorder, and also with -- well, the name of it is psychotic

15  disorder NOS.  NOS is "not otherwise specified."  You know, he

16  was psychotic.

17  Q.  Did you get any impression one way or another as to

18  whether Mr. Hoffman was somehow faking the fact that he may

19  have had PTSD?

20  A.  A standard part of doing a psychological evaluation on a

21  legal thing like this is to, you know, do some kind of formal

22  assessment with an instrument that has been shown to be

23  reliable and valid to identify people who are malingering.  So

24  I gave one of the malingering tests, and I don't think he

25  scored a single point.

1    Q.  And just for everyone's awareness, what exactly does the

2    word "malingering" mean?

3    A.  Malingering means lying in order to look crazy.

4    Q.  Did you conclude one way or another whether Mr. Hoffman

5    was easily susceptible to panic attacks?

6    A.  Yes.  I mean, clearly he has PTSD.  So anybody with PTSD,

7    when people with PTSD are confronted with a stimuli that

8    reminds them of a traumatic event they experienced, they, you

9    know, develop increases in the symptoms of PTSD.

10    Q.  Okay.  Your 2003 evaluation, though, didn't mention

11    claustrophobia.  Does that mean that he can never develop

12    claustrophobia?

13    A.  No.

14    Q.  And why not?

15    A.  I mean, he could.  He could develop claustrophobia easily.

16    There's no reason, nothing -- no reason to think that he

17    couldn't.

18         **MR. ROBERT:**  Your Honor, I'm going to object to this

19    questioning.  He's an expert.  It's not anywhere in his

20    declaration.  It's not anywhere in his 2003 report.  He has

21    given no opinions on claustrophobia at any time prior to his

22    testimony today, and I think it's outside his scope of his

23    expertise.

24         **THE COURT:**  Did he address it in his declaration?  I

25    looked at his declaration, and I don't recall seeing

1    claustrophobia.

2         **MR. CHAN:**  Your Honor, he did not, but he was here in

3    court listening to the testimony, and we are merely asking, or

4    I'm preemptively asking why -- if it's not in his evaluation,

5    if that is going to somehow mean that he can't get

6    claustrophobia at a later time, he meaning Mr. Hoffman.

7         **THE COURT:**  But you retained him, he has examined

8    Mr. Hoffman twice, according to his report or his declaration,

9    and he has not addressed claustrophobia and he did not address

10   claustrophobia in his declaration.  So how are the defendants

11   to make a defense with no notice?

12        **MR. CHAN:**  Well, I just want to make sure that

13   there's going to be no line of questioning about, well, if he

14   didn't address it then, that necessarily means he can't have

15   claustrophobia.

16        **THE COURT:**  I will allow that one question.

17        **MR. CHAN:**  Yeah, and that's what I was getting at,

18   Your Honor.

19        **THE COURT:**  All right.  Your objection as to that

20   question is overruled, but the Court will not entertain opinion

21   testimony about claustrophobia.

22   **BY MR. CHAN:**

23    Q.  Dr. Sautter, your 2003 evaluation did not diagnose

24   Mr. Hoffman with claustrophobia.  Does that necessarily mean

25   that Mr. Hoffman can never have claustrophobia?

1    A.   No, it doesn't exclude that from happening.

2    Q.   And before we get into your next evaluation of Mr.

3    Hoffman, can you just briefly describe some symptoms of PTSD or

4    post-traumatic stress disorder?

5    A.   The symptoms of post-traumatic stress disorder are, first,

6    exposure to a traumatic event, something that has to be

7    life-threatening potentially.  The symptoms are hyperarousal,

8    which is an increase in, you know, strong negative emotions,

9    avoidance symptoms, avoidances, avoiding memories, things that

10   remind you of your trauma, reexperiencing symptoms are not so

11   much -- well, they're symptoms, but it's when a person is

12   exposed to a stimuli that reminds them of a traumatic event.

13   And when that occurs, because of Pavlovian classical

14   conditioning, there is a conditioned emotional response, and

15   with that conditioned emotional response, when a person sees

16   the stimuli that was present when they were traumatized, our

17   brains kind of automatically go to a previous time when, you

18   know, a threatening event occurred.

19        So people will see trauma reminders, and they will

20   remember the emotions and the memories that they had, the

21   cognitions that they had when a traumatic event occurred.  That

22   is called "getting triggered."

23   Q.   Dr. Sautter, let's move to your second evaluation of

24   Mr. Hoffman.  Did you meet with Mr. Hoffman on February 11th of

25   2025?

1    A.  Yes, I did.

2    Q.  And on that date, did you assess his mental health?

3    A.  Yes, I did.

4    Q.  As part of your clinical assessment, did you review any

5    records related to Mr. Hoffman between 2003 and 2025?

6    A.  No.

7    Q.  And why not?

8    A.  Well, it's standard practice with the people who are

9    involved with treating him.  And, you know, if you look at any

10   medical record, you know, there are, you know, frequent reports

11   of symptoms and problems that people are experiencing.  And,

12   you know, his clinicians that I know and -- were involved in

13   kind of managing him, are getting these reports on almost a

14   daily basis, certainly on a weekly basis, that report problems

15   that he would be experiencing.

16   Q.  And without seeing those records, did that affect your

17   ability to assess Mr. Hoffman's mental health?

18   A.  No.

19   Q.  And why not?

20   A.  Well, there's nothing to -- you know, there was no reason

21   to, you know -- I have no knowledge of anything that would

22   affect the testing, and I felt that any problem that was

23   relevant I would be able to pick up with my assessment

24   instruments.

25   Q.  And when you saw Mr. Hoffman last month, did you conduct

1  the same or substantially similar assessment to the one you did

2  in 2003?

3  A.  No.

4  Q.  And why not?

5  A.  Well, it wasn't necessary, you know.  I know the disorder

6  he has is a chronic disorder, and I know from reports that have

7  been going to his clinicians and to the team are indicating

8  that there's no big, you know, changes in terms of what kind of

9  problems he has.

10  Q.  During your clinical assessment last month, what findings

11  did you make with respect to Mr. Hoffman's mental health?

12  A.  Could you repeat that question?

13  Q.  Yeah.  During your clinical assessment last month, what

14  findings did you make with respect to Mr. Hoffman's mental

15  health?

16  A.  Well, the most dramatic thing that was rather clear was

17  that he was managing his PTSD.  So, you know, he's got a

18  chronic disorder that is, you know, very difficult to manage.

19  You know, I've treated, you know, hundreds of people with

20  post-traumatic stress disorder, and, you know, very few are

21  able to be successful in managing it to the extent that he was.

22  And, you know, I was very taken by that, and I asked him, you

23  know, how that happened.  And that's when he began telling me

24  about Buddhism and the breathing.

25  Q.  So it's your understanding that he has been able to manage

1    his PTSD through his practice of Buddhism?

2    A.  Well, at least through his practice of breathing, which he

3    tells me -- he told me that he learned that through Buddhism.

4    That was a major thing when I -- that I found out during that

5    visit.

6    Q.  Okay.  Can you educate us as to an example of a benefit of

7    gaining control or being able to manage your PTSD -- managing

8    PTSD?

9    A.  Well, when I was talking about what the symptoms of PTSD

10   are, you know, I indicated that when a person is exposed to

11   something that reminds them of their trauma, that they begin to

12   have reexperiencing symptoms, which means that their traumatic

13   event, their memory and the emotions instantly kind of flood

14   their being, and, you know, it seemed that Jessie had learned

15   to calm himself when he started to get triggered, and, you

16   know, by doing that, he's, you know, decreasing the activity of

17   his sympathetic nervous system, his panic, his fear, that are

18   the essence of what a reexperiencing symptom is.  It just gets

19   calmed down, which kind of blew my mind.  It's really amazing

20   the extent to which, you know, he has learned to adopt

21   practices that enable him to stop reexperiencing symptoms,

22   which doesn't mean that they are totally gone, but they are

23   significantly minimized.

24   Q.  So if Mr. Hoffman was able to manage his PTSD, does that

25   mean he was free and clear of PTSD?

1    A.   No.

2    Q.   And why not?

3    A.   Because -- well, for many reasons.  You know, I mentioned

4    that one of the symptoms is avoidance, and it's natural to not

5    want to be triggered.  And -- could you repeat the question?  I

6    think I'm wandering away from it.

7    Q.   Okay.  No problem.  So with Mr. Hoffman being able to

8    control his PTSD, does that mean that he was free and clear of

9    PTSD, that he was somehow cured of PTSD?

10   A.   No, because when he encounters another trauma reminder,

11   perhaps it is different, you know, he can get triggered again,

12   and that's frequently what happens.  You know, I worked for 30

13   years at the Department of Veterans Affairs treating PTSD, and

14   frequently people would have an evidence-based PTSD treatment,

15   which has become the standard called prolonged exposure

16   therapy, and, you know, people will go -- veterans will go

17   through that, will get below the diagnostic threshold for PTSD,

18   and then they will walk down the street and, you know, they

19   will hear a gunshot, and that's a trauma reminder.  And very

20   often that will start to increase those PTSD symptoms.

21        So the reexperiencing, you know, the hyperarousal,

22   feelings of discomfort.  So if they don't have a way of dealing

23   with that, basically they start reexperiencing PTSD, the

24   criteria.

25   Q.   So if Mr. Hoffman has been able to manage his PTSD, what

1  would that mean with respect to whether or not he would

2  experience panic attacks in the future?

3  A.  He can easily experience panic attacks if he sees a

4  stimuli that triggers anxiety.  You don't stop --

5  unfortunately, and that's why PTSD is so hard, because you can

6  make it better, but you can still be susceptible to getting

7  stimuli that will remind you of trauma and then kind of bring

8  back the entire syndrome, which doesn't mean that people can't

9  do it.  People do do it.  But that's one of the major things I

10 do now in my private practice.

11 Q.  So Mr. Hoffman, in your opinion, is still susceptible to

12 being triggered by traumatic memories and events?

13 A.  Yes, of course.

14 Q.  Dr. Sautter, what is your understanding as to how the

15 State of Louisiana plans to execute Mr. Hoffman?

16 A.  My understanding is that at the present time, they would

17 use the -- what is -- I'm blocking on the name.  It is

18 embarrassing.

19 Q.  You can use layman's terms to describe it.

20 A.  Nitrogen.  So they put a mask on that introduces nitrogen

21 and excludes oxygen.  Nitrogen replaces oxygen.  So as soon as

22 you get nitrogen in there, then they have less oxygen, and

23 because they have less oxygen, they die.

24 Q.  Is the term you were looking for nitrogen hypoxia?

25 A.  Yes.  Hypoxia.

1    Q.  Yeah.  Have you read the State of Louisiana's execution

2    protocol with respect to hypoxia?

3    A.  Yes, I have.

4    Q.  Have you seen pictures of the gas chamber that the State

5    is going to use?

6    A.  Yes.

7         **MR. ROBERT:**  Objection, Your Honor, to the

8    characterization of it as a gas chamber.

9         **THE COURT:**  I can make the distinction.  Thank you

10   for pointing it out.  Overruled.

11   **BY MR. CHAN:**

12   Q.  Dr. Sautter, do you recall Mr. Hoffman telling you

13   anything about his execution by nitrogen hypoxia during your

14   meeting with him last month?

15   A.  Yes, I do.

16   Q.  What do you remember from that?

17   A.  That he was scared and, you know, really kind of freaked

18   out by the idea of not being able to breathe and, you know,

19   actually started getting kind of panicky when he was talking

20   about it.

21   Q.  Well, if Mr. Hoffman has control or is able to manage his

22   PTSD, why would he get freaked out, as you said, about being

23   executed by nitrogen hypoxia?

24   A.  Because when I was using the word "getting triggered"

25   before, which is the essence of his many ways of PTSD, which

1    caused by a classical conditioned response -- it is Pavlovian

2    conditioning.  So it is actually rather simple despite the fact

3    it is so deadly.  And, you know, if he is triggered, then if he

4    is anxious, if he feels threatened, if his life is threatened,

5    certainly if he thinks he is going to die, he is going to

6    become susceptible to having some PTSD symptoms, to having

7    those reexperiencing symptoms.

8         The reexperiencing symptoms, as I mentioned, you know,

9    consist of, you know, almost reliving the emotions that you had

10   when you were traumatized, as well as having, like, you know,

11   visions of what happened, and it can really, like, take you

12   back there.

13        So -- and the Buddhist breathing techniques apparently

14   allowed him to kind of address those kinds of things when it

15   happened so that it would calm him down so he could stay away

16   from PTSD.

17   Q.  Do you have any opinion as to whether oxygen deprivation

18   would increase or decrease the likelihood of panic attacks for

19   Mr. Hoffman?

20   A.  I would think that it would, yes.

21   Q.  Do you have an opinion as to whether Mr. Hoffman would

22   reexperience traumatic events and memories and emotions if he

23   were to be executed by nitrogen hypoxia?

24   A.  Yes.  I mean, anybody -- it's really, like, standard stuff

25   in PTSD.  I don't mean to insult anybody, but it's pretty clear

1   when you have a life-threatening event, it scares the shit out

2   of you, especially if you've been previously exposed to events,

3   you know, that almost killed you.

4   Q.   Yeah.

5   A.   And you get triggered, so it comes back.

6   Q.   Okay.   What would be the impact on Mr. Hoffman of

7   reexperiencing trauma, whether it is memories or events?

8   A.   He would remember -- he would reexperience the emotions.

9   The powerful negative emotions would kind of come flooding in,

10  and he would remember the -- some of the things that he

11  associates with, you know, his first experiences, when he felt

12  those strong negative emotions, negative emotions being, like,

13  you know, being terrified.

14       To be a Criteria A, traumatic event, it has to be

15  life-threatening or it doesn't count.

16  Q.   Would reexperiencing trauma cause severe psychological

17  harm or pain and suffering?

18  A.   Well, if you have PTSD, it means you are having a total

19  relapse into PTSD, which means you are going back to

20  life-threatening events that have ruined your life.

21  Q.   Why would Mr. Hoffman reexperience trauma from execution

22  by nitrogen hypoxia if none of the trauma he experienced as a

23  child or adolescent involved choking or suffocation?

24  A.   Because it's -- when you get afraid, when you have a

25  life-threatening event, it doesn't just cause you to get

1    afraid.  It is life-threatening.  It is kind of a natural

2    response to start to choke on yourself.  I mean, that's a

3    natural response to high levels of fear and having your life

4    threatened.

5    Q.  So, in your opinion, what will execution by nitrogen

6    hypoxia do to Mr. Hoffman?

7    A.  Well, when somebody has PTSD, there is recent research

8    showing that, you know, besides the fact that you have a

9    vulnerability to getting triggered again, there is actually

10   areas in the brain that mediate the fear response, that those

11   areas maintain their sensitivity for very long periods of time.

12   They are somewhat permanent.  And those are the areas that get

13   turned on when you see something that is a trauma reminder.

14       It is simple.  It is just like Pavlov's dogs.  Everybody

15   knows about the Pavlovian experiment where they start

16   salivating because they have been classically conditioned to

17   food.  Well, he has been classically conditioned to fear and

18   fear of death.  And the things that are associated with that,

19   with fear of death, if anybody in this room started having the

20   fear of death, you would find you would start to lose your

21   breath a little bit.  I mean, it takes your breath away.

22   Q.  Is it fair to say that this is all sort of psychological

23   distress that he would experience?

24   A.  Yes.

25   Q.  And in your opinion, is psychological distress, is that

1    real pain?

2    A.   It's just the terrible emotions and losing control of your

3    emotional state, you know, which then affects your ability to

4    think logically.   You know, when we say, when somebody is

5    getting mad, "they are losing it," that's what it is.   They are

6    losing the ability to regulate their emotions and their

7    thoughts.

8    Q.   And then, finally, in your opinion, will Mr. Hoffman be

9    able to practice Buddhist breathing techniques while under

10   psychological distress?

11   A.   Yes.

12   Q.   He will be able to practice breathing techniques while

13   under psychological distress?

14   A.   Well, if he can practice the breathing, then he will be

15   able to decrease his distress, if he is able to do the

16   breathing.

17   Q.   Will he be able to do breathing while being executed by

18   nitrogen hypoxia?

19        **MR. ROBERT:**   Objection, Your Honor.   This is just

20   pure speculation.

21        **THE COURT:**   Beyond his expertise.   Sustained.

22   **BY MR. CHAN:**

23   Q.   Dr. Sautter, is it cruel to subject someone like

24   Mr. Hoffman to extreme psychological distress?

25   A.   Would you repeat the question?

1  Q.  Is it cruel to subject --

2          MR. ROBERT:  Your Honor, I object again.  I don't

3  know that his expertise extends to cruelty.

4          THE COURT:  Sustained.  It's the ultimate question.

5  Sustained.

6  BY MR. CHAN:

7  Q.  Dr. Sautter, so in your opinion, what will execution by

8  nitrogen hypoxia do to Mr. Hoffman?

9  A.  It will probably cause him to reexperience the worst

10 emotions and fear.  Terrible life events he's ever had in his

11 life will come flooding back.

12         MR. CHAN:  No further questions, Your Honor.

13         THE COURT:  Cross.

14                    **CROSS-EXAMINATION**

15 BY MR. ROBERT:

16 Q.  Good morning, Mr. Sautter.

17 A.  Good morning.

18 Q.  In 2003, you did a clinical assessment, correct?

19 A.  That's correct.

20 Q.  And during that assessment, you diagnosed Mr. Hoffman as

21 having PTSD, correct?

22 A.  That's true.

23 Q.  And there was no mention in that report whatsoever about

24 claustrophobia, correct?

25 A.  That is true.

1   Q.  And there was another psychologist at or around that time,

2   Dr. Elaine Salzar, who saw Mr. Hoffman and evaluated him.  Do

3   you recall that?

4   A.  I recall seeing that, yes.

5   Q.  Yeah.  It's in your report, isn't it?

6   A.  Pardon me?

7   Q.  It is mentioned in your 2003 report, isn't it?

8   A.  It should be.

9   Q.  Okay.  And Dr. Salzar didn't find that Mr. Hoffman had

10  PTSD, correct?

11  A.  That was her conclusion, yes.

12  Q.  That's right.  And that's in your report, correct?

13  A.  Yes.

14  Q.  And when you saw Mr. Hoffman in 2003, you didn't recommend

15  or you don't recall recommending any course of treatment for

16  him, for his PTSD, correct?

17  A.  I wasn't asked to, no.

18  Q.  Okay.  And you don't know if he ever asked anybody at

19  Louisiana State Penitentiary for any kind of mental health

20  treatment, correct?

21  A.  No, that's false.  I'm in contact with people who are --

22  you know, see the medical reports that come in on a daily

23  basis --

24  Q.  Who were you in contact with?

25  A.  I was in contact -- I hate to, like, not remember names of

1    people when I'm looking at them, but -- so I'm looking at her

2    right there, and I'm blocking on her name.  There are any

3    number of people.

4    Q.  Were you in contact with any of the mental health

5    professionals at Angola?

6    A.  Pardon?  I didn't get that.

7    Q.  Did you have any conversation or communication with any of

8    the mental health professionals at Angola about Mr. Hoffman?

9    A.  Not until this case became relevant.

10   Q.  And who did you talk to that was a mental health

11   professional that worked for Angola?

12   A.  I didn't say they worked for Angola.  I said the people

13   who would have access to be able to look at records.

14   Q.  Okay.  And what people would that be?

15   A.  One of them is the woman I'm looking -- I'm pointing --

16        **THE COURT:**  So for the record, Mr. Hoffman's lawyer,

17   one of Mr. Hoffman's lawyers.

18   A.  Yeah.

19   **BY MR. ROBERT:**

20   Q.  Did you actually review any mental health records of

21   Mr. Hoffman after 2003?

22   A.  No, I didn't.

23   Q.  Okay.  And you had had no contact and no follow-up with

24   Mr. Hoffman between the time you issued that report in 2003

25   until the time that you saw him in February of 2005, correct?

1    A.   No, that's not true.

2    Q.   Okay.  When did you have contact or communication with him

3    in that interim?

4    A.   Well, I can find out about how he is doing without coming

5    into contact with him.  I know two of the -- probably the

6    biggest experts in the world in post-traumatic stress disorder

7    who did evaluations of him, and you know, I've read those

8    evaluations.  They have more validity and reliability than any

9    observation of anybody else I know.

