**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF LOUISIANA**

JESSIE HOFFMAN,

               Plaintiff,

      v.

GARY WESTCOTT, Secretary, Louisiana Department of Public Safety and Corrections; DARREL VANNOY, Warden, Louisiana State Penitentiary; and JOHN DOES, unknown executioners,

            Defendants.

Civil Action No. 25-169-SDD-SDJ

*EXECUTION SET FOR MARCH 18, 2025*

**PLAINTIFF'S PROPOSED FINDINGS OF FACT & CONCLUSIONS OF LAW**

Pursuant to the Court's February 28, 2025, Order and Minute Entry (Rec. Doc. 29), Plaintiff Jessie Hoffman, through his counsel, hereby respectfully submits the following proposed findings of fact & conclusions of law:

### [PROPOSED] FINDINGS OF FACT

**A.    Background**

1.    Plaintiff Jessie Hoffman is 46 years old. Tr. Part II, Antognini Testimony at 163:15-16.[1]

---

[1] Transcript citations are to *rough* copies of the transcripts from the hearing testimony on March 7, 2025. Plaintiff reserves all rights to submit an errata and correct as necessary for any appeal(s). "Tr. Part I" refers to Volume 1 of 2 of the rough hearing transcript, "Tr. Part II" refers to Volume 1 of 2 of the rough hearing transcript, "PX" refers to Plaintiff's exhibits, and "DX" refers to Defendants' exhibits.

2. On November 27, 1996, Mr. Hoffman was indicted for the first-degree murder of Molly Elliott. A jury found Mr. Hoffman guilty on June 25, 1998. On June 27, 1998, the jury issued a death verdict.[2]

3. Beginning on September 15, 1991, and including the time the offense occurred that subjected Mr. Hoffman to a death sentence and the time Mr. Hoffman was sentenced to death, Louisiana law provided that "*[e]very sentence of death . . . shall be* by lethal injection; that is, by the intravenous injection of a substance or substances in a lethal quantity into the body of a person convicted until such person is dead." La. Rev. Stat. § 15:569 (1991) (emphasis added).

4. Mr. Hoffman was thus sentenced by a jury to death by lethal injection.[3]

5. Mr. Hoffman is currently in the custody and control of the Louisiana Department of Public Safety and Corrections ("DPSC") and is held on Death Row at the Louisiana State Penitentiary in Angola, Louisiana ("Angola").

6. On February 25, 2025, Mr. Hoffman initiated this action pursuant to 42 U.S.C. § 1983 for violations and threatened violations of his rights under the First, Sixth, Eighth and Fourteenth Amendments, and the ex post facto clause, to the United States Constitution. *See* Compl. dated February 25, 2025 (Rec. Doc. 1)

7. Mr. Hoffman asserts in the Complaint that attempting to execute him by nitrogen hypoxia on March 18, 2025 would: (1) violate his right to be free from cruel and unusual punishment under the Eighth Amendment; (2) substantially burden his right to exercise his religion under the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc,

---

[2] The Court can take judicial notice of the facts underlying Mr. Hoffman's criminal conviction. *See* Fed. R. Evid. 201.

[3] *See* Record on Appeal, *State v. Hoffman*, No. 98-KA-3118 (La.), at R. 4554.

*et seq.*; (3) violate the *ex post facto* clause of the United States Constitution; and (4) violate his rights to access to counsel and the courts under the First, Sixth, and Fourteenth Amendments.

8.    Mr. Hoffman also filed a Motion for Preliminary Injunction, asserting that he is likely to succeed on the above claims and would be irreparably harmed if he were to be executed before those claims could be fully developed and heard on the merits. Rec. Doc. 4.

9.    This Court held an evidentiary hearing on Mr. Hoffman's Motion for Preliminary Injunction on Friday, March 9, 2025, from 9:00 a.m. to 8:30 p.m. This Court heard from many witnesses, both expert and lay, in support of Mr. Hoffman's claims. *See generally* Tr. Part I & II. The Defendants presented two witnesses: the Chief Operating Officer of the DPSC (*see* Tr. Part I, S. Smith Testimony, at 173), and Dr. Antognini, an anesthesiologist who has testified for the state in fifteen to twenty method of execution challenges. Tr. Part II, Antognini Testimony, at 109, 192:19-23.

### B.    Mr. Hoffman Suffers from PTSD and Psychotic Disorder

10.    Dr. Frederick Sautter testified an expert "in the fields of clinical psychology with specialization in PTSD and trauma disorders." Tr. Part I (Court) at 55:12-56:1. Dr. Sautter was the *only expert in clinical psychology*. *See generally* Tr. Part I & II.

11.    In 2003, Dr. Sautter diagnosed Mr. Hoffman with PTSD and Psychotic Disorder resulting from horrific trauma, violence and abuse as a child.   *See generally* PX-20[4]; *see also* Tr. Part I, Sautter Testimony at 58:18-60:9, 62:2-22. PTSD is a mental health condition that develops after an individual experiences a traumatic event—"there is a conditioned emotional response"

---

[4] As agreed during the hearing, Mr. Hoffman's counsel uploaded a revised version of PX-20 after the trial that contained only Dr. Sautter's 2003 Psychological Evaluation of Mr. Hoffman. *See* Tr. at 57:22-58:16. To the extent the Court did not receive the revised version, counsel notes that only the psychological evaluation in the older version of PX-20 should be considered (pages 15-27 of the PDF).

when subsequently exposed to that event or "a stimuli that reminds" the individual of the event. *Id.* at 62:2-22.

12.     Mr. Hoffman has a significant multi-generational family history of mental illness, incest, sexual, physical, and psychological trauma, poverty and deprivation." PX-20[5] at 3. "He lived almost continuously in neighborhoods assaulted by community violence and crime." *Id*. at 3.

13.     Mr. Hoffman's childhood was characterized by sexual, physical, and verbal abuse, and other torture and violence. PX-20 at 3-7. "From about the age of 3 till 10 years of age," Mr. Hoffman's mother, who also had PTSD, physically abused" him.  PX-20 at 4,5. "The physical abuse she inflicted" on him "included beatings with sticks, pipes, pans, baseball bats, and frequently, with extension cords." *Id.* at 5, 11. "The beatings left welts and scars, and sometimes drew blood." *Id.* "They were often administered to him while he was naked, often when wet from a shower or bath, to increase the pain." *Id.* "It [was] the beatings and abuse at the hands of his mother that are associated with the onset of his PTSD symptoms." *Id.* at 7; *see also id.* at 11 ("The early environmental adversity experienced by Mr. Hoffman between the ages of 3 and 10 includes beatings with sticks, pipes, pans, baseball bats, and, frequently, with extension cords. These trauma . . . led to the development of PTSD in this individual."); Tr. Part I, Sautter Testimony at 83:21-84:10.

14.     "In addition to physical abuse," his "mother verbally and psychologically maltreated" him.  *Id.* For example, she "frequently called" him names and "cursed at" him; told

[5] Dr. Frederick James Sautter, Jr., Ph.D., is a clinical psychologist with expertise in Post Traumatic Stress Disorder ("PTSD").  He received his Ph.D. in Psychology in 1988 from the University of Cincinnati and is licensed in Clinical Psychology in the State of Louisiana. Dr. Sautter has over thirty years of experience conducting assessments of traumatic events and adversity and the range of debilitating mental health disorders, including PTSD. (*Id.* ¶ 2-4, and Exhibit A thereto)

him he was "no good" and that she "hated" him; and "threatened" to "turn [him] in" to the juvenile authorities. *Id.* She also "deprived" him of food at times and "punished" him "for eating any food" that she did not give him. *Id.* (quotation marks omitted). "The psychological abuse was compounded by lack of positive acts of parental love, support, or affection" from his mother. *Id.*

15.     Mr. Hoffman "did not live with his father for any appreciable time until he was an adolescent . . . ." *Id*. at 4. His father was "emotionally distant" and a "strict disciplinarian" who used "physical punishment frequently." *Id.* His father also abused his mother. *Id.* As a result of his experiences, Mr. Hoffman had PTSD and psychotic symptoms known as Psychotic Disorder as early as 2003. PX-20 at 7-12.[6]

16.     Mr. Hoffman rarely received family or social support, and the traumatic stress of the psychosocial environment in which he existed was toxic. PX-20 at 9 ("Mr. Hoffman was exposed to childhood abandonment and neglect, and witnessed violence and aggressive acts on a frequent basis. . . . Historical information consistently describes Mr. Hoffman as being socially isolated . . . ."); *see also id.* at 3-7.

17.     "In the year or so" before the crime Mr. Hoffman committed (i.e., sometime during high school), he "was robbed at gunpoint twice." PX-20 at 6. Notably, by then he had "*already* suffered from PTSD and was very paranoid and thought disordered . . . ." *Id.* at 10; *see also* Tr. Part I, Sautter Testimony at 82:11-18, 83:1-10 (a gun is "not going to be the primary stimulus that is going to stay with him for the rest of his life"); Tr. Part I, Sautter Testimony at 83:21-84:10 (child abuse "[became] a part of who [Mr. Hoffman was]"). To this day, Mr. Hoffman continues

---

[6] Although Dr. Sautter did not specifically diagnose Mr. Hoffman with claustrophobia, that matters little as to whether Mr. Hoffman is claustrophobic.  As Dr. Sautter explained, his lack of such a diagnosis does not preclude Mr. Hoffman from developing claustrophobia. Tr. Part I, Sautter Testimony at 61:23-62:1.

to suffer from PTSD, which can be "triggered" by traumatic memories and events, notwithstanding that his condition has improved to some degree. Tr. Part I, Sautter Testimony at 62:23-63:3, 64:13-67:13, 77:21-78:3, 85:1-12.[7]

### C. Mr. Hoffman Suffers from Claustrophobia

18.     Mr. Hoffman experiences severe claustrophobia from childhood experiences of being locked in small spaces. Tr. Part I, Hoffman Testimony at 30:18-31-1.  He testified to one such incident when he was seven or eight years old and his brother locked him in the kitchen pantry after his mother had left the home. Tr. Part I, Hoffman Testimony at 30:19-21. He recalls "yelling and screaming, throwing stuff off the shelf, trying to get out, but it was locked, so I couldn't – at some point, I just blacked out. I don't know how long. I was in there for – I woke up when they pulled me out, when they took me out." Tr. Part I, Hoffman Testimony at 30:21-25.

