**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**

JESSIE HOFFMAN

VERSUS

GARY WESTCOTT, et al.

CIVIL ACTION

NO. 25-169-SDD-SDJ

**<u>RULING</u>**

Before the Court is a Motion for Preliminary Injunction filed by Plaintiff Jessie Hoffman, ("Plaintiff" or "Hoffman").[1] Defendants Gary Westcott, ("Secretary Westcott"), Secretary for the Louisiana Department of Public Safety and Corrections, ("DPSC); Darrel Vannoy, Warden of the Louisiana State Penitentiary, ("Warden Vannoy"); and John Does, unknown executioners, (collectively, "Defendants" or "the State"), oppose the motion.[2] Plaintiff has filed a reply.[3] The Court held a preliminary injunction hearing on March 7, 2025. During this hearing, Plaintiff urged the Court to reconsider its denial of his RLUIPA[4] claim (Count VI).[5]

After reviewing the evidence, and considering the law and arguments of the parties, for the reasons which follow, the Court shall GRANT the Plaintiff's Motion for Preliminary Injunction under the Eighth Amendment, DENY the Plaintiff's Motion to Reconsider the RILUIPA claim, and DENY Injunctive Relief in all other respects. The Defendants shall be enjoined from executing Jessie Hoffman on March 18, 2025, using nitrogen hypoxia.

---

[1] Rec. Doc. 4.
[2] Rec. Doc. 56.
[3] Rec. Doc. 75.
[4] Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc *et seq.*
[5] Rec. Doc. 87, p. 115.

## I.    BACKGROUND

Plaintiff is a death row inmate at the Louisiana State Penitentiary in Angola, Louisiana, ("Angola"). He was sentenced to death by lethal injection on September 11, 1998, for the murder of Mary "Molly" Elliot.[6] Over 26 years later on February 20, 2025, Plaintiff was served the death warrant for his March 18, 2025 execution.[7] Secretary Westcott[8] chose nitrogen hypoxia as Plaintiff's method of execution, not lethal injection as per his September 11, 1998 death sentence.[9]

Hoffman does not challenge his conviction or death sentence. He challenges the method of his execution under 42 U.S.C. § 1983. He seeks to be executed by firing squad or a drug cocktail known as DDMAPh instead of nitrogen hypoxia, which he argues poses a substantial risk of severe psychological pain when compared to the alternatives he proposes.

Nitrogen hypoxia is the deprivation of oxygen through the inhalation of nitrogen.[10] In February 2024, the Louisiana legislature amended La. R.S. § 15:569 to add nitrogen hypoxia as a method of execution effective July 2024.[11] Now, the State has the option to execute those on death row in one of three ways: lethal injection, electrocution, and nitrogen hypoxia.[12] Louisiana is one of only four states that authorizes execution by

---

[6] *State v. Hoffman*, 1998-3118 (La. 4/11/00); 768 So. 2d 542, 549–50.

[7] *See* Rec. Doc. 56-2, p. 5 (suggesting the death warrant was issued on February 10, 2025); Rec. Doc. 86, pp. 25–26 (Plaintiff's testimony from PI hearing that he was served the death warrant on February 20, 2025).

[8] Secretary Westcott has been the Secretary of the Louisiana Department of Public Safety and Corrections since August 2024. Rec. Doc. 87, p. 24.

[9] *Id.*

[10] *See, e.g., id.* at p. 30 (Dr. Bickler defining hypoxia).

[11] *See* La. R.S. § 15:569(A); La. Acts 2024, 2nd Ex. Sess., No. 5, §1, eff. July 1, 2024.

[12] La. R.S. § 15:569(A).

nitrogen hypoxia.[13] Alabama is the only state that has used this method and has done so on four occasions since January 25, 2024.[14] The parties do not dispute that Louisiana's nitrogen hypoxia protocol was modeled after, and is identical to, Alabama's protocol in all relevant respects.

After years of being unable to conduct executions through lethal injection, the Governor on March 5, 2024, signed a law that adds nitrogen hypoxia as a means of execution available to the DPSC.[15] This law took effect on July 1, 2024.[16] Before the law took effect, the DPSC visited Alabama to see its nitrogen gas execution system[17] and purchased the nitrogen that would be used in executions.[18] By November 2024, and after two trips to Alabama, Louisiana's nitrogen gas execution system was "assembled and in place" at Angola.[19] Training on the nitrogen system started in November 2024.[20] Obviously, DPSC anticipated the ability to use nitrogen for executions. Yet, despite the leg work that DPSC had already undertaken, Louisiana's execution protocol, a carbon copy of Alabama's, was not promulgated until February 7, 2025.[21]

Almost immediately thereafter, Hoffman's death warrant was signed and served upon him, giving him less than 60 days to challenge his method of execution. Then he was stymied by the State's refusal to produce even a redacted version of his execution protocol. By order of the Court, the State produced the protocol to Hoffman pursuant to a

---

[13] Oklahoma, Mississippi, and Alabama also have nitrogen hypoxia as a method of execution. *See* Okla. Stat. tit. 22, § 1014(B); Miss. Code § 99-19-51(1); Ala. Code § 15-18-82.1.

[14] *See Frazier v. Hamm*, No. 24-732, 2025 WL 361172 (M.D. Ala. Jan. 31, 2025) (discussing the Alabama executions of Demetrius Frazier, Kenneth Smith, Alan Miller, and Carey Grayson by nitrogen hypoxia).

[15] *See* La. R.S § 15:569 and its legislative history, available at https://legis.la.gov/legis/BillInfo.aspx?s= 242ES&b=ACT5&sbi=y.

[16] *Id.*

[17] Rec. Doc. 86, p. 178.

[18] *Id.* at pp. 162–63.

[19] Rec. Doc. 87, p. 18.

[20] *Id.* at pp. 14–15

[21] *Id.* at p. 12.

protective order three days before the hearing.[22] This highlights a key difference between Louisiana and Alabama. Alabama finalized its execution protocol in late August of 2023,[23] and its first nitrogen hypoxia execution was on January 25, 2024.[24] Here, Louisiana finalized its protocol in the eleventh hour, allowing Hoffman virtually no time to seek redress.