10   Q.   Mr. Sautter, my question was pretty simple.  My question

11   was, did you have any contact or communication with Mr. Hoffman

12   between 2003 and February of 2025?

13   A.   No, I didn't.

14   Q.   Now, after 20-plus years, you met with Mr. Hoffman again

15   in February of 2025; is that correct?

16   A.   That is true.

17   Q.   And you interviewed him at that time, correct?

18   A.   Yes.

19   Q.   And he reported to you that he was capable of

20   self-regulating his emotions, thoughts and behavior, correct?

21   A.   That's what I heard.  He didn't use those words.

22   Q.   Well, that's what you put in your declaration, isn't it?

23   A.   I put my words because I know what it means.  So if

24   somebody says they can't -- that they are increasing their

25   ability to manage their emotions and their thoughts and they're

1    having less behavioral problems, then any licensed psychologist
2    ought to know that they are beginning to get better at emotion
3    regulation because that underlies that type of thing.
4    Q.  So that's what he related to you, correct?
5    A.  He related the information that allowed me to make that
6    inference.
7    Q.  And you made that inference in your report, correct?
8    A.  I believe so.
9    Q.  Or your declaration.  I'm sorry.  I don't know if you
10   termed it a report or a declaration.
11   A.  Declaration.
12   Q.  But either one, you submitted something in connection with
13   this litigation, right?
14   A.  Yes.
15   Q.  And you also said in that declaration that his clinical
16   presentation had improved.  Isn't that correct?
17   A.  Could you repeat that?
18   Q.  You also said in your declaration that his clinical
19   presentation had improved, correct?
20   A.  Yes.
21   Q.  And you also said in your declaration that it had improved
22   through a commitment to Buddhism and Buddhist breathing
23   techniques, correct?
24   A.  That is absolutely correct, and I would still say that.
25   Q.  Now, let's talk about PTSD.  And you've given some

1   opinions on PTSD, and you say that it is likely that he will be

2   triggered, his PTSD may be triggered in this particular case.

3   A.  I said it will be.

4   Q.  Will be.  Okay.  In your declaration and on the stand

5   today, you said a hallmark symptom of PTSD is reexperiencing

6   it, right?  The trauma.

7   A.  It's a -- it's one of the symptoms.

8   Q.  So it's one of the symptoms?

9   A.  Yes.

10  Q.  And you also said in your declaration that "further trauma

11  occurs when a trauma survivor is exposed to a stimulus that

12  they associate with their trauma."  Have you said that?

13  A.  Yes.

14  Q.  Is that correct?

15  A.  That's exactly what I said.

16  Q.  Okay.  And none of the trauma, back in 2003, when you

17  wrote your report, you didn't write anything in your report

18  about Mr. Hoffman having any trauma as a result of being in

19  restraints, correct?

20  A.  No, I didn't.

21  Q.  Okay.  And you didn't put in your report anything about

22  him having any prior trauma regarding being required to breathe

23  oxygen in a mask, correct?

24  A.  Not that I recall.

25  Q.  Okay.  Now, your report in 2003 did specifically mention

1    that part of the trauma that he had previously experienced

2    involved being held at gunpoint on two occasions during an

3    armed robbery.  Do you remember that?

4    A.  No.  I believe you, though.

5    Q.  Did you put that in your report?

6    A.  I don't remember every little thing I put in the report,

7    but I believe you.

8    Q.  Okay.  But if you put it in your report, that would have

9    been one of the traumas that you noted, correct?

10    A.  It would be a traumatic event, yes, assuming that he was

11    experiencing a lot of fear when it happened.  It's the

12    emotions.

13    Q.  Right.  And if he were put in front of a firing squad and

14    had numerous guns pointed at him, that would be the kind of

15    triggering event that may trigger his PTSD, correct?

16            **MR. CHAN:**  Objection.

17            **THE COURT:**  What's the nature of your objection?

18            **MR. CHAN:**  Objection because it mischaracterizes the

19    alternative method being proffered.

20            **THE COURT:**  Do you want to respond, Mr. Robert?

21            **MR. ROBERT:**  It's my understanding that the

22    alternative method is to stand him in front of a firing squad.

23            **THE COURT:**  Overruled.  Restate your question for the

24    witness and for the Court actually.

25    **BY MR. ROBERT:**

1  Q.  So if Mr. Hoffman is placed in front of a firing squad

2  with a number of guns pointing at him, that would likely

3  trigger his PTSD, correct?

4  A.  That would depend on his emotional response.

5  Q.  Okay.  But you've sat up here today and talked about how

6  reexperiencing things that you've experienced before is

7  something that would likely trigger PTSD, didn't you?

8  A.  That's true.

9  Q.  And he previously experienced the trauma of being held at

10  gunpoint, correct?

11  A.  That's true.

12  Q.  And he related that to you in 2003, when you did your

13  report, didn't he?

14  A.  You know, the fact -- I never said that he developed PTSD

15  because he had a traumatic event that occurred when guns were

16  pointed at him.  And that's very important.

17        MR. ROBERT:  If I could have one second, Your Honor.

18  I don't know if I highlighted it, but it is in this report.

19        THE COURT:  Why don't we take a 15-minute break.  We

20  are about 20 minutes past the time that I indicated that we

21  would take a 15-minute break.  So we will be in recess for 15

22  minutes.

23        MR. ROBERT:  Thank you very much.

24        **(RECESS TAKEN AT 11:05 A.M. UNTIL 11:25 A.M.)**

25        THE COURT:  Mr. Robert, please resume.

1          **MR. ROBERT:**  Thank you, Your Honor.

2     **BY MR. ROBERT:**

3     Q.  Dr. Sautter, when we left off, we were talking about

4     traumas that Mr. Hoffman recounted to you in 2003.  Do you

5     remember that, us talking about that a few minutes ago?

6     A.  Yes, I remember.

7     Q.  Okay.  So I asked you if, in your 2003 report, you

8     recounted that he had had trauma involving being held at

9     gunpoint on two occasions during armed robberies, correct?

10    A.  Correct.

11    Q.  And you didn't remember that, correct?

12    A.  No.  I'm sorry.

13    Q.  Well, let's just go -- let's look at your report.  This is

14    page 6 of the report that you issued in 2003.  You can see on

15    your monitor --

16          **THE COURT:**  Have you got an exhibit number?

17          **MR. ROBERT:**  It's Exhibit 20, Your Honor.  I'm sorry.

18          **THE COURT:**  And it's already been admitted, correct?

19          **MR. ROBERT:**  Yes.

20          **THE COURT:**  Okay.  Proceed.

21    **BY MR. ROBERT:**

22    Q.  Let's look at the highlighted portion of that.  Okay?  And

23    I will read it to you.  You tell me if I've got it wrong.

24    A.  Okay.

25    Q.  It says, "In the violent communities in which Jessie

1    lived, gun-fire was reportedly an everyday hazard.  Jessie

2    confirms having witnessed several shootings and stabbings and

3    numerous dead bodies on the streets."  Okay?

4         I also highlighted, "In the year or so prior to the crime

5    for which he is convicted, Jessie Hoffman was robbed at

6    gunpoint twice."  Okay.  Did I read that correctly?

7    A.  Yes.

8    Q.  Okay.  So does that refresh your memory that he recounted

9    that trauma to you in 2003?

10   A.  That's true.

11   Q.  Okay.  So my question is, if he was placed in front of a

12   firing squad, isn't that the same kind of stimuli that would

13   trigger a PTSD response?

14   A.  Not necessarily.

15   Q.  No?  Why not?

16   A.  Because really it's the emotions, the emotional response

17   that you have.  It's not necessarily, you know, the picture of

18   what you see.

19   Q.  Okay.  You stated in your declaration that reliving prior

20   traumatic experiences is a trigger for PTSD.  You sat up here

21   today and you said that.  You also said, you talked about the

22   Pavlovian response.  Okay?  Something triggers in your memory

23   what happened in the past that will trigger the PTSD.  Do you

24   recall giving that testimony?

25   A.  Yes.

1    Q.   Okay.  And so you sit here today and tell me that a gun

2    being pointed at him is not something that is going to trigger

3    that response.  Is that your testimony today?

4    A.   It's one of maybe a hundred different kinds of stimuli he

5    has been exposed to that are associated with traumatic events

6    that he has lived with his entire life.  Now, those are not --

7    those are two things that happened, and they are things that

8    are expected in the neighborhood, which is not to belittle

9    them, but it's not going to be the primary stimulus that is

10   going to stay with him for the rest of his life.

11   Q.   But you just acknowledged or you will acknowledge that it

12   is at least one of the stimuli, correct?

13   A.   It is one of the stimuli that could.  I never evaluated

14   that.

15   Q.   Okay.

16        **MR. ROBERT:**  That's all the questions I have, Your

17   Honor.  I'm sorry.

18        **THE COURT:**  Redirect.

19                    **REDIRECT EXAMINATION**

20   BY MR. CHAN:

21   Q.   Dr. Sautter, good morning, again.  Is Mr. Hoffman's PTSD

22   more attributable to his childhood abuse or being robbed at

23   gunpoint?

24   A.   His diagnosis was complex PTSD.  He has had PTSD,

25   primarily first developed in response to his earlier

1    environment, and all of his symptom presentations are

2    consistent with complex PTSD, which is, you know, a form of

3    PTSD, and it increases your vulnerability later in life to

4    other trauma reminders, but it's the first trauma.  And because

5    it happens before your personality is fully developed, it's

6    like -- it becomes more than a conditioned response.  It

7    becomes part of who you are.

8    Q.  And so when you are referring to the earlier environment,

9    is that the environment that included child abuse?

10   A.  Yes.

11   Q.  Dr. Sautter, do you use breathing techniques to treat your

12   patients with PTSD?

13   A.  Yes.

14           **MR. ROBERT:**  Your Honor, I'm going to object to that

15   question.  I didn't go into any discussion of him using

16   breathing techniques in my cross-examination.  He could have

17   talked to him about that in his direct.

18           **THE COURT:**  Sustained.

19   **BY MR. CHAN:**

20   Q.  Dr. Sautter, does nitrogen hypoxia undermine Mr. Hoffman's

21   ability to use his Buddhist breathing techniques?

22           **MR. ROBERT:**  Same objection, Your Honor.

23           **THE COURT:**  Sustained.  You have to limit your

24   redirect to the scope of cross.

25   **BY MR. CHAN:**

1   Q.  Dr. Sautter, there was some discussion with opposing

2   counsel about how Mr. Hoffman's presentation had improved when

3   you saw him in February of 2025.  Do you remember that?

4   A.  Yes.

5   Q.  Despite that improved clinical presentation, does

6   Mr. Hoffman still have PTSD?

7   A.  Yes.

8   Q.  Does Mr. Hoffman, is he still susceptible to panic

9   attacks?

10  A.  Yes.

11  Q.  Triggered by an emotion of fear?

12  A.  Yes.

13  Q.  And notwithstanding that clinical -- improved clinical

14  presentation, does that mean that he won't get PTSD if he is

15  executed by nitrogen hypoxia?

16  A.  Could you repeat the question?

17  Q.  Sure.  With the improved clinical presentation, does that

18  necessarily mean that Mr. Hoffman won't get PTSD if he is

19  executed by nitrogen hypoxia?

20  A.  That doesn't matter.  No, it doesn't.  He could easily.

21          **MR. CHAN:**  No further questions.

22          **THE COURT:**  You may step down, sir.

23          **THE WITNESS:**  Thank you.

24          **THE COURT:**  Okay.  We have a noon witness.  They are

25  going to need about 15 minutes to set up this gizmo over here.

1   We can either take a lunch break now, come back at noon, that

2   makes the most sense, or take ten minutes worth of a witness.

3   If you think you have a witness you can finish by 11:45, I'm

4   willing to entertain it.

5                    **MR. STRONSKI:**  I think we should take lunch now, Your

6   Honor.

7                    **THE COURT:**  We are going to be in recess for lunch

8   until -- when can you get Dr. Capone on the video?  At straight

9   up noon?

10                    **MR. STRONSKI:**  Yes, Your Honor.

11                    **THE COURT:**  We will resume court at five minutes

12  after 12.  We will be in recess.

13          **(RECESS TAKEN AT 11:33 A.M. UNTIL 12:05 P.M.)**

14                    **THE COURT:**  The parties have agreed and the Court has

15  granted leave for the next witness to testify remotely by

16  video.  Call your next witness, please.

17                    **MS. POURCIAU:**  Mr. Hoffman calls Lawrence Lee Capone,

18  Jr.  Mr. Capone, can you unmute your microphone?

19                    **THE WITNESS:**  Yes, I can hear you.

20                    **MS. POURCIAU:**  We can hear you.  We just can't see

21  you.  There we go.  Good afternoon, Mr. Capone.  Can you please

22  introduce yourself to the Court.

23                    **THE COURT:**  We need to swear him in first.

24                    **MS. POURCIAU:**  Oh, I'm sorry.

25                    **THE COURT:**  Swear the witness in, please.

1    **(OATH ADMINISTERED.)**

2    **LAWRENCE LEE CAPONE, JR.,**

3    **having first been duly sworn, testified as follows via Zoom:**

4    **DIRECT EXAMINATION**

5    **BY MS. POURCIAU:**

6    Q.  Good afternoon, Mr. Capone.  Would you please introduce

7    yourself to the Court?

8    A.  My name is Lawrence Lee Capone, Jr.  I go by my middle

9    name, Lee.  I'm a veterinarian that is licensed to practice

10   small animal medicine in the state of Louisiana.  I've been

11   practicing for the last 45 years.

12   Q.  Can you tell the Court a little about your experience as a

13   veterinarian?

14   A.  I graduated in 1979 at LSU School of Veterinarian

15   Medicine.  I was in their third graduating class.  After

16   graduation, I went into practice in a small animal practice in

17   New Orleans, and then three years later, I opened up my own

18   veterinary practice, small animal practice in Mandeville,

19   Louisiana and named it Lakeshore Veterinary Hospital and Pet

20   Lodge.  I practiced there for over 40 years, and I just

21   recently sold it to my associate.

22   Q.  Where do you work today?

23   A.  I'm still working full-time.  I split my time between

24   Saints SPCA, which is a feline rescue in Hammond, Louisiana,

25   providing medicine and surgery.  I also practice Big Sky Care,

1  which is a Low Cost Clinic in Folsom, Louisiana, and I provide

2  spay/neuter surgery, some nonroutine surgeries and other

3  veterinary medical procedures as they need them.  And then

4  lastly, I work at the Low Cost Animal Medical Clinic in New

5  Orleans.

6  Q.  What is your experience, if any, with the use of gassing

7  suffocation on animals?

8  A.  In 1983, after I had opened my small animal practice, I

9  decided to offer my services to the local shelter, and I knew

10  that animals were being euthanized there, and they were using

11  gas euthanasia, but I really wasn't aware of how traumatic it

12  would be to witness it.

13      One particular day they were going to be doing

14  euthanasias, and they walked out the animals, young and old,

15  and began putting them in a very small concrete chamber that

16  was about maybe 15, 20 feet, about 15, 20 feet in just -- it

17  wasn't very high, maybe four feet high.  It had a metal door

18  that reminded me of kind of the doors on, like, a wood-burning

19  stove, and they just continued to shove and push animals in

20  that were conscious until they couldn't get any more in and

21  then closed the door and began gassing them.

22      And I could hear them screaming and hollering.  The sounds

23  were very loud at first, but with time, it subsided and there

24  were no longer any noises.

25  Q.  Because the animals had died?

1    A.   Yes.

2    Q.   But it wasn't nitrogen gas that was used in that instance,

3    correct?

4    A.   No, it was not.  It was carbon monoxide.  But the two

5    gases are different, but they still --

6         **MR. ROBERT:**  Your Honor, I'm going to object to him

7    opining as to the effects of the two gases.

8         **MS. POURCIAU:**  Your Honor, he is a Doctor of

9    Veterinary Medicine.  He is a doctor.  He can opine on --

10        **THE COURT:**  Did I miss the tender?

11        **MS. POURCIAU:**  I'm not tendering him as an expert,

12   but he has the -- so I am tendering him as an expert in

13   veterinary medicine.

14        **THE COURT:**  Is there any objection to the tender in

15   the field of veterinary medicine?

16        **MR. ROBERT:**  Yes.

17        **THE COURT:**  There is an objection.

18        **MS. POURCIAU:**  Your Honor, we filed a declaration by

19   the deadline the Court set on Monday at 9 a.m. with his

20   opinions.  Nothing -- and this is in his declaration.

21        **THE COURT:**  His objection is to the tender.  Do you

22   want to cross on the tender?  She needs to make a record on the

23   tender if she intends to do that, and then you can cross, but

24   what is your statement, sir?

25        **MR. ROBERT:**  My objection is the fact that he gave a

1    declaration that includes no opinions with respect to his --

2    anything regarding the veterinary medicine.  There's no

3    opinions.  It's all statements of fact in his declaration.

4    That's the basis for my objection, not necessarily that he is

5    qualified as a veterinarian.  No, I'm not objecting to that,

6    Your Honor.

7          **THE COURT:**  You may respond.

8          **MS. POURCIAU:**  So if he's not objecting to the

9    tender, then I would like to tender him as an expert in

10   veterinary medicine.

11         **THE COURT:**  He said he is objecting to the tender.

12   Just because you are an expert in your field doesn't mean that

13   you are qualified to give opinion testimony.  I think what Mr.

14   Robert is saying is that he objects to him giving opinion

15   testimony because his declaration had no opinions.

16         **MS. POURCIAU:**  Mr. Capone, through his credentials,

17   is qualified to give an answer about the difference between

18   nitrogen and gassing because he has a doctorate.  The

19   plaintiffs don't feel strongly that he needs to be tendered as

20   an expert, but on the basis of his credentials, as a fact

21   witness, even he can answer the question that he knows the

22   answer to.

23         **THE COURT:**  Mr. Robert, even if he is not tendered,

24   can he testify -- I guess it is a lay opinion at that point.  I

25   don't know that it's a lay opinion but whatever.

1    **MR. ROBERT:**  Well, if it is a lay opinion, I don't

2    know that it provides anything that is going to help the trier

3    of fact, if it is a lay opinion as to whether he thinks there's

4    -- any of us think what the effects will be if it's not

5    scientific in any way.

6         **THE COURT:**  I'm going to let him answer the question,

7    and I'm going to trust it to Mr. Robert's skilled

8    cross-examination.

9         **MS. POURCIAU:**  Just for the record, plaintiffs want

10   to make a record that we offered Mr. Capone for a deposition

11   and defendants didn't depose him.

12        **THE COURT:**  Okay.  Noted for the record.

13   **BY MS. POURCIAU:**

14   Q.  Mr. Capone, can you describe -- Dr. Capone, can you

15   describe why, even though the gas is carbon monoxide versus

16   nitrogen, they are similar in terms of the effects they would

17   have on living beings?

18   A.  I mean, I think they both deprive the animal of oxygen,

19   which leads to asphyxiation.

20   Q.  And were other states using nitrogen instead of carbon

21   monoxide at that time, if you know?

22   A.  No.  Most of them were using carbon monoxide.  I mean, at

23   that time, when I witnessed that, I knew I had to try to make a

24   change, and immediately I went to our local channels to speak

25   to the reporters to see if we could get a story, and they did,

1    and the public was just as outraged as I was because no one

2    really was aware that they were doing that.

3        I mean, in our private practices, we were using injectable

4    euthanasia, so it took some time before we got the legislation

5    changed, but I offered my services, and we stopped doing the

6    euthanasia by gas and started using injectable euthanasia.

7    Q.  Going back just a moment, what happened when the gas

8    chamber was unsealed, when you witnessed it?

9    A.  Oh, well, I mean, when they opened the chamber and began

10   retrieving the animals, most of them had sort of a horrific

11   look on their faces.  I mean, they had dilated pupils, open

12   mouths.  Some had vomited, some had defecated, some had

13   urinated.  It was pretty horrific to see it.  Some of them had

14   all of those bodily functions when they drew them out.  But as

15   I stood there and as they pulled them out and I witnessed that,

16   I mean, the only thing I was thinking of at the time was how

17   people were gassed at the concentration camps in the 1940s.

18   Q.  Does that experience of witnessing the animals be gassed

19   still impact you today?