19.     Last year, on March 7, 2024, Mr. Hoffman refused medical treatment because he could not withstand being locked in the small cage in the back of the transport van. PX-2. Mr. Hoffman testified that he was transferred into a small space like a "dog cage" in the back of the van, and immediately upon the doors closing began to have a panic attack. Tr. Part I, Hoffman Testimony at 29:21-22. He asked to be let out and then had to sign a form stating that he was refusing medical care. Tr. Part I, Hoffman Testimony at 29:13-30:3. He wrote: "Claustrophobia: couldn't breathe upon entering cage of transportation van." PX-2; Tr. Part I, Hoffman Testimony at 30:4-6.

---

[7] While Dr. Sautter did not evaluate Mr. Hoffman in February 2025 in the same manner that he did in 2003, that did not impact Dr. Sautter's ability to assess Mr. Hoffman's mental health and find that Mr. Hoffman still had PTSD.  Tr. Part I, Sautter Testimony at 63:4-64:9, 65:24-66:24, 75:14-18.

20.     On February 20, 2025, Mr. Hoffman was transferred from his regular cell on Death Row to a small solitary cell in another location, which again "triggered [his] anxiety of small spaces[.]" Tr. Part I, Hoffman Testimony at 25:25-26:5.

21.     Mr. Hoffman testified that he believes having a mask over his face will trigger his claustrophobia. Tr. Part I, Hoffman Testimony at 31:7-14.

### D.     Mr. Hoffman Is A Practicing Buddhist.

22.     Mr. Hoffman has been a devout follower of the Buddhist faith for over two decades. Tr. Part I, Hoffman Testimony at 23:12-13; Tr. Part I, Bono Testimony at 49:7-9. Mr. Hoffman follows Buddhist teachings and practices mindfulness and breathing meditation. Tr. Part I, Hoffman Testimony at 24:9-17; Tr. Part I, R. Smith Testimony at 101:10-14. He began his journey learning and practicing Buddhism when he was gifted a book, *Start Where You Are*, in 2002, and continued to learn and practice on his own for many years. Tr. Part I, Hoffman Testimony at 23:12-22.

23.     Mr. Hoffman began participating in Buddhist classes in 2018, the first time they were offered to individuals on Death Row. Tr. Part I, Hoffman Testimony at 24:18-22; 25:9-13. Reverand Michaela Bono, a Zen Buddhist priest accepted by the Court as an expert in Buddhist practices and Buddhism, was his teacher in those classes. Tr. Part I, Bono Testimony at 41:25; Tr. Part I, Bono Testimony at 47:3-4. Reverend Michaela was ordained in 2010, after spending 6 years in monastic training in California. Tr. Part I, Bono Testimony at 44:6-12.  In 2012, she founded and directed Mid City Zen, a Buddhist temple in New Orleans.  Tr. Part I, Bono Testimony at 45:20-21. She served as the Buddhist chaplain at Angola from 2018-2020. Tr. Part I, Bono Testimony at 46:12; 48:5-6. Reverand Michaela testified that when she met Mr. Hoffman in 2018, "she was impressed with his meditation practices." Tr. Part I, Bono Testimony at 47:20-21.

Reverand Michaela testified that while she typically had to provide a fair amount of instruction in her prison ministry, Mr. Hoffman did not need to be instructed, and it was clear that he [could] apply the Buddhist teachings to his challenges in life, his daily situation, his mind." Tr. Part I, Bono Testimony at 47:20-48:1. She testified that "he was very calm and still[,]" which "really impacted our group in a positive way." Tr. Part I, Bono Testimony at 47:22-25.

24.     Mr. Hoffman's spiritual advisor, Brother Reimoku Gregory Smith,[8] testified that Mr. Hoffman is a "calm, grounded individual who is clearly very devoted to Buddhist meditation practice." Tr. Part I, R. Smith Testimony at 101:8-9.

25.     A core component of the Buddhist religion is the use of breathing meditation and techniques. Tr. Part I, Bono Testimony at 44:25-45:7. As Reverand Michael Bono testified: "in every sect of Buddhism, breathing meditation takes some form. In one of the most revered scriptures of the Buddha called Anapanasati, it is a detailed guidance on how to practice breathing meditation. . . And the whole fundamental – all of that is based on the breath. The breath is the vehicle to liberation in Buddhism. It is essential." Tr. Part I, Bono Testimony at 48:18-49:2.

26.     Mr. Hoffman has been able to manage his PTSD through his practice of Buddhism and breathing. Tr. Part I, Sautter Testimony at 64:13-65:5, 77:21-24; Tr. Part I, Hoffman Testimony at 32:21-23. For instance, on February 20, 2025, when Mr. Hoffman was notified that the State would execute him via nitrogen hypoxia, and he was moved from his living quarters to a small solitary cell in unexpectedly, he was able to utilize his Buddhist breathing practices to manage his anxiety and panic. Tr. Part I. Hoffman Testimony at 25:25-26:7.

---

[8] Brother Reimoku Gregory Smith moved into the New Orleans Zen Temple in 2011 and has been practicing Buddhism since. Tr. Part I, R. Smith Testimony at 99:21-22. He currently practices at Mid City Zen Center and is Mr. Hoffman's spiritual advisor. Tr. Part I, R. Smith Testimony at 100:1-7.

### E. The Gassing Protocol Substantially Burdens Mr. Hoffman's Practice of Buddhism.

27. Mr. Hoffman will not be able to practice Buddhism if he is executed by nitrogen hypoxia. Tr. Part I, R. Smith Testimony at 103:9-11. As expert witness Reverand Michaela testified: "I believe that [an execution by nitrogen hypoxia] would interfere with his ability to practice Buddhism at the end of his life." Tr. Part I, Bono Testimony at 49:12-14. His spiritual advisor, Brother Reimoku Smith, explained: "according to the Zen tradition, one must be able to breathe oxygen. . . up until the point of death, the state of mind is very important. So if a gas mask were placed over his face and he was gassed with nitrogen, he will not be able to breathe oxygen, thus impeding his ability to sustain his practice up until the moment of transition." Tr. Part I, R. Smith Testimony at 103:13-19.

28. In order to practice Buddhist meditation, one must breathe air, as "[i]t's the air that nourishes your body[,]" and without access to air, one "cannot put his awareness on that breathing and thus cannot follow that practice." Tr. Part I, Bono Testimony at 49:21-24. It is insufficient to merely inhale and exhale, if you are not breathing in air. Tr. Part I, Bono Testimony at 51:20-52:1. Mr. Hoffman testified that he will not be able to practice his Buddhist meditative breathing once the mask is filled with nitrogen gas. Tr. Part I, Hoffman Testimony at 31:15-17.

29. As Reverend Michaela testified, "if you have traumatic final moments, they can negatively impact what's called the Bardo, which is the realm between death and then your next rebirth." Tr. Part I, Bono Testimony at 50:13-18. Traumatic final moments can lead to a negative rebirth. Tr. Part I, Bono Testimony at 50:19:20.

30. Mr. Hoffman's ability to practice his faith at the moment he is put to death is thus substantially burdened under the Nitrogen Gassing Protocol, and it would not be with either of the two pleaded alternative methods.

**F. Louisiana Adopted Executions by Nitrogen Hypoxia in 2024.**

31.     On March 5, 2024, the Louisiana Legislature amended La. Rev. Stat. § 15:569, effective July 1, 2024, to add two new methods of execution in addition to lethal injection – nitrogen hypoxia and electrocution. The amendment expressly delegated the selection of the method of execution to "the discretion of the secretary of the [DPSC]." La. Rev. Stat. § 15:569(A).

32.     The Louisiana Legislature also amended La. Rev. Stat. § 15:570, effective July 1, 2024, to provide for "the absolute confidentiality" of persons or entities involved in executions.

33.     In determining to execute Mr. Hoffman, the DPSC did not consider using lethal injection as an execution method. Tr. Part I, S. Smith Testimony at 159:4-6.

34.     In determining to execute Mr. Hoffman, the DPSC did not consider using electrocution as an execution method. Tr. Part I, S. Smith Testimony at 159:1-9.

**G. The Warrant for Execution and Notice of Execution by Nitrogen Hypoxia.**

35.     On February 12, 2025, Judge Alan Zaunbrecher of the 22nd Judicial District Court for the Parish of St. Tammany issued a Warrant for Execution of Person Condemned to Die (the "Warrant").  Pursuant to the Warrant, Defendant Gary Westcott, Secretary of the DPSC, was "directed and commanded . . . to cause the execution of Jessie D. Hoffman . . . in the manner provided by law," to "cause the condemned Jessie D. Hoffman to be put to death on March 18, 2025, between the hours of 6:00 p.m. and 11:59 p.m.," and to "follow all of the requirements and requisites of the law in carrying out this execution."

36.     Secretary Westcott is the chief executive officer of and exercises control over the DPSC.  He is responsible for protecting the constitutional rights of all persons held in the DPSC's custody, including Mr. Hoffman.

37.     Defendant Darrel Vannoy is the Warden of Angola ("Warden").  He is responsible for properly carrying out executions at Angola, including but not limited to making staffing,

budget, and administrative decisions related to executions, and is responsible for the "custody, control, care, and treatment of adjudicated people" at Angola.[9]

38.     By letter dated February 20, 2025, Secretary Westcott notified Mr. Hoffman that the DPSC had received a certified copy of the Warrant, provided a copy of the Warrant to Mr. Hoffman, and notified Mr. Hoffman that, "[p]ursuant to La. R.S. 15:569, the method of execution will be by nitrogen hypoxia."

### H.     The Nitrogen Gassing Protocol

39.     Louisiana has not conducted an execution for well over a decade, and the DPSC has never executed or attempted to execute a condemned inmate by nitrogen hypoxia.

40.     On February 10, 2025, Louisiana Governor Jeff Landry announced that the DOC "finalized and implemented an updated protocol that allows for the sentences of those on Death Row to be carried out," including "procedures for the nitrogen hypoxia method . . . ."[10]

41.     The updated execution protocol ("Nitrogen Gassing Protocol"), DPSC Department Regulation No. OP-D-8, provides for execution by forced nitrogen gassing. PX-1.  Pursuant to the Nitrogen Gassing Protocol: (a) Mr. Hoffman will be strapped to a gurney PX-1, at 25; (b) the mask – a continuous flow, full face, supplied air respirator with head straps – will be placed on Mr. Hoffman and cover his entire face, PX-1, at 24; (c) Mr. Hoffman will remain strapped to the gurney with the mask covering his face for a significant period of time, starting with a two minute monitoring period, for the time it takes to engage with his spiritual advisor and carry out the spiritual advisor's approved written plan, for several more minutes while the Warden opens the

---

[9] La. Dep't of Public Safety & Corrections, Louisiana State Penitentiary, https://doc.louisiana.gov/location/louisiana-state-penitentiary/.