Plaintiff filed this suit on February 25, 2025, challenging the constitutionality of nitrogen hypoxia as Louisiana's chosen method of his execution.[25] He brings multiple claims, including violations of the First, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution; the *Ex Post Facto* Clause, Article 1, § 10 of the Constitution; 18 U.S.C. § 3599, providing access to counsel; and RLUIPA, 42 U.S.C. § 2000cc *et seq*.[26] Plaintiff filed a Motion for Preliminary Injunction seeking to prohibit the State from executing him on March 18, 2025, through nitrogen hypoxia.[27] He prays that "the execution should be stayed by preliminary injunction to allow for a reasonable period of expedited discovery, briefing and a hearing with experts so that this case may be decided on a developed record."[28]

Given Plaintiff's scheduled execution date of March 18, 2025, the Court set a preliminary injunction hearing for March 7, 2025.[29] The parties had exactly one week to prepare for the hearing, which included exchanging expert declarations, redacting sensitive information from documents, agreeing to stipulations of fact, responding to

---

[22] Rec. Doc. 41.
[23] *Frazier*, 2025 WL 361172, at *3.
[24] *Id.* at *5.
[25] Rec. Doc. 1.
[26] *Id.*
[27] Rec. Doc. 4.
[28] Rec. Doc. 4-1, p. 3.
[29] Rec. Doc. 29.

written discovery, conducting numerous depositions, preparing witnesses, assembling exhibits, and engaging in motion practice.[30]

With respect to motion practice, Defendants filed a Motion to Dismiss Plaintiff's claims,[31] which Plaintiff opposed.[32] The Court granted Defendants' Motion to Dismiss in part and denied it in part.[33] Specifically, the Court dismissed as moot the claim for Refusal to Disclose the Execution Protocol Claim (Count V). The Court dismissed the Religious Exercise Claims (Counts VI and VII) with prejudice. The Eighth Amendment, *Ex Post Facto* and Right to Counsel/ Access to Courts claims (Counts I-IV) proceeded to hearing. Plaintiff urges the Court to reconsider denying his RLUIPA claim (Count VI).[34]

The Court held a preliminary injunction hearing on March 7, 2025, beginning approximately at 9:00 a.m. and ending sometime past 8:00 p.m. Multiple witnesses testified, making the hearing transcript over 400 pages.[35] The parties received copies of the hearing transcript on the morning of Saturday March 8, 2025, and had until March 9, 2025, at 9:00 a.m. to submit to the Court Proposed Findings of Fact and Conclusions of Law.

Now, after an expedited hearing, and absent a fully developed record, this Court must answer the ultimate question: is nitrogen hypoxia cruel and unusual punishment under the Eighth Amendment? If Plaintiff can prove there is a substantial likelihood that he will succeed on this claim—or any of his remaining claims for that matter—do the balance of equities weight in his favor, insomuch as it is in the public's interest for this

---

[30] *See, e.g.*, Rec. Docs. 10, 33, 40, 55.
[31] Rec. Doc. 55.
[32] Rec. Doc. 69.
[33] Rec. Doc. 79. Defendants filed a 12(b)(6) Motion to Dismiss but have not yet answered the Complaint.
[34] Rec. Doc. 87, p. 115.
[35] *See* Rec. Docs. 86, 87.

Court to issue an injunction prohibiting the irreparable harm that will result from his March 18, 2025 execution?

## II.    MOTION TO RECONSIDER DISMISSAL OF PLAINTIFF'S RLUIPA CLAIM

Plaintiff moves for reconsideration of the Court's 12(b)(6) dismissal of his RLUIPA claim.[36] Count VI alleges that the execution by nitrogen hypoxia violates RLUIPA because it substantially burdens Hoffman's religious exercise to breathe meditatively since he will be deprived from breathing air.[37]

RLUIPA states that

[n]o government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution . . . even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person—(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest.[38]

The Supreme Court has summarized the RLUIPA test as follows:

A plaintiff bears the initial burden of proving that a prison policy implicates his religious exercise. Although RLUIPA protects any exercise of religion, whether or not compelled by, or central to, a system of religious belief, a prisoner's requested accommodation must be sincerely based on a religious belief and not some other motivation. The burden on the prisoner's religious exercise must also be substantial. Once a plaintiff makes such a showing, the burden flips and the government must demonstrate that the imposition of the burden on that person is the least restrictive means of furthering a compelling governmental interest.[39]

The Court finds that meditative breathing is an exercise attendant to practicing Hoffman's chosen faith of Buddhism.[40] The Court dismissed Hoffman's RLUIPA claim finding that substituting nitrogen for atmospheric air does not substantially burden

---

[36] Rec. Doc. 87, p. 115.
[37] Rec Doc. 1, ¶¶ 233–38.
[38] 42 U.S.C. § 2000cc–1(a).
[39] *Ramirez v. Collier*, 595 U.S. 411, 425 (2022) (quoting 42 U.S.C. § 2000cc–1(a); *Holt v. Hobbs*, 574 U.S. 352, 360–62 (2015)) (cleaned up).
[40] "[T]raditional forms of religious exercise" satisfy the religious exercise prong of RLUIPA. *Id*. at 425, 427.

Hoffman's ability to breath. Nothing in the evidence changes this conclusion. The record evidence established that nitrogen is an inert, tasteless, colorless, odorless gas.[41]

"[A] government action or regulation creates a 'substantial burden' on a religious exercise if it truly pressures the adherent to significantly modify his religious behavior and significantly violate his religious beliefs."[42] Plaintiff responds that Hoffman's "sincerely held religious beliefs are substantially burdened **not** because he will be unable to breathe" but because he will be forced to breath nitrogen instead of air.[43] At the preliminary injunction hearing, two Buddhist clerics testified that air (not nitrogen) is necessary for meditative breathing.[44] They cited no religious text or instruction by the historical Buddha in support of this proposition.

The Court finds that Buddhism calls its adherents to a ritual of breathing rhythmically to achieve a mediative state, what the clerics referred to as "zen." This is analogous to Western religions' practice of prayer. The Plaintiff admits that he will have the ability to breathe in the nitrogen as it is administered.[45] The Court finds there is no substantial burden to his exercise of rhythmic breathing. The Court denies reconsideration of this claim.

## III.    EXHAUSTION UNDER THE PLRA

Hoffman filed a grievance as soon as the law adding nitrogen hypoxia as a method of execution went into effect on July 1, 2024.[46] The Defendants rejected his grievance as premature, stating:

REJECTED. Your request has been rejected for the following reason(s):

---

[41] Rec. Doc. 87, p. 89.
[42] *Adkins v. Kaspar*, 393 F.3d 559, 570 (5th Cir. 2004).
[43] Rec. Doc. 69, p. 20 (emphasis added).
[44] Rec. Doc. 86, pp. 48, 49 (Reverend Michaela Bono), 103 (Reverend Reimoku Gregory Smith).
[45] *Id.* at p. 39.
[46] Rec. Doc. 69-1, pp. 1–6.

YOUR GRIEVANCE ALLEGING THAT VARIOUS EXECUTION METHODS CONSTITUTE CRUEL AND UNUSUAL PUNISHMENT IN VIOLATION OF THE CONSTITUTION HAS BEEN REJECTED AS PREMATURE, AS IT CONCERNS EVENTS THAT HAVE NOT YET HAPPENED AND/OR ACTIONS OR DECISIONS THAT HAVE YET TO OCCUR. A VALID DEATH WARRANT HAS YET TO ISSUE IN YOUR CASE, AND THE LAW ENACTING THE VARIOUS EXECUTION MEANS OUTLINED IN YOUR GRIEVANCE HAS YET TO TAKE LEGAL EFFECT. FOR THE REASONS STATED ABOVE, YOUR REQUEST FOR RELIEF IS REJECTED WITHOUT CONSIDERATION ON THE MERITS. PLEASE NOTE THAT REJECTED REQUESTS FOR ADMINISTRATIVE REMEDY ARE NOT APPEALABLE TO THE SECOND STEP. [47]

After his attorneys received notice that the State was seeking an execution warrant, Hoffman filed a grievance under the prison's Administrative Remedy Procedure ("ARP") on February 10, 2025.[48] Angola responded to his grievance advising that a response would be issued within 40 days, i.e., after his scheduled execution.[49] Hoffman then filed a second emergency grievance on February 14, 2025.[50] No response to the second emergency grievance is contained in the record.