20   A.  Oh, yes, absolutely.  I mean, it's a vivid image even now.

21   I mean, all of these years later, I still can vividly see it.

22   It was very horrific, very traumatic.  You try to suppress it,

23   but there are times when it comes back and it haunts you for a

24   long time.

25   Q.  And you mentioned you were able to get public sentiment on

1    your side to stop this practice, and then later on, eventually,

2    it became outlawed officially in Louisiana.  Why do you think

3    you were able to get people on your side so quickly, even

4    before -- and have the practice be stopped even before it was

5    officially outlawed?

6    A.   Because I think the practice of gassing was so gruesome.

7    I mean, just the thought of animals being denied of oxygen and,

8    you know, the state of the animals that I visualized when they

9    came out of that chamber, once people heard that, I think they

10   were horrified, as I was, and they didn't witness it like I

11   did.

12   Q.   What do the American Veterinarian Medical Association

13   guidelines for the euthanasia of animals say about gassing for

14   euthanizing?

15   A.   They no longer use gas as a means of euthanasia.  It's

16   only injectable.  I think it is allowed for certain species,

17   like maybe chickens and turkeys, but for mammals, it's no

18   longer advocated.  They passed legislation to no longer use gas

19   as a means of euthanasia.

20   Q.   Besides testifying today, have you done anything else to

21   express your opposition to Louisiana's decision to use gassing

22   as an execution method for Jessie Hoffman on March 18th?

23   A.   Yes, I participated with a group of veterinarians against

24   gassing humans.  We met as a small group last week at a dog

25   park in New Orleans trying to get the word out and just

1  advocate against using gas anesthesia as a means of euthanasia.

2  Based on what I saw and witnessed, we are trying to advocate

3  against it.  I mean, that --

4  Q.  Are you trying to equate the gassing of dogs and cats by

5  gassing chambers using carbon monoxide to the planned execution

6  of humans using nitrogen asphyxiation through a gas mask?

7  A.  Well, I realize the two gases are different, but I think

8  the bottom line is that they both deprive the individual or the

9  mammal -- people are mammals, and dogs and cats are mammals --

10  it deprives them of oxygen, and they asphyxiate.  They are not

11  getting the oxygen that they need.

12      **MS. POURCIAU:**  Thank you.  No further questions at

13  this time.

14      **THE COURT:**  Cross, please.

15                    **CROSS-EXAMINATION**

16  BY MR. ROBERT:

17  Q.  Dr. Capone, I'm Randy Robert, and I just have a few

18  questions for you.  I just want to follow up on a few things.

19  Now, you said you witnessed an event in 1983; is that correct?

20  A.  Yes.

21  Q.  Okay.  And you indicated and you gave a declaration in

22  connection with this case that there were animals being

23  euthanized in a 20-by-20-by-4-foot chamber, correct?

24  A.  Yes.

25  Q.  What type of an animals?

1    A.   Dogs and cats.  I didn't witness them having them

2   together, but the day I was there, it was animals -- it was

3   dogs.

4    Q.   It was dogs.  Okay.  And you said that there were a whole

5   bunch of dogs that were all herded into this 20-by-20-by-4-foot

6   room or chamber, correct?

7    A.   Yes.  I don't recall the exact number, but they tried to

8   get as many as they could into the chamber.  I mean, I don't

9   know the exact number, but it was a large number of animals

10  that they -- and I'm not -- maybe the chamber was a little bit

11  smaller.  I don't recall.

12   Q.   Well, you gave a declaration that said it was

13  20-by-20-by-4.  Do you recall signing that just about a week

14  ago?

15   A.   Yes, and I did say that, and I still believe that that was

16  the dimensions, or at least very close to the dimensions.

17   Q.   So you didn't count the animals, but they herded enough

18  animals in there just to fill up that entire area, correct?

19   A.   Yes.

20   Q.   And I would imagine that placing all of these animals into

21  one chamber all together, that would evoke a negative response

22  from them, correct?

23   A.   Yes.

24   Q.   And you didn't actually witness the event, the

25  euthanizing --

1   A.  No, there were no windows.  I didn't see animals until

2   they were removed from the chamber.

3   Q.  And it was carbon monoxide that was used, correct?

4   A.  Yes.

5   Q.  And you -- that's the only time you were ever present

6   during a situation like that where carbon monoxide was used in

7   a gas-type chamber, correct?

8   A.  Correct.

9   Q.  And you've never witnessed nitrogen being used in the

10  euthanization of any animals, correct?

11  A.  Correct.

12  Q.  Under any circumstances, correct?

13  A.  Correct.

14  Q.  Now, you stated that the law has been changed in Louisiana

15  regarding the euthanasia of animals.  Did you look at the

16  statute, before testifying today, what the statute says?

17  A.  No.

18  Q.  Okay.  Well, if I represent to you that the statute says

19  euthanasia by carbon monoxide gas chambers on cats and dogs is

20  prohibited, is that your recollection?

21  A.  Yes.

22  Q.  Now, you have not studied or tested the nitrogen system

23  that's being proposed by the state in this particular case,

24  correct?

25  A.  No, I have not.

1    Q.  And you have no personal experience with executions using

2    nitrogen, correct?

3    A.  No.

4          **MR. ROBERT:**  Thank you, Your Honor.

5          **THE COURT:**  Any redirect?

6          **MS. POURCIAU:**  No, Your Honor.  Thank you,

7    Dr. Capone.

8          **THE COURT:**  Thank you, Dr. Capone.  We are going to

9    sign off now.

10         **THE WITNESS:**  Thank you.

11         **THE COURT:**  Next witness, please.

12         **MS. POURCIAU:**  Plaintiff calls Pastor Reimoku Gregory

13   Smith.

14       **(OATH ADMINISTERED.)**

15                    **REIMOKU GREGORY SMITH,**

16   **having first been duly sworn, testified as follows:**

17                    **DIRECT EXAMINATION**

18   **BY MS. POURCIAU:**

19    Q.  Reverend Reimoku, can you please introduce yourself to the

20   Court.

21         **THE COURT:**  Can he please state and spell his name

22   for the record first because it's a little unusual.

23         **THE WITNESS:**  Yes, ma'am.  My name is Reverend

24   Reimoku Gregory Smith.  R-E-I-M-O-K-U G-R-E-G-O-R-Y S-M-I-T-H.

25   **BY MS. POURCIAU:**

1    Q.   Now, could you please introduce yourself to the Court.

2    A.   My name is Reverend Reimoku Gregory Smith.

3    Q.   And where do you live?

4    A.   I live in New Orleans.

5    Q.   How long have you lived in New Orleans?

6    A.   Since 2009.

7    Q.   How did you make your way to New Orleans?

8    A.   Well, both sides of my family are from New Orleans.  I was

9    born in New Orleans in '91.  I moved away to California when I

10   was five, and I moved back when I was 18 in 2009, and I've been

11   there ever since.

12   Q.   Where did you go to college?

13   A.   I spent my first two years of undergrad at Loyola

14   University in New Orleans, and I graduated from Tulane in 2016.

15   Q.   What religion are you?

16   A.   I am a Buddhist in the Soto Zen tradition.

17   Q.   When did your interest in Buddhism start?

18   A.   When I was a senior in high school --

19        **MS. TOMENY:**  I'm going to object again to the

20   relevancy of his testimony.  As I said before, the free

21   exercise claim was abandoned.  The RLUIPA claim was dismissed

22   with prejudice.  We heard testimony earlier this morning about

23   Buddhism.

24        **THE COURT:**  You don't have to argue your objection.

25   Just tell me what the basis of your objection is --

1          **MS. TOMENY:**  Relevance.

2          **THE COURT:**  -- which is relevance.  Okay.  It is

3    relevant -- we don't have a question yet, any kind of

4    substantive question, so I don't really know where we are

5    going.  So your objection is overruled.  There is some

6    potential relevance to the Eighth Amendment "as applied" claim.

7    Please carry on.

8    BY MS. POURCIAU:

9    Q.  When did your interest in Buddhism start?

10   A.  When I was a senior in high school in 2009, I took a class

11   called Search for Self in Contemporary Literature, and we had

12   to right a senior dissertation using a list of authors to

13   supplement our writing, and I just so happened to choose the

14   Zen Master Thich Nhat Hahn, and his books changed my life

15   forever.

16   Q.  And how did you pursue your interest in Buddhism after

17   that?

18   A.  When I started college at Loyola in 2009, I wanted to find

19   a place where I could put the philosophy I had read up until

20   that point into practice, and so I attended an orientation at

21   the New Orleans Zen Temple in 2009, and I moved in as a

22   resident in 2011.  And it's been history ever since.

23   Q.  And what do you do now to practice Buddhism?

24   A.  Well, from the perspective of Zen Buddhism, everything you

25   do is the practice, what you think, how you behave, how you

1    speak, and, of course, daily meditation.  I currently practice

2    at the Mid City Zen Center.

3    Q.  And why are you here today?

4    A.  I am here to testify on behalf of Mr. Hoffman and advocate

5    for his religious freedom.

6    Q.  Are you his spiritual advisor?

7    A.  Yes, I am.

8    Q.  Are you being paid for your time on the stand today?

9    A.  No.

10    Q.  What is your understanding of how Louisiana currently

11    plans to execute Mr. Hoffman?

12         **MS. TOMENY:**  Your Honor, can I renew my objection on

13    the basis of relevancy?  He said he is here today to ensure

14    that Mr. Hoffman's religious freedom is accommodated, and

15    again, those claims are dismissed.

16         **THE COURT:**  Respond.

17         **MS. POURCIAU:**  That was the witness' articulation,

18    but the legal relevancy is as to the "as applied" Eighth

19    Amendment challenge, and --

20         **THE COURT:**  Well, you are going to have to tie it up

21    pretty quickly because so far what we have is that he's his

22    spiritual advisor.  We don't really have anything else.  I'm

23    going to overrule the objection, but you are on a short leash.

24    **BY MS. POURCIAU:**

25    Q.  What is your understanding of how Louisiana currently

1    plans to execute Jessie?

2    A.   Through the use of nitrogen hypoxia.

3    Q.   When did you first meet Jessie?

4    A.   This past Wednesday.

5    Q.   How long was that meeting?

6    A.   Two hours.

7    Q.   What were you first impressions of Jessie?

8    A.   Jessie struck me as a calm, grounded individual who is

9    clearly very devoted to Buddhist meditation practice.

10   Q.   And what is your understanding of how Mr. Hoffman

11   practices Buddhism?

12   A.   Through the use of Anapanasati, which is awareness of the

13   breath, regular meditation, sitting meditation, walking

14   meditation and the like.

15             THE COURT:  Will you spell Anapanasati for the court

16   reporter, please, sir.

17             THE WITNESS:  Anapanasati is A-N-A-P-A-N-A-S-A-T-I.

18             THE COURT:  Is it all one word or three words?

19             THE WITNESS:  One word.

20             THE COURT:  All one word.  Go ahead.

21   BY MS. POURCIAU:

22   Q.   What is the purpose of a spiritual advisor?

23   A.   The purpose of a spiritual advisor is to provide the

24   advisee with support in their practice and to help them create

25   the conditions for peace and freedom within their current

1    circumstances.

2    Q.  And as the spiritual advisor for Jessie, do you have a

3    plan for Mr. Hoffman?

4    A.  Yes.

5    Q.  Why is the plan necessary?

6    A.  The plan is necessary because in order to become a

7    spiritual advisor, I was asked to submit a plan of care, of

8    spiritual care.

9           **MS. TOMENY:**  Your Honor, I'm going to renew my

10   relevancy objection again.

11          **MS. POURCIAU:**  May I respond?

12          **THE COURT:**  Yes.

13          **MS. POURCIAU:**  Your Honor, we are presenting Reverend

14   Reimoku because he has had a conversation recently with

15   Mr. Hoffman and came to attest as to his current state of mind

16   as to how this will impact his execution, whereas Michaela Bono

17   has not interacted with Jessie recently, and so we --

18          **THE COURT:**  You had Mr. Hoffman on the stand to

19   testify to his mental state of mind.  This Reverend -- Reverend

20   Gregory is -- I'm going to sustain the objection.

21          **MS. POURCIAU:**  Okay.  I withdraw that question.

22          **THE COURT:**  Okay.  Move ahead.

23   **BY MS. POURCIAU:**

24   Q.  Will Jessie be able to practice Buddhism if he is executed

25   by nitrogen hypoxia?

1    A.  No.

2           **MS. TOMENY:**  I'm going to object, lack -- he's not

3    here as an expert.  I don't know that he can answer that based

4    on his knowledge.

5           **THE COURT:**  I don't think you need to be an expert.

6    I mean, he is certainly a reverend in Buddhism, and he -- I'm

7    going to allow the question.

8    **BY MS. POURCIAU:**

9    Q.  Will Jessie be able to practice Buddhism if he is executed

10   by nitrogen hypoxia?

11   A.  No.

12   Q.  Why not?

13   A.  Well, according to the Zen tradition, one must be able to

14   breathe oxygen, and as it was already stated, up until the

15   point of death, the state of mind is very important.  So if a

16   gas mask were placed over his face and he was gassed with

17   nitrogen, he will not be able to breathe oxygen, thus impeding

18   his ability to sustain his practice up until the moment of

19   transition.

20          **MS. POURCIAU:**  Thank you.  No further questions.

21          **THE COURT:**  Cross?

22          **MS. TOMENY:**  No, Your Honor, no cross.

23          **THE COURT:**  Next witness.

24          **MS. BARNARD:**  Good afternoon, Your Honor.  We would

25   like to call Dr. James Williams.  This is April Barnard.

104

1          (OATH ADMINISTERED.)

2              **DEPUTY CLERK:**  Would you please state your name and

3    spell it for the record.

4              **THE WITNESS:**  James S. Williams, Stuart.  J-A-M-E-S

5    S-T-U-A-R-T  W-I-L-L-I-A-M-S.

6                         **DR. JAMES WILLIAMS,**

7    **having first been duly sworn, testified as follows:**

8                         **DIRECT EXAMINATION**

9    **BY MS. BARNARD:**

10   Q.  Would you please introduce yourself to the Court.

11   A.  James Williams, M.D.

12   Q.  Could you briefly walk us through your educational and

13   professional experience?

14   A.  I have a Master's of Science Degree in Endocrinology from

15   the University of Calgary in 1988, and a medical degree from

16   that same university in 1991.  I completed a residency at the

17   Royal Alexandra Hospital under the University of Alberta in

18   1993.  And I've been practicing medicine continuously since

19   1993.

20   Q.  What is your current position?

21   A.  I practice primarily emergency medicine.  I did a

22   combination of general medicine, intensive care medicine, and

23   emergency medicine starting in '93, became full-time ER in

24   2003, and continue to practice that today.

25          I've been the medical director of three different

1    emergency departments, including my current position in West

2    Texas, Big Lake, Texas.

3    Q.  Do you have any additional expertise that's relevant here?

4    A.  I have expertise in firearms and ballistics, and I've been

5    recognized by the International Association of Law Enforcement

6    Firearms Instructors, IALEFI, as well as ILEETA, International

7    Law Enforcement Educators and Trainers Association as such.

8    Q.  And do you believe the opinions you give today are within

9    a reasonable degree of medical certainty?

10    A.  I do.

11    Q.  Are you being paid to be here today?

12    A.  I am.

13    Q.  Has your compensation affected your opinions you are going

14    to give today?

15    A.  It has not.

16    Q.  Okay.  Briefly, could you state what your opinion is in

17    the case with respect to executing by fire squad?

18         **THE COURT:**  Is there going to be a tender?

19         **MS. BARNARD:**  Sorry?

20         **THE COURT:**  You are calling for an opinion.  Is there

21    going to be a tender?

22         **MS. BARNARD:**  May we tender him as an expert?

23         **THE COURT:**  In what field?

24         **MS. BARNARD:**  In emergency medicine and firearms.

25         **MR. ROBERT:**  No objection to that tender, Your Honor.

1          **MS. BARNARD:**  Thank you.

2          **THE COURT:**  Dr. Williams will be permitted to give

3     opinion testimony in the fields of firearms and emergency

4     medicine.

5          **MS. BARNARD:**  Thank you.

6     **BY MS. BARNARD:**

7     Q.   Briefly, could you please state your opinion in this --

8     what your opinion is in this case with respect to execution by

9     firing squad?

10    A.   I was asked to write an opinion on whether firing squad

11    execution is efficient, efficacious and relatively painless,

12    and I responded in the affirmative.

13    Q.   Did you read the declaration provided by Dr. Joseph

14    Antognini?

15    A.   I did.

16    Q.   Did anything in Dr. Antognini's declaration change your

17    opinion in this case?

18    A.   It did not.

19    Q.   Could you explain what a cardiac bundle is and why a

20    firing squad would aim for that area?

21    A.   The term is used more -- it's not strictly a medical term.

22    It's more a term used in use of deadly force, in ballistic

23    training and firearms training for law enforcement and

24    military.

25         What we are referring to is the heart, the larger organ of

1   the heart and all of its accessory structures, as well as the

2   great vessels above and around the heart, which comprise the

3   major portions of the circulatory system.

4   Q.  Based on your medical training and experience, do you have

5   an opinion as to what the immediate effect will be when the

6   bullets from a firing squad strike the cardiac vascular bundle?

7   A.  I do.  The protocols that I have offered in my report, my

8   declaration.  Primarily, the State of Utah Department of

9   Corrections protocol, as well as the United States Military

10  protocol --

11              **COURT REPORTER:**  Slow down, please.

12              **THE COURT:**  Yes.

13              **MR. ARCHERY:**  I'm sorry.  I tend to speak too fast.

14      The State of Utah Department of Corrections and the United

15  States Military protocols are both offered in my declaration.

16  These are well established and well documented in multiple

17  sources as the means of execution.

18      These have been studied in great detail.  In fact, if you

19  look at the historical record, firing squad executions have

20  been offered and utilized extensively since the at least the

21  Napoleonic wars, if not earlier, as means of military

22  execution, so there is great track record for this particular

23  method of execution being effective and relatively humane

24  compared to other methods of execution.

25  **BY MS. BARNARD:**

1    Q.  Physiologically and anatomically what happens when a

2    bullet or multiple bullets will pierce the cardiac bundle?

3    A.  The bullets used in the firing squad executions that are

4    protocols that are allowed in the United States, Utah

5    primarily, as well as military, these are military rifle

6    calibers, .30 caliber, .30 inches roughly, .308 inches.  These

7    bullets are going to be striking the individual's body at a

8    velocity of around 2800 feet per second, 4 bullets in Utah, 3

9    in South Carolina, the military provides for up to 8.

10    These bullets will strike the body with a combined energy

11    of roughly the equivalent of being struck by a 3-quarter-ton

12    fully loaded truck in about .04 seconds --

13        **THE COURT:**  I'm sorry.  You're going fast again.

14    Point what?

15    A.  I'm sorry.  .04, 4 milliseconds.

16        **THE COURT:**  .04.

17    A.  And traverse the torso of the individual.  So the bullets

18    will strike the outside of the body and then traverse through

19    the heart, unleashing tremendous destructive energy upon the

20    heart, which will literally tear the heart to pieces, the

21    structures behind that, which would include the spine, thoracic

22    spine.  In major terms, there would be other items there as

23    well.  The great vessels behind the heart, aorta and vena cava

24    would be destroyed more or less to a degree, and the bullets

25    would, in all probability, exit the posterior aspect of the

1   body.

2       This is significant destructive power which is unleashed

3   in less than a fraction of a second and would cause complete

4   cessation of all cardiac output from the moment the bullets

5   traverse the heart.

6   Q.   Can you explain a little bit about what cardiac output is?

7   A.   Certainly.   The heart supplies the oxygenated blood to the

8   entire body via the pumping of blood containing hemoglobin.

9   Oxygen is transported in the blood to the brain, to the other

10  portions of the body where it is consumed and then circulated

11  back to the heart.

12      Cardiac output simply refers to the amount of blood that

13  is being transferred with each heartbeat, the amount and the

14  force that is being ejected from the heart into the blood

15  vessels.   So some portion of that goes to the brain and is, of

16  course, required for consciousness and the ability to perceive

17  sensory input by the brain.

18  Q.   So in your expert opinion as a medical doctor, as well as

19  firearms expert, how long, in your experience, does it take

20  between being pierced by a bullet and unconsciousness?