[10] Press Release, Louisiana Governor Jeff Landry, *Promises Made, Promises Kept: Justice Coming for Crime Victims* (Feb. 10, 2025), https://gov.louisiana.gov/news/4762.

curtain, turns on the microphone and gives Mr. Hoffman up to two more minutes to make a last statement, and then for the time it takes the Warden to notify the witnesses that the state is carrying out the execution PX-1, at 25-26; (d) the nitrogen to be used in the execution is industrial grade, not medical grade, Tr. Part I, S. Smith Testimony at 175:8-17.; and (e) the nitrogen hypoxia system will then be activated, introducing pure nitrogen into the mask at a flow rate of 70 L/minute for fifteen (15) minutes or five minutes following a flatline indication on the EKG. PX-1, at 26.

42.     The Nitrogen Gassing Protocol does not provide that Mr. Hoffman is allowed access to his counsel during the execution process, but instead provides that "[t]he Secretary shall select and finalize witness approvals." PX-1, at 3.

43.     Warden Vannoy confirmed that he will terminate Mr. Hoffman's contact with his counsel at approximately 4:30 p.m., hours before the execution actually occurs. Tr. Part II, Vannoy Testimony at 17:13-14, 20. While Warden Vannoy testified that he would allow Mr. Hoffman's counsel to have their cell phone while at the prison, it is not within his discretion to allow Mr. Hoffman's counsel to witness the execution. Tr. Part II, Vannoy Testimony at 18:4-10. That discretion rests solely with Secretary Westcott. Tr. Part II, Westcott Testimony at 23:1-4.

44.     Secretary Westcott has made the decision *not* to allow Mr. Hoffman's counsel to witness the execution. Tr. Part II, Westcott Testimony at 23:5-7. Instead, he will allow representatives from the Governor's office, the Attorney General's office, and law enforcement to witness the execution. Tr. Part II, Westcott Testimony at 23:19-22.

**I.      Louisiana Law Prohibits Euthanizing Animals Using Gas**

45.     In 1983, Lawrence Lee Capone (DVM) personally witnessed the use of gas to euthanize animals using carbon monoxide, which, like nitrogen, "deprive[s] the animal of oxygen

which leads to asphyxiation." Tr. Part I, Capone Testimony at 88:8-21; 91:14-19.[11] When the animals were retrieved, "they had dilated pupils, open mouths. Some had vomited, some had defecated, some had urinated. It was pretty horrific to see." Tr. Part I, Capone Testimony at 92:11-13. Dr. Capone testified that the practice was so "gruesome" that he was quickly able to get public sentiment on his side through the media and get the practice stopped. Tr. Part I, Capone Testimony at 91:24-92:6; 92:25-93:11.

46.     Dr. Capone testified that the American Veterinary Medical Association ("AVMA") guidelines for the euthanasia of animals no longer allow the use of gassing for mammals. Tr. Part I, Capone Testimony at 93:12-19.[12]

47.     Based in part on Mr. Capone's advocacy to eliminate the "gruesome" practice, the Louisiana Legislature passed a law that specifically outlawed gassing as a method of euthanasia for cats and dogs and provides that "[e]uthanasia methods and procedures [for animals] must conform with recommendations outlined in the report of the American Veterinary Medical Association on Euthanasia." La. Rev. Stat. § 3:2465(C)(1)-(2); Tr. Part I, Capone Testimony at 93:6.

---

[11] Dr. Capone is a Louisiana-licensed veterinarian who has practiced veterinary medicine for over forty-five (45) years. Tr. Part I, Capone Testimony at 87:8-11.

[12] This Court may take judicial notice of the AVMA Guidelines for the Euthanasia of Animals, at 28 (2020 ed.), www.avma.org/sites/default/files/2020-02/Guidelines-on-Euthanasia-2020.pdf. These guidelines are followed by major research universities, including Louisiana State University and Louisiana State University Health Sciences Center. *See, e.g.*, LSU Health, New Orleans, Institutional Animal Care and Use Committee, www.lsuhsc.edu/administration/academic/ors/iacuc/default.aspx.

**J.     The United Nations Has Announced that the Use of Nitrogen Gas May Cause
"Grave Suffering" and Amount to "Torture"**

48.     The United Nations Human Rights Office has admonished the use of nitrogen gas

and the "grave suffering"[13] it may cause as likely "amount[ing] to torture under international

law."[14]

**K.     Executing Mr. Hoffman Using the Method of Nitrogen Gassing Will be Less
Humane and More Burdensome than the Method of Execution in Place at the
Time Mr. Hoffman Was Sentenced**

49.     At the time of commission of the underlying offense, the only legal method of

execution was lethal injection. *Supra* ¶ 2-4. The lethal injection method includes a sedative. Tr.

Part II, Bickler Testimony at 63:25, 64:1. The person being executed loses consciousness very

quickly, within seconds. Tr. Part II, Bickler Testimony at 64:1-3. According to Defendants' expert

Dr. Antognini, lethal injection does not subject the inmate to pain and suffering. Tr. Part II,

Antognini Testimony at 194:24-25, 195:1-3.

50.     Nitrogen is not an anesthetic. Tr. Part II, Bickler Testimony at 37:25, 38:1-2. The

Louisiana nitrogen gassing protocol does not include any drug or anesthetic that would relieve

pain or anxiety. Tr. Part II, Bickler Testimony at 37:18-21. On the contrary, nitrogen gassing

executions elicit a "massive sympathetic nervous system response." Tr. Part II, Bickler Testimony

at 38:5-6. It "produces a terror response." Tr. Part II, Bickler Testimony at 38:6-7. Dr. Bickler

examined the eyewitness accounts, including those of the Alabama Department of Corrections,

and concluded that "the suffering was longer than . . . advocates for the method predicted" and

---

[13] This Court may take judicial notice of the U.N.'s statements regarding nitrogen gas executions. U.N.
Human Rights, Office of the High Commissioner, *United States: UN Experts Alarmed at Prospect of First-
Ever Untested Execution by Nitrogen Hypoxia in Alabama* (Jan. 3, 2024), www.ohchr.org/en/press-
releases/2024/01/united-states-un-experts-alarmed-prospect-first-ever-untested-execution.

[14] *First U.S. Nitrogen-Gas May Constitute Torture—UN Rights Office*, reuters.com (Jan. 16, 2024),
www.reuters.com/world/us/first-us-nitrogen-gas-execution-may-constitute-torture-un-rights-office-2024-
01-16/.

"the duration of the suffering was much longer that [Dr. Bickler] would consider humane." Tr. Part II, Bickler Testimony at 64:6-19.

###### L. The Nitrogen Gassing Protocol Is Inhumane and Will Cause Mr. Hoffman to Experience Superadded Pain and Suffering

51.     Dr. Phillip Bickler has extensive experience studying human hypoxia.[15] Dr. Antognini admits that Dr. Bickler has far more expertise in the field of human hypoxia, Tr. Part II, Antognini Testimony at 196:11-19. Dr. Antognini further admits that Dr. Bickler has done a lot of work in the area that he has not done. *Id*. at 193:20-194:1. Moreover, Dr. Antognini confirmed that he neither endorsed nor approved what Louisiana was doing with this method. *Id*. at 175:16-20.  Dr. Antognini has published no article or study, and given no medical presentations on nitrogen hypoxia. *Id*. at 174:13-23.

52.     Hypoxia is oxygen deprivation. Tr.Part II, Bickler Testimony at 28:2. Nitrogen "hypoxia" is a method of execution that involves forced asphyxiation, depriving the condemned inmate of oxygen by gassing the individual to death with nitrogen, causing, as Dr. Bickler explained, "**extreme discomfort, distress, pain and terror all the way up to the point of losing consciousness and eventually dying**." Tr. Part II, Bickler Testimony at 30:9-12 (emphasis added). This suffering would last approximately three to five minutes before consciousness is lost. *Id*. at 43:13-17; 47:3-7; and 54:1-6, 14-19. Dr. Bickler bases this opinion on duration of suffering on his extensive experience with nitrogen hypoxia, including producing controlled hypoxemia in at least five thousand human subjects and an analysis of eyewitness nitrogen hypoxia execution reports,

---

[15] Phillip E. Bickler, M.D., Ph.D., received a B.A. in Chemistry in 1984 from The Johns Hopkins University and a Ph.D. in Biophysical Chemistry in 1989 from the University of California, Berkeley.  He has been a practicing physician since 1986 and is a Board-certified anesthesiologist.  Since 2006, Dr. Bickler has been the Chief of Neuroanesthesia at the University of California, San Francisco (UCSF).  Dr. Bickler has studied hypoxia for over forty years and has been, for over thirty years, the Director of the Hypoxia Research Laboratory at UCSF, a leading center for the study of the effects of hypoxia (oxygen deprivation) on humans. Tr. Part II, Bickler Testimony at 27:17-24; PX-16 at 1-75 (Dr. Bickler CV).

including press articles and transcript testimony. *Id*. at 37:6-24; 38:10-19; 41:3-14. This included the transcript of the testimony of Dr. Brian McAlary, an anesthesiologist who witnessed the nitrogen gas execution of Mr. Carey Grayson in Alabama. *Id*. at 41:15-18; 42:9-25; 43:1-17; 44:1-25; 45:1-25; 46:1-25; 47:1-7. Dr. Bickler based his opinion on the duration of suffering also on multiple press reports showing purposeful movement long after the short during of consciousness argued by Dr. Antognini. *Id*. at 47: 15-25; 48:1-25; 49:1-25; 50:1-7; 51:20-25; 52:1-25; 53:1-3.

53.     Additionally, compounding the experience of suffering, nitrogen has no anesthetic properties. *Id*. at 37:25-38:2; 63:23. The Nitrogen Gassing Protocol has no drug or anesthetic to relieve pain or anxiety. *Id*. at 63: 18-21. Instead, what the nitrogen "does is it elicits this massive sympathetic nervous system response, so **it produces a terror response** if you will." *Id*. at 38:5-7 (emphasis added).

54.     "The sensations associated with being exposed to conditions where there is no oxygen in the environment produces a feeling of suffocation, of extreme breathlessness, anxiety, increased heart rate, the fight or flight response, all of that." Tr. Part II, Bickler Testimony at 30:16-20. It is "**[v]ery similar to drowning**. If you've had a near drowning experience, you know what I'm talking about. It's pretty terrifying." *Id*. at 30:21-23 (emphasis added).