"Where an administrative process does not facilitate addressing execution-related claims within the timeframe of a scheduled execution, it is likely not an 'available' remedy that must be exhausted under the PLRA."[51] When prison officials mishandle an inmate's grievance, it cannot be said that he failed to exhaust his remedies.[52]

Defendants complain that Hoffman did not plead an alternative method of execution in his emergency ARP. However, the Prison Litigation Reform Act does not require legal detail in a grievance. Grievances must provide a factual basis "to identify

---

[47] *Id.* at p. 8.
[48] Rec. Doc. 56-2, pp. 2, 5–7.
[49] *Id.* at p. 4.
[50] *Id.* at pp. 9–12.
[51] *Ramirez*, 595 U.S. at 438 (2022) (Sotomayor, J., concurring).
[52] *Dole v. Chandler*, 438 F.3d 804, 811 (7th Cir. 2006).

problems, but need not necessarily advance specific legal theories."[53] An incarcerated person "need not present legal theories in his grievance[]."[54] The purpose of an ARP is fair notice. The State was on notice that Hoffman challenged his method of execution.

Defendants challenge Hoffman's failure to include his *Ex Post Facto* and Right to Counsel/Access to Courts Claims in is ARP. The Prison Litigation Reform Act provides that "[n]o action shall be brought **with respect to prison conditions** . . . by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."[55] This is not a conditions of confinement claim. The remedy Hoffman seeks—a declaration that La. R.S. § 15:569 is unconstitutional under the *Ex Post Facto* Clause, 18 U.S.C. 3599, and the Sixth and Eighth Amendments of the U.S. Constitution cannot be redressed through the prison grievance process.[56]

The Court finds that Plaintiff has exhausted all available remedies. Based on these facts, there is no administrative process *available* for Hoffman to obtain any relief for the actions complained of. An administrative process is not available if it is not "'capable of use' to obtain 'some relief for the action complained of.'"[57]

## IV.    MOTION FOR PRELIMINARY INJUNCTION

### Legal Standard for Preliminary Injunctions

A preliminary injunction is an "extraordinary and drastic remedy" that may only be awarded upon a clear showing that the plaintiff is entitled to such relief.[58]  A plaintiff seeking injunctive relief must demonstrate by a preponderance of the evidence that "(1)

---

[53] *Williams v. Estelle Unit Prison Offs.*, No. 23-20036, 2024 WL 3026778, at *3 (5th Cir. June 17, 2024) (citing *Johnson v. Johnson*, 385 F.3d 503, 517 (5th Cir. 2004)).
[54] *Johnson*, 385 F.3d at 517.
[55] 42 U.S.C. § 1997e(a).
[56] *Ross v. Blake*, 578 U.S. 632, 639 (2016).
[57] *Id.* at 642 (quoting *Booth v. Churner,* 532 U.S. 731, 738 (2001)).
[58] *Munaf v. Geren*, 553 U.S. 674, 689 (2008).

it is likely to succeed on the merits, (2) it is likely to suffer irreparable harm without an injunction, (3) the balance of equities tips in its favor, and (4) an injunction is in the public interest."[59]

"The decision to grant or deny a preliminary injunction is discretionary with the district court."[60] However, because a preliminary injunction is an extraordinary remedy, it "should not be granted unless the party seeking it has clearly carried the burden of persuasion on all four requirements."[61]  Consequently, the decision to grant a preliminary injunction is "the exception rather than the rule."[62]

**Irreparable Harm**

Wright & Miller instructs that "[p]erhaps the single most important prerequisite for the issuance of a preliminary injunction is a demonstration that if it is not granted the applicant is likely to suffer irreparable harm before a decision on the merits can be rendered."[63] Here, Plaintiff will most certainly suffer irreparable harm if his claim for injunctive relief is not decided prior to his March 18, 2025 execution date. No harm is more irreparable than death. Finding so, the Court moves to the remaining elements of the preliminary injunction analysis.

**Substantial Likelihood of Success on the Merits**

**A. Eighth Amendment Claims (Counts I and II)**

Plaintiff argues that nitrogen hypoxia execution violates the Eighth Amendment prohibition against cruel and unusual punishment facially and as applied to him.

---

[59] *United States v. Abbott,* 110 F.4th 700, 706 (5th Cir. 2024) (citation omitted).
[60] *Miss. Power & Light Co. v. United Gas Pipe Line Co.*, 760 F.2d 618, 621 (5th Cir. 1985).
[61] *Planned Parenthood v. Suehs*, 692 F.3d 343, 348 (5th Cir. 2012).
[62] *Miss. Power & Light Co.*, 760 F.2d at 621.
[63] 11A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2948.1 (3d ed. 2024).

"[C]lassifying a lawsuit as facial or as-applied affects the extent to which the invalidity of the challenged law must be demonstrated and the corresponding 'breadth of the remedy,' but it does not speak at all to the substantive rule of law necessary to establish a constitutional violation."[64] It is well settled that "[w]hile the Eighth Amendment doesn't forbid capital punishment, it does speak to how States may carry out that punishment, prohibiting methods that are 'cruel and unusual.'"[65] "Punishments are cruel when they involve torture or a lingering death[.]"[66] "It implies . . . something inhumane and barbarous, something more than the mere extinguishment of life."[67]

To that end, the question in dispute is whether the State's chosen method of execution "intensifie[s] the sentence of death" with "a (cruel) superaddition of terror, pain or disgrace."[68] "As originally understood, the Eighth Amendment tolerated methods of execution, like hanging, that involved a significant risk of pain, while forbidding as cruel only those methods that intensified the death sentence by 'superadding' terror, pain, or disgrace."[69] "To establish that a State's chosen method cruelly 'superadds' pain to the death sentence, a prisoner must show a feasible and readily implemented alternative method that would significantly reduce a substantial risk of severe pain and that the State has refused to adopt without a legitimate penological reason."[70]

"Only through a 'comparative exercise,' . . . can a judge 'decide whether the State has cruelly "superadded" pain to the punishment of death.'"[71] Here, Plaintiff proposes two