21  A.   Well, and that's the big question, and we have to look to

22  the literature to get answers for that.   We can look to some

23  degree to anecdotal evidence, which I've done in my research

24  for these cases, but I think the most compelling argument comes

25  from a paper which I've cited in my report.   It is one of many

1    papers that have been published, but the van Rijn paper in 2011

2    was one in which rats were decapitated so that all blood flow

3    to the brain was terminated immediately.  And the researchers

4    monitored electroencephalographic data from the rat's brains to

5    determine what had happened to their -- or what did happen to

6    their brain activity after the traumatic event.

7         The conclusion of van Rijn & Associates was that three to

8    four seconds after termination of all blood flow, the rats were

9    unconscious.  We transcribe -- or we can to some degree

10    extrapolate from that paper to the human condition in the sense

11    that brains, mammalian brains of all types respond to oxygen in

12    the same manner.  The physiology is very similar.  Although the

13    size may vary, the period of latency to unconsciousness is

14    probably going to be about the same period of time.

15         We can get some corroboration of that from experiential

16    information from martial arts and law enforcement defensive

17    tactics community, where if we apply a lateral vascular neck

18    restraint, or LVNR, to the sides of the neck, cutting off

19    carotid circulation, unconsciousness occurs very rapidly in a

20    period of about 3 to 4 seconds.  I've experienced this myself

21    in my police training and defensive tactics classes where I

22    have been subjected to an LVNR and --

23              **THE COURT:**  What is an LVNR?

24    A.  I'm sorry.  I said it too quickly, Your Honor, previously.

25    Lateral vascular neck restraint.  Sleeper hold, or sometimes we

1    refer to it as a choke hold in the press.  Police don't like to
2    refer to it as a choke hold because --
3                    COURT REPORTER:  Wait.
4                    THE COURT:  Wait.  You are going too fast.  You are
5    killing the court reporter here.
6                    THE WITNESS:  Maybe if I take my shoes off, I'll slow
7    down.
8                    COURT REPORTER:  You said sleep what?
9                    THE WITNESS:  Sleeper hold.  I apologize, ma'am.
10                   THE COURT:  So you've been put in what is called a
11   sleeper hold, which you have mnemonically called LVNR, which
12   stands for?
13                   THE WITNESS:  Lateral vascular neck restraint.
14                   THE COURT:  Okay.  Now, go on from there.
15   A.   I'm sorry.  The LVNR is commonly used in martial arts and
16   law enforcement today still.  We know that people, which I've
17   experienced personally, who are subjected to a correct LVNR
18   maneuver become unconscious within a matter of a very few
19   seconds, three to four seconds, five seconds at most.  This is
20   well documented in the law enforcement literature.
21         I would further add that I have, in the course of my
22   research for this testimony, I've debriefed several medical
23   personnel from the United States Armed Forces, particularly a
24   gentleman who is a Special Forces Medic in Afghanistan who
25   witnessed multiple people at very close range being shot in the

1    heart, cardiovascular bundle, by battle bullets, battle rifles.

2    His opinion rendered to me was that when people are shot in

3    this manner, they collapse immediately.  There is little to no

4    purposeful movement after only a second, three seconds, four

5    seconds.  And this has been well established by -- or

6    corroborated, I should say, by his colleagues that I've also

7    spoken to through my various law enforcement and military

8    colleagues with whom I interact regularly.

9    Q.  So, in your opinion, just to be clear, when the blood

10   pressure drops to zero after the heart is obliterated by a

11   bullet, how long before unconsciousness?

12   A.  I would say, at most, three or four seconds.  At most,

13   five seconds, but most likely less than that.

14   Q.  And have there been any instances or studies in which an

15   individual's vitals, such as heart activity, has been monitored

16   during execution by firing squad?

17   A.  Yes, it has.  I've included in my report a newspaper

18   article published in 1938 in which physicians examined an

19   inmate in the state of Utah who was executed by a firing squad.

20   And included in that newspaper article is a photograph of an

21   enlargement of an electrocardiograph tracing of that individual

22   which shows what happened to his heart at the moment the

23   bullets struck him and in the few seconds thereafter.

24       It shows that what was left of the heart went into an

25   electrical activity called ventricular fibrillation.

First Transcript

1    Electrical activity of the heart, the impulse that we register

2    on the EKG, does not necessarily correlate the cardiac output.

3    It's simply a register of the electrical activity.

4        In the emergency department, in critical care medicine, we

5    run into people all the time -- all the time -- very frequently

6    who have electrical pulses that look like an EKG tracing, but

7    they have no cardiac output because the heart is damaged to the

8    degree that it can no longer pump blood.  So that is what we

9    presume has happened in this case.  This individual went into

10   ventricular fibrillation immediately upon being hit by the

11   bullets and ventricular fibrillation, as stated in my report,

12   is a cardiac arrhythmia which is associated with zero blood

13   flow, zero cardiac output, which I've witnessed many, many

14   times in my practice.

15   Q.   In your experience and in your practice, have you seen

16   many people come back from atrial fibrillation?

17   A.   Ventricular fibrillation you mean?

18   Q.   Yes.  Sorry.

19   A.   Yes.  We've gotten some people back from ventricular

20   fibrillation.  Usually we shock them, sometimes we give them

21   drugs and they do come back, but these are people with intact

22   hearts.  An inmate who has been shot by a firing squad is not

23   going to have an intact heart.  There will be no restoration of

24   the normal heart rhythm or cardio output.

25   Q.   In your medical experience and opinion, would an

114

1    individual executed by a firing squad experience superadded

2    pain from multiple gunshots in the chest?

3    A.  Yeah, in my --

4         MR. ROBERT:  Object, Your Honor, to any testimony as

5    to his opinions as to superadded pain.

6         THE COURT:  You're a little late.  The cat's out of

7    the bag.  Overruled.

8    A.  I'm sorry.  The question?

9    **BY MS. BARNARD:**

10   Q.  In your medical experience and opinion, would the

11   individual executed by a firing squad experience superadded

12   pain from multiple gunshot wounds to the chest?

13   A.  I'm sorry.  I didn't understand the word super --

14   Q.  Sorry.  Superadded.

15   A.  I don't understand.

16        THE COURT:  He doesn't understand the question.  I

17   think the objection was probably good.  So make another

18   question or phrase another question.

19   **BY MS. BARNARD:**

20   Q.  In your medical opinion and from your expertise, when you

21   have patients come in that have sustained gunshot wounds to the

22   chest, have they complained about pain?

23   A.  For the most -- well, actually, let me retract.  My

24   experience treating people with gunshot wounds to the chest is

25   extensive.  We see it quite a bit, and most of these wounds are

1    survivable in the hospital.  I would say it's -- I don't recall

2    a patient ever telling me that he was -- he or she was actually

3    experiencing pain in the immediate minutes after they entered

4    the ER.  I always ask people, are you hurting, are you having

5    pain, as part of my assessment of whether the individual is

6    conscious, alert, able to answer questions, so cognitively

7    intact.  Respiratory status is evaluated by them answering a

8    question.  So I'm not just asking about pain, but I'm

9    evaluating their medical status, their vital signs, in asking

10   the question.  But I learned early in my career, if I ask them

11   about pain, it gives me some clues as to what I might need to

12   be addressing in addition to the life-threatening injury

13   because pain is a crucial part of the human experience.

14        The vast majority, if not all, of the patients I've

15   treated with gunshot wounds to the chest who are able to answer

16   questions have all said to me they were not experiencing pain.

17   What they described as experiencing was a sensation of a

18   profound numbness, tingling.  The inability to describe it as

19   pain was -- is virtually a universal response, and there's good

20   physiological reasons for that.

21   Q.  Can you talk about the physiological reasons for that?

22   A.  Yes.  It has to do with the physics of terminal

23   ballistics, which I addressed in my report.  When a high

24   velocity rifle bullet strikes a target, meaning a living

25   organism, the energy that is dissipated as the bullet enters

1  the body, it radiates out from the point of impact, kind of

2  like ripples in a pond, but also, as the bullet traverses

3  through the body, the energy is dissipated on a second plane

4  horizontally from that.  So you've got two forms of directions

5  of radiation of the energy wave that passes through the body.

6      This causes soft tissue to stretch dramatically, and in

7  that stretching, the more plastic structures, such as nerves

8  and blood vessels, will be stretched to the point of sometimes

9  cellular disruption and sometimes even can cause fractures.

10 This is called the temporary cavity in terminal ballistics.

11     The temporary cavity, when it forms in soft tissue, will

12 stretch nerves to the point that they will become nonfunctional

13 or stunned for a period of hours to, in fact, a permanent

14 disability, and this tends to produce a profound numbness or

15 stunning effect that lasts for, as I said, several hours, which

16 I can also speak to personally from my own experience.

17 Q.  I was going to ask you, have you been shot, Dr. Williams?

18 A.  I was shot in the chest when I was 18 years of age.

19 Q.  Can you describe what that experience was like?

20 A.  It was unpleasant.  I received a gunshot wound just under

21 my right clavicle, which transversed my shoulder through the

22 trapezius muscle, narrowly missed the lung and the subclavian

23 artery which passes just below the clavicle by about a

24 centimeter.  As the bullet transversed through the muscle in my

25 shoulder and hit -- came to rest against the second thoracic

1    vertebra in my back.  The process was very violent.  Even

2    though it did not have the energy of a military rifle bullet,

3    it had enough energy to knock me back, and I had an immediate

4    sensation of being stunned, physically stunned, harder than any

5    tackle I had ever taken in rugby or football or any tackle I

6    had ever been given was the way I would describe it at the

7    time.

8        And I experienced nothing that I would call pain at the

9    time of the injury, nor during the time I drove myself to the

10   hospital, nor at the hospital for about three hours after the

11   injury was sustained.  I then began to experience significant

12   pain, which was treated with narcotic analgesics one time, but

13   that was the only time I received pain medicine for that.

14   Q.  And can you discuss the difference between the bullet you

15   were hit with and the bullets that would be used in the firing

16   squad protocol?

17   A.  Certainly.  I was hit with a .22 Magnum Rimfire bullet,

18   which has about 280 foot pounds of energy at the point of

19   striking, which is about 1/10th of the energy of a single

20   firing squad rifle bullet.  If we are using 5 -- 4, 5, 8 rifle

21   bullets, you multiply that accordingly.  So it was a relatively

22   trivial amount by comparison.  It was still capable of causing

23   considerable damage, and I'm very fortunate I'm alive today.

24   Q.  Regarding death by a firing squad, are you familiar with

25   any established protocols?

1    A.   I am aware of several established protocols, some more

2    familiar than others.  I've studied the Utah Protocol

3    extensively.  The published protocol, Pracey (phonetic) is in

4    my declaration.  I've also studied documents of -- the entire

5    execution policies and procedures manual is many pages long,

6    several hundred pages long.  I've also studied that.

7        The U.S. Military Protocol, I only have the basic

8    documents as published by the United States Government, but I

9    believe there is also policy manuals there.  I've studied, as

10   far as I can, obtained the South Carolina execution protocol by

11   firing squad which was instituted in large part based on the

12   State of Utah protocol.  And I have some early indications of

13   the execution protocol by a firing squad for the State of

14   Idaho, but that is still kept in close confidence by that

15   Department of Corrections, so I don't have great details.

16       I think the point that should be made here is the State of

17   Utah has a very open record of their -- the effectiveness of

18   their method of execution by firing squad going back to the

19   1870s.  There have been 43 executions by firing squad.  All

20   were successful, although two were slightly delayed by some

21   unusual events that botched the execution.

22             **MR. ROBERT:**  Your Honor, I need to object.  None of

23   this discussion is anywhere in the declaration that he gave us.

24             **MS. BARNARD:**  It's in his report that was submitted.

25             **THE COURT:**  The Utah -- 43 executions in Utah going

1    back to 1870 --

2              **MS. BARNARD:**  Oh, I'm sorry.  May we admit the Utah

3    and U.S. Army protocols that were appended to his report that

4    was submitted?

5    A.  Yes.

6              **MR. ROBERT:**  Your Honor --

7              **THE COURT:**  Okay.  The objection is sustained.  Ask

8    another question or ask your next question.

9    **BY MS. BARNARD:**

10   Q.  Is it fair to say that there are reliable, replicable and

11   effective firing squad protocols, in your opinion?

12   A.  Yes.

13   Q.  Is there a lot of variability in these protocols that you

14   have studied?

15   A.  No.

16   Q.  Dr. Antognini's declaration references the botched

17   execution of Eliseo Mares in 1951.  Do you know about that?

18   A.  I do.

19   Q.  Can you describe what happened in those circumstances?

20   A.  Yeah.  That execution was -- it's not publicly easily

21   available information, but the representation that I received

22   in the course of my research was that the individual, the

23   inmate, Mr. Mares, had offended personally some members of the

24   execution team, and the execution team members strayed from the

25   published protocol and from their instructions, and they shot

1    Mr. Mares in places other than the heart deliberately, so as to

2    cause him pain and suffering.  A second volley was then fired

3    and he was killed.

4    Q.  So then there was no accepted protocol for that particular

5    execution?

6    A.  No.  That was an abject deviation from protocol, and those

7    individuals were severely disciplined.

8    Q.  Are you aware of any other so-called botched firing squad

9    executions?

10   A.  There was an earlier one in Utah where the inmate knew, I

11   believe 1878, he knew the executioners, he assured them he

12   would not try to run away, sat in a chair, and when he heard

13   the command to fire, he jumped up and tried to run.  So they

14   missed his heart with their shots.  So he was brought back to

15   the chair and then secured and then executed.  Those were the

16   only two botched executions in Utah.

17   Q.  Is there any reason why a person that is going to be

18   executed in this way could not exercise breathing prior?

19   A.  No, absolutely not.

20   Q.  Are you aware that there's a firing squad death scheduled

21   for today?

22   A.  Yes.

23   Q.  Are you familiar with that protocol?

24   A.  I am.

25   Q.  Is it similar to the Utah and U.S. Army protocols?

First Transcript

121

1    A.   In the major details, it is, yes.

2    Q.   And do you think that these protocols would be feasible in

3    Louisiana?

4    A.   Yes.

5              **MS. BARNARD:**  That's all I have.

6              **THE COURT:**  Cross?  Before I give you up on cross, I

7    have a question because it may cause your lawyer to have to ask

8    you another question.  This LVNR, you said the sleeper hold,

9    when done properly, it will render the victim of that sleeper

10   hold unconscious in 3 to 5 seconds.  Anatomically, why is that?

11             **THE WITNESS:**  This principle involved is that there

12   are -- the two major arteries to the brain are the carotid

13   arteries, which are in the lateral neck.  And then there are

14   two minor arteries in the vertebral bodies, the vertebral

15   arteries.  But the vast majority of the blood that goes to the

16   brain to maintain function is through the carotids.  So when

17   the LVNR hold is applied, you occlude the carotids by pressing

18   them down, so temporarily stopping all blood flow.

19             **THE COURT:**  Thank you.  Do you need to ask any

20   follow-up questions?

21   **BY MS. BARNARD:**

22   Q.   So stopping all blood flow stops all oxygen from the

23   brain, and that almost immediately renders you unconscious,

24   correct?

25   A.   Yes.

First Transcript

1          **THE COURT:**  Mr. Robert, cross?

2                    **CROSS-EXAMINATION**

3     **BY MR. ROBERT:**

4     Q.  Dr. Williams, do you recall giving a -- providing a report

5     in connection with this case?

6     A.  I did.

7     Q.  Okay.  And you stated at page 3 of your report that

8     gunshot wounds may be painful in certain circumstances,

9     correct?

10    A.  Correct.

11    Q.  Okay.  And you agree that a gunshot wound would be very

12    painful if it shattered a bone, correct?

13    A.  I would qualify that by saying a long bone.

14    Q.  Okay.  And you would agree that a gunshot wound would be

15    very painful if it damaged the spinal cord, correct?

16    A.  Well, the spinal column does have bones, so yes, that

17    would be painful.

18    Q.  Okay.  And you would agree that physical pain is often

19    subjective, right?

20    A.  Absolutely.

21    Q.  So pain tolerance amongst individuals varies by person to

22    person, right?

23    A.  It does.

24    Q.  For example, you described today, you just testified on

25    the stand about being shot yourself in 1972, correct?

1    A.   Yes.

2    Q.   And you said you drove yourself to the hospital, correct?

3    A.   I did.

4    Q.   Well, you are a doctor of emergency medicine.  Is that

5    typical of people who get shot in the chest, that they drive

6    themselves to the hospital?

7    A.   I've seen even more dramatic responses.

8    Q.   That's not my question.

9    A.   Is it typical?  Moderately so, yes.

10   Q.   Okay.  And you described it as being virtually painless,

11   correct?

12   A.   Correct.

13   Q.   But you stated in your report that medical professionals

14   ask you repeatedly if you needed pain medication, correct?

15   A.   That's true.

16   Q.   So you agree that the medical professionals attending to

17   you had some concerns about your level of pain, correct?

18   A.   They did.

19   Q.   And you also would agree with me that the level of pain

20   that persons subject to a firing squad would exhibit would be

21   subject to human error, right?

22   A.   I'm not sure of what you mean by human error, sir.

23   Q.   Well, you've got shooters who are going to shoot at

24   Mr. Hoffman, and if they miss their target, it would likely

25   cause more pain, correct?

1    A.  If they missed the target and don't hit the heart, that

2    would be true, yes.

3    Q.  If they don't hit -- perfectly hit that cardiac bundle

4    that you talked about, right?

5    A.  Right.

6    Q.  And if you've done any analysis, or you didn't put it in

7    your report, you haven't done any analysis, at least not in

8    your report, of the psychological pain that this person would

9    exhibit if he stood in front of a firing squad?

10    A.  I've not offered an opinion on the psychiatry of it, no.

11    Q.  Right.  And in your report you state that an execution

12    through firing squad has occurred three times since 1977 in the

13    United States, correct?

14    A.  In the state of Utah, yes.

15    Q.  Are you aware of any other state that has done it between

16    1977 and today?

17    A.  No.  Today would be the fourth.

18    Q.  So it's three times, correct?

19    A.  Yes, sir.

20    Q.  And the last time that method was used was 2010, right?

21    A.  Yes.

22    Q.  And in order for the state to use a firing squad, they

23    would have to put forth -- get volunteers to participate,

24    correct?

25    A.  I would assume so, yes.

1   Q.   So they would have to give how many?  I think you said

2   three to five or four to -- tell me what number they would have

3   to get.

4   A.   Well, if they followed the Utah protocol, they would need

5   five shooters, plus three alternates.  That's the Utah policy.

6   Q.   All right.  And based on the protocol that you suggested,

7   those officers, who would, first of all, have to volunteer,

8   would also be publicly identified once they -- during the

9   firing squad process, correct?

10  A.   I don't know what the policy for publishing executioners'

11  names in the state of Louisiana is, sir.

12  Q.   Well, you don't have anything in your protocol about them

13  wearing hoods or their identify being withheld, correct?

14  A.   Well, I do know that in Utah, the identity of the

15  executioners is strictly held in confidence.

16  Q.   Okay.  So they don't allow witnesses to witness the

17  execution?

18  A.   The executioners, the firing squad members, are behind a

19  ballistic barrier, which is a separate portion of the execution

20  chamber.  Witnesses are on one side, execution staff is on the

21  other, and directly opposite of each other would be the

22  condemned person and the firing squad.  The firing squad people

23  are behind a ballistic barricade with a firing slip, so no one

24  can see their faces, no.

25  Q.   Sure.  But the protocol that you put in your report

1    doesn't mention anything about that, does it?

2    A.  No, I didn't mention that in my report.

3    Q.  Okay.  And you state in your report that using blanks,

4    which has been a traditional way of at least one or more guns

5    having blanks, that that really doesn't work, correct?

6    A.  No, it doesn't do much.

7    Q.  So the person doing the firing, he has got no plausible

8    deniability, correct?

9    A.  I think -- you know when you fired a blank round in a

10   rifle, sir.

11   Q.  So they have no basis, the person firing the shot, had no

12   basis to -- no, excuse me.  And you haven't done any studies on

13   the psychological impact that shooters in a firing squad would

14   suffer as a result of this method of execution, have you?