55.     Dr. Antognini relied on publications of limited relevance to nitrogen hypoxia execution to advocate for a short time to loss of consciousness, specifically an Ernsting paper, two Ogden papers, Miller and Mazur, and a "dog study." Reliance on any dog euthanasia study for anything other than that nitrogen will be lethal would be flawed, as Dr. Antognini admits that the dogs would have different ventilation, different cardiac output and different metabolisms to humans, and would not likely be holding their breath. Tr. Part II, Antognini Testimony at 179:25; 180:1-7. The Ernsting paper is not instructive on time to loss of consciousness. Dr. Antognini admitted that the results of experiments with different methods cannot be compared and that the

Ernsting method, involving the purging of lung air followed by the hyperventilation of nitrogen, were two "very different things" in that method as compared with Louisiana's nitrogen hypoxia method. Tr. Part II, Antognini Testimony at 183:22-25; 184:1-6. The Miller and Mazur Fermilab paper is a safety paper, not a study or experiment, it includes no method information or data and only cites to other references not before this Court. Tr. Part II, Antognini Testimony at 184:7-25; 185:1-4. Lastly, the two Ogden papers were, among other problems, the work of a sociologist documenting six voluntary suicides of individuals in poor health. *Id.* at 188:9-26; 189:1-25; 190:1-25; 191:1-2.

56. Dr. Bickler explained that most humans can hold their breath for about a minute. Tr. II Bickler Testimony at 39:9-12. Breath-holding causes carbon dioxide in the body to rise and "your heart rate to increase, your catecholamines, your sympathetic nervous system starts to really ramp up and as you get to the end it's pretty extreme and you just can't do it anymore. It's that feeling of utter lack of control. Your drive to breathe overcomes your conscious will." *Id.* at 40:9-14.

57. Dr. Antognini agreed that if breathing would cause one to die, as in this method, "there would be some people that would be motivated to hold their breath" and to do so "as long as possible." Tr. II Antognini Testimony at 176:25-177:11. Dr. Antognini agreed that healthier and younger individuals generally can hold their breath longer, *Id.* at 177: 15-18, and that he thought that some trained diver may even be hold their breath for up to fifteen minutes. *Id.* at 176:19-24.

58. Dr. Antognini agreed that breath holding caused a condition called hypercapnia, which is elevated carbon dioxide in the body. *Id.* at 177:19-24. This condition triggers respiratory centers in the brain that tell your body "breath, breath . . . . And they're pushing and you're holding your breath trying to resist that. But you get to the point where you just can't hold it any longer." *Id.* at 178:1-16.

59.     Dr. Antognini further agreed, under these circumstances, that if the hypercapnia is forcing your body to breathe and your mind knows breathing will kill you, that it is a fair statement that that will create "**a condition of severe emotional suffering**." *Id*. at 178:17-24.

60.     Dr. Bickler studied data for all four of Alabama's nitrogen gas executions and concluded that, for all four, "the duration of suffering was much longer than I would consider humane." Tr. II Bickler Testimony at 64:6-16.

61.     Accordingly, forcing a person to inhale nitrogen to execute them causes "extreme discomfort, distress, pain and terror." Tr. Part II, Bickler Testimony at 30:12; *see also* Tr. Part I, Sautter Testimony at 70:16-20, 71:5-72:7, 77:21-78:3, 85:17-20 (execution by nitrogen hypoxia will cause Mr. Hoffman psychological distress and him to lose control over his emotional state).

62.     And Mr. Hoffman will "lose control of [his] emotional state," as well as the "ability to regulate [his] emotions and [his] texts." Tr. Part I, Sautter Testimony at 71:25-72:7. This is very likely to all occur, regardless of any improvement to his PTSD. *Id.* at 77:21-78:3, 85:17-20.

**M.     The Pain and Suffering Experienced by Mr. Hoffman Will Be More Severe Due to His PTSD and Claustrophobia**

63.     The choice of which of the three statutorily authorized methods of execution to use to execute a given individual is solely within Secretary Westcott's discretion. Tr. Part II, Westcott Testimony at 21:24-25, 22:1. Mr. Hoffman suffers from PTSD, which can be "triggered" by traumatic events, particularly those involving claustrophobia. Tr. Part I, Sautter Testimony at 62:23-63:3, 64:13-67:13, 77:21-78:3, 85:1-12; Tr. Part I, Hoffman Testimony, at 26:5.

64.     Secretary Westcott testified that he did not consider Mr. Hoffman's vulnerabilities when making the choice of which method to use to execute him. Westcott Testimony at 22:6-9.

65.     Dr. Bickler testified "for someone like Mr. Hoffman, nitrogen asphyxiation would be a particularly horrible method, a really inhumane choice for an individual who has a history of

PTSD." Tr. II, Bickler Testimony at 31:7-14. Dr. Bickler's opinion was based on his experience as Chief of the Division of Neuro Anesthesia at the University California San Francisco, where he tends to patients with PTSD undergoing brain surgery while awake. *Id*. at 33:17-25; 34: 34:1-19. Further, Dr. Bickler considered the photographs of the execution mask and execution chamber and testified "I think anyone with a history of PTSD when confronted with this kind of environment would be extremely uncomfortable." Id. at 55:3-25. In view of Mr. Hoffman's claustrophobia and the mask that will interfere with Mr. Hoffman meditative breaching coping techniques, Dr. Bickler testified that "… Mr. Hoffman would suffer additional stress if those coping mechanisms were interfered with. So he would experience additional terror." *Id*. at 58:19-25; 59:1-9.

66.    Dr. Antognini did not take into consideration and provided no opinion on how a person suffering from PTSD and/or claustrophobia would tolerate the nitrogen execution under the protocol that Louisiana will use.  Tr. II, Antognini Testimony at 173:20-25; 174:1-6.

67.    Execution by nitrogen hypoxia will instill fear into Mr. Hoffman and cause him to reexperience trauma because it is a life-threatening event that will "freak" him out. Tr. Part I, Sautter Testimony at 68:12-70:3, 70:6-15, 77:21-78:3. Depriving him of oxygen will increase the likelihood that he has a panic attack. *Id.* at 69:17-20.

68.    Because execution by nitrogen hypoxia will cause Mr. Hoffman to reexperience trauma, it will lead to severe psychological distress. Tr. Part I, Sautter Testimony at 70:16-20, 71:5-24. And Mr. Hoffman will "lose control of [his] emotional state," as well as the "ability to regulate [his] emotions and [his] texts." *Id.* at 71:25-72:7.  This can all occur, regardless of any improvement to his PTSD. *Id.* at 85:17-20.

**N.     Dr. Antognini's Opinion Fails to Account for Critical Facts Relevant to this Case and is Based on Suicides, Dogs, and Workplace Accidents**

69.     Dr. Joseph F. Antognini is an anesthesiologist who testified for Defendants that execution by nitrogen hypoxia would not cause pain and suffering. Tr. Part II, Antognini Testimony at 173:9–13.

70.     Dr. Antognini has not practiced anesthesiology since 2019. Tr. Part II, Antognini Testimony at 174:7–12. He has neither published an article or study nor given a medical presentation on nitrogen hypoxia. *Id.* at 174:13–23. He has never witnessed a person dying from inhalation of nitrogen gas. *Id.* at 174:24–175:2. He has "not done studies like Dr. Bickler" of humans in a hypoxic condition. *Id.* at 179:5–11; *see also id.* at 193:20–23 (admitting that Dr. Bickler "has done a lot of work that I haven't done" in studying the effects of hypoxia in humans.

71.     Dr. Antognini's opinion that forced inhalation of nitrogen would not cause pain and suffering is based on his opinion that the condemned person will become unconscious in 30 to 40 seconds after administration of nitrogen gas. *Id.* at 171:21–25. He admits that "we do not have data where we've taken humans and we've subjected them to 100 percent nitrogen to see how long they become unconscious." *Id.* at 180:13–16; *see also id.* at 181:3–7 ("we haven't done studies where we've taken the humans and . . . gave them a hundred percent nitrogen and studied them to see when they become unconscious, when does the heart stop and all that kind of stuff, for obvious reasons"). So, he had "to collect data from other sources." *Id.* at 181:8–9.

72.     Dr. Antognini relies on five "other sources" none of which report results based on methods comparable to Defendants' method for nitrogen hypoxia executions. *Id.* at 181:16–182:2 (agreeing that "you can't compare experimental results and draw conclusions about their differences unless the methods are comparable where you can draw analogies to the methods that

make them useful to compare"). Each of Dr. Antognini's other sources involve subjects voluntarily inhaling inert gases for experiments, to commit suicide, or in tragic industrial accidents. Those methods are not comparable to forced inhalation of nitrogen to involuntarily cause death because, in that circumstance, "there would be some people that would be motivated to hold their breath" for "as long as possible." Tr. Part II, Antognini Testimony at 176:25–177:11. And his estimation that a person would become unconscious 30 to 40 seconds after inhaling pure nitrogen "depends on how long they are holding their breath." And neither Dr. Antognini or any of his "other sources" have anything to say about how a person with claustrophobia and PTSD would tolerate forced inhalation of nitrogen gas under Louisiana's protocol. *Id.* at 173:20–174:6.

73.     First, Dr. Antognini relies on a paper published in 1963. *Id.* at 179:12–17; DX 3-12. But in that study, the subjects were instructed to "expire maximally" before nitrogen was introduced, which has the effect of "forcing the oxygen out of their lungs before the experiment," and then to hyperventilate when nitrogen was introduced. Tr. Part II, Antognini Testimony at 182:16–183:5, 183:12–21; DX3-12 at 292–93. And Dr. Antognini admitted that there is no requirement or expectation that a condemned inmate will do that under the Defendants' protocol. Tr. Part II, Antognini Testimony at 183:6–10, 183:22–184:3.

74.     Dr. Antognini also relies on two papers by Ogden who is a sociologist—not a medical doctor or biologist—involving subjects who voluntarily inhaled helium as a means of suicide. *Id.* at 183:5–13; DX3-23. In the first paper, Ogden observed two women who inhaled helium. But Dr. Antognini admitted that Ogden is "not qualified from a medical perspective of doing a consciousness check," which would raise a "reliability issue" about his reporting of the time it took for the women to become unconscious. Tr. Part II, Antognini Testimony at 186:5–14. The second Ogden paper involves the suicides of four people by voluntarily inhaling helium. *Id.* at 188:14–17; DX3-23. None of the authors were present during the suicides. *Id.* at 188:18–21.