---

[64] *Bucklew v. Precythe*, 587 U.S. 119, 138 (2019) (citing *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 331 (2010)).
[65] *Id.* at 130.
[66] *Baze v. Rees*, 553 U.S. 35, 49 (2008) (quoting *In re Kemmler*, 136 U.S. 436, 447 (1890)).
[67] *Id.* (quoting *In re Kemmler*, 136 U.S. at 447).
[68] *Bucklew*, 587 U.S. at 133 (cleaned up).
[69] *Id.* at 119.
[70] *Id.* at 119–20 (citing *Baze*, 553 U.S. at 52; *Glossip v. Gross*, 576 U.S. 863, 867–78 (2015)).
[71] *Nance v. Ward*, 597 U.S. 159, 164 (2022) (quoting *Bucklew*, 587 U.S. at 136).

alternative methods of execution: firing squad and DDMAPh, which is a regimen used for medical-aid-in-dying. The fact that these methods are not authorized under Louisiana law is immaterial.[72] In such a scenario, as the United States Supreme Court has explained, "the State can enact legislation approving what a court has found to be a fairly easy-to-employ method of execution."[73] When a state "has legislated changes to its execution method several times before[,]" there is "no reason to think that the amendment process would be a substantial impediment."[74]

Therefore, the Court's analysis turns on whether Plaintiff has shown a substantial likelihood that (1) making the condemned breath pure nitrogen until dead cruelly superadds pain and suffering to the execution when compared to firing squad or DDMAPh; (2) firing squad or DDMAPh is "feasible, readily implemented and in fact significantly reduce[s] a substantial risk of severe pain;"[75] and (3) the state has refused to adopt one of these methods without a legitimate penological reason.

### 1. Substantial Risk of Harm

"Nitrogen hypoxia" as a method of execution was first advanced in 2014 by four criminal law professors at Oklahoma's East Central University.[76] Louisiana has never executed or attempted to execute a condemned inmate by nitrogen gassing, nor has the federal government. The only state to have used nitrogen gas as a method of execution

---

[72] See *Nance*, 597 U.S. 159 (holding that Section 1983 is an appropriate vehicle for a method-of-execution claim where the prisoner proposes an alternative method not authorized under their State's law).
[73] *Id.* at 170.
[74] *Id.*
[75] *Glossip*, 576 U.S. at 877 (quoting *Baze*, 553 U.S. at 52).
[76] MICHAEL COPELAND ET AL., NITROGEN INDUCED HYPOXIA AS A FORM OF CAPITAL PUNISHMENT (2014) (a white paper by Professors Michael Copeland, Christine Pappas, and Thomas Parr proposing asphyxiation by nitrogen gas, coining "nitrogen hypoxia" as an alternative to lethal injection).

is Alabama. To date, Alabama has executed four condemned men by nitrogen hypoxia.[77] In the execution context, the condemned is forced to inhale pure nitrogen, which displaces the oxygen in the lungs thereby robbing the body of oxygen needed for survival. Eyewitness accounts from these executions are the most probative evidence of what death by forced inhalation of nitrogen looks like.

The accounts of all four Alabama executions describe suffering, including conscious terror for several minutes, shaking, gasping, and other evidence of distress. In particular, eyewitnesses observed:

- violent writhing of the entire body under the straps "to the point that the entire gurney [was] moving up and down";[78]

- vigorous convulsing and shaking for four minutes;[79]

- repeated gasping while conscious;[80]

- minutes of conscious struggling for life;[81]

- heaving and spitting;[82]

- two minutes of shaking and trembling "followed by about six minutes of periodic gulping breaths before [becoming still]";[83]

---

[77] *See Frazier*, 2025 WL 361172 (discussing the Alabama executions of Demetrius Frazier, Kenneth Smith, Alan Miller, and Carey Grayson by nitrogen hypoxia).

[78] Rec. Doc. 68-2, James Finn, *Jeff Landry supports death penalty by nitrogen gas. Here's how an eyewitness described it*, THE ADVOCATE, February 20, 2024, Https://www.nola.com/news/politics/legislature/witness-recounts-nitrogen-execution-supported-by-jeff-landry/article_be56ebb8-d021-11ee-8b2b-772fa7c8c892.html.

[79] Rec. Doc. 4-5, pp. 213–14.

[80] *Id.* at pp. 211, 218.

[81] *Id.* at pp. 228, 285.

[82] *Id.* at pp. 74, 271.

[83] Rec. Doc. 4-1, Ivana Hrynkiw, Alabama inmate Alan Miller executed with nitrogen gas Thursday for 1999 shootings, AL.com (Sept. 26, 2024 8:59 PM), https://www.al.com/news/2024/09/alabama-inmate-alan-miller-set-to-be-executed-with-nitrogen-gas-thursday-for-1999-shootings.html.

A spiritual advisor, who also happens to be a physician, recounts his observations as follows: "We don't see people jerking around like that while they're dying normally. His face was twisted, and he looked like he was suffering."[84]

None of these eyewitnesses testified at the preliminary injunction. In the absence of eyewitness testimony of executions by nitrogen hypoxia, the parties' called medical experts. Plaintiff called Dr. Philip Bickler,[85] a Board-Certified Anesthesiologist whom the State stipulated is an expert in the fields of "Anesthesiology and Human Hypoxia."[86] Defendants called Dr. Joseph F. Antognini, a Board-Certified Anesthesiologist whom Plaintiff' stipulated is an expert in the fields of "Anesthesiology, General Medicine, and Physiology."[87]

Dr. Bickler has extensive clinical experience observing the effects oxygen deprivation (hypoxia) on humans and the scientific study of controlled blood oxygen desaturation. For thirty years, he has conducted clinical research on human subjects in various states of hypoxia.[88] He has conducted at least 5,000 hypoxia studies on humans involving administering low oxygen containing gas and monitoring the subjects' responses.[89] From his work at the Hypoxia Research Laboratory, he has published extensively in peer-reviewed scientific and medical journals regarding the physiological effects of hypoxia on humans and other animals.[90] The Court finds Dr. Bickler is a qualified expert in the field on anesthesiology, and the Court finds Dr. Bickler to be superbly

---

[84] *Ivana Hrynkiw, Alabama inmate Alan Miller executed with nitrogen gas Thursday for 1999 shootings, AL.com (Sept. 26, 2024 8:59 PM), https://www.al.com/news/2024/09/alabama-inmate-alan-miller-set-to-be-executed-with-nitrogen-gas-thursday-for-1999-shootings.html.*
[85] Rec. Doc. 4-5, pp. 5–72 (Dr. Bickler CV).
[86] Rec. Doc. 87, p. 27.
[87] *Id.* at pp. 126–27.
[88] *Id.* at p. 30. He runs a Hypoxia Research Lab.
[89] *Id.* at p. 44.
[90] *See* Rec. Doc. 4-5, pp. 5–72 (Dr. Bickler CV).

qualified in the field of human hypoxia, owing to his long and extensive clinical work in the effect of low oxygen (hypoxia) on humans.