15   A.  I've done some reading on it, yes.

16   Q.  You've done some reading on it.  You didn't talk about

17   that in your report, though, did you?

18   A.  No, I did not.

19   Q.  And you, under the proposed method of execution, the --

20   Mr. Hoffman would have to be tied to a post?

21   A.  The method used in the state of Utah is to be seated in a

22   chair, restrained in a chair.  It's also what they are planning

23   to do in South Carolina.

24   Q.  So you would suggest a chair instead of a post?

25   A.  I don't suggest anything, sir.  I'm just merely stating

1    what has been done, and I provided that factual information.

2    Q.  Well, you provided us with the protocol.

3    A.  I did, but I'm not suggesting it as a proposal for the

4    state.  I'm saying this is a way it can be done.

5    Q.  And you would have to be tied down, correct?

6    A.  That would be smart, yes.

7    Q.  Yeah, because if he moves, that increases the likelihood

8    that you might miss the target and he might suffer more pain,

9    correct?

10   A.  Spot on, right.

11   Q.  And that can happen, right?

12   A.  It can.

13   Q.  Now, you summarized the Utah protocol in your report,

14   didn't you?

15   A.  I did.

16   Q.  Okay.  And under the Utah protocol, Mr. Hoffman would have

17   a bull's eye placed on his chest, right?

18   A.  He would have a paper target about four inches in diameter

19   placed on his heart, pinned to his chest, to his shirt.

20   Q.  Yeah.  And the Utah protocol provides that if the first

21   volley is unsuccessful, we go for the second volley, correct?

22   A.  That's correct.

23   Q.  So the Utah protocol at least recognizes the reality that

24   the first volley might not work, right?

25   A.  That's why it's in there, yes.

First Transcript

1    Q.  And the Army's protocol is, instead of a second volley,

2    you take a pistol and you shoot the person in the head,

3    correct?

4    A.  Yes.  The protocol that I included in my report, that's

5    what they state, yeah.

6    Q.  Okay.  So the Army's protocol indicates that the first

7    volley might not work, right?

8    A.  That's the supposition, yes.

9    Q.  And as you sit here today, you can't present any

10   scientific evidence that the protocol that you suggest will

11   result in less physical pain than the state's nitrogen hypoxia

12   protocol, correct?

13   A.  I offer no opinion on the nitrogen hypoxia method, sir.

14   Q.  Okay.  And as you sit here today, you can't present any

15   scientific evidence that your suggested protocol will result in

16   less psychological pain than the method elected by the state,

17   right?

18   A.  Again, I offered no psychological evidence.

19         **MR. ROBERT:**  Thank you, Your Honor.

20         **THE COURT:**  Any redirect?

21         **MS. BARNARD:**  We just want to make sure that the Utah

22   protocols and the Army protocols are in the record and you have

23   stipulated to that?

24         **MR. ROBERT:**  Excuse me?

25         **MS. BARNARD:**  The Utah protocol and the U.S. Army

1    protocol and the report that we submitted is in the record?

2    You've submitted to that?

3              **MR. ROBERT:**  I have no objection to that.

4              **MS. BARNARD:**  Thank you.

5              **THE COURT:**  You've not moved the admission of

6    anything.  While we are on this subject, y'all haven't moved

7    the admission of nary a thing except I think Exhibit 20.

8              **MS. POURCIAU:**  We have been corresponding over

9    e-mail, and defendants have now an outstanding request from us

10   to admit all of the party's exhibits into evidence.

11             **THE COURT:**  But you haven't done that.

12             **MS. POURCIAU:**  I know.  I'm asking.  I'm updating the

13   Court on the status of where we are in the process, and I'm

14   asking the defendants now if they are willing to do that.

15             **THE COURT:**  Mr. Stronski?

16             **MR. STRONSKI:**  Your Honor, I understand from e-mail

17   communication that I think the parties are in agreement that we

18   would stipulate to the admission of the exhibits that have been

19   filed with the court.  Is that correct?

20             **MR. CODY:**  Your Honor, I can say no.  There was some

21   discussion about it, but we have determined we are just going

22   to do it exhibit by exhibit.

23             **THE COURT:**  Okay.  Move the admission of it.  You

24   can't just ask him and then presume that it is there.

25             **MS. BARNARD:**  May I admit the report of Dr. James

130

1    Williams with the appendices attached to the report, including

2    the Utah protocol, as well as the Army protocol?

3            **DEPUTY CLERK:**  What's the number?

4            **MS. BARNARD:**  It's 15.

5            **MR. ROBERT:**  Your Honor, I'm going to object to

6    admitting the report itself because he is here on the stand and

7    he has testified.  I have no objection if she wants to admit

8    the protocols.  I have no objection to it.

9            **DEPUTY CLERK:**  P-15 is the declaration.

10           **THE COURT:**  P-15 is the entire declaration?  I would

11   sustain that objection.  The declaration is not admissible.  It

12   is hearsay.  He has testified.

13           **MS. BARNARD:**  But the appendices are, correct?

14           **THE COURT:**  You should know that, not me.  I mean, I

15   do know that, but you should know that.  Do you move the

16   admission of the appendices?

17           **MS. BARNARD:**  Yes.

18           **THE COURT:**  What is the exhibit number?

19           **MS. BARNARD:**  15.

20           **THE COURT:**  Do you have any objection to the

21   appendices only being admitted as P-15?

22           **MR. ROBERT:**  I don't, Your Honor.

23           **THE COURT:**  You do not?

24           **MR. ROBERT:**  I don't have any objection to the

25   appendices -- well, to the protocols.

1          **MS. BARNARD:**  The appendices that would include the

2    protocols, yes.

3          **THE COURT:**  Are you moving admission of all

4    appendices or only the protocols?

5          **MS. BARNARD:**  All appendices, which include his CV.

6          **THE COURT:**  Which none of the CVs have come in

7    either, people.

8          **MR. ROBERT:**  I won't object to those exhibits --

9          **THE COURT:**  The appendices, which include his CV,

10   will be admitted as Plaintiff's 15.  You will need to reupload

11   P-15 into JERS because the declaration has not been admitted.

12         **MS. BARNARD:**  That's all.

13         **THE COURT:**  You may step down.

14         **THE WITNESS:**  Thank you, Your Honor.

15         **THE COURT:**  The next witness.  We will take a break

16   at about 2.

17         **MR. STRONSKI:**  We call Dr. Blanke, Your Honor.

18         **(OATH ADMINISTERED.)**

19                        **DR. CHARLES BLANKE,**

20   **having first been duly sworn, testified as follows:**

21                        **DIRECT EXAMINATION**

22   **BY MR. STRONSKI:**

23   Q.  Good afternoon, Dr. Blanke.  Please introduce yourself to

24   the Court.

25   A.  I'm Dr. Charles David Blanke.

1    Q.   And what is your educational background?

2    A.   I was in a combined college and medical school program

3    through Northwestern University, graduating first in my class

4    from the undergraduate portion, and with distinction from the

5    medical school portion.  I did internal medicine training at

6    the Gundersen Medical Clinic, and then a fellowship in

7    hematology oncology at Indiana University in Indianapolis.

8    Q.   Okay.  And what is your current position?

9    A.   I actually hold two.  I'm a tenured professor of medicine

10   at the Knight Cancer Institute at Oregon Health & Science

11   University, and I'm the chair of the SWOG Cancer Research

12   Network.

13   Q.   Okay.  Talk slowly, please.

14   A.   That was slow.  I'll go slower.

15   Q.   What is the SWOG Institute?

16   A.   SWOG is one of four federally funded research institutions

17   that conducts cancer trials ranging from prevention to

18   treatment, population science, studies all types of diseases.

19   We have 20,000 members at more than 1300 sites in about nine

20   countries.

21   Q.   And what is your role there?

22   A.   I'm the chair, the overall leader.

23   Q.   And what exactly does it do?

24   A.   Mostly it conducts research to try and better the lives of

25   patients touched by cancer.  It does a little bit of education

1    and granting, but mostly it conducts the actual trials, designs

2    and conducts the trials.

3    Q.   And have you been involved yourself in finding new cures

4    for cancer?

5    A.   Yes, I've been doing research for more than 30 years.

6    Q.   Is there an instance where you were involved in developing

7    a drug that treated for the first time a type of stomach

8    cancer?

9    A.   Yes.   In the early 2000s, we used a drug called Imatinib

10   or Glivec in a wholly untreatable type of stomach cancer and

11   had a remission rate of nearly 90 percent.

12   Q.   Are you also -- what is your practice presently?

13   A.   My practice presently is solely devoted to end of life,

14   and the majority of that is actually medical-aid-in-dying or

15   MAID.

16   Q.   And how did you get involved in medical-aid-in-dying?

17        MR. ROBERT:  Your Honor, if we can -- if this helps,

18   I have no objection to him being tendered as an expert doctor

19   and with expertise in medical-aid-in-dying techniques.

20        THE COURT:  You want to make a tender?

21        MR. STRONSKI:  Yes, Your Honor.  We would tender Dr.

22   Blanke as an expert in medical-aid-in-dying and the drugs and

23   methods used in the field.

24        MR. ROBERT:  No objection, Your Honor.

25        THE COURT:  Okay.  Dr. Blanke will be permitted by

First Transcript

1    the Court to give opinion testimony in the fields of

2    medical-aids-in-dying and the drugs and methods for

3    medical-aids-in-dying.

4    **BY MR. STRONSKI:**

5    Q.  And Dr. Blanke, are you being paid to appear today?

6    A.  Yes, I am.

7    Q.  Has that affected your testimony?

8    A.  No, it has not.

9    Q.  And are you testifying today to at least a reasonable

10   degree of medical certainty?

11   A.  Yes, I am.

12   Q.  Do you have an opinion as to whether protocols in teaching

13   and medical-aid-in-dying could be used as a humane way of

14   executing people?

15   A.  Yes, I do.

16   Q.  And what is your opinion, Doctor?

17   A.  My opinion is the drugs used in medical-aid-in-dying would

18   offer a humane and highly effective method of execution.

19   Q.  Is there a particular protocol that you would think would

20   be appropriate?

21   A.  Yes, I would use a drug combination called DDMAPh high

22   dose.

23            **THE COURT:**  Okay.  Give us the mnemonics.

24            **THE WITNESS:**  Okay.  DDMAPh.

25            **THE COURT:**  Thank you.

1    BY MR. STRONSKI:

2    Q.  Unfortunately, it is an acronym that is hard to pronounce,

3    isn't it?

4    A.  Yes.  It doesn't actually spell out anything, so we just

5    call it DDMAPh.

6    Q.  And so tell us exactly what that is.

7    A.  So DDMAPh itself, meaning just the drugs, is a five-drug

8    combination.  It has digoxin, it has diazepam, commonly known

9    as Valium, amitriptyline, morphine, and phenobarbital.

10              THE COURT:  Teri, do you need him to spell any of

11   those?

12              COURT REPORTER:  No, ma'am.

13              THE COURT:  She's heard those before, so go ahead.

14   BY MR. STRONSKI:

15   Q.  Are any of those lethal injection drugs?

16   A.  Not to the best of my knowledge.

17   Q.  How does the protocol work?

18   A.  I'm sorry.  Do you mean how do the drugs work or how does

19   the mechanism --

20   Q.  How is it administered?

21   A.  So all state laws require using the gastrointestinal tract

22   from mouth down to the bottom in one way or the other.  Most

23   commonly people ingest the combination of drugs mixed up in

24   some apple juice and/or apple syrup by swallowing it.  If they

25   have issues that lead to difficulties in swallowing, say, a

1    bowel obstruction, whatever, we can administer it through a

2    tube placed into the rectum.

3    Q.   And you mentioned five drugs.   Tell us what those drugs

4    do.

5    A.   Certainly.   So two of the drugs are aimed at causing the

6    heart to beat irregularly and eventually to stop beating

7    altogether, a condition known as asystole.   The other three

8    drugs --

9    Q.   Let's stop.   Which of those --

10   A.   That is the digoxin and the amitriptyline.

11   Q.   Then what do the other three drugs do?

12   A.   So morphine is a potent painkiller, will also depress

13   level of consciousness to some extent.   The Valium causes

14   people to forget and also will make sure people are

15   extraordinarily sleepy or more.   And the phenobarbital

16   essentially puts them into a coma as well.

17   Q.   And what dosages of these drugs do you recommend be used?

18   A.   So the doses I recommend, the high dose variation uses

19   100 milligrams of digoxin, which is about 400 times the

20   therapeutic does.   The Valium is given at 2,000 milligrams.

21   The amitriptyline is given at 8,000 milligrams.   The morphine

22   is given at 15,000 milligrams.   And the phenobarb is given at

23   8,000 milligrams -- I'm sorry, 10,000 milligrams.   Excuse me.

24   Q.   And in your experience, is it effective in causing death?

25   A.   In my experience, it is 100 percent effective in causing

1   death.

2   Q.  Let's talk about your experience.  Among the doctors in

3   this field, how do you rate in terms of your experience?

4   A.  So because my practice is solely devoted to death aid, as

5   well as the fact that Oregon is one of only two states that

6   lets out-of-state patients, not our residents, use it, I am

7   able to sustain a clinic that is solely devoted to

8   medical-aid-in-dying.  I have participated in more than 500

9   patient deaths since the law was passed in Oregon, and I

10  believe that represents approximately 20 percent of Oregonian

11  prescriptions, and I very strongly believe I write the most of

12  any Oregonian physician.  And I'm certain I'm in the top tier

13  among U.S. physicians.

14  Q.  You mentioned a rectal administration.  Can you explain

15  it, how that would work?

16  A.  Certainly.  So again, there are patients with, say, Lou

17  Gehrig's disease or bowel obstructions from cancer who can't

18  use their mouth basically to swallow their medication, in the

19  case of rectal administration, which is becoming more common,

20  we take a rubber tube that is slightly smaller than my pinkie,

21  we lubricate it, we place it through the patient's anus a few

22  inches into the rectum, blow up a small balloon to secure it.

23  We then, or at some point similar in time, mix up the

24  medications themselves, draw up the medication into two

25  separate syringes and inject each of the syringes into that

1    catheter that I just told you about.

2    Q.   And in your experience, does that cause pain or any

3    significant discomfort to the patients?

4    A.   No, placing the catheter causes at most mild pressure, and

5    there's no abnormal sensation from the medication going in.

6    Q.   Okay.  Are the people who have reported when they take the

7    medication orally that it is bitter or tastes bad or irritates

8    the mouth or something like that?

9    A.   I would say most people report a mild level of bitterness.

10   It's never stopped anybody I know of or not any of my patients

11   from taking it.  The sensation of irritation is more variable.

12   It can occur.  It is universally very brief lived.

13   Q.   And do these drugs put a patient in a coma making them

14   insensate?

15   A.   Yes, they do.

16   Q.   And what does insensate mean in this context?

17   A.   To me, it means -- first of all, we are talking about

18   their loss of consciousness, almost like being under

19   anesthesia, but it also means that they are not feeling pain,

20   they are not feeling anxiety, they are not aware of basically

21   anything going on in their nearby environment.

22   Q.   Okay.  And there have been some criticisms of how long

23   this might take in this context.  How long would you expect it

24   to take for a person to die in using a medical-aid-in-dying

25   protocol for an execution?

1    A.   So I'll use two sources.  We have published literature on

2    all DDMAPh, the previously used lower dose and my recommended

3    high dose.  We haven't parsed out the high dose, but, of

4    course, I have my own experience of approximately 150 cases of

5    high dose administration.  So for DDMAPh across the board, the

6    average time to sleep is 5.8 minutes, and the average time to

7    death is about 96 minutes.

8    Q.   You used the word -- you said bleep?

9    A.   I hope I didn't but --

10   Q.   The average time to what?

11   A.   Oh, I'm sorry.  The average time to coma is 5.8 minutes.

12   The average time to dying is 96 minutes.

13   Q.   And before they are in a coma, what are they experiencing?

14   A.   Many of them actually talk to their families for a couple

15   of minutes, can engage with their environment fairly

16   universally -- no, I wouldn't say that.  Some experience

17   light-headedness.  Very rarely we see mild nausea or nausea.

18   Q.   Any reports for pain?

19   A.   Except for the irritation I talked about before, none.

20   Q.   Okay.  After you did your report, there was a declaration

21   from a Mr. Smith that the state has a hard time buying lethal

22   injection drugs.  Are you familiar with that?

23   A.   Yes.

24   Q.   And again, are these lethal injection drugs?

25   A.   No.

First Transcript

1   Q.  And that the State has some sort of certificates that we

2   haven't seen where they agree not to use lethal injection drugs

3   they buy from certain companies.  Is that correct?

4   A.  Yes.

5   Q.  And that the company identified was Pfizer.  Are you

6   familiar with that?

7   A.  Yes.

8   Q.  So after learning that, did you do any investigation?

9   A.  Yes.  I went to the FDA national drug coding site, which

10  lists the labeled products for use in the United States.  I

11  also have talked to the pharmacy that I personally use for my

12  medical-aid-in-dying cases.

13  Q.  And what did you learn from your investigation of publicly

14  available data on the FDA site?

15  A.  That there are many different labeled versions of each of

16  the five drugs, ranging from 8 to 14 different products.

17  Q.  Okay.  So for each of the five drugs, is it fair to say

18  there are 8 to 14 different companies that sell them?

19  A.  There might be some overlap, but I dug down a bit and

20  talked to the pharmacist, and there appear to be at least five

21  different manufacturers for each drug.

22  Q.  So in the case, for example, when you say 8, the three of

23  them -- three of those 8 might be the same manufacturer under

24  different brands?

25  A.  Correct.

1    Q.  But there are 8 different brands?

2    A.  Different labels.

3    Q.  Is that right?

4    A.  Yes.  There are multiple sources for all five drugs.

5    Q.  And is Pfizer a source of any of those drugs?

6    A.  Pfizer is under the label for digoxin.

7    Q.  And are there other suppliers besides Pfizer for digoxin?

8    A.  For digoxin specifically, there are at least six other

9    manufacturers listed.

10   Q.  And do you have a hard time getting these five drugs for

11   your practice?

12   A.  The only hard time I have is invariably the patient asks

13   if they can go to their local Walmart.  And we say, no, they

14   have to go to a special compounding pharmacy.  But the pharmacy

15   itself has not had difficulty getting any of the agents.  In

16   fact, I use several pharmacies, and none of them have

17   complained about difficulties.

18   Q.  Okay.  And roughly, what does it cost?

19   A.  $725 on a credit card.

20   Q.  Okay.  And have you, in the past, talked to the pharmacy

21   you work with about whether they would make these available for

22   execution?

23   A.  So I was involved with a previous case where that specific

24   question came up.  I asked the pharmacy if they would have any

25   objection to selling to a prison or a state, and the answer

1    was, no, they would be willing to do so.

2              **MR. STRONSKI:**  No further questions, Your Honor.

3              **THE COURT:**  Cross, please.

4                        **CROSS-EXAMINATION**

5    **BY MR. ROBERT:**

6    Q.  Dr. Blanke, let's start out with your subsequent inquiry

7    into the drugs.  What provider did you talk to that said that

8    they would be willing to allow Louisiana to use these drugs

9    that you've identified in connection with an execution?

10   A.  I did not talk to any providers.

11   Q.  Okay.  So you don't have any information that can confirm

12   that Louisiana can in fact use these drugs for executions,

13   correct?

14   A.  Could not confirm or refute it.

15   Q.  Okay.  And your discussions with providers are in

16   connection with medical-aid-in-dying, correct, in self-assisted

17   suicide, correct?

18   A.  Not correct.  It's actually no longer considered

19   suicide --

20   Q.  I understand.

21   A.  -- under the statute.

22   Q.  My apologies.  I misstated that.  Medical-aid-in-dying.

23   That is your -- the nature of your communications about being

24   able to get drugs for your patients, correct?

25   A.  That is correct.

1    Q.  And there's a difference between inquiries or the ability

2    to obtain drugs in connection with medical-aid-in-dying versus

3    executions.  You are aware of that, correct?

4    A.  I'm sorry.  I'm not actually sure what you are asking.

5    Please repeat it.

6    Q.  There is a difference between seeking or obtaining drugs

7    in your case for medical-aid-in-dying and obtaining drugs in

8    connection with executions, correct?