Instead, the authors reviewed videos that were made to confirm that the suicides were legal under Swiss law. *Id.* at 189:6–13.

75.     Next Dr. Antognini relies on a white paper that reports results from other sources. *Id.* at 184:4–21. But Dr. Antognini admits that he doesn't have any information about the reliability of the methods or work from the underlying sources. *Id.* at 184:22–185:4.

76.     Finally, Dr. Antognini relies on an animal study involving dogs inhaling gas. But dogs differ from humans in terms of ventilation, cardiac output, and metabolism that would affect the time in which they would become unconscious after exposure to pure nitrogen relative to humans. *Id.* at 179:20–180:8. And there is no basis to believe that the dogs were holding their breath during the experiment. *Id.* at 180:6–8.

77.     Dr. Antognini's opinion does not comport with his own testimony that to extrapolate from studies about inhalation of gas to the method for executing condemned inmates by nitrogen hypoxia, those studies must use comparable methods to those contemplated by the protocol. *Id.* at 181:16–182:2.

78.     The Court finds Dr. Bickler's testimony on the effects of forced inhalation of nitrogen as contemplated by the Defendants' protocol more credible.

**O.     The Nitrogen Gassing Protocol Lacks Sufficient Oversight and Safeguards**

79.     Doctors and medical professionals were not consulted in creating the Nitrogen Gassing Protocol and did not give input into the Nitrogen Gassing Protocol. Tr. Part I, S. Smith Testimony at 155:16-24.

80.     No medical textbooks or journals were considered in creating the Nitrogen Gassing Protocol. *Id*. at 155:25-156:5.

81.     Other than Defendants' paid expert witness, Dr. Antognini, no other doctor or medical professional has reviewed the Nitrogen Gassing Protocol to ensure that there are adequate safeguards so that the condemned inmate will not suffer pain and torture in the execution process. *Id*. at 156:18-25, 157:15-19.

82.     The execution team does not include an anesthesiologist or any other type of medical doctor. Tr. Part I, S. Smith Testimony at 160:25, 161:1-3.

83.     The member of the execution team who will place the gas mask on Mr. Hoffman's face is a corrections officers with no medical training. Tr. Part I, S. Smith Testimony at 161:4-9.

84.     The member of the execution team who obtained the nitrogen gas that will be used in the execution is a maintenance worker. Tr. Part I, S. Smith Testimony at 161:10-13.  This maintenance worker also maintains the nitrogen gas system and checks the nitrogen gas flow during the execution.  *Id.* at 162:2-8. This maintenance worker has no medical training. *Id.* at 162:9-11.

85.     The Nitrogen Gassing Protocol mirrors Alabama's nitrogen hypoxia execution protocol. *Id*. at 157:20-24. In creating the Nitrogen Gassing Protocol, the DPSC only looked at Alabama's nitrogen hypoxia execution protocol and did not consider any other state's nitrogen hypoxia execution protocol. *Id*. at 157:25-158:5.

86.     No member of the execution team has ever participated in a nitrogen gassing execution. *See* Tr. Part II, Vannoy Testimony at 15:20-22. Warden Vannoy has never participated in a nitrogen gassing execution. Tr. Part II, Vannoy Testimony at 8:11-13. Secretary Westcott has never participated in any executions. Tr. Part II, Westcott Testimony at 21:22-23.

87.     The Nitrogen Gassing Protocol does not take into consideration the inmate's medical, mental, psychological or emotional conditions in determining the manner in which the

execution by nitrogen hypoxia will be carried out. Tr. Part I, S. Smith Testimony at 165:25-166:8, 166:13-16.

88. Nitrogen Gassing Protocol does not take into consideration whether the inmate suffers from PTSD in determining the manner in which the execution by nitrogen hypoxia will be carried out. Tr. Part I, S. Smith Testimony at 166:9-12.

89. Defendants and other persons tasked with carrying out executions by nitrogen hypoxia, including Defendants John Does, have not received adequate training and conducted adequate practice in order to be able to carry out executions in a manner that protects the constitutional rights of condemned inmates, including the scheduled execution of Mr. Hoffman on March 18, 2025. Warden Vannoy testified that he started at his current position as warden on November 27, 2024. Tr. Part II, Vannoy Testimony at 6:21-24. He was not informed that the DPSC had enacted a protocol dated February 3, 2025. Tr. Part II, Vannoy Testimony at 14:13-15. He was not informed that the DPSC had enacted the February 7, 2025, version of the protocol until February 11, 2025. Tr. Part II, Vannoy Testimony at 10:14-18. He was not consulted in the drafting of either iteration of the protocol, nor did he see any drafts. Tr. Part II, Vannoy Testimony at 10:19-24. The execution trainings that were conducted between November 27, 2024, and February 11, 2024, were not done pursuant to any protocol. Tr. Part II, Vannoy Testimony at 12:14-25, 13:1-4. Instead, Warden Vannoy assumed that nitrogen gas would be the method. Tr. Part II, Vannoy Testimony at 13:1-4.

90. Defendants and other persons tasked with carrying out executions by nitrogen hypoxia, including Defendants John Does, are not qualified to administer lethal gas to a human being. Tr. Part II, Vannoy Testimony at 15:20-23.

91. The nitrogen gas that will be used in Mr. Hoffman's execution is not medical grade. Tr. Part I, S. Smith Testimony at 163:13-15.

92. The nitrogen gas that will be used in Mr. Hoffman's execution has not been tested by the DPSC to ensure that it has appropriate purity levels. Tr. Part I, S. Smith Testimony at 163:16-19.

93. The Nitrogen Gassing Protocol prohibits full access to counsel and the courts during the execution process. On the day of Mr. Hoffman's execution, after 3:00 pm, the warden can terminate Mr. Hoffman's contact with his attorneys. Tr. Part I, S. Smith Testimony at 162:12-15. On the day of Mr. Hoffman's execution, after 3:00 pm, the warden may also terminate Mr. Hoffman's contact with his religious advisor. *Id*. at 162:16-20.

**P.    Alternative Means of Execution are Feasible, Readily Available, and Would Significantly Reduce Mr. Hoffman's Risk of Harm**

**1.    Execution by Firing Squad**

94. The DPSC has not considered using execution by firing squad as an execution method. Tr. Part I, S. Smith Testimony at 159:16-22.

95. Execution by firing squad is an available and feasible alternative method that would cause less pain and suffering than execution by forced nitrogen gassing and is less likely to trigger Mr. Hoffman's PTSD. Tr. Part I, Williams Testimony at 121:2-4; Tr. Part I, Sautter Testimony at 82:11-83:10.

96. Plaintiff's expert, Dr. James Williams, a board certified medical doctor in emergency medicine as well as firearms and ballistics, has examined the firing squad protocols of Utah and the U.S. Army. Tr. Part I, Williams Testimony at 104:21-25, 105:1-7, 107:7-10. He has also been shot in the chest himself. Tr. Part I, Williams Testimony at 116:17-18. Dr. Williams testified that, for the vast majority of gunshot wound patients, the sensation of being shot in the

chest is nearly painless. Tr. Part I, Williams Testimony at 115:14-20.[16] Evidence and recent experience strongly suggest that "the firing squad is significantly more reliable" than lethal injection. *See Glossip v. Gross*, 576 U.S. 863, 976-77 (2015) (Sotomayor, J., dissenting); Tr. Part I, Williams Testimony at 119:10-15. Historically, the firing squad has resulted in significantly fewer "botched" executions. Dr. Williams testified that the only two "botched" firing squad executions were one with no protocol, and one in which the officers deliberately shot around the inmate's heart to cause him pain and suffering. Tr. Part I, Williams Testimony at 120:8-116.

 97. During the March 7, 2025, evidentiary hearing, the State of South Carolina executed Brad Sigmon by firing squad using a protocol similar to the ones Dr. Williams attached to his report. Tr. Part I, Williams Testimony at 20-121:1. This Court may take judicial notice that, from media accounts, the death was nearly instantaneous. [17]

 98. Death by firing squad is currently approved by five States: Mississippi, MS Code § 99-19-51; Oklahoma, 22 OK Stat § 1014; Utah, UT Code § 77-18-113; South Carolina, SC Code § 24-3-530; and Idaho, ID Code § 19-2716. Utah has executed three inmates by firing squad since 1976—most recently on July 18, 2010.[18]

---

[16] James S. Williams M.D. M.Sc. received his MD in 1991 from the University of Calgary, and is Board-certified by the American Board of Family Medicine since 1998 and the Canadian College of Family Practice since 1993, and has been certified in Advanced Trauma Life Support by the American College of Surgeons since 1994. Dr. Williams is engaged in active practice as an emergency services physician with more than 40,000 hours of ER and ICU experience, about 25% of which has been spent in direct trauma care. (*Id.* at 1-2)

[17] Jeffrey Collins, *Firing squad witness describes South Carolina execution of Brad Sigmon: "My heart started pounding,"* CBS News, March 8, 2025, available at https://www.cbsnews.com/news/firing-squad-witness-describes-south-carolina-execution-brad-sigmon/ (entire process took three minutes, including "less than a minute," for the doctor to come out, "and his examination took about a minute more.").

[18] *See* Kirk Johnson, *Double Murderer Executed by Firing Squad in Utah*, N.Y. Times, June 19, 2010, https://www.nytimes.com/2010/06/19/us/19death.html.

99.     Protocols for execution by firing squad are known and available.  Utah's technical manual, which specifies the state's execution protocol in great detail, is publicly accessible.[19] Tr. Part I, Williams Testimony at 118:2-4; 16-21.

100.    Defendants could easily identify qualified personnel to carry out an execution by firing squad.  Tr. Part I, Smith Testimony at 160:7-12.

101.    The weapons and ammunition necessary to carry out an execution by firing squad are available or easily obtainable.  Tr. Part I, Smith Testimony at 160:1-6.

102.    Dr. Antognini testified that he has no expertise in the availability of the materials needed to have a firing squad in Louisiana. Tr. II. Antognini Testimony at 175: 6-10.

103.    Mr. Hoffman testified that he believed the firing squad would substantially reduce his pain and suffering compared to nitrogen hypoxia method. Tr. Part I, Hoffman Testimony 40:25-41:2.

## 2.     Execution by Administration of Medical-Aid-In-Dying.

104.    The DPSC has not considered using Medical-Aid-In-Dying ("DDMAPh") as an execution method. Tr. Part I, S. Smith Testimony at 157:7-9.