On the other hand, Dr. Antognini has never clinically studied the effects of hypoxia on humans. He has not published nor presented any studies regarding the effects of nitrogen hypoxia. Professionally, the only study of human hypoxia Dr. Antognini has done is in connection to providing opinions to Alabama and Louisiana in support of nitrogen hypoxia execution. He has testified for various states in fifteen to twenty lethal injection execution cases and in five cases involving nitrogen hypoxia.[91]

Dr. Bickler explained the physiological effects of oxygen depletion. When oxygen levels drop, "it sets off all our alarm bells. It hyperactivates our sympathetic nervous system, so there is an increase in heart rate, in blood pressure. You feel blood pounding in your head. You have an increased drive to breathe. You feel like you're gasping for air."[92] Hypoxia "elicits [a] massive sympathetic nervous system response . . . it produces a terror response."[93] "Your drive to breathe overcomes your conscious will."[94] He explained that the "lungs are a four-to-five-quart reservoir of air which contains 20% oxygen. So it may take a number of minutes depending on the breathing volume [for nitrogen] to wash out all the oxygen that is remaining in the lungs."[95] "[W]hat this represents is forced asphyxiation, gassing a subject to death, exposing him to a lack of oxygen such that both extreme discomfort, distress, pain, and terror would be felt all the

---

[91] Rec. Doc. 87, p. 203. The five cases involving nitrogen hypoxia include: *Smith v. Hamm*, No. 23-656, 2024 WL 116303 (M.D. Ala. Jan. 10, 2024); *Miller v. Marshall*, No. 24-197, 2024 WL 3737346 (M.D. Ala. July 8, 2024); *Grayson v. Hamm*, No. 24-376, 2024 WL 4701875 (M.D. Ala. Nov. 6, 2024); *Frazier v. Hamm*, No. 24-732, 2025 WL 361172 (M.D. Ala. Jan. 31, 2025); and the instant matter.
[92] Rec. Doc. 87, pp. 34–35.
[93] *Id.* at pp. 40–41.
[94] *Id.* at p. 43.
[95] *Id.* at p. 93.

way up to the point of losing consciousness."[96] Dr. Bickler agrees that nitrogen hypoxia does not cause physical pain. "It does not cause physical pain in terms of somatic pain. It causes emotional terror."[97] Both experts agree that nitrogen hypoxia does not produce physical pain.[98]

On the question of psychologic pain, Dr. Antognini agreed that oxygen deprivation in the lungs triggers an instinctual response driven by respiratory centers in the brain that tell your body to breathe.[99] He also agreed that if your brain is telling you to breathe and your mind knows breathing will kill you, this creates "severe emotional suffering."[100] Thus, there is agreement among the experts that the inability to quiet the primal urge to breathe is severe emotional suffering. The question becomes how long this psychological suffering is likely to endure. What is the time between nitrogen onset and unconsciousness?

Dr. Bickler candidly concedes that a person who is administered 100% pure nitrogen and is breathing normally will lose consciousness in less than one minute.[101] But if the condemned holds his breath, Dr. Bickler opines that it could take 3 to 5 minutes to lose consciousness.[102] In order to minimize the time to unconsciousness, and thus the duration of suffering, the condemned must cooperate in his own execution. However, the ability to cooperate (repeatedly inhale deeply) would require the condemned to mentally

---

[96] *Id.* at pp. 32–33.
[97] *Id.* at p. 98.
[98] *Id.* at pp. 98, 169.
[99] *Id.* at p. 187. Dr. Antognini tries to limit the primal response to breathe to circumstances of hypercapnia, a condition caused by excess CO2 in the lungs. *Id.* at pp. 380–81. The court finds Dr. Bickler's opinion that oxygen deficiency, and not the type of gas depleting the oxygen, triggering the panic response to breathe is more credible.
[100] *Id.*
[101] *Id.* at p. 83.
[102] *See id.* at pp. 50, 58.

overcome the primal urge to breathe that is triggered by lack of oxygen.[103] On the other hand, if the condemned holds his breath, Dr. Bickler opines that it could take 3 to 5 minutes to lose consciousness.[104] The State's expert, Dr. Antognini, agrees that breath-holding will increase the time until loss of consciousness.[105]

After careful consideration of these medical experts and their opinions in the context of their reliance materials and experience, the Court credits Dr. Bickler's testimony and opinions over Dr. Antognini's. Dr Antognini's opinions are untested scientific hypotheses. The studies on which he relies are either irrelevant or unpersuasive.[106]

The Court is convinced by Dr. Bickler's testimony and by common sense[107] that the deprivation of oxygen to the lungs causes a primal urge to breathe and feelings of intense terror when inhalation does not deliver oxygen to the lungs. The experts agree and the Court finds that this causes severe psychological pain. The experts also agree that this severe psychological pain endures until the loss of consciousness.[108] Dr. Antognini argues that loss of consciousness will occur between 10 and 40 seconds from inhalation of nitrogen, and Dr. Bickler opines that consciousness will more likely persist

---

[103] *Id.* at p. 211 (rebuttal testimony of Dr. Bickler explaining that low oxygen, not CO2 or other gas, displacement creates the hunger and panic for air).

[104] *See id.* at pp. 50, 58.

[105] *Id.* at pp. 184–85.

[106] Dr. Antognini relied on an Ernsting paper, two Ogden papers, Miller and Mazur, and a "dog study." Reliance on the dog euthanasia study is flawed. Dr. Antognini admits dogs have different ventilation, different cardiac output, and different metabolisms as compared to humans and would be unlikely to hold their breath. *Id.* at pp. 199–200. The Ernsting paper is not instructive on time to loss of consciousness for the reasons discussed in this Ruling at *infra* p. 18 and note 10. The Miller *and* Mazur paper is a white paper, not a study or experiment. Rec. Doc. 87, p. 200. It includes no method information or data. The Ogden papers were the work of a Sociologist who observed videos of four voluntary suicides by helium ingestion. *Id.* at pp. 152; 197–99.

[107] One need only hold their breath to understand that there is a primal urge to breath. Breath-holding causes inhaled CO2 to displace the oxygen in the lungs as it is carried out of the lungs to the rest of the body. In the case of breath-holding, O2 is displaced by CO2; the physiological effect of displacement by nitrogen is no different. *See id.* at pp. 210–17 (Bicker Rebuttal).

[108] *Id.* at pp. 98, 169.

for a minute or more. On the low end, conscious terror and a sense of suffocation endures for 35 to 40 seconds.[109] On the high end, conscious psychological suffering endures for 3 to 5 minutes if an unwilling inmate holds his breath.