9    A.  I would agree they are clearly different situations.

10   Q.  That's right.  And you are aware that the method, the

11   medical-aid-in-dying process that you have assisted individuals

12   with in Oregon is prohibited in Louisiana, correct?

13   A.  I was not aware of that.

14   Q.  Okay.

15   A.  Sorry.  Do you mean medically, for medically --

16   Q.  Yes.

17   A.  Oh, yes, I am aware of that.

18   Q.  Are you aware that doctors aren't allowed to assist in

19   connection with -- or they are prohibited from assisting in

20   executions, correct?

21   A.  I was not aware of that.

22   Q.  Okay.  If they were, if that is the case, that they are

23   prohibited in Louisiana from participating in executions, that

24   would affect the ability to administer the drugs, correct?

25   A.  I don't believe so.  It's not a particularly skilled

1   administration.  It's certainly easier than lethal injection,

2   so I wouldn't see that as a major impediment.

3   Q.  So you discuss in your report that you provided to the

4   Court that medical assistance would be required in doing the

5   rectal method?

6   A.  I think there are a variety of medical personnel who can

7   put in a rectal tube, yes.

8   Q.  And you talked about nurses and physician assistants,

9   correct?

10  A.  I don't actually recall that, but I certainly believe they

11  could do it, as well as EMTs and a variety of other personnel.

12  Q.  But you don't mention EMTs in your report, do you?

13  A.  I don't recall.

14  Q.  Now, you stated on the stand and in your report that the

15  median time of consciousness is 5.8 minutes, correct?

16  A.  It's actually mean.

17  Q.  Mean?

18  A.  Correct.

19  Q.  You put median, I think, in your report.

20  A.  Incorrectly.

21  Q.  So the meantime is 5.8 minutes?

22  A.  Correct.

23  Q.  And you state that the meantime to death would be over an

24  hour and a half, correct?

25  A.  Roughly 96 minutes, yes.

First Transcript

1    Q.   But it could take longer than 96 minutes for this type of
2    application to cause death, right?
3    A.   That's correct.  It could be shorter or longer.
4    Q.   And if the person is younger, if the patient is younger,
5    that might affect the amount of time it would take to reach --
6    to die, correct?
7    A.   We actually don't know that.  There are reasons,
8    physiologically, why it might take longer, but there are
9    actually reasons, including better gut function, why it might
10   be shorter.  That is one of the things currently being
11   explored.
12   Q.   Okay.  In fact, studies have shown that it could take up
13   to 67 hours for a person to die using this method, correct?
14   A.   It's not actually the method I'm recommending per se, but
15   it is using similar drugs, yes.
16   Q.   And you haven't done any comparative analysis of the time
17   that it would take for a person to die using
18   medical-aid-in-dying drugs versus the amount of time it would
19   take for a person to die using nitrogen hypoxia, correct?
20   A.   Have I personally?
21   Q.   Yeah, right.
22   A.   I have not.
23   Q.   Okay.  Now, the method of administration, you talked about
24   two methods, right?  Orally or rectally, correct?
25   A.   Yes.

1   Q.   In your experience, all of the patients that you had have

2   been taking the medications voluntarily, right?

3   A.   Yes.

4   Q.   If a person did not want to take these medications

5   voluntarily, they might try to spit it out, correct?

6   A.   Yes, if it was done orally.

7   Q.   Right.  And they might try to not swallow, correct?

8   A.   Yes, if it was done orally.

9   Q.   And they might fight and refuse to swallow the drugs,

10  right?

11  A.   Yes.

12  Q.   So you do recognize there are issues with the oral method

13  if a person is not willingly taking it, correct?

14  A.   With the oral method, yes.

15  Q.   Okay.  Now, the rectal method, you talked about inserting

16  a tube rectally with respect to the patient, correct?

17  A.   Yes.

18  Q.   And every time that you've done that, the person was

19  willingly participating, right?

20  A.   Actually, in medical-aid-in-dying, yes, but we have used

21  rectal tubes with patients who are less voluntary for other

22  medical indications.

23  Q.   And if they are fighting it, there might be some pain

24  involved, if they are fighting you, trying to keep you from

25  putting that tube inside, correct?

147

1    A.   If they were actively fighting, there could be some brief

2    discomfort.

3    Q.   And that would be very invasive for a person who did not

4    voluntarily consent to have that done to them, right?

5    A.   Can you describe "very invasive"?

6    Q.   Well, I don't know if I need to define sticking a tube up

7    somebody's behind, whether that is invasive or not.  Do I need

8    to define that further?

9    A.   Yes, actually.  Please.

10   Q.   Well, I can't define it much further than that.

11   A.   Okay.

12   Q.   So you don't think that that is invasive?

13   A.   It's not what I would customarily think of as an invasive

14   procedure.

15   Q.   Is it embarrassing?

16   A.   Again, in the cases of medical-aid-in-dying, it is not

17   embarrassing, ever.

18   Q.   Okay.  But I'm not talking about medical-aid-in-dying.

19   I'm talking about a person who is about to be executed who

20   doesn't want a tube placed up his rectum.  Would that be

21   embarrassing, do you think?

22   A.   I certainly could see how some patients would be -- sorry,

23   how some convicts would be embarrassed, yes.

24   Q.   Now, could the subject, if he didn't want to accept these

25   medications even rectally, could they attempt to expel those

1    medications?

2    A.   No.

3    Q.   Okay.  And why not?

4    A.   Because when the catheter is placed, and it could be

5    placed even involuntarily, you would inflate a small balloon

6    that keeps the catheter in place.  It blocks the medications

7    from coming back out after you have the balloon up, and you

8    clamp the tube as well.

9    Q.   So a person can fight it and try and try, but he can't get

10   it to come out, right?

11   A.   Yes.

12   Q.   But that would probably be uncomfortable, right?

13   A.   I honestly can't comment on what somebody would feel in a

14   situation.  Of course, it never happens in

15   medical-aid-in-dying.

16   Q.   Right.  In your experience, you don't have any experience

17   with that kind of circumstance, correct?

18   A.   Correct.

19   Q.   All right.  And you haven't done any comparative analysis

20   on pain with respect to an unwilling person being injected

21   with -- rectally injected with drugs versus the nitrogen

22   hypoxia method that the State is recommending, correct?

23   A.   Again, I would say the injection would be painless,

24   regardless of their willingness.  Placing a tube could be

25   different.

1    Q.  Okay.  All right.  And you are not aware of anywhere in

2    the United States where the method that you described today is

3    being used in executions, right?

4    A.  That is correct.

5         **MR. ROBERT:**  Those are my questions, Your Honor.

6         **THE COURT:**  Any redirect?

7         **MR. STRONSKI:**  Yes, just a couple, Your Honor.

8                    **REDIRECT EXAMINATION**

9    **BY MR. STRONSKI:**

10   Q.  Let me ask you about -- you've been asked about a rectal

11   tube embarrassment and pain if somebody fights.  Do you

12   remember that?

13   A.  I do.

14   Q.  Okay.  But the actual insertion of the rectal tube, is

15   there any pain with that?

16   A.  So, to be fair, I was asked if it was completely

17   involuntary.  Normally there is no discomfort.  If they were

18   fighting, I could imagine some brief pressure discomfort as

19   well.

20   Q.  And you are familiar that people are executed with lethal

21   injection in the United States?

22   A.  Yes.

23   Q.  And you have to get the drug in the body that way too,

24   right?

25   A.  That is correct, either through -- well, it could be a

1    central line, and I believe some protocols have --

2    Q.   And people, because it is IV, are not swallowing the drug,

3    correct?

4    A.   That is correct.

5    Q.   So it's a means, like rectal, if the individual is not

6    compliant, it still could be used, correct?

7    A.   That is correct.

8    Q.   How does that compare -- how does opening up a peripheral

9    line or a central line compare to inserting the rectal tube you

10   described?

11   A.   I believe placing a rectal tube would be markedly less

12   uncomfortable, when done involuntarily, than placing any kind

13   of venous access.

14   Q.   Okay.  I just want to clear something up.  You were asked

15   about an instance where somebody took 67 hours to die.  Do you

16   remember that?

17   A.   I do.

18   Q.   Okay.  That's not your protocol, correct?

19   A.   We don't know for sure because it was a mix, but the

20   overwhelming percentage of the cases used in those figures were

21   standard dose DDMAPh.  I used a higher dose, and I have a much

22   shorter mean and a shorter outlier for that matter as well.

23   Q.   I'm sorry.  I guess I asked an unclear question.  That

24   number is not based on the high dose DDMAPh regimen that you

25   are recommending here, correct?

1    A.  That is correct.

2              MR. STRONSKI:  No further questions, Your Honor.

3              THE COURT:  Thank you, Dr. Blanke.  You may step

4    down.

5              THE WITNESS:  Thank you very much.

6              THE COURT:  We will take a 15-minute recess.  Before

7    we do, let's talk about what we have left.  It looks to me like

8    we have, at the most, four witnesses left.  Two by the

9    plaintiffs and two by the defendants?

10              MR. STRONSKI:  We have three witnesses.

11              THE COURT:  You have three and the defendants have

12    two?

13              MR. CODY:  Two, Your Honor.

14              THE COURT:  Okay.  Well, let's take a 15-minute

15    recess.

16         (RECESS TAKEN AT 1:48 P.M. UNTIL 2:09 P.M.)

17              THE COURT:  Just so you all know, the next break will

18    be at 3:15 because we are going to change out court reporters,

19    and it will take the next court reporter a few minutes to set

20    up her equipment.  The next witness?  Hello, next witness.

21              COURT REPORTER:  State your name, please.

22              MS. HALSTEAD:  My name is Ellen Halstead.  I

23    represent the plaintiff.  We are calling Seth Smith, please.

24         (OATH ADMINISTERED.)

25              DEPUTY CLERK:  Would you pleases state your name and

1    spell it for the record.

2            **THE WITNESS:**  Sure.  Seth, S-E-T-H, Henry, H-E-N-R-Y,

3    Smith, S-M-I-T-H, Jr.

4                    **SETH HENRY SMITH, JR.,**

5    **having first been duly sworn, testified as follows:**

6                    **DIRECT EXAMINATION**

7            **MS. HALSTEAD:**  I apologize, Your Honor.  If you could

8    give me a minute, please.

9    **BY MS. HALSTEAD:**

10   Q.  Good afternoon, Mr. Smith.

11   A.  Good afternoon.

12           **MS. HALSTEAD:**  Your Honor, I have what's been marked

13   as Plaintiff's Exhibit 1 for identification.

14           **THE COURT:**  Okay.  You can put it on, but it's not

15   going to be published until it is admitted.

16           **MS. HALSTEAD:**  May I show it to the witness.

17           **THE COURT:**  You may.  She is going to put it on for

18   you, but you have got to publish it from your counsel table,

19   but it is on just the witness monitor.

20           **MS. HALSTEAD:**  Please put up the first page, please.

21   **BY MS. HALSTEAD:**

22   Q.  Mr. Smith, I'm showing what's been marked as Plaintiff's

23   Exhibit 1 for identification.

24   A.  Okay.

25   Q.  What is it?

1    A.  It is the department regulation number OPD-8 death

2    penalty.

3    Q.  Do you recognize it?

4    A.  I do.

5    Q.  How do you recognize it?

6    A.  I've reviewed it and read it.

7    Q.  Is this a fair and accurate representation of the

8    regulation?

9    A.  That is the regulation.

10         **MS. HALSTEAD:**  Your Honor, I move to admit

11   Plaintiff's Exhibit 1 into evidence.

12         **THE COURT:**  Any objection?

13         **MR. CODY:**  No objection, Your Honor.

14         **THE COURT:**  P-1 is admitted.

15         **MS. HALSTEAD:**  Additionally, Your Honor, I also want

16   to show the witness Plaintiff's Exhibit 3, but I do not want to

17   show it to the Court.  I just want to have it admitted into

18   evidence.  It's a copy of Plaintiff's Exhibit 1.  It's a --

19   it's an unredacted version.

20         **DEPUTY CLERK:**  Is that what you have up now?

21         **THE COURT:**  Okay.  The P-3 is the unredacted

22   regulation.  Well, why don't you get it admitted first and then

23   we will deal with how we are going to protect it.

24   **BY MS. HALSTEAD:**

25   Q.  Mr. Smith, you should be seeing -- you need to please pull

1    up Exhibit 3, please, so the witness can see it.  It should not

2    be put into open court.

3         Mr. Smith, I'm showing you what has been marked as

4    Plaintiff's Exhibit 3 for identification.  What is it?

5    A.  It is the unredacted of the same reg, OPD-8.

6    Q.  And you recognize it?

7    A.  I do.

8         **MS. HALSTEAD:**  Your Honor, I would like to move

9    Plaintiff's Exhibit 3, but I don't want to show it in open

10   court, due to the highly confidential nature.  That's

11   defendant's position.  It's not my position.

12        **MR. CODY:**  Your Honor, no objection to the admission

13   of Exhibit 3.  However, defendants do reserve the right to file

14   a motion to seal or otherwise to protect it from disclosure.

15        **THE COURT:**  If I admit it, unless it is sealed, it is

16   disclosed.  So you mean to say you want it sealed?

17        **MR. CODY:**  We do want it sealed, Your Honor.

18        **THE COURT:**  P-3 will be admitted into the record

19   under seal.  P-1 is not under seal.  Subsequent to this

20   testimony, if the plaintiffs want to argue or present a

21   subsequent motion as to why P-3 should be unsealed, they may do

22   so.  It's up to you, Mr. Cody, to protect the seal.  So what's

23   going to happen, ladies and gentlemen, is that when P-3 is

24   referenced, it will not be displayed on the screen for the

25   gallery.  It will be shown to both counsel table and to the

1    witness and to the Court.  You may proceed, ma'am.

2    **BY MS. HALSTEAD:**

3     Q.  Please pull up Plaintiff's Exhibit 1.

4           **MS. HALSTEAD:**  And Your Honor, since it is admitted

5    into evidence, we can publish.  We can show it to the

6    courtroom.

7           **THE COURT:**  Correct.

8    **BY MS. HALSTEAD:**

9     Q.  Mr. Smith, I'm going to refer to Plaintiff's Exhibit 1 as

10   the execution protocol.  Do you understand that reference?

11    A.  I do.

12    Q.  This is the current execution protocol, right?

13    A.  It's the current regulation.  The protocol is attached.

14    Q.  And it's dated February 7th, 2025, correct?

15    A.  Correct.

16    Q.  Doctors were not consulted in creating the execution

17   protocol?

18    A.  No, ma'am.

19    Q.  No medical professional was consulted in creating the

20   execution protocol?

21    A.  No, ma'am.

22    Q.  No medical professional has given input into the execution

23   protocol?

24    A.  No, ma'am.

25    Q.  Medical textbooks were not considered in creating the

1    execution protocol?

2    A.   That's correct.

3    Q.   Medical journals were not considered in creating the

4    execution protocol?

5    A.   Correct.

6    Q.   No doctor has looked at the execution protocol to make

7    sure there are adequate safeguards so that the condemned inmate

8    will not suffer pain in the execution process?

9    A.   I believe we had an expert witness that went and viewed

10   the execution process, and I'm not sure about the protocol.

11   Q.   Other than your -- the expert witness is paid, correct?

12   A.   Correct.

13   Q.   Other than your paid expert witness, no other doctor has

14   looked at the current execution protocol to make sure there are

15   adequate safeguards so that the condemned inmate will not

16   suffer pain in the execution; is that correct?

17   A.   That's correct.

18   Q.   Other than your paid expert witness, no medical

19   professional has looked at the current execution protocol to

20   make sure there are adequate safeguards so that the condemned

21   inmate will not suffer pain in the execution protocol?

22   A.   Correct.

23   Q.   The expert witness you referred to, is that Dr. Antonelli

24   (sic)?

25   A.   Correct.

First Transcript

1    Q.   Other than Dr. Antonelli (sic), no doctor has looked at

2    the current execution protocol to make sure there are adequate

3    safeguards so that the condemned inmate will not suffer torture

4    in execution; is that right?

5              THE COURT:  Just a minute.  Mr. Cody, do you have

6    something that you would like to say?

7              MR. CODY:  Just to note for the record, and this may

8    continue to happen, but Dr. Antognini is the name of the

9    expert.

10             THE COURT:  Yes, I think for the record, let's say

11   Antognini and not Antonelli because you may end up with

12   somebody not knowing who you are talking about on review or

13   whatever.  So it's Antognini.  You may proceed.

14   BY MS. HALSTEAD:

15   Q.   Other than Dr. Antognini, no medical professional has

16   looked at the current protocol to make sure there are adequate

17   safeguards so that the condemned inmate will not suffer torture

18   in the execution process?

19   A.   Correct.

20   Q.   Louisiana's nitrogen hypoxide (sic) execution protocol

21   mirrors Alabama's nitrogen hypoxide execution protocol; is that

22   right?

23   A.   It's almost exactly.  And I believe it is nitrogen hypoxia

24   in the way it's referred to in the system, in the regulation.

25   Q.   In creating the execution protocol, the Department of

1    Corrections only looked at Alabama's protocol?

2    A.   Correct.

3    Q.   The Department of Corrections did not look at any other

4    state's nitrogen hypoxia execution protocol?

5    A.   Correct.

6    Q.   Can you please turn to, in Exhibit 1, please turn to

7    attachment F, paragraph R.  Mr. Smith, I'm referring you to

8    paragraph R, subparagraph 1 of attachment F.  Do you see that

9    on the screen?

10   A.   I do.

11   Q.   And I'm going to read it.  "After the nitrogen gas is

12   introduced, it will be administered for, (1), 15 minutes, or

13   (2), five minutes following a flat-lined indication on the EKG,

14   whichever is longer, at a flow rate of 70L/minute."  Do you see

15   that?

16   A.   I do.

17   Q.   The Department of Corrections copied this 15 minutes from

18   Alabama; is that right?

19   A.   That is correct.

20   Q.   And the D.O.C. also copied the five minutes that's

21   referred to here from Alabama?

22   A.   Yes, ma'am.

23   Q.   Louisiana's statute provides that execution can take place

24   by nitrogen gas, electrocution, or lethal injection?

25   A.   Correct.

1    Q.   In determining to execute Mr. Hoffman, the Department of

2    Corrections did not consider electrocution as a method?

3    A.   Correct.

4    Q.   In determining to execute Mr. Hoffman, the D.O.C. did not

5    consider lethal injection as an execution method?

6    A.   It's not a method we could carry out.  Therefore, no.

7    Q.   The Department of Corrections did not consider using

8    medical-aid-in-dying as an execution method?

9    A.   It's not a legal method in the state of Louisiana, so no.

10    Q.   And it's the Department of Correction's position that they

11    cannot carry out a medical-aid-in-dying with a noncompliant

12    person?

13    A.   The execution isn't allowed by using that procedure, so we

14    have not looked into it at that level, but I would say that,

15    no, we couldn't.

16    Q.   The Department of Corrections is not using a firing squad

17    in Mr. Hoffman's execution?

18    A.   Correct.

19    Q.   The Department of Corrections has not reviewed other

20    states' execution protocols for a firing squad as a method of

21    execution?

22    A.   Correct.

23    Q.   The Louisiana State Penitentiary has a gun range; is that

24    correct?

25    A.   That is correct.

1   Q.   The Department of Corrections maintains a supply of
2   firearms?
3   A.   We do.
4   Q.   The Department of Corrections maintains a supply of
5   ammunition?
6   A.   Correct.
7   Q.   The Department of Corrections employs people who are
8   comfortable in using firearms?
9   A.   Absolutely.
10  Q.   The Department of Corrections employs people who are
11  trained in using firearms?
12  A.   Yes, ma'am.
13  Q.   But the Department of Corrections did not identify
14  personnel who could carry out an execution by firing squad?
15  A.   Ma'am, it's not a legal method of execution in the state
16  of Louisiana.  Therefore, we have not looked into it.
17  Q.   This is a yes or no question, Mr. Smith.
18  A.   Ask it again.
19  Q.   The Department of Corrections has not identified personnel
20  who can carry out an execution by firing squad; yes or no?
21  A.   No, ma'am.
22  Q.   Mr. Smith, Exhibit 1 refers to an execution team; is that
23  right?  And feel free if you want to look at another page.
24  A.   Yes, it does refer to an execution team.
25  Q.   There are no medical doctors on the execution team?