105.    Execution by DDMAPh is an available and feasible alternative method that would cause less pain and suffering than execution by forced nitrogen gassing as testified to by Dr. Blanke,[20] who the Court accepted as an expert in the fields of Medical-Aid-In-Dying and the drugs

---

[19] *See* Technical Manual of Utah Department of Corrections, https://cdn.muckrock.com/foia_files/2017/03/22/3-13-17_MR34278_RES.pdf; *see also* United States Army Firing Squad Protocol (1959).

[20] Charles David Blanke, MD, FASCO, FAWM, is a tenured professor of medicine at the Knight Cancer Institute of the Oregon Health and Science University in Portland, Oregon.  Tr. Part I, Blanke Testimony at 132:9-12. Dr. Blanke is a clinical researcher with board certification in medical oncology.  He has recognized expertise in end-of-life mediations and related issues and procedures. *Id.* at 132:15-133:15, 21-24.

and methods for Medical-Aid-In-Dying. Tr. Part I, Blanke Testimony at 133:22-134:3, 134:17-18, 148:23-24.

106. DDMAPh consists of the administration of digonxin, diazepan, morphine, amtirtipyline and phenobarbital, drugs that are easily obtainable through reasonable efforts. Tr. Part I, Blanke Testimony at 135:7-9, 140:13-141:19. The Defendants claim that they have signed certifications that prohibit the use of these drugs in executions. However, those certifications also state: "I further certify that our organization and none of its subsidiaries or affiliated organizations administer capital punishment." PX-135 at 2. Chief Smith admitted that this was a false statement. Tr. Part II, S. Smith Testimony at 4:21-24.

107. The medications are simply mixed with apple juice/apple syrup and administered to the prisoner. Tr. Part I, Blanke Testimony at 135:22-24. DDMAPh does not require any specialized training. Tr. Part I, Blanke Testimony at 143:22-144:2. The medications are readily available for execution from compounding pharmacies. Tr. Part I, Blanke Testimony at 141:13-14.

108. Administration of DDMAPh to a condemned prisoner would cause death and would do so reliably and painlessly. Tr. Part I, Blanke Testimony at 139:13-19. The combination of medications results in the loss of sensation and a "loss of consciousness, almost like being under anesthesia, but it also means that they are not feeling pain, they are not feeling anxiety, they are not aware of basically anything going on in their nearby environment." Tr. Part I, Blanke Testimony at 138:17-21. In most cases, for DDMAPh across the board, the average time to sleep is 5.8 minutes. Tr. Part I, Blanke Testimony at 139:5-6. Botched executions would also be avoided because DDMAPh is 100% effective in causing death. Tr. Part I, Blanke Testimony at 136:25; 137:1.

109.    The use of DDMAPh will reduce or eliminate the substantial risk of severe pain and suffering that Mr. Hoffman will likely experience if executed by forced nitrogen gassing. *See e.g.* Tr. Part I, Blanke Testimony at 134:17-18; Tr. Part I, Blanke Testimony at 148:23-24.

110.    Dr. Antognini testified that he has no experience with Medical-Aid-In-Dying. Tr. II, Antognini Testimony at 175:6-10.

111.    Mr. Hoffman testified that the DDMAPh method would result in his death without any risk of prolonged pain and suffering. Tr. Part 1, Hoffman Testimony 38:10-13.

**Q.    Exhaustion.**

112.    Mr. Hoffman filed a grievance as soon as Louisiana Revised Statute 15:569 adding the nitrogen hypoxia method went into effect on July 1, 2024. Tr. Part I, Court Ruling 11:14-16. The Defendants rejected his grievance as premature. Tr. Part I, Court Ruling 11:16-17. .  After his attorneys received notice that the State was seeking an execution warrant, Mr. Hoffman, in an abundance of caution, filed an emergency ARP on February 11, 2025. Tr. Part I, Court Ruling at 11:18-22.  On February 13, 2025, Mr. Hoffman was notified that a response from the Angola Warden's office would be issued within 40 days of the date of filing of the ARP. Tr. Part I, Court Ruling at 11:23-25.

**II.    [PROPOSED] CONCLUSIONS OF LAW**

**A.    Legal Standard**

113.    The purpose of a preliminary injunction "is merely to preserve the relative positions of the parties until a trial on the merits can be held." *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981). The primary reason to grant a preliminary injunction is "to preserve the court's power to render a meaningful decision after a trial on the merits." 11A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice & Procedure* § 2947, at 112, 114 (3d ed. 2013).

114.     "[P]reliminary injunctions are 'customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits." *Attorney General of Okla. v. Tyson Foods, Inc.*, 565 F.3d 769 (10th Cir. 2009) (quoting *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981)).

115.     The moving party is not required to "prove his case in full at a preliminary injunction hearing." *Id*. (quoting *Camenisch*, 451 U.S. at 395).

116.     To be entitled to a preliminary injunction, generally, a party should demonstrate that (1) they will likely succeed on the merits of their claim(s); (2) without preliminary relief, they will likely suffer irreparable harm; (3) "the balance of the equities tips in [their] favor"; and (4) "an injunction is in the public interest." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Any of the four factors may provide a reason for this Court to enter or deny an injunction. *See also Hill v. McDonough*, 547 U.S. 573, 584 (2006) (The same factors apply for a stay of execution.)   Where, as here, "the Government is the opposing party," the equities and public interest factors "merge." *Nken v. Holder*, 556 U.S. 418, 435 (2009).

117.     Where the other factors are strong, "it is not even necessary that a substantial likelihood of success be shown…a showing of some likelihood of success on the merits will justify temporary injunctive relief." *Productos Carnic*, *S.A. v. Central Amer. Beef and Seafood Trading Co.*, 621 F.2d 683, 686 (5th Cir. 1980). In particular, "the likelihood-of-success element varies with the relative harm occasioned to the parties from the issuance *vel non* of the injunction." *Bluebonnet Savings Bank v. Office of Thrift Supervision*, 62 F.3d 397, 397 (5th Cir. 1995)

**B.** **Mr. Hoffman Is Likely to Succeed on His Claim that Execution by Nitrogen Hypoxia Under the Nitrogen Gassing Protocol Would Violate His Eighth Amendment Right to be Free from Cruel and Unusual Punishment**

118.    The Eighth Amendment forbids the State, in carrying out a death sentence, from inflicting pain beyond that necessary to end the condemned prisoner's life. *In re Kemmler*, 136 U.S. 436, 447 (1890). "Punishments are cruel when they involve torture or a lingering death . . . something more than the mere extinguishment of life." *Id*.; *see also Baze v. Rees*, 553 U.S. 35, 50 (2008) (Execution violates the Eighth Amendment if it presents a "substantial risk of serious harm").

119.    A condemned prisoner challenging a method of execution must show the method creates a "substantial risk of serious harm" or an "objectively intolerable risk of harm" when compared to an alternative method of execution to the state's protocol that is "feasible, readily implemented, and in fact significantly reduce[s] a substantial risk of severe pain." *Glossip*, 576 U.S. at 876 (quoting *Baze*, 553 U.S. at 50, 52).

120.    A "substantial risk of serious harm" may occur when the method of execution involves "torture or a lingering death," *Baze*, 553 U.S. at 48, or the "'superaddition' of 'terror, pain, or disgrace.'" *Bucklew*, 587 U.S. at 133 (quoting *Baze*, 553 U.S. at 48).

121.    A prisoner's proposed alternative need not be authorized by state law. *Bucklew v. Precythe*, 587 U.S. 119, 153 (2019) (Kavanaugh, J., concurring). "Point[ing] to a well-established protocol in another State as a potentially viable option" is acceptable in identifying an alternative method. *Nance v. Ward*, 597 U.S. 159, 165 (2022) (citing *Bucklew*, 587 U.S. at 140).

**1.** **Executing Mr. Hoffman By Forced Nitrogen Gassing Would Subject Him to a Substantial Risk of Superadded Pain**

122.    Mr. Hoffman is likely to succeed on his Eighth Amendment claim that execution under the Nitrogen Gassing Protocol violates his right to be free from cruel and unusual

punishment under the Eighth Amendment because death by forced nitrogen gassing is cruel, unreliable and will subject him to a substantial and significant risk of severe, excessive and excruciating physical and psychological pain and suffering, and a prolonged death process with struggling and distress.

123.     Asphyxiation by forced nitrogen gassing is likely to cause conscious terror for several minutes and excruciating sensations of being suffocated to death.  Forcing Mr. Hoffman to inhale nitrogen gas will deprive him of oxygen.  The resulting hypoxia will likely lead to a cascade of physiological responses including reflexive and uncontrollable hyperventilation, confusion, disorientation and severe anxiety.  Hypoxia will be accompanied by intense air hunger, a profoundly distressing, primal, and overwhelming sensation of suffocation.  As oxygen levels decline, Mr. Hoffman's body chemoreceptors will trigger intense distress and his brain's control over motor function will deteriorate leading to involuntary muscle spasms and convulsions.

**2.      There Are Feasible and Readily Available Alternatives that Would Significantly Reduce the Substantial Risk of Superadded Pain to Mr. Hoffman**

124.     The two alternative execution methods plead by Mr. Hoffman – firing squad and DDMAPh – are "feasible, readily implemented, and in fact [would] significantly reduce the substantial risk of severe pain." *Baze*, 553 U.S. at 52.

125.     The two alternative execution methods plead by Mr. Hoffman are "sufficiently detailed to permit a finding that the State could carry it out 'relatively easily and reasonably quickly.'" *Bucklew*, 587 U.S. at 141 (citing *McGehee v. Hutchinson*, 854 F.3d 488, 493 (8th Cir. 2017)).

126.     Each of the two alternative execution methods plead by Mr. Hoffman will produce a reliable death with little or no pain, and each presents a substantially lesser risk of additional superadded pain and suffering than forced nitrogen gassing. *Bucklew*, 587 U.S. at 141.

127.     Accordingly, Mr. Hoffman is likely to succeed on his claim that attempting to execute him by nitrogen hypoxia under the Nitrogen Gassing Protocol violates his right under the Eighth Amendment to be free from cruel and unusual punishment.

C.     **Mr. Hoffman Is Likely to Succeed on His *As Applied* Claim that Execution by Nitrogen Hypoxia Under the Nitrogen Gassing Protocol Would Violate His Eighth Amendment Right to be Free from Cruel and Unusual Punishment**

128.     Mr. Hoffman has been diagnosed with complex PTSD caused by childhood trauma and abuse. *See supra* at Sec. (I)(B). He also suffers from claustrophobia. *See supra* at Sec. (I)(C). These conditions can cause panic, severe anxiety, mood dysregulation, high blood pressure, disassociation, and a sense of restricted breathing. Mr. Hoffman has learned to manage his PTSD symptoms using his Buddhist faith and breathing techniques. *See supra* at ¶ 26.