The Ernsting study,[110] cited and relied upon by both Dr. Bickler and Dr. Antognini, is a human nitrogen hypoxia study done in 1960 and is the only study that recorded time to unconsciousness following the inhalation of pure nitrogen. In the Ernsting study, human subjects were instructed to fully exhale and then hyperventilate 100% pure nitrogen. Under those circumstances, the subjects lost consciousness in 30 to 40 seconds.[111] The controlled variables in the Ernsting study (complete exhalation and hyperventilated inhale of nitrogen) are not analogous to execution conditions. The Ernsting study supports the conclusion that when the inhalation and exhalation variables are uncontrolled, as it will be in an execution setting, the time to unconsciousness will be longer than 30-40 seconds. Dr. Antognini admitted that the results of experiments using different methods cannot be compared and that the Ernsting method, involving the purging of lung air followed by the hyperventilation of nitrogen, is "very different" from Louisiana's nitrogen hypoxia method.[112]

The Court does not credit Dr. Antognini's opinion that the Louisiana's system "will cause unconsciousness within 35 to 40 seconds or perhaps sooner once the inmate starts to inhale in 90 to 100% nitrogen gas."[113] This opinion is belied by the Ernsting study which documents unconsciousness occurring 30 to 40 seconds after purging of air from the

---

[109] Rec. Doc. 87, p. 326
[110] *Id.* at p. 57.
[111] *Id.*
[112] *Id.* at pp. 192–93.
[113] *Id.* at p. 132.

lungs followed by the hyperventilation of nitrogen. Dr. Antognini conceded that "Dr. Bickler is absolutely right that the lungs will have some oxygen in [them,] [s]o you have to consider not just the volume of the mask but also the volume of the lungs."[114] He opines that unconsciousness will occur "around 10 to 12 seconds" after the "inspired oxygen level is down to about 5%."[115] He candidly referred to his time to unconsciousness as an "estimate."[116]

Short of direct observation of humans in hypoxic states, Dr. Antognini presents nothing more than a scientific hypothesis. The scientific method calls for testing hypotheses. His hypothesis could have been tested by observation of the Alabama executions. Dr. Antognini testified for the state in the first Alabama execution (Smith). Alabama hired him in connection with the next three nitrogen hypoxia executions (Miller, Grayson, and Frazier). Dr. Antognini did not observe any of these three Alabama executions following his initial opinion and hypothesis. His hypothesis regarding time until unconsciousness remains untested and unsubstantiated.

The Court finds that Dr. Bickler's thirty years of clinical research, specifically studying hypoxia in humans, results in reliable scientific understanding of the physiological effect of hypoxia in humans. Anecdotal evidence from eyewitnesses to the four Alabama nitrogen hypoxia executions corroborate and reinforce his opinions.[117] The Court finds that Plaintiff has clearly shown that he is substantially likely to prove that nitrogen hypoxia poses a substantial risk of conscious terror and psychological pain.

---

[114] *Id*. at p. 147.
[115] *Id*. at p. 149.
[116] *Id*. at p. 151.
[117] *See* Rec. Doc. 4-5, pp. 206–285.

## 2. Alternative Methods

Plaintiff's two proposed alternatives are firing squad and DDMAPh. The Court begins with addressing firing squad as a proposed alternative.

At the preliminary injunction hearing, Plaintiff called Dr. James Williams to testify, whom the State stipulated is an expert in the fields of "Emergency Medicine and Firearms.[118] Dr. Williams has been an Emergency Room physician for over 30 years and has seen and treated scores of gunshot wounds.[119] Dr. Williams is also recognized by the International Association of Law Enforcement Instructors and the International Law Enforcement Educators and Trainers Association as having an expertise in firearms and ballistics.[120] Dr. Williams testified at length, basing his opinions on his professional observations and experience, his knowledge of firearms and ballistics, and the State of Utah's Department of Corrections and the United States Military's firing squad protocols.[121]

Stated simply, execution by firing squad is the process of firing multiple high caliber bullets[122] in someone's "cardiac bundle." The cardiac bundle is "the larger organ of the heart and all of its accessory structures, as well as the great vessels above and around the heart . . . ."[123] Military rifle calibers are used, causing multiple bullets to strike "the individual's body at a velocity of around 2800 feet per second . . . ."[124] These bullets "strike the body with a combined energy of roughly the equivalent of being struck by a 3-quarter-

---

[118] Rec. Doc. 86, p. 105.
[119] *Id.* at p. 104.
[120] *Id.* at p. 105.
[121] *Id.* at pp. 104–31.
[122] Utah's protocol provides for four bullets, South Carolina's three, and the Military's up to eight. *See id.* at p. 108.
[123] *Id.* at pp. 106–07.
[124] *Id.* at p. 108.

ton fully loaded truck in about .04 seconds and traverse the torso of the individual."[125] "[T]he bullets will strike the outside of the body and then traverse through the heart, unleashing tremendous destructive energy upon the heart, which will literally tear the heart to pieces . . . ."[126] "This is significant destructive power which is unleashed in less than a fraction of a second and would cause complete cessation of all cardiac output from the moment the bullets traverse the heart."[127] "[U]nconsciousness occurs very rapidly in a period of about 3 to 4 seconds."[128]

The Court finds Dr. Williams' testimony that the condemned would be rendered unconscious in 3 to 4 seconds credible. As explained above, Dr. Bickler and Dr. Antognini differ on how long the condemned will suffer psychological terror before becoming unconscious during a nitrogen hypoxia execution. The Court finds it substantially likely that Hoffman will be able to prove a duration of conscious suffering of 30 to 40 seconds. Thus, the Court concludes that Hoffman has clearly demonstrated that he is substantially likely to prevail in his assertion that nitrogen hypoxia superadds pain and terror as compared to firing squad.

Execution by firing squad has been upheld by the Supreme Court under the Eighth Amendment.[129] The firing squad method of execution is currently approved by five states,[130] and South Carolina most recently utilized this method on March 7, 2025.[131]

---

[125] *Id.*
[126] *Id.*
[127] *Id.* at p. 109.
[128] *Id.* at p. 110.
[129] *Wilkerson v. Utah,* 99 U.S. 130 (1878) (upholding a sentence to death by firing squad imposed by a territorial court, rejecting the argument that such a sentence constituted cruel and unusual punishment). (cited in *Baze*, 553 U.S. at 48, and *Bucklew*, 587 U.S. at 131).
[130] Mississippi, Miss. Code § 99-19-51; Oklahoma, Okla. Stat. tit. 22, § 1014; Utah, Utah Code § 77-18-113; South Carolina, S.C. Code § 24-3-530; and Idaho, Idaho Code § 19-2716.
[131] Jeffrey Collins and Patrick Phillips, *'Violent and sudden': Witness to first SC firing squad execution describes what he saw*, Live 5 WCSC (Mar. 8, 20225, 11:15 AM),

"Point[ing] to a well-established protocol in another State as a potentially viable option" is probative of whether a proposed alternative is acceptable and available.[132] Considering this, there is no legitimate, penological reason why the State has refused to adopt this method of execution. Just as the State modeled its nitrogen hypoxia protocol and procedures after Alabama, it could do the same with the five other states that use firing squad as a method of execution. Chief Operations Offer of the DPSC Seth Smith, ("COO Smith"), testified that the DPSC maintains a supply of firearms and ammunition and has officers trained and skilled in the use of firearms.[133]

The Court finds that Plaintiff has clearly shown a substantial likelihood that (1) making the condemned breath pure nitrogen until dead cruelly superadds pain and suffering to the execution when compared to firing squad; (2) firing squad is "feasible, readily implemented, and in fact significantly reduce[s] a substantial risk of severe pain;"[134] and (3) that the State has failed to adopt firing squad as a method of execution without a legitimate penological reason.