1    A.   Correct.

2    Q.   There are no anesthesiologists on the execution team?

3    A.   Also correct.

4    Q.   The person who will place the gas mask on Mr. Hoffman's

5    face is a corrections officer; is that correct?

6    A.   That's correct.

7    Q.   And that person does not have medical training; is that

8    correct?

9    A.   That is also correct.

10   Q.   The person who obtained the nitrogen gas that will be used

11   in Mr. Hoffman's execution does maintenance for the Louisiana

12   State Penitentiary, correct?

13   A.   Correct.

14        **MR. CODY:**  Your Honor, I just have to object.  The

15   parties agreed 15:570 would be honored as far as keeping

16   confidential the identities or information that could lead to

17   the identification of people.  When we are pinpointing specific

18   roles like this, that is when we are getting into that area.

19        **THE COURT:**  Ms. Halstead, do you want to respond?

20        **MS. HALSTEAD:**  Your Honor, I identified these two

21   people as a corrections officer and a maintenance person.  I

22   don't believe those are specific identities.

23        **THE COURT:**  Overruled.  Did he answer the question?

24        **THE WITNESS:**  I did.

25        **THE COURT:**  Okay.  Thank you.

First Transcript

1    **BY MS. HALSTEAD:**

2    Q.   And this maintenance person who obtains the nitrogen gas,

3    he also maintains the nitrogen gas system that will be used in

4    Mr. Hoffman's execution?

5    A.   Correct.

6    Q.   And this maintenance person also checks the nitrogen gas

7    flow that will be used in Mr. Hoffman's execution?

8    A.   Correct.

9    Q.   This maintenance person does not have any medical

10   training?

11   A.   Correct.

12   Q.   On the day of Mr. Hoffman's execution, after 3:00 p.m.,

13   the warden can terminate Mr. Hoffman's contact with his

14   attorneys?

15   A.   Correct.

16   Q.   On the day of Mr. Hoffman's execution, after 3:00 p.m.,

17   the warden can also terminate Mr. Hoffman's contact with his

18   religious advisor?

19   A.   I would like to see that in the regulation.  I believe the

20   verbiage is "may," but he can, yes.

21   Q.   The execution protocol is dated February 7, 2025?

22   A.   Correct.

23   Q.   The Department of Corrections obtained nitrogen gas for

24   Mr. Hoffman's execution in July of 2024?

25   A.   We obtained nitrogen at that time.  We didn't know who

1    would have the first warrant or anything, but yes, we obtained

2    nitrogen.

3    Q.  So the nitrogen gas that will be used for Mr. Hoffman's

4    execution was obtained in July of 2024; yes or no?

5    A.  Again, that's a possibly because we have obtained other

6    nitrogen since then, and some of those tanks have been

7    depleted, so I can't tell you that we are going to use that

8    bottle.

9    Q.  So, yes or no, you are telling me you don't know when the

10   nitrogen gas that will be used in Mr. Hoffman's execution was

11   obtained?

12   A.  No, I don't know.

13   Q.  The nitrogen gas that will be used in Mr. Hoffman's

14   execution is not medical grade?

15   A.  No, ma'am.

16   Q.  The nitrogen gas that will be used for Mr. Hoffman's

17   execution has not been tested to ensure that it has appropriate

18   purity levels?

19   A.  Not by us.

20   Q.  Is it the Department of Corrections' position that it's

21   not necessary to test the nitrogen gas to ensure that it has

22   the appropriate purity level?

23   A.  The nitrogen we are using is ultra high purity that comes

24   from the manufacturer at 99.99 percent.  They are responsible

25   for ensuring it is what it is.

1          **MS. HALSTEAD:**  Your Honor, I move to strike that

2    answer.

3          **MR. CODY:**  Your Honor, he fairly answered the

4    question.

5          **THE COURT:**  He did answer the question.  Overruled.

6    You can ask the question again and then ask for a yes or no,

7    but he is allowed to explain his answers.

8    **BY MS. HALSTEAD:**

9    Q.  Mr. Hoffman -- Mr. Smith, yes or no:  The Department of

10   Corrections believes it is not necessary for them to test the

11   nitrogen gas to ensure that it has the appropriate purity

12   level?

13   A.  Correct.

14   Q.  And Alabama does not test nitrogen gas to ensure that it

15   has the appropriate purity level?

16         **MR. CODY:**  Your Honor, I'm going to object to whether

17   this knowledge is even in the scope of this witness.

18         **THE COURT:**  If you know, sir.

19   A.  I honestly was going to answer that I'm not certain that

20   Alabama does or does not.  To my knowledge, they do not.

21   **BY MS. HALSTEAD:**

22   Q.  The current execution protocol is dated February 7th,

23   2025?

24   A.  Correct.

25   Q.  And the current execution protocol was not in effect in

First Transcript

1    August of 2024?

2    A.   Also correct.

3    Q.   And in August of 2024, the previous execution protocol was

4    in effect, which was dated -- is dated March 2014?

5    A.   Correct.

6    Q.   And that's the lethal injection protocol?

7    A.   Also correct.

8    Q.   And the March 2014 execution protocol does not cover

9    nitrogen hypoxide (sic)?

10   A.   No, ma'am.  Hypoxia.

11   Q.   Hypoxia.  I apologize.  But in August of 2024, the

12   execution team started training on the method that would be

13   used to execute Mr. Hoffman?

14   A.   Correct.

15   Q.   And the Department of Corrections completed work on the

16   nitrogen hypoxia system that will be used in Mr. Hoffman's

17   execution in September of 2024?

18   A.   Correct.

19   Q.   And there was no protocol for nitrogen hypoxia execution

20   in effect in August of 2024?

21   A.   There was no written protocol in effect, correct.

22   Q.   The nitrogen hypoxia protocol does not take the condemned

23   inmate's medical conditions into consideration to determine how

24   the execution will be carried out?

25   A.   No, ma'am.

1    Q.  The nitrogen hypoxia protocol does not take the condemned

2    inmate's mental condition into consideration to determine how

3    execution will be carried out?

4    A.  It is carried out the same, correct.

5    Q.  The nitrogen hypoxia protocol does not take the condemned

6    inmate's psychological condition into consideration to

7    determine how the execution will be carried out?

8    A.  There's no deviation, correct.

9    Q.  The nitrogen hypoxia protocol does not take into

10   consideration that the condemned inmate suffers from PTSD to

11   determine how the execution will be carried out?

12   A.  Again, same procedure.

13   Q.  The nitrogen hypoxia protocol does not take the condemned

14   inmate's emotional condition into consideration to determine

15   how the execution will be carried out?

16   A.  No, ma'am.

17   Q.  If the condemned inmate has a beard, the current execution

18   protocol calls for that beard to be shaven before the mask is

19   placed on his face?

20   A.  It does.

21   Q.  And even if the inmate has a beard for religious reasons,

22   the beard will be shaven before the mask is placed on his face?

23          **MR. CODY:**  Objection, Your Honor.  Objection.

24          **THE COURT:**  What is your objection?

25          **MR. CODY:**  That's not in the scope of any of this,

1    Your Honor.

2          **THE COURT:**  Not in the scope of any of this?

3    Overruled.

4          **MR. CODY:**  It's a religious claim, Your Honor, which

5    you have dismissed from this case.

6          **THE COURT:**  Yes, I understand.  Overruled.

7     A.  At this time, the protocol does read that the beard will

8    be shaven.

9    **BY MS. HALSTEAD:**

10    Q.  Thank you, Mr. Smith.  Mr. Smith, you submitted a

11    declaration in this case on March 4th, 2025?

12    A.  Correct.

13    Q.  Mr. Smith, I'm going to read paragraph 35 of your

14    declaration.  "For example, in 2018, DPSC executed a

15    certification to Pfizer and its wholesaler, Morris and Dickson,

16    in order to access potential execution drugs solely for the

17    medical care needs of its inmate population, which, if

18    violated, could jeopardize DPSC's ability to utilize these

19    drugs for medical care."  Do you recall that?

20    A.  I do.

21    Q.  This was one certification that DPSC executed; is that

22    correct?

23    A.  Correct.

24    Q.  The Department of Corrections did not execute another

25    certification?

168

1    A.  I would have to see by declaration.  There was something

2    from Hikma, but I'm trying to remember what it was.  There was

3    a letter from Hikma we responded to.  That's what it was.  But

4    yes, that's the only certification.

5    Q.  Mr. Smith, would you like to see your declaration to

6    refresh your memory?

7    A.  I would.  I would.

8         **MS. HALSTEAD:**  We are going to have to put that up.

9    **BY MS. HALSTEAD:**

10   Q.  Mr. Smith, you're being shown Plaintiff's Exhibit 25.  Do

11   you see that?

12   A.  I do.

13   Q.  Do you need us to scroll to a certain page to refresh your

14   recollection?

15   A.  I wanted to see what you were reading.  I think you said

16   35.

17   Q.  35, yes.

18   A.  Actually, I think I saw it on 41, what I was looking for.

19   Yeah, Hikma.

20   Q.  Does that refresh your recollection?

21   A.  Yes, it does.

22   Q.  Please put it back down.  So my question, the Department

23   of Corrections did not execute another certification with a

24   pharmaceutical company?

25   A.  Correct.

1    Q.  So, in 2018, over 7 years ago, the Department of

2    Corrections executed this one certification?

3    A.  Correct.

4    Q.  Mr. Smith, I'm going to read paragraph 41 of your

5    declaration.  "DPSC has also previously received correspondence

6    from Hikma Pharmaceuticals, PLC, (Hikma) stating that it

7    objected to DPSC's use of any of its drugs for capital

8    punishment, including any restricted drugs listed on its

9    website."  Do you recall that statement?

10   A.  I do.

11   Q.  The Department of Corrections received a letter from Hikma

12   in 2022?

13   A.  Correct.

14   Q.  The Department of Corrections also received a letter from

15   Hikma in 2023?

16   A.  Correct.

17   Q.  The Department of Corrections did not receive any other

18   letters from Hikma?

19   A.  Not to my knowledge.

20   Q.  And the Department of Corrections did not execute a

21   certificate with Hikma?

22   A.  Correct.

23   Q.  Mr. Smith, I'm going to read the last sentence of

24   paragraph 8 from your declaration.  "DPSC has received multiple

25   correspondence from pharmaceutical companies prohibiting the

1     use of their products for lethal injections."  Do you see that?

2     A.  I don't have it in front of me, so no.

3     Q.  Would you like to see it to refresh your memory?

4     A.  I would like to see it.

5              **MS. HALSTEAD:**  Please put it back up.  For the

6     record, I'm putting up Plaintiff's Exhibit 25 back on the

7     screen.

8     **BY MS. HALSTEAD:**

9     Q.  Mr. Smith, are you able to see that?

10    A.  I am.

11    Q.  Does that refresh your memory?

12    A.  Which part were you at again?

13    Q.  I was at paragraph 8, the last sentence I read.

14    A.  Okay.  I'm reading the whole thing, not just the last

15    sentence.  Okay.  Go ahead.

16    Q.  You can take it back down.  So in reference to the last

17    sentence, the Department of Corrections only received the two

18    letters we just discussed from Hikma?

19    A.  My declaration said correspondence, if I remember

20    correctly, and we had verbal correspondence numerous times

21    throughout this with various pharmaceutical manufacturers and

22    our wholesalers.  They all told us the same thing.  If we get

23    caught using one of their drugs, they are no longer going to

24    supply drugs we need to treat people.

25              **MS. HALSTEAD:**  Your Honor, I move to strike the

1    answer.

2              **THE COURT:**  Denied.

3    **BY MS. HALSTEAD:**

4    Q.  The Department of Corrections only executed a

5    certification with Pfizer and its parent company, Morris and

6    Dickson?

7    A.  I think Morris and Dickson is the wholesaler, not the

8    parent company, but yes, we only did one.

9    Q.  The Department of Corrections did not receive any other

10   written letters from other pharmaceutical companies prohibiting

11   their use of the products for lethal injection?

12   A.  Not that I'm aware of.

13             **MS. HALSTEAD:**  Please give me one second, Your Honor.

14             **THE COURT:**  Counsel, let's move along, please.

15   Ms. Halstead, it is customary to ask for a short indulgence or

16   break rather than just take one, but you may proceed.

17             **MS. HALSTEAD:**  Thank you, Your Honor.

18   **BY MS. HALSTEAD:**

19   Q.  Mr. Smith, earlier you testified that you did not look

20   into other execution methods, including firing squad and

21   medical-aid-in-dying, because they were not authorized by law,

22   correct?

23   A.  Correct.

24   Q.  So you did not look into execution by nitrogen hypoxia

25   before July 2024?

1    A.   Yes, ma'am.  There was a concurrent resolution that asked

2    a team of us or requested a team of us to do that very thing in

3    2014, I believe, so we did.  But it was asked of us, and that

4    was our task.

5    Q.   Between 2014 and 2024, did you look into nitrogen hypoxia

6    method of execution?

7    A.   Sorry.  Give me those dates again.

8    Q.   Between -- after 2015, up until July 2024, did you look

9    into the method of execution, nitrogen hypoxia?

10   A.   I did.

11   Q.   What date?

12   A.   I'm not sure what date.  I just know that we had that

13   study that I was a part of, and I knew we didn't have any other

14   way of carrying it out, and I definitely have looked into it

15   since then.

16   Q.   Has anyone else in the Department of Corrections looked

17   into that method of execution?

18   A.   Not to my knowledge.

19   Q.   It was only yourself?

20   A.   Yes.

21   Q.   Thank you.

22        **THE COURT:**  Nothing further, ma'am?  Ms. Halstead,

23   nothing further?

24        **MS. HALSTEAD:**  Nothing further.  Yes.

25        **THE COURT:**  Okay.  I know that Mr. Smith is on your

1   "will call" witness list.  Do you want to take your direct now?

2          **MR. CODY:**  Your Honor, I reserve the right to bring

3   him back for our direct, if it's okay.

4          **THE COURT:**  Well, I mean, why are you going to get

5   two bites at him?

6          **MR. CODY:**  Well, if it pleases Your Honor, I will go

7   ahead and take him now.  I apologize.

8          **THE COURT:**  Please do.  Then they will be able to

9   cross on the direct.  But I will hold them to crossing on the

10  direct and doing their redirect at the same time so they don't

11  get multiple bites at the apple.  So there you go.

12         **MR. CODY:**  Yes.  Okay.  Thank you, Your Honor.

13                          **CROSS—EXAMINATION**

14  BY MR. CODY:

15  Q.  Good afternoon, Mr. Smith.

16  A.  Good afternoon.

17  Q.  You were asked about various things a moment ago, and I

18  just want to go over some of these with you.  You were asked

19  about whether LSP has ammunition for a firing squad.  And I

20  just want to make sure I understand.

21         I think you indicated there's a gun range, there's a

22  supply of firearms, maybe some ammunition.  Is it your

23  understanding that just any firearms can be used for firing

24  squads?

25  A.  Firing squad is not my area of expertise.  I'm not aware

1    of which to use or what.  I indicated we have ammunition

2    available, not necessarily for that purpose, because we don't.

3    Q.  Do you know specifically whether you may have ammunition

4    that could be used for a firing squad?

5    A.  I believe any bullet will kill you, so maybe.

6    Q.  Okay.  You heard -- I don't know -- did you hear Dr.

7    Williams' testimony earlier today?

8    A.  I'm not sure which one I came in on.

9    Q.  That's fine.  And you were also asked -- sorry, I'm having

10   trouble reading my handwriting.  You were also asked about

11   whether the person that is placing the mask on the condemned,

12   as far as the nitrogen hypoxia process, has medical training.

13   Is it your understanding whether or not the mask that is

14   utilized by LSP requires any medical training?

15   A.  The mask that is being utilized is industrial in nature

16   and has no medical use.  Therefore, I see no reason a medical

17   person would be applying it.  A medical person would have no

18   training in the use of that mask.

19   Q.  I think you said earlier that the gas that is going to be

20   used is not a medical grade?

21   A.  It's better than medical grade.

22   Q.  All right.  Is it your understanding that any medical

23   training is needed for running the nitrogen hypoxia system?

24   A.  No, and I'm glad you bring that up.  In the medical

25   setting, which I've once worked, other than the flow meter,

First Transcript

1    everything beyond that is done by maintenance.  I mean, it is a

2    manifold.  It's bottles.  It's lines.  It's basically plumbing

3    and electrical.  I don't believe the medical personnel know how

4    to work on any of that.

5    Q.  And I think you said earlier, and I just want to make sure

6    I understand, this ultra high purity, what is that in reference

7    to?

8    A.  Nitrogen comes in at least three grades, and I don't claim

9    to be a nitrogen expert, but I know it comes in regular

10   industrial nitrogen, which is somewhere around 95, 97 percent,

11   if I remember correctly.  So you can have 3 plus percent

12   impurities, which could be oxygen.

13       Medical grade is typically 99.0 or greater.  So, in

14   theory, you could have one percent oxygen.  What we are using

15   is ultra high purity, which is 99.999.  So 1/1000ths of one

16   percent is the only impurity you can have.  So we wouldn't want

17   to use medical grade in this case.

18   Q.  Now, do you know if there is any certification that comes

19   with the tanks that indicates the ultra high purity?

20   A.  Every tank is labeled with the UHP 300 label, which UHP is

21   the ultra high purity.  Our invoices show the UHP.  The 300 is

22   merely the size of the tank.

23   Q.  You were asked earlier by plaintiff's counsel whether

24   there was a protocol in place when the training began on the

25   nitrogen hypoxia system.  Do you recall?

1     A.   Yes.

2     Q.   And I just want to make sure.  So when did LSP receive --

3     or did it receive the Alabama protocol?

4     A.   I'm not sure of the exact date, but no later than July.

5     When I said they didn't have the nitrogen protocol in place, we

6     had a protocol.  The only thing that changed was what you did

7     after they were strapped to the table.  We knew that medication

8     was not available.  We knew what Alabama did, so we practiced

9     it as closely as possible until we had a written protocol.  So

10    it was a combination of what we brought back from Alabama and

11    what we already had in writing.

12    Q.   And earlier you were also asked about things -- statements

13    made in your declaration, and I just want to hone in on maybe

14    one or two of those.  In your declaration, you were asked about

15    the certification to Pfizer in 2018.

16    A.   Um-hm.

17    Q.   What is the Department of Corrections' position on whether

18    or not that certification made in 2018 could or could not be

19    violated?

20    A.   Well, I went back and looked at it again, and it does not

21    have an expiration date, first and foremost.  But the biggest

22    thing is Morris and Dickson and Pfizer, and other drug

23    manufacturers, maybe not in writing, have made it very clear to

24    us that if we use any of their medication for a capital

25    punishment case, they reserve the right to pull all of their

1    medication off the table.

2        We have an aging population in the prison system.  We have

3    large infirmaries.  We have full-blown hospitals.  We cannot

4    run the risk of losing access to life-saving drugs for this

5    reason, and that's why we did that.  We quit pursuing it.  We

6    came out and publicly said we quit pursuing it for those

7    reasons, and nothing has changed.

8    Q.  And what do you think might happen if the Department of

9    Corrections decided to change course and begin using drugs for

10   lethal injection at this point?

11   A.  I'm afraid that we would lose our possibility of getting

12   life-saving drugs that we need for other people.  You know, we

13   have got 60-plus in-patient beds at two different facilities.

14   That is 120 in-patient beds.  We run a full-fledged hospital at

15   two prisons.  We run smaller ones elsewhere.  It's not worth

16   sticking our neck out on that risk.

17   Q.  Thank you.  Now, I want to take you back to when did --

18   you talked a little bit about the historical, I guess, looking

19   into research and that sort of thing, into the nitrogen

20   hypoxia, and I want to take you back to -- what was your

21   understanding of when the law was first considered that made

22   this possible?

23   A.  2000 and -- look, I may have my dates wrong.  I would have

24   to look at it again.  I think it is in my declaration.  I think

25   in 2014, it was Resolution 142 that directed us to do a study.

1  There was a law that was -- a bill that was put out there in

2  '15 that we anticipated was going to pass, and we anticipated

3  we were going to have nitrogen hypoxia moving forward.

4  Now, that bill, if I'm not mistaken, got pulled during

5  that session, and it never moved forward.  So that's -- I

6  didn't just up and say, I want to look into nitrogen hypoxia.