129.     Under the Nitrogen Gassing Protocol, Mr. Hoffman will be forced to put on a mask that will cover his nose and mouth; pure nitrogen gas will be forced into his lungs; he will be deprived of oxygen and unable to breathe. This method will render him unable to manage his PTSD symptoms by Buddhist breathing techniques and will otherwise cause him to experience PTSD-related extreme and severe psychological distress, panic, and terror. Mr. Hoffman likely will experience a heightened level of superadded pain and suffering due to his long-diagnosed PTSD and claustrophobia.

130.     Under this Nitrogen Gassing Protocol, Mr. Hoffman will be forcibly prevented by the State from engaging in the core Buddhist breathing and meditation practices, especially critical at the time of his transition from life to death, that are a fundamental and necessary part of his

Buddhist faith. *See supra* Sec. (I)(E). This restriction on his religious practice will subject him to a substantial and significant risk of severe, excessive and excruciating psychological pain and suffering.

   **D.   Mr. Hoffman Is Likely to Succeed on His Claim that Attempting to Execute Him by Nitrogen Hypoxia Under the Nitrogen Gassing Protocol Would Violate His Rights Under RLUIPA**

   131.   RLUIPA provides that "[n]o government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution"—including state prisoners—"even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person—(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U. S. C. §2000cc-1(a). "In RLUIPA, in an obvious effort to affect a complete separation from the First Amendment case law, Congress deleted reference to the First Amendment and defined the 'exercise of religion' to include 'any exercise of religion, whether or not compelled by, or central to, a system of religious belief.'" *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 696 (2014) (quoting 42 U.S.C. § 2000cc-5(7)(A)).

   132.   "A plaintiff bears the initial burden of proving that a prison policy 'implicates his religious exercise.'" *Ramirez v. Collier*, 595 U.S. 41, 425 (2022) (citing *Holt v. Hobbs*, 574 U.S. 352, 360 (2015). Mr. Hoffman has far surpassed this initial burden. Not only does the prison's plan to execute him via the Nitrogen Gassing Protocol implicate his religious exercise of his Buddhist beliefs, but it also completely prevents him from practicing them at the moment of his death. *See supra* Sec. (I)(E). Moreover, even though RLUIPA protects "any exercise of religion, whether or not compelled by, or central to, a system of religious belief," §2000cc-5(7)(A).

133.     "[A] prisoner's requested accommodation 'must be sincerely based on a religious belief and not some other motivation[.]" *Ramirez*, 595 U.S. at 425 (quoting *Holt*, 574 U.S. at 360-361). Mr. Hoffman has demonstrated the longstanding sincerity of his beliefs through his testimony and the testimony of his teacher, Reverand Michaela Bono. *See supra* Sec. (I)(D).

134.     "The burden on the prisoner's religious exercise must also be 'substantial.'" *Ramirez*, 595 U.S. at 425 (quoting *Holt*, 574 U.S. at 361). Mr. Hoffman has proven that the burden would be substantial, as the breathing meditation is central to Buddhism generally, and is of even more significance at the moment of death. *See supra* at ¶¶ 25, 28.

135.     "Once a plaintiff makes such a showing, the burden flips and the government must 'demonstrate[ ] that imposition of the burden on that person' is the least restrictive means of furthering a compelling governmental interest." *Ramirez*, 595 U.S.  at 425 (citing §2000cc-1(a)). "This allocation of respective burdens applies in the preliminary injunction context." *Ramirez*, 595 U.S. at 425 (citing *Gonzales* v. *O Centro Espírita Beneficente União do Vegetal*, 546 U. S. 418 (2006). While the Defendants may have a compelling governmental interest in caring out Mr. Hoffman's execution, the nitrogen hypoxia protocol is not the least restrictive means to do so. Mr. Hoffman has pled two alternative methods of execution that would not substantially burden his religious exercise, as both would allow him to practice his breathing meditation at the time of death. *See supra* at Sec. (I)(P).

136.     Under the Nitrogen Gassing Protocol, Mr. Hoffman will be forced to put on a mask that will cover his nose and mouth; pure nitrogen gas will be forced into his lungs; he will be deprived of oxygen and unable to breathe.  Mr. Hoffman will thereby be forcibly prevented by the State from engaging in the core breathing and meditation practices, especially critical at the time of his transition from life to death, that are a fundamental and necessary part of his Buddhist faith.

137.     The Nitrogen Gassing Protocol thus violates Mr. Hoffman's free exercise of religion under RLUIPA. *See, e.g.*, *Ramirez v. Collier*, 595 U.S. 411, 427-30 (2022) (ban on audible prayer in execution chamber violates RLUIPA); *Smith v. Comm'r, Ala. Dep't of Corr.*, 844 Fed. Appx. 286, 291 (11th Cir. 2021) (holding that the district court erred in finding that the plaintiff failed to establish a substantial likelihood of success on the merits of his RLUIPA claim regarding whether he was entitled to have his religious advisor present inside the execution chamber at the time of execution).

138.     Accordingly, Mr. Hoffman is likely to succeed on his claim that attempting to execute him by nitrogen hypoxia under the Nitrogen Gassing Protocol violates his right to the free exercise of religion under RLUIPA.

**E.      Mr. Hoffman Is Likely to Succeed on His Claim that Executing Him Under the Nitrogen Gassing Protocol Would Violate His Rights to Due Process and Access to Counsel and the Courts**

139.     Mr. Hoffman has the right under the Sixth and Fourteenth Amendments to access to counsel at all "critical" stages of criminal proceedings. *United States v. Wade*, 388 U.S. 218, 227-28 (1967), including throughout the execution procedure and during the execution. *See Harbison v. Bell*, 556 U.S. 180, 194 (2009); *see also In re Ohio Execution Protocol Litig.*, No. 2:11-CV-1016, 2018 WL 6529145, at *4-5 (S.D. Ohio Dec. 12, 2018).

140.     "The right of access to the courts . . . assures that no person will be denied the opportunity to present to the judiciary allegations concerning violations of fundamental constitutional rights." *Wolff v. McDonnell,* 418 U.S. 539, 579 (1974).

141.     In *McGehee v. Hutchinson*, 463 F. Supp. 3d 870, 925 (E.D. Ark. 2020), *aff'd sub nom. Johnson v. Hutchinson*, 44 F.4th 1116 (8th Cir. 2022), the district court found "that 'there is unquestionably a right to access the courts involved in the context of executions that inherently

injects the issue of access to counsel into this discussion'" (quoting *Cooey v. Strickland*, No. 2:04-C V-1156, 2011 WL 320166, at *7 (S.D. Ohio Jan. 28, 2011), *aff'd*, 44 F.4th 1116 (8th Cir. 2022).

142.     Although the traditional *Lewis* analysis requires some showing of actual injury for standing purposes, that showing is inapplicable in an execution context. This Court in the Related Case 12-796 denied the Defendants' Rule 12(b)(6) motion to dismiss Mr. Hoffman's right of access to the courts claim, noting that "courts have recognized that the traditional access to the courts analysis requiring actual injury is unworkable in the prisoner execution context." Hoffman v. Jindal, No. 12-796, Rec. Doc. 99, at 10 (M.D. La. Jan. 10, 2014). This Court considered the well-pled factual allegations in Mr. Hoffman's complaint and found that the allegations that "attorney contact with clients ceases three to six hours before an execution and attorneys are not allowed to witness the execution" were sufficient to survive Defendants' motion to dismiss. *Id*. at 12.

143.     In *McGehee*, the court applied the four-factor test laid out in *Turner v. Safley*, 482 U.S. 78, 88 (1987), to determine the reasonableness of the prison's restriction. 463 F. Supp. at 927. These factors are: (1) whether there is a "'valid, rational connection' between the prison regulation and the legitimate government interest put forward to justify it"; (2) "whether there are alternative means of exercising the right that remain open to prison inmates"; (3) the "impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally"; and (4) "the absence of ready alternatives is evidence of the reasonableness of a prison regulation." *Turner*, 482 U.S. at 89-90 (citations omitted). Significantly, the plaintiff in *McGehee* asserted that he was entitled to at least two attorneys as witnesses to his execution, while the state statute only mandated the presence of one attorney. *McGehee*, 463 F. Supp. 3d at 927. The argument was that if only one attorney was present, that attorney would have to leave the room to access a land line to access the courts, leaving no attorney

present at the execution. *Id.* Applying the *Turner* factors, the court held that the state was required to allow counsel to witness the execution and have reasonable access to a phone line.

144.     In *Cooey v. Strickland*, No. 2:04-CV-1156, 2011 WL 320166, at \*5 (S.D. Ohio Jan. 28, 2011), the court considered an Ohio protocol providing for up to three witnesses at the request of the inmate being executed. Although the court found that the protocol did not violate the inmate's right to counsel (because the inmate could allot any or all of his three witnesses to his counsel), the court denied summary judgment on the claim that the protocol violated the inmate's right to access the courts. *Id*. at \*12. The court found that the right to meaningful access to the courts requires that counsel have some access to the prisoner during the last hour before the execution and be permitted to witness his execution and have access to a telephone until execution has been successfully carried out. *Id*.

145.     Finally, in the case of *Coe v. Bell*, 89 F. Supp. 2d 962 (M.D. Tenn. Apr. 3, 2000), the inmate filed a petition to enjoin the warden from denying him access to counsel during the insertion of the catheters that would carry the lethal drugs into his body. The court issued an injunction, holding that "Plaintiff's right to meaningful access to the courts to assert that right requires that counsel have some access to the prisoner during the last hour before the execution and be permitted to witness his execution and have access to a telephone until execution has been successfully carried out." *Id*. at 966. Mr. Coe was executed with counsel present. *See Coe v. Bell*, 230 F.3d 1357 (6th Cir. 2000).

146.     Applying the *Turner* factors here, the Defendants have pled no valid government interest in support of Secretary Westcott's decision to ban counsel from witnessing the execution.[21]

---

[21] The Defendants' only response to this claim is that Mr. Hoffman lost his right to counsel after direct appeal and has no right to counsel during his execution. Rec. Doc. 55-1, at 27. The Defendants miss the point: Mr. Hoffman has a fundamental right to access the courts and that right requires access to counsel and for counsel to have access to a telephone.