Though Plaintiff satisfies his burden through his first proposed alternative of firing squad, he does not meet this burden with respect to his second proposed alternative of DDMAPh. At the preliminary injunction hearing, Plaintiff called Dr. Charles David Blanke, whom Defendants stipulated was an expert in medical-aid-in-dying and the drugs and methods used in the field.[135] Dr. Blanke testified that DDMAPh is a five-drug cocktail of digoxin, diazepam (commonly known as Valium), amitriptyline, morphine, and

---

https://www.live5news.com/2025/03/08/violent-sudden-witness-first-sc-firing-squad-execution-describes-what-he-saw/.

[132] *Nance v. Ward*, 597 U.S. 159, 165 (2022) (quoting *Bucklew*, 587 U.S. at 140). Again, the Court need not hinge its analysis on the fact that firing squad is not authorized under Louisiana law. *See id.* at 170.

[133] Rec. Doc. 86, p. 160.

[134] *Glossip*, 576 U.S. at 877 (quoting *Baze*, 553 U.S. at 52).

[135] Rec. Doc. 86, p. 133.

phenobarbital.[136] "Most commonly, people ingest the combination of drugs mixed up in some apple juice and/or apple syrup by swallowing it."[137] However, DDMAPh in the execution context would likely involve rectal administration. According to Dr. Blanke, the average time to unconsciousness is 5.8 minutes, and the average time to death is about 96 minutes.[138]

DDMAPh is not a feasible and readily available form of execution in Louisiana. At the hearing, COO Smith testified credibly that drugs used for executions are not available to the State. He testified that "Morris and Dickson and Pfizer, and other drug manufacturers, maybe not in writing, have made it very clear to [the DPSC] that if [it] use[s] any of their medication for a capital punishment case, they reserve the right to pull all of their medication off the table."[139] He went on to explain that the DPSC has an aging population and runs "large infirmaries" and "full-blown hospitals."[140] In short, the DPSC "cannot run the risk of losing access to life-saving drugs . . . ."[141] The Court agrees and finds that DDMAPh is not a feasible and readily available form of execution. Accordingly, Plaintiff has failed to meet his burden with respect to DDMAPh.

The Court concludes that there is a substantial likelihood that Plaintiff will succeed on the merits that nitrogen hypoxia violates the Eighth Amendment's prohibition against cruel and unusual punishment. Plaintiff has shown that nitrogen hypoxia superadds psychological pain, suffering, and terror to his execution when compared to execution by firing squad. He has shown that execution by firing squad is a feasible and readily

---

[136] *Id.* at p. 135.
[137] *Id.*
[138] *Id.* at p. 139.
[139] *Id.* at p. 176–77.
[140] *Id.* at p. 177.
[141] *Id.*

available alternative that the State has no legitimate penological reason for not adopting. Finding that Plaintiff has met his burden as to his facial challenge, the Court need not address his as-applied challenge but notes that there is evidence in the record that execution by nitrogen hypoxia is cruel and unusual as applied to him.[142]

The fact that no method of execution has been violative of the Eighth Amendment does not change the Court's opinion. The Court in *Bucklew* recognized the importance of a full record, noting that "Mr. Bucklew had ample opportunity to conduct discovery and develop a factual record."[143] After three executions, in *Frazier v. Hamm* the Middle District of Alabama recognized that "the longer an inmate remains conscious while breathing in nitrogen during an execution, the more likely it becomes that the Eighth Amendment may be violated."[144]

### B.  *Ex Post Facto* Clause Claim (Count III)

The *Ex Post Facto* Clause of the United State Constitution "forbids . . .  Congress and the States to enact any law 'which imposes a punishment for an act which was not punishable at the time it was committed; or imposes additional punishment to that then prescribed.'"[145] In *Weaver v. Graham*, the Supreme Court discussed its 1915 decision in *Malloy v. South Carolina*[146] and explained that in *Malloy*, a change in the method of execution was "not ex post facto [where] evidence showed the new method to be more humane . . ."[147] In *Sepulvado v. Jindal*, the Fifth Circuit cited *Weaver* and *Malloy* and

---

[142] *See, e.g.*, Rec. Doc. 87, pp. 33–34 (Dr. Bickler's testimony that "for someone like Mr. Hoffman, nitrogen asphyxiation would be a particularly horrible method, a really inhumane choice for an individual who has a history of PTSD."); *id.* at p. 36 ("If someone has an anxiety disorder, the degree of difficulty goes up exponentially.").

[143] *Bucklew*, 587 U.S. at 144.

[144] 2025 WL 361172, at *14.

[145] *Weaver v. Graham*, 450 U.S. 24, 28 (1981) (quoting *Cummings v. Missouri*, 4 Wall. 277, 325–26 (1866)).

[146] 237 U.S. 180 (1915).

[147] *Weaver*, 450 U.S. 32 n.17.

explained that "a post-offense change in a state's execution protocols would violate the ex post facto prohibition *unless* the change in execution method is more humane than the prior method of execution."[148] In *Nelson v. Campbell,* the Supreme Court succinctly explained that there is "no ex post facto violation to change [a] method of execution to [a] more humane method."[149]

The Court agrees with the Defendants that the *Ex Post Facto* claim "rises and falls" on whether execution by nitrogen hypoxia will subject Plaintiff "to an increased punishment [that is] a less humane method of execution than lethal injection, which was his original method of execution." [150]

The method of execution change in this case was from lethal injection to nitrogen hypoxia. The Plaintiff submitted scant evidence comparing the harm of lethal injection to the harm of nitrogen hypoxia. The Plaintiff therefore failed to demonstrate that he is substantially likely to succeed on this claim.

### C.  Right to Counsel and Access to Courts Claim (Count IV)

Hoffman argues that he has a constitutional right to have counsel[151] present at his execution, in order to protect his constitutional right to access the Courts.[152] Citing the Southern District of Ohio, Hoffman argues that he has a right to counsel throughout the execution procedure and during the execution.[153] Hoffman also cites to the Eastern District of Arkansas, the Middle District of Tennessee, and the Sixth and Eighth Circuits

---

[148] 739 F.3d 716, 722 n.5 (5th Cir. 2013).
[149] 541 U.S. 637, 644 (2004) (citing *Weaver*, 450 U.S. at 32–33 n.17).
[150] Rec. Doc. 81, ¶ 114.
[151] Prisoners have a Sixth Amendment right to access to counsel at all "critical" stages of criminal proceedings. *United States v. Wade*, 388 U.S. 218, 227-28 (1967).
[152] Prisoners have a right under the First and Fourteenth Amendments to access to the courts. *See, e.g.*, *Lewis v. Casey*, 518 U.S. 343, 350–51 (1996).
[153] Rec. Doc. 1, ¶ 219; Rec. Doc. 82, ¶ 139 (citing *In re Ohio Execution Protocol Litig.*, No. 11-1016, 2018 WL 6529145, at *4–5 (S.D. Ohio Dec. 12, 2018)).

in support of his position.[154] However, the Fifth Circuit holds that a claim of the right to counsel "during the events leading up to and during the execution" under the First, Sixth, and Eighth Amendment is "without merit."[155] The Fifth Circuit further instructs that "the possibility of "botched executions" that access to counsel could address [to the Courts] . . . fails as well."[156] Under the law of the Fifth Circuit, Plaintiff fails to show a substantial likelihood of prevailing on Count IV.