7  I was tasked with doing it.  I did it.  And even though the

8  bill pulled -- I'm not going to tell you that I didn't see a

9  documentary on T.V. about it and say, ooh, I want to watch

10  that, or stumble across literature and say, ooh, I want to

11  watch that, but I have, and that's what I've done.

12  Q.  Thank you for that answer.  So -- and just to kind of

13  speed up to present a little bit.  So when did it first -- when

14  did plans first -- were first initiated to implement some sort

15  of nitrogen hypoxia system at LSP?

16  A.  Well, whenever the law changed at the second special

17  session, we knew that we had to look at various ways to apply

18  the law or come into compliance with the law.  So after that,

19  we went to Atmore, Alabama in March, and then another group

20  went back in July.  And we were trying to replicate as closely

21  as possible the system that they had there because they were

22  the only state that had actually carried one out.

23  Q.  Why were you tasked with this?

24  A.  Why was I tasked with it?  That's a good question.  I

25  don't know.  I was told to.  I'm chief of operations.  All of

First Transcript

1    this falls underneath my umbrella.  And, you know, maybe --

2    well, I will tell you.  It's probably the answer you're fishing

3    for.  I have a medical background, quite honestly.  I don't

4    currently.  I had a Registered Nurse.  I let my license go in I

5    want to say 2010.  I don't actively work in that field, have

6    not in over a decade and have no desire to go back to it, but

7    it does give me a little bit of knowledge, I guess.

8    Q.  Okay.  And then I guess to be fair, you did indicate

9    earlier about the study that you were a part of in 2014, 2015?

10   A.  Correct.

11   Q.  So was that also part of why you were involved in this

12   effort?

13   A.  I can only assume as much, yes.

14   Q.  Suffice it to say, you have done quite a bit of research

15   into nitrogen hypoxia over the years?

16   A.  I have read a lot of literature and seen, well, one

17   documentary in particular, but I've definitely done that.

18   Q.  I want to ask you about the trip to Atmore, Alabama.  Can

19   you try to describe what that entailed?

20   A.  Sure.  Basically, we went to Atmore, Alabama, met with

21   their executive staff, basically, and we were taken on a tour

22   of the facility.  I want to say the facility.  Specifically the

23   execution chamber and everything associated with that.

24        I'm trying to think what else to say on that.  Just got to

25   see what the whole process was like.  I also got to talk with

1  them because they recently had had their first one, their first

2  execution using that system.  So it gave us a chance to consult

3  with somebody that had already been there, done that, so to

4  speak, and kind of learn from their ways.

5  Q.  Just to give context to that time period, was that after

6  the Kenny Smith execution?

7  A.  If he was the first one, then yes, and I do believe his

8  name was Smith.  So, yes.

9  Q.  What's your understanding of how many executions have

10  taken place in Alabama at this point?

11  A.  It's three or four.  I want to say four.

12  Q.  Were all of those with nitrogen hypoxia; do you know?

13  A.  There may have been more executions.  There's either been

14  three or four with nitrogen.  That much I know.

15  Q.  Thank you.  So you kind of explained the trip, but I just

16  wanted to ask some specifics about what you saw.

17  A.  Sure.

18  Q.  Was there any sort of mask involved?

19  A.  Yes.

20  Q.  Can you describe the mask?

21  A.  The mask is very similar, if not identical, to the one we

22  have.  It's a -- I think it's called a single source or a

23  source respirator mask.  It's a silicone mask with -- I want to

24  say it's got a plexi-glass screen.  It has a tube going in it

25  to supply you with air.  I was told it was a mask that

1    typically would be used for painters or sandblasters where you

2    are in an environment where you don't want to breathe the air

3    you are working in, either because of the quality of the air or

4    the particulates that might be in the air.

5         It has a hose coming into it.  It flows into you.  You

6    breathe.  You are able to exhale.  It has got a very wide

7    gasket, so to speak, that seals around you, so it accommodates

8    various sizes.  It's not just a -- you know, you measure my

9    head and get one specific for me.  The thing around it, the

10   gasket type material that seals to you I would say is at least

11   3 to 4 inches that goes up against your face, that straps

12   around the back.  That is pretty much it.

13   Q.  Thank you.  So you get back from the trip to Alabama.

14   What were the next steps involved in trying to implement this

15   process at LSP?

16   A.  Well, the next step there was talking to the warden, who

17   actually was with me, and relaying to them what I wanted to see

18   built.  And that's where the process started off.

19   Q.  Okay.  Just for the record, was that the LSP warden at the

20   time?

21   A.  Correct.  Tim Hooper, not the current one.

22   Q.  What were the next steps after, I guess, the discussions

23   with the warden?

24   A.  They ordered components to try to comply with my request,

25   and quite honestly, they missed the mark.  And then we went and

First Transcript

1    looked at it again, and apparently Warden Hooper's memory

2    wasn't as good as mine, and I ultimately sent a team back to go

3    take another look with the right people that knew what they

4    were looking at so we could make it better and, if anything,

5    improve upon what we had seen in Alabama.

6    Q.   Okay.  I'm just trying to get some context here.  So the

7    first trip, I think you said, may have been in March of 2024?

8    A.   Correct.

9    Q.   Okay.  So by the time of your viewing of the construction

10   or the setup at LSP, approximately when was that in the year?

11   A.   Probably early July.

12   Q.   July of 2024?

13   A.   Correct, based upon when their trip was, because I know

14   they went back in July.

15   Q.   And then I think you said something about another trip.

16   Did you go on that trip?

17   A.   No, I did not.

18   Q.   Okay.  And without identifying who went on the trip, so

19   what do you know about that trip?

20   A.   I know that we had some people that were more directly

21   involved with piping, maintenance type work, that needed to go

22   take a look because it was the particulars there that our

23   memories were different, and I needed to send somebody that had

24   a little more working knowledge with that system.  So that's

25   what they went there for, more of the details, more in the

1   weeds.

2   Q.   Okay.   Is it your understanding that the people that went

3   on that second trip, did they see everything they needed to see

4   with respect to the Alabama system?

5   A.   I would say so, yes.

6   Q.   Okay.   And do you understand what steps were taken when

7   they got back from the Alabama trip?

8   A.   Correct.   They ordered new equipment/parts, pieces, to

9   assemble what is there today, fittings, things of that nature.

10  Q.   Okay.   Now, I want to take you a little bit back.   When

11  you first saw the system before that second Alabama trip, were

12  there any things that -- any items, I guess I should say, or

13  components that appeared to definitely be missing from the

14  setup at that point?

15  A.   Well, what they had built the first time would work.

16  Okay?   I'm not saying it was substandard and would not work.

17  But it left more room for human error.   Specifically, the way

18  that it was set up, and I may have to remember the one that's

19  no longer there, it had manual manifolds, meaning that you had

20  gauges on bottles, both breathing air and on nitrogen.   If the

21  breathing air were to be depleted or the nitrogen air was to be

22  depleted during this process, it would have to rely on someone

23  looking at it, manually switching it over at the time, and

24  increasing possible issues.

25        The system that I wanted and the one that we have that

First Transcript

1  mirrors Alabama has two electronic manifolds.  Each manifold

2  has two bottles going to it.  One has two nitrogen, one has two

3  breathing air.  Whenever you turn that on, it tells you what

4  the pressure is at the bottle.  It tells you what the pressure

5  is coming out the tank.  And with manual gauges, it did this

6  before, but now it has an electronic telling you.

7      On the manifold -- let's just talk about one side, the

8  nitrogen side.  One side is going to have a green light and say

9  "Ready," and the other one is going to have a yellow light and

10  say -- or one is going to say "Ready in use," and the other is

11  going to say "Stand by".  If that bottle were to deplete down

12  to I want to say 200 psi, which still means you've got gas, it

13  automatically flips without a break in service.  So there's no

14  pause in receiving air or nitrogen.  It automatically flips.

15  This one goes red.  You have got all the time in the world to

16  change that bottle out, and it can go back and forth forever

17  with no break.  That was the big thing that they were missing,

18  and that's what we had added.  I don't know if that answers

19  your question or not.

20  Q.  I think so.  If I understand you correctly, the special

21  manifold was something that the Alabama system appeared to

22  have?

23  A.  Yes, they had that system.

24  Q.  So when the personnel get back from that second trip to

25  Alabama, do you know if those items were ordered?

First Transcript

185

1    A.   Yes, they were.

2    Q.   Okay.   And approximately when do you think the mask was

3    ordered?

4    A.   About the same time because they didn't have the mask.

5    You are correct.

6    Q.   And you did describe the mask earlier.   Do you know

7    anything about the flow rates or --

8    A.   Sure.

9    Q.   What do you know about the flow rate?

10   A.   The flow rate that Alabama used and what we have in our

11   protocol is 70 liters per minute, which -- I'm getting ahead of

12   myself here.   I was a little concerned.   I'm not going to lie

13   to you because 70 liters a minute seems like a lot, but in

14   researching it, the mask actually can go higher than that.   So

15   I actually went and tried one on, put it at 70 liters myself in

16   probably August or September, just to see what that would be

17   like, as far as if it was too much coming at you at once and

18   become aggravating, I guess, which it absolutely did not.

19        I also made a point of making breaths, and I have facial

20   hair, so I -- I did at that time, trying to see if it would

21   break the seal.   And two things I can tell you, I couldn't

22   inhale more than it was giving me, so it was sufficient, and I

23   could not break the seal.

24   Q.   Just for clarity of the record, I assume this was not with

25   nitrogen gas that you wore the mask?

1    A.  I would not be here if it was with nitrogen gas.  You are

2    correct.

3    Q.  So what kind of air or gas were you breathing at that

4    time?

5    A.  Breathing quality air.  It's a tank you also get from a

6    gas supplier, and that's what it's labeled, "Breathing quality

7    air."

8    Q.  All right.  Now, you had mentioned -- so you said you

9    came, I guess, in the fall when you wore the mask?

10   A.  Correct.

11   Q.  What were you there for at the time?

12   A.  I can't tell you the exact reason I was at Angola, but

13   while I was there, I observed a training.  I went and saw the

14   entire system, and I saw a training.

15   Q.  Approximately how many trainings have you observed?

16   A.  At least three.  It's possibly more, but at least three.

17   Q.  I think you indicated earlier that the protocol was not --

18   the current protocol was not in place at that time, but there

19   was, I guess, a process based on the old protocol?

20   A.  Can I walk you through one versus the other?

21   Q.  Oh, please.

22   A.  The old protocol basically starts where you go to the Camp

23   F cell block, which is right adjacent to the room.  They go in,

24   they fully iron up someone who, if there is a condemned named,

25   is roughly the same size.  They escort them to the execution

1    chamber.  They strap them down.  The IV and the IV team would

2    come in, start an IV, go in the next room.  In this case, you

3    strap the mask on them, and the room is exited by everybody

4    except the warden, a designee, a spiritual advisor, if there is

5    one.

6         So the only thing we did differently is we knew we would

7    not be able to carry out a lethal injection.  We were doing

8    what we assumed would be nitrogen, because it was on the books

9    and we actually had it.  Now, we didn't have a written

10   protocol, but again, we had the knowledge from Alabama combined

11   with the protocol we had, and we modified it to basically what

12   is in writing today.

13   Q.  Thank you.  Going back to the mask for a moment, you

14   indicated you had the mask on.  You are familiar with the

15   operation or the function of the mask?

16   A.  Correct.

17   Q.  So is there any type of valve or release for gas on the

18   mask?

19   A.  It definitely allows you to exhale.  I mean, if not, it

20   would just swell up on your face and cause discomfort and cause

21   pressure.  When we were in Alabama, we even asked about that,

22   because not being that familiar with the nitrogen, you know, do

23   I want to be in the room with somebody that's getting nitrogen

24   applied to them at this level?  And they are the ones that

25   showed us the oxygen monitors that you wear.

1    What we are breathing right now is 98 percent nitrogen,

2    and believe it or not, what is coming out of that mask is not

3    going to change that.  It really dilutes very well.  And also,

4    nitrogen is lighter than oxygen, and it is going to rise to the

5    top, and we have got exhaust fans in the chamber to exhaust it

6    out.

7    Q.  The exhaust fans you mentioned, is that a new item that

8    was added to the death chamber?

9    A.  Correct.  We pulled a window unit, air-conditioning unit

10   out and in that space put two exhaust fans, not one, just in

11   case there's an issue, two independent exhaust fans.  And even

12   if there was an issue, there would not be one, quite honestly,

13   but in an abundance of caution, we put in two exhaust fans and

14   then went back with a different type, different style

15   air-conditioning for climate control.

16   Q.  Now, you mentioned oxygen monitors.  Can you kind of

17   elaborate on what that means?

18   A.  Sure.  You know, we aren't really concerned with how much

19   nitrogen is in the air.  You asked me about oxygen monitors.

20   You could measure whatever gas you want, but honestly, what we

21   need to know is how much oxygen is in the air.

22       Again, 78 percent of the air is typically going to be

23   nitrogen.  Roughly 20 percent, 20.9 is going to be oxygen.  So

24   we have the visiting -- I say the visiting -- the observation

25   room, the witnessing room, we have the chamber itself, and then

1    we have the room where the bottles are stored and where the

2    valves and all of that are.  All of those are equipped with a

3    permanently mounted oxygen monitor to monitor the room and its

4    oxygen content the entire time.  They have alarms set, and I

5    think from the manufacturer they came at 18.5 percent and we

6    left them there.  So if the oxygen were to get below that --

7    you don't have to have somebody sitting there staring at it.

8    It's going to yell at you if it drops.  And at 18.5, you still

9    have plenty of oxygen.  It's not a big deal.

10        But in addition to that, we have portable ones that you

11    can wear.  You actually turn them on.  They self-calibrate.

12    You see that they are reading 20.9.  You compare them to

13    everybody else.  Okay.  We are good to go.  Those are tested

14    per the manufacturer's instructions.  We hit them with straight

15    nitrogen and see them deplete to where we know that they all

16    function.

17    Q.  Thank you.  And have you witnessed any trainings this

18    year?  Well, let me back up.  Have you witnessed any trainings

19    since the protocol that is in place today was executed?

20    A.  Yes.

21    Q.  Okay.  Can you describe -- was that training -- were you

22    satisfied with that training?

23    A.  I was very satisfied with that training.  If I'm not

24    mistaken, it was February 14th, because it was Valentine's Day.

25    And I got to watch the whole process.  I think they actually

1    ran through it a couple of times.  But at that point,

2    obviously, Warden Vannoy was the warden there, and like I say,

3    we went start to finish with the entire process, and very

4    satisfied, yeah.  Didn't see any issues with any of it.

5    Q.  Let me ask you this.  Who acts in place of the condemned

6    for a training?

7    A.  It depends on who the condemned is.  Once we have a date

8    and a warrant, we are going to try to find someone who is

9    similar size and body type.  You are not going to be able to

10   match them exactly, but that's what they do.

11   Q.  So for the one that you witnessed on the 14th, was

12   somebody acting as condemned, I assume?

13   A.  We always have somebody acting as condemned.  I'm trying

14   to remember if we had a warrant or not.  I do know that we had

15   a small female, so it is possible.

16   Q.  I just wanted to make sure, the small female you

17   referenced was not with regard to the execution that we are

18   dealing with here today?

19   A.  No, absolutely not.

20   Q.  And so, let's see, the protocol was in the works, I guess,

21   when you were doing the trainings in the fall?

22   A.  Yes, the protocol has been in the works, you know.  I hate

23   to say attorneys, but you send something there, they send it

24   back, and you sort through it until you get it all where you

25   feel like you are good with it.  And then as you see, we turned

1    around and still found a few little issues and fixed it.  So it

2    was going back and forth.

3            **MR. CODY:**  Your Honor, if I may have just a little

4    time to confer.

5            **THE COURT:**  You may.

6            **MR. CODY:**  Thank you, Your Honor.

7    **BY MR. CODY:**

8    Q.  I just want to get kind of a more vivid description for

9    the Court's benefit of the process from essentially the tanks

10   to the mask.

11   A.  Okay.  First of all, we are going to have a storage area

12   where we have multiple tanks that are not in use, but they are

13   full and ready to be in use.  I'm just working myself across

14   the room as I see it.  So you have to bear with me.

15           First we have a storage area that has both nitrogen and

16   breathing air clearly labeled.  Move over, you are going to

17   have your two manifolds.  Your two manifolds are each going to

18   have two bottles, as I said earlier.  Both of those are going

19   to read a minimum of 500 psi per bottle on both sides.  So we

20   are going to have four readings.  All of them are going to be

21   500 or greater.

22           Then they are going to go out.  There's going to be two

23   exits or two ways out on this, two pipes going out.  One pipe

24   going out is a vent.  That pipe is just in case -- it's like a

25   pop-off valve in a hot water heater.  If it overpressures for

1    any reason, there's a way for it to safely exhaust, and it

2    does, it exhausts to the outside air, which is perfectly fine

3    with either gas.

4         The other pipe is the important one when it comes out of

5    each.  They are both going to come out of the top and be routed

6    to the next room.  They are both labeled as they go as to which

7    one is which.  They are going to go from there to a T.  Yeah --

8    it is going to go to a T which goes and feeds to a flow meter.

9    Now, prior to the T -- and this is important.  Prior to the T,

10   there is a manual gauge on both lines.  We know that it is

11   leaving at 50 psi out of the manifolds.  The person that's

12   sitting there monitoring this has the manual gauges to look at

13   and verify 50.  So if there is an issue, we have a redundancy.

14        Okay.  From there, it goes, like I said, to a T, and then

15   it goes to a flow meter.  The process is, as you run breathing

16   air, so the same air we are breathing right now, just coming

17   from a bottle into that mask, until the time comes to turn on

18   the nitrogen.  You turn on the nitrogen, off the gas.  It's at

19   70 liters per minute.  It doesn't matter if you've got them

20   both wide open.  All you are going to get is 70.  But that

21   allows it to where the person that's wearing the mask never

22   knows when the air gets turned off and when the gas gets turned

23   on.  They are both tasteless and odorless.  So I believe that

24   has got every piece of it from there to there.

25   Q.  Thank you.

First Transcript

1    A.   I'm sorry.  I cut you -- but from the bottom of the flow

2    meter, you are at 70 liters per minute, and then it is going to

3    go to a tube, and that tube is actually going to exit the room

4    and do a quick connect into the mask, and that's the one place

5    that we saw that Alabama was doing and we said we wanted to do

6    it a little better.  They were using a more medical grade hose,

7    and we went to a bigger, heavier, something less likely to get

8    kinked.  But that's from start to finish.

9    Q.   Very good.  Thank you.

10              **MR. CODY:**  Your Honor, at this point, I have no

11   further questions.  I would like to go ahead and ask that the

12   Smith declaration be admitted into evidence.  He was

13   cross-examined on that or examined on that extensively, and he

14   identified it.

15              **THE COURT:**  Any objection to the Smith declaration.

16              **MS. HALSTEAD:**  We object to it as hearsay.

17              **THE COURT:**  Sustained.  Ms. Halstead, we are going to

18   need to break in five minutes.  Do you want to take a -- you

19   can have more than five minutes.  You are going to need to do

20   your redirect and your cross.

21              **MS. HALSTEAD:**  Yes, we would like a break, Your

22   Honor, please.

23              **THE COURT:**  Okay.  We are going to break until

24   3:30 so we can change out the court reporters.

25        (THE REMAINDER OF THE HEARING IS FOUND UNDER SEPARATE COVER

1                              IN VOLUME 2.)

2

3

4                    CERTIFICATE OF COURT REPORTER

5

6          I, Teri B. Norton, RMR, FCRR, RDR, Official Court

7    Reporter for the United States District Court for the Southern

8    District of Mississippi, appointed pursuant to the provisions

9    of Title 28, United States Code, Section 753, do hereby certify

10   that the foregoing is a correct transcript of the proceedings

11   reported by me using the stenotype reporting method in

12   conjunction with computer-aided transcription, and that same is

13   a true and correct transcript to the best of my ability and

14   understanding.

15         I further certify that the transcript fees and format

16   comply with those prescribed by the Court and the Judicial

17   Conference of the United States.

18

19

20

21        S/ *Teri B. Norton*
          TERI B. NORTON, RMR, FCRR, RDR
22        OFFICIAL COURT REPORTER

23

24

25