No alternative means exist for Mr. Hoffman to exercise his right of access to the courts, as he will be strapped down to a gurney and a mask will be tightly strapped onto his face. For counsel to serve as an execution witness and have access to a phone would have no detrimental impact on guards or other inmates. "The state certainly has no legitimate interest in depriving the Plaintiff of access to the courts to assert a claim of cruel and unusual treatment." *Coe*, 89 F. Supp. 2d at 966. And, there are no alternatives to ensure that Mr. Hoffman can access the courts during his execution. *See Turner*, 482 U.S. at 89-90.

147.    Without access to counsel and access to the courts, Mr. Hoffman would not be able to seek court intervention if something goes wrong during his execution. Mr. Hoffman has pled both facial and as-applied challenges to Louisiana's nitrogen gassing protocol, asserting that it is likely to cause him substantial harm in the form of severe pain and emotional torture. Particularly given that Louisiana is using Mr. Hoffman as a test case for a new and unusual method of execution that has never been attempted in this state or by these individuals, the risk is too great to deny Mr. Hoffman access to the courts and to counsel during his execution.

148.    The execution of Joseph Wood in Arizona on July 23, 2014, demonstrates the necessity of immediate judicial review during the execution process. After his execution began, Mr. Wood remained alive for nearly two hours, "gasping, snorting, and unable to breathe." *Wood v. Ryan*, No. CV 14-1447-PHX-NVW, Telephonic Motion for Emergency Stay of Execution at 3 (D. Ariz. July 23, 2014). His attorneys were forced to leave the witness room to seek a stay of execution during a telephonic hearing with a federal judge, requesting that the Court direct the prison to take lifesaving measures as required by their protocol. *Id*. Mr. Wood died during the course of the 30-minute hearing. *Id*. at 16.

149.     Accordingly, Mr. Hoffman is likely to succeed on his claim that the Nitrogen Gassing Protocol violates his rights to access to counsel and the courts under the First, Sixth, and Fourteenth Amendments.

**F.     Mr. Hoffman Is Likely to Succeed on His Claim that [As A Matter of Law Louisiana May Not Execute Him by Nitrogen Hypoxia and or, Alternatively, that] Executing Him by Nitrogen Hypoxia Under the Nitrogen Gassing Protocol Violates the *Ex Post Facto* Clause of the United States Constitution**

150.     Mr. Hoffman was sentenced to be executed by lethal injection because, at the time of the offenses for which Mr. Hoffman has been sentenced to death and at the time Mr. Hoffman was sentenced to death, La. Rev. Stat. § 15:569 provided that "[e]very sentence of death executed on or after September 15, 1991, shall be by lethal injection; that is, by the intravenous injection of a substance or substances in a lethal quantity into the body of a person convicted until such person is dead."  La. Rev. Stat. § 15:569 (1991).

151.     Effective July 1, 2024, the Louisiana Legislature amended § 15:569 to add nitrogen hypoxia as a method of execution, but the Legislature did not make that amendment retroactive.

152.     Accordingly, as a matter of law, nitrogen hypoxia may not be used to execute Mr. Hoffman.

153.     Even *assuming arguendo* the amendment of § 15:569 to add nitrogen hypoxia as a method of execution had retroactive effect, it would violate the United States Constitution, which prohibits the States from passing any "*ex post facto* law." U.S. Const. art. I, § 10, ¶ 1. "Two critical elements must be present for a law to fall within the *ex post facto* prohibition: first, the law must be retrospective, that is, it must apply to events occurring before its enactment; and second, it must disadvantage the offender affected by it." *Henderson v. Scott*, 260 F.3d 1213, 1215 (10th Cir. 2001) (internal citation omitted).

154. Executing Mr. Hoffman by nitrogen hypoxia under the Nitrogen Gassing Protocol would create "a significant risk" of increased punishment. *Garner v. Jones*, 529 U.S. 244, 255, 120 S.Ct. 1362 (2000). *See also Weaver v. Graham*, 450 U.S. 24 (1981) (Where a change in method of execution increases the punishment, the change violates the United States Constitution's *ex post facto* prohibition.); and *Hines v. Martel*, 2024 U.S. Dist. LEXIS 31395, at *125 (E.D. Cal. Feb. 22, 2024) (A change in the manner of execution "may reflect an *ex post facto* violation if the new method is less humane than that utilized at the time the defendant committed the capital crime").

155. There is a substantial likelihood that execution by nitrogen gassing will cause Mr. Hoffman to experience superadded pain and suffering, which pain and suffering will be further enhanced due to his PTSD-related reactions and his inability to utilize his Buddhist faith and breathing techniques. Subjecting Mr. Hoffman to this superadded pain and suffering is less humane, in particular as applied to Mr. Hoffman, than the execution method applicable at the time of Mr. Hoffman's sentencing. *See* Minute Order, *State v. Neveaux*, No. 16-04029 (La. Dist. Ct., 24th Jud. Dist., Apr. 19, 2024) ("Def Motion to Declare La RS 15:569(A)(2) & (3) Unconstitutional – GRANTED by the Court, State objection noted for the record.").

156. Accordingly, Mr. Hoffman is likely to succeed on his claim that Louisiana may not execute him using nitrogen hypoxia.

### G. Mr. Hoffman Will Be Irreparably Harmed Without an Injunction

157. "An injury is 'irreparable' only if it cannot be undone through monetary remedies." *Yorktown Sys. Grp. Inc. v. Threat Tec LLC*, 108 F.4th 1287, 1296 (11th Cir. 2024) (citation omitted); *Ne. Fla. Chapter of Ass'n of Gen. Contractors of Am. v. City of Jacksonville*, 896 F.2d 1283, 1285 (11th Cir. 1990).

158. The harm here is evident and irreparable – nothing is more final and irreversible than death. This factor weighs heavily in favor of granting a preliminary injunction. *See D.T. v. Sumner Cnty. Schs.*, 942 F.3d 324, 327 (6th Cir. 2019) ("When one factor is dispositive, a district court need not consider the others.").

159. Moreover, under the Nitrogen Gassing Protocol, Mr. Hoffman will suffer a needlessly painful execution attempt in violation of his rights under the United States Constitution.

160. Moving forward with the execution under the Nitrogen Gassing Protocol would result in irreparable injury.

161. Accordingly, Mr. Hoffman will suffer irreparable injury if he is executed before the merits of his claims are resolved.

**H.     The Public Has an Interest in Ensuring a Merits Determination**

162. "It is always in the public interest to prevent the violation of a party's constitutional rights." *Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1145 (10th Cir. 2013). The public interest is served when constitutional rights are protected." *Melendez v. Sec'y, Fla. Dep't of Corr.*, No. 21-13455, 2022 WL 1124753, at *17 (11th Cir. Apr. 15, 2022) (citation and internal quotation marks omitted).

163. "[T]he public interest has never been and could never be served by rushing to judgment at the expense of a condemned inmate's constitutional rights." *In re Ohio Execution Protocol Litig.*, 840 F. Supp. 2d 1044, 1059 (S.D. Ohio 2012) (citation omitted).

164. Mr. Hoffman has raised colorable claims alleging that executing him by nitrogen hypoxia under the Nitrogen Gassing Protocol will violate his constitutional and other legal rights.

165. Accordingly, the public interest favors the issuance of a preliminary injunction to prevent Mr. Hoffman from being executed before final judgment is entered on his claims.

### I.      The Balance of Equities Favors Mr. Hoffman

166.    Mr. Hoffman's interest here is to ensure that he is not summarily executed in an before having a full and fair opportunity to litigate his claims of constitutional violations.

167.    The State has an interest in enforcing criminal judgments, *see Jones v. Allen*, 485 F.3d 635, 638 (11th Cir. 2007), but it does not have a legitimate interest in carrying out an unconstitutional execution.

168.    The balance of equities clearly and self-evidently favors Mr. Hoffman.  The brief stay sought by Mr. Hoffman will not prejudice the State or have any adverse effect on the State's interest, and will ensure that the State does not perform an unconstitutional execution. *See Gomez v. U.S. Dist. Ct. for N. Dist. Of Cal.*, 966 F.2d 460, 462 (9th Cir. 1992) (Noonan, J. dissenting from grant of writ of mandate) ("The state will get its man in the end. In contrast, if persons are put to death in a manner that is determined to be cruel, they suffer injury that can never be undone, and the Constitution suffers an injury that can never be repaired.").

169.    Accordingly, the balance of equities favors the issuance of a preliminary injunction to prevent Mr. Hoffman from being executed before final judgment is entered on his claims.

### CONCLUSION

170.    Based on the foregoing findings of fact and conclusions of law, the Court hereby enjoins Defendants from executing Mr. Hoffman during the pendency of this litigation.

Dated: March 9, 2025                    Respectfully submitted,

                                        /s/ *Cecelia Trenticosta Kappel*
                                        Cecelia Trenticosta Kappel, La. Bar No. 32736
                                        Loyola Center for Social Justice
                                        7214 St. Charles Ave. Box 907
                                        New Orleans, Louisiana 70118
                                        Tel: 504-861-5735
                                        Email: ckappel@defendla.org

Samantha Bosalavage Pourciau, La. Bar No. 39808
Promise of Justice Initiative
1024 Elysian Fields Avenue
New Orleans, LA 70117
Tel: (504) 529-5955
Sbosalavage@defendla.org

Rebecca L. Hudsmith
Office of the Federal Public Defender
For the Middle and Western Districts of Louisiana
102 Versailles Blvd., Suite 816
Lafayette, LA 70501
Tel:  337-262-6336
Rebecca_Hudsmith@fd.org

James K. Stronski
Ellen M. Halstead
Crowell & Moring LLP
Two Manhattan West
375 Ninth Avenue
New York, NY 10001
Tel: (212) 223-4000
JStronski@crowell.com
EHalstead@crowell.com

William H. Frankel
David Lindner
Crowell & Moring LLP
455 N. Cityfront Plaza Drive
Suite 3600
Chicago, IL 60611
Tel: (312) 321-4200
WFrankel@crowell.com
DLindner@crowell.com

Adam J. Singer
Hugham Chan
April Barnard
Crowell & Moring LLP
1001 Pennsylvania Avenue, NW
Washington, DC 20004
Tel: (202) 624-2500
ASinger@crowell.com
HChan@crowell.com
ABarnard@crowell.com

*Counsel for Plaintiff Jessie Hoffman*

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the above and foregoing was filed electronically with the Clerk of Court using CM/ECF on this 9th day of March, 2025.  Notice of this filing as generated by the electronic filing system constitutes service of the filed document on counsel of record for Defendants.

 /s/ *Cecelia Trenticosta Kappel*
Cecelia Trenticosta Kappel