### D. Balance of Equities and the Public's Interest

The final two elements Plaintiff must satisfy for a preliminary injunction are that the threatened harm (a violation of the Eighth Amendment) outweighs any harm that may result to the State (delay in carrying out a sentence), and that the injunction will not undermine the public interest.[157] These factors may be considered together particularly because "[t]hese factors merge when the Government is the opposing party,"[158] and these two factors overlap considerably.[159] In weighing equities, a court must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief.[160] The public interest factor requires the court to consider what public interests may be served by granting or denying a preliminary injunction.[161]

---

[154] Rec. Doc. 82, ¶¶ 141–45 (citing *McGehee v. Hutchinson*, 463 F. Supp. 3d 870, 925 (E.D. Ark. 2020), *aff'd sub nom. Johnson v. Hutchinson*, 44 F.4th 1116 (8th Cir. 2022); *Coe v. Bell*, 89 F. Supp. 2d 962 (M.D. Tenn. Apr. 3, 2000); and *Coe v. Bell*, 230 F.3d 1357 (6th Cir. 2000)).

[155] *Whitaker v. Collier*, 862 F.3d 490, 501 (5th Cir. 2017).

[156] *Id.* at 467.

[157] *Valley v. Rapides Par. Sch. Bd.*, 118 F.3d 1047, 1051 (5th Cir. 1997).

[158] *Nken v. Holder*, 556 U.S. 418, 435 (2009).

[159] *Texas v. United States*, 809 F.3d 134, 187 (5th Cir. 2015).

[160] *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008).

[161] *Sierra Club v. U.S. Army Corps of Engineers*, 645 F.3d 978, 997–98 (8th Cir. 2011).

The Court finds that the balance of equities and public interest weigh in favor of enjoining Hoffman's March 18, 2025 execution through nitrogen hypoxia until the matter can be resolved at a trial on the merits. The Fifth Circuit holds that an injunction does not disserve the public interest when it prevents constitutional deprivations.[162] Stated another way, injunctions preventing the violation of constitutional rights are "always in the public interest."[163]

The Court is asked to make this important decision on an undeveloped record after an expedited preliminary injunction hearing. Hoffman is going to be executed. It's not a question of if; it's merely a question of how, and the alternatives are quickly narrowing. Louisiana has no readily available electric chair[164] and cannot get the drugs needed for lethal injection.[165] The only viable alternatives appear to be nitrogen hypoxia and firing squad. The State's desire for swiftness does not prevail over well-informed deliberation.

There have been only four executions by nitrogen hypoxia in the United States. These executions were carried out by the state of Alabama between January 25, 2024, and February 6, 2025.[166] On all four occasions, the condemned chose nitrogen hypoxia as their method of execution. In Alabama, "[a] death sentence shall be executed by lethal injection, unless the person sentenced to death affirmatively elects to be executed by

---

[162] *Jackson Women's Health Org. v. Currier*, 760 F.3d 448, 458 n.9 (5th Cir. 2014).
[163] *Id.* at 458 (quoting *Awad v. Ziriax*, 670 F.3d 1111, 1132 (10th Cir. 2012). *See also Ingebretsen on behalf of Ingebretsen v. Jackson Public Sch. Dist.*, 88 F.3d 274, 280 (5th Cir. 1996); *see also, e.g., G & V Lounge, Inc. v. Mich. Liquor Control Comm'n*, 23 F.3d 1071 (6th Cir. 1994); *Charles H. Wesley Educ. Fdn., Inc. v. Cox*, 408 F.3d 1349, 1355 (11th Cir. 2005); *Deerfield Med. Ctr. v. City of Deerfield Beach*, 661 F.2d 328, 338–39 (5th Cir. 1981).
[164] Rec. Doc. 87, p. 15.
[165] Rec. Doc. 86, p. 176–77.
[166] *See Frazier*, 2025 WL 361172, at *3.

electrocution or nitrogen hypoxia."[167] This is in stark comparison to Louisiana, which delegates the method of execution to the discretion of the DPSC Secretary.[168]

The State even refused to make the new nitrogen hypoxia protocol available to the public. The State relented to releasing a redacted protocol to the public until the day before the preliminary injunction hearing.[169] The redacted protocol easily meets the definition of a public record[170] under Louisiana law, yet the State shrouded the redacted protocol in secrecy until the day before the hearing.

The public has an interest in knowing how its government operates. The obfuscation of the protocol by the State is deleterious to the public's interest. The United States Constitution is simply the government's promises to its citizens. The Eighth Amendment is the government's assurance that no citizen will be punished by means that are cruel and unusual. Courts are the arbiter of whether the government honors this promise to her people. It is in the best interests of the public to examine this newly proposed method of execution on a fully developed record. The public has paramount interest in a legal process that enables thoughtful and well-informed deliberations, particularly when the ultimate fundamental right, the right to life, is placed in the government's hands. Accordingly, Plaintiff's Motion for Preliminary Injunction is granted.

---

[167] Ala. Code § 15-18-82.1(a).

[168] La. R.S. § 15:569(A).

[169] Rec. Doc. 70.

[170] *See* La. R.S. § 44:1(A)(2)(a) ("All books, records, writings, accounts, letters and letter books, maps, drawings, photographs, cards, tapes, recordings, memoranda, and papers, and all copies, duplicates, photographs, including microfilm, or other reproductions thereof, or any other documentary materials, regardless of physical form or characteristics, including electronically stored information or information contained in databases or electronic data processing equipment, having been used, being in use, or prepared, possessed, or retained for use in the conduct, transaction, or performance of any business, transaction, work, duty, or function which was conducted, transacted, or performed by or under the authority of the constitution or laws of this state, or by or under the authority of any ordinance, regulation, mandate, or order of any public body or concerning the receipt or payment of any money received or paid by or under the authority of the constitution or the laws of this state, are 'public records', except as otherwise provided in this Chapter or the Constitution of Louisiana.")

## V.    CONCLUSION

Considering the foregoing, Plaintiff's Motion to Reconsider the Court's Denial of his RLUIPA Claim (Count VI) shall be DENIED. Plaintiff's Motion for Preliminary Injunction shall be GRANTED on the Eighth Amendment claim, and Defendants are enjoined from executing Jessie Hoffman on March 18, 2025, using nitrogen hypoxia. Plaintiff's Motion for Preliminary Injunction is DENIED as to Counts III and IV.

Baton Rouge, Louisiana, this <u>11th</u> day of _____ March _____, 2025.


_____
**SHELLY D. DICK**
**CHIEF DISTRICT JUDGE**
**MIDDLE DISTRICT OF LOUISIANA